IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| IN RE OPANA ER ANTRITRUST LITIGATION | MDL Docket No. 2580 |
|  | Case No. 14 C 10150 |
|  | Judge Harry D. Leinenweber |

<u>MEMORANDUM OPINION AND ORDER</u>

This lawsuit is one of many in the federal courts involving the application of the Supreme Court's decision in *FTC v. Actavis, Inc.,* 133 S.Ct. 2223 (2013), to settlements between branded and generic pharmaceutical manufacturers. In this case, Direct Purchaser Plaintiffs ("DPPs") have brought claims under the Sherman Act, and Indirect, or End-Payor Purchaser Plaintiffs ("EPPs") have brought claims under state antitrust, consumer protection, and unjust enrichment laws. DPPs and EPPs (collectively, the "Plaintiffs") allege that Endo Health Solutions Inc., Endo Pharmaceuticals Inc., Penwest Pharmaceuticals Co. (collectively, "Endo"), and Impax Laboratories, Inc. ("Impax") (collectively, the "Defendants") delayed the entry of generic versions of Opana ER to the Oxymorphone ER Market by entering into an illegal reverse payment agreement to settle ongoing patent infringement litigation between Endo and Impax.

Currently before the Court are two Motions to Dismiss. The Motions seek dismissal of DPPs' First Amended Consolidated Complaint

[ECF No. 118], and EPPs' First Amended Consolidated Complaint [ECF No. 121] under FED. R. CIV. P. 12(b)(6).  For the following reasons, the Motion to dismiss DPPs' First Amended Consolidated Complaint is denied, and the Motion to Dismiss EPPs' First Amended Consolidated Complaint is granted in part and denied in part.

## I.  BACKGROUND

Except where noted, the following facts are contained in both DPPs' and EPPs' Complaints, documents attached to the Complaints, and documents that are referenced in, and critical to, the Complaints. *Geinosky v. City of Chicago,* 675 F.3d 743, 745 n.1 (7th Cir. 2012) (In resolving a motion to dismiss, the court must consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice.").  Plaintiffs' factual allegations are accepted as true for purposes of deciding the motions to dismiss.

### A.  Hatch-Waxman Regulatory Framework

Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers that create a new drug must obtain approval to sell the product by filing a New Drug Application ("NDA").  21 U.S.C. §§ 301-392.  An NDA must include specific data concerning the safety and effectiveness of the drug, as well as information on applicable patents.  *Id.* at § 355(a), (b).  When the Food and Drug Administration ("FDA") approves a brand manufacturer's NDA, the manufacturer may list in the "Approved Drug Products with Therapeutic

Equivalence Evaluations" (commonly known as the "Orange Book") any patents that the manufacturer believes could reasonably be asserted against a generic manufacturer that makes, uses, or sells a generic version of the brand drug. *Id.* at § 355(b)(1). When a brand manufacturer wishes to make changes to a drug that already has an approved NDA, the brand manufacturer must submit a supplemental new drug application ("sNDA") to the FDA. An sNDA is required when a brand manufacturer wishes to change a drug label, market a new dosage strength, or change the way the drug is manufactured.

The Hatch-Waxman Act, enacted in 1984, simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file NDAs. Under the Act's abbreviated regulatory approval process for generic drugs, a generic drug manufacturer may file an Abbreviated New Drug Application ("ANDA") relying on the scientific findings of safety and effectiveness in the brand drug's NDA, and demonstrating that the proposed generic is pharmaceutically equivalent and bioequivalent (together "therapeutically equivalent") to a brand drug. *Id.* at § 355(j)(8)(b).

To obtain FDA approval of an ANDA, a manufacturer must also certify that the generic drug will not infringe any patents listed in the Orange Book. Under the Hatch-Waxman Act, the ANDA must contain one of four certifications: (I) that there are no patents listed in the Orange Book that cover the brand drug; (II) that any Orange Book listed patents have expired; (III) that the generic is not seeking

approval before the expiration of any unexpired patents listed in the Orange Book; or (IV) that any unexpired patents listed in the Orange Book are not infringed, are invalid, and/or are unenforceable (this is commonly referred to as a "Paragraph IV certification"). *Id.* at § 355(j)(2)(A)(vii).

A generic manufacturer must serve notice to the brand company of a Paragraph IV certification because such a certification creates an "artificial act" of patent infringement, permitting the brand company to file a patent infringement suit against the generic manufacturer. 35 U.S.C. § 271(e)(2)(A). If the brand company files suit within 45 days of receiving the Paragraph IV certification, final FDA approval of the generic manufacturer's ANDA is automatically stayed until the earlier of (i) 30 months, or (ii) entry of a district court judgment finding patent invalidity or non-infringement. 21 U.S.C. § 355(j)(5)(B)(iii). During this stay, the FDA may grant "tentative approval" of the generic manufacturer's ANDA if it determines that the ANDA would otherwise qualify for final approval absent the stay. *Id.* at § 355(j)(5)(B)(iv).

As an incentive for generic pharmaceutical companies to challenge suspect patents listed in the Orange Book, the Hatch-Waxman Act grants the first company to file a Paragraph IV ANDA (commonly known as the "first-filer") a 180-day period of generic marketing exclusivity during which time the FDA will not approve a later-filed ANDA for the same brand drug. *Id.* at § 355(j)(5)(B)(iv). During the

180-day period of market exclusivity, the first-filer only competes against the brand manufacturer and potentially any Authorized Generic ("AG") marketed under the brand manufacturer's NDA. *Id.* The start of the 180-day exclusivity period is triggered by the earlier of two events: (1) the first-filer's commercial marketing of a drug product, or (2) a court decision of noninfringement or patent invalidity. *Id.* Only the first-filer can trigger its 180-day exclusivity period via the commercial-marketing trigger. *Id.* at § 355(j)(5)(B)(iv)(I). However, a subsequent Paragraph IV ANDA filer can trigger the first-filer's 180-day exclusivity period via a successful court judgment. *Janssen Pharmaceutical, N.V. v. Apotex, Inc.,* 540 F.3d 1353, 1357 (Fed. Cir. 2008). This 180-day period of exclusivity "can prove valuable, possibly worth several hundred million dollars" to the first-filer. *Actavis,* 133 S.Ct. at 2229.

### B. AB-Rated Generic Drugs

Generic drugs that are "therapeutically equivalent" to their brand counterpart receive an "AB" rating from the FDA. This means that the generic and brand drugs have the same active ingredient, form, dosage, strength, and safety and efficacy profile. An AB-rated generic may be automatically substituted at the pharmacy counter for the brand drug. Today, all 50 states and the District of Columbia have drug substitution laws to further encourage generic competition. *New York ex rel. Schneiderman v. Actavis PLC,* 787 F.3d 638, 644-45 (2d Cir. 2015). Although the specific terms of these laws vary by

state, drug substitution laws either permit or require pharmacists to dispense an AB-rated generic drug in place of a brand drug, absent the prescribing physician's contrary instructions. *Id.*

Because an AB-rated generic drug may be automatically substituted for the brand drug, once the generic drug hits the market, it quickly captures sales from the brand drug, often capturing 80% or more of the brand sales within the first six months. DPP Complaint ("DPC") ¶ 46; EPP Complaint ("EPC") ¶ 36. Within a year of a generic drug's entry in the market, on average, the generic obtains about 90% of the brand drug sales, and the price of the drug typically drops by 85%. DPC ¶ 46; EPC ¶ 38.

### C. Endo-Impax Patent Litigation

Until early spring of 2012, Defendant Endo manufactured Opana ER, an extended release form of oxymorphone hydrochloride marketed for the relief of moderate to severe pain. DPC ¶ 73; EPC ¶ 1. Endo's NDA for Opana ER was approved by the FDA on June 22, 2006, and Endo launched the product the following month. DPC ¶ 74; EPC ¶ 84. At the time, Endo only had three years of regulatory protection from generic competition for Opana ER because the patent on the active ingredient in Opana ER (oxymorphone hydrochloride) had expired decades earlier. Knowing this, Endo purchased the rights to four patents — U.S. Patent No. 5,128,143 (the "143 patent"), No. 5,958,456 (the "'456 patent"), No. 5,662,933 (the "'933 patent"), and No. 7,276,250 (the "'250 patent") (collectively, the "Penwest

Patents") — that could be used to block generic entry beyond those three years. DPC ¶¶ 70, 71, 76; EPC ¶¶ 79, 80. Endo then listed the '143 patent in the Orange Book as covering Opana ER, and later added the '456 and '933 patents. DPC ¶¶ 85, 87; EPC ¶ 87.

In November of 2007, Impax filed an ANDA seeking to market a generic version of Opana ER, and submitted a Paragraph IV certification stating that the Penwest Patents were not valid and/or would not be infringed by Impax's generic. DPC ¶¶ 40-44, 88, 93; EPC ¶ 92. On January 25, 2008, Endo sued Impax over the 456 and 933 patents, triggering the 30-month stay. DPC ¶¶ 39, 92, 156; EPC ¶¶ 51, 94. Other generic companies later filed ANDAs seeking to market generic versions of Opana ER before the expiration of the Penwest Patents, and Endo sued each for alleged patent infringement. DPC ¶¶ 99-125; EPC ¶¶ 101-127. Because Impax was the first-filer for the 5, 10, 20, 30, and 40 mg strengths of Opana ER, it was entitled, upon obtaining FDA approval, to 180 days of exclusivity for those strengths as against the other ANDA filers. DPC ¶¶ 40-44, 93, 96; EPC ¶¶ 53, 95, 98. Thus, by filing suit and delaying Impax's entry for 30 months, Endo delayed all generics from launching 5, 10, 20, 30 and 40 mg strengths of generic Opana ER.

On May 13, 2010, a month before the 30-month stay was set to expire, the FDA tentatively approved Impax's ANDA for all strengths of Opana ER. DPC ¶¶ 39, 212; EPC ¶¶ 51, 133. This meant that, upon the expiration of the 30-month stay on June 14, 2010, Impax was free

to make an "at-risk" launch of its generic without waiting for the trial court's final ruling in the Impax patent litigation. But, for whatever reason, Impax agreed not to launch its generic through the last day of trial. DPC ¶ 214; EPC ¶ 135. The trial began on June 3, 2010, and proceeded for two days. DPC ¶ 129; EPC ¶ 138. On June 8, 2010, Endo and Impax settled. DPC ¶ 131; EPC ¶ 141.

### D. Endo-Impax Settlement

The Endo-Impax Settlement consisted of two agreements entered into simultaneously: (1) the Settlement and License Agreement ("SLA"), and (2) the Development and Co-Promotion Agreement ("DCA"). DPC ¶ 132; EPC ¶¶ 148, 150. Under the SLA, Impax agreed to delay its launch of generic Opana ER until the earlier of: (i) January 1, 2013, (ii) thirty days after a non-appealable federal court decision finding that Endo's patents were invalid or not infringed, or (iii) Endo's withdrawal of its patents from the Orange Book. SLA § 3.2. Impax further agreed to refrain from challenging the validity or enforceability of the '933 and '456 patents, as well as the '250 patent, which Endo had not even accused Impax of infringing. SLA § 3.3. In return, Endo covenanted not to sue Impax on, and granted Impax a license as to, any then-existing or subsequently obtained patents relating to Opana ER. *Id.* at § 4.1(a),(b). Additionally, Endo agreed to refrain from launching an AG version of Opana ER during Impax's 180-day exclusivity period ("No-AG Agreement"). *Id.* at § 4.1(c).

The SLA was also structured so that, depending on the volume of Opana ER sales at the time Impax's generic entered the market, one of three things would occur. First, if at the time Impax entered the market, sales of Opana ER had declined below a certain threshold defined in the SLA, Endo was required to pay Impax under the "Endo Credit" provision. *Id.* at § 4.4. The amount of the Endo Credit payment depended on the amount of decline in Opana ER sales — the greater the decline in sales, the larger the payment required under the Endo Credit provision. *Id.* Second, if Opana ER sales exceeded a certain threshold defined in the SLA by the time Impax entered the market, then Impax was required to pay Endo a 28.5% royalty on Net Sales of Impax's generic under the Royalties provision. *Id.* at § 4.3. Finally, if sales of Opana ER remained somewhere between the Endo Credit and the Royalties threshold amounts, neither party was required to pay anything.

The other aspect of the Endo-Impax Settlement was the DCA, which resulted in a $10 million cash payment from Endo to Impax. DCA § 3.1. Under the DCA, Endo and Impax agreed to work together on the development and promotion of a drug for the treatment of Parkinson's disease. *Id.* at § 2.1. Among other things, Endo agreed to support the product's development through a $10 million up-front payment, and to make additional future payments to Impax if Impax successfully completed various clinical and commercial milestones. *Id.* at §§ 3.1, 3.2, 3.3. In return, Endo received an exclusive license to promote

the product to non-neurologists in the United States. *Id.* at §§ 2.1, 2.2. Endo also received the right to keep between 75% and 100% of the profits from the sale of the drug to non-neurologists in the United States. *Id.* at § 3.4. Endo paid Impax the $10 million cash payment, but no other payments have been made pursuant to the DCA. DPC ¶ 152; EPC ¶ 152.

## E. Aftermath

One month after Endo settled with Impax, on July 7, 2010, Endo filed an sNDA for the approval of a crush resistant formula of Opana ER ("Opana ER CRF"). DPC ¶¶ 176-77; EPC ¶¶ 145-46. Endo purportedly made this switch to Opana ER CRF for patient safety reasons, because the crush resistant formula was less prone to abuse. DPC ¶ 182; EPC ¶ 170. But the FDA found insufficient evidence to conclude that Opana ER had an increased potential for abuse compared to Opana ER CRF. DPC ¶ 182; EPC ¶¶ 173-178. Plaintiffs allege that Endo made this switch in anticipation of the market erosion for branded Opana ER that would result from the ultimate launch of Impax's generic.

Despite the lack of evidence supporting Endo's purported reasons for the switch to the new crush resistant formula, the FDA nonetheless approved Endo's sNDA for Opana ER CRF on December 9, 2011. DPC ¶ 179; EPC ¶ 147. By May 2012, Endo had ceased manufacturing Opana ER and shifted its marketing efforts to Opana ER CRF. DPC ¶ 180; EPC ¶ 169. Opana ER CRF sales quickly replaced the vast majority of the sales of Opana ER. DPC ¶ 186; EPC ¶ 183. By

July of 2012, Endo publically reported that 90% of Opana ER sales had moved to Opana ER CRF.  DPC ¶ 146 n.30; EPC ¶ 183.

Because of Endo's market shift from Opana ER to Opana ER CRF, by the time Impax's generic entered the market in line with the terms of the Endo-Impax Settlement Agreement, in January 2013, sales of Opana ER had declined below the threshold defined in the SLA, triggering the Endo Credit provision.  The amount Endo was required to pay Impax under the Endo Credit was determined based on the sales of Opana ER in the quarter immediately prior to the launch of Impax's generic — the lower the brand Opana ER sales, the higher the Endo Credit payment. SLA § 1.1; DPC ¶ 140; EPC ¶ 184.  Ultimately, in April of 2013, Endo paid Impax $102,049,000 pursuant to the Endo Credit provision.  DPC ¶ 7; EPC ¶ 184.  Moreover, because the FDA did not determine Opana ER and generic versions thereof to be AB-rated equivalents of Opana ER CRF, generic versions of Opana ER, like Impax's generic, were not automatically substitutable, and were therefore unable to capture the sales of Opana ER CRF.   DPC ¶¶ 178, 189; EPC ¶¶ 167, 211.  Without generic competition, Endo was able to sell Opana ER CRF at supracompetive prices.  DPC ¶ 185; EPC ¶¶ 8, 10.

## II.  <u>LEGAL STANDARD</u>

A motion to dismiss for failure to state a claim under Rule 12(b)(6) challenges the legal sufficiency of a complaint. *Hallinan v. Fraternal Order of Chi. Lodge No. 7,* 570 F.3d 811, 820 (7th Cir. 2009).  A complaint must contain "enough facts to state a

claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). When considering a Rule 12(b)(6) motion to dismiss, the Court accepts the plaintiff's allegations as true, and analyzes those facts in the light most hospitable to the plaintiff's theory, drawing all reasonable inferences for the plaintiff. *Camasta v. Jos. A. Bank Clothiers, Inc.,* 761 F.3d 732, 736 (7th Cir. 2014).

Stating a Sherman Act claim merely requires enough facts taken as true to suggest that an agreement was made. *Twombly,* 550 U.S. at 556. "Asking for plausible grounds to infer an agreement does not impose a probability requirement . . . it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [an] illegal agreement." *Id.* But in analyzing a motion to dismiss, the Court need not accept as true "legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Brooks v. Ross,* 578 F.3d 574, 581 (7th Cir. 2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)) (internal quotations and alterations omitted).

## III. **ANALYSIS**

Plaintiffs' claims arise out of the Supreme Court's opinion in *FTC v. Actavis,* which decided whether it is illegal for a brand-name company to provide a payoff to a potential generic competitor, to keep it from entering the market earlier than it otherwise might have. *FTC v. Actavis,* 133 S.Ct. at 2223. In *Actavis,* a

- 12 -

pharmaceutical company, Company A, had FDA approval to market a brand name drug, and held the related patent. *Id.* at 2229. Two other pharmaceutical companies, Companies B and C, filed ANDAs containing Paragraph IV certifications suggesting that the generics Company B and Company C intended to market did not infringe Company A's patent. *Id.* A fourth would-be generic manufacturer, Company D, agreed with Company C to share certain litigation costs and related profits. *Id.* Predictably, Company A initiated patent infringement litigation against Companies B and C, triggering the 30-month stay under the Hatch-Waxman Act. *Id.* Later, Companies A, B, C and D entered into a settlement agreement. *Id.* Pursuant to the agreement, Companies B, C and D agreed to delay the market entry of their generics for approximately nine years. *Id.* In exchange, Company A paid Companies B, C and D several hundred million dollars. *Id.* The Federal Trade Commission ("FTC") brought antitrust claims against all four companies, alleging that they had conspired to restrain trade when Companies B, C and D agreed to share in Company A's monopoly profits by accepting payment in exchange for agreeing not to compete.

The district court dismissed the FTC's antitrust claims on grounds that the agreement between Companies A, B, C and D did not exceed the scope of the underlying patent and therefore could not be treated as an agreement to restrain trade. *In re AndroGel Antitrust Litig. II,* 687 F.Supp.2d 1371, 1377-79 (N.D. Ga. 2010). The district court reasoned that Company A's patent gave Company A the exclusive

right to manufacture and sell the product in question, and the agreement merely prohibited the generic manufacturers from marketing an identical product. *Id.* at 1377. The Eleventh Circuit affirmed on the same grounds. *F.T.C. v. Watson Pharms., Inc.*, 677 F.3d 1298, 1312 (11th Cir. 2012) ("[A]bsent sham litigation or fraud in obtaining the patent, a reverse payment settlement is immune from antitrust attack so long as its anticompetitive effects fall within the scope of the exclusionary potential of the patent.").

The Supreme Court reversed the Court of Appeals. The Court noted that it is unusual for the patentee to pay a purported infringer when the latter has no pending damages claim, and concluded that settlement agreements structured in this manner may raise antitrust concerns. *See,* 133 S.Ct. at 2237–38. Specifically, the Court held that a reverse settlement payment, that is, a payment by a patentee to a claimed infringer, may be a restraint of trade under a "rule of reason" analysis when the payment is large and unjustified. *Id.* at 2230, 2237–38. In so holding, the Court rejected the lower courts' "scope of the patent" test, which immunized reverse payments from antitrust challenge so long as the settlement allowed generic entry before the expiration of the challenged patent. *Id.* at 2230. Instead, the Court explained that the "likelihood of a reverse payment bringing about anticompetitive effects depends upon its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might

represent payment and the lack of any other convincing justification." *Id.* at 2237.

This decision, the Court made clear, was not intended to disturb other well-recognized forms of settlement. For example, antitrust concerns do not arise from settlements where the patentee simply allows the claimed infringer to enter the market before the patent expires and where the patentee pays the litigation costs of its adversary. *Id.* at 2237. Nonetheless, under *Actavis,* a reverse payment that is large and unjustified — when analyzed with reference to traditional settlement considerations — may have the potential to work anticompetitive harm. *Id.* at 2237.

Following the Court's lead in *Actavis,* Plaintiffs allege that the Endo-Impax Settlement contained a large and unjustified reverse settlement payment that satisfies a "rule of reason" analysis. Defendants, in their Motions to Dismiss DPPs' and EPPs' Complaints, make four broad arguments: (1) the Endo Credit and the No-AG Agreement were not reverse payments; (2) the Endo Credit and No-AG Agreement were not large; (3) the DCA payment was not large or unjustified; and (4) Plaintiffs have failed to allege antitrust injury. Additionally, Defendants argue that EPPs' state law allegations should all be dismissed for failure to state a claim. The Court will discuss each argument in turn.

## A. Reverse Payments

The first inquiry under *Actavis* is whether Plaintiffs have sufficiently pleaded that the consideration paid by Endo to Impax constitutes a "reverse payment." If they have not done so, their antitrust claims fail, and the Court need not go any further. Plaintiffs allege that the Endo-Impax Settlement included a reverse payment — which was made up of the Endo Credit, the No-AG Agreement, and the DCA — for Impax's agreement not to introduce its generic into the market until January 1, 2013 (32 months after the FDA tentatively approved Impax's ANDA).

Defendants argue that the Endo Credit was not a reverse payment because: (1) no money was exchanged at the time the SLA was signed; (2) the Endo Credit provision did not *require* Endo to pay Impax at a future date; (3) under the Royalties provision, there was a chance Impax would be required to pay Endo; and (4) the type and amount of payment to be made under the SLA was conditioned on future events unknown at the time the Settlement Agreement was entered. Defendants also argue that the No-AG Agreement was not a reverse payment to Impax because Endo did not agree under this provision to refrain from competing with Impax, and therefore the No-AG Agreement did not have value to Impax.

Plaintiffs urge the Court to look at the agreement as a whole and acknowledge the economic reality of the relevant transaction. In this regard, Plaintiffs argue that the contingency of the payment

does not insulate it from antitrust scrutiny. Specifically, Plaintiffs allege that the economic reality of the SLA was plain: it insured that Impax would receive a large reverse payment in exchange for staying off the market either through the Endo Credit if sales of Opana ER dropped, or through the No-AG Agreement if sales of Opana ER remained steady after two-and-one-half years. Plaintiffs argue that even if Impax had been required to pay Endo under the Royalties provision, Impax would still have received significant value through the Settlement. This is because the Royalties provision was only triggered if sales of Opana ER rose by a predefined amount. If this rise in sales occurred, then when Impax entered the market with its generic, there would be more Opana ER sales for it to capture, and Endo's promise not to compete through an AG during Impax's 180-day exclusivity period would become even more valuable.

The Court agrees with Plaintiffs that it is improper to view the components of the Endo-Impax Settlement in isolation. *See, e.g., In re Niaspan Antitrust Litig.,* 42 F.Supp.3d 735, 752 (E.D. Pa. 2014) ("[T]he Licensing Agreement must be read in conjunction with the Co-Promotion and Manufacturing Agreements executed that same day."). When looked at from this perspective, Plaintiffs' allegation that the Endo Credit and No-AG Agreement were "Two Sides of the Same (Reverse Payment) Coin" is plausible and persuasive. Plaintiffs allege that Endo and Impax drafted a sophisticated agreement, and acknowledging that the future was largely unpredictable, included multiple

contingencies to account for possible market changes and ensure that Impax received payment for delaying the entry of its generic into the market. Although the form and amount of that payment were contingent on future occurrences, taking the Plaintiffs' allegations as true, it was certain at the time of the Endo-Impax Settlement that Impax would receive anywhere from $33 to $49 million under the No AG-Agreement and an additional $10 million under the DCA.

Moreover, the Court finds Defendants' argument regarding the No-AG Agreement unpersuasive. Although it may be true that Endo was free to compete with Impax in other areas of the market, that does not change the fact that the No-AG Agreement was a payment, possibly of great monetary value to Impax as the first-filing generic.

A "payment" is defined as the "[p]erformance of an obligation by the delivery of money *or* some other valuable thing accepted in partial or full discharge of the obligation." *Black's Law Dictionary* (10th ed. 2014). In *Actavis,* the Supreme Court recognized generally that the 180–day exclusivity period is "possibly 'worth several hundred million dollars,'" and may be where the bulk of the first-filer's profits lie. *Actavis,* 133 S.Ct. at 2229 (quoting C. Scott Hemphill, *Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem,* 81 N.Y.U. L.Rev. 1553, 1579 (2006)). At the same time, Endo's commitment not to produce an AG means that it gave up the valuable right to capture profits in the new two-tiered market. As such, the No-AG Agreement transferred the profits Endo

would have made from its AG to Impax — plus potentially more, in the form of higher prices, because it enabled Impax to have a generic monopoly instead of a generic duopoly. *See, King Drug Co. of Florence v. Smithkline Beecham Corp.,* 791 F.3d 388, 405 (3d Cir. 2015). Thus, even though Endo was free to compete with Impax in other areas, by agreeing not to launch an AG during Impax's 180-day exclusivity period, Endo conveyed significant value to Impax.

Therefore, Plaintiffs have sufficiently alleged that the Endo-Impax Settlement contained a reverse payment. The Court now considers whether this reverse payment was large and unjustified.

### B.  Large and Unjustified

Defendants argue that (1) Plaintiffs fail to establish that the Endo Credit and the No-AG Agreement were large payments, and (2) the $10 million up-front payment under the DCA was neither large nor unjustified. Again, Defendants choose to assess the components of the Endo-Impax Settlement in piecemeal fashion and argue that each individual payment fails to rise to the level of a large and unjustified payment. The Court disagrees with this approach. Instead, the Court must determine whether, when taken as a whole, the total payment Impax received under the SLA, No-AG Agreement and DCA was large and unjustified.

A "large" payment is anything more than the value of the avoided litigation costs plus any other services provided from the generic to the brand manufacturer. *In re Lipitor Antitrust Litig.,* 46 F.Supp.3d

523, 543 (D.N.J. 2014). A payment is justified when it reflects "traditional settlement considerations, such as avoided litigation costs or fair value for services." *Actavis,* 133 S.Ct. at 2236. Such payments do not raise the "concern that a patentee is using its monopoly profits to avoid the risk of patent invalidation or a finding of noninfringement." *Id.* The burden is on the defendant to "show in the antitrust proceeding that legitimate justifications are present, thereby explaining the presence of the challenged term and showing the lawfulness of that term under the rule of reason." *Id.* Thus, at the motion to dismiss stage, a plaintiff need only plausibly plead that a large payment was made and that any such payment is not explained by traditional settlement considerations. *Id.*

Defendants note correctly that Plaintiffs have not attempted to assign dollar values with significant precision to the various provisions of the Settlement Agreement. This is among the stronger of Defendants' arguments. Some other courts interpreting *Actavis* have held that pleading an estimate of the total monetary value and a reliable foundation for that value are necessary to establish the plausibility required by Rule 12(b)(6). *See, e.g., In re Effexor XR Antitrust Litig.,* No. 3:11–CV–5479 PGS, 2014 WL 4988410 (D.N.J. Oct. 6, 2014); *Lipitor Antitrust Litig.,* 46 F.Supp.3d at 542. While sharing the concerns expressed by those courts and agrees that a plaintiff must provide at least a rough estimate of the value of the reverse payment and anticipated litigation costs, the Court is also

aware that a precise valuation may require discovery, as it will likely depend on evidence in Defendants' exclusive possession and on expert analysis. *In re Aggrenox Antitrust Litig.,* 94 F.Supp.3d 224, 244 (D. Conn. 2015).

That being said, Plaintiffs have provided an estimate of the total monetary value of the Endo-Impax Settlement and some basis for this valuation. Specifically, DPPs estimate that the minimum cash value of the Settlement Agreement was approximately $59 million — $49,067,032 for the No-AG Agreement plus an additional $10 million under the DCA. DPC ¶ 148. To reach this estimate, DPPS rely on the formula in the SLA used to calculate the payment under the Endo Credit provision, which they contend was designed to capture the value to Impax of the No-AG Agreement during the 180-day exclusivity period, based on peak Opana ER sales. DPC ¶¶ 140-148. EPPs estimate the value of the No-AG Agreement to be between $33 and $49 million, plus the additional $10 million under the DCA, making their total estimated value of the Settlement Agreement between $43 and $59 million. EPC ¶ 155. EPPs rely on IMS data to approximate Opana ER sales over the 180-day exclusivity period, and then estimate that the value of the No AG-Agreement was a fraction of that amount "depending on reasonable assumptions and methodologies used." EPC ¶ 155.

Although not perfect, the Court cannot conclude simply from the absence of precise figures that the pleadings represent formulaic recitations of elements and allegations that fail to rise above the

speculative. On the contrary, the complaints make specific allegations about the terms of the settlement and their relative value that are plausible on their face. Whether Plaintiffs can substantiate those allegations may be an issue for summary judgment or trial, but for purposes of the motions to dismiss, the allegations are sufficient.

DPPs allege that the median cost of an entire patent litigation with more than $25 million at stake is approximately $5 million. DPC ¶ 149. Plaintiffs allege that the amount of litigation costs saved by Endo would have been a small fraction of this since the litigation had already proceeded to trial before ultimately reaching settlement. DPC ¶ 149; EPC ¶ 161. Thus, even the most conservative estimate of the value of the reverse payment in the Endo-Impax Settlement — $33 million — is large in comparison to the value of the avoided litigation costs. Therefore, the Court concludes that Plaintiffs sufficiently pleaded the existence of a large reverse payment under *Actavis*.

Plaintiffs allege that this large payment was unjustified because it did not reflect traditional settlement considerations. Specifically, Plaintiffs argue that the payment was much larger than any saved litigation costs and was not in exchange for other services. As discussed above, Plaintiffs' allegations, if taken as true, support the conclusion that this payment was significantly larger than any litigation costs Endo and Impax may have saved by

settling so late in the game. Moreover, despite their attempts, Defendants cannot justify the $10 million upfront payment under the DCA as being made in exchange for "other services provided from the generic to the brand manufacturer." This is because the DCA guaranteed Impax the $10 million payment even if Impax did not manufacture the drug or the drug did not gain FDA-approval.

Thus, Plaintiffs have met their *prima facie* burden, and going forward, the burden shifts to Defendants to offer pro-competitive justifications for the reverse payment. *Id.* at 245. But such justifications, as with any affirmative defense, cannot be resolved on a motion to dismiss unless the facts establishing the defense are clear on the face of Plaintiffs' Complaint. *Cf. Jones v. Bock,* 549 U.S. 199, 215 (2007); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.,* No. CV 14-MD-02503-DJC, 2015 WL 5458570, at *7 (D. Mass. Sept. 16, 2015).

Defendants argue that the Endo Credit and No-AG Agreement were a "carrot" and "stick" intended to reasonably balance the parties' economic incentives by (1) enticing Endo to continue making robust sales of Opana ER prior to Impax's licensed entry date and (2) disincentivizing Endo from taking actions that could lead to a significant decrease in sales of Opana ER before Impax launched. This justification is certainly plausible, but the facts establishing it are not clear on the face of Plaintiffs' Complaints or from the SLA itself. Essentially, Plaintiffs and Defendants have raised two

starkly contrasting characterizations of the provisions of the SLA, both of which are believable. But to find Defendants' justification to establish conclusively that the payment under the SLA was made for procompetitive reasons, the Court would need to make inferences from the allegations in the complaints in Defendants' favor, which is contrary to the motion to dismiss standard. *See, Phelan v. City of Chicago,* 347 F.3d 679, 681 (7th Cir. 2003) (In reviewing a motion to dismiss a court "must draw all reasonable inferences in favor of the non-movant."). Therefore, the Court concludes that Plaintiffs have pleaded sufficiently that the reverse payment was large and unjustified.

## C. Antitrust Injury

Defendants contend that even if Plaintiffs have alleged sufficiently the existence of a large and unjustified reverse payment from Endo to Impax, the Complaints must still be dismissed because Plaintiffs have failed to allege plausibly that this reverse payment caused injury to competition and to Plaintiffs themselves. Defendants argue that there is no allegation of actual injury, because there is no plausible allegation of actual delay of the entry of a generic into the Oxymorphone ER Market. Specifically, under Defendants' theory, Plaintiffs must allege facts to show that, but for the Endo-Impax Settlement, Impax would have *lawfully* launched a generic version of Opana ER before January 1, 2013. However

logically compelling that argument may be in isolation, it is at odds with the Supreme Court's reasoning in *Actavis*.

By requiring Plaintiffs to plead that Impax would have been able to lawfully launch its generic, Defendants essentially contend that Plaintiffs must plead that the Endo patents would ultimately have been invalidated or found uninfringed. In doing so, Defendants favor a rule that requires litigating the patents' merits — at least in some abbreviated fashion — in order to determine whether the settlement violates antitrust law. But the Supreme Court in *Actavis* expressly disclaimed this line of analysis:

> [I]t is normally not necessary to litigate patent validity to answer the antitrust question . . . . An unexplained large reverse payment itself would normally suggest that the patentee has serious doubts about the patent's survival. And that fact, in turn, suggests that the payment's objective is to maintain supracompetitive prices to be shared among the patentee and the challenger rather than face what might have been a competitive market — the very anticompetitive consequence that underlies the claim of antitrust unlawfulness.

*Actavis,* 133 S. Ct. at 2236. The Court made clear that the anticompetitive harm is not that the patent surely would have been invalidated if not for the settlement, and that a generic therefore surely would have entered the market at an earlier date. If that were the standard, a determination of a patent settlement's lawfulness under antitrust law would require the very same patent litigation that the settlement avoided.

Instead, the anticompetitive harm, under *Actavis,* is that the reverse-payment settlement "seeks to prevent the risk of competition." *Id.* Plaintiffs need not plead (or prove) the weakness of the Endo patents, because the patent's ultimate validity is not at issue. Rather, "they must plead facts sufficient to infer (and they must ultimately prove, within the rule-of-reason framework) that a large and otherwise unjustified reverse payment was made as part of the settlement in order to shore up some perceived risk" of competition. *Aggrenox Antitrust Litig.,* 94 F.Supp.3d at 240.

Plaintiffs contend that Endo used this large payment to buy itself freedom from generic competition. Plaintiffs allege but for Endo's unlawful and large reverse payment, Impax would have launched its generic earlier than it finally did either: (a) "at-risk" (that is, while the patent litigation was still pending); (b) after winning the patent suit; or (c) via a lawful settlement agreement that provided for an earlier Impax entry date without a large reverse payment from Endo to Impax. Instead of this occurring, Plaintiffs contend that Endo and Impax – competitors – conspired to allocate the Oxymorphone ER Market in a manner that gave each company more exclusivity than it was lawfully entitled to in order to maximize profits at the expense of Plaintiffs and consumers.

Plaintiffs further allege that Endo used that market exclusivity to further stifle generic competition by switching the market to its new formulation, Opana ER CRF. Plaintiffs allege that the reverse

payment was designed to, and did in fact: (a) delay the entry of Impax and other less expensive, AB-rated generic versions of Opana ER; (b) fix, raise, maintain or stabilize the price of brand and generic versions of Opana ER; (c) allow Endo to make Opana ER CRF, and to make sales that otherwise would have gone to less expensive generic Opana ER; and (d) allocate nearly 100% of the Oxymorphone ER Market to Endo for at least two and one-half years. Finally, Plaintiffs contend that Impax ensured it received full compensation for agreeing not to compete and ceding most of the sales to Endo's new formulation. Plaintiffs allege that the Endo-Impax Settlement Agreement worked to guarantee that Impax would get paid for staying off the market, whether or not Endo switched the market to Opana ER CRF: if Endo did not switch the prescription base, Impax would get paid through the valuable No-AG Agreement; if Endo did switch the prescription base, Impax would get cash plus the less valuable No-AG Agreement.

These allegations, if true, raise a reasonable expectation that discovery will reveal sufficient evidence to prove the large reverse payment was made to prevent competition on various fronts. *Aggrenox Antitrust Litig.,* 94 F.Supp.3d. at 245-46. Therefore, the Court concludes that Plaintiffs have stated a viable claim under *Actavis.* The Court denies Defendants' Motion to Dismiss DPPs' Complaint.

For the same reasons, the Court also denies Defendants' Motion to Dismiss EPPs' Complaint for failure to state an antitrust cause of

action under *Actavis*.   The Court now turns to Defendants' Motion to Dismiss EPPs' various state law claims.

### D.  EPPs' State Law Claims

EPPs have brought state antitrust claims under the laws of 28 jurisdictions, EPC ¶¶ 256, 265, 273, state consumer protection claims under the laws of four additional jurisdictions, *id.* at ¶ 279, and unjust enrichment claims in the combined 32 jurisdictions, *id.* at ¶¶ 93-94.  Defendants contend that all of EPPs' state law claims must be dismissed because: (1) EPPs lack Article III standing to bring state law claims in ten jurisdictions; (2) EPPs lack standing under *Illinois Brick* to bring antitrust claims in three states; (3) the claims under ten state antitrust laws are defective for various other reasons; (4) EPPs have failed to state valid claims under state consumer protection laws; and (5) EPPs have failed to state a valid claim for unjust enrichment.   The Court will address briefly each argument.

### 1.  *Article III Standing*

Defendants argue that EPPs' claims in District of Columbia, Maine, Nebraska, New Hampshire, New Mexico, North Dakota, Oregon, Puerto Rico, South Dakota, Utah, and Vermont must be dismissed because EPPs have failed to allege any connection whatsoever with those jurisdictions, and therefore lack standing to bring those claims under Article III of the Constitution. Plaintiffs argue that

Defendants are attempting to create a class action standing barrier that exceeds the requirements of Article III.

To establish standing under Article III, a plaintiff must show (1) that he has suffered (or is imminently threatened with) a concrete and particularized "injury in fact," (2) that is fairly traceable to the challenged conduct, and (3) that is likely to be redressed by a favorable judicial decision. *Johnson v. U.S. Office of Pers. Mgmt.,* 783 F.3d 655, 660 (7th Cir. 2015) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)). Essentially, Defendants argue that because EPPs have not established that the named plaintiffs have a connection with these ten jurisdictions, they have failed to allege injury-in-fact as to those claims. It is true that injury is a prerequisite to standing. But Article III's injury-in-fact requirement "has nothing to do with the text of the statute relied upon." *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 97 (1998). As long as one member of the class has a plausible claim to have suffered an injury that is fairly traceable to the challenged conduct and likely to be redressed by a favorable decision, the requirements of Article III standing are satisfied. *Kohen v. Pac. Inv. Mgmt. Co. LLC,* 571 F.3d 672, 676 (7th Cir. 2009).

EPPs have satisfied the requirements of Article III. EPPs contend that Defendants alleged anticompetitive conduct caused EPPs injury by delaying market entry of generic Opana ER and forcing plaintiffs to pay supracompetitive prices. Further, EPPs seek

damages for their state law claims, so a favorable decision will redress their injury. A greater showing is not required at this stage of the proceedings. Whether the named plaintiffs "may assert the rights of absent class members is neither a standing issue nor an Article III case or controversy issue but depends rather on meeting the prerequisites of Rule 23 governing class actions." *Lewis v. Casey,* 518 U.S. 343, 395–96 (1996) (Souter, J., concurring in part, dissenting in part, and concurring in the judgment) (alterations and internal quotation marks omitted); *Arreola v. Godinez,* 546 F.3d 788, 795 (7th Cir. 2008) (analyzing named plaintiff's standing as a separate inquiry from his entitlement to relief or ability to satisfy the criteria of Rule 23). The Court denies Defendants' Motion to Dismiss EPPs' claims for lack of standing. The suitability of the named plaintiffs as representatives of the class will be addressed at the class certification stage.

### 2. Illinois Brick

This case is rendered much more complicated by the rules of *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977), and *California v. ARC America Corp.,* 490 U.S. 93 (1989). In the former case, the Supreme Court held that only the overcharged direct purchaser, and no one else in the chain of distribution, can recover damages under federal antitrust law, *Illinois Brick,* 431 U.S. at 746; in the latter, the Supreme Court held that the "indirect-purchaser rule" does not prevent indirect purchasers from recovering damages under

state antitrust laws where the state laws otherwise allow it, *ARC America,* 490 U.S. at 101.   Many states have passed so-called "*Illinois Brick* repealer statutes" in response to the Court's decision in *ARC America Corp.*   Other states continue to follow the rule of *Illinois Brick,* and deny recovery to indirect purchasers under their states' antitrust laws.   Defendants argue that Illinois and Puerto Rico are *Illinois Brick* jurisdictions, and that Rhode Island was too until it passed an *Illinois Brick* repealer statute in 2013, which Defendants argue should not be applied retroactively. EPPs dispute Defendants' interpretation of the laws of these states.

### a.   Illinois

Defendants argue that under the Illinois Antitrust Act only the Illinois Attorney General may bring a class action asserting indirect purchaser antitrust claims.   *See,* 740 ILCS 10/7(2). Defendants note that courts have dismissed indirect purchaser class action claims asserted in federal court under Illinois law for this reason.   *See, e.g., In re Nexium Antitrust Litig.,* 968 F.Supp.2d 367, 408-09 (D. Mass. 2013) (applying the attorney general restriction to bar an indirect purchaser class action in federal court); *In re Flonase Antitrust Litig.,* 692 F.Supp.2d 524, 539 (E.D. Pa. 2010) ("In this case, Plaintiffs are prohibited from asserting claims under the Illinois Antitrust Act, because the Act does not provide relief to indirect purchasers through class actions.").

EPPs rely on *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,* 559 U.S. 393 (2010), to argue that Illinois cannot limit Rule 23's class action procedure. But this argument has been repeatedly rejected by the courts. *See, e.g., In re Wellbutrin XL Antitrust Litig.,* 756 F.Supp.2d 670, 677 (E.D. Pa. 2010) ("The Illinois restrictions on indirect purchaser actions are intertwined with Illinois substantive rights and remedies . . . [such that] application of Rule 23 would 'abridge, enlarge or modify' Illinois' substantive rights, and therefore Illinois' restrictions on indirect purchaser actions must be applied in federal court."). The Court agrees with the analysis in *Wellbutrin.* Under *Shady Grove,* state procedural rules control in federal court when they are "part of a State's framework of substantive rights or remedies." *Shady Grove,* 559 U.S. at 419 (Stevens, J., concurring). That is the case here. Therefore, the Court must apply the Illinois Antitrust Act and dismiss with prejudice EPPs' indirect purchaser antitrust claim brought under Illinois law.

### b. Puerto Rico

Puerto Rico has not passed an *Illinois Brick* repealer, and its territorial courts have not addressed the issue directly. Other federal district courts have concluded that *Illinois Brick* applies and bars indirect-purchaser actions in Puerto Rico. *See, e.g., United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA, Inc.,* 74 F.Supp.3d 1052,

1085-86 (N.D. Cal. Nov. 7, 2014); *Nexium Antitrust Litig.,* 968 F.Supp.2d at 409-10; *In re Digital Music Antitrust Litig.,* 812 F.Supp.2d 390, 413 (S.D.N.Y. 2011) (*citing In re TFT-LCD (Flat Panel) Antitrust Litig.,* 599 F.Supp.2d 1179, 1185-87 (N.D. Cal. 2009)). Despite the overwhelming authority to the contrary, EPPs argue that Puerto Rico liberally construes its antitrust laws to permit suit by "[a]ny person" injured by acts prohibited by the statute, including indirect purchasers.

The case relied upon by EPPs, *Rivera-Muñiz v. Horizon Lines Inc.,* 737 F.Supp.2d 57 (D.P.R. 2010), cites as support for its conclusion *Pressure Vessels of Puerto Rico, Inc. v. Empire Gas de Puerto Rico,* 137 D.P.R. 497, 509-18 (1994). *Pressure Vessels* did not address indirect purchaser standing or the rule of *Illinois Brick*. *See, generally, Pressure Vessels,* 137 D.P.R. at 497. Therefore, the Court does not find *Rivera-Muñiz* persuasive. Absent an interpretation by the courts of Puerto Rico allowing antitrust recovery by indirect purchasers or an express *Illinois Brick* repealer statute enacted by the legislature, the Court concludes that EPPs' indirect purchaser antitrust claim is barred in Puerto Rico and must be dismissed with prejudice.

### c. Rhode Island

Rhode Island was an *Illinois Brick* state until its legislature enacted a repealer statute on July 15, 2013. *See,* R.I. Gen. Laws § 6-37-7(d). Although enacted after the Endo-Impax Settlement was

entered, EPPs argue the statute should apply to their claims because
it was in effect when they filed their first complaints in June of
2014. "It is well established, however, that statutes and their
amendments are presumed to apply prospectively . . . . Only when 'it
appears by clear, strong language or by necessary implication that
the Legislature intended' a statute to have retroactive application
will the courts apply it retrospectively." *Hydro-Mfg. v. Kayser-Roth
Corp.,* 640 A.2d 950, 954-55 (R.I. 1994) (quoting *VanMarter v. Royal
Indemnity Co.,* 556 A.2d 41, 44 (R.I. 1989)). Here, the statute
provided that it shall "take effect on passage." 2013 R.I. Pub. Laws
365, § 2. Therefore, EPPs' Rhode Island indirect purchaser antitrust
claim is not saved by the later-enacted repealer statute, and must be
dismissed with prejudice.

### 3. State Law Antitrust Claims

#### a. District of Columbia, Hawaii, Mississippi, New York, Oregon and West Virginia

Defendants argue that the antitrust laws of District of
Columbia, Hawaii, Mississippi, New York, Oregon and West Virginia
"limit claims to anticompetitive conduct that takes place solely or
predominantly within the jurisdictions' borders." None of the cited
states' laws contain so categorical a limitation, however. Moreover,
although EPPs' claims allege national anticompetitive conduct, they
also claim that the unlawful Endo-Impax Settlement affected commerce
in each state and resulted in overcharges to end-payors in each

state.   EPC ¶ 233; *In re Auto. Parts Antitrust Litig.,* No. 12-md-2311, 2013 WL 2456612, at *20-21 (E.D. Mich. June 6, 2013) ("[T]he price-fixed products entered into the stream of commerce in these states and caused injury, thereby triggering the antitrust laws of the states.").   The Court does not see why the *intra*state effect of the *inter*state anticompetitive conduct would not be reached by the laws of these states; therefore, the Court declines to dismiss EPPs' claims on this basis.

### b.   Illinois and Mississippi

Defendants next argue that EPPs cannot maintain indirect purchaser claims in Mississippi or Illinois because:   (1) "Mississppi does not permit class actions of any kind"; and (2) the Illinois Antitrust Act "requires that all indirect purchaser class suits be brought by the Illinois Attorney General."   Having previously addressed Defendants argument, and dismissed EPPs' claims under the Illinois Antitrust Act, the Court will focus on the argument in regards to Mississippi law.

Mississippi does not provide for class actions in its state courts as a matter of state procedure.   Its antitrust law states that "[i]t shall be the duty of the district attorneys . . . to enforce the civil features of the antitrust laws of this state," but it does not expressly state that antitrust class actions are prohibited. Miss. Code Ann. § 75-21-37.   Under the *Shady Grove* analysis discussed previously, Mississippi's procedural rule banning class actions is

not "part of [the] State's framework of substantive rights or remedies," and therefore does not control in federal court. *Shady Grove,* 559 U.S. at 419 (Stevens, J., concurring); *cf. In re New Motor Vehicles Canadian Exp. Antitrust Litig.,* 241 F.R.D. 77, 83 (D. Me. 2007) *vacated on other grounds,* 522 F.3d 6 (1st Cir. 2008). As such, the Court must apply FED. R. CIV. P. 23 and decline to dismiss EPPs' indirect purchaser antitrust claim brought under Mississippi law.

### c. Kansas, Mississippi, and Tennessee

Defendants argue that EPPs' statutory claims based on Kansas, Mississippi, and Tennessee law should be dismissed because these claims are barred by the statutes of limitations in those states. Kansas and Mississippi provide that antitrust claims are subject to a three-year limitations period. *See,* Kan. Stat. Ann. § 60-512; Miss. Code Ann. § 15-1-49. But Tennessee law in this area is not settled. *Compare State ex rel. Leech v. Levi Strauss & Co.,* No. 79-722-III, 1980 WL 4696 (Tenn. Ch. Sept. 25, 1980) (applying three-year limitations period to state antitrust claim), *with Stratienko v. Chattanooga-Hamilton Cnty Hosp. Auth.,* No. 1:07-CV-258, 2009 WL 736007, at *12 (E.D. Tenn. Mar. 17, 2009) (declining to apply three-year limitations periods to state antitrust claim). The Court is reluctant to decide an unsettled area of state law; therefore, the Court declines to dismiss EPPs' indirect purchaser antitrust claim brought under Tennessee state law.

Turning to the claims under the laws of Kansas and Mississippi, EPPs argue that their claims are not barred under the "continuing violation" doctrine — an exception to the statute of limitations. This doctrine advises that "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act," and as to those damages, "the statute of limitations runs from the commission of the act." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). EPPs argue that Defendants' sale of Opana ER and its generic equivalents at supracompetitive prices throughout the Class Period triggered application of the "continuing violation" doctrine and tolled the statute of limitations on their state antitrust claims in Kansas and Mississippi.

The federal courts routinely apply the "continuing violation" doctrine in the context of federal antitrust law. But the doctrine has received mixed treatment by state courts deciding state antitrust claims. *Compare, McKinnon v. Honeywell Intern., Inc.,* 977 A.2d 420, 425 (Me. 2009) ("[W]e have never adopted the continuing violations doctrine as a means of tolling the statute of limitations . . . [and] [w]e decline to [do so] in this case."), *with Medicare Rentals, Inc. v. Advanced Servs.,* 460 S.E.2d 361, 365 (N.C. Ct. App. 1995) ("Under [North Carolina law], each subsequent [antitrust] violation is a separate offense for the purpose of the statute of limitations."). EPPs do not point to, and the Court has not found, a single case from

Mississippi or Kansas expressly adopting the "continuing violation" doctrine in the antitrust context. In light of the unsettled nature of this doctrine, and the absence of guidance from the states in question, the Court declines to toll the statute of limitations for EPPs' antitrust claims under Kansas and Mississippi law. These claims are therefore dismissed with prejudice.

### d. Utah

Utah has passed an *Illinois Brick* repealer statute, and its antitrust statute therefore does grant indirect purchasers the right to bring antitrust damages claims, but only if they are citizens or residents of Utah. *See,* Utah Code § 76-10-3109. EPPs appear to be asserting claims under that law on behalf of residents of Utah, but they do not claim that any of the named plaintiffs are such residents. Although, as stated earlier, this deficiency does not prevent EPPs from establishing Article III standing, it does prevent them from bringing an indirect purchaser claim under the laws of Utah. Therefore, the Court dismisses this claim with leave to replead.

### 4. Consumer Protection Claims and Unjust Enrichment Claims

Defendants argue that EPPs' claims under the consumer protection laws of Florida, Massachusetts, Missouri, and Pennsylvania and all of EPPs' unjust enrichment claims should be dismissed because the Complaint is devoid of factual allegations sufficient to show that Defendants have violated these laws. Specifically, Defendants contend

that EPPs fail to set forth the elements of the claims under each state's laws, much less plead facts sufficient to establish that those elements have been met.

The Court agrees with Defendants. EPPs have *listed* claims under various state laws, but they have not truly *pleaded* claims under those laws sufficient to show their entitlement to recovery under them, as required by FED. R. CIV. P. 8. *See, Iqbal,* 556 U.S. at 678 ("A pleading that offers labels and conclusions or formulaic recitation of the elements of a cause of action will not do."). Rather, they have pleaded antitrust claims and the factual foundation for them, and have merely alleged that those claims are also actionable under state consumer protection laws and as unjust enrichment.

EPPs' pleadings on their consumer protection and unjust enrichment claims fail to account for any consequential differences that may exist among the undifferentiated state-law claims. The bald assertion that the alleged antitrust conduct violates dozens of non-antitrust laws, or the implication that there are no consequential differences between those laws, is not entitled to deference, because "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal,* 556 U.S. at 678.

The Court need not rule on the many specific arguments Defendants make regarding the individual state claims, because EPPS

have not pleaded state law consumer protection or unjust enrichment claims sufficient to satisfy Rule 8 under *Twombly* and *Iqbal*. Therefore, the Court dismisses EPPs' consumer protection and unjust enrichment claims, and grants leave to replead in a non-conclusory fashion.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, Defendants' Motion to Dismiss DPPs' First Amended Consolidated Complaint [ECF No. 118] is denied. Defendants' Motion to Dismiss EPPs' First Amended Consolidated Complaint [ECF No. 121] is granted in part and denied in part. EPPs' antitrust claims under the state laws of Illinois, Puerto Rico, Rhode Island, Kansas, and Mississippi are dismissed with prejudice. EPPs' antitrust claims under Utah state law, and all of their consumer protection and unjust enrichment claims are dismissed with leave to replead within twenty-one (21) days from the date of this memorandum opinion and order.

**IT IS SO ORDERED.**

_____
    Harry D. Leinenweber, Judge
    United States District Court

Dated:2/10/2016