**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE OPANA ER ANTITRUST LITIGATION | MDL No. 2580 |
| | Lead Case No. 14-cv-10150 |
| THIS DOCUMENT RELATES TO: | Hon. Harry D. Leinenweber |
| All Actions | **PUBLIC VERSION** |

**ENDO DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION TO COMPEL**

In the FTC investigation that spawned this litigation, Endo produced more than 400,000 documents, totaling more than two million pages, culled from the files of thirty-nine employees. In this private plaintiff litigation, Endo has produced not only all of the documents it previously produced to the FTC, but also more than 100,000 additional documents, totaling more than 400,000 additional pages.[1] These nearly 2.5 million pages cover virtually every topic that might conceivably be relevant to this matter.

Notwithstanding Endo's fulsome document production, Plaintiffs have moved to compel the production of three additional categories of documents that are neither relevant nor proportional to the needs of this case.

---

[1] Endo produced these documents in response to Plaintiffs' First Request for Production of Documents, which was served in April 2016 and included 112 individual document requests, many with subparts. Endo is currently in the process of responding to yet another set of document requests Plaintiffs served on October 18, 2017.

First, Plaintiffs seek forecasting documents from the files of three low-level Endo employees, even though (1) Endo has already produced reams of sales forecasts from the files of more senior employees; and (2) to the extent the additional proposed custodians prepared relevant forecasts that were sent to the more senior employees who were in a position to make decisions related to the conduct at issue in this case, those documents have already been produced. Thus, the likely benefit of the additional discovery is minimal or non-existent, and it is disproportionate to the needs of the case.

Second, Plaintiffs seek all "agreements Endo entered into concerning the development of a brand or generic drug," including Endo's due diligence and commercial, legal, and technical evaluations of those agreements. (Pl. Br. at 10.) These sweeping requests encompass an enormous swath of Endo's business activities, the vast majority of which are utterly irrelevant to this case. They are exactly the sort of discovery requests that recent amendments to the Federal Rules of Civil Procedure regarding proportionality were designed to prevent.

Finally, Plaintiffs seek the production of all documents Endo previously produced to the New York Attorney General ("NY AG") in an unrelated, non-antitrust investigation into alleged marketing practices related to Opana ER. Unlike the FTC investigation (from which Plaintiffs already have Endo's entire document production), the NY AG's investigation had nothing to do with either of the two agreements at issue this litigation, *i.e.*, the 2010 patent settlement agreement and Development and Co-Promotion Agreement ("DCA") between Endo and Impax. The mere fact that the NY AG's investigation related to Opana ER does not make all documents Endo produced in that investigation relevant to the claims and defenses at issue in this case.

Plaintiffs' motion should be denied in its entirety.

## BACKGROUND

This multi-district litigation arose following an investigation by the FTC into whether Endo Pharmaceuticals Inc. and Impax Laboratories, Inc. violated the antitrust laws through their 2010 settlement of patent litigation and entry into the DCA.  In the settlement, Endo licensed Impax to sell its generic version of Endo's Opana ER prior to the expiration of certain patents. The companies also entered into the DCA, a separate agreement that related to an Impax product-in-development known as IPX-203.  As part of discovery in the FTC investigation, Endo collected and searched the files of thirty-nine Endo custodians and ultimately produced more than 430,000 documents, totaling more than two million pages.  In April 2016, Endo produced these same documents to the Plaintiffs in this case.  Over the last eighteen months, Endo has worked with Plaintiffs to supplement that production, and to negotiate the scope of searches in response to Plaintiffs' more than 100 (often multi-part) requests for production of documents. As a result, to date, Endo has produced more than 540,000 documents totaling nearly 2.5 million pages.  The additional materials Plaintiffs now seek do not satisfy Rule 26's basic standard that materials be "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).

## ARGUMENT

The document requests at issue here are exactly the type of unbounded discovery that the recent amendments to the Federal Rules of Civil Procedure were designed to prevent.  Under the newly-amended rules, the scope of discovery is limited to "nonprivileged matter that is ***relevant to any party's claim or defense and proportional to the needs of the case***, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its

likely benefit." Fed. R. Civ. P. 26(b)(1) (emphasis added). A court must therefore "limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C).

Even if the Plaintiffs could demonstrate that the requested materials had some relevance to this case, the recent changes were designed "to rein in popular notions that anything relevant should be produced and to emphasize the judge's role in controlling discovery." *Noble Roman's, Inc. v. Hattenhauer Distrib. Co.*, 314 F.R.D. 304, 307 (S.D. Ind. 2016); *see also Black v. Buffalo Meat Serv., Inc.*, No. 15-0049, 2016 WL 4363506, at *6 (W.D.N.Y. Aug. 16, 2016) (observing that restoring the role of proportionality in defining the scope of discovery was intended to, among other things, "avoid discovery becoming 'an instrument for delay and oppression'" and that, as a result, "the universe of discoverable information is smaller than before"). Plaintiffs' requests here are precisely the sort of irrelevant and disproportionate discovery that should be rejected under the amended rules. *See Gilead Sciences, Inc. v. Merck & Co.*, No. 13-4057, 2016 WL 146574, at *2 (N.D. Cal. Jan. 13, 2016) (denying motion to compel because discovery on unrelated products in patent infringement case was disproportionate and "would be like requiring GM to produce discovery on Buicks and Chevys in a patent case about Cadillacs simply because all three happen to be cars"). And it is particularly appropriate to reject discovery requests

where, as here, Plaintiffs have failed to demonstrate the relevance and proportionality of the discovery they seek.

## I.     The Additional Forecasting Documents Plaintiffs Seek Are Not Relevant to Any Claim or Defense and Are Disproportionate to the Needs of the Case

Like many commercial enterprises, Endo generates numerous forecasts analyzing the possible impact of potential future events, likely or not, such as the entry of a competitive product or a particular pricing decision. The forecasts typically consider a variety of potential scenarios based on various assumptions, since no one can predict the future with certainty. Some of those forecasts are forwarded to decision-makers for further review and consideration (and possible revision); many do not make it that far. Some find their way into business planning documents; many do not. Plaintiffs do not deny that Endo has produced reams of these forecasts, both from the files of employees who were in a position to make the type of decisions that may be relevant in this litigation, and through the production of planning documents that incorporate sales forecasts.

Plaintiffs nevertheless demanded that Endo also search the files of five "day-to-day forecasters": James Bradley, Theresa Frey, Asit Chadha, Clark Baker, and Brian Hogan. (Def. Ex. 1 at 9.) Endo responded that (a) the existing production was replete with forecasts from the files of persons with decision-making authority and that the forecasts already produced were sufficient for Plaintiffs' needs; and (b) forecasts that did not reach decision-makers could not have played a part in any decision that is relevant here, and were therefore irrelevant.[2] In an

_____

[2] Plaintiffs are incorrect that files shared with decision-makers at Endo "will exclude relevant and responsive underlying calculations, assumptions, and discussions concerning the bases for those conclusions." (Pl. Br. at 7.) As Endo explained to Plaintiffs in July (with examples), many of the forecasts already provided to Plaintiffs explicitly disclose their underlying assumptions. (*See* Pl. Ex. L at 5–6.) Furthermore, where decision-makers required such underlying information, they requested it, and such materials have also been produced. *Id.* Plaintiffs did not offer any further support or explanation for their speculative assertion that

effort to avoid further dispute, however, Endo nonetheless agreed to search the files of two of the five employees Plaintiffs identified – Messrs. Baker (Endo's Manager, Forecasting and Senior Manager, Commercial Analytics) and Hogan (Endo's Director, Financial Planning & Analytics) – for certain forecasting documents, and to conduct supplemental searches on a previous custodian. (*See* Pl. Ex. B at 4–9.)

Additional discovery on Opana ER/CRF sales forecasting untethered to whether the target employee had authority to make a decision that might be relevant to this case serves no purpose, is needlessly cumulative, and is disproportionate to the needs of the case. Plaintiffs have not shown otherwise. Indeed, Plaintiffs' own exhibits demonstrate that their three latest targets (James Bradley, Asit Chadha, and Theresa Frey) worked closely with employees at Endo whose files have already been collected and searched. Plaintiffs' Exhibit D, for example, is an email chain involving James Bradley, Brian Hogan, Mark Bradley, and Demir Bingol. Endo already produced documents from two of the individuals on the chain and has agreed to collect documents from a third. Likewise, Plaintiffs' Exhibit E is an email chain involving Darnell Turner, whose documents Endo has already agreed to search, and Guy Donatiello, whose documents have been produced. Plaintiffs offer no reason to believe that a search of Mr. Bradley's, Mr. Chadha's, or Ms. Frey's documents would be likely to yield unique forecasting documents relevant to this case such that the likely benefit of the additional discovery would justify the burden and expense associated with it.

---

relevant forecasting information was missing from the production or that collection of forecasts that were not shared with decision-makers would somehow provide new information regarding forecasts that have already been produced. They instead declared the parties to be at an impasse. (Def. Ex. 2 at 6.)

The reality is that Plaintiffs have already received extensive discovery on Opana ER/CRF sales forecasts. There is no reason to compel the collection and review of cumulative documents from other custodians on the subject, particularly when such documents were not shared with decision-makers.

## II. Deal Documents Unrelated to the Endo-Impax Agreements Are Not Relevant to Any Claim or Defense and Are Disproportionate to the Needs of the Case

Plaintiffs have moved to compel on a series of requests that they characterize as pertaining to all "agreements Endo entered into concerning the development of a brand or generic drug," including the "criteria, strategies, due diligence and any other factors Endo considered when deciding whether to enter into" such agreements. (Pl. Br. at 10.)[3] Plaintiffs contend that such documents are relevant to assess "whether Endo's conduct in this case is consistent with its normal business practices" and will help them determine whether payments made under the DCA were for fair value. (Pl. Br. at 10–11.) But Plaintiffs' core assumption— that the deals Endo does are all so similar that they call for the same type of evaluation by Endo—is wrong. How Endo evaluated its $1.2 billion acquisition in 2010 of a large generic drug company, for example, or how it valued a license agreement for a product already on the market in 2012 is irrelevant to the question of whether Endo followed its "normal business practices" in 2010 in evaluating the proposed development and subsequent co-promotion of the specific drug at issue in the DCA (which had not even entered clinical trials) or paid fair value for that deal.

Plaintiffs have not shown that the materials they seek are relevant—much less how the likely benefit of such information would justify requiring Endo to search for, review and produce

---

[3] Plaintiffs' brief refers both to RFPs 13-15 (Pl. Br. at 10) and RFPs 13-17 (Pl. Br. at 12). The inclusion of RFPs 16 and 17 appears to be an error because they relate to authorized generics and have nothing to do with the arguments in Plaintiffs' motion. Most importantly, the parties separately resolved any dispute related to RFPs 16 and 17. For avoidance of doubt, Endo opposes any motion to compel production with respect to RFPs 16 and 17.

documents related to dozens (at least) of unrelated business deals. Instead, Plaintiffs argue that Endo's position that its other commercial agreements bear no resemblance to the DCA somehow "validates" their relevance claim because any differences must be attributable to the DCA's being a secret "payment" to Impax. (Pl. Br. at 12.) That makes no sense. Endo's many other business deals *are* different from the DCA—and from each other—because they are all *unique transactions* that required individual analyses from varying strategic and financial perspectives. The differences between the DCA and Endo's other deals add nothing to Plaintiffs' assertion that the DCA involved a "secret" payment to Impax.

Endo evaluates dozens of business opportunities annually, and is party to many agreements "concerning the development of a brand or generic drug." (*See, e.g.*, Def. Ex. 3 at 23–24 (2012 Board of Directors presentation discussing eight recent Endo acquisitions, some involving multiple drug products, and listing an additional twenty-three licensing agreements or other collaborations dating back to 2009).) As Plaintiffs are well aware, addressing even one of their proposed categories of information—*e.g.*, "any technical and IP due diligence conducted by Endo prior to entering into any such agreements"—would require looking back in time a decade or more to figure out which of potentially dozens of Endo employees were involved in evaluating each specific transaction and then collecting, reviewing, and producing large volumes of documents, notwithstanding their utter irrelevance to the issues at stake in this litigation. And that is just *one* of the categories of information that Plaintiffs want.

In sum, Plaintiffs appear to seek, *inter alia*, due diligence, marketing evaluation, regulatory, and research and development documents for dozens of business deals that:

- Had different deal structures ranging from acquisitions of other companies with diverse product portfolios to specific deals for individual products;

- Were completed by different Endo evaluation teams under different Endo senior executive management;

- Involved different types of drug products for the treatment of different diseases at different stages of drug development with distinct legal and regulatory hurdles;

- Were evaluated under different strategic company priorities in different economic environments over a period of nearly five years; and so on.

Despite these and other dimensions of difference, Plaintiffs baldly assert, without support, that the due diligence and evaluation documents for each and every one of those deals are relevant to the issues in ***this*** case, and refuse to narrow their request beyond "agreements Endo entered into concerning the development of a brand or generic drug." (Pl. Br. at 10.)

Not only are these materials irrelevant, but the boundaries of what Plaintiffs actually want have always been unclear. Plaintiffs have consistently refused to focus the scope of their vague and overreaching requests, and their brief muddies the waters further by mischaracterizing what the requests actually seek. Plaintiffs have never defined what they mean by agreements "concerning the development of a brand or generic drug." (Pl. Ex. A at 16.) In their brief, Plaintiffs suggest for the first time that they are interested in "joint development agreements *similar to the DCA*," (Pl. Br. at 10) but have not defined "joint development agreements" nor provided any criteria Endo may use to identify which agreements Plaintiffs would consider "similar to the DCA." For that matter, the wording of the RFPs themselves is broader than just "joint development agreements similar to the DCA" or agreements "concerning the development of a brand or generic drug." RFP 13, for example, includes "drug development agreements, drug marketing agreements, drug promotion agreements, or drug detailing agreements," all of which could be different from the DCA in key ways that make comparisons meaningless.

In response to Endo's repeated requests to narrow and define these RFPs, Plaintiffs agreed to narrow the relevant time period, but not the type of agreement sought. (Def. Ex. 2 at

7.)  Furthermore, Plaintiffs' brief characterizes the RFPs in ways that broaden the targeted materials even more—for example, RFPs 13–15 do not on their face appear to include "technical and IP due diligence conducted by Endo prior to entering into any such agreements," (*compare* Pl. Br. at 10 *with* Pl. Ex. A at 16–17), but Plaintiffs' brief now suggests that such materials are covered by these requests.  Endo has no meaningful way of knowing what set of agreements are encompassed by the requests, nor what materials related to those agreements Plaintiffs actually want.

Requiring Endo to produce discovery regarding all of these unrelated deals simply because this case involves a deal "would be like requiring GM to produce discovery on Buicks and Chevys in a patent case about Cadillacs simply because all three happen to be cars." *Gilead Sciences*, 2016 WL 146574, at *2.  The Court should not allow discovery into documents of so little relevance based on Plaintiffs' speculation that they might demonstrate some "inconsistency" with Endo's evaluation of the DCA.  *See Wells Fargo Bank, N.A. v. RLJ Lodging Tr.*, No. 13-758, 2015 WL 156778, at *1 (N.D. Ill. Jan. 12, 2015) (rejecting motion to compel production of documents because "evidence of how [one party] serviced other commercial loans with potentially different terms under different circumstances, and how it dealt with different borrowers, is largely irrelevant to whether [that party] acted in a commercially reasonably manner with respect to the [loan at issue in this case]"); *see also Miller UK Ltd. v. Caterpillar, Inc.*, 17 F. Supp. 3d 711, 721–22 (N.D. Ill. 2014) (explaining that discovery rules

were "were never intended to be an excursion ticket to an unlimited exploration of every

conceivable matter that captures an attorney's interest").

### III. Documents Endo Produced to the New York Attorney General in an Unrelated Investigation Are Not Relevant to Any Claim or Defense and Are Disproportionate to the Needs of the Case

Endo long ago provided Plaintiffs the documents it produced in connection with the

FTC's antitrust investigation into the Endo-Impax settlement agreement.  Promptly providing

those documents to Plaintiffs made sense because the FTC was investigating the same

agreements on which the Plaintiffs base their claims.  Now, Plaintiffs also demand the

documents Endo produced to the NY AG in a separate and distinct investigation related to

different conduct, without any cogent explanation as to why those documents may be relevant

here.  (Pl. Br. at 12–13.)  Many courts in this Circuit have rejected such efforts to "piggyback"

off of discovery produced in other cases without an adequate showing that the documents sought

are actually relevant to the case at hand.  Here, Plaintiffs have not made any such showing, and

Plaintiffs' request for these documents should be denied.

It is axiomatic that a "party's requested discovery must be tied to the particular claims at

issue in the case."  *Moore v. Morgan Stanley & Co.*, No. 07-5606, 2008 WL 4681942, at *2

(N.D. Ill. May 30, 2008).  Plaintiffs are not automatically entitled to documents just because they

were produced in another case.  *See Fields v. Wright Med. Tech., Inc.*, No. 15-110, 2017 WL

3048867, at *3 (N.D. Ind. July 19, 2017) ("[T]o the extent that [p]laintiff is requesting that the

Court compel [d]efendants to produce information merely because it has been produced in other

cases, and she has not specifically requested the information contained in those documents in this

case, that request is denied.").  Rather, Plaintiffs must "do their own work and request the

information they seek directly."  *See Midwest Gas Servs., Inc. v. Indiana Gas Co.*, No. 99-690,

2000 WL 760700, at *1 (S.D. Ind. Mar. 7, 2000) (rejecting motion to compel production of discovery from another case because plaintiffs did not "make proper requests describing the information in which they are interested"); *Wollam v. Wright Med. Grp., Inc.*, No. 10-3104, 2011 WL 1899774, at *2 (D. Colo. May 18, 2011) (explaining that the plaintiffs must make specific discovery requests that "allow a court to consider the relevance of the information sought to the specific claims and defenses in the pending case."). Even where there is ***direct*** overlap between the litigation and a parallel state AG investigation, courts will not order wholesale production of cloned discovery. *See In Re Broiler Chicken Antitrust Litigation*, No. 16-8637, 2017 WL 4417486, at *5 (N.D. Ill. Sept. 28, 2017) ("The Court agrees with CID Defendants that reflexive production of documents previously provided to governmental entities is not appropriate.").

Here, Plaintiffs have issued a blanket request for documents produced to the NY AG without seriously attempting to explain why the documents are relevant to this case. Their brief contains a single sentence purportedly explaining the relevance of the documents: that the "NY AG investigation focused on the lack of improved safety of Opana ER CRF *vis a vis* Opana ER, which goes directly to Plaintiffs' claims that absent the Endo-Impax pay for delay agreement, Endo—faced with generic Opana ER competition—would not have been able to switch prescriptions to Opana ER CRF, which the FDA concluded is no safer (and may even be more dangerous) than Opana ER." (Pl. Br. at 12–13.)

This argument mischaracterizes the NY AG's investigation. As readily available public documents demonstrate, the NY AG's investigation focused on Endo's alleged marketing practices.[4] That issue has nothing to do with the Endo-Impax agreements in this case or any purported violation of the antitrust laws. The bare assertion that the NY AG investigation

---

[4] *See* Def. Ex. 4 (NY AG Assurance of Discontinuance dated March 1, 2016).

12

involved Opana ER and Opana ER CRF does not entitle the Plaintiffs to every document from a government investigation into very different alleged conduct.  *See Oklahoma v. Tyson Foods*, 2006 WL 2862216, at * 1 (N.D. Okla. Oct. 4, 2006) (holding that a showing of "some surface similarities" is insufficient to require "*carte blanche*" production of all documents produced in a different case).  Discovery in this case should proceed on the basis of specific requests targeting discovery relevant to ***this*** case.  Plaintiffs' motion to compel production of these documents should be denied.

## IV.    Conclusion

For the reasons above, Endo respectfully urges the Court to deny Plaintiffs' motion to compel in its entirety.

Respectfully submitted,

/s/ *George G. Gordon*
George G. Gordon (admitted *pro hac vice*)
Christine C. Levin (admitted *pro hac vice*)
**DECHERT LLP**
Cira Centre, 2929 Arch Street
Philadelphia, PA  19104
Tel.:  (215) 994 4000
Fax:  (215) 994-2222
george.gordon@dechert.com
christine.levin@dechert.com

Morgan J. Feder (admitted *pro hac vice*)
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
Tel: (212) 698-3648
Fax: (212) 314-0073
morgan.feder@dechert.com

Angela Liu
**DECHERT LLP**
35 West Wacker Drive, Suite 3400
Chicago, IL  60601

Tel.: (312) 646-5800
Fax: (312) 646-5858
angela.liu@dechert.com

*Counsel for Defendants Endo Health Solutions Inc.,*
*Endo Pharmaceuticals Inc., and*
*Penwest Pharmaceuticals Co.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2017, I caused to be filed the foregoing document with the United States District Court for the Northern District of Illinois using the CM/ECF system, and caused it to be served on all registered participants via the notice of electronic filing.

/s/ *Angela Liu*
**DECHERT LLP**
35 West Wacker Drive, Suite 3400
Chicago, IL 60601
Tel.: (312) 646-5800
Fax: (312) 646-5858
angela.liu@dechert.com