**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE OPANA ER ANTITRUST LITIGATION | MDL No. 2580<br><br>Lead Case no. 14-cv-10150 |
| THIS DOCUMENT RELATES TO:<br><br>All Actions | Hon. Harry D. Leinenweber |

## <u>INDEX OF EXHIBITS</u>

A.    Plaintiffs' Second Set of Interrogatories to Impax, dated January 9, 2018

B.    Excerpt of Respondent Impax Laboratories, Inc.'s Proposed Findings of Fact and Conclusions of Law in In the Matter of Impax Laboratories, Inc., FTC No. 9373

C.    Impax's Objections and Responses to Plaintiffs' Second Set of Interrogatories, dated February 15, 2018

D.    March 12, 2018 Letter from J. Gerstein to Counsel for Impax

E.    February 12, 2018 Letter from A. Curley to Counsel for Impax

F.    March 6, 2018 Letter from A. Curley to Counsel for Impax

G.    Excerpt of Impax's Objections and Responses to Plaintiffs' First Set of Interrogatories, dated August 18, 2017

H.    Excerpt of Endo's Supplemental Responses to Plaintiffs' First Set of Interrogatories, dated November 15, 2017

I.    March 2, 2017 Letter from K. Koger to A. Curley

# EXHIBIT A
FILED UNDER SEAL

# EXHIBIT B

*PUBLIC*

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

FEDERAL TRADE COMMISSION
RECEIVED DOCUMENTS
12 27 2017
589180
SECRETARY

ORIGINAL

In the Matter of:

IMPAX LABORATORIES, INC.,

a corporation.

**Docket No. 9373**

---

**RESPONDENT IMPAX LABORATORIES, INC.'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Edward D. Hassi
Michael E. Antalics
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006
Telephone: +1-202-383-5300
Facsimile: +1-202-383-5414

[Additional Counsel on Signature Page]

*Counsel for Impax Laboratories, Inc.*

to be invalid, unenforceable, or not infringed by a generic version of Opana ER; or (ii) the withdrawal of the patents at issue from the Orange Book.  (JX-001-009 (¶ 34) (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity); CX2626 (executed settlement agreement); Snowden, Tr. 370).

142.    At no point during settlement discussions did Endo and Impax discuss Impax accepting a later entry date in exchange for something of value from Endo.  (Mengler, Tr. 567-68; CX4012 (Donatiello, IHT at 172-73) (no provisions in SLA linked to commencement date)).

143.    Impax would have "absolutely" accepted an earlier license date if it had been possible.  (Mengler, Tr. 567).

144.    There is no evidence that Endo ever offered an entry date earlier than January 1, 2013, despite Impax's efforts to secure one.  (Mengler, Tr. 566-67).

## C.    The SLA Contained a Broad Patent License

145.    At the time of the settlement, Endo had pending applications for patents relating to Opana ER.  (JX-001-010 (¶ 36) (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity)).

146.    Impax knew of Endo's pending applications, and recognized that Endo could acquire still other patents.  (RX-398.0001; RX-568; Mengler, Tr. 571-72; Snowden, Tr. 440, 442-43).

147.    In a 2009 email assessing the Endo-Actavis settlement, for example, Impax employees noted that the Actavis settlement did not cover Endo's pending patent applications.  (RX-398.0001 (noting Endo was "banking on [its] pending patents")).

148.    Given the possible effects of those patent applications, a reasonable litigant would have been concerned with Endo's future patents.  (Figg, Tr. 1938).

149.    But Impax was more concerned than most.  It is "incredibly conservative."
(CX4021 (Ben-Maimon, Dep. at 34)).

150.    It "is very important for [Impax] to have a . . . risk-free launch" before it markets
any generic product.  (CX4014 (Hsu, IHT at 117)).  Accordingly, Impax seeks "freedom to
operate" without patent risks.  (CX4026 (Nguyen, Dep. at 155-58)).

151.    Every "agreement has to cover all the patent[s], not just the patent [at issue]
today, but cover all future patent[s] as well," "otherwise you end up with [a] launch [of] the
product and still have to be under [patent] risk, and that doesn't really help us."  (CX4014 (Hsu,
IHT at 116)).

152.    For that reason, Impax fought hard to secure a broad patent license covering all
possible patents.  Endo's first draft of the settlement agreement only offered Impax a license to
current patents and any extensions thereof.  (RX-333.0005).

153.    During subsequent negotiations, the parties exchanged no fewer than seven
separate versions of the license agreement.  (CX0324; CX2771; RX-573; CX1813; RX-335; RX-
322; RX-336; RX-402).

154.    Impax gradually secured greater patent protections, ultimately securing a license
and covenant not to sue that covered all patents "that would ever be owned by [Endo and
Penwest] that would cover the Impax product, so the patents that existed at the time as well as
future patents."  (Snowden, Tr. 439; CX2626-009 (executed SLA)).

155.    Specifically, Section 4.1(a) of the Settlement and License Agreement grants
Impax a license both to the "Opana ER Patents" (meaning the '933, '456, and '250 patents) and
to "any patents and patent applications owned by Endo or Penwest . . . that cover or could
potentially cover the manufacture, use, sale, offer for sale, importation, marketing or distribution

of products . . . that are the subject of the Impax ANDA . . . ."  (JX-001-009-10 (¶ 35) (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity)).

156.    The Settlement and License Agreement identified "the patent applications (and any patents issued thereunder)" as the "Pending Applications."  (JX-001-010 (¶ 36) (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity)).

157.    The broad patent license and covenant not to sue ensured that Impax could launch its generic oxymorphone ER product free from patent risk on January 1, 2013.  (Koch, Tr. 236).

### D.    The Endo Credit and Royalty Provisions

#### 1.    The Introduction of Reformulated Products

158.    When the FDA approves an ANDA for a generic drug, the FDA has determined that the drug is bioequivalent to the brand-name product.  This is often referred to as "AB-rated." (Mengler, Tr. 521-22; Bingol, Tr. 1309; Snowden, Tr. 413; Figg, Tr. 1853-54; Noll, Tr. 1380 (Actavis 7.5 mg and 15 mg generic Opana ER products enjoyed AB-rating when launched in 2011)).

159.    All 50 states and the District of Columbia have drug substitution laws that encourage and facilitate substitution of lower-cost AB-rated generic drugs for branded drugs. When a pharmacist fills a prescription written for a branded drug, these laws allow or require the pharmacist to dispense an AB-rated generic version of the drug instead of the more expensive branded drug, unless a physician directs or the patient requests otherwise.  Conversely, these laws generally do not permit a pharmacist to substitute a non-AB-rated generic for a branded drug unless the physician specifically prescribes it by writing the chemical name of the drug, rather than the brand name, on the prescription.  (JX-003-011 (¶ 72) (Second Set of Joint Stipulations); *see* Mengler, Tr. 521-22; Bingol, Tr. 1309; Addanki, Tr. 2272 (seventeen states require substitution, almost all others permit substitution)).

160.     Substitution of generic products for brand-name products is the primary way that generic companies make their sales.  (Mengler, Tr. 522; Engle, Tr. 1703).

161.     Brand pharmaceutical companies sometimes reformulate their brand-name products, "in theory to have some improved properties."  (CX4003 (Snowden, IHT at 30)).

162.     But introducing a reformulated product can also protect the branded franchise from losing sales to AB-rated generics.  (Snowden, Tr. 433-34; CX4043 (Hoxie, Dep. at 144-45); CX4030 (Hsu, Dep. at 108)).

163.     Specifically, when brand companies introduce a reformulated drug, they often cease marketing and selling the original product.  They can also withdraw the original product's reference-listed drug designation, preventing generic products from having AB-rated status.  (CX4003 (Snowden, IHT at 30-31); CX4014 (Hsu, IHT at 152)).

164.     In so doing, the brand company can greatly reduce the opportunity for generic versions of the original drug since those generic products are no longer bioequivalent to—and not subject to automatic substitution in place of—the reformulated product.  (Snowden, Tr. 434; CX4030 (Hsu, Dep. at 108); Koch, Tr. 238 (reformulation can "switch patients away from the brand product that Impax has the generic to in favor of a line extension" not covered by the ANDA)).

165.     Because "the generic would rely on the . . . automatic substitution in the pharmacy," not having a reference brand product means that pharmacists "can't substitute." (CX4014 (Hsu, IHT at 152)).

166.     For the generic drug to be sold, doctors must actually write out a prescription for the generic product.  (CX4014 (Hsu, IHT at 152); CX4004 (Engle, IHT at 221)).

# EXHIBIT C
FILED UNDER SEAL

# EXHIBIT D
FILED UNDER SEAL

# EXHIBIT E

FILED UNDER SEAL

# EXHIBIT F

FILED UNDER SEAL

# EXHIBIT G

FILED UNDER SEAL

# EXHIBIT H
FILED UNDER SEAL

# EXHIBIT I
FILED UNDER SEAL