**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE OPANA ER ANTITRUST LITIGATION | MDL No. 2580 |
| | Lead Case no. 14-cv-10150 |
| THIS DOCUMENT RELATES TO: | Hon. Harry D. Leinenweber |
| All End-Payor Actions | **FILED UNDER SEAL** |
| | PUBLIC REDACTED VERSION |

**END-PAYOR PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................ iii

GLOSSARY OF DEFINED TERMS ......................................................................... vii

I.      INTRODUCTION ............................................................................................ 1

II.     STATEMENT OF FACTS .............................................................................. 2

      A.     Impax threatened Endo's Opana ER monopoly ..................................... 2

      B.     The Opana ER patent litigation ............................................................. 3

      C.     Impax prepared to launch generic Opana ER ........................................ 4

      D.     To avoid losing its Opana ER monopoly, Endo paid Impax to delay .................... 4

            1.     Under the SLA, Endo paid Impax tens of millions of dollars ................... 5

            2.     Under the DCA, Endo paid Impax a guaranteed $10 million ................... 6

      E.     Endo used the paid-for delay to launch reformulated Opana ER, further damaging competition for Opana ER ................................................. 6

      F.     Defendants' conduct injured end payors ................................................. 7

III.    ARGUMENT ................................................................................................... 8

      A.     Antitrust claims are well-suited for class certification ........................... 9

      B.     EPPs satisfy the Rule 23(a) requirements .............................................. 9

            1.     Numerosity is satisfied ................................................................. 9

            2.     The litigation involves common questions of law and fact ..................... 10

            3.     EPPs' claims are typical of the Classes' claims ................................. 10

            4.     EPPs will fairly and adequately represent the Classes' interests ............. 12

      C.     EPPs satisfy Rule 23(b)(3) requirements .............................................. 13

            1.     Common issues predominate as to market power ................................. 15

            2.     Common issues predominate as to Defendants' violations of state antitrust, consumer protection, and unjust enrichment laws ................... 15

            3.     Common issues predominate as to antitrust impact ............................. 19

i

(a) Common evidence demonstrates that Defendants delayed competition from generic Opana ER ............................................. 20

(a) Defendants' Agreement kept Opana ER prices at supracompetitive levels, injuring end payors................................ 21

(b) Seventh Circuit precedent explicitly holds that predominance is not defeated by the presence of uninjured class members ............................................................................. 22

4. EPPs will establish aggregate damages and disgorgement estimates through common economic models tied to their liability theories............. 23

5. A class action is the superior means of litigating this dispute and is manageable ................................................................................ 27

D. The end-payor classes are ascertainable ............................................ 29

IV. CONCLUSION.................................................................................................. 30

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)............................................................................................9, 14, 15

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013).............................................................................................8, 14

*In re Aqua Dots Prods. Liab. Litig.*,
   270 F.R.D. 377 (N.D. Ill. 2010)..............................................................................17

*In re Auto. Parts Antitrust Litig.*,
   29 F. Supp. 3d 982 (E.D. Mich. 2014)....................................................................18

*Barden v. Hurd Millwork Co.*,
   249 F.R.D. 316 (E.D. Wis. 2008) ...........................................................................12

*BCS Servs. Inc. v. Heartwood 88, LLC*,
   637 F.3d 750 (7th Cir. 2011) ..................................................................................23

*Bigelow v. RKO Radio Pictures*,
   327 U.S. 251 (1946)................................................................................................19

*In re Brand Name Prescription Drugs Antitrust Litig.*,
   1998 WL 326721 (N.D. Ill. June 12, 1998)............................................................29

*Butler v. Sears, Roebuck & Co.*,
   727 F.3d 796 (7th Cir. 2013) ......................................................................14, 17, 27

*In re Cardizem CD Antitrust Litig.*,
   200 F.R.D. 326 (E.D. Mich. 2001) .........................................................................12

*Carnegie v. Household Int'l, Inc.*,
   376 F.3d 656 (7th Cir. 2004) ..................................................................................27

*In re Flonase Antitrust Litig.*,
   284 F.R.D. 207 (E.D. Pa. 2012)..............................................................10, 11, 15

*Fox v. Riverview Realty Partners*,
   2014 WL 1613022 (N.D. Ill. Apr. 22, 2014) .........................................................14

*FTC v. Actavis, Inc.*,
   133 S. Ct. 2223 (2013)................................................................................15, 19, 27

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
  392 U.S. 481 (1968) ...........................................................................................25

*Hawaii v. Standard Oil Co.*,
  405 U.S. 251 (1972) .............................................................................................9

*Kleen Prods. LLC v. Int'l Paper*,
  306 F.R.D. 585 (N.D. Ill. 2015) (Leinenweber, J.), *aff'd* 831 F.3d 919 (7th
  Cir. 2016) ...............................................................................................16, 21, 23

*Kleen Prods. LLC v. Int'l Paper Co.*,
  831 F.3d 919 (7th Cir. 2016) ....................................................................... *passim*

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
  571 F.3d 672 (7th Cir. 2009) ........................................................................12, 22

*Lauber v. Belford High Sch.*,
  2012 WL 5822243 (E.D. Mich. Jan. 23, 2012)..................................................18

*In re Lidoderm Antitrust Litig.*,
  2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ......................................... *passim*

*In re Linerboard Antitrust Litig.*,
  203 F.R.D. 197 (E.D. Pa. 2001), *aff'd*, 305 F.3d 145 (3rd Cir. 2002)...................11

*In re Linerboard Antitrust Litig.*,
  223 F.R.D. 335 (E.D. Pa. 2004)........................................................................27

*In re Lithium Ion Batteries Antitrust Litig.*,
  2016 WL 948874 (N.D. Cal. Mar. 14, 2016)......................................................13

*McMahon v. LVNV Funding*,
  807 F.3d 872 (7th Cir. 2015) .............................................................................14

*Mednick v. Precor*,
  320 F.R.D. 140 (N.D. Ill. 2017) (Leinenweber, J.).............................................16

*Messner v. Northshore Univ. Health Sys.*,
  669 F.3d 802 (7th Cir. 2012) ...............................................................8, 9, 14, 27

*Mullins v. Direct Dig., LLC*,
  2014 WL 5461903 (N.D. Ill. Sept. 30, 2014), *aff'd,* 795 F.3d 654 (7th Cir.
  2015) ..............................................................................................................12, 17

*Mullins v. Direct Dig., LLC*,
  795 F.3d 654 (7th Cir. 2015) ...................................................................14, 29, 30

*In re Nexium Antitrust Litig.*,
  777 F.3d 9 (1st Cir. 2015)....................................................................................22, 26

*In re Nexium (Esomeprazole) Antitrust Litig.*,
  297 F.R.D. 168 (D. Mass 2013), *aff'd*, 777 F.3d 9 (1st Cir. 2015)................................. *passim*

*In re Nexium (Esomeprazole) Antitrust Litig.*,
  309 F.R.D. 107 (D. Mass. 2015), *aff'd*, 842 F.3d 34 (1st Cir. 2016).....................................29

*In re Niaspan Antitrust Litig.*,
  2015 WL 4197590 (E.D. Pa. July 9, 2015)......................................................................26

*In re NorthShore Univ. HealthSystem Antitrust Litig.*,
  2018 WL 2383098 (N.D. Ill. Mar. 31, 2018)....................................................................13

*In re Opana ER Antitrust Litig.*,
  162 F. Supp. 3d 704 (N.D. Ill. 2016) ......................................................................17, 19

*In re Opana ER Antitrust Litig.*,
  2016 WL 4245516 (N.D. Ill. Aug. 11, 2016) .............................................................17, 27

*Overka v. Am. Airlines, Inc.*,
  265 F.R.D. 14 (D. Mass. 2010)........................................................................................28

*Rapoport-Hecht v. Seventh Generation, Inc.*,
  2017 WL 5508915 (S.D.N.Y. Apr. 28, 2017)....................................................................18

*In re Ready-Mixed Concrete Antitrust Litig.*,
  261 F.R.D. 154 (S.D. Ind. 2009)................................................................................10, 15

*In re Relafen Antitrust Litig.*,
  221 F.R.D. 260 (D. Mass. 2004)............................................................................9, 10, 15

*Saltzman v. Pella Corp.*,
  257 F.R.D. 471 (N.D. Ill. 2009), *aff'd,* 606 F.3d 391 (7th Cir. 2010) ............................ *passim*

*In re Scrap Metal Antitrust Litig.*,
  527 F.3d 517 (6th Cir. 2008) ...................................................................................9, 15

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
  2017 WL 4621777 (D. Mass. Oct. 16, 2017)................................................................ *passim*

*In re Steel Antitrust Litig.*,
  2015 WL 5304629 (N.D. Ill. Sept. 9, 2015) .....................................................................16

*Suchanek v. Sturm Foods, Inc.*,
  764 F.3d 750 (7th Cir. 2014) .....................................................................................9, 22

*In re Sulfuric Acid Antitrust Litig.*,
2007 WL 898600 (N.D. Ill. Mar. 21, 2007)......................................................................10, 27

*Teva Pharms. USA, Inc. v. Abbott Labs.*,
252 F.R.D. 213 (D. Del. 2008) ........................................................................................9, 15

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
267 F.R.D. 291 (N.D. Cal. 2010)..........................................................................................11

*Toscano v. Koopman*,
148 F. Supp. 3d 679 (N.D. Ill. 2015) ....................................................................................18

*Toys 'R' US, Inc. v. FTC*,
221 F.3d 928 (7th Cir. 2000) ................................................................................................15

*U.S. Gypsum Co. v. Indiana Gas Co., Inc.*,
350 F.3d 623 (7th Cir. 2003) ................................................................................................20

*In re Urethane Antitrust Litig.*,
237 F.R.D. 440 (D. Kan. 2006)..............................................................................................27

*In re Urethane Antitrust Litig.*,
251 F.R.D. 629 (D. Kan. 2008), *aff'd*, 768 F.3d 1245 (10th Cir. 2014)................................11

**Rules**

Fed. R. Civ. P. 23 ................................................................................................ *passim*

**Other Authorities**

7AA Wright & Miller § 1781 ....................................................................................10

*Manual for Complex Litig.* § 21.222 (4th ed. 2005) ....................................................29

## GLOSSARY OF DEFINED TERMS

| Abbreviation | Description |
|---|---|
| **"Actavis"** | Actavis South Atlantic LLC |
| **"AG"** | Authorized generic |
| **"Agreement"** | The SLA and DCA |
| **"ANDA"** | Abbreviated New Drug Application |
| **"Antitrust/Consumer Class"** | All persons or entities who indirectly purchased, paid for, and/or provided reimbursement for some or all of the purchase price for brand or generic Opana ER 5 mg, 10 mg, 20 mg, 30 mg, and/or 40 mg, other than for resale, in the states and commonwealths of Arizona, California, Florida, Hawaii, Iowa, Maine, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Vermont, West Virginia, Wisconsin, and the District of Columbia from April 2011 through and including the date that the anticompetitive effects of Defendants' unlawful conduct ceased |
| **"AWP"** | Average Wholesale Price |
| **"Belvis Rep."** | Expert report of Glen Belvis, Esq., dated March 25, 2019, attached as **Exhibit 1** to the Declaration of Michael J. Freed |
| **"Bruno Rep."** | Expert report of James Bruno, dated March 25, 2019, attached as **Exhibit 2** to the Declaration of Michael J. Freed |
| **"Class Period"** | April 2011 through and including the date that the anticompetitive effects of Defendants' unlawful conduct ceased |
| **"DCA"** | Development and Co-Promotion Agreement between Endo and Impax |
| **"DEA"** | U.S. Drug Enforcement Agency |
| **"DeLeon Rep."** | Expert report of Janet K. DeLeon, RAC, dated March 23, 2019, attached as **Exhibit 3** to the Declaration of Michael J. Freed |

| | |
|---|---|
| **"Endo"** | Endo Pharmaceuticals, Inc., Endo Health Solutions Inc., and Penwest Pharmaceuticals Co. |
| **"EPPs"** | End-Payor Plaintiffs Plumbers and Pipefitters Local 178 Health & Welfare Trust Fund, Louisiana Health Service & Indemnity Company, d/b/a Blue Cross and Blue Shield of Louisiana, Fraternal Order of Police, Miami Lodge 20, Insurance Trust Fund, Wisconsin Masons' Health Care Fund, Pennsylvania Employees Benefit Trust Fund, and International Union of Operating Engineers, Local 138 Welfare Fund |
| **"Freed Decl."** | Declaration of Michael J. Freed, Esq., dated March 25, 2019 in support of EPPs' motion for class certification |
| **"Freed Kanner"** | Freed Kanner London & Millen LLC |
| **"generic Opana ER"** | AB-rated generic versions of Opana ER sold by Impax or Actavis under ANDAs 079087 and 079046, respectively |
| **"Impax"** | Impax Laboratories Inc. |
| **"Labaton Sucharow"** | Labaton Sucharow LLP |
| **"Leitzinger Rep."** | Expert report of Jeffrey Leitzinger, Ph.D., dated March 25, 2019, attached as **Exhibit 4** to the Declaration of Michael J. Freed |
| **"McGuire Rep."** | Expert report of Thomas G. McGuire, Ph.D., dated March 25, 2019, attached as **Exhibit 5** to the Declaration of Michael J. Freed |
| **"Molina Rep."** | Expert report of Luis A. Molina, dated March 25, 2019, attached as **Exhibit 6** to the Declaration of Michael J. Freed |
| **"NDA"** | New Drug Application |
| **"PBM"** | Pharmacy benefit manager |
| **"reformulated Opana ER"** | Endo's reformulated version of Opana ER, known internally at Endo as EN3288. |
| **"Rosenthal Rep."** | Expert Report of Meredith Rosenthal, Ph.D., dated March 25, 2019, attached as **Exhibit 7** to the Declaration of Michael J. Freed |
| **"SLA"** | Settlement and License Agreement between Endo and Impax |

| | |
|---|---|
| **"TPPs"** | Third party payors |
| **"Tupman Rep."** | Expert report of John R. Tupman, Jr., dated March 25, 2019, attached as **Exhibit 8** to the Declaration of Michael J. Freed |
| **"Unjust Enrichment Subclasses"** | All persons or entities who from April 2011 through and including the date that the anticompetitive effects of Defendants' unlawful conduct ceased indirectly purchased, paid for, and/or provided reimbursement for some or all of the purchase price for brand or generic Opana ER 5 mg, 10 mg, 20 mg, 30 mg, and/or 40 mg, other than for resale, as set forth in the following groups: |

**Subclass 1**: Iowa, Michigan, Oregon, West Virginia

**Subclass 2**: Maine, New Mexico, Wisconsin

**Subclass 3**: Hawaii, Massachusetts, Mississippi, Nebraska, Vermont

**Subclass 4**: Florida, Minnesota, Missouri, Nevada, Pennsylvania, South Dakota, Utah

**Subclass 5**: Arizona, North Dakota

| | |
|---|---|
| **"WAC"** | Wholesale Acquisition Cost |

## I.      INTRODUCTION

Under Federal Rules of Civil Procedure 23, EPPs seek certification of classes of end payors that purchased and/or reimbursed some or all of the purchase price for branded or generic versions of the opioid Opana ER 5 mg, 10 mg, 20 mg, 30 mg, and 40 mg, beginning as early as April 1, 2011 through the date the anticompetitive effects of Defendants' unlawful conduct ceased in certain states. One class seeks certification of claims under certain state antitrust and consumer laws (the "**Antitrust/Consumer Class**"). The other classes seek certification of claims under certain state unjust enrichment laws (the "**Unjust Enrichment Subclasses**").[1]

EPPs allege that Defendants' June 8, 2010 Agreement ending their Opana ER patent infringement trial unlawfully delayed the entry of Impax's less-expensive generic Opana ER. To avoid the risk of losing its monopoly over Opana ER, Endo promised Impax millions of dollars in the form of: (1) a promise not to launch an AG of Opana ER when Impax launched its generic version of Opana ER; (2) a provision known as the "Endo Credit" under which Endo paid Impax over $102 million; and (3) $10 million for a drug that never came to market. In exchange, Impax delayed the launch of its generic Opana ER until January 2013. Such "pay for delay" agreements are unlawful because they eliminate competition from less expensive generic alternatives. EPPs bear the brunt of such agreements as they are forced to pay inflated drug prices.

Defendants' anticompetitive conduct caused EPPs to suffer classwide injury in the form of overcharge damages. Courts routinely certify end-payor classes alleging anticompetitive

---

[1] The following persons and entities are excluded from the proposed Classes: (a) Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates; (b) all governmental entities, except for government-funded employee benefit plans; (c) all persons or entities who purchased Opana ER for purposes of resale or directly from defendants or their affiliates; (d) fully-insured health plans (plans that purchased insurance from another third-party payor covering 100 percent of the plan's reimbursement obligations to its members); (e) flat co-payers (consumers who paid the same co-payment amount for brand and generic drugs); (f) PBMs; (g) all Counsel of Record; and (h) the Court, Court personnel and any member of their immediate families.

conduct under various state laws. *See, e.g.*, *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2017 WL 4621777 (D. Mass. Oct. 16, 2017); *In re Lidoderm Antitrust Litig.*, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017); *In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168 (D. Mass 2013), *aff'd*, 777 F.3d 9 (1st Cir. 2015). EPPs here also satisfy the class certification requirements under Rule 23(a) and (b)(3) because:

- the members of the classes are so numerous that joinder is impracticable;

- the claims involve common questions of law and fact;

- the claims of named EPPs are typical of the claims of other members of the classes;

- the named plaintiffs will fairly and adequately represent the interests of the classes;

- common questions of law and fact predominate over individual issues; and

- class certification is superior to other available means of adjudication.

EPPs' claims are well-suited for class treatment as they arise from a single course of conduct to delay generic competition for Opana ER 5 mg, 10 mg, 20 mg, 30 mg, and 40 mg. Rule 23 was designed to facilitate the classwide adjudication of similar claims and to achieve economies of time, effort, and expense while promoting uniformity of decision as to all those similarly situated. The class action mechanism is not only the superior method to adjudicate claims such as those alleged here, but it also is the only viable method of doing so.

Accordingly, EPPs respectfully request (1) certification of the Antitrust/Consumer and Unjust Enrichment Classes, (2) appointment of Labaton Sucharow and Freed Kanner as Co-Lead Class Counsel; and (3) appointment of EPPs as representatives of the Classes.

## II.    STATEMENT OF FACTS

### A.    Impax threatened Endo's Opana ER monopoly

In 2006, Endo launched Opana ER and recorded hundreds of millions of dollars in annual sales. Leitzinger Rep. ¶25. In 2007, Impax submitted an ANDA for generic Opana ER in the 5,

10, 20, and 40 mg strengths, which was amended in 2008 to include the 30 mg strength. DeLeon Rep. ¶¶32-35. In its ANDA, Impax made a Paragraph IV certification against certain Endo patents, claiming that they were invalid, unenforceable, or not infringed by Impax's generic versions. Because Impax was the first company to submit a Paragraph IV certification, it was eligible for (and ultimately was granted) 180 days of marketing exclusivity for the five strengths covered by its ANDA. *Id.* ¶¶33, 36, 53.[2]

████████████████████████████████████

████████████████████████████████████

███████████████████████████████ Rosenthal Rep. ¶13.

### B. The Opana ER patent litigation

In response to Impax's Paragraph IV certification, Endo sued Impax for patent infringement, triggering a 30-month stay on the FDA's ability to approve Impax's ANDA. DeLeon Rep. ¶¶56, 67. The stay prevented the FDA from approving Impax's 5, 10, 20, and 40 mg strengths until June 14, 2010, and from approving Impax's 30 mg strength until December 16, 2010. *Id*. ¶¶56, 66. Impax, however, was well-positioned to succeed in the patent litigation and confident that it could do so. As Impax's former CFO told investors at a June 2010 conference: "if we're unsure of our ability to avoid the patent we'll likely pick another project. So, we go into these projects pretty sure that we can beat the patent or we don't pick it up." McGuire Rep. ¶76 ████████████████████████████

████████████████████████████████████

---

[2] Actavis was the first ANDA applicant to make Paragraph IV certifications against the 7.5 mg and 15 mg strengths of Opana ER. *See* DeLeon Rep. ¶42.

*See* Belvis Rep. ¶¶426-431. ████████████████████████████████

████████████████████████████████████████████████ *Id.* ¶426.

### C.  Impax prepared to launch generic Opana ER

Impax's former CEO identified the launch of generic Opana ER as a "Company Key Goal" for 2010. McGuire Rep. ¶190; Bruno Rep. ¶¶87. Impax's pre-SLA forecasts assumed ███████████████████████ McGuire Rep. ¶190 n.327. After receiving tentative approval of its ANDA, the President of Impax's Generics Division raised the possibility of an at-risk launch of generic Opana ER, calling it a "good candidate." *Id.* ¶190. Indeed, Impax had more than $1.3 million in generic Opana ER inventory. *Id.* ¶190 n.332; Bruno Rep. ¶98, n. 105. And just after the SLA was executed, Impax received additional oxymorphone quota from the DEA that would have allowed it to be ready to launch certain strengths of generic Opana ER no later ████████████████████████████████████████ *Id.* ¶¶72, 99-104.

████████████████████████████████████████████

███████ On May 13, 2010, Impax obtained tentative approval of its ANDA, which meant that the FDA was ready to grant a final approval but for the 30-month stay. DeLeon ¶¶57-60.

████████████████████████████████████████████

███████████████████████████ *Id.* ¶¶114, 116.

### D.  To avoid losing its Opana ER monopoly, Endo paid Impax to delay

To end the threat of competition to Opana ER, Defendants negotiated and executed the SLA and DCA, both signed June 8, 2010. Each provided Impax significant consideration in exchange for Impax's agreement to delay entry until January 2013.

### 1.    Under the SLA, Endo paid Impax tens of millions of dollars

The SLA provided significant value to Impax under two interrelated provisions: the no-AG promise and the Endo Credit. EPPs' expert, Dr. McGuire, estimates that these provisions were worth at least ███████████ at the time of the SLA's execution (and potentially as much as ███████████, McGuire Rep. ¶129, an amount far exceeding the estimated███████████ in saved litigation expenses Endo realized by settling the patent case. *Id.* ¶¶118, 130.

***The No-AG Promise***. ███████████████████████████████████

████████████████████████████████████████████████████ *Id.* ¶¶23-24. Because the no-AG promise would remove a potential generic competitor, Impax executives viewed a no-AG promise as "among the more important things" in a settlement with Endo. *Id.* ¶23. Impax projected that an Endo AG would reduce Impax's generic Opana ER profits by $24.5 million. *Id.* Endo similarly projected that it would earn $25 million from an AG. Molina Rep. ¶53. ████████████████████████████████████████

████████████████████████████████████████ *Id.* ¶¶57-68, 73.

***The Endo Credit***.████████████████████████████████████████

███████████████████████ McGuire Rep. ¶¶22, 30, 209. The former president of Impax's Generic Division worried that Endo had a "secret plan to damage the market" by launching a reformulated version of Opana ER. *Id.* ¶132. To protect itself against a possible launch by Endo of a reformulated version Opana ER, Impax requested an acceleration clause that would permit Impax to launch its generic earlier than 2013 if original Opana ER sales declined. Endo again refused. *Id.* ¶¶30, 209. ████████████████████████████████████the "Endo Credit," *Id.* ¶¶120-129, under which Endo would pay Impax if, prior to Impax's launch, Opana ER sales fell below 50% of Endo's peak quarterly sales prior to Impax's launch. *Id.* ¶¶39; 120. Significantly, in exchange for the Endo Credit, Impax stopped pursuing an earlier launch date.

*Id.* ¶40. The Endo Credit gave Impax "downside protection" from any market degradation to Opana ER caused by Endo launching reformulated Opana ER, which was "super, super important" to Impax. *Id.* ¶27. As a result, Impax viewed the Endo Credit as a "make-whole provision" or ███████████████████████████ *Id.* ¶27.

When Endo launched a reformulated Opana ER and pulled Opana ER from the market, Endo paid Impax over $102 million under the Endo Credit. *Id.* ¶121.

### 2. Under the DCA, Endo paid Impax a guaranteed $10 million

While negotiating the SLA, Defendants also hastily negotiated a development and co-promotion deal for an Impax product— the pre-clinical "IPX-203." Tupman Rep. pp. 38-41. Endo's due diligence for IPX-203 was done under an unusually short timeline—just a few days—and was thus atypical of the due diligence period for other development deals Endo entered. *Id.* pp. 42-46. ███████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████ *Id.* pp. 59-63. Ultimately, IPX-203 was never developed into a marketable product—the DCA was terminated in December 2015. *Id.* pp. 31, 33.

Plaintiffs' expert, John Tupman, concludes that no reasonable pharmaceutical company would have entered the DCA and that Endo overpaid Impax by at least ███████ *Id.* pp. 63.

### E. Endo used the paid-for delay to launch reformulated Opana ER, further damaging competition for Opana ER

Endo quickly readied itself to launch reformulated Opana ER. Prior to entering the Agreement, Endo understood that reformulated Opana ER's commercial success was contingent on launching it ahead of Opana ER generics and assumed it could only convert "about ~25% of all existing oxymorphone business with [reformulated Opana ER] . . . if we launch after the

6

advent of generics." Rosenthal Rep. ¶¶17-18. Thus, just one month after settling with Impax, Endo filed its NDA for reformulated Opana ER. DeLeon Rep. ¶54.

In December 2011, the FDA approved reformulated Opana ER, and in February 2012 Endo began shipping reformulated Opana ER. *Id.* ¶¶54, 99.

To thwart expected competition from generic Opana ER, Endo systematically withdrew original Opana ER from the market, first removing the 7.5 and 15 mg strengths prior to Actavis's July 2011 launch and then removing the remaining strengths in May 2012, seven months ahead of Impax's launch in January 2013. *Id.* ¶¶96-98. Endo also filed a Citizen Petition asking the FDA to refuse to approve any pending ANDA for a generic version of Opana ER and suspend and withdraw the approval of any ANDA referencing Opana ER. *Id.* ¶100. In May 2013, the FDA not only denied the petition but found that reformulated Opana ER was, in fact, *more* prone to certain forms of abuse than original Opana ER. *Id.* ¶105 (citing FDA denial of Endo Citizen Petition, where the FDA noted "the troubling possibility that a higher (and rising) percentage of [reformulated Opana ER] abuse is occurring via injection than was the case with [original Opana ER]"). Indeed, in June 2017, the FDA requested that Endo withdraw reformulated Opana ER from the market "based on [the FDA's] concern that the benefits of the drug may no longer outweigh its risks"—which Endo agreed to do. *Id.* ¶107.

## F.   Defendants' conduct injured end payors

The proposed Classes include consumers and TPPs that indirectly purchased and/or reimbursed for Opana ER or generic Opana ER, other than for resale, during the Class Period. Absent unlawful payments, Defendants would have been economically motivated to settle on an entry date anytime between April and July 2011 and would have entered into an alternative settlement that would have permitted (a) Impax to enter the market earlier than it did, and (b) Endo to launch Opana ER AG to compete with Impax's generic, further driving down generic

Opana ER prices. *See* McGuire Rep. ¶¶199-210 (concluding that Defendants were motived to enter a no-payment settlement with an Impax generic entry date anytime between April and July 2011). Had Impax launched its generic Opana ER between April and July 2011, Endo would have been ready, willing, able, and incentivized to launch an AG to compete with Impax's generic. *See, e.g.,* Bruno Rep. ¶¶107-114; Molina Rep. ¶¶55-74; DeLeon Rep. ¶¶110-113. And once Impax's 180-day exclusivity period expired, Actavis would have been able to launch its generic Opana ER, driving prices down further. McGuire Rep. ¶¶213-14; DeLeon Rep. ¶¶80-86.

As a result of Defendants' illicit scheme, EPPs and other end payors were injured because they (1) continued to pay monopoly prices for Opana ER through January 2013, when Impax's generic launched; (2) paid more for generic Opana ER when Impax launched because Endo did not launch an Opana ER AG; and (3) continued to pay supracompetitive prices well after Impax's generic launch because Endo's paid-for delay permitted it to complete the switch to reformulated Opana ER, which further limited generic competition from Impax's generic.

## III.   ARGUMENT

At class certification, EPPs "must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternatives in Rule 23(b)." *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 811 (7th Cir. 2012). At this stage, EPPs need not show that they will succeed on the merits at trial, as Rule 23 "grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

A.      **Antitrust claims are well-suited for class certification**

Because "[e]very violation of the antitrust laws is a blow to the free-enterprise system," both state and federal law encourage vigorous private enforcement of those laws—particularly through class actions. *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 (1972). Courts frequently certify classes in antitrust cases, reflecting the fact that such cases are particularly well suited for class treatment. *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *Messner*, 669 F.3d at 815 (same) (quoting *Amchem*); Freed Decl. Ex. 11 (appendix of certified end-payor classes in pay-for-delay actions). This is because the central issues in antitrust cases— defendants' conduct, antitrust impact, and measure of damages—are common to all class members. *See Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 929 (7th Cir. 2016) (certifying antitrust class where liability and aggregate damages were common to all members); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) ("[P]roof of the conspiracy is a common question that is thought to predominate over the other issues of the class.") (citing 7AA Wright & Miller § 1781 (collecting authorities)).

B.      **EPPs satisfy the Rule 23(a) requirements**

1.      **Numerosity is satisfied**

The proposed EPP Classes are "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, over one million prescriptions for Opana ER were filled during the Class Period, easily satisfying numerosity. Rosenthal Rep. ¶24; *Teva Pharms. USA, Inc. v. Abbott Labs.,* 252 F.R.D. 213, 232 (D. Del. 2008) (numerosity satisfied where "record indicates that millions of prescriptions were dispensed in the past several years, such that joinder is impracticable"); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 267 (D. Mass. 2004) (same).

### 2. The litigation involves common questions of law and fact

EPPs also can establish the existence of "questions of law or fact common to the class."

Fed. R. Civ. P. 23(a)(2). "Where the same conduct or practice by the same defendant gives rise

to the same kind of claims from all class members, there is a common question." *Suchanek v.*

*Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014). Here, the central issue "whether or not [a]

conspiracy existed—*i.e.*, whether or not Defendants' practiced 'standardized conduct' toward all

parties—is one that is common to all Defendants." *In re Sulfuric Acid Antitrust Litig.*, 2007 WL

898600, at \*4 (N.D. Ill. Mar. 21, 2007). *See also* 7AA Wright & Miller § 1781 (collecting

authorities). Other common questions are identified in EPPs' Complaint. *See* ECF No. 164,

¶246(a)-(j). Further, courts routinely find that pay-for-delay cases present common questions.

*See, e.g.*, *Solodyn*, 2017 WL 4621777, at \*14-20; *Lidoderm*, 2017 WL 679367, at \*18-25;

*Nexium*, 297 F.R.D. at 174-83.[3] Accordingly, EPPs satisfy commonality.

### 3. EPPs' claims are typical of the Classes' claims

Rule 23(a)'s third requirement is that class representatives' claims be "typical" of the

proposed classes' claims. Fed. R. Civ. P. 23(a)(3). Typicality "is closely related to commonality

and should be liberally construed." *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 479 (N.D. Ill.

2009), *aff'd,* 606 F.3d 391 (7th Cir. 2010). When "the representative party's claim arises from

the same course of conduct that gives rise to the claims of other class members and all of the

claims are based on the same legal theory," factual differences among class members do not

defeat typicality. *Id.* (citation omitted). *See also In re Ready-Mixed Concrete Antitrust Litig.*, 261

F.R.D. 154, 168 (S.D. Ind. 2009). Where "it is alleged that the defendants engaged in a common

---

[3] *See also Relafen*, 221 F.R.D. at 267 (commonality established because all class members' claims allege injury arising from same conduct by defendants); *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 217 (E.D. Pa. 2012) (commonality established because "proof of the essential elements" of antitrust claims would focus on "allegations surrounding [the] alleged conduct in delaying generic entry").

scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical[.]" *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 207 (E.D. Pa. 2001), *aff'd*, 305 F.3d 145 (3rd Cir. 2002).[4]

Here, all claims arise from the same course of conduct: Defendants' anticompetitive scheme to delay the availability of generic Opana ER, subjecting *all* end payors to supracompetitive prices for branded and generic Opana ER during the Class Period. Moreover, EPPs' claims are based on the common legal theory that Endo and Impax conspired to restrain trade and monopolize the market for Opana ER. The fact that EPPs' claims arise under multiple state laws does not defeat typicality because the claims "arise from an identical course of conduct" by Defendants. *Flonase*, 284 F.R.D. at 217-18.

That EPPs and other end payors may have purchased or reimbursed branded and generic Opana ER at different prices and at different times does not render EPPs' claims atypical. In antitrust cases, the

> typicality requirement does not mandate that the products purchased, methods of purchase, or even damages of the named plaintiffs must be the same as those of the absent class members. . . . [T]he overarching scheme is the linchpin of plaintiffs' complaint, regardless of the product purchased, the market involved or the price ultimately paid.

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 300, 303 (N.D. Cal. 2010) (quotation marks, citations, and alterations omitted).

Nor does it matter that the named EPPs do not have Opana ER or generic Opana ER claims in every state they seek to include in the Classes. Courts in the Seventh Circuit have upheld certification of multistate classes where there is not a class representative in each state.

---

[4] *See also In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 640 (D. Kan. 2008) ("[t]ypicality refers to the nature of the claims . . . not the individual characteristics of the plaintiff"), *aff'd*, 768 F.3d 1245 (10th Cir. 2014) (citation omitted).

*See, e.g.*, *Saltzman*, 257 F.R.D. at 480, 484 n.12 (certifying six-state subclasses and rejecting defendants' argument that plaintiffs lacked standing to pursue claims on behalf of four of six states); *Mullins v. Direct Dig., LLC*, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014) (certifying multistate class even though named plaintiff was a resident of one state), *aff'd*, 795 F.3d 654 (7th Cir. 2015).[5] As described below, named EPPs' interests are aligned with all EPPs. Accordingly, typicality is satisfied here.

### 4. EPPs will fairly and adequately represent the Classes' interests

Finally, Rule 23(a) requires that the proposed class representatives fairly and adequately represent the interests of the class. Fed. R. Civ. P. 23(a)(4). Adequacy is a two-part test: (i) the named plaintiffs cannot have claims in conflict with other class members, and (ii) the named plaintiffs and proposed class counsel must demonstrate their ability to litigate the case vigorously and competently on behalf of named and absent class members alike. *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 244 F.R.D. 469, 478-79 (N.D. Ill. 2007), *aff'd*, 571 F.3d 672 (7th Cir. 2009).

Here, EPPs have no conflicts with other end payors. Rather, their interests are aligned because EPPs, like all end payors, were injured by the same alleged conduct and share a strong interest in establishing Defendants' liability and maximizing classwide damages—this holds true whether the EPP is a consumer or TPP. *See Nexium*, 297 F.R.D. at 172 (holding that TPPs can represent all end payors).[6] The first prong of the adequacy requirement, therefore, is satisfied.

---

[5] *See also Barden v. Hurd Millwork Co.*, 249 F.R.D. 316 (E.D. Wis. 2008) (certifying 21-state warranty class).

[6] *See also In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 326, 337 (E.D. Mich. 2001) ("Defendants' arguments about potential conflicts are insufficient to deny class certification" because each class member "has the same interest in maximizing the aggregate amount of classwide damages"); *Solodyn*, 2017 WL 4621777, at *12 ("argument [that consumers and TPPs are different groups] has been rejected by this Court and others certifying end-payor classes consisting of both consumers and third-party purchasers."); *Lidoderm*, 2017 WL 679367, at *26 (no conflict between TPPs and consumers).

At all times, EPPs and Class Counsel have pursued the matter vigorously and competently on behalf of end payors. Each EPP has dedicated substantial time and effort to the case by, among other things: reviewing pleadings; responding to written discovery; searching for, collecting, and producing documents; and preparing and sitting for depositions. EPPs are represented by counsel with substantial antitrust and class action litigation experience. *See* Freed Decl. Exs. 9-10 (firm resumes for Labaton Sucharow and Freed Kanner); ECF No. 78 (order appointing Labaton Sucharow and Freed Kanner interim lead counsel). Counsel have aggressively prosecuted this case, including successfully litigating against Defendants' motion to dismiss and several discovery motions. Counsel have devoted substantial resources to prosecute this action, including retaining multiple experts, and will continue to do so.

For all these reasons, EPPs and their counsel satisfy Rule 23(a)(4).[7]

### C.     EPPs satisfy Rule 23(b)(3) requirements

Under Rule 23(b)(3), EPPs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Considerable overlap exists between the court's determination of commonality and a finding of predominance. A finding of commonality will likely satisfy a finding of predominance because, like commonality, predominance is found where there exists a common nucleus of operative facts." *Saltzman*, 257 F.R.D. at 484. Yet "Rule 23 does not demand that every issue be common; classes are routinely certified under Rule

---

[7] If this Court finds any of the proposed class representatives to be inadequate, EPPs request leave to substitute an alternative class representative. *See*, *e.g.*, *In re Lithium Ion Batteries Antitrust Litig.*, 2016 WL 948874 (N.D. Cal. Mar. 14, 2016) (permitting substitution of class representatives during class certification briefing); *In re NorthShore Univ. HealthSystem Antitrust Litig.*, 2018 WL 2383098, at *1 (N.D. Ill. Mar. 31, 2018) (permitting substitution when there was no adequate class representative).

23(b)(3) where common questions exist and predominate, even though other individual issues will remain after the class phase." *Kleen,* 831 F.3d at 922.[8] For example, "it is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3).'" *Id.* at 925 (quoting *Messner,* 669 F.3d at 815)). Nor does predominance require a decision on the merits of those common questions. *Amgen,* 568 U.S. at 459. Rather, it requires that the questions are "*capable of proof at trial* through evidence that is common to the class rather than individual to its members." *Messner,* 669 F.3d at 818 (emphasis in original).

Here, EPPs will demonstrate through common proof that Defendants' Agreement violated state antitrust, consumer protection, and unjust enrichment laws. Classwide impact of Defendants' conduct will and can be established through common proof of the lower prices for branded and generic Opana ER that would have prevailed but for Defendants' unlawful conduct. Indeed, predominance is "readily met" in antitrust cases such as this one. *Amchem,* 521 U.S. at 625; *Messner,* 669 F.3d at 814. The superiority requirement of Rule 23(b)(3) is also met here: a class action will minimize waste and maximize efficiency without prejudice to any party.[9]

---

[8] *See also McMahon v. LVNV Funding*, 807 F.3d 872, 875-76 (7th Cir. 2015) ("the need for individual proof alone does not necessarily preclude class certification") (citing *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010)); *Fox v. Riverview Realty Partners*, 2014 WL 1613022 at *5 (N.D. Ill. Apr. 22, 2014) ("The issue for Rule 23(b)(3) purposes is not whether there are individualized issues—there are some individualized issues in virtually every situation in which class certification is sought—but rather whether common issues predominate over any individualized issues.").

[9] Moreover, should this Court find that this "case requires determinations of individual issues of causation and damages," "[i]t is well established that . . . a court may 'bifurcate the case into a liability phase and a damages phase.'" *McMahon*, 807 F.3d at 876; *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 671 (7th Cir. 2015) (same). *See also Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013) ("[A] class action limited to determining liability on a class-wide basis, with separate hearings to determine . . the damages of individual class members or homogenous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed."). Accordingly, EPPs reserve the right to seek certification of specific issues under Rule 23(c)(4).

### 1. Common issues predominate as to market power

EPPs can establish that Endo possessed market power through direct (*e.g.*, proof of supracompetitive pricing) or indirect (*e.g.*, proof that Endo has dominant share of the relevant market) evidence that is common to all end payors. *See Toys 'R' US, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (market power proven through direct or indirect evidence); *Flonase*, 284 F.R.D. at 219 ("The issues relevant to proving liability—relevant market, monopoly power, exclusionary conduct, and causation—can be proven through class-wide, common evidence because these issues focus on [defendant]'s conduct, not on the actions of the individual class members.").[10] Here, EPPs will prove market power through historical pricing data and Defendants' internal documents, including models and forecasts. This common evidence will show that ███████████████████████████████████████████████████████████ ████████████████████████████████████████ Leitzinger Rep. ¶¶34, 60.

### 2. Common issues predominate as to Defendants' violations of state antitrust, consumer protection, and unjust enrichment laws

The predominance test is "readily met" in cases alleging antitrust violations where, as here, plaintiffs' theories of liability are necessarily premised on the defendants' conduct, not on issues particular to individual class members. *See, e.g.*, *Amchem*, 521 U.S. at 625.[11] The central

---

[10] *Teva Pharms. USA*, 252 F.R.D. at 228 (certifying direct purchaser and end payor class: "[T]he court finds that each putative class member, had they pursued their claims individually, would have been required to prove identical facts, such as defendants' monopoly power, exclusionary scheme, effect on interstate commerce, conspiracy, and unreasonable restraint of trade.").

[11] *See also Kleen*, 831 F.3d at 929 (common issues over liability and damages predominated); *Scrap Metal*, 527 F.3d at 535 (in antitrust cases, "proof of the *conspiracy* is a common question that is thought to predominate over the other issues of the case."); *Solodyn*, 2017 WL 4621777, at *17-18 (common questions concerning defendants' liability predominated for both consumers and third party payors); *Lidoderm*, 2017 WL 679367, at *1 (finding the following common questions predominated: "Did defendants engage in anticompetitive conduct? Did the conduct lead to overcharges for brand and generic lidocaine patches? What aggregate damages resulted from the overcharges?"); *Ready-Mixed Concrete*, 261 F.R.D. at 169-71 (holding that questions about antitrust liability and impact predominated); *Relafen*,

15

issue in all pay-for-delay cases, like this one, is whether the brand manufacturer (here, Endo) paid a generic competitor (here, Impax) to delay market entry of its competing generic product. *See FTC v. Actavis*, *Inc.*, 133 S. Ct. 2223, 2236 (2013).

In proving Defendants' antitrust violation here, "virtually all class members would be relying on the same evidence that [EPPs] have submitted in support of class certification—namely the documents, emails, . . . and other indirect evidence necessary to prove that Defendants conspired in violation of antitrust laws." *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 594 (N.D. Ill. 2015) (Leinenweber, J.), *aff'd* 831 F.3d 919 (7th Cir. 2016); *In re Steel Antitrust Litig.*, 2015 WL 5304629, at \*6 (N.D. Ill. Sept. 9, 2015) ("Any trial in this matter will focus overwhelmingly on common proof of conspiracy. . . ."). Here, common proof will include an analysis of (1) the terms of the Agreement; (2) Defendants' negotiations of and communications concerning the Agreement; and (3) expert analysis demonstrating that the purpose and effect of the Agreement was to induce Impax to delay the launch of its generic Opana ER and restrain competition for branded and generic Opana ER.

That EPPs' claims are brought under state antitrust, consumer protection, and unjust enrichment laws does not alter this conclusion. For example, in three recent pay-for-delay class actions, courts have held that end-payors' state law claims were sufficiently similar to be resolved through common evidence. *Solodyn*, 2017 WL 4621777, at \*20 ("the substantial similarities in the language among states and between state and federal provisions" and that any differences did "not rise to the level necessary to defeat predominance"); *Lidoderm*, 2017 WL 679367, at \*27 (certifying multistate end-payor class; "[t]he differences in the applicable state

---

221 F.R.D. at 275 ("The alleged antitrust violation relates solely to [defendant's] conduct, and as such, constitutes a common issue subject to common proof.").

laws identified by defendants do not appear to be material or even significant"); *Nexium*, 297 F.R.D. 168 (same; certifying multistate end-payor class).

This Court similarly held in a consumer class action that "the differences among the states[' laws] are manageable" and did not defeat predominance. *Mednick v. Precor*, 320 F.R.D. 140, 156-57 (N.D. Ill. 2017) (Leinenweber, J.) (certifying class alleging violations of five state consumer protection laws); *see also Mullins*, 2014 WL 5461903, at *3 (predominance satisfied in consumer class action alleging violations of multiple states' consumer protection laws); *Saltzman*, 257 F.R.D. 484 n.12 (certifying subclasses under six state consumer laws: "Although there are some differences in state consumer protection statutes, the factual and legal questions to be answered are substantively the same.").[12]

Here, each applicable state antitrust laws either mirrors federal antitrust law, contains a federal harmonization provision, or has been interpreted harmoniously with federal law. SCAC ¶¶249-259; Freed Decl. Ex. 12 (appendix surveying state antitrust and consumer laws). Indeed, this Court previously held that Defendants' violation of federal antitrust law would likewise violate state antitrust laws. *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 721-22 (N.D. Ill. 2016). *See also Nexium*, 297 F.R.D. at 175-76 ("violation of traditional antitrust elements constitutes a violation of the relevant consumer protection statute[s]"). This Court also recognized that EPPs' consumer protection claims have been interpreted to permit recovery for anticompetitive, unfair, or unconscionable conduct. *In re Opana ER Antitrust Litig.*, 2016 WL 4245516, at *2 (N.D. Ill. Aug. 11, 2016); Freed Decl. Ex. 12. EPPs' unjust enrichment claims

---

[12] Moreover, "the fact that damages are not identical across all class members should not preclude class certification," "[i]f the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses." *Butler*, 727 F.3d at 801.

also reach anticompetitive conduct. *See* Freed Decl. Ex. 13 (appendix of cases showing that unjust enrichment claims can redress antitrust violations).

Common questions also predominate for the unjust enrichment subclasses, which combine similar state unjust enrichment laws while respecting the nuances among the several states' laws. *See id.* at Ex. 14 (appendix surveying EPPs' unjust enrichment claims).[13] Every unjust enrichment claim generally requires EPPs "to show that Defendants received a benefit and [that,] under the circumstances of the case, retention of the benefit would be unjust." *In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1014 (E.D. Mich. 2014). EPPs recognize, though, that certain states require additional elements to prove an unjust enrichment claim—*e.g.*, Defendants' knowledge or appreciation of the benefit and EPPs' lack of an adequate remedy at law.[14]

Most significantly, regardless of the unjust enrichment elements in any one state, ***Defendants' conduct here would establish liability under all of them***. *See Lauber v. Belford High Sch.*, 2012 WL 5822243, at *9 (E.D. Mich. Jan. 23, 2012) (certifying multistate unjust enrichment class because "the Court cannot imagine a situation in which [the defendant] would be liable under one state's law but not under another state's law").[15] Defendants' Agreement, as

---

[13] EPPs are cognizant of the fact that courts in this district have rejected multistate unjust enrichment classes that failed to appreciate differences among states' laws, *see, e.g.*, *In re Aqua Dots Prods. Liab. Litig.*, 270 F.R.D. 377, 385 (N.D. Ill. 2010) and thus have included in Exhibit 14 a chart depicting any differences and dividing the EPPs into appropriate subclasses accordingly.

[14] With four exceptions—Massachusetts, Mississippi, Pennsylvania, and Utah—EPPs' unjust enrichment claims that require the absence of an adequate remedy at law are being maintained only in the alternative to their antitrust claims. *See, e.g.*, *Toscano v. Koopman*, 148 F. Supp. 3d 679, 689 (N.D. Ill. 2015) (declining to dismiss unjust enrichment because "Plaintiff is correct that he is permitted to plead alternative theories."). Unjust enrichment is the only means of recovery for end payors from these states.

[15] *See also Rapoport-Hecht v. Seventh Generation, Inc.*, 2017 WL 5508915, at *3 (S.D.N.Y. Apr. 28, 2017) ("[N]umerous courts have certified nationwide classes based on a common claim of unjust enrichment" on the ground that "'[a]lthough there are numerous permutations of the elements of the unjust enrichment cause of action in the various states, there are few real differences,' and regardless of which state's law applies, 'the focus of an unjust enrichment claim is whether the defendant was *unjustly* enriched'") (alteration in original).

18

well as the negotiations leading up to it, reflects their intent to delay generic competition and

perpetuate Endo's monopoly in exchange for substantial payments to Impax. With Impax's

delayed launch secured, Endo was able to maintain its dominance over Opana ER in the 5 mg, 10

mg, 20 mg, 30 mg, and 40 mg strengths over the delay period, causing EPPs and other end

payors to pay higher prices for the drug. *See* Leitzinger Rep. ¶¶34, 86-87. *See also* Rosenthal

Rep. ¶¶13-18, 30, 45, 46.   Moreover, even when Impax launched its generic, Endo's no-AG

promise caused end payors to pay inflated prices for Impax's generic during Impax's 180-day

exclusivity period. To permit Defendants to retain the benefits of their unlawful scheme would

therefore be unjust. *See Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265–66 (1946) ("The

constant tendency of the courts is to find some way in which damages can be awarded where a

wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery

for a proven invasion of the plaintiff's rights.") (quotations omitted). These common facts would

satisfy the most stringent of unjust enrichment laws offered here.

### 3. Common issues predominate as to antitrust impact

Pay-for-delay agreements are anticompetitive because the "payment's objective is to

maintain supracompetitive prices to be shared among the patentee and the challenger rather than

face what might have been a competitive market." *Actavis*, 133 S. Ct. at 2235-36. The Supreme

Court explained that when "a party with no claim for damages . . . walks away with money

simply so it will stay away from the patentee's market," it creates the kind of collusion that "is

the supreme evil of antitrust." *Id.* at 2233. A "payment in return for staying out of the market . . .

simply keeps prices at patentee-set levels" and allows drug companies to divide monopoly

profits with the result that "[t]he patentee and the challenger gain; the consumer loses." *Id.* at

2234-35; *Opana ER*, 162 F. Supp. 3d at 720-21 (antitrust claims stated where defendants

"conspired to allocate Oxymorphone ER Market in a manner that gave each company more

exclusivity than it was lawfully entitled to in order to maximize profits at the expense of Plaintiffs and consumers").

Because generic drugs are typically significantly less expensive than their branded counterparts, when consumers and TPPs are denied access to generic drugs, they incur billions of dollars in extra costs. McGuire Rep. ¶¶59, 69, 85, 89. This lessening of competition and the resulting price increases caused by pay-for-delay agreements creates antitrust injury and is common across end payors. *See U.S. Gypsum Co. v. Indiana Gas Co., Inc.,* 350 F.3d 623, 626-27 (7th Cir. 2003) ("A private plaintiff must show antitrust injury—which is to say, injury by reason of those things that make the practice unlawful, such as . . . higher prices.").

### (a) Common evidence demonstrates that Defendants delayed competition from generic Opana ER

Common evidence shows that the Agreement is anticompetitive:

- Absent the Agreement, Impax was motivated to launch generic Opana ER, and would have been ready with launch quantities of certain generic Opana ER strengths by ███████████ Bruno Rep. ¶¶24, 87.

- Even though Endo was economically incentivized to launch an AG upon Impax's launch of generic Opana ER, Endo agreed to a no-AG promise, which kept an AG off the market during Impax's 180-day exclusivity. Molina Rep. ¶¶43, 57, 63-65.

- In lieu of an earlier entry date for Impax, the parties negotiated the Endo Credit, which if triggered, would provide Impax "downside protection" ████████████ ████████████████ to sell generic Opana ER if Endo was able to switch the market to reformulated Opana ER. McGuire Rep. ¶26.

- At the time the SLA was executed, Endo expected to pay Impax at least ███████ ██████ under the Endo Credit and no-AG promise, far exceeding Endo's saved litigation costs of ████████ McGuire Rep. ¶130; Belvis Rep. ¶¶108; 440-441.

- ████████████████████████████████████████ ████████████████████████████████████████ ████████ Tupman Rep. at pp. 63.

- Endo used its paid-for delay to switch the market to reformulated Opana ER— which the FDA later requested Endo remove from the market due to its abuse

liability—prior to Impax's launch of generic Opana ER, further perpetuating Endo's monopoly. McGuire Rep. ¶49.



McGuire Rep. ¶32; Rosenthal Rep. ¶13.

Leitzinger Rep. ¶¶46-47 █████████

███████████████████████████████████████████████████████

██████████ Rosenthal Rep. ¶14. And prices would have further eroded when Actavis's generic launched after the expiration of Impax's exclusivity. Rosenthal Rep. ¶57. *See also id.*, Attachment C.9 ██████████████████████████████████████████████

██████████████. Thus, common evidence shows that EPPs were injured by Defendants' conduct.

### (a) Defendants' Agreement kept Opana ER prices at supracompetitive levels, injuring end payors

Classwide overcharges are sufficient to establish antitrust impact and injury for Class members. *See, e.g.*, *Solodyn*, 2017 WL 4621777, at *18 (certifying end-payor class; "if the jury finds Defendants' conduct violated the state laws in question here, the vast majority of EPPs who purchased generic or brand Solodyn during this period and experienced injury in the form of overcharges"). "Plaintiffs need 'only to demonstrate that the element of antitrust impact *is capable of proof at trial* through evidence that is common to the class rather than individual to its members.'" *Kleen*, 306 F.R.D. at 595-96 (quoting *Messner*, 669 F.3d at 818).

Common evidence and economic analysis will demonstrate that all or nearly all members of the classes were injured by Defendants' anticompetitive Agreement to delay generic competition. Dr. Rosenthal's analysis demonstrates that absent Defendants' conduct, Opana ER

prices would have been significantly lower under any but-for scenario EPPs offer. Rosenthal Rep. ¶¶75-86. Further, Dr. Rosenthal also finds that in the but-for world, less-expensive generic Opana ER would have taken significantly more share than it did in the actual world. *Id.* ¶¶55, 75; *id.*, Attachment C.9. As a result, members of the Classes have suffered impact because, absent Defendants' conduct, they would have purchased or reimbursed for the less expensive generic Opana ER in lieu of the brand.

> **(b)     Seventh Circuit precedent explicitly holds that predominance is not defeated by the presence of uninjured class members**

While EPPs have demonstrated that Defendants' unlawful conduct injured all or nearly all members of the Classes, the Seventh Circuit has repeatedly held that plaintiffs need not demonstrate that *all* class members were injured to certify a class: "While we have no quarrel with the proposition that each and every class member would need to make . . . a showing [of injury] in order ultimately to recover, we have not insisted on this level of proof at the class certification stage." *Kleen*, 831 F.3d at 927.[16] "[A] class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable because at the outset of the case many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown." *Kohen*, 571 F.3d at 677.[17]

In pay-for-delay cases like this, it is axiomatic that "antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset." *Nexium*, 777 F.3d

---

[16] *See also, e.g.*, *Suchanek*, 764 F.3d at 757 ("If the [district] court thought that no class can be certified until proof exists that every member has been harmed, it was wrong.").

[17] *In re Nexium Antitrust Litig.*, 777 F.3d 9, 22 (1st Cir. 2015) ("In certifying a (b)(3) class there is an almost inevitable tension between excluding all non-injured parties from the defined class and including all injured parties in the defined class. Ideally, that tension should be resolved by adopting a class definition that includes no uninjured parties and excludes no injured parties.").

at 27.[18] EPPs' expert, Dr. Rosenthal, has demonstrated that all or virtually all class members were injured by Defendants' unlawful foreclosing of generic competition. Rosenthal Rep. ¶¶34-58. Consistent with the exclusions in the defined classes, Dr. Rosenthal's aggregate overcharge analysis deducts any sales attributable to governmental plans that are excluded from the Classes, as well as the sales that would be attributable to brand-loyalists (*i.e.*, consumers who would have continued purchasing branded Opana ER (reformulated or original)) and those with flat-copays (i.e., those who would pay the same copay for brand or generic Opana ER), who are likewise excluded. *Id.* ¶¶52, 70, 73, 80, 81.[19] Further, as described below in Section III.D, brand loyalists can be identified through a variety of means approved under prevailing Circuit precedent. Under Seventh Circuit precedent, that is sufficient.

### 4. EPPs will establish aggregate damages and disgorgement estimates through common economic models tied to their liability theories

As with liability and impact, damages and disgorgement owed to the Classes can be established through common evidence and analyses. "To establish predominance, a plaintiff must produce a reliable method of measuring classwide damages based on common proof." *Kleen*, 306 F.R.D. at 601; *In re Sulfuric Acid Antitrust Litig.*, 2007 WL 898600, at *6 (N.D. Ill. Mar. 21, 2007) (same). "Plaintiffs are not obliged to drill down and estimate each individual class member's damages." *Kleen*, 831 F.3d at 929.[20] Dr. Rosenthal's calculations of classwide overcharges and disgorgement rely on methodologies that courts have previously approved in

---

[18] *See also Solodyn*, 2017 WL 4621777, at *18 (end payors "'need only suffer damage on one purchase to be injured'") (quoting *Lidoderm*, 2017 WL 679367, at *20-21).

[19] The brand-loyal prescriptions are derived from Endo's own assumed conversion rates for reformulated Opana ER in a but-for world where generic Opana ER beat reformulated Opana ER to the market. Rosenthal Rep. ¶¶84-86.

[20] It is also well established that plaintiffs bear a "more relaxed burden of proof" on damages, "especially if . . . the defendants' conduct has made it difficult for [them] to prove the precise extent of his damages." *BCS Servs. Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 759 (7th Cir. 2011) (collecting cases).

pay-for-delay cases such as this. Rosenthal Rep. ¶48; *Nexium*, 297 F.R.D. at 176-78 (crediting Dr. Rosenthal's methodology for calculating impact and damages to end payors). Each analysis is tailored to the five alternative, no-payment settlement scenarios (the "But-For Scenarios") under which Impax could have launched generic Opana ER. *See Kleen*, 831 F.3d at 926 (classwide damages analysis matched theory of harm).[21] Dr. Rosenthal's methodologies, as well as the evidence and inputs used in applying the methodologies, are common to the Classes. *Id.* ¶¶47-58.

*__Overcharge Damages__*. For her overcharge analysis, Dr. Rosenthal uses a "yardstick" methodology, a commonly accepted method for calculating overcharges. *See, e.g.*, *Nexium*, 297 F.R.D. at 176-78 (crediting Dr. Rosenthal's yardstick method for establishing classwide impact and damages).[22] Dr. Rosenthal's yardsticks estimate (1) Endo and Impax's relative market shares in the but-for world and (2) generic Opana ER prices in the but-for world.

For the market share yardstick, Dr. Rosenthal uses Endo forecast documents to determine expected market shares for generic Opana ER and reformulated Opana ER in the But-For Scenarios. Endo forecasts demonstrate that in a world where generic Opana ER launches before reformulated Opana ER, reformulated Opana ER captures between ████████████ of the market. Rosenthal Rep. ¶¶75, 85. They further demonstrate that, absent the switch to reformulated Opana

---

[21] Based on Dr. McGuire's analysis showing that Defendants could have entered a lawful, no-payment settlement with Impax generic entry dates any time between ██████████████████████ EPPs offer five but-for entry dates for purposes of the classwide overcharges and disgorgement analyses: ████████████████████████████████ Rosenthal Rep. ¶¶28-29.

[22] Under the yardstick method, Dr. Rosenthal compares "actual prices and quantities in the market of interest [here branded and generic Opana ER]" with "prices and quantities that occur in a similar market that is untainted by the alleged" anticompetitive conduct. Rosenthal Rep. ¶48.

ER, generic Opana ER would capture over ███ of the Opana ER market after one year of launch. *Id.* ¶55.

    For the generic Opana ER price yardstick, Dr. Rosenthal starts with Endo's actual list prices—*i.e.*, AWP and WAC. *Id.* ¶¶53, 56. But-for generic Opana ER prices are determined as a discount off Endo's WAC, and further adjustments are made to those prices to account for the launches of Endo's AG and Actavis's generic—both of which would compete with Impax's generic. *Id.* ¶57.[23] Because the prices paid by end payors are determined as a discount off Endo's list prices, Dr. Rosenthal makes further adjustments to arrive at the prices for generic Opana ER that end payors would have paid absent Defendants' conduct. *Id.* ¶¶53, 67. These yardsticks are common to all members of the Antitrust/Consumer Class and are applied to each But-For Scenario. From there, Dr. Rosenthal estimates aggregate classwide overcharge damages by applying the yardsticks to retail purchase data obtained from IQVIA (formerly known as IMS) and are adjusted to account for the states included in the Antitrust/Consumer Class. *Id.* ¶¶67-68, 70, 86.[24]

    Dr. Rosenthal estimates that the gross overcharges suffered by the Antitrust/Consumer Class are as high as ██████████ depending on the But-For Scenario and estimated conversion rate for reformulated Opana ER. *Id.* ¶86 (Table 3). These gross overcharge estimates do not net-out rebates received by TPPs. However, they do include copay coupons or Patient Assistance

---

[23] Upon Actavis's market exit in April 2016, Dr. Rosenthal holds the but-for generic Opana ER prices remain constant because Impax's generic would still be competing with Endo's AG. Rosenthal Rep. ¶79.

[24] The IQVIA data is further adjusted to exclude purchases made through certain excluded government programs, like Medicaid, Department of Defense, and workers compensation, among others which are not part of the Classes. *See* Rosenthal Rep. ¶¶73, 83.

Program discounts provided to consumers because those benefits, unlike TPP rebates, are applied *at the time* of the retail transaction. Rosenthal Rep. ¶86.

Moreover, gross overcharges is the appropriate damages measure here because netting-out rebates received by TPPs would improperly allow Defendants to offset their damages exposure arising from their unlawful conduct on the basis that their victims allegedly did not suffer the full impact of the overcharge. Federal antitrust precedent since *Hanover Shoe* has consistently rejected such attempts by defendants to avoid the full extent of their antitrust liability. *See, e.g.*, *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 491-94 (1968); *Nexium*, 777 F.3d at 27 ("[C]ourts will not go beyond the fact of injury to determine whether the victim of the overcharge has partially recouped."). Because state antitrust laws follow federal precedent (*see* Freed Decl. Ex. 12), end payors here are permitted "to recover the full amount of the alleged overcharge on its purchases . . . regardless of whether the price paid at the point of sale was subsequently offset by a rebate." *In re Niaspan Antitrust Litig.*, 2015 WL 4197590, at *3 (E.D. Pa. July 9, 2015).[25]

Regardless of whether rebates are included, the aggregate damages analysis is common to all members of the Antitrust/Consumer Class.

***Disgorgement of Profits***. Dr. Rosenthal's disgorgement analysis is similarly common to all end payors in the Unjust Enrichment Classes. For this analysis, Dr. Rosenthal calculates the difference between the "actual world Opana ER and reformulated Opana ER gross profit enjoyed by Endo and the but-for world Opana ER and reformulated Opana ER gross profit that would have occurred absent the challenged conduct." Rosenthal Rep. ¶87; *see also id.* ¶¶88-96. She

---

[25] In any event, even when TPP rebates are factored into the analysis, overcharge damages are as high as ▮▮▮▮▮▮▮▮▮ depending on the But-For Scenario and estimated conversion rate for reformulated Opana ER. *See* Rosenthal Rep. ¶86 (Table 3).

uses Endo's own profit and loss statements and adjusts them based on the yardsticks she developed for her unjust enrichment analysis to estimate the additional profits Endo realized as a result of its unlawful Agreement with Impax. *Id.* ¶¶59-63; *see also id.* ¶¶87-96.

As with her overcharges analysis, Dr. Rosenthal's unjust enrichment analysis makes further adjustments to account for different potential conversion rates for reformulated Opana ER. She also accounts for the additional profits Endo would realize through the launch of an AG and cost-savings it would realize through the cessation of promotional efforts in connection with original Opana ER. *Id.* ¶¶90, 91, 95. She then calculates disgorgement for each state in the Unjust Enrichment Classes under each But-For Scenario. *Id.* ¶96. Dr. Rosenthal's disgorgement calculation is as high as ███████ depending on the But-For Scenario and estimated conversion rate for reformulated Opana ER. *Id.* ¶96 (Table 6).

As is the case with her overcharge analysis, Dr. Rosenthal's methods and inputs for her unjust enrichment analysis are common to all members of the Unjust Enrichment Subclasses.

### 5. A class action is the superior means of litigating this dispute and is manageable

Rule 23(b)(3) provides that certification is warranted if a classwide trial is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Given the "many common issues of law and fact" here, *Messner*, 669 F.3d at 814 n.5, class certification is "the most efficient means of adjudicating the controversy," *Sulfuric Acid*, 2007 WL 898600, at *9. Denying certification would be "grossly inefficient, costly, and time consuming because the parties, witnesses, and courts would be forced to endure unnecessarily duplicative litigation." *In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 453 (D. Kan. 2006). Here, end payors would be forced to file hundreds of individual lawsuits, which would be inefficient and infeasible. *See Carnegie v. Household Int'l, Inc*., 376 F.3d 656, 661 (7th Cir.

2004), *accord Butler*, 727 F.3d at 801 ("the more claimants there are, the more likely a class action is to yield substantial economies in litigation").

Adjudicating EPPs' state law claims is manageable. At base, EPPs' state law claims arise from the same misconduct and thus would rise and fall together. "[T]he state antitrust statutes on which [EPPs]' claims are based are modeled upon or closely track the language of the federal antitrust statutes." *In re Linerboard Antitrust Litig.*, 223 F.R.D. 335, 351 (E.D. Pa. 2004). The same is true for EPPs' consumer protection claims. *Opana ER*, 2016 WL 4245516, at *2. The *Actavis* decision, which applied federal antitrust law to pay-for-delay settlements, will therefore provide the framework for adjudicating each of EPPs' claims. That EPPs have brought claims under multiple state antitrust and consumer laws does not, therefore, create any difficulties in managing the litigation.

EPPs' unjust enrichment claims are likewise manageable because the Unjust Enrichment Classes are grouped by similar unjust enrichment laws so that they can be adjudicated together. Each subclass faces largely identical questions that can easily be tailored to account for any slight differences among state's laws. *See Overka v. Am. Airlines, Inc.*, 265 F.R.D. 14, 21 (D. Mass. 2010) (certifying 34-state unjust enrichment class, explaining that the "manageable way" to try the claim is to "charge the jury as to the base claim of unjust enrichment" and ask the jury "special questions" required in the few states with additional elements). For example, to the extent EPPs must show Defendants' knowledge, a jury instruction and verdict question can address that issue. *See* Freed Decl. Ex. 16 (Plaintiffs' Special Verdict Form Exemplar). And for those states that require an adequate remedy at law, the task is even simpler: if a jury finds that Defendants violated those states' antitrust laws, neither the court nor jury will have to address

unjust enrichment. Accordingly, any argument that EPPs' unjust enrichment subclasses create manageability concerns is a red herring.

EPPs have included a Trial Management Plan Exemplar that suggests how a jury trial on liability and damages/disgorgement, as well as the process for allocating damages and disgorgement among the members of the Classes, could be handled. *See* Freed Decl. Ex. 15. The plan suggests a single, bifurcated trial on all claims and demonstrates that there are no significant manageability concerns that would prevent resolution of EPPs' claims on a classwide basis. This sort of approach has worked in multiple antitrust cases, including two recent reverse payment cases that went to trial, one involving Impax. *See, e.g.*, *In re Solodyn Antitrust Litig.*, No. 14-md-2503, ECF No. 1033 (D. Mass. Feb. 28, 2018) (Plaintiffs' Response to Impax's Jury Verdict Statement and in Support of the Plaintiffs' Structure For Phase I and Phase II for Trial); *In re Nexium (Esomeprazole) Antitrust Litig.*, 309 F.R.D. 107, 110-11 (D. Mass. 2015) (direct and indirect purchasers' federal and state claims were tried together at the liability phase), *aff'd*, 842 F.3d 34 (1st Cir. 2016); *see also In re Brand Name Prescription Drugs Antitrust Litig.,* 1998 WL 326721, at *5 (N.D. Ill. June 12, 1998) (bifurcating antitrust class action trial with the first phase to address liability and injury and the second phase to decide damages awarded to the Class).

### D. The end-payor classes are ascertainable

EPPs' proposed end-payor Classes are ascertainable. Membership is defined by reference to objective criteria: (1) branded or generic Opana ER purchases not for resale, (2) in certain states, and (3) during a discrete time period. *See Manual for Complex Litig.* § 21.222, at 270 (4th ed. 2005) ("The definition must be precise, objective, and presently ascertainable."). Excluded are several categories of purchasers who did not pay overcharges due to attributes of their health insurance plans or for other reasons. To the extent any "brand loyalists" or other end payors did not suffer injury, those individuals can (if necessary) be identified during the allocation process

through self-identification via affidavits, a procedure endorsed by the Seventh Circuit. *See Mullins*, 795 F.3d at 662 (declining defendants' invitation to reject use of affidavits for purposes of identifying class members).[26]

Moreover, in the prescription drug market, each drug purchase is documented and closely tracked, and detailed records of those purchases are available. ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████Rosenthal Rep. ¶40 n.79.

Accordingly, the Classes are properly defined and members can be readily identified (and notified). *See Saltzman*, 257 F.R.D. at 476. *See also Solodyn*, 2017 WL 4621777, at *13-14 (administratively feasible to ascertain end-payor class membership in pharmaceutical industry given data collected and maintained at every transaction level).

Finally, there is no due process concern here because (as noted above) EPPs will seek aggregate damages and disgorgement award. The Seventh Circuit in *Mullins* rejected a heightened ascertainability test for similar reasons, holding that "where the total amount of damages can be determined in the aggregate . . . the identity of particular class members does not implicate the defendant's due process interest at all." 795 F.3d at 670.

## IV.  CONCLUSION

For the foregoing reasons, EPPs respectfully request that their class certification motion be granted.

 Dated: March 25, 2019                             Respectfully submitted,

---

[26] To the extent Defendants seek to "test" affidavits, the Seventh Circuit held that "a district judge has discretion . . . to establish mechanisms to test those affidavits as needed." *Id.* at 669.

*/s/ Gregory S. Asciolla*
Gregory S. Asciolla
Karin E. Garvey
Matthew J. Perez
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
(212) 907-0700
gasciolla@labaton.com
kgarvey@labaton.com
mperez@labaton.com

*/s/ Michael J. Freed*
Michael J. Freed
Robert J. Wozniak
Brian M. Hogan
FREED KANNER LONDON
 & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
(224) 632-4500
mfreed@fklmlaw.com
rwozniak@fklmlaw.com
bhogan@fklmlaw.com

*Interim Co-lead Counsel for the End Payor Classes*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of March, 2019, I served End-Payor Plaintiffs'

Memorandum of Law in Support of their Motion for Class Certification via electronic mail upon:

J. Douglas Baldridge
Lisa Jose Fales
Danielle R. Foley
Kristin M. Koger
VENABLE LLP
600 Massachusetts Ave, NW
Washington, DC 20001
(202) 344-4000
(202) 344-8300 (fax)
jdbaldridge@venable.com
ljfales@venable.com
drfoley@venable.com
kmkoger@venable.com

Lawrence R. Desideri
Maureen L. Rurka
Joanna Rubin Travalini
Kevin F. Wolff
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
LDesideri@winston.com
MRurka@winston.com
JTravalini@winston.com
KWolff@winston.com

*Counsel for Defendant Impax Laboratories, Inc.*

Craig G. Falls
DECHERT LLP
1900 K Street NW
Washington, DC 20006
Tel.: (202) 261-3373
Fax: (202) 261-3333
craig.falls@dechert.com

George G. Gordon
DECHERT LLP

Cira Centre, 2929 Arch Street
Philadelphia, PA 19104
Tel.: (215) 994 4000
Fax: (215) 994-2222
george.gordon@dechert.com

Angela Liu
DECHERT LLP
77 West Wacker Drive, Suite 3200
Chicago, IL 60601
Tel.: (312) 646-5816
Fax: (312) 646-5858
angela.liu@dechert.com

*Counsel for Defendants Endo Health Solutions Inc., Endo Pharmaceuticals Inc., and Penwest Pharmaceuticals Co.*

David F. Sorensen
Andrew C. Curley
Richard D. Schwartz
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
T: (215) 875-3000
F: (215) 875-4604
dsorensen@bm.net
acurley@bm.net
rschwartz@bm.net

Bruce E. Gerstein
Jonathan M. Gerstein
GARWIN GERSTEIN & FISHER, LLP
Wall Street Plaza
88 Pine Street, 10th Floor
New York, NY 10005
T:  (212) 398-0055
F:  (212) 764-6620
bgerstein@garwingerstein.com
jgerstein@garwingerstein.com

*Interim Co-Lead Counsel for the Direct Purchaser Class*

Gary L. Specks
KAPLAN FOX & KILSHEIMER LLP
423 Sumac Road
Highland Park, IL 60035

T: (847) 831-1585
F: (847) 931-1580
gspecks@kaplanfox.com

Robert N. Kaplan
Matthew P. McCahill
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue, 14th Fl
New York, NY 10022
T: (212) 687-1980
F: (212) 687-7714
rkaplan@kaplanfox.com
mmcahill@kaplanfox.com

*Interim Liaison Counsel for the Direct Purchaser Class*

Scott E. Perwin
Lauren C. Ravkind
Anna T. Neill
KENNY NACHWALTER P.A.
Four Seasons Tower – Suite 1100
1441 Brickell Avenue
Miami, FL 33131
T: (305) 373–1000
F: (305) 372–1861
sperwin@knpa.com
lravkind@knpa.com
aneill@knpa.com

*Counsel for Plaintiffs Walgreen Co., Kroger Company, Safeway, Inc., HEB Grocery Co. L.P., and Albertson's LLC*

Monica Kiley
Eric L. Bloom
HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
4507 North Front Street, Suite 303
Harrisburg, PA 17110
T: (717) 364-1007
F: (717) 364-1020
mkiley@hangley.com
ebloom@hangley.com

Barry L. Refsin
HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103

Tel: (215) 496-7031
brefsin@hangley.com

*Counsel for Plaintiffs Rite Aid Corporation, Rite Aid Hdqtrs. Corp., and CVS Pharmacy, Inc.*

/s/ Brian M. Hogan
Brian M. Hogan