**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE OPANA ER ANTITRUST LITIGATION | MDL No. 2580 |
| | Lead Case No. 14-cv-10150 |
| THIS DOCUMENT RELATES TO: | Hon. Harry D. Leinenweber |
| All Actions | |

**PUBLIC VERSION**

**MEMORANDUM OF LAW IN SUPPORT OF**
**ENDO'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
**WITH RESPECT TO CERTAIN PATENT ISSUES**

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 3

ARGUMENT ............................................................................................................................ 6

    I.     GOVERNING LEGAL STANDARDS.......................................................................... 6

    II.    ENDO IS ENTITLED TO JUDGMENT AS A MATTER OF LAW THAT IMPAX COULD NOT HAVE LAWFULLY SOLD GENERIC OPANA ER FROM NOVEMBER 13, 2012 THROUGH NOVEMBER 22, 2029.................................................................................. 7

    III.    ENDO IS ENTITLED TO JUDGMENT AS A MATTER OF LAW WITH RESPECT TO ANY PATENT LAW DEFENSES THAT IMPAX WOULD NOT HAVE BROUGHT AT TRIAL................................................................................................................................... 9

    IV.    ENDO IS ENTITLED TO JUDGMENT AS A MATTER OF LAW WITH RESPECT TO SEVERAL OF THE PATENT LAW DEFENSES ON WHICH PLAINTIFFS RELY .... 10

        A.   Impax's Anticipation Defense ........................................................................... 11

            1.   Governing Law ...................................................................................... 11

            2.   "Hydrophobic Material" ........................................................................ 13

            3.   "Sustained Release".............................................................................. 21

        B.   Impax's Non-Infringement Defense Based on the "Sustained Release" Limitation .... 26

CONCLUSION....................................................................................................................... 29

## TABLE OF AUTHORITIES

**Cases**

*3M Innovative Properties Co. v. Avery Dennison Corp.*,
  350 F.3d 1365 (Fed. Cir. 2003) ............................................. 13

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)............................................................ 6

*Atofina v. Great Lakes Chem. Corp.*,
  441 F.3d 991 (Fed. Cir. 2006) ............................................ 12

*Basista v. Weir*,
  340 F.2d 74 (3d Cir. 1965) .................................................. 7

*Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.*,
  15 F.3d 1573 (Fed. Cir. 1993) ............................................ 12

*Cont'l Can Co. v. Monsanto Co.*,
  948 F.2d 1264 (Fed. Cir. 1991) .......................................... 12

*Ferring B.V. v. Watson Labs., Inc.-Florida*,
  764 F.3d 1401 (Fed. Cir. 2014) ..................................... 14, 18

*Finisar Corp. v. The DirecTV Grp., Inc.*,
  523 F.3d 1323 (Fed. Cir. 2008) .......................................... 12

*Glaxo v. Novopharm, Ltd.*,
  52 F.3d 1043 (Fed. Cir. 1995) ............................................ 12

*Hoover Grp., Inc. v. Custom Metalcraft, Inc.*,
  66 F.3d 299 (Fed. Cir. 1995)............................................... 12

*In re Androgel Antitrust Litig.*,
  No. 1:09-CV-955-TWT, 2018 WL 2984873 (N.D. Ga. June 14, 2018)................................ 6, 7

*In re Arkley*,
  455 F.2d 586 (C.C.P.A. 1972)............................................ 13

*In re Nexium (Esomeprazole) Antitrust Litig.*,
  842 F.3d 34 (1st Cir. 2016)................................................. 6

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
  868 F.3d 132 (3d Cir. 2017) ................................................ 6

*In re Wellbutrin XL Antitrust Litig.*,
  133 F. Supp. 3d 734 (E.D. Pa. 2015)................................... 7

*Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*,
  730 F.2d 1452 (Fed. Cir. 1984) .......................................... 12

*MEHL/Biophile Int'l Corp. v. Milgraum*,
   192 F.3d 1362 (Fed. Cir. 1999) ............................................................ 15

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
   238 F. Supp. 2d 1024 (N.D. Ill. 2003) (Leinenweber, J.),
   *aff'd*, 354 F.3d 661 (7th Cir. 2004) ...................................................... 6

*Microsoft Corp. v. i4i Ltd. P'ship*,
   564 U.S. 91 (2011) ................................................................................ 12

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
   545 F.3d 1359 (Fed. Cir. 2008) ........................................................ 12, 13

*Purdue Pharma L.P. v. Boehringer Ingelheim, GmbH*,
   237 F.3d 1359 (Fed. Cir. 2001) ............................................................ 27

*Reserve Supply Corp. v. Owens–Corning Fiberglas Corp.*,
   971 F.2d 37 (7th Cir. 1992) .................................................................... 6

*Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*,
   637 F.3d 1269 (Fed. Cir. 2011) .............................................................. 7

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*,
   837 F.2d 1044 (Fed. Cir. 1988) ............................................................ 12

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010) ...................................................................... 7

*Yamanouchi Pharm. v. Danbury Pharmacal, Inc.*,
   231 F.3d 1339 (Fed. Cir. 2000) .............................................................. 4

*Zenith Elecs. Corp. v. PDI Commc'n Sys., Inc.*,
   522 F.3d 1348 (Fed. Cir. 2008) ............................................................ 20

**Statutes**

35 U.S.C. § 102 .......................................................................................... 13

35 U.S.C. § 271(e) ..................................................................................... 10

35 U.S.C. § 282 .......................................................................................... 13

35 U.S.C. § 283 .......................................................................................... 10

**Other Authorities**

Fed. R. Civ. P. 1 ........................................................................................ 12

Fed. R. Civ. P. 37(c)(1) .............................................................................. 8

Fed. R. Civ. P. 52(c) .................................................................................... 6

Defendants Endo Health Solutions Inc., Endo Pharmaceuticals Inc., and Penwest Pharmaceuticals Co. (collectively "Endo") submit this Memorandum of Law in Support of Endo's Motion for Partial Summary Judgment with respect to Certain Patent Issues.

## PRELIMINARY STATEMENT

Plaintiffs in this antitrust litigation challenge a 2010 Settlement and License Agreement ("SLA") resolving patent litigation between Endo and Impax related to Opana ER, Endo's long-acting opioid pain reliever (the underlying "Patent Litigation"). If this case proceeds to trial notwithstanding Defendants' Causation/Damages Motion for Summary Judgment ("Defendants' MSJ"), the jury would be presented with extensive, complex testimony about a wide variety of economic and scientific issues. In addition to being asked to resolve complicated antitrust questions regarding, for example, market definition and competitive effects, the Plaintiffs' theories of antitrust injury would require the jury to answer complex questions related to patents and patent litigation. If the Court does not grant summary judgment to Defendants in full, then at a minimum it should streamline the issues for trial by granting summary judgment on two particular patent law-related issues.

First, if this case proceeds to trial, the jury would need to take into account the impact of the patents that Endo later obtained and successfully enforced against all generic manufacturers of Opana ER, but which Endo did not enforce against the Impax product at issue here solely because of the broad patent license that Impax received from Endo in the SLA. *See* Defendants' MSJ at 13-14. In particular, the jury would need to determine whether Endo's additional patents would also have prevented Impax from lawfully selling generic Opana ER even if Impax had won the initial Patent Litigation. There is, however, no material factual dispute regarding this issue for the jury to resolve. Endo's showing that its additional patents would have prevented Impax from

- 1 -

lawfully selling generic Opana ER is unrebutted by Plaintiffs, and that conclusion is undeniable in light of the actual outcome of the real-world litigations. The Court, therefore, should grant summary judgment that, absent the broad patent license in the SLA, Impax could not have lawfully sold any generic Opana ER from November 13, 2012 (when the first of Endo's additional patents issued) through November 22, 2029 (when the last of those patents expires).

Second, Plaintiffs' theories of antitrust injury would also require the jury to determine Impax's likelihood of success in the underlying Patent Litigation. *See* Defendants' MSJ at 24-25, 32-33. That would require the jury to decide a "case within a case"—it would need to decipher and resolve competing expert testimony regarding complex technical issues regarding the issues of patent infringement and validity that would have been presented at trial in the Patent Litigation.

To simplify this task, the Court should grant summary judgment in favor of Endo with respect to any patent defenses raised by Plaintiffs on which Impax could not have succeeded in the underlying Patent Litigation. That would include any defenses on which Endo would have been entitled to judgment in its favor as a matter of law (*i.e.*, for which Impax's trial evidence would have been insufficient to sustain a judgment in its favor), as well as any defenses or arguments that Impax did not intend to actually assert at trial, as Impax could not have prevailed on a defense or argument it planned to abandon before trial. Plaintiffs should not be permitted to present such defenses to the jury.

Although granting this motion would not eliminate all of the patent law-related issues from this case, it would significantly streamline the presentation of those issues at trial and materially reduce the burden on the jury. Any trial in this case would be complex and unwieldy under any circumstances, and if the Court does not grant summary judgment to Defendants in full, it should at a minimum take this opportunity to "separate the wheat from the chaff" by eliminating patent

law-related issues that need not and should not be presented to the jury.

## **FACTUAL BACKGROUND**

In the underlying Patent Litigation, Endo asserted claims against Impax for infringing two of its patents—U.S. Patent Nos. 5,958,456 ("'456 patent") and 5,662,933 ("'933 patent") (the "patents in suit"). Broadly speaking, the patents relate to controlled release delivery systems that allow oral tablets to release the active ingredient over extended time periods, and thereby reduce the frequency with which patients have to take the medication (*e.g.*, once/twice daily, rather than every 4 or 6 hours). In particular, they relate to gel matrix-based delivery systems in which the tablets include a gelling agent that, upon ingestion, becomes hydrated and forms a gel that surrounds the tablet and controls the rate at which the medicament releases out of the tablet. Ex. 8[1], February 1, 2010 Expert Report of Edmund J. Elder ¶¶ 3-5; Ex. 7 (Endo Trial Br.) at 1-2; Ex. 10 (Trial Tr.) at 58-61.

The inventors discovered that the controlled release properties of existing gel matrix-based delivery systems could be improved by adding particular substances to those formulations that would slow hydration of the gelling agent, but not disrupt the matrix that the gelling agent formed around the tablet. For purposes of their patents, the inventors dubbed the materials that would perform that critical inventive function as "hydrophobic materials." The inventors asserted that the use of such "hydrophobic materials" was an improvement over prior controlled release tablets because it allowed once or twice daily dosage forms to be developed for certain medicaments that previously could only be formulated for 4- or 6-hour dosing. *See, e.g.*, Ex. 4 ('456 patent) at 1:65-2:6, 5:29-37; Ex. 7 (Endo Trial Br.) at 1-2; Ex. 9 (*Markman* Opinion Tr.) 10:1-20:9, 43:18-55:5; Ex. 10 (Trial Tr.) 58.

---

[1] All exhibits referenced herein are exhibits to the Statement of Material Undisputed Facts in support of this Motion (hereafter "Patent SUF").

Endo asserted that Impax infringed a number of claims of the patents in suit, including claims 1–2, 5, and 7 of the '456 patent, and claims 1–2, 7–8, and 10 of the '933 patent (the "Asserted Claims"). Ex. 5 (Final Pretrial Order) at 10. Claim 1 of the '456 patent (Ex. 4 at col. 21, lines 8-20) is representative of the other Asserted Claims for purposes of this motion, and it recites as follows (with key terms discussed below underlined):

> 1. A controlled release solid dosage form for oral administration of a therapeutically active medicament to a patient in need thereof, comprising:
>
> a pharmaceutically effective amount of a medicament to be administered to a patient in need of said medicament;
>
> a sustained release excipient comprising a gelling agent; a pharmaceutically acceptable **_hydrophobic material_**; and an inert pharmaceutical diluent wherein the ratio of said inert diluent to said gelling agent is from about 1:8 to about 8:1, **_said dosage form providing a _sustained release_ of said medicament_** when exposed to an environmental fluid.

The case proceeded to trial in June 2010. Neither party sought to narrow the issues in dispute prior to trial through summary judgment.[2] The court entered a Final Pretrial Order that defined the issues for trial, including lists of the witnesses and exhibits to be presented at trial. *See* Ex. 5 (Final Pretrial Order) at 101-104, 106, 111; Ex. 12, July 10, 2019 Deposition of Glen Belvis 158:12-159:9. The parties also submitted trial briefs summarizing the evidence and arguments they intended to present. Exs. 7 (Endo Trial Br.) and 14 (Impax Trial Br.). ██████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

---

[2] Given that ANDA patent infringement cases typically involve bench trials conducted under strict time constraints, some district court judges refuse to allow summary judgment motions in such cases. Consistent therewith, Impax, Endo and the trial court agreed to proceed to trial without a period for such motions. Ex. 15, March 25, 2019 Expert Report of Glen Belvis [hereafter "Belvis Rep."] ¶ 97. Nevertheless, Endo would have been entitled to seek judgment in its favor as a matter of law as to defenses at the close of Impax's case-in-chief, and failing that, via post-trial briefing. Fed. R. Civ. P. 52(c); *Yamanouchi Pharm. v. Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1342-43 (Fed. Cir. 2000).

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████. Ex. 14 (Impax Trial Br.) at i, 1, 3-14;  Ex. 15, Belvis

Rep. i-ii, Section VII.A.2.

On the first day of trial, Endo presented testimony from its infringement expert explaining why the Impax ANDA tablets infringed the Asserted Claims.  Ex. 10 (Trial Tr.) at 50-133.  The parties settled their dispute before the start of the second day of trial, and promptly signed the SLA, which included a broad license to additional patents that Endo might obtain in the future (the "Broad License").  *See* ECF No. 247, No. 09-cv-0831 (D.N.J.) (minute entry reflecting trial proceedings held on June 7, 2010); Ex. 15, Belvis Rep. ¶ 102; Ex. 17 (SLA) at § 4.1.

Not long thereafter, Endo obtained several additional patents covering Original Opana ER, including, among others, U.S. Patent Nos. 8,309,122 ("'122 patent"), 8,329,216 ("'216 patent"), and 8,871,779 ("'779 patent")[3] (the "Additional Patents").   Patent SUF ¶ 34.   Endo has successfully enforced the Additional Patents in two different sets of litigation, resulting in every generic defendant (nine in total) either withdrawing its ANDA(s), committing not to launch before expiration of the relevant patents under the existing circumstances, or taking the cases to trial, losing, and being enjoined from entering with generic versions of Original Opana ER and/or Reformulated Opana ER.  Patent SUF ¶¶ 35-53.  Actavis, which launched at risk, was also ordered to remove its product from the market.  *Id.* at ¶¶ 40-41.  Impax was among those defendants, but Endo sued Impax only with respect to Impax's later ANDA to the reformulated version of Opana

---

[3]	The '779 patent was issued to Mallinckrodt, and Endo has an exclusive license to it.

ER. *Id.* at ¶¶ 39, 46. Because of the SLA, Endo did not sue Impax with respect to the original form of Opana ER. *See id.*

## ARGUMENT

### I.   GOVERNING LEGAL STANDARDS

"Summary judgment is appropriate where . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1031–32 (N.D. Ill. 2003) (Leinenweber, J.), *aff'd*, 354 F.3d 661 (7th Cir. 2004). To survive summary judgment, a non-moving party must present evidence sufficient to demonstrate the existence of each element of its claim. *See Reserve Supply Corp. v. Owens–Corning Fiberglas Corp.*, 971 F.2d 37, 48–49 (7th Cir. 1992). A mere "scintilla of evidence" is not enough; rather, "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986).

As discussed in more detail in Defendants' MSJ, to succeed on their antitrust claims, the Plaintiffs must prove, among other things, that Impax's sales of generic Opana ER would have been lawful absent the SLA. They therefore must show that Impax ***would have won*** the Patent Litigation. *See In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 169 (3d Cir. 2017) (plaintiffs must show "that the launch ***would*** have been legal") (emphasis added); *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 62–63 (1st Cir. 2016); *In re Androgel Antitrust Litig.*, No. 1:09-CV-955-TWT, 2018 WL 2984873, at *13 (N.D. Ga. June 14, 2018). It is not enough to show that the generic company would have launched at an earlier date absent the settlement. That launch must be lawful, because the existence of a valid, infringed patent "would interfere with the plaintiffs' chain of causation:   a valid patent independently 'preclude[s] competition' apart from any agreement and an 'at risk' launch is unlawful absent a later finding of

- 6 -

patent invalidity or non-infringement." *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 765 (E.D. Pa. 2015); *see also Androgel*, 2018 WL 2984873, at *14.

In attempting to demonstrate that Impax would have won the Patent Litigation, Plaintiffs must limit themselves to arguments and evidence that would have actually been available to the parties in that Patent Litigation. For example, Endo and Impax would have been limited to the witnesses and evidence they preserved in the Final Pretrial Order entered in the case. *See, e.g.*, *Basista v. Weir*, 340 F.2d 74, 85 (3d Cir. 1965) (pretrial order "limits the issues for trial and in substance takes the place of pleadings covered by the pretrial order"); Ex. 5 (Pretrial Order) at 101-104, 106, 111; Ex. 12, July 2019 Belvis Dep. 158:12-159:9. And the parties' respective experts would have been limited at trial to the opinions and evidence disclosed in their expert reports. *See, e.g.*, Fed. R. Civ. P. 37(c)(1); *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1287 (Fed. Cir. 2011); Ex. 12, July 2019 Belvis Dep. 156:18-157:13.

In addition, to ultimately satisfy the element of antitrust injury, Plaintiffs must demonstrate that they would have been better off in the but-for world than they were in the actual world. *See W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 101 (3d Cir. 2010) (antitrust plaintiffs must show they are "better off absent the violation"). A comparison of Plaintiffs' position in the actual world and their position in the but-for world also requires a determination of whether Impax's sales would remain lawful once Endo's Additional Patents issued in November 2012.

## II.     ENDO IS ENTITLED TO JUDGMENT AS A MATTER OF LAW THAT IMPAX COULD NOT HAVE LAWFULLY SOLD GENERIC OPANA ER FROM NOVEMBER 13, 2012 THROUGH NOVEMBER 22, 2029

If the Court does not grant summary judgment to Defendants in full, it should at least streamline the trial and narrow the scope of any patent law-related issues that will be presented to the jury by ruling that any Impax sales of Opana ER would have infringed Endo's Additional

Patents and thus been unlawful during the term of those patents, regardless of the outcome of the 2010 Patent Litigation.

The Patent Office issued the '122 and '216 patents November and December 2012, respectively, and Endo promptly filed lawsuits in the SDNY against all generic manufacturers who had filed ANDAs relating to Opana ER, asserting claims of infringement of those newly-acquired patents. Patent SUF ¶¶ 35-36. It, along with Mallinckrodt, filed additional patent infringement suits against those defendants in the District of Delaware in 2014, after acquiring exclusive rights to the '779 patent. *Id.* at ¶¶ 44-46. Impax was among the generic manufacturers Endo sued in both the SDNY and Delaware, but only as to Impax's Reformulated ANDA Tablets. *Id.* at ¶¶ 39, 46. Endo did not sue Impax with respect to its Original ANDA Tablets precisely because those sales were covered by the Broad License in the SLA. *Id.*

Endo prevailed in those litigations—both at trial and on appeal—against Impax and all of the other defendants. *Id.* ¶¶ 35, 41-43, 47-53. As a result, no one other than Impax can sell generic Opana ER tablets until the last of the Additional Patents expires in November 2029. *Id.* ¶¶ 34-53.

In these antirust cases, Endo has submitted extensive evidence demonstrating ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████ *See* Patent SUF ¶¶ 54-59; Ex. 34, August 29, 2019 Rebuttal Report of Jonathan Singer [hereafter "Singer Rep."] ¶¶ 240-245, 247, 248, 251-254; see Ex. 18, August 29, 2019 Expert

Report of Reza Fassihi [hereafter "Fassihi Antitrust Rep."] ¶¶ 198-203.  *See also* 35 U.S.C. §§ 271(e)(4)(B), 283.

Plaintiffs have proffered nothing to rebut this evidence.  Indeed, Plaintiffs' patent litigation expert cited the Additional Patents in his opening report, and acknowledged that Impax was aware at the time of the SLA that Endo had additional patent applications covering Opana ER pending before the Patent Office.  *See* Ex. 15, Belvis Rep. ¶¶ 451-458.  However, he expressed no opinions disputing Endo's evidence that, but for the SLA, Impax's sales after November 13, 2012 would have infringed the Additional Patents and hence been unlawful, or that Endo would have been successful in enjoining Impax from selling its Original ANDA Tablets until 2029.  Plaintiffs have not otherwise proffered anything to dispute Endo's evidence concerning the Additional Patents.  Nor could they, because the outcome of the later litigations is indisputable—Endo prevailed, at trial and on appeal, against Impax and the other generics as to both infringement and validity.  The record is clear:  Endo would have prevailed with respect to Impax's Original ANDA Tablets, just as it did with respect to Impax's Reformulated ANDA Tablets and all of the other generics' ANDA Tablets, and no reasonable jury could find otherwise.

Thus, Endo is entitled to judgment as a matter of law that once the later patents issued, but for the SLA, Endo would have been successful in obtaining a judgment that any generic Opana ER sales by Impax after November 13, 2012 were unlawful, and would continue to be unlawful until the last of those Additional Patents expires on November 22, 2029.

## III.     ENDO IS ENTITLED TO JUDGMENT AS A MATTER OF LAW WITH RESPECT TO ANY PATENT LAW DEFENSES THAT IMPAX WOULD NOT HAVE BROUGHT AT TRIAL

Plaintiffs proffer a scientific expert (Dr. Byrn) to offer an opinion that Endo's '456 and '933 patents were not infringed by Impax's ANDA tablets and were invalid.  However, in support of those opinions, Dr. Byrn relies on theories of non-infringement and invalidity that Impax itself

did not intend to raise at trial.  For example, in its Trial Brief and its expert's trial demonstrative,

███████████████████████████████████████████████████████████████████████████

█████████████████████████████████████ Ex. 14 (Impax Trial Br) at 15-21; Ex. 16

(Elder Trial Demonstrative).  Yet, Dr. Byrn goes far beyond that, ████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ *See* Ex. 21, March 25,

2019 Expert Report of Stephen Byrn [hereafter "Byrn Rep."] iii.  *See also* Endo's Motion to

Exclude the Opinions and Proposed Testimony of Stephen Byrn, being filed in conjunction

herewith.  Dr. Byrn's approach stands in stark contrast to Plaintiffs' patent litigation expert, Mr.

Belvis, who concluded that at trial, Impax intended to rely solely on the Pankhania and Baichwal

'143 references with respect to its anticipation defense, and therefore, limited his opinions to just

those references.  Ex. 12, July 2019 Belvis Dep.161:7-163:11; *see also* Ex. 15, Belvis Rep.

Sections VII. A. 3. ii. and iii.

Impax of course could not have prevailed in the underlying Patent Litigation on arguments

it was not going to assert at trial.  Accordingly, in view of the undisputed evidence as to Impax's

intentions and the admissions by Plaintiffs' own patent litigation expert, if the Court does not grant

summary judgment to Defendants in full, it should narrow the issues for the jury by ruling that

Endo is entitled to judgment that in the underlying Patent Litigation, Impax would not have

succeeded in proving that the Asserted Claims were anticipated by the Five Additional References

(*i.e.*, the ones other than Pankhania and Baichwal '143).

## IV. ENDO IS ENTITLED TO JUDGMENT AS A MATTER OF LAW WITH RESPECT TO SEVERAL OF THE PATENT LAW DEFENSES ON WHICH PLAINTIFFS RELY

This Court can and should also streamline any trial and narrow the scope of any patent law-

related issues that would be presented to the jury by paring away any patent defenses asserted by

- 10 -

Plaintiffs that the trial court in the underlying litigation would have found deficient as a matter of law. In particular, the Court should grant summary judgment in favor of Endo with respect to two defenses to Endo's infringement claims that Plaintiffs raise in this antitrust action—specifically: (1) Impax's contention that the Asserted Claims were anticipated by the prior art, and (2) Impax's non-infringement defense based on the "sustained release" limitation in the Asserted Claims. Although these rulings would not resolve all issues related to the outcome of the Patent Litigation, doing so would streamline any trial and simplify the case for the jury, consistent with the goal of Fed R. Civ. P. 1 "to secure the just, speedy, and inexpensive determination of every action and proceeding."

### A.    Impax's Anticipation Defense

Plaintiffs contend that Impax would have succeeded in proving that the Asserted Claims of the '456 and '933 patents were invalid as both anticipated by and obvious in view of the prior art. *See* 35 U.S.C. §§ 102, 103. With respect to anticipation, Plaintiffs' patent litigation expert (Belvis) opined that Impax was likely to succeed in proving that the Asserted Claims were anticipated by two prior art references—the "Baichwal '143" and "Pankhania" references. Ex. 15, Belvis Rep. ¶¶ 279-347. In fact, however, Impax's anticipation defense would have failed because, as discussed in detail below, its proofs were deficient as a matter of law with respect to at least two of the limitations found in each of the Asserted Claims—the "hydrophobic material" limitation and the "sustained release" limitation. Accordingly, Endo is entitled to summary judgment with respect to that defense.

### 1.    Governing Law

Patents are presumed valid. 35 U.S.C. § 282. This presumption applies to each patent claim independently, and the patent challenger bears the burden of proving invalidity by the heightened clear and convincing evidence standard. *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837

F.2d 1044, 1050 (Fed. Cir. 1988); *Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.*, 15 F.3d 1573, 1581 (Fed. Cir. 1993). The Supreme Court has made clear that a patent challenger bears "a heavy burden of persuasion" in proving that a patent claim is invalid by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 102 (2011).

To prove anticipation, Impax had to show that each and every limitation of the Asserted Claims was disclosed, either expressly or inherently, in a single prior art reference. *Glaxo v. Novopharm, Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995). In order to prove that a claim limitation not expressly disclosed in a reference is nonetheless disclosed inherently, Impax had to show that that missing feature was necessarily and inevitably present in the single anticipating reference. *See, e.g.*, *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 1000 (Fed. Cir. 2006) ("[A]nticipation by inherent disclosure is appropriate only when the reference discloses prior art that must necessarily include the unstated limitation"); *accord Cont'l Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). If a reference fails to disclose even one limitation of the claimed invention, expressly or inherently, then the claim is not anticipated. *Hoover Grp., Inc. v. Custom Metalcraft, Inc.*, 66 F.3d 299, 302 (Fed. Cir. 1995).

Furthermore, "disclosure of each element is not quite enough—this court has long held that [a]nticipation requires the presence in a single prior art disclosure of all elements of a claimed invention *arranged as in the claim*." *Finisar Corp. v. The DirecTV Grp., Inc.*, 523 F.3d 1323, 1334 (Fed. Cir. 2008) (emphasis added) (internal quotations omitted).[4] "It is not enough that the

---

[4]      *See also Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*, 730 F.2d 1452, 1459 (Fed. Cir. 1984); *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008) ("[U]nless a reference discloses within the four corners of the document not only all of the limitations claimed but also all of the limitations arranged or combined in the same way as recited in the claim, it cannot be said to prove prior invention of the thing claimed and, thus, cannot anticipate under 35 U.S.C. § 102.").

prior art reference discloses part of the claimed invention, which an ordinary artisan might supplement to make the whole, or that it includes multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008). Instead, the prior art "must clearly and unequivocally" disclose the claimed invention as it is arranged in the claims "without *any* need for picking, choosing, and combining various disclosures." *In re Arkley*, 455 F.2d 586, 587 (C.C.P.A. 1972) (reversing Board's finding of anticipation where Board combined the disclosures of two examples and other teachings in the prior art patent); *Net MoneyIN*, 545 F.3d at 1370-71 (finding that combining two "links" from different internet payment protocols was insufficient to establish anticipation).

### 2. "Hydrophobic Material"

Claim Construction: The Asserted Claims require that the claimed oral dosage form include a "hydrophobic material." *See, e.g.*, representative Claim 1 of the '456 patent recited above. The trial court construed that term to mean "a material which is effective to slow the hydration of the gelling agent without disrupting the hydrophilic matrix." *See* Ex. 11 (Amended *Markman* Order) at 3; Ex. 9 (*Markman* Opinion Tr.) 10-20, 43-55. In other words, the trial court adopted a functional definition for "hydrophobic material"—that is, for purposes of Endo's patents, in order for a substance to qualify as a "hydrophobic material" in a particular formulation, it must slow hydration of the gelling agent without disrupting the hydrophilic matrix. In so doing, the court specifically rejected the idea that the claimed "hydrophobic material" had to be "hydrophobic" in the ordinary sense of the word (*i.e.*, water fearing).[5] *Id. See also* Ex. 12, July

---

[5] It is a well-established tenet of patent law that a patentee can act as its "own lexicographer" by defining a term in a patent claim to mean something different than its ordinary meaning. *3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003). That is what the trial court held that the patentees did here—they coined the phrase "hydrophobic material" to describe a substance that performed the novel function of slowing hydration in a gel-matrix based controlled release delivery system. Ex. 9 (*Markman* Opinion Tr.) 43-55.

2019 Belvis Dep. 214:23-215:23; 226:9-227:3.

*Ferring B.V. v. Watson Laboratories, Inc.-Florida*, 764 F.3d 1401 (Fed. Cir. 2014) is directly on point. There, the court construed the term "modified release material" to mean "a material that modifies the release of the active material ingredient." *Id.* at 1410. The Federal Circuit held that under that construction, "just because a certain material *can* modify release of the active pharmaceutical ingredient tranexamic acid, does not necessarily mean that it actually *does*." *Id.* It further noted that "[e]xperts for both parties agreed that testing is required to measure whether a particular excipient actually functions to modify the release of tranexamic acid in a given formulation and therefore qualif[ies] as a modified release material." *Id.* at 1410-11.

Scientific Principles: All of the scientific experts (both here and in the underlying Patent Litigation) agree that components in pharmaceutical formulations are multi-functional—*i.e.*, the same material can perform different functions in different formulations, and the particular function(s) it performs in any particular formulation will depend on a variety of factors, including the amount of the material in the formulation, the identity and the amounts of the other components, interactions between components, and the type of dosage form and method of manufacturing it, etc. *See, e.g.*, Ex. 18, Fassihi Antitrust Rep. ¶¶ 55-56; Ex. 26, February 21, 2010 Expert Report of Reza Fassihi [hereafter "Fassihi Patent Rep."] ¶¶ 67-69; Ex. 19, February 23, 2010 Deposition of Edmund Elder, Volume 1 [hereafter "Elder Vol. 1 Dep."] 110:18-22; Ex. 20, February 24, 2010 Deposition of Edmund Elder, Volume 2 [hereafter "Elder Vol. 2 Dep."] 312:2-20; Ex. 21, Byrn Rep. ¶ 185 ███████████████████████ ██████████ Ex. 22, July 18, 2019 Deposition of Stephen Byrn 41:16–43:22; Ex. 12, July 2019 Belvis Dep. 95:4-10; *see also* Ex. 23 (Treatise) at 1635 ("[M]ost excipients used in formulating tablets and capsules have many uses, and a thorough understanding of their properties and

limitations is necessary in order to use them rationally."). Accordingly, the same material may perform a function in some formulations, but not others, and it may perform a function if used at one concentration in a given formulation but not if used at another. *Id.*

This functional aspect of pharmaceutical formulations applies to the claimed "hydrophobic materials." The trial court's construction requires that the claimed "hydrophobic material" be included in an amount that is effective to slow hydration of the gelling agent without disrupting the hydrophilic matrix. Accordingly, it is not enough that a material might be suitable for use as a hydrophobic material; rather, it must be used "as arranged in the claim" (*see* cases cited *supra*)— *i.e.*, in the context of the formulation at issue, it must be used in a way and in an amount such that is effective to perform the functions required by the court's definition.

<u>Impax's Burden</u>: Therefore, to sustain its anticipation defense, Impax was required to demonstrate by clear and convincing evidence that the putative "hydrophobic material" disclosed in the allegedly anticipating prior art references was actually used as such—*i.e.*, either that it was expressly disclosed in the prior art reference as performing the required function, or that, as a matter of inherency, it was used in a formulation disclosed in those references in a manner such that it would necessarily perform that function. Neither Impax nor Dr. Elder asserted that any of the cited prior art references disclosed this expressly, such that they would have had to show that the prior art references disclosed formulations in which the asserted "hydrophobic material" performed that function inherently. It would not have been enough for Impax and Dr. Elder to show that the material could or might perform the function; they had to show that it necessarily would perform that function. *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999) ("Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing *may* result from a given set of circumstances is not sufficient."). As

- 15 -

detailed below in the discussion of the cited prior art, Impax and Dr. Elder failed to meet that

burden.  Accordingly, Endo would have been entitled to judgment in its favor, as a matter of law,

with respect to Impax's anticipation defense.

<u>Baichwal '143</u>:  With respect to Baichwal '143, ███████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████  *See* Ex. 24, December 9, 2009 Expert Report of

Edmund Elder [hereafter "Elder Validity Rep."] ¶¶ 72, 81-82.  The entirety of the substantive basis

for his opinion was the following:

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

*Id.* ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████

- 16 -



Ex. 20, Elder Vol 2 Dep. 316:8–22.[6] ███████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████ *See* Ex. 3 ('933 patent) at 3:1-15; Ex. 14 (Impax Trial Br.) at 15-18; Ex. 24, Elder Validity

Rep. ¶¶ 81-82. ████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████ *See, e.g.*, Ex. 18, Fassihi Antitrust Rep. ¶¶ 68-76. ████

████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████ Ex. 22, July

2019 Byrn Dep. 107:1-109:3, 211:14-212:20.[7]

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████ Again, *Ferring* is directly on point. As noted above, the court adopted a functional definition of the term "modified release material," and just because a material *could* satisfy that functional definition did not mean that it necessarily *actually did* in the context of the particular formulation at issue in that case. *Ferring*, 764 F. 3d at 1410-11. Thus, the Federal Circuit required evidence that "a particular excipient actually functions to modify the release of tranexamic acid in a given formulation and therefore qualif[ies] as a modified release material." *Id.* Because "Ferring did not conduct any such testing and thus provided no basis from which to draw any reliable inferences regarding whether any of the active ingredients in Watson's ANDA product would modify the release of the tranexamic acid," it failed to show that that product met the requirements of the patent claims at issue. *Id.*

---

[7] ██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████

The same is true here. All of the scientific experts have agreed that in the context of a particular formulation, the mere fact a tablet includes a material that is listed in the '456 and '933 patents as being "suitable" for use as a "hydrophobic material" in an amount that falls within the very broad range of 1-90% for such materials does not necessarily mean that the material is actually performing the required function of slowing hydration of the gelling agent in that particular tablet formulation. Yet, ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

Accordingly, Endo would therefore have been entitled in the Patent Litigation to judgment in its favor, as a matter of law, that Impax failed to present clear and convincing evidence that Baichwal '143 anticipated the Asserted Claims, as they all require that a "hydrophobic material" be included in the claimed dosage form.

<u>Pankhania Reference</u>: Impax's and Dr. Elder's proofs are even more deficient with respect to the Pankhania reference. For Pankhania, ██████████████████████

████████████████████████████



Ex. 24, Elder Validity Rep. ¶ 61. ████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████ Ex. 19, Elder Vol 1 Dep. 130:5-8; Ex. 20, Elder Vol 2 Dep. 363:13-

20. ████████████████████████████████████████████

████████████████████████████████████████████

██████████

That showing was deficient as a matter of law. Invalidity must be proven by clear and convincing evidence; it cannot be based on unsupported assumptions. In *Zenith Electronics Corp. v. PDI Communication Systems, Inc.*, 522 F.3d 1348, 1363 (Fed. Cir. 2008), for instance, the accused infringer proffered no actual evidence that the prior art TV system met two limitations of the patent claims at issue, but argued that if those claims covered the infringer's own product, then they would also cover and be anticipated by that TV system. The district court found that evidence to be sufficient, but the Federal Circuit reversed, holding that the patent could not be invalidated without actual proof that all of the claim limitations were present in the prior art. *Id.* at 1363-64.

Impax and Dr. Elder made the same mistake as the accused infringer in *Zenith*—██

████████████████████████████████████████████

█████████████████████████ That is insufficient as a matter of law. ██████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████ Accordingly, Impax would have had no evidence to support any such assertion,

and Endo would have been entitled to judgment in its favor, as a matter of law, that Pankhania does not anticipate the Asserted Claims.[8]

### 3. "Sustained Release"

Claim Construction:  All of the Asserted Claims require that the claimed oral dosage form provide a "sustained release" of the active ingredient.  The trial court construed that term to mean that "the active medicament is released at a controlled rate such that therapeutically beneficial blood levels of the medicament are maintained over a period of at least 12 hours."  *See* Ex. 11 (Amended *Markman* Order) at 3; Ex. 9 (*Markman* Opinion Tr.) 10-20, 29-43.  In doing so, the court ruled that the claims required that therapeutically beneficial blood levels of the active ingredient be maintained not just for any extended or sustained period, they must be maintained for ***at least 12 hours***.  *Id.*  The court specifically rejected a construction that other, shorter sustained periods (such as only 6, 8 or 10 hours) would qualify.  *Id.*  In this way, the patentees again acted as their own "lexicographer," and for purposes of the '456 and '933 patents, not just any ordinary sustained release would do.

Scientific Principles:  ███████████████████████████████████

---

[8]    Other Prior Art References:  ███████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
Ex. 24, Elder Validity Rep. ¶¶ 7-109; Ex. 18, Fassihi Antitrust Rep. ¶¶ 110-160; Ex. 22, July 2019 Byrn Dep. 195:15-219:1.

██████████████ █████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████[10]   Thus, in order to demonstrate that a particular

formulation will satisfy the "sustained release" limitation of the Asserted Claims in accordance

with the court's construction—*i.e.* that it will maintain therapeutically beneficial blood levels for

at least 12 hours—one must show more than that the medicament will be released out of the tablet

over an extended period of time.

Impax's Burden:  To prove anticipation, therefore, Impax and Dr. Elder were required not

only to show that tablets taught by a prior art reference included a "hydrophobic material," but

also to show (by clear and convincing evidence) that the active ingredient would be released out

of those tablets at a rate that would maintain therapeutic blood levels of the active for the specified

12 hours.  And again, they would have to show either an express disclosure that the tablet

containing the "hydrophobic material" actually did that, or that, as a matter of inherency, the tablet

---

[9]   "Dissolution" tests are tests that are conducted in a laboratory to measure how much of the active ingredient will be released out of a tablet over time when it is placed in a fluid, typically a fluid that is intended to mimic the fluids that exist in a patient's stomach and/or intestinal tract. The purpose is to simulate and measure how quickly the active ingredient will dissolve out of a tablet once it has been ingested by a patient.  Ex. 19, Elder Vol 1 Dep. 66:3-68:13; Ex. 25 (1997 IVIVC Guidance, DTX-438).

[10]   The reason that dissolution testing alone is insufficient is because it only tells us how quickly the active ingredient is released into a patient's stomach or intestines; it does not tell us how much of or how quickly the active ingredient will be absorbed by the intestines and reach the bloodstream or how long the active ingredient will remain in the bloodstream before it is metabolized and excreted by the body.  *Id*.  Thus, it is undisputed that for controlled release medicaments like the ones at issue here, without what is known as an *in vitro-in vivo* correlation (IVIVC) (*i.e.*, an established correlation between dissolution test results and blood level data), one cannot know how long therapeutically beneficial blood levels will be maintained based only on dissolution data.  *See id*.

necessarily would do that. They failed to meet that burden, and accordingly, Endo would have been entitled to judgment as a matter of law in its favor with respect to Impax's anticipation defense for that additional reason.

Baichwal '143: With respect to Baichwal '143, ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████ :



Ex. 24, Elder Validity Rep. p. 19. That is it. In other words, ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

Ex. 22, July 2019 Byrn Dep. 210:24-211:8.

Later in his report, Dr. Elder opined ██████████████████████████████

████████████████████████████████████████████████

[REDACTED]

Accordingly, the evidence and opinions expressed by Dr. Elder were insufficient, as a matter of law, to prove by clear and convincing evidence that Baichwal '143 disclosed a formulation that would provide the required "sustained release" of the active medicament. Endo would therefore have been entitled to judgment as a matter of law that Baichwal '143 does not

anticipate any of the Asserted Claims, as they all require that the claimed dosage form both include a "hydrophobic material" and provide the recited "sustained release."

Pankhania Reference: Impax's and Dr. Elder's proofs fail with respect to the Pankhania reference for the same reasons. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

████████████████████████████████████████████████████████

Ex. 24, Elder Validity Rep. p. 25. That is it. ██████████████████████████████

████████████████████████████████████████████████████████. *See also*

Ex. 18, Fassihi Antitrust Rep. ¶¶ 105-106.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████



Ex. 20, Elder Vol. 2 Dep. 382:12-21.  *See also* Ex. 22, July 2019 Byrn Dep. 216:5-12 ██████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

Accordingly, the evidence and opinions expressed by Dr. Elder were insufficient, as a matter of law, to prove by clear and convincing evidence that Pankhania disclosed a formulation that would provide the required "sustained release" of the active medicament, and Endo would have been entitled to judgment as a matter of law that that reference does not anticipate any of the Asserted Claims.[11]

**B.    Impax's Non-Infringement Defense Based on the "Sustained Release" Limitation**

On the issue of infringement, Plaintiffs' patent litigation expert opines that Endo would have failed to prove in the underlying Patent Litigation that the accused Impax ANDA tablets meet the "sustained release" limitation recited in each of the Asserted Claims.  Ex. 15, Belvis Rep. ¶¶ 175-190.  Endo is entitled to summary judgment with respect to that non-infringement defense,

---

[11]    Other Prior Art References:  As above with respect to "hydrophobic material," to the extent Plaintiffs try to rely on any of the Five Additional References as allegedly anticipating the Asserted Claims, those references are legally irrelevant in this antitrust action because Impax did not intend to actually assert them at trial (*see* discussion *supra* at 9-10 & n.8), and in any event, Impax's and Dr. Elder's proofs as to those references were likewise insufficient as a matter of law for the same reasons as their proofs as to Baichwal '143 and Pankhania were.  *See* Ex. 24, Elder Validity Rep. ¶¶ 7-109; Ex. 18, Fassihi Antitrust Rep. ¶¶ 110-160; Ex. 22, July 2019 Byrn Dep. 195:15-219:1.

however, because Endo's infringement proofs as to that limitation would have been unrebutted by any expert testimony or other evidence, and Impax's arguments that those proofs were insufficient contradicted the trial court's construction of the term "sustained release."

Determining infringement is a two-step inquiry: the court first construes the claims as a matter of law, and then compares the properly-construed claims to the accused product. *Purdue Pharma L.P. v. Boehringer Ingelheim, GmbH*, 237 F.3d 1359, 1363 (Fed. Cir. 2001). Here, the trial court construed the term "sustained release" to mean that "the active medicament is released at a controlled rate such that ***therapeutically beneficial blood levels of the medicament are maintained*** over a period of at least 12 hours." *See* Ex. 11 (Amended *Markman* Order) at 3 (emphasis added). The therapeutic benefit provided by the accused Impax ANDA tablets is pain relief. Thus, to succeed, Endo had the burden to prove that Impax's ANDA tablets would release oxymorphone at a rate that would ***maintain*** pain relief for a period of at least twelve hours.

Endo easily met that burden. At trial, Endo's infringement expert (Dr. Lowman) explained that the FDA had approved Impax's ANDA tablets as being effective in providing "continuous, around-the-clock" relief of pain, based on 12 hour/twice-a-day dosing. Ex. 10 (Trial Tr.) 81:6-83:19; *see also* Ex. 27 (Impax Package Insert, PX-1001F); Ex. 28 (Impax ANDA excerpt regarding labeling, PX-1047) at 178; Ex. 29 (Tentative Approval Letter for Impax ANDA, PX-1145). In other words, taking one Impax ANDA tablet every 12 hours provides patients with continuous, non-stop pain relief. As a matter of logic, that necessarily means that each individual tablet will release oxymorphone out of the tablet at a rate that ***maintains*** therapeutic blood levels of oxymorphone in the patient's body for a period of at least 12 hours. If that were not the case, the patient would start to feel pain again before it was time to take the next tablet, and pain relief

would not be provided "continuous[ly], around-the-clock." Thus, Dr. Lowman testified that the accused Impax tablets readily satisfied the "sustained release" limitation. *Id*.

Impax would not have presented any contrary expert testimony at trial. Its technical expert, Dr. Elder, challenged other aspects of Endo's infringement proofs, but did not dispute Dr. Lowman's opinion that Impax's ANDA tablets provide the required "sustained release" of oxymorphone. Nor did Impax dispute that opinion until just before trial, when it interjected into the Final Pretrial Order a new, previously unasserted contention that its ANDA tablets do not satisfy that limitation. *See* Ex. 7 (Endo Trial Br.) at 7. Without an expert who agreed with it, however, Impax would have had to rely entirely on lawyer argument, which would have been insufficient as a matter of law to sustain judgment in its favor on the issue.

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████ But, more importantly for present purposes, Impax's assertion was legally irrelevant. Nothing in the claims requires that the claimed tablet be taken by a patient who has none of the active ingredient in their bloodstream, or that the very first tablet taken by a patient both (i) raise the blood levels of the active ingredient in the patient's bloodstream from zero to therapeutic levels, and (ii) thereafter maintain those therapeutic blood levels for the required 12 hours.[12] Rather, in accordance with the trial court's construction, the

---

[12] Indeed, the argument flies in the face of the primary way that controlled release formulations are administered: "[i]n order to maintain drug blood levels within the therapeutic range over the entire course of therapy, most sustained-release drug delivery systems are, like conventional dosage forms, administered as multiple rather than single doses." Ex. 23 (Treatise) at 1678.

"sustained release" limitation merely requires that the accused Impax tablets release oxymorphone at a controlled rate such that therapeutic blood levels ***are maintained***—*i.e.*, kept in their existing state: preserved from decline[13]—over a period of at least 12 hours. The accused Impax ANDA tablets necessarily do just that. As described above, patients taking those tablets twice-a-day will feel continuous, around-the-clock pain relief, such that each individual Impax ANDA tablet will necessarily maintain (*i.e.*, keep/preserve from decline) the amount of oxymorphone in the patient's bloodstream at therapeutic levels for at least the next 12 hours, when the patient is scheduled to take the next tablet.

Impax's lawyer-argument—unsupported by expert evidence—that Endo's evidence was insufficient to satisfy the "sustained release" limitation thus contradicted the trial court's claim construction, and Endo would have been entitled to judgment as a matter of law in its favor on the issue. Accordingly, if the Court does not grant Defendants summary judgment in full, it at a minimum should grant Endo summary judgment with respect to Plaintiffs' non-infringement defense based on the "sustained release" limitation.

## CONCLUSION

If the Court denies Defendants' motion for full summary judgment, then it should streamline the already complex trial it would need to conduct, and reduce the burden on the jury, by granting partial summary judgment in favor of Endo that (1) but for the SLA, Endo would have been successful in obtaining a judgment that any generic Opana ER sales by Impax after November 13, 2012 were unlawful, and would continue to be unlawful until the last of those Additional Patents expires on November 22, 2029; and (2) that Impax could not have succeeded in the

---

[13] *See* Ex. 45 (Merriam-Webster definition of "maintain").

underlying Patent Litigation with respect to its assertion of patent defenses on the grounds of anticipation or on the grounds of non-infringement based on the "sustained release" limitation.

Dated:  April 15, 2020                    Respectfully submitted,

*/s/ George G. Gordon*
George G. Gordon (admitted *pro hac vice*)
Julia Chapman (admitted *pro hac vice*)
Thomas J. Miller (admitted *pro hac vice*)
John P. McClam (admitted *pro hac vice*)
Sharon K. Gagliardi (admitted *pro hac vice*)
DECHERT LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA  19104
Tel.:  (215) 994 4000
Fax:  (215) 994-2222
george.gordon@dechert.com
julia.chapman@dechert.com
thomas.miller@dechert.com
john.mcclam@dechert.com
sharon.gagliardi@dechert.com

Craig Falls (admitted *pro hac vice*)
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
Tel.:  (202) 261-3300
Fax:  (202) 261-3333
craig.falls@dechert.com

Robert D. Rhoad (*pro hac vice* pending)
DECHERT LLP
502 Carnegie Center, Suite 104
Princeton, NJ 08540
Tel.: (609) 955-3269
Fax.: (609) 873-9142
robert.rhoad@dechert.com

Angela Liu
DECHERT LLP
35 West Wacker Drive, Suite 3400
Chicago, IL  60601
Tel.:  (312) 646-5800
Fax:  (312) 646-5858
angela.liu@dechert.com

*Counsel for Defendants Endo Health*
*Solutions Inc., Endo Pharmaceuticals Inc.,*
*and Penwest Pharmaceuticals Co.*

- 31 -