**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE OPANA ER ANTITRUST LITIGATION | MDL No. 2580 |
| | Lead Case No. 14-cv-10150 |
| THIS DOCUMENT RELATES TO: | Hon. Harry D. Leinenweber |
| All Actions | |
| | **PUBLIC VERSION** |

**ENDO'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE WITH RESPECT TO ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CERTAIN PATENT ISSUES**

Pursuant to Local Rule 56.1, Endo Pharmaceuticals Inc., Endo Health Solutions Inc., and Penwest Pharmaceuticals Co. (collectively, "Endo") submit this statement of material facts as to which there is no genuine issue in support of its Motion for Partial Summary Judgment with respect to Certain Patent Issues.

# TABLE OF CONTENTS

**Page**

I. DESCRIPTION OF THE PARTIES ....................................................................... 3

II. JURISDICTION AND VENUE ............................................................................. 3

III. BACKGROUND ON HATCH-WAXMAN AND PHARMACEUTICAL PATENT LITIGATION .................................................................................................... 3

IV. OPANA ER ........................................................................................................ 3

V. ENDO-IMPAX D.N.J. PATENT LITIGATION – THE "PATENT LITIGATION" ........... 4

    A. The '456 and '933 Patents ........................................................................ 4

    B. Endo-Impax Patent Litigation Involving '456 and '933 Patents ...................... 5

        1. Claims Asserted ................................................................................ 5

        2. The Court's Claim Construction (*Markman*) Ruling ............................... 6

        3. Trial ................................................................................................ 7

        4. Impax's Trial Evidence ...................................................................... 9

        5. The Parties' Settlement (the SLA) ...................................................... 17

VI. ENDO'S LATER-ACQUIRED PATENTS – THE "ADDITIONAL PATENTS" .............. 17

VII. THE SUBSEQUENT PATENT LITIGATIONS – THE SDNY AND DE PROCEEDINGS .................................................................................................. 18

    A. The SDNY Proceedings ............................................................................ 18

        1. District Court Proceedings .................................................................. 18

        2. SDNY Appeal ................................................................................... 21

    B. The DE Proceedings ................................................................................ 21

        1. District Court Proceedings .................................................................. 21

        2. DE Appeals ...................................................................................... 23

VIII. BUT FOR THE BROAD LICENSE IN THE SLA, ENDO WOULD HAVE SUCCESSFULLY ENJOINED IMPAX FROM SELLING ITS ANDA TABLETS UNTIL 2029 .................................................................................... 24

IX. THE EXPERT REPORTS OF DR. STEPHEN BYRN, PLAINTIFFS' TECHNICAL EXPERT REGARDING PATENT ISSUES IN THESE ANTITRUST ACTIONS ........ 26

I.    **DESCRIPTION OF THE PARTIES**

1.    *See* Defendants' Joint Local Rule 56.1 Statement of Material Facts As To Which There Is No Genuine Issue in connection with Defendants' companion Motion for Summary Judgment ("Defendants' MSJ Statement of Facts"), at ¶¶ 1-5.

II.   **JURISDICTION AND VENUE**

2.    *See* Defendants' MSJ Statement of Facts, at ¶ 6.

III.  **BACKGROUND ON HATCH-WAXMAN AND PHARMACEUTICAL PATENT LITIGATION**

3.    *See* Defendants' MSJ Statement of Facts, at ¶¶ 7-10.

IV.   **OPANA ER**

4.    Opana ER (extended-release oxymorphone hydrochloride tablets) was first approved in 2006 for the management of moderate-to-severe pain when a continuous, around-the-clock opioid analgesic is needed for an extended period of time.  *See* Ex. 1 (FDA "Regulatory History of Opana ER") at 6.  Between 2006 and 2017, Endo sold two different formulations of Opana ER.  Endo sold one version of Opana ER from 2006 until May 2012 (hereafter, "Original Opana ER").  *Id.* at 8–10.  Endo sold Original Opana ER in 5 mg, 7.5 mg, 10 mg, 15 mg, 20 mg, 30 mg, and 40 mg dosage strengths.  *Id.* at 8.  In 2010, Endo applied for approval of reformulated version of Opana designed to be crush-resistant, so as to address abuse by crushing and snorting (hereafter, "Reformulated Opana ER").  *Id.* at 9.  In late 2011, the FDA granted approval, and from early 2012 to 2017, Endo sold Reformulated Opana ER.  *Id.* at 10; *see also* Ex. 2 (FDA, "Oxymorphone (marketed as Opana ER) Information").[1]

---

[1]  Both products were sold as "Opana ER," but the terms "Original Opana ER" and "Reformulated Opana ER" are used for clarity throughout Defendants' briefing to refer to Endo's two formulations of Opana ER.  Where the distinction is relevant, corresponding generic

## V.     ENDO-IMPAX D.N.J. PATENT LITIGATION – THE "PATENT LITIGATION"

5.     Plaintiffs in this antitrust litigation challenge a 2010 Settlement and License Agreement ("SLA") resolving patent litigation between Endo and Impax related to Opana ER, Endo's long-acting opioid pain reliever ("Patent Litigation"), as discussed in more detail below.

### A.     The '456 and '933 Patents

6.     U.S. Patent No. 5,662,933 (the '933 patent) issued on September 2, 1997.  *See* Ex. 3 ('933 patent).  U.S. Patent No. 5,958,456 (the '456 patent) issued on September 28, 1999. *See* Ex. 4 ('456 patent).  Both patents were later assigned to Penwest Pharmaceuticals Co., who subsequently licensed both patents to Endo.  *See* Ex. 5 (Final Pretrial Order) at 7, 14.  FDA listed both the '933 and '456 in the Orange Book for Opana ER in October 2007.  *Id.* at 8.  Both the '933 patent and '456 patent were scheduled to expire on September 9, 2013.  *See* Ex. 6 (Historic Opana ER Orange Book Entry) at 78.

7.     Broadly speaking, the '933 patent and '456 patents generally claimed controlled release delivery systems that allow oral tablets to release the active ingredient over an extended period of time, and thereby reduce the frequency with which a patient has to take the medication (*e.g.*, to enable once or twice daily dosing, rather than dosing every 4 or 6 hours).  Ex. 7 (Endo Trial Br.) at 1-2.  In particular, they relate to gel matrix-based delivery systems in which the tablets include a gelling agent that, upon ingestion by a patient, becomes hydrated and forms a gel that surrounds the tablet and controls the rate at which the medicament is released out of the

---

versions of Opana ER are referred to as "Generic Original Opana ER" and "Generic Reformulated Opana ER."

tablet.[2]  *See, e.g.,* Ex. 8, February 1, 2010 Expert Report of Edmund J. Elder ¶¶ 3-5; Ex. 7 (Endo Trial Br.) at 1-2; Ex. 10 (Trial Tr.) 58-61.

8.      The inventors discovered that the controlled release properties of existing gel matrix-based delivery systems could be improved by adding particular substances to those formulations that would slow hydration of the gelling agent, but not disrupt the matrix that the gelling agent formed around the tablet.  For purposes of their patents, the inventors dubbed the materials that would perform that critical inventive function as "hydrophobic materials."  The inventors asserted that the use of such "hydrophobic materials" was an improvement over the prior art because it allowed once or twice daily dosage forms to be developed for certain medicaments that previously could only be formulated for 4- or 6-hour dosing.  *See, e.g.*, Ex. 4 ('456 patent) at 1:65-2:6, 5:29-37; Ex. 7 (Endo Trial Br.) at 1-2; Ex. 9 (*Markman* Opinion Tr.) 10:1-20:9, 43:18-55:5; Ex. 10 (Trial Tr.) 58.

**B.      Endo-Impax Patent Litigation Involving '456 and '933 Patents**

**1.      Claims Asserted**

9.      In 2007, Impax filed Abbreviated New Drug Application ("ANDA") 79-087 seeking FDA approval to market certain strengths of generic Original Opana ER.  *See* Ex. 5 (Final Pretrial Order) at 9.  Impax included with its ANDA a Paragraph IV certification claiming that the '933 patent and '456 patent were invalid, unenforceable, or would not be infringed by the manufacture, use, or sale of Impax's generic Original Opana ER product.  *Id.*

10.      Endo asserted the '933 and '456 patents against Impax's generic Original Opana ER product in a number of cases in the U.S. District Court for the District of New Jersey (the "Patent Litigation").  *See, e.g., id.* at 9-10.  In particular, Endo asserted that Impax infringed the

---

[2] This is in contrast to, for example, an immediate release tablet that dissolves quickly in a patient's stomach, and releases all of the medicament out of the tablet at once.

following claims, among others, of the patents in suit: claims 1–2, 5, and 7 of the '456 patent, and claims 1–2, 7–8, and 10 of the '933 patent (the "Asserted Claims"). *Id.* at 10.

11.     Claim 1 of the '456 patent is representative of the other Asserted Claims for purposes of this motion, and it recites as follows:

> 1. A controlled release solid dosage form for oral administration of a therapeutically active medicament to a patient in need thereof, comprising:
> a pharmaceutically effective amount of a medicament to be administered to a patient in need of said medicament;
> a sustained release excipient comprising a gelling agent; a pharmaceutically acceptable hydrophobic material; and an inert pharmaceutical diluent wherein the ratio of said inert diluent to said gelling agent is from about 1:8 to about 8:1, said dosage form providing a sustained release of said medicament when exposed to an environmental fluid.

Ex. 4 ('456 patent) at col. 21, lines 8-20.

## 2.     The Court's Claim Construction (*Markman*) Ruling

12.     Prior to trial, the Court issued a *Markman* claim construction order. *See* Ex. 11 (Amended *Markman* Order). Among other things, the trial court construed that term "hydrophobic material" to mean "a material which is effective to slow the hydration of the gelling agent without disrupting the hydrophilic matrix." *See id.* at 3; Ex. 9 (*Markman* Opinion Tr.) 10-20, 43-55. In other words, the trial court adopted a functional definition for "hydrophobic material"—for purposes of Endo's patents, in order for a substance to qualify as a "hydrophobic material" in a particular formulation, it must slow hydration of the gelling agent without disrupting the hydrophilic matrix. In so doing, the court specifically rejected the idea that the claimed "hydrophobic material" had to be "hydrophobic" in the ordinary sense of the word (*i.e.*, water fearing). *Id. See also* Ex. 12, July 10, 2019 Deposition of Glen Belvis 214:23-215:23; 226:9-227:3.

13.     In addition, the trial court construed that term "sustained release" to mean that "the active medicament is released at a controlled rate such that therapeutically beneficial blood levels of the medicament are maintained over a period of at least 12 hours." *See* Ex. 11 (Amended *Markman* Order) at 3; Ex. 9 (*Markman* Opinion Tr.) 10-20, 29-43. In doing so, the court ruled that the claims required that therapeutically beneficial blood levels of the active ingredient be maintained not just for any extended or sustained period, they must be maintained for ***at least 12 hours***. *Id.*[3] The court specifically rejected a construction that other, shorter sustained periods (such as only 6, 8 or 10 hours) would qualify. *Id.*

### 3.     Trial

14.     The case proceeded to trial in June 2010. Neither party sought to narrow the issues in dispute prior to trial through summary judgment.[4] The trial court entered a Final Pretrial Order that defined the issues for trial, including lists of the witnesses and exhibits that could be presented at trial. *See* Ex. 5 (Final Pretrial Order) at 101-104, 106, 111; Ex. 12, July 2019 Belvis Dep. 158:12-159:9. The parties also submitted trial briefs summarizing the evidence and arguments they intended to present at trial. *See* Exs. 7 (Endo Trial Br.) and 14 (Impax Trial Br.). And the parties' respective experts would have been limited at trial to the

---

[3] The Merriam Webster dictionary defines the word "maintain" as "to keep in an existing state…:  preserve from …decline." Ex. 45 (Merriam-Webster definition of "maintain").

[4]  Given that ANDA patent infringement cases typically involve bench trials conducted under strict time constraints, some district court judges refuse to allow summary judgment motions in such cases. *See, e.g.,* Ex. 13, Rhoades, Katherine, "Do Not Pass Go, Do Not Stop for Summary Judgment: The U.S. District Court for the District of Delaware's Seemingly Disjunctive Yet Efficient Procedures in Hatch-Waxman Litigation," Northwestern J. of Tech. and Intellectual Property, Vol. 14, Issue 1 Article 4. Consistent therewith, Impax, Endo and the trial court agreed to proceed to trial without a period for summary judgment motions. Ex. 15, March 25, 2019 Expert Report of Glen Belvis [hereafter "Belvis Rep."] ¶ 97.

opinions and evidence disclosed in their expert reports.  Ex. 12, July 2019 Belvis Dep. at 156:18-

157:13

15.     Impax explained that it would assert that its ANDA tablets did not infringe the

Asserted Claims and that those Claims were invalid.



Ex. 14 (Impax Trial Br.) at i,1, 3-14; Ex. 15, Belvis

Rep. i-ii, Section VII.A.2.

16.     With respect to validity, ████████████████████████

Ex. 14 (Impax Trial Br.) at i,1, 15-23; Ex. 16 (Elder Trial

Demonstratives); Ex. 12, July 2019 Belvis Dep. 161:7-163:11.

17.     On the first day of trial, Endo presented testimony from its infringement expert

explaining why the Impax ANDA tablets infringed the Asserted Claims.  Ex. 10 (Trial Tr.) 50-

133.  The parties settled their dispute before the start of the second day of trial, and promptly

signed the SLA, which included a broad license to additional patents that Endo might obtain in

the future (the "Broad License").  *See* ECF No. 247, No. 09-cv-0831 (D.N.J.) (minute entry

reflecting trial proceedings held on June 7, 2010); Ex. 15, Belvis Rep. ¶ 102; Ex. 17 (SLA) at

§ 4.1. (discussed below).

### 4. Impax's Trial Evidence

#### a) Invalidity Defenses – Evidence of Alleged Anticipation

##### (1) "Hydrophobic Material" Limitation

18. All of the scientific experts (both here and in the underlying Patent Litigation) agree that components in pharmaceutical formulations are multi-functional—*i.e.*, the same material can perform different functions in different formulations, and the particular function(s) it performs in any particular formulation will depend on a variety of factors, including the amount of the material in the formulation, the identity and the amounts of the other components, interactions between components, and the type of dosage form and method of manufacturing it, etc. *See, e.g.*, Ex. 18, August 29, 2019 Expert Report of Reza Fassihi [hereafter "Fassihi Antitrust Rep."] ¶¶ 55-56; Ex. 26, February 21, 2010 Expert Report of Reza Fassihi [hereafter "Fassihi Patent Rep."] ¶¶ 67-69; Ex. 19, February 23, 2010 Deposition of Edmund Elder, Volume 1 [hereafter "Elder Vol. 1 Dep."]110:18-22; Ex. 20, February 24, 2010 Deposition of Edmund Elder, Volume 2 [hereafter "Elder Vol. 2 Dep."] 312:2-20; Ex. 21, March 25, 2019 Expert Report of Stephen Byrn [hereafter "Byrn Rep."] ¶ 185 ██████████████ ████████████████████████████████ Ex. 22, July 18, 2019 Deposition of Stephen Byrn 41:16–43:22; Ex. 12, July 2019 Belvis Dep. 95:4-10; *see also* Ex. 23 (Treatise) at 1635 ("[M]ost excipients used in formulating tablets and capsules have many uses, and a thorough understanding of their properties and limitations is necessary in order to use them rationally."). Accordingly, the same material may perform a function in some formulations, but not others, and it may perform a function if used at one concentration in a given formulation but not if used at another. *Id.*

19. <u>Baichwal '143</u>: With respect to the allegedly anticipating "Baichwal '143" prior art reference, Impax's expert in the underlying Patent Litigation (Dr. Elder) opined only ████

9

███████████████████████████████████████████████████████

████████████████████████████  *See* Ex. 24, December 9, 2009 Expert Report of Edmund Elder [hereafter "Elder Validity Rep."] ¶¶ 72, 81-82.  The entirety of the substantive basis for his opinion was the following:

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████.

    20.    █████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████



8      Q.   Okay.  Do you have any basis for
9   asserting that as used in Baichwal '143 the
10  hydrogenated vegetable oil would slow hydration of
11  the gelling agent without disrupting the
12  hydrophilic matrix?
13      A.   As a hydrophobic material, it will
14  slow down the water uptake into the tablet.
15      Q.   Do you have any basis for asserting
16  that at the amount used it would perform that
17  function?
18      A.   It could perform that function, yes.
19      Q.   I didn't ask you if it could.  I asked
20  you if you have any proof to demonstrate that it
21  is performing that function at that amount.
22      A.   No.  I do not.

Ex. 20, Elder Vol 2 Dep. 316:8–22.[5]

21.     Impax and Dr. Elder relied on the fact that ██████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████     *See* Ex. 3 ('933 patent) at 3:1-15; Ex. 14 (Impax Trial Br.) at

15-18; Ex. 24, Elder Validity Rep. ¶¶ 81-82.  ██████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████     *See, e.g.*, Ex. 18, Fassihi

Antitrust Rep. ¶¶ 68-76.

---

[5] ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

22. ███████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████ Ex. 22, July 2019 Byrn Dep. 107:1-109:3, 211:14-212:20.[6]

23. <u>Pankhania Reference</u>: With respect to the "Pankhania" prior art reference, ███

████████████████████████████████████

██████████████████



Ex. 24, Elder Validity Rep. ¶ 61. ████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

---

[6] ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████

12

**(2)**      **"Sustained Release" Limitation**



24.

25.    <u>Baichwal '143</u>: With respect to Baichwal '143,

---

[7] "Dissolution" tests are tests that are conducted in a laboratory to measure how much of the active ingredient will be released out of a tablet over time when it is placed in a fluid, typically a fluid that is intended to mimic the fluids that exist in a patient's stomach and/or intestinal tract. The purpose is to simulate and measure how quickly the active ingredient will dissolve out of a tablet once it has been ingested by a patient. Ex. 19, Elder Vol 1 Dep. 66:3-68:13; Ex. 25 (1997 IVIVC Guidance, DTX-438).

[8] The reason that dissolution testing alone is insufficient is because it only tells us how quickly the active ingredient is released into a patient's stomach or intestines; it does not tell us how much of or how quickly the active ingredient will be absorbed by the intestines and reach the bloodstream or how long the active ingredient will remain in the bloodstream before it is metabolized and excreted by the body. *Id*. Thus, for controlled release medicaments like the ones at issue here, without what is known as an *in vitro-in vivo* correlation (IVIVC) (*i.e.*, an established correlation between dissolution test results and blood level data), one cannot know how long therapeutically beneficial blood levels will be maintained based only on dissolution data. *See id*.

███████████████████████████████████████████
███████████████████████████████████████████

Ex. 24, Elder Validity Rep. at p. 19. ████████████████████████████

███████████████████████████████████████████

████████████████████████████ *See* Ex. 19, Elder Vol 1 Dep. 66:3-68:13; Ex. 18,

Fassihi Antitrust Rep. ¶¶ 78-80.

26.     Plaintiffs' scientific expert in this case (Dr. Byrn) conceded that Dr. Elder's

evidence was insufficient:

███████████████████████████████████████████

Ex. 22, July 2019 Byrn Dep. 210:24-211:8.

27.     Later in his report, Dr. Elder opined that Baichwal '143 ████████████

███████████████████████████████████████████

14

████████████████████████████████████████████████████████

███████████████████████████.

28.　████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████

29.　<u>Pankhania Reference:</u>　██████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████

████████████████████████████████████████

Ex. 24, Elder Validity Rep. at p. 25.  Thus, as with Baichwal '143, he relied entirely on dissolution testing.  *See also* Ex. 18, Fassihi Antitrust Rep. ¶¶ 105-106.

30.　█████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

15



Ex. 20, Elder Vol 2 Dep. 382:12-21. *See also* Ex. 22, July 2019 Byrn Dep. 216:5-12 ██████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

### b) Non-Infringement Defenses – Evidence of No "Sustained Release"

31.     At trial, Endo's infringement expert (Dr. Lowman) explained that the FDA had tentatively approved Impax's ANDA tablets as being effective in providing "continuous, around-the-clock" relief of pain, based on 12 hour/twice-a-day dosing.  Ex. 10 (Trial Tr.) 81:6-83:19; *see also* Ex. 27 (Impax Package Insert, PX-1001F); Ex. 28 (Impax ANDA excerpt regarding labeling, PX-1047) at 178; Ex. 29 (Tentative Approval Letter for Impax ANDA, PX-1145); Ex. 46 (Lowman Trial Demonstrative, citing PX-1051) at 28.  In other words, taking one Impax ANDA tablet every 12 hours will provide a patient with continuous, non-stop pain relief.

32.     Impax would not have presented any contrary expert testimony at trial. ██

████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

### 5. The Parties' Settlement (the SLA)

33.     The parties settled their dispute before the start of the second day of trial, and promptly signed the SLA, which included a broad license to additional patents that Endo might obtain in the future (the "Broad License").  *See* ECF No. 247, No. 09-cv-0831 (D.N.J.) (minute entry reflecting trial proceedings held on June 7, 2010); Ex. 15, Belvis Rep. ¶ 102; Ex. 17 (SLA) at § 4.1. (discussed below).

## VI.     ENDO'S LATER-ACQUIRED PATENTS – THE "ADDITIONAL PATENTS"

34.     Following settlement of the underlying Patent Litigation and execution of the SLA, Endo either acquired or licensed a number of new patents covering Opana ER, including the following (collectively, the "Additional Patents"):

- **'122 Patent.**  On November 13, 2012, the U.S. Patent and Trademark Office (PTO) issued U.S. patent number 8,309,122 (the '122 patent) to Endo as assignee.  *See* Ex. 30 ('122 patent).  The '122 patent expires on February 4, 2023.  *See* Ex. 31 (FDA Orange Book: Opana ER).

- **'216 Patent.**  On December 11, 2012, the PTO issued U.S. patent number 8,329,216 (the '216 patent) to Endo as assignee.  *See* Ex. 32 ('216 patent).  The '216 patent expires on February 4, 2023.  *See* Ex. 31 (FDA Orange Book: Opana ER).

- **'779 Patent.**  On October 28, 2014, the PTO issued U.S. patent number 8,871,779 (the '779 patent) to Mallinckrodt.  *See* Ex. 33 ('779 patent).  Endo is the exclusive licensee of the '779 patent.  *See Endo Pharm. Inc. v. Amneal Pharm., LLC*, 224 F. Supp. 3d 368, 384 (D. Del. 2016).  The '779 patent expires on November 22, 2029.  *See* Ex. 31 (FDA Orange Book: Opana ER).

## VII.  THE SUBSEQUENT PATENT LITIGATIONS – THE SDNY AND DE PROCEEDINGS

35.     As explained more fully below, Endo has successfully enforced the Additional Patents in two different sets of litigation, resulting in every generic defendant[9] either withdrawing its ANDA(s), committing not to launch before expiration of the relevant patents, or taking the cases to trial, losing, and being enjoined from entering with generic versions of Original Opana ER or Reformulated Opana ER.  Actavis, which had launched at risk, was also ordered to remove its product from the market.

### A.     The SDNY Proceedings

#### 1.     District Court Proceedings

36.     Following the issuance of the '122 and '216 patents, Endo filed a number of patent infringement lawsuits in U.S. District Court for the Southern District of New York against all generic manufacturers who had filed ANDAs relating to either the original or reformulated versions of Opana ER, asserting claims for infringement of those patents (the "SDNY Proceedings"), specifically Amneal (No. 12-cv-8115); Sandoz (No. 12-cv-8318 & No. 13-cv-3287); Teva/Barr (No. 12-cv-8060 & No. 13-cv-3285); ThoRx (No. 12-cv-8317); Actavis (No. 12-cv-8985 & No. 13-cv-436); Par (No. 12-cv-9261 & No. 13-cv-3284); Impax (No. 13-cv-435); Mallinckrodt (No. 13-cv-3286); Roxane (13-cv-3288); Ranbaxy/Sun (No. 13-cv-4343 & No. 13-cv-8597).

_____

[9]  The defendants in those cases included Amneal Pharmaceuticals of New York, LLC and Amneal Pharmaceuticals LLC ("Amneal"); Mallinckrodt Pharmaceutical Co. ("Mallinckrodt"); Par Pharmaceutical ("Par"); Impax (solely with respect to its ANDA directed to reformulated Opana ER); ThoRx Laboratories, Inc. ("ThoRx"); Sun Pharmaceutical Industries, Ltd., Ranbaxy, Inc., and Ranbaxy Pharmaceuticals, Inc. ("Sun"); Roxane Laboratories, Inc. ("Roxane"); Actavis Inc. and Actavis South Atlantic LLC ("Actavis"); Sandoz, Inc. ("Sandoz"); Teva Pharmaceuticals USA, Inc. ("Teva"); Barr Laboratories, Inc. ("Barr"); and Watson Pharmaceuticals, Inc. ("Watson").

37.     Before trial, a number of generic defendants either withdrew their ANDAs or otherwise committed not to enter before the expiration of Endo's patents under the existing circumstances, and accordingly, Endo dismissed its claims against those generic defendants. *See, e.g.,* Ex. 34, August 29, 2019 Rebuttal Report of Jonathan Singer [hereafter "Singer Rep."] ¶¶ 96-100, 239-241;  ECF No. 114, 12-cv-8318 (S.D.N.Y.) (Sandoz); ECF No. 27, 13-cv-8597 (S.D.N.Y.) (Sandoz); ECF No. 8, 13-cv-3285 (S.D.N.Y.) (Teva); ECF No. 93, 12-cv-09261 (S.D.N.Y.) (Par); ECF No. 65, 13-cv-3284 (S.D.N.Y.) (Par); ECF No. 17, 13-cv-3286 (S.D.N.Y.) (Mallinckrodt).[10]

38.     Endo proceeded to trial against all of the other remaining generic ANDA filers with a Paragraph IV certification: Actavis/Watson (Original and Reformulated), Amneal (Reformulated), Roxane (Original), Sun Pharma (Original and Reformulated), Barr/Teva (Reformulated), ThoRx (Reformulated), and Impax (Reformulated) (the "SDNY defendants"). *Endo Pharm. Inc. v. Amneal Pharm., LLC*, No. 12-cv-8060 (TPG), 2015 WL 9459823 (S.D.N.Y. Aug. 18, 2015).  *See also* Ex. 34, Singer Rep. ¶¶ 101, 241.

39.     In the SDNY Proceedings, Endo asserted the '122 and '216 patents against Impax with respect to the products described in in Impax's ANDA 204211 relating to Reformulated Opana ER (Impax's "Reformulated Opana ER Product").  *See* Ex. 36 (Impax SDNY Complaint), 13-cv-435 (S.D.N.Y.).  Endo did not sue Impax for infringement of the '122 and '216 patents with regard to its Original ANDA Product because of the broad patent license that Impax received in the SLA.  *See, e.g.,* Ex. 34, Singer Rep. ¶ 239-240; Ex. 37 (Complaint, *Endo*

---

[10] Endo settled its claims against Mallinckrodt in the SDNY Proceedings, pursuant to a settlement agreement in which Endo obtained exclusive rights to the '779 patent and Mallinckrodt agreed not to launch a generic Opana ER product prior to the expiration of Endo's additional patents unless three other generic entrants had already done so.  *See* Ex. 35 (Agreement with Mallinckrodt).

*Pharmaceuticals Inc. vs. Impax Laboratories, Inc.*, Case No. 16-2526 (D.N.J.)) at ¶ 52 ("But for

the parties' compromise, Endo would have sued Impax in the New York Litigation with respect

to [Impax's generic version of Original Opana ER] . . ."); Ex. 38 (Answer, *Endo*

*Pharmaceuticals Inc. vs. Impax Laboratories, Inc.*, Case No. 16-2526 (D.N.J.)) at ¶ 52 ("Impax

admits that but for the license contained in the [SLA], it is likely that Endo would have sued

Impax in the [SDNY Proceedings] with respect to Impax's generic version of [Original] Opana

ER. "); Ex. 39, September 2018 Donatiello 30(b)(6) Dep. 46:18-24; 48:14-21.

40.     In September 2013, while the SDNY Proceedings were pending, Actavis launched

5, 10, 20, 30 and 40 mg dosage strengths of its generic Original Opana ER product at risk.  *See*

Ex. 40, April 2018 Myers Dep. Ex. 4 (September 2013 press release on Actavis launch).  Actavis

had earlier launched its 7.5 and 15 mg dosage strengths of generic Original Opana ER in July

2011, before the '122 and '216 patents issued.  *See id*.

41.     There was a five-week bench trial in the SDNY Proceedings in March-April

2015.  Impax participated at trial with respect to its Reformulated Opana ER Product.  Following

the trial, the court entered judgment finding that all but two of the asserted claims of the '122 and

'216 patents were valid and infringed.  *See Endo Pharm. Inc. v. Amneal Pharm., LLC*, No. 12-

cv-8060 (TPG), 2015 WL 9459823, at *65-66 (S.D.N.Y. Aug. 18, 2015).  In each case, the

defendants were enjoined from selling their respective generic versions of Original Opana ER

and/or Reformulated Opana ER until the expiration of the '122 and '216 patents in 2023.  *See*

*id.*; *see also* Ex. 39, September 2018 Donatiello 30(b)(6) Dep. 45:19-49:5.  As a result of the

court's order, Actavis was ordered to remove all dosage strengths of its generic Opana ER tablets

from the market, and ultimately settled with Endo for $25 million in damages from these sales.

*See* Ex. 41 (Endo 2017 10-K at F-56); *see also* Ex. 39, September 2018 Donatiello 30(b)(6) Dep. 49:22-51:4.

42.     On April 29, 2016, the district court issued an Omnibus Opinion on motions to, *inter alia*, amend the judgment.  The court revisited and reaffirmed its decision to enjoin Actavis and certain other moving SDNY defendants from making or selling its generic products prior to expiration of the '122 and '216 patents, and again ordered Actavis to remove its products from the market.  *Endo Pharm. Inc. v. Amneal Pharm. Inc., LLC*, No. 12-cv-8060 (TPG), 2016 WL 1732751, at *11 (S.D.N.Y. April 29, 2016).

### 2.     SDNY Appeal

43.     In May 2018, the Federal Circuit affirmed the district court's finding that the '122 and '216 patents were valid and infringed by manufacturers of generic Original Opana ER and Reformulated Opana ER, and affirmed the injunctive relief issued by the district court.  *See Endo Pharm. Inc. v. Teva Pharm. USA, Inc.*, 731 F. App'x 962, 964 (Fed. Cir. 2018), *vacated in part*, 729 F. App'x 936 (Fed. Cir. 2018); *see also* Ex. 39, September 2018 Donatiello 30(b)(6) Dep. 49:6-14.

### B.     The DE Proceedings

### 1.     District Court Proceedings

44.     Following Endo's acquisition of an exclusive license to the '779 patent from Mallinckrodt, Endo and Mallinckrodt filed lawsuits in U.S. District Court for the District of Delaware against all other generic manufacturers who had filed ANDAs relating to either Original Opana ER or Reformulated Opana ER (the "Delaware Proceedings"), asserting claims for infringement of the '779 patent (as well as an additional patent).  *See* Ex. 39, September 2018 Donatiello 30(b)(6) Dep. 51:17-25.

21

45.     Specifically, Endo asserted the '779 patent against Actavis, Amneal, Impax, ThoRx, Par, Sun, Roxane, Sandoz, and Teva/Barr in the District of Delaware (the "Delaware Defendants").  14-cv-1381 (Actavis); 14-cv-1382 (Amneal); 14-cv-1383 (Impax); 14-cv-1384 (ThoRx); 14-cv-1385 (Par); 14-cv-1386 (Sun); 14-cv-1387 (Roxane); 14-cv-1388 (Sandoz); 14-cv-1389 (Teva).  Before trial, a number of generic defendants either withdrew their ANDAs or otherwise committed not to enter before the expiration of the '779 patent under the existing circumstances, and accordingly, Endo dismissed its claims against those generic defendants. *See, e.g.*. Ex. 34, Singer Rep. ¶¶ 104-117, 246-250; ECF No. 19, 14-cv-1388 (D. Del.) (Sandoz); ECF No. 16, 14-cv-1385 (D. Del.) (Par); *supra* at ¶¶ 37.

46.     As with the SDNY Proceedings, Endo only asserted the '779 patent against Impax's Reformulated Opana ER product.  Endo did not assert that patent against Impax's Original Opana ER product because of the broad patent license Impax received in the SLA.  *See* Ex. 34, Singer Rep. ¶ 247; Ex. 39, September 2018 Donatiello 30(b)(6) Dep. 52:11-21.

47.     Actavis, Amneal, Impax, ThoRx, Sun, Roxane, and Teva/Barr stipulated that their respective formulations of generic Original Opana ER and Reformulated Opana ER met all of the limitations of claims 1-6 of the '779 patent, as did Impax with respect to its Reformulated ANDA Product.  *See* Ex. 34, Singer Rep. ¶ 248.  *See also, e.g.,* ECF No. 120, 14-cv-1381 (D. Del.) (Actavis); ECF No. 110, 14-cv-1382 (D. Del.) (Amneal); Ex. 42 ECF No. 116, 14-cv-1383 (D. Del.) (Impax/ThoRx); ECF No. 95, 14-cv-1386 (D. Del.) (Sun/Ranbaxy), ECF No. 88, 14-cv-1387 (D. Del.) (Roxane), ECF No. 118, 14-cv-1389 (D. Del.) (Teva/Barr).  Impax, ThoRx, Sun, and Roxane entered into stipulations that the judgments with respect to the other defendants would be binding on them.  *See id.*  Because of those stipulations, the Delaware Proceedings primarily pertained to whether the patents-in-suit were valid and enforceable.

48.     Following a trial against Amneal and Teva/Barr in the Delaware Proceedings, the court entered final judgment in October 2016 finding all claims of the '779 patent valid and enforceable and enjoining those defendants from making or selling their generic products before the expiration of the '779 patent in November 2029.  *See* ECF No. 157, 14-cv-1382 (D. Del.) (Judgment against Amneal); ECF No. 203, 14-cv-1389 (D. Del.) (Judgment against Teva/Barr).

49.     Following a subsequent trial against Actavis in the Delaware Proceedings, the court entered final judgment in August 2017 finding all claims of the '779 patent valid and enforceable and enjoining Actavis from making or selling its generic Opana ER product prior to expiration of the '779 patent in November 2029.  *See* ECF No. 234, 14-cv-1381 (D. Del.) (Judgment against Actavis); *see also Endo Pharm. Inc. v. Actavis Inc.*, No. 14-cv-1381, 2017 WL 3731001 (D. Del. Aug. 30, 2017) (D. Del.) (Trial Opinion).

50.     While the Delaware Proceedings were pending, Impax withdrew its ANDAs for its Reformulated ANDA Products, and accordingly, Endo's claims against Impax with respect to those products were dismissed.  *See* Ex. 43 (ECF No. 123, 14-cv-1383 (D. Del.)).  Impax remained bound by the rulings as to the validity of the '779 patent.  *See* Ex. 44 (ECF No. 122, 14-cv-1383 (D. Del.)).

### 2.     DE Appeals

51.     Amneal and Teva appealed the district court's decision regarding the validity of the '779 patent to the Federal Circuit.  Ultimately, Teva and Amneal voluntarily dismissed their appeals regarding the validity of the '779 patent, thereby leaving the district court's final judgment of validity in place.  *See* ECF No. 169, 14-cv-1382 (D. Del.) (Amneal); ECF No. 214, 14-cv-1389 (D. Del.) (Teva/Barr).

52.     Actavis also appealed the district court's decision regarding the validity of the '779 patent following trial in the case.  On May 3, 2019, the Federal Circuit affirmed the

judgment entered by the district court in the Actavis appeal with respect to the validity of the '779 patent. *See Endo Pharm. Inc. v. Actavis LLC*, 922 F.3d 1365 (Fed. Cir. 2019).

53.     As a result of the Federal Circuit decisions, all of the generics that litigated the '779 patent to judgment are enjoined from making or selling their proposed generic Original and Reformulated Opana ER products until after the '779 patent expires in 2029. *See* ECF No. 246, 14-cv-1381 (D. Del.) (Actavis and Teva); ECF No. 173, 14-cv-1382 (D. Del.) (Amneal); ECF No. 103, 14-cv-1387 (D. Del.) (West-Ward and Hikma); ECF No. 218, 14-cv-1389 (D. Del.) (Teva/Barr); Ex. 39, September 2018 Donatiello 30(b)(6) Dep. 52:1-10.

## VIII.   BUT FOR THE BROAD LICENSE IN THE SLA, ENDO WOULD HAVE SUCCESSFULLY ENJOINED IMPAX FROM SELLING ITS ANDA TABLETS UNTIL 2029

54.     Given that Endo sued all of the ANDA filers seeking FDA approval to sell generic versions of Opana ER, including Impax itself with respect to Impax's Reformulated ANDA Products, it is clear that but for SLA and accompanying broad license to all of Endo's future patents, Endo would have also sued Impax in the SDNY and DE proceedings with respect to its Original ANDA Products as well. Ex. 34, Singer Rep. ¶¶ 240, 247. *See also id.* at ¶¶ 96-117, 239-254.

55.     Moreover, based on the undisputed facts of record, Impax's Original ANDA Tablets infringe the '122, '216 and '779 patents at issue in the SDNY and DE proceedings for the same reasons that all of the other accused ANDA Tablets (including Impax's Reformulated ANDA Tablets) were found to infringe. *See id.* at ¶¶ 240-245, 247, 248, 251-254; Ex. 18, Fassihi Antitrust Rep. ¶¶ 198-203.

56.     In particular, one of Endo's technical experts in these antitrust cases—Dr. Reza Fassihi—who was also an expert witness in the underlying Patent Litigation and the SDNY proceedings, opined that he reviewed the information in Impax's ANDA regarding its Original

ANDA Tablets, and concluded that based on the same types of evidence presented as to the other generics' products in the SDNY and DE proceedings (including with respect to Impax's Reformulated ANDA Products), Impax's Original ANDA Tablets infringe the Additional Patents for essentially the same reasons that all of the accused generic tablets at issue in the SDNY and DE proceedings also infringed those patents. Ex. 18, Fassihi Antitrust Rep. ¶¶ 198-203. He provided detailed infringement charts setting forth, on a claim-by-claim and limitation-by-limitation basis, the basis for these conclusions. *See id.* at ¶¶ 201, 203.

57. Endo's patent litigation expert in these antitrust cases (Jonathan Singer, an experienced Hatch-Waxman Act litigator) reviewed the district court and Federal Circuit opinions, and spoke to Dr. Fassihi regarding his opinion that Impax's Original ANDA Products infringe the Additional Patents, and the bases therefor. Ex. 34, Singer Rep. ¶¶ 242-243, 251-252. In view of what actually happened in the SDNY and DE proceedings, and the decisions entered by the district courts and Federal Circuit in those case, he opined that if Endo had sued Impax in those proceedings with respect to Impax's Original ANDA Products, Endo would have prevailed for the same reasons that it did with respect to Impax's Reformulated ANDA Products and the other defendants' products. *Id.* at ¶¶ 239-254.

58. Plaintiffs have submitted no expert or other evidence to rebut these conclusions. Indeed, Plaintiffs' patent litigation expert cited the Additional Patents in his opening report, and acknowledged that Impax was aware at the time of the Settlement that Endo had additional patent applications covering Opana ER pending before the Patent Office. *See* Ex. 15, Belvis Rep. ¶¶ 451-458. He expressed no opinions, however, disputing Endo's evidence that once those patents issued, but for the SLA, Impax's sales after November 13, 2012 would have infringed the

Additional Patents, and hence been unlawful, or that Endo would have been successful in enjoining Impax from selling its Original ANDA Tablets until 2029.

59.     Thus, in view of these undisputed facts, but for the Broad License, Endo would have prevailed, and Impax would have been enjoined from making or selling its Original ANDA Tablets until the '779 patent expires in 2029—just as the other generic manufacturers that litigated their cases were.  *See* Ex. 34, Singer Rep. ¶¶ 240-245, 247, 248, 251-254.  *See also* 35 U.S.C. §§ 271(e)(4)(B), 283.

## IX.    THE EXPERT REPORTS OF DR. STEPHEN BYRN, PLAINTIFFS' TECHNICAL EXPERT REGARDING PATENT ISSUES IN THESE ANTITRUST ACTIONS

60.     Plaintiffs proffer a pharmaceutical formulation expert (Dr. Byrn) to offer an opinion that Endo's '456 and '933 patents were not infringed by Impax's ANDA tablets and were invalid. █████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████     *See*

Ex. 21, Byrn Rep. iii.  *See also* Endo's Motion to Exclude the Opinions and Proposed Testimony of Stephen Byrn, being filed in conjunction herewith.

61.     Dr. Byrn's approach stands in stark contrast to Plaintiffs' patent litigation expert, Mr. Belvis, ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████     Ex. 12, July 2019 Belvis Dep. 161:7-163:11.  *See also* Ex. 15, Belvis Rep. Sections VII. A. 3. ii. and iii.

Dated: April 15, 2020

Respectfully submitted,

*/s/ George G. Gordon*
George G. Gordon (admitted *pro hac vice*)
Julia Chapman (admitted *pro hac vice*)
Thomas J. Miller (admitted *pro hac vice*)
John P. McClam (admitted *pro hac vice*)
Sharon K. Gagliardi (admitted *pro hac vice*)
DECHERT LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104
Tel.: (215) 994 4000
Fax: (215) 994-2222
george.gordon@dechert.com
julia.chapman@dechert.com
thomas.miller@dechert.com
john.mcclam@dechert.com
sharon.gagliardi@dechert.com

Craig Falls (admitted *pro hac vice*)
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
Tel.: (202) 261-3300
Fax: (202) 261-3333
craig.falls@dechert.com

Robert D. Rhoad (*pro hac vice* pending)
DECHERT LLP
502 Carnegie Center, Suite 104
Princeton, NJ 08540
Tel.: (609) 955-3269
Fax.: (609) 873-9142
robert.rhoad@dechert.com

Angela Liu
DECHERT LLP
35 West Wacker Drive, Suite 3400
Chicago, IL 60601
Tel.: (312) 646-5800
Fax: (312) 646-5858
angela.liu@dechert.com

*Counsel for Defendants Endo Health*
*Solutions Inc., Endo Pharmaceuticals Inc.,*
*and Penwest Pharmaceuticals Co.*