# EXHIBIT 9

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF NEW JERSEY
 2                         CIVIL NO. 09-831
    ENDO PHARMACEUTICALS, INC., and      :
 3  PENWEST PHARMACEUTICALS, CO.,         :
                         Plaintiffs, :
 4  -vs-                                  :
                                          :
 5  IMPAX LABORATORIES, INC., et al       :
                                          :
 6                                        : OPINION
                             Defendants   :
 7  _ _ _ _ _ _ _ _ _ _ _ _ _  _ _ _ _:
                             Newark, New Jersey
 8                           March 19, 2010 11:00 a.m.
    B E F O R E:
 9
            THE HONORABLE KATHARINE S. HAYDEN, U.S.D.J.
10
    A p p e a r a n c e s:
11
    DECHERT LLP
12  Attorneys for Plaintiffs
    Suite 500 902
13  Carnegie Center
    Princeton, New Jersey 08540-6531
14  EY: MARTIN J. BLACK, ESQ.
        ROBERT D. RHOAD, ESQ.
15      THOMAS P. LIHAN, ESQ.

16  CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO PC
    Attorneys for Defendant-IMPAX
17  5 Becker Farm Road
    Roseland, New Jersey 07068-1739
18  EY: MELISSA E. FLAX, ESQ.

19  WILSON SONSINI GOODRICH & ROSATI PA
    Attorneys for Plaintiff-IMPAX LABORATORIES, INC.
20  One Market Street
    Spear Tower, Suite 3300
21  San Francisco, CA 94105-1126
    EY: ROGER J. CHIN, M.D., ESQ.

22
    _____
                    Pursuant to Section 753 Title 28 United States Code,
23  the following transcript is certified to be an accurate
    record as taken stenographically in the above-entitled
24  proceedings.

25                           s\ RALPH F. FLORIO
                             Official Court Reporter


            U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101
```

CONFIDENTIAL

EPI001606264

ENDO-OPANA-000066151

2

```
 1
 2   DUANE MORRIS
 3   Attorneys for Defendants
 4   505 9th Street, N.W., Suite 1000
 5   Washington, D.C. 20004-2166
 6   BY: KERRY B. MCTIGUE, ESQ.
 7
 8   DUANE MORRIS LLP
 9   Attorneys for Defendants
10   470 Atlantic Avenue, Suite 300
11   Boston, MA 02210-2243
12   BY: VINCENT L. CAPUANO, ESQ.
13
14   DUANE MORRIS LLP
15   Attorneys for Defendants 744
16   Broad Street, Suite 1200
17   Newark, New Jersey 07102-3889
18   BY: INGRID E. MELNICHUK, ESQ.
19
20   LITE DEPALMA GREENBERG, LLC
21   Attorneys for Defendants-BARR LABORATORIES
22   Two Gateway Center, 12th Floor,
23   Newark, New Jersey 07102
24   BY: MICHAEL E. PATUNAS, ESQ.
25
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606265

ENDO-OPANA-000066152

3

1

2

3   WINSTON & STRAWN

4   Attorneys for BARR LABORATORIES

5   BY: TODD EHLMAN, ESQ.

6

7

8

9   ALSO PRESENT

10

11   NONE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

**CONFIDENTIAL**

**EPI001606266**

**ENDO-OPANA-000066153**

4

```
 1            I N D E X

 2

 3   WITNESSES:                    PAGES:

 4   NONE                          NONE

 5

 6

 7

 8          E X H I B I T S

 9   NUMBER         DESCRIPTION         PAGE

10   SEE ATTACHED INDEXING

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

**CONFIDENTIAL**

**EPI001606267**

**ENDO-OPANA-000066154**

5

1          THE COURT:  Good morning.  Counsel, I think you've
2   given your appearances to Mr. Florio and so that I could link
3   up some of the new faces and old faces I'll ask you to put
4   your appearances on the record now.
5          MR. BLACK:  Certainly, your Honor.  Martin Black,
6   Bob Rhoad and Tom Lihan from Dechert for the plaintiffs.
7          MS. FLAX:  Good morning, your Honor. Melissa Flax
8   from Carella Byrne on behalf of Impax Laboratories.
9          MR. CHIN:  Good morning, your Honor. Roger Chin of
10  Wilson Sonsini Goodrich & Rosati on behalf of Impax
11  Laboratories as well.
12         MR. MCTIGUE:  Good morning, your Honor. Kerry
13  McTigue from Duane Morris on behalf of Sandoz with Vince
14  Capuano, also from Duane Morris.  And our local counsel is
15  from our Newark office Ms. Ingrid Melnichuk.
16         MS. MELNICHUK:  Good morning, your Honor.
17         MR. PATUNAS:  Good morning, your Honor. Michael
18  Patunas from Lite DePalma Greenberg & Rivas, with me, Todd
19  Ehlman from Winston & Strawn.
20         THE COURT:  Okay.  Thank you very much.  And thank
21  you for your patience gentlemen and ladies.  I know you have
22  been here for a while.
23         What I'm going to do is give you my claim
24  construction on the disputed terms, and then let you all go.
25  We have had argument and briefing, and I found that the

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606268
ENDO-OPANA-000066155

1    materials presented at the time of the argument, as well as

2    the briefs leading up to the argument to be very helpful.

3             How many people are flying to far away places?  If

4    so, what time are the airplanes?  Anybody flying away to far

5    away places?

6             MR. CHIN:  California.  I have a late flight, so

7    it's okay.

8             THE COURT:  Okay.  Good, thank you.  With some

9    humility, district courts approach the task of claim

10   construction, because of course, particularly in a

11   pharmaceutical case we are kind of out of our element.  If we

12   could have done this we would all be doctors and we all know

13   that.  And Dr. Chin did the reverse, I guess, because I saw

14   the MD.  But I think you are the rarity, Dr. Chin.

15            And so I will tackle this quite frankly privileged

16   position of bringing the skills of a judge to bear, because

17   the law that has come about.  And I am talking now about the

18   bedrock law that governs claim construction, is in the long

19   run compatible with what judges do every day.

20            We're doing them in an area that is not our own,

21   but I think that the whole idea of construction, intrinsic

22   versus extrinsic evidence and an attempt to embrace what is

23   going on in the particular problem, or dispute, or thing on

24   the bench, and the thing on the bench is the patent, right?

25            Now, a judge has a certain way of doing things, and


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606269

ENDO-OPANA-000066156

7

1  I will attempt to do it in a way that is productive today,

2  and we'll take it from there.

3       Let's talk about what the law is in a Markman claim

4  construction.  The Court must construe disputed terms with

5  what the inventors intended to envelop within the claim.

6  That's right out of Phillips, which is cited frequently in

7  the field and frequently by both sides: 415 F.3d 1303 at

8  1312, Federal Circuit 2005.

9       In doing so -- and this is from Phillips at page

10  1313 -- the court must read the claim term, not only in the

11  context of the particular claim in which the disputed term

12  appears, but in the context of the entire patent including

13  the specification.

14       In Markman, the seminal case, the Federal Circuit

15  explained that a specification contains a written description

16  of the invention and that must enable one of ordinary skill

17  in the art to make and use the invention.

18       For claim construction purposes, the description

19  may act as a sort of dictionary which explains the invention

20  and may define terms used in the claims.  Accordingly, the

21  Federal Circuit held in Renishaw PLC v. Marposs Societa' per

22  Azioni, 158 F.3d 1243, 1250, Federal Circuit 1998.

23       Ultimately, "The construction that stays true to

24  the claim language and most naturally aligns with patent

25  description of the invention will be in the end the correct

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606270

ENDO-OPANA-000066157

8

1    instruction." End quote.

2              It is well established that intrinsic evidence

3    comprised of the patent itself, including the claims and

4    specification as well as the prosecution history is the,

5    quote, "Most significant source of the legally operative

6    meaning of disputed claim language." End quote.

7              As such, Philip instructs, quote, "The claims must

8    be read in view of the specification of which they are a

9    part." And noted as well that the specification is always

10   highly relevant to the claim construction analysis usually it

11   is dispositive, it as single best guide to the meaning of a

12   disputed term.

13             In construing terms generally, words of a claim are

14   given their ordinary and customary meaning -- and again,

15   that's Phillips -- a patentee can act as his own

16   lexicographer to specifically define terms of a claim

17   contrary to their ordinary meaning.  And that concept of the

18   patentee acting as his own lexicographer is referred to again

19   by both sides in their brief.

20             All that is required is that the patent applicant

21   set out the different meaning in the specification in a

22   manner sufficient to give one of ordinary skill in the art,

23   notice of the change from ordinary meaning.  In Novis/Pure

24   Water, Inc. and that is 381 F.3d 1111 at page 1117.

25             This new definition need not be explicit though

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606271

ENDO-OPANA-000066158

9

1    because even when guidance is not provided in explicit

2    definitional format, the specification may define claims term

3    by implication, such that the meaning may be found in or

4    ascertained in or by the patent documents.  Again, from

5    Phillips.

6            Extrinsic evidence, such as dictionary or treatises

7    may be consulted by the court to assist in claim

8    construction, but it is to be given less weight because it

9    gives less meaning to claim terms only in the abstract,

10   rather than within the specialized context of the patent

11   itself.

12           Also the Federal Circuit instructs extrinsic

13   evidence cannot be used to contradict a claim meaning that is

14   unambiguous in view of the intrinsic record but may be used

15   to help give meaning to an ambiguous term.  All of that is

16   cut of Phillips.

17           So let's turn to the disputed terms, which I'm

18   going to take, not necessarily in the order in which we

19   argued them, we argued them talking about the hydrophobic

20   material first.

21           I think counsel had in your own minds organized

22   things around sustained release being the first term.  But

23   let me go according to my notes here and begin with the

24   specific term having to do with the medicament concentration

25   time curve.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606272

ENDO-OPANA-000066159

10

1           Before I do that, let me just review generally what

2    I see in the patent.  We have two:  the '933 patent and the

3    '456 patent.

4           The lawsuit here originates, and I'm going to be

5    using, just to kind of put us in context, the slides

6    presented by the plaintiff just to talk about the technology

7    a little bit here.  And that doesn't mean that I disagree

8    with the slides of the defendants, or that the defendants

9    didn't give me good slides, it's a little easier for me to

10   refer to what the origin of this lawsuit is and the

11   technology to -- just a minimal extent -- so we know we are

12   not talking about airplanes or ladders or watches.  Let's

13   just get into what we're talking about.

14          The plaintiffs are Endo Pharmaceuticals and

15   Penwest.  Endo holds the FDA approval OR OPANA ER.  Penwest

16   owns the patents in suit and licensed them to Endo.

17          The defendants, Impax, Barr Labs and Sandoz, seek

18   FDA approval to market generic versions of OPANA ER.  And the

19   plaintiffs have sued under the Hatch-Waxman Act.

20          I don't think we have to go into what OPANA ER so

21   much, as what I want to do is talk patent overview.  And more

22   importantly right now the technology overview.

23          We're talking about obviously sustained release or

24   controlled release medication.  And the technology for that

25   that is described beginning on page 8 of the plaintiffs'

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606273

ENDO-OPANA-000066160

1   slides disclosed to me in the slides a dissolution vessel and

2   a tablet.

3          Prior to being exposed to water, active drug and

4   gelling agent are mixed together and compacted into a

5   tablet.  At that point there is no gel matrix presence

6   because the gelling agent is not hydrated.

7          Now, we're talking really about art that was in

8   being before the invention came along.

9          Then in the next slide, slide number 9, describes

10  how water is absorbed into the outer portion of the tablet

11  begins to swell and slowly break down.  The center core

12  remains unhydrated and releases slightly as some of the drug

13  is released.

14         The gelling agent in the outer portion of that

15  tablet hydrates and forms the gel matrix.  The gel matrix is

16  an interconnected network structure that traps fluids within

17  the pores of the network.

18         I don't think any of this is in dispute.  I'm

19  asking counsel for the defense, but I don't think what's

20  going on in this particular technology is in dispute.

21         MR. CAPUANO:  Your Honor, Vince Capuano for

22  Sandoz.  I would point out to your Honor, the claims aren't

23  limited to tablets.

24         THE COURT:  I understand that.  I'm talking about

25  this whole idea.  There's capsules as well, I understand

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606274

ENDO-OPANA-000066161

12

1 that.

2    I'm talking now about this idea of the gel matrix

3 and the idea of the release of medicament over time.

4    MR. CHIN:  From Impax's perspective, we agree to

5 that description generally, that the technology that of

6 course is only one embodiment as opposed to there may not be

7 subtlies in the claim language that may go beyond that, for

8 example.

9    THE COURT:  I think what I am trying to do is kind

10 cf put a face on the technology, so when we're talking about

11 some of the disputed terms we have something to hang this

12 cn.  Okay.

13    If I am saying anything that is in dispute, just

14 jump up and let me know.  But I'm not doing this for purposes

15 cf claim construction as much as I am for the context of the

16 disputed terms.  Okay.

17    Anything from plaintiffs so far?

18    MR. BLACK:  No, your Honor.

19    THE COURT:  Okay.  I'm using your slides so that

20 would be kind of odd.  Okay.

21    Then there is a slide number 10, an illustration of

22 the tablet hydration over time which demonstrates, at least

23 with this tablet formulation, that as water is absorbed, the

24 tablet begins to swell and slowly break down. The center core

25 remains unhydrated and releases slightly as some of the drug

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606275

ENDO-OPANA-000066162

13

1    is released.  And as water penetrates the matrix, the active

2    dissolves and slowly defuses out of the matrix.

3              And then there are slides that indicate further

4    diffusion and erosion of the outer portions of the gel

5    matrix.  More and more of the gelling agent becomes hydrated

6    and gels, the active is released via a combination of

7    diffusion and erosion.

8              Now, turning to the patent.  It would help me,

9    counsel, now if, and I hope this isn't leading into a

10   dispute, but in reading over the materials, slides, and

11   looking over argument and looking over briefs, there didn't

12   seem to be any pattern or strategy as to either sides'

13   reference to '456 and '933 patent.

14             And it would helpful to me for both sides to

15   indicate that obviously this is a family of patents.  And if

16   you would just indicate to me the kind of ebb and flow of

17   reference to the '933 and the '456, it would help me to do

18   the same when I am trying to give you my claim construction.

19             We'll let plaintiff go first and then the

20   defendant.

21             MR. BLACK:  Both patents have exactly the same

22   specification and claims differ of course, but there really

23   should be no difference in how your Honor construes the two

24   patents.

25             THE COURT:  So in trying to explain, and using

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606276

ENDO-OPANA-000066163

14

1    intrinsic evidence, for instance, if I were to be using that
2    in any claim construction as the guide, as it were, I could
3    jump from '456 to '933 without offending any of your
4    positions; is that correct?
5          MR. BLACK:  That's correct, your Honor.
6          MR. CHIN: We agree with that as well.  I think just
7    the source of jumping back and forth, just to explain that,
8    while the patent specification description is up until the
9    claims are the same, medicament concentration time, for
10   example, that language appears only in the '933.  So I
11   imagine when we cited to '933 in that section.
12         On the other hand, only the '456 patent, for
13   example, against Sandoz.  So I understand in their section
14   they probably cite to that patent.
15         THE COURT:  That's helpful.  I didn't quite see
16   that and that is helpful to me.
17         I will just continue along as I came upon my
18   decision on the various disputed terms without worrying that
19   I am doing '456 or'933.
20         I'm going to talk about '933, because I have most
21   cf my notes on that particular patent.  But I was satisfied
22   that both are written with the same headings, as it were, and
23   in the same order of materials.
24         The patents referred to the field of invention.
25   And in the '933 that is expressed as the present invention

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606277

ENDO-OPANA-000066164

15

1 relates to controlled release formulation which may be

2 blended with the wide range of therapeutically active

3 medicaments and made into controlled release solid dosage

4 forms for oral administration.  And then we get into the

5 background of the invention.

6          Beginning first with the advantages of controlled

7 release products.  That they are well known in the

8 pharmaceutical field and include the ability to maintain a

9 desired blood level of a medicament over a comparatively

10 longer period of time while increasing patient compliance by

11 reducing the number of administration.

12          And then in the second paragraph oral controlled

13 release delivery system should be adaptable so the release

14 rates and profiles can be mapped to physiological and

15 chronotherapeutic requirements.

16          Then there's a discussion of controlled release,

17 excipients disclosed in other patents and under certain trade

18 names.

19          And the beginning column 1, line 66, quote:

20  "However, heretofore there has been no teaching of a

21 controlled release formulation providing a novel and

22 unexpected combination of suitable proportions of a

23 homopolysaccharide such as xanthan gum, a

24 heteropolysaccharide such as e.g. locust bean gum together

25 with inert diluent and a pharmacologically acceptable

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606278

ENDO-OPANA-000066165

1  hydrophobic material so as to provide an improvement in

2  controlled release properties for such an active medicament."

3          So from the language of the patent, the patentees

4  are writing that nothing until now provided an improvement in

5  controlled release properties.

6          Immediately thereafter objects and summary of the

7  invention section begins.  And the language is, it is

8  therefore an object of the present invention to provide a

9  controlled release formulation for a therapeutically active

10  medicament.  It is a further object of the present invention

11  to provide a method for preparing a controlled release

12  formulation for a therapeutically active medicament.  It is

13  yet another object of the present invention to provide a

14  controlled release excipient which may be used in the

15  preparation of a sustained release oral solid dosage form of

16  a therapeutically active medicament that provides an even

17  rate of release of an active medicament.

18          It is the further object of the present invention

19  to provide a controlled release excipient, which when

20  combined with an effective amount of bronchodilators, such as

21  Albuterol, is suitable for providing a sustained release of

22  that medicament so as to provide a therapeutically effective

23  blood level of the medicament for e.g. 12 or 24 hours without

24  allowing an excessive early release of medication.  And where

25  the released kinetics are unaffected by the contents of the

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606279

ENDO-OPANA-000066166

17

1  patient's gastrointestinal track.

2          And then it is yet a further object of the present

3  invention to provide a method of, for treating patients with

4  an active medication in controlled release form.  The

5  above-mentioned object and others are achieved by virtue of

6  the present invention which relates in part to a controlled

7  release formulation comprising therapeutically effective

8  amount of the medicament and a controlled release excipient

9  comprising gelling agent and a swelling agent such as, for

10  example, homopolysaccharide, a heteropolysaccharide and inert

11  diluent.

12          I promise I'm not going to read every paragraph.

13  But it kind of should give you some comfort that I was kind

14  of interested at this point and that's a wonderful thing,

15  because the language of the patent and the way in which it's

16  leading up identifies early on within its borders, as it

17  were, what the advantages of controlled release are.  What

18  controlled release is to begin with, its advantages, and then

19  the improvements that are sought and the object and goals

20  that are sought within the patent.

21          Moving on with the summary, we come onto some of

22  what we are here about, which is those terms:  sustained

23  release and hydrophobic material.

24          So I have to go back into that the paragraphs.  In

25  these paragraphs that talk about the objects of the present

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606280

ENDO-OPANA-000066167

18

1    invention and how the objects are achieved through the

2    controlled release formulation comprised of those ingredients

3    just described, the patent in column 2 line 65 reads:

4           The dosage form optionally includes a

5    pharmaceutically acceptable hydrophobic material.  Any

6    pharmaceutically acceptable hydrophobic material may be

7    suitably employed.

8           Suitable hydrophobic materials include, and then

9    there is a list of what the patentees describes as suitable

10   hydrophobic materials.

11          And then after a list comes the sentence:

12   Preferably the hydrophobic material selected from cellulose

13   ether to the cellulose ester, and alco cellulose such as

14   ethyl cellulose, and carboxyl methyl cellulose.

15          The hydrophobic material may be included in dosage

16   forms in amounts selected to slow dehydration of a gelling

17   agent when exposed to environmental fluid.

18          And then the patent goes on to talk about the

19   percentages by way of the solid dosage form that hydrophobic

20   material is present in, indicating it can be present in an

21   amount ranging from about 25 percent through about 50 percent

22   by weight of the solid dosage forms.

23          So pretty quickly we come into three of the four

24   terms that are in dispute:  What a hydrophobic material term

25   shall be construed as?  What the percentages mean, the word

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606281

ENDO-OPANA-000066168

19

1    about means in an amount ranging from about 25 percent

2    through about 50 percent, and what sustained release means.

3            A little further down, after talking about the

4    range of weight of the hydrophobic material present in the

5    solid dosage form, the medicament is described as any

6    medicament.  The controlled release solid dosage form can be

7    prepared in any convention orally administered dosage form,

8    including a tablet.  When the hydrophobic material option

9    will be applied, which will be before during or after the

10   process of tableting.

11           And then beginning on line 44 column 3, quote:  The

12   invention also relates to methods for preparing a controlled

13   release solid dosage form as described above for providing an

14   active medicament in an amount effective for treating a

15   patient for from 12 to about 24 hours.  The method includes

16   the steps of preparing a sustained release excipient

17   comprised, and then goes on.

18           And then in column 4 line 10:  Preferably

19   medicament is Albuterol or the derivative thereof in an

20   amount effective to provide therapeutically effective blood

21   levels of said medicament for at least 24 hours.  The present

22   invention is further related to a method of treating a

23   patient comprising orally administering the sustained

24   Albuterol tablets to a patient thereby providing

25   therapeutically effective blood levels of medicament for at

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606282

ENDO-OPANA-000066169

1    least 24 hours.

2            And then a paragraph that consumes us here today,

3    somewhat, quote: "By sustained release, it is meant for

4    purposes of the present invention that the therapeutically

5    active medicament is released from the formulation at a

6    controlled rate such that therapeutically beneficial blood

7    levels but below toxic levels of medicament are maintained

8    over an extended period of time, e.g., providing a 24 hour

9    dosage form."

10           Now I realize it would be very logical for me to

11   leap into that sustained release, but let me take care of the

12   term that I said we would be begin with.

13           I think that I have put on the record and made my

14   own mind comfortably with the technology that we're talking

15   about and with enough of the claim language to understand

16   where we are at.  And all of this is before the section that

17   begins the column 5 line 11, the detailed description

18   section.

19           Right before the claims begin, which is in column

20   21 line 1, and before the conclusion that is drawn in column

21   20 line 50.  That in fact the formulation, according to the

22   invention, do provide a controlled release of an active

23   medicament without any significant differences induced by a

24   fed or fast effect due to the presence of food in the

25   gastrointestinal track comes a series of tables that are

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606283

ENDO-OPANA-000066170

```
 1   critical to that conclusion that is drawn:  That the fed/fast
 2   effect doesn't induce significant differences in terms of the
 3   controlled release of the active medicament.
 4          And along with invitro studies there was an in viro
 5   study called or talked about, it is referenced on line 29 of
 6   column 13 and called the bioavailability study, quote: "A
 7   study was conducted to evaluate the viability of the test
 8   formulation about numeral sulfates, using a randomized
 9   balanced open labeled, single dose crossover design.  This
10   study was performed using 12 healthy male and female
11   volunteers," and so on.
12          And the data from that study, am I correct in my
13   understanding, that's the data from that study appears in
14   table 19?
15          MR. RHOAD:  Yes, your Honor, that is correct.
16          THE COURT:  That's agreed upon, yes?
17          MR. CHIN: That's our understanding as well.
18          THE COURT:  Okay, fine.  And that leads to the one
19   cf the terms that the Court is asked to construe, and it
20   appears in claim 35 of the '933 patent at column 23 line 58:
21   The controlled release solid dosage form of claim 1, which
22   when orally administered to a patient provides a medicament
23   plasma concentration time curve with an area under the curve
24   to infinity ranging from about 89 to 150.
25          And that medicament plasma concentration time curve
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

**CONFIDENTIAL**

EPI001606284

ENDO-OPANA-000066171

1   is repeated in the claim 36, 37.  And then in 38 there is a

2   slight change: The controlled release solid dosage form of

3   claim 1 which when orally administered to a patient provides

4   a mean plasma concentration ranging from about 7 to about

5   12.  But the issue between the parties is whether or not the

6   medicament plasma concentration time curve refers to a

7   patient or a population study.

8           Let me just put the competing claims -- competing

9   instructions on the record.

10          Defendants proposed construction is a curve

11  representing the relationship of medicament plasma

12  concentration versus time in a study population.

13          So I don't misrepresent what the plaintiffs'

14  instruction is:  It's a plot of the concentration of active

15  medicament in the plasma of a patient over time.

16          And I believe that the intrinsic evidence, and

17  that's why I began with this particular term, leads me pretty

18  confidently to the construction consistent with the one

19  offered by the defendants.

20          In this case, the information gathered for the

21  particular claim 35, and I believe illustrated in 38, with a

22  reference to a mean, is set forth through the intrinsic

23  evidence in the patent that the bioavailability study that

24  leads to the specific recitals of the concentration time

25  curve in 35 comes from the bioavailability study referenced

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606285

ENDO-OPANA-000066172

1    cn column 13 line 28:  Using 12 healthy male and female

2    volunteers.  In other words, a study population.

3           Now the defendants support as well their

4    construction, not only with the reference in '933 patent, but

5    also extrinsic evidence, the bioavailability studies that are

6    set forth by the Food and Drug Administration, and also the

7    language of 35 where they say that the idea of range would

8    not make sense if you were talking about just one patient.

9           They also cite law that says from the Federal

10   Circuit, quote: "This Court has repeatedly emphasized that an

11   indefinite article a or an in patent parlance carries a

12   meaning one or more in open-ended claims containing the

13   transitional phrase "comprising".  And that case is EJ Corp.,

14   v. Connecticut Concept 223 F.3d 1351.

15          But I believe that the common sense intrinsic

16   evidence of the patent specification, as well as the claim,

17   leads, as I said, without too much trouble to the conclusion

18   that it was a study population that is meant.  And I construe

19   the claim to mean that it is the plasma concentration, the

20   medicament plasma concentration time curve that was derived

21   from the population study as opposed to the reference point

22   being a patient.

23          And so the Court will adopt for purposes of claim

24   construction, the defendants' construction that the time

25   curve is a curve representing the relationship of medicament


                 U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606286

ENDO-OPANA-000066173

1   plasma concentration versus time in a study population as

2   opposed to the medicament in the plasma of a patient over

3   time. And I begin as I said with that finding and that

4   construction because it yields easily from the intrinsic

5   evidence, i.e., the claims, the specification and to the

6   extent relevant to the prior art.

7        Now, the next term to discuss is that slippery

8   little word about. I referenced it already in talking

9   through or walking through relevant portions of the patent

10   for purposes of setting context here.

11        The claim term is, quote: "From about 25 percent

12   through about 50 percent, the plaintiffs' proposed

13   construction is within the stated range of 25 percent to 50

14   percent plus or minus five percent." And the defendants have

15   a narrower range and talk about rounding out in the almost

16   default available to science generally. Acceptable science.

17        So defendants' construction is, "From about 25

18   percent to about 50 percent is from 24.5 percent to 50.4

19   percent." And here, I do not find aid within the language of

20   the patent. The defendants point me right to standard of

21   scientific rounding preventions and provided material and in

22   the slides extracted from Wikipedia, which is the instruction

23   for quantity, weights or measures, which must have an

24   accuracy and indicated with the degree of precision.

25        And it goes onto say, for example, in the case of

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606287

ENDO-OPANA-000066174

1   weighing precision correspondence, plus or minus 5 units

2   after the last figure stated plus 2.5 grams interpreted as

3   2.45 grams to 2.55 grams.  This is an example of rounding the

4   degree of precision is implied by the number of significant

5   figures.  And frankly, the law really isn't all that

6   different.

7           The plaintiff gave me good cases that would suggest

8   that the leeway to be given arises out particulars of the

9   specification.

10          Plaintiff refers to the Paul Corp., v. Micron

11  Separation's decision, 66 F.3d 1211 and 1217 from Federal

12  Circuit in 1995, which states, the term about, quote: "Does

13  not have universal meaning in patent claims and its meaning

14  depends on technological facts of the particular case." End

15  quote.

16          In Ortho-McNeil Pharm, Inc. v. Caraco Pharm Labs,

17  Ltd. 476 F.3d 1321, 1327, the Federal Circuit wrote in 2007,

18  that that must be, that the whole idea of the leeway must be

19  interpreted in light of the teachings of the specification

20  and the criticality of the recited numerical limitation to

21  the claimed inventions.

22          Where frankly the Court is not assisted in looking

23  at the extrinsic evidence, the problem identified is that

24  while plaintiffs claim that a lot of the numerical jumps are

25  in 5 to 10 percent increments, that's really not necessarily

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606288

ENDO-OPANA-000066175

26

1  so.  In column 3, the '933 patent at line 13, the hydrophobic

2  material is preferably present in an amount ranging from

3  about 1 through 90 percent by weight of the solid dosage form

4  and can also be present in an amount ranging from about 25

5  percent to about 50 percent by weight of the solid dosage

6  form.

7          In claim 7, the controlled release solid dosage

8  form according to claim 1, wherein said hydrophobic material

9  is present in an amount ranging from about 1 to about 90

10 percent by weight of the solid dosage form.

11         The defendants point out that the patentees did not

12 uniformly use increments of 5 or 10.  And I must agree.

13         In the '933 patent column 3 at line 14 the patent

14 recites from about 1 to 90 percent, at line 32 from about 1

15 to about 20 percent.  At line 34 from about 1 percent to

16 about 20 percent.

17         There was a point where, and the defendants

18 advanced this in support of their position, Dr. Banker was on

19 the ropes because the questioning was as follows, quote:

20         "Question: The term about would be interpreted by a

21 person of ordinary skill in the art to mean plus or minus 5

22 percent follows that a person skilled in the art would read

23 claim 7 of the '933 patent to cover a range from the negative

24 4 percent to 95 percent; is that is correct?

25         "Answer: You haven't asked my opinion.  And my

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606289
ENDO-OPANA-000066176

27

1   opinion is that's not how a person skilled in the art would

2   read it.  They would read it as ranging from somewhere

3   between zero and one percent through about 95 percent.

4          "Question: Because it would be impossible to have

5   material present in the amount of negative 4 percent by

6   weight in a solid dosage form, correct?

7          "Answer: That would be correct."

8          I am simply reluctant to go down the path of

9   assuming that at the bottom of that range one would know that

10  it is between zero and one percent, which is obvious.  And at

11  the top one would suddenly know that it's between 90 and 95

12  percent.

13         That just simply does not arise out of the patent

14  sufficiently to convince me, particularly when there is

15  really no uniform increment used throughout the patent.  And

16  therefore, while both sides are, I believe imposing their

17  own, and I would assume strategic interpretations.  Because

18  this is after all claim construction that's in aid of the

19  ultimate dispute, not the ultimate dispute, I have to accept

20  the defendants' reference -- I don't have to, I am accepting

21  the defendants external evidence taken from the scientific

22  rounding convention they referred to.

23         Not because I'm knocked off my chair with the

24  perfection of it all, but because we simply have about used

25  in a variety of context in such a manner that I believe the

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606290

ENDO-OPANA-000066177

28

1    Court is best advised since it is not binding guidance within

2    the patent to go to extrinsic evidence that is solid and

3    sure.  And to that extent the standard scientific rounding

4    convention of this very frequently used term, plus or minus

5    cr about, I believe is the appropriate claim construction to

6    give this particular term.

7              So in that respect I am accepting the defendants'

8    claimed construction, that the term from about 25 percent to

9    about 50 percent in claim 5 of the '456 patent will be

10   construed as meaning from about 25 percent to about -- I'm

11   sorry -- from about 24.5 percent to 50.4 percent.

12             So as counsel can see, the Court has been quite

13   confident that the intrinsic evidence leads to a construction

14   cf one term, the medicament plasma time curve and does not

15   aid the Court, and in fact extrinsic evidence is necessary to

16   construe the other term, which is about 25 percent to about

17   50 percent.

18             Now, I don't believe that those are the make it or

19   break it of the four claim terms.  And I believe that when we

20   first began oral argument, I don't know if that's still on

21   counsel's mind, but I think hydrophobic material that people

22   felt would be the claim term most in dispute between the

23   parties, or at least would drive the parties to shape the

24   case one way or the other, so I will lead up to that one and

25   we'll do sustained release.


                U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101


CONFIDENTIAL

EPI001606291

ENDO-OPANA-000066178

29

```
 1          And I think one of the pleasant parts of this
 2   particular task for district courts is we sort of don't know
 3   where we're going with this.  We're just giving you the best
 4   we have and then you take it back to the office and you make
 5   your phone call.
 6          So with respect to sustained release.  And the
 7   hydrophobic material, again, I'm confident and comfortable
 8   with making my claim construction based upon the intrinsic
 9   evidence.  Based upon the claim language.  Based upon the
10   specification in the patent.  The only time I am inclined to
11   go outside, I've already done so.  And that may lead people
12   to predict where I'm going.  But let me tell you what I see
13   with respect to those particular terms.
14          Sustained release.  Going back into the patent
15   specification, and where the parties are resting their
16   proposed construction.  I've already read from the-- well
17   referring to the '456 patent now, I read you from the '933
18   patent.  But at column 4 line 20, comes the definition of
19   sustained release and it's also in the '933 patent.  Quote,
20    "By sustained release it is meant for purposes of the
21   present invention that the therapeutically active medicament
22   is released from the formulation at the control rate such as
23   therapeutically beneficial blood levels, but below the toxic
24   levels of the medicament are maintained over an extended
25   period of time." And as I understand it that's the
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606292

ENDO-OPANA-000066179

30

1   defendants' construction.

2            Out of patent and the plaintiff goes no, no, we've

3   lopped off the e.g. that appears in the patent, which is

4   e.g., providing a 24 hour dosage form.  And the plaintiffs

5   argue that that's improper to simply lop it off.  And instead

6   the right approach is to review the specification to

7   determine what time periods were intended.  And the

8   defendants go, we don't agree with you, but any way you're

9   not doing that-- you're not just doing that e.g., you are

10  saying for at least 12 hours.

11           So that the plaintiffs construction is, "the active

12  medicament is released at a controlled rate such that

13  therapeutically beneficial blood levels of the medicament are

14  maintained over a period of at least 12 hours." And as

15  indicated the defendants construction is, "the

16  therapeutically active medicament is released from the

17  formulation at the controlled rate such that therapeutically

18  beneficial blood levels, but below toxic levels of the

19  medicament are maintained over an extended period of time."

20           It would be very interesting to see what a whole

21  room full of law students would do with this.  Because it

22  really is a dispute that calls for a resolution, but each

23  side has good arguments.  And as I said, I believe that the

24  intrinsic evidence guides the Court.  The issue really

25  becomes whatever the Court may believe, does the Court make

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606293

ENDO-OPANA-000066180

1   that call now or later?  And I would like to turn to the

2   parties just very briefly-- I'm not asking for oral argument

3   but just for simply a clarification.

4          In the slide 26 of the plaintiffs' presentation,

5   they define the parties dispute as follows.  Should the Court

6   (A), clarify the meaning of "extended period of time" now as

7   part of the Markman process.  Which is what they want.  Or,

8   defer resolution, and re-visit claim construction again in

9   the future.  Which they attribute to the defendants.

10         Is that the defendants' position that, and anybody

11  who wants to tackle this? And if it is your position what do

12  you mean?

13         MR. CAPUANO:  Well, you read their slide-- you want

14  my view of their slide?

15         THE COURT:  No. What do you mean by defer?  When

16  would this magic moment come again?  When do you see it as

17  something I would be in a position to do?

18         MR. CAPUANO:  We don't think that you need to give

19  it a number, they say that you might have to defer to give it

20  a number.

21         THE COURT:  Later on?

22         MR. CAPUANO:  Our view is that it's clear from

23  patent, the intrinsic evidence, that the extended period of

24  time is relative to an immediate release form.

25         So if you get release longer than you would get

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606294

ENDO-OPANA-000066181

1   what within the immediate release form then that that's an

2   extended period of time.  It may be 24 hours, in some cases

3   and it could be 12-- 6 and 8.

4           THE COURT:  I understand.  But you're saying call

5   it, now, we're not waiting for you to do it later; is that

6   correct?

7           So when the plaintiffs say that the defendants want

8   me to defer resolution and re-visit claim construction again

9   in the future; that's not your position.  You're saying that

10  that's not what the claim term mean, correct?

11          MR. CAPUANO:  That's correct.

12          THE COURT:  All right. As long as it clarified it.

13  I'm trying to find out if people think there are some other

14  moment, Mr. Black, when I'm going to be in the position that

15  I am in now.?

16          MR. BLACK:  Well, the difficulty would be, if your

17  Honor just said extended period of time, we would then have

18  to construe extended period of time at the trial.

19          The definition that your Honor read, sustained

20  release says, over an extended period of time e.g. providing

21  a 24 hour dosage form.  If you could take that sentence and

22  then have the experts opine on their view as to whether or

23  not particular products fell within that definition.  But if

24  you just use the word extended period of time I think you're

25  leaving open an issue which would not be resolved.


                U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

33

```
 1          THE COURT:  Okay.  That's fine.  I understand
 2  better.  And I do understand what the parties have differing
 3  views on.
 4          The plaintiffs illustrate the proposed construction
 5  as the preferred construction, the one that the Court should
 6  adopt, by reference to language in the patent under the
 7  argument that, the patentees made clear that the invention
 8  relates to 12 or 24 hour formulation.  And in slide 29 and
 9  30, they refer to places within the patent where the
10  patentees talk about this specific period of time 12 to 24
11  hours, 12 or 24 hours.  And that would be '456 patent at
12  column 3, line 43 to 47.  '456 patent at column 5, lines 21
13  to 37.  At column 2, to 30.  Column 11, 15 to 19.  And again,
14  at column 5, 21 to 29 and column 5, 30 to 37.
15          In deciding whether to leave it as the defendants
16  proposed and argue strongly, that sustained release refers to
17  therapeutically beneficial blood levels of the medicament
18  being maintained over an extended period of time as opposed
19  to over a period of at least 12 hours.  The Court looks at
20  what I believe is important language in the patents.  That's
21  contained in background of the invention.  The objects in
22  summary of the invention.  And the detailed description of
23  the invention.
24          When I read the beginning paragraphs of the '933
25  patent, the significance of what was going on in this patent
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606296

ENDO-OPANA-000066183

34

1   began to take form with the paragraph at line 6 of column 1,

2   quote, "However, heretofore there's been no teaching of the

3   controlled release formulation providing a novel and

4   unexpected combination of suitable proportions of a

5   homopolysaccharide, a heteropolysaccharide, together with an

6   inert diluent and a pharmaceutically acceptable hydrophobic

7   material so as to provide an improvement in controlled

8   release properties for such an active medicament." That's the

9   way the section background of the invention ends.

10          The beginning of that section begins quote, "The

11  advantages of controlled release products are well known in

12  the pharmaceutical field and include the ability to maintain

13  a desired blood level of a medicament over a comparatively

14  longer period of time while increasing patient compliance by

15  reducing the number of administration.  These advantages have

16  been attained by a wide variety of methods.  For example,

17  different hydrogels have been described for use in controlled

18  releases medicines, some of which are synthetic, but most of

19  which are semi-synthetic or of natural origin.  A few contain

20  both synthetic and non-synthetic material, however some of

21  the system provide special process production equipment and

22  in addition some of these systems are susceptible to variable

23  drug release."

24          So right away the patent talks about problems that

25  attend an already existing art and that is controlled

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606297

ENDO-OPANA-000066184

1  release.  Some of the problems have to do with special

2  process.  Some of the problems have to do with systems that

3  are susceptible to variable drug release.  And the whole idea

4  as we know is sustained release, controlled release, not an

5  up and down release.  And the next paragraph begins right

6  away with the observation. "Oral control of release delivery

7  systems should ideally be adaptable so that release rates and

8  profiles could be match psychological and chronotherapeutic

9  requirements." And then as I said, this section ends with the

10 observation, "that nothing up until the invention that is

11 claimed within the '933 patent and the '456 patent, has there

12 been something that would provide an improvement in

13 controlled release properties." And with that language, the

14 Court moved into an appreciation for the argument the

15 plaintiff is making which is that, over an extended period of

16 time would as it were suggest that the invention is more or

17 less reinventing the wheel, because there is something

18 already in place, there's something that is well described

19 that's in place.  There's something that is called a good

20 thing and that is the idea of controlled release.  The

21 advantages of controlled release products are well known in

22 the pharmaceutical field.

23          So if all we're saying is that what is being

24 invented here is something that's better and longer in

25 release than the immediate release, that flies in the face of

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606298

ENDO-OPANA-000066185

1  the language of the patent right up front.  And then we come

2  to the objects and summary of the invention, which comes

3  right after that section that I've been talking about and

4  those are the objects.  And I read that to you and you could

5  see how each time the paragraphs go something else is added.

6          So it is there for an object to provide a

7  controlled release formulation for a therapeutically active

8  medicament.  It is a further object to provide a method for

9  preparing a controlled release formulation for a

10 therapeutically active medicament.

11         It is yet another object to provide a controlled

12 release excipient which may be used in the preparation of a

13 sustained release oral solid dosage form.  And I think that

14 language is important.  That second paragraph talks about

15 providing a method as the object, one of the objects of the

16 present invention.  And the third is to provide a form, a

17 solid dosage form that provides an even rate of release of an

18 active medicament.

19         Then paragraph 4 of the object is, it is a further

20 object to provide a controlled release excipient, which when

21 combined with an effective amount of a bronchdilator such as

22 Albuterol, is suitable of providing a sustained release of

23 that medicament so as to provide a therapeutically effective

24 blood level of the medicament for e.g. 12 or 24 hours,

25 without allowing an excessively early release of medication

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606299

ENDO-OPANA-000066186

1    and where the released kinetics are unaffected by the

2    contents of the patient's gastrointestinal track.  And then

3    finally, "It is yet a further object of the present invention

4    to provide a method for treating patients with an active

5    medication in a controlled release form."

6          So I believe that the unfolding of the object with

7    the accretion of the invention's objects and the invention of

8    a method and an invention of a form.  It is important to note

9    that it is arising out of an acceptable and in fact good

10   existing formulation of delivery of medication, i.e., over

11   time.  And improves it and talks about a method of providing

12   that even distribution into the system of a therapeutically

13   effective dosage.  And defines that therapeutically effective

14   dosage as a sustained release for e.g. 12 or 24 hours,

15   without allowing an excessive early release of medication and

16   where the release kinetics are unaffected by the contents of

17   the patient's gastrointestinal track.

18         Now, if we move to the claims, claim one.  What is

19   claimed is, one, a controlled release solid dosage form for

20   cral administration of a therapeutically active medicament to

21   a patient in need thereof comprising. And then a

22   pharmaceutically effective amount of a medicament, a

23   sustained release excipient and what it's comprised of.  And

24   a pharmaceutically acceptable hydrophobic material.  And then

25   there are dependent claims that are set forth.


                U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

EPI001606300
ENDO-OPANA-000066187

38

1          Paragraph 21, which the plaintiffs rely on reads,

2     that what is claimed is 21, a method of preparing a

3     controlled release solid dosage form, comprising of a

4     medicament for oral administration, the method comprising,

5     preparing a sustained release excipient comprising from about

6     10 to 99 percent by weight of a gelling agent and what that's

7     comprised of.  And from about 1 to 90 percent by weight of a

8     pharmaceutically acceptable hydrophobic material.

9          And then the second subparagraph of 21, and adding

10    an effective amount of a medicament thereto, such that a

11    final product is obtained having a ratio of said medicament

12    to said gelling agent from about 1 to 3 to about 1 to 8, such

13    that a gel matrix is created when said formulation is exposed

14    to environmental fluid and said formulation provides

15    therapeutically effective blood levels of said medicament for

16    at least 12 hours.  And I see that that is in keeping with

17    the objects and summary of the invention.

18          In other words, the specification and the claims

19    are harmonious with respect to that 12 to 24 or even that 12

20    cr 24 reference point because it's both.  Depending upon

21    where it appears.

22          So that the plaintiffs' construction, post

23    construction of at least 12 hours is consistent with the

24    language of 12 or 24 or the language of 12 to 24.  To the

25    extent that that means different things.  And arguably one

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606301

ENDO-OPANA-000066188

39

 1   could see that it does.

 2          Now there's another point in the patent that I

 3   found assisted me.

 4          Off the record for a moment.

 5          (RECESS TAKEN).

 6          THE COURT:  Back on the record.  I indicated that

 7   there was another part of the patent that-- another area of

 8   the patent that assisted me.  In a detailed description that

 9   begins at column 5 line 12.  Patentees referenced other

10   patents and incorporate their disclosures.  And in these

11   patents gelling agents, or a gelling agent is described,

12   which produce a higher viscosity and faster hydration than

13   would be expected by either of the gums in the gelling agent

14   alone.  The resulting gelling is faster forming and more

15   rigid.

16          And then the second paragraph. "In the present

17   invention it has been found that a sustained release

18   excipient comprising of only the gelling agent may not be

19   sufficient to provide a suitable sustained release and an

20   active medicament to provide a 12 or 24 hour formulation,

21   when the formulation is exposed to a fluid in an environment

22   cf use, e.g. an aqueous solution or gastrointestinal fluid."

23          Next paragraph. "In certain embodiments the present

24   invention is related to the surprising discovery that by

25   granulating the sustained release excipient of the solution

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606302

ENDO-OPANA-000066189

40

1    cr dispersion of a pharmaceutically acceptable hydrophobic

2    material prior to add mixture of a sustained release

3    excipient with a medicament.  The medicament may provide

4    therapeutically effective blood levels for extended periods

5    cf time, e.g., from about 12 to about 24 hours.  The

6    hydrophobic material was present in a range from about 0 to

7    about 90 percent by weight of the sustained release excipient

8    and a preferred embodiment is present in a range from about 1

9    to 20 percent of the sustained release excipient, or from

10    about 25 to 75 percent of a sustained release excipient.

11         But again in that series of paragraphs under

12    detailed description, the progression that I noted before

13    that's referenced right from the beginning at the patent,

14    from gels that were providing for a gelling agent in aid of

15    sustained release or controlled release is improved and

16    couldn't before the invention provide a 12 or 24 hour

17    formulation.  The gels in existence, the gel formulation is

18    in the earlier art.

19         Now, with the addition of the hydrophobic material

20    those gelling agents are able to provide for a longer and

21    extended period of time defined as from about 12 to about 24

22    hours.

23         And I find that that again is other intrinsic

24    evidence as to the object and the specification of the

25    invention related to a 12 to 24 hour period as opposed to a

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

**CONFIDENTIAL**

**EPI001606303**

**ENDO-OPANA-000066190**

41

1    simple extended period of time.  In other words, as a logical
2    observation it would appear that the object, the goal, and
3    the discovery even described as the surprising discovery of
4    the addition of a hydrophobic material, gains as it were for
5    the patentee-- gains for the improvement of the delivery
6    system.  A longer period of time defined as a 12 hour dose,
7    or a 24 hour dose, or released for a period of time of at
8    least 12 to 24 hours.
9            Now, I am aware and I think it's a very important
10   argument that the plaintiff makes, that the paragraph that
11   defines what is sustained release means and which appears in
12   column 4 at line 20, gives an example of a 24 hour dosage
13   form and I'll read it again. By sustained release it is meant
14   for purposes of the present invention that the agent's active
15   medicament is released from the formulation at a controlled
16   rate such that therapeutically beneficial blood levels, but
17   below toxic levels of the medicament are maintained over an
18   extended period of time e.g. providing a 24 hour dosable
19   form.  There are other parts of the patent, other paragraphs
20   in the patent, where the amount of time is at least 24 hours
21   or a 24 hour dose, and I understand that.  But there is also
22   the refrain as it were of the sustained release providing a
23   therapeutically effective blood level of the medicament for
24   12 or 24 hours or for 12 to 24 hours.
25           Again, on line 44 of column 3, under the section

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606304

ENDO-OPANA-000066191

1  entitled object in summary of the invention, quote, "The

2  invention also relates to methods for preparing a controlled

3  release solid dosage form as described above, for providing

4  an active medicament in an amount effective for treating a

5  patient for from 12 to about 24 hours."

6       And finally, going back to that very first term

7  that was in dispute, the profiles gained from the

8  bioavailability study and the conclusion that begins on line

9  50 of column 20, right before the claims are set forth.  From

10  the results provided in above examples it can be seen,

11  meaning the various tables. "It can be seen that the

12  formulations according to the invention provides controlled

13  release of an active medicament, such as Albuterol sulfate

14  without any significant differences, induced by a fed/fast

15  effect, due to the presence of food in the gastrointestinal

16  track.  Accordingly, the results provide that the tablets

17  produced according to the invention are suitable for

18  delivering medicaments as an oral solid dosage form over a 24

19  hour oral period of time."

20       I see the intrinsic evidence in the patent

21  language, the claims and specifications as the defining for

22  us, for purposes of this claim construction, a period of at

23  least 12 hours.  As opposed to the construction offered by

24  the defendant, that sustained release refers to a release of

25  a therapeutically active medicament at a controlled rate such

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

43

1   that the therapeutically beneficial blood levels are

2   maintained over an extended period of time.  And I believe

3   that the law that I cited that is at the beginning of this

4   case which says, that the Court must construe disputed terms

5   with what the inventors quote, "Intended to envelop within

6   the claim." End quote.  Drives the conclusion that I am

7   making.

8           And to define the period time that is sought and

9   claimed in this invention as at least 12 hours.  Because it

10  is harmonious, not only in the context of the particular

11  claim in which the disputed term appears, but in the context

12  of the entire patent including the specification.  And

13  therefore, I am adopting the plaintiffs' construction that

14  sustained release means the active medicament is released at

15  a controlled rate such that the therapeutically beneficial

16  levels of the medicament are maintained over a period of at

17  least 12 hours.

18          Finally, we come to the hydrophobic material.  And

19  it's interesting, in the sustained release dispute the

20  defendants have tagged plaintiff as importing a term from

21  claim 21 and putting it in claim 1, or otherwise offending

22  some of the rules of claim construction, which I find they

23  are not doing because I am finding that the intrinsic

24  evidence allows me to say that that particular time frame is

25  enveloped within the claim.  But here the dispute on

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

**CONFIDENTIAL**

**EPI001606306**

**ENDO-OPANA-000066193**

44

1    hydrophobic material finds plaintiffs kind of applying the

2    same argument against the defendants.

3            So in that final term here are the parties'

4    respective construction.  Plaintiffs' construction of the

5    term hydrophobic material is a material which is effective to

6    slow the hydration of the gelling agent without disrupting

7    the hydrophilic matrix.  And the defendants' construction is

8    that hydrophobic material quote, "A material which lacks

9    affinity for water e.g. is resistant to or avoids wetting,

10   and which is effective to slow hydration of the gelling agent

11   cr gums, without disrupting the hydrophilic matrix."

12           Now, plaintiff says that, essentially the parties

13   are in agreement that the term hydrophobic material is

14   effective to slow hydration of the gelling agent with gums

15   without disrupting the hydrophilic matrix.  And that is

16   pretty obvious from the language that each sets forth.  It is

17   the defendants' inclusion of the language that it is a

18   material quote, "Which lacks affinity for water e.g. is

19   resistant to or avoids wetting." Defendants maintain that the

20   simple language itself hydrophobic, hydro water, phobic

21   fearful and, you know, resistant to-- backing off of, are all

22   incorporated in their construction.  That a material which

23   lacks affinity for water, it is resistant to or avoids

24   wetting.

25           Plaintiffs argue essentially two things.  First,

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606307

ENDO-OPANA-000066194

45

 1   that hydrophobic material is as it were probably too

 2   simplified to say it's a made up term.  But I think the

 3   plaintiffs are saying, it's a term that is specifically

 4   relevant in this particular patent.

 5            Am I right about that, Mr. Black?  That it has no

 6   dictionary definition, it's the patentee's own term?

 7            MR. BLACK:  Yes, your Honor.

 8            THE COURT:  And, therefore, it's not susceptible to

 9   being construed by reference to a dictionary definition or

10   some other assistance such as we did with the word about.

11   And I don't think that the defendants are actually doing

12   that.  They're saying, what is hydrophobic mean, by a logical

13   extension of the roots, hydrophobic means a material that

14   lacks affinity for water and is resistant to avoid wetting.

15            So the defendants are saying, we're not going

16   cutside of the plaintiff, we're trying to construe the terms

17   as the patent sets forth and it is a made up term; let's talk

18   about what the language bears by way of construction.

19            And the plaintiffs say back, well, let's go further

20   into the specification and note that that hydrophobic

21   material when it's first mentioned quickly moves into a list

22   cf acceptable hydrophobic materials.  Bottom of the first

23   page of the patent column 2, lines 55 quote, "The dosage form

24   cptionally includes a pharmaceutically acceptable hydrophobic

25   material, any pharmaceutically acceptable hydrophobic

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606308

ENDO-OPANA-000066195

46

1  material may be suitably employed.  Suitable hydrophobic

2  material--" we're on column 3 now. "Includes," and there's a

3  whole list of them, it goes on for about 5 lines.  And then

4  it talks about a preferred hydrophobic material, but selected

5  from cellulose ether.  And then ends the paragraph with, "the

6  hydrophobic material maybe included in the dosage form in an

7  amount effective to slow the hydration of the gelling agent

8  when exposed to an environmental fluid."

9           So the plaintiffs say, within that list of suitable

10  hydrophobic materials is sitting material that in fact has an

11  affinity for water and, therefore, the defendants' additional

12  language, that the hydrophobic material is material which

13  lacks affinity for water e.g. is resistant to or avoids

14  wetting, would read out of the patent language in the patent

15  as to suitable hydrophobic material.  And to that the

16  defendants' response, that the plaintiffs are savaging the

17  language of the term because hydrophobic means lacking an

18  affinity for water.  The plaintiffs say hydrophobic is a

19  relative term.  Its meaning and use will vary depending upon

20  the circumstances.

21           The parties' dispute in my mind echo a little bit

22  of what was going on when the fifth disputed term was up here

23  on the bench with me before the parties took it back and

24  settled it.  And that was the homopolysaccharide gum term.

25           Does everybody remember that?  Where the parties

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606309

ENDO-OPANA-000064196

47

1    were disputing how the galactomannan, which is a

2    heteropolysaccharide, could be referred to as a

3    homopolysaccharide and it is.  And ultimately the parties

4    took that issue back and-- how did you ultimately resolve

5    it?  That you left the term in as long as the galactomannan

6    was the reference point?

7              MR. CHIN:  That's correct.  Galactomannan was

8    tagged on to the end of the agreed definition.

9              THE COURT:  Right. Mr. Black.

10             MR. BLACK:  It's a little bit different than that,

11   your Honor.

12             There is a question and issue about whether the

13   subunit has to be identical at the level of the entire unit

14   cr the things which are attached to it.

15             THE COURT:  Right.  I understand that.

16             MR. BLACK:  And we resolved that and was to leave

17   that for trial.

18             THE COURT:  Okay.  I thought we were all finished

19   with that.

20             MR. BLACK:  No, we have had a definition and of

21   course the second part of the case would be applying it.

22             THE COURT:  And what happens next?

23             MR. CHIN:  I think he was describing the second

24   part of the case for which there may be a technical dispute.

25   I'm not sure we agree that it's materially a claim

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

**CONFIDENTIAL**

**EPI001606310**

**ENDO-OPANA-000066197**

48

1    construction dispute, but plainly that's an issue that will

2    be resolved at a different time.

3            THE COURT:  All right.  But when we were going back

4    and forth about it I think that everybody was aware, no

5    matter which side of the story you were on, that there was a

6    tension between what the patentees were talking about in

7    talking-- in calling galactomannans homopolysaccharides.  But

8    they came right out and said that homopolysaccharides include

9    galactomannans.  And clearly a preferred embodiment is an

10   important part of the art that's taught in the patent is the

11   use of xanthan gum and whatever one could make of it.  I

12   believe that one was brought back to one of the essential

13   tenants of claim construction, which is that the patentee can

14   act as their own lexicographer, to specifically define terms

15   of the claim contrary to their ordinary meaning.

16           Now, I think that was a far more defined dispute,

17   because any scientist would probably be a little bit

18   perturbed at calling the galactomannans homopolysaccharide,

19   and we're not bringing in a reasonably competent scientist to

20   prove that, but I believe that what I read in the materials

21   it just doesn't sit.  But we're allowing these patentees, not

22   just because the parties have taken the term back and

23   resolved it, but because the Court could have under existing

24   law construed that term not giving it its ordinary meaning

25   but rather giving it the meaning that the patentee gives it

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606311

ENDO-OPANA-000066198

49

1   as his own lexicographer.

2           And I find that it's actually an easier mental

3   exercise to do here, where it's an agreement that the term

4   hydrophobic material is very much bound up with the invention

5   here, and the surprising discovery that is recited in the

6   patent and the novel invention of adding a hydrophobic

7   material.

8           That leads to the final reason why the defendants

9   say, you have all of that, but then you're saying it's any

10  cld material on the face of the planet and therefore you are

11  adopting a construction that really has no meaning because

12  all you're talking about is function.  And I've looked at the

13  case that's relied on for that principal which is in Westlaw

14  and I will get to it on the defendants' materials.

15          The York Products case.

16          That's relied on by the defendants in indicating

17  that the plaintiffs' definition, the plaintiffs' instruction

18  is wrong because under the York Products case quote, "The

19  language in the syntax of the claim precluded a functional

20  definition." And that specifically had to do with the latter

21  and how the court construed one of the claims.  And the

22  federal circuit indicated in the quote, "substantial part"

23  end quote, which was the term meant only ample height to

24  accomplish a purpose the claim would need to read, only so

25  much height as necessary to affix a structure against

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606312

ENDO-OPANA-000066199

50

1  movement.  This redraft would essentially strip many words in

2  the claim of their meaning.

3          Further, the defendants argue, that the function

4  does not expunge the expressed requirement that the material

5  is hydrophobic.  And again coming back to what a hydrophobic

6  material is.  And the defendants line up the analysis in K-2

7  Corp. v Solomon, 191 F.3d 1356, 1363, a 1999 decision of the

8  federal circuit and argued, that the claim language in the

9  patent in suit requires that the material is hydrophobic, the

10  function is to slow hydration without disrupting the

11  hydrophilic matrix.  The functional language is fully

12  consistent with the hydrophobic properties and the material

13  must be hydrophobic in addition to performing the function.

14  And that is the defendants' response to the plaintiffs' point

15  or argument that hydrophobic is a relative term.

16          The Court, after weighing and evaluating both

17  arguments, concludes that in this case the patentees as they

18  did with the homopolysaccharides were active as their own

19  lexicographers.  We begin with that overall observation when

20  we say that hydrophobic material is a term used in this

21  patent to describe what the invention in the discovery is,

22  taking those gels that were already claimed in other patents

23  and adding a hydrophobic material.  And coming up with a form

24  of sustained release that brought us to a longer period of

25  time which therapeutically effective levels of medicaments

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606313

ENDO-OPANA-000066200

1  could be maintained in the patient's system.

2          The phrase as plaintiffs put it, that slows the

3  hydration of the gelling agent, does not appear in any

4  dictionary under the definition of hydrophobic.  Plaintiffs

5  argued none of the experts have said that that is the

6  definition of hydrophobic that's normally used by the

7  pharmaceutical chemists.  But I think everybody and

8  plaintiffs argued and both sides, and I agree would say that

9  the language appears in both parties' constructions as what's

10 going on when this hydrophobic material is added to the gel

11 matrix-- I'm sorry to the compound, and the plaintiffs

12 conclude that is the language the inventor chose.

13         In the '933 patent at column 7, lines 44 to 47

14 quote, "The sustained release excipient of the present

15 invention may be further modified by incorporation of the

16 hydrophobic material which slows the hydration of the gums

17 without disrupting the hydrophilic matrix." And it's helpful

18 to just think about what's going on here and that's why at

19 the very beginning of the construction I talk about what the

20 overall technology is.  That slow release of the therapeutic

21 medicament-- or the medicine in a therapeutically effective

22 way by diffusion and erosion, and the invention that permits

23 for this over a longer period of time so that the hydration

24 of the gums in that matrix is slowed to the addition of the

25 material, but the hydrophilic matrix is not disrupted,

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606314

ENDO-OPANA-000066201

52

1   because then the whole idea of getting this stuff into the

2   patient wouldn't happen.

3           So again, in the '933 patent at column 3, lines 9

4   to 12, quote, "The hydrophobic material may be included in

5   the dosage form in an amount effective to slow the hydration

6   of the gelling agent when exposed to an environmental fluid."

7   End quote.  And the plaintiffs are unabashed about saying the

8   definition is a functional one.  Requiring the use of a

9   substance to slow hydration of the gelling agent or gums.

10          "The plaintiffs argue that the language lacks

11  affinity for water e.g. is resistance to or avoids wetting

12  does not come from the patent specification--" and I agree it

13  does not, it is the defendants' insertion.  Phillips comes up

14  again where plaintiffs rely on it for the proposition that it

15  rejects the line of cases that rely on the dictionary

16  definitions and directed district courts to consider the

17  specifications of the patent.

18          Finally, the plaintiffs indicate that only Dr.

19  Banker is offered to construe that particular construction--

20  or that particular term as one of skill in the art, and the

21  defendants' expert did not perform that analysis.  I'm aware

22  that there is some dispute about whether or not the Court had

23  the benefit of the defendants' expert.  And I'm not saying

24  that it is because Dr. Banker said so that I'm going this

25  way.


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606315

ENDO-OPANA-000066202

53

1          I'm rather relying on the specific language of a

2    patent and the preferred embodiments and the specification.

3    Enrico Company v. Katun.  I read it Katun, anybody?  Katun

4    K-A-T-U-N Corp., 486 F.Supp 2d from our district 2007 quote,

5     "As the specification expressly or implicitly defines term

6    and use of the claim differently than their ordinary meaning,

7    then the definition derived from the specification will

8    govern how the claims terms are to be interpreted." But I

9    think it's even broader than that.  We don't have an ordinary

10   meaning here.  We're not talking about hydrophobic materials

11   are commonly talked about.  We're talking about a functional

12   definition that is offered within this patent to explain how

13   come there is an improvement in the sustained release that

14   the patentees have claimed as part of their invention.

15          And in the federal circuit decision of Oatey v. IPS

16   Corp. 514 F.3d 1271, I think it's important that we come back

17   to the practical point quote, "We normally do not interpret

18   claims in a way that excludes embodiments disclosed in the

19   specifications and it's very clear that several of the

20   compounds identified as hydrophobic material in the invention

21   are hydroscopic and have an affinity for water and absorb

22   it."

23          So without going further into the arguments of the

24   parties, I'm satisfied that from the intrinsic evidence of

25   the patent language, the patentees have acted as their own

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606316

ENDO-OPANA-000066203

54

1    lexicographer, that this is inferred and accepted by

2    everybody approaching the dispute in this case, the term

3    hydrophobic material must be read in the context of this

4    patent.  It is the, as it were, touchstone of much of what is

5    going on in the claims and in the specification.  And for

6    that reason the patentees may act as their own lexicographers

7    in terms of how they define the particular material, and it

8    is defined in terms of function.  And I find a significant

9    difference between the particularity of what's going on here

10    with the hydrophobic material, that slows done the hydration

11    without disturbing the hydrophilic matrix versus the language

12    that flattened out other language in the York Products case.

13           I see this as not falling into that problem, but

14    rather that there is a value and a better argument to the

15    plaintiffs' side of this particular issue.

16           And, therefore, with respect to that last term

17    hydrophobic material, the Court accepts the plaintiffs'

18    proposed construction that a quote, "A material which is

19    effective to slow the hydration of the gelling agent without

20    disrupting the hydrophilic matrix is the preferred

21    construction." It's adopted by the Court.  It is not unduly

22    related simply to function so as to have no meaning.  And

23    that the specification and number of preferred embodiments

24    and interrelationship of that particular term with others

25    that are not in dispute, all suggest to the Court that that

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

**CONFIDENTIAL**

**EPI001606317**

**ENDO-OPANA-000066204**

55

```
1    is the preferred construction as opposed to the importation
2    of the language quote, "A material which lacks affinity for
3    water e.g. is resistant to avoids wetting," which would
4    necessarily exclude some of the suitable and acceptable
5    hydrophobic material that is identified in the patent.
6              Those are the four terms construed by the Court.
7              Now, let's go off the record and talk about the
8    next steps in this case.
9              Thank you all.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

**CONFIDENTIAL**

**EPI001606318**

**ENDO-OPANA-000066205**