# EXHIBIT 10

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF NEW JERSEY
 2
     ENDO PHARMACEUTICALS, INC., and    :
 3   PENWEST PHARMACEUTICALS, CO.,       :
                         Plaintiffs,     :
 4   -vs-                                 :
                                          :
 5   IMPAX LABORATORIES, INC.,           :
                                          :
 6                                        : CIVIL NO. 09-831
                         Defendant.       :
 7   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _  :
                                          :
 8                                        :
                                          :
 9   ENDO PHARMACEUTICALS INC., and      :
     PENWEST PHARMACEUTICALS, CO.,       :
10                       Plaintiffs,     :
     V.                                   : CIVIL NO. 09-836
11                                        :
     SANDOZ, INC.,                       :
12                  Defendant.           : TRIAL DAY-ONE
     _____   :   *****
13
                                    Newark, New Jersey
14                                  June 3, 2010 10 a.m. & 2 p.m.
     B E F O R E:
15
            THE HONORABLE KATHARINE S. HAYDEN, U.S.D.J.
16
     A p p e a r a n c e s:
17
     DECHERT, LLP
18   Attorneys for Plaintiff-Endo Pharmaceuticals Inc.
     Circa Centre, 2929 Arch Street
19   Philadelphia, PA 19104-2808
     BY: MARTIN J. BLACK, ESQ.
20       ROBERT D. RHOAD, ESQ.
         KEVIN M. FLANNERY, ESQ.
21

22
```
_____

```
                    Pursuant to Section 753 Title 28 United States Code,
23   the following transcript is certified to be an accurate
     record as taken stenographically in the above-entitled
24   proceedings.

25                              s\ RALPH F. FLORIO
                                Official Court Reporter
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

2

```
 1  WILSON SONSINI GOODRICH & ROSATI
    Attorneys for Defendant
 2  12235 El Camino Real
    Suite 200
 3  San Diego, CA 92130-3002
    BY: RON SHULMAN, ESQ.
 4      MICHAEL A. BERTA, ESQ.
        JENNIFER KOH, ESQ.
 5
    DUANE MORRIS LLP
 6  Attorneys for Defendant
    505 9th Street, N.W.
 7  Suite 1000
    Washington, D.C. 20004-2166
 8  BY: KERRY B. MCTIGUE, ESQ.
        VINCENT L. CAPUANO, Ph.D.
 9      RICHARD T. RUZICH, ESQ.
        INGRID E. MELNICHUK, ESQ.
10      W. BLAKE COBLENTZ, ESQ.

11  CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO PC
    Attorneys for Defendant
12  5 Becker Farm Road
    Roseland, New Jersey 07068-1739
13  BY: MELISSA E. FLAX, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25
```

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001496

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

3

1               I N D E X

2

3

4   WITNESSES:                        PAGES:

5   DEMIR BINGOL                      7

6   DR. A.M. LOWMAN                   50

7

8

9

10          E X H I B I T S

11  NUMBER          DESCRIPTION          PAGE

12  SEE ATTACHED INDEXING

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001497

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

4

1        MS. GUILLOTY:  All rise.

2        THE COURT:  Good morning everybody.  Welcome

3  everybody to the trial of Endo v. Impax and Endo v. Sandoz.

4        I've had the benefit of well-written and

5  comprehensive trial briefs.  I have sat on the Markman

6  hearing.  I am somewhat familiar with the issues in the case,

7  but I will become much more familiar with the issues in the

8  case.  I have had the opportunity to discuss with counsel the

9  form in which the testimony will be given, always, of course,

10  subject to what happens when a trial starts getting

11  unspooled.  And we've prepared.

12        There are enough people at counsel table; we'd like

13  to hear their names.  So let's go through the drill and have

14  Mr. Black introduce who is his sitting with you, and Mr.

15  Shulman and Mr. McTigue and, Mr. Capuano, tell me who else is

16  extra at your tables.

17        MR. BLACK:  Certainly, your Honor. Mr. Rhoad and

18  Mr. Flannery from my office.

19        THE COURT:  Okay, thank you.

20        MR. SHULMAN:  Good morning, your Honor.  To my left

21  is Mike Berta, my partner, Jennifer Koh, who is an associate,

22  and you know Ms. Flax.

23        MS. FLAX:  Good morning, your Honor. Also with us

24  today is Impax's, vice president of intellectual property and

25  Huong Nguyen, intellectual property, here on the left.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

5

```
 1          THE COURT:  Thank you.
 2          MR. MCTIGUE:  Good morning, your Honor.  Kerry
 3  McTigue from Duane Morris.  I'm here with Mr. Vincent Capuano
 4  to my left, Rich Ruzich and Ingrid Melnichuk.
 5          MS. MELNICHUK:  Good morning, your Honor.
 6          MR. MCTIGUE:  We represent Sandoz.  Along with us
 7  today in the audience is Alexandra Hanner (ph), in-house
 8  counsel for Sandoz Inc.
 9          THE COURT:  Wave, please.
10          MR. BLACK:  Your Honor, I am definitely remiss.  I
11  did not introduce the Endo personnel here.  Guy Donatiello
12  vice president of IT and Mr. Bingol will be the first
13  witness.
14          THE COURT:  Thank you very much.  Mr. Black, then
15  we can get started.
16          MR. BLACK:  Thank you, your Honor.  As we discussed
17  in chambers, your Honor, there are a number of stipulations
18  relating to exhibits.  This is a patent case; it's only
19  fitting that we move into evidence the patent formally before
20  we get started with the testimony.
21          So plaintiffs move in evidence Exhibits 1 and 2,
22  which are the 456 and 933 patents, and as well as the file
23  histories for the 456 and 933 patents, which are Exhibits 5
24  and 6.
25          THE COURT: They are so moved.  Thank you.
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

6

```
 1          ^ (So marked).
 2          MR. BLACK:  Also as part of the file history, there
 3   are a number of terminal disclaimers which we also move into
 4   evidence.  And those are Exhibits PX-360, 361, 362, 363, 415
 5   and 416.
 6          THE COURT:  Those matters are also in evidence.
 7          ^ (SO MARKED).
 8          MR. BLACK:  Thank you, your Honor.
 9          As a matter of formality, if this were a jury
10   trial, the next thing we'd do is probably read the stipulated
11   facts in evidence.  I don't think we can do that here, but I
12   so move that it's moved in evidence for purposes of the
13   trial.
14          THE COURT:  Granted.
15          ^ (SO MARKED).
16          MR. BLACK:  At this point the plaintiffs are
17   prepared to call the first witness.
18          THE COURT:  Yes.
19          MR. BLACK:  Plaintiffs call Demir Bingol.
20          THE COURT:  Mr. Bingol, come forward.
21   ^ DEMIR BINGOL, the witness herein, having been first duly
22   sworn by the Courtroom Deputy, was examined and testified as
23   follows:
24          MS. GUILLOTY:  Have a seat. State your name, spell
25   it for the record.
```

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

7

1          THE WITNESS:  Yes.  My name is Demir Bingol,

2     D-E-M-I-R  B-I-N-G-O-L.

3     ^ DIRECT EXAMINATION

4     BY MR. BLACK:

5     Q.   Good morning, Mr. Bingol, how are you?

6     A.   Good morning, thank you, fine.

7     Q.   Could you tell the Court what your position is at Endo?

8     A.   I am currently the senior marketing director for opioid,

9     specifically OPANA and OPANA ER.  Those two products.  I'm

10    also the acting regional sales director for the Midwest

11    region.

12    Q.   What is an opioid?

13    A.   An opioid is an analgesic for pain relief.

14    Q.   What are your responsibilities as senior marketing

15    director for OPANA?

16    A.   The basic four P's: Product, promotion of the products,

17    how the product is distributed and pricing in general terms.

18    Q.   When did you join the company?

19    A.   I joined Endo in May of 2006.

20    Q.   And under what circumstances, why did you join the

21    company?

22    A.   I was asked if I would consider coming to the company to

23    help launch OPANA and OPANA ER.

24    Q.   And do you know when the approval date was for OPANA ER?

25    A.   June 2006.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                    IMPAX-OPANA00001501

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

8

1    Q.   And when was the launch?

2    A.   July, that year.

3    Q.   And you came to the company to handle the marketing for

4    the product launch; is that right?

5    A.   That's correct.

6    Q.   Have you held that position since that time?

7    A.   Yes.

8    Q.   Could you describe for the Court generally what Endo's

9    product line is?

10   A.   Sure.  The picture on the screen are four primary

11   in-line products.  We have OPANA and OPANA ER, which I

12   mentioned is an opioid analgesic for moderate or severe

13   chronic pain.

14        The product to the right is called Froze Up which

15   is in the triptane class for migraines.

16        Below is Voltaren Gel.  It's a topical

17   noninflammatory cream for arthritic joints.

18        The bottom left is Lidoderm which is a lidocaine

19   patch, a topical patch used for the treatment post RPHN in

20   urology.

21   Q.   And there's some bit of a theme there.  Do these

22   products relate to any particular area that Endo specializes

23   in?

24   A.   Well, they are all pain products, of course.

25   Q.   This slide also mentions generic products.  Does Endo

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

9

1   have a generic business?

2   A.   Yes.

3   Q.   What's Endo's largest generic product?

4   A.   Percocet.

5   Q.   Where is Endo located?

6   A.   Chadds Ford, Pennsylvania.

7   Q.   And how large a company is it?  A big pharmaceutical

8   company, medium, small?

9   A.   I think we're cresting on the medium size company in

10  terms of numbers of sales and employees.

11  Q.   And roughly what's the annual revenue?

12       MR. BERTA:  Sorry, your Honor, I can't hear.

13       THE COURT:  We're working on that. Let's just take

14  a moment to angle the microphones.

15  Q.   Roughly the annual sales of Endo?

16  A.   About 1.5 billion.

17  Q.   And of those sales, how much of the sales are from the

18  OPANA franchise?

19  A.   Roughly 250,000 million.

20  Q.   Now we have a slide here called the OPANA family of

21  products.  Could you describe what's on the slide?

22  A.   Yes.  Those are the three products that we have that

23  incorporate the oxymorphone molecule into three different

24  presentations or formulations.

25       The first is OPANA injection which is an injectable

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

10

1    product used in the hospital for preoperative purposes.

2            The next product is OPANA immediate release, which

3    is the short acting form of OPANA indicated for when the use

4    of an opioid is appropriate, but for short term purposes.

5    Maybe post surgery, severe strains and sprains.  Those

6    conditions were usually the pain set to resolve over a short

7    period of time.

8            And then third is OPANA ER, which is our extended

9    release version which is indicated for moderate to severe

10   chronic pain with the use of opioid analgesic which is

11   appropriate for round-the-clock therapy for a long duration

12   of time.

13   Q.    All three have the same active ingredient?

14   A.    Yes.  It's oxymorphone hydrochloride.

15   Q.    On the right-hand side we marked OPANA ER there's a

16   reference to four dosages: 5, 10, 20 and 40.  Are there

17   additional strengths?

18   A.    There are.

19   Q.    What are those strengths?

20   A.    The 7.5, 15 and 30 milligram strengths.

21   Q.    And why do you have so many strengths?

22   A.    It's a convenience factor for the clinician and for the

23   patient.

24           When you're taking opioids, as a course of therapy,

25   especially when you're converting from one opioid to another,

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

11

1  more precision you have in dosing makes it easier, makes it a

2  more accurate conversion and more simpler tetrad to increase

3  a dose as necessary to reach the effective dose that the

4  patient may need.

5         It's a smaller step to go going from 20 to 30 when

6  launched these from 20 to 40.

7  Q.   Are all products sold to same customers or sold to

8  different types of customers?

9  A.   Ah, of these three products here?  They would be -- the

10  injection, of course, is sold to different type of customer

11  because it's really for post surgical use and more of account

12  base selling into the hospital scenario.

13         But the other two products may or may not be sold

14  to the exact same customer groups just depending upon who's

15  treating what type of pain.

16  Q.   Of the sales of OPANA, I mean OPANA generic, no pun,

17  OPANA, the three different OPANA products, what percentage of

18  the sales that is OPANA, OPANA immediate release and OPANA

19  extended release?

20  A.   Well the injection is very small.  We actually as a

21  company don't have any representation in the hospital arena

22  and we pulled that almost immediately after the launch of

23  these relaunch of injections.  So we don't promote that.

24  It's very small, about $350,000 a year.

25         The other two products roughly 75-25.  In terms of

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001505

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

12

1   the split in favor OPANA ER.  Roughly 75 percent of our

2   receivables.

3   Q.   Prior to the launch of OPANA ER in June of -- prior to

4   approval in June 2006, was there an extended release

5   oxymorphone product on the market?

6   A.   No.

7   Q.   Could you tell us who your competitors are?

8   A.   Well the competitors for OPANA ER in the long-acting

9   opioid space or other long-acting opioids that we market

10  against.  It would be M.S. Contin for one and all of its

11  generic manifestations would be Avinza, Kadian, Embeda, and

12  of course OxyContin, which is the market leader.

13           There is also a patch in this category, if you want

14  to group it that way.  In terms of long-acting patch called

15  analgesic, which is also a long acting, a three-day patch

16  application.

17  Q.   Does Endo sell OPANA ER to all types of doctors or only

18  specific types of doctors?

19  A.   Only specific types of doctors.

20  Q.   Who do you target your market for OPANA ER?

21  A.   Based on your risk map with the agency, with the FDA,

22  that is, we made a commitment not to expand the market for

23  OPANA ER.  And so our internal definition of that would be

24  promoting products, these products only to customers who have

25  experience with long-acting opioids prescribing.  So we make

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

13

1  a decision to talk to only those customers who's written

2  roughly four prescriptions or more per month of a long-acting

3  opioid; we are allowed to promote to them.

4  Q.   So would you have your sales force going out to talk to

5  direct general practice physicians who like one day or

6  another day have a need for pain relief drugs?

7  A.   Not generally speaking.  They have to have a history

8  prescribing these products already.  So if they haven't, we

9  wouldn't be talking to somebody, trying to create a new

10 account, if you will, for a new customer.  They would have to

11 demonstrate that experience in prescribing this category

12 product.

13 Q.   How large is the OPANA sales force?

14 A.   About 700 individuals, including managers, sales

15 representatives and managers.

16 Q.   Do sales representatives sell only OPANA or other

17 products as well?

18 A.   They sell other products.

19 Q.   Why do you market your products that way?

20 A.   Well for efficiency.  Certainly there, especially when

21 having multiple pain products, it's conceivable and indeed

22 through many of your customers that you way may want to talk

23 about OPANA ER who also prescribe triptanes for migraines or

24 maybe treat a lot of post traumatic pathology and use

25 applications for our other products.  So it creates the most

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

14

1  efficiency by having multiple calls, if you will, with one

2  sales rep, rather than one sales product for one sales rep.

3  Q.   If there was generic competition, would Endo lose those

4  synergies?

5  A.   Yes.  Because obviously we wouldn't, as a company, if

6  there were generics available on the marketplace we wouldn't

7  continue to promote OPANA ER, and therefore essentially

8  creating more capacity we would have fewer products in the

9  bag, as it were, for the rep to detail with particular

10  customers.

11  Q.   Does Endo have a history of promoting itself as pain

12  management company?

13  A.   Yes.

14  Q.   And would losing the brand's status of OPANA negatively

15  affect Endo's marketability to market itself in that fashion?

16  A.   I think so.

17  Q.   Okay.  What I have up on the screen now is a timeline

18  just to provide some context for how we got here today.  And

19  the first item on the timeline you will see in 1997 September

20  is Endo Penwest strategic alliance agreement.

21       Could you generally describe what that is?

22  A.   Yes. I believe that our initial agreement with Penwest

23  to develop OPANA ER.

24  Q.   And December 2002, there's a reference to the NDA file.

25  What is the NDA?

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  A.   It's the New Drug Application.  The official filing to

2  the FDA when you're seeking drug approval or approval for a

3  new product.

4  Q.   And then, as you mentioned before, the review process

5  was completed in June of 2006 with FDA approval?

6  A.   Yes.

7  Q.   And then which strengths did you launch in July?

8  A.   The 5, 10, 20 and 40.

9  Q.   And was there a later launch?

10  A.   Yes.

11  Q.   When was that?

12  A.   About a year and a half later.  What we launched

13  immediate strength 7.5, 15 and 30.

14  Q.   And now could you tell the Court what's on the screen

15  now?

16  A.   That's a picture of all of our seven strengths for OPANA

17  ER.

18  Q.   Why are they all different colors?

19  A.   Well, pharmaceutical products need to be distinguished

20  one from another for safety reasons, so they color, size,

21  shape, markings, all those things taken into consideration so

22  they are different for easier identification.

23  Q.   Let's jump back to the strategic alliance agreement and

24  Penwest, which is also a plaintiff in this action.

25  A.   Yes.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001509

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

16

1  Q.   Who's Penwest?

2  A.   I'm sorry.  Development partner, the folks who develop

3  the TIMERx, T-I-M-E-R-X.

4  Q.   And can you identify PX-26?

5  A.   Yes.  It's one of the, I guess the original agreement

6  for the partnership with Penwest.

7          MR. BLACK: And there are a number of other

8  agreements, PX-25, 27, 28 and 414, which I will represent are

9  amendments to the Strategic Alliance Agreement and Plaintiffs

10  move them into evidence.

11          THE COURT:  So marked.

12          MR. BERTA:  No objection to all. I think in the

13  record PX-25 is not an amendment, but replacement; is that

14  right?

15          MR. BLACK:  Technically amended and restated.

16          MR. BERTA:  No objection, your Honor.

17          THE COURT:  In evidence.

18          ^ (SO MARKED).

19          MR. BLACK:  Thank you.

20  Q.   Can you identify PX-4A?

21  A.   Yes.  That's the first page of our product labeling or

22  package insert.

23  Q.   Do you have any involvement at Endo in the labeling

24  process?

25  A.   Yes.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

17

1  Q.   What is that involvement?

2  A.   Well I am part of a cross-functional review team.  So

3  when these types of documents get created and submitted

4  before they are multiple functions in the organizations, look

5  and review and comment and incorporate their particular area

6  of expertise into the document.

7  Q.   Is the label for a prescription drug approved by the

8  FDA?

9  A.   Yes.

10 Q.   Was the label for OPANA ER approved by the FDA?

11 A.   Yes.

12 Q.   Let's step through the first page of the label.

13 A.   Yes.

14 Q.   Right under the product name is a reference to

15 oxymorphone hydrochloride.  You mentioned that before.  What

16 is that?

17 A.   It's the active ingredient.

18 Q.   And then we have the strengths, correct?

19 A.   Yes, those are the seven strengths.

20 Q.   And there's a reference on the next line, RX only and

21 C2.  Could you describe what those are?

22 A.   RX only, RX being shorthand for prescription only.  And

23 C2 is the DEA scheduling designation for this product, which

24 is a schedule 2 or C2.

25 Q.   Are there any other schedule 2 controlled substances

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

18

1  that you're aware of?

2  A.   Oh, yes, many.

3  Q.   Could you describe some for the Court.

4  A.   Well all of the products in this long-acting opioid

5  category are schedule 2, which have ingredients of morphine

6  or oxycodone, fathenel.  So all of those products and their

7  derivatives are schedule 2.

8  Q.   Is there a ranking, schedule 2, schedule 3, schedule 1,

9  what does that mean?

10  A.   Yes, there is.  I believe schedule 1 through 5, with one

11  being really, I think, schedule 1 products are those that

12  don't have any pharmaceutical or therapeutic value, heroin or

13  cocaine are considered by the DEA to be schedule 1.  Schedule

14  2 would be the next in line in terms of potency and potential

15  abuse liability, potential diversion.  They get the strongest

16  scheduling.  And then from there it goes down to schedule 5,

17  which is the most mildest, I guess the least worrisome, but

18  still enough to have a scheduling.

19  Q.   In light of the schedule 2 status of the drug, does Endo

20  have to interface with the DEA in addition to the FDA in

21  relation to OPANA ER?

22  A.   Sure.  When you manufacturer products like this there's

23  certainly special considerations, certain forms you have to

24  file, certain requirements you have to meet and you have to

25  request the active pharmaceutical ingredient via DEA.  They

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

19

1   have to grant your quota to manufacturer this product.

2   Q.   Would you read the next item into the record?

3   A.   Yes.  It says OPANA ER contains oxymorphone which is a

4   morphine-like and schedule 2 controlled substance with abuse

5   liability similar to other opioid analgesics.

6   Q.   What is abuse liability?

7   A.   Abuse liability is referencing the-- almost the

8   likability of the drug.  When you do abuse likability to your

9   scheduling, you really try to understand how this drug is

10  doing to be perceived in the marketplace in terms of

11  likability, sense of being diverted, misused, etc. and that

12  kind of gets grouped together as abuse liability.  When you

13  reach a certain threshold they schedule it as a 2, which all

14  opioids analgesics are.

15  Q.   Would you read the call at the bottom.

16  A.   It says OPANA ER is an extended release oral formulation

17  of oxymorphone indicated for the management of moderate to

18  severe pain when a continuous around the clock opioid

19  analgesic is needed for an extended period of time.

20  Q.   What does around the clock opioid analgesic mean?

21  A.   That means when you need your pain relief to be fully

22  covered 24 hours a day, usually in context of being a chronic

23  pain patient.

24  Q.   This is a excerpt from page 28 of a label.  Would you

25  describe briefly what this is?

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001513

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  A.   This is our conversion ratio for OPANA ER.  When the
2  clinician deciding to switch a patient who's opioid
3  experience is on another existing opioid, they don't all have
4  the same level of potency, so you have to understand what the
5  relative value is of your drug.  In this case OPANA ER versus
6  their current drug so that you can make an appropriate
7  conversion.
8         These are representative of the dosing schedule
9  that we have use in our two pivotal trials to demonstrate
10  what approximated the appropriate conversion.  So, for
11  example, oxycodone, that the total daily dosage is 20
12  milligrams a day, somebody in taking in our product would
13  multiply it by .5, and that patient at least started on 10
14  milligrams of OPANA ER at that point.
15  Q.   What's the common name of oxycodone?
16  A.   OxyContin.
17  Q.   Could you identify the PX-396 please.
18  A.   This is the cover page of one of our sales, our core
19  visual aid.
20  Q.   Is there a copy of the actual sales aid in the pocket of
21  your binder there?
22  A.   Yes.
23  Q.   Okay.  On the front cover you have a statement, really
24  one statement: Uniquely engineered for true 12 hour dosing
25  that lasts.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                    IMPAX-OPANA00001514

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

21

1           What does that mean?

2    A.    That means this products specifically formulated to

3    provide true 12 hour dosing that lasts.  That true and lasts

4    part is a reference to the, what we perceive in the

5    marketplace as having other competitive products that may be

6    don't live up to their value proposition in that regard.

7    Whereas in our clinic trial data we were confident that ours

8    did and able to make that statement based upon how that

9    product was formulated.

10   Q.    And again, around the clock opioid treatment for

11   extended period of time, is this a document which you provide

12   to physicians, salespeople, how is it used?

13   A.    This particular version is used by the sales

14   representative to convey messages to the prescriber.  There's

15   an identical version of this, we call it the Slim Jim version

16   that has all the exact same information we use as the lead

17   behind the material for prescriber.

18   Q.    By the way, are you obligated to send your marketing

19   materials like PX-396 to the FDA?

20   A.    Yes.  We send all of our promotional material.  They get

21   retention copies for their files.

22   Q.    Have you ever received any complaints PX-396 being

23   inaccurate?

24   A.    No.

25   Q.    On this page of PX-396, there's a reference to TIMERx.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

22

1    Could you read that in the record and explain what's being

2    communicated here.

3    A.    The whole box or just the bullet?

4    Q.    Just the bullet.

5    A.    Patented TIMERx-N oral delivery system precisely

6    predictably controls release oxymorphone for steady plasma

7    levels over the entire 12 hour dosing period.

8    Q.    Why do you put that in your marketing materials, why is

9    that important?

10   A.    Because it's a key indicator perhaps of making sure that

11   there's a right amount of drug or enough drug in the system.

12   The drug has to be in the system for it to work.  So this is

13   smooth plasma concentration also speaks to minimizing the

14   peaks and trough of what enters the body in terms of every

15   time you take a tablet you tend to see a peak or spike.  And

16   then if it leaves quickly, you might see a trough.  And

17   usually adverse events are associated with that type of peak

18   and trough affects and that helps to minimize that as well.

19   Q.    It also says, only OPANA ER has a true matrix for every

20   12 hour dosage.  What does that mean?

21   A.    Well, the matrix is in Penwest technology is that the

22   drug is fused throughout the entire pill.  So when it

23   releases, it releases over time and as the pill erodes to

24   nothing in the gut, versus perhaps another-- delivery system

25   say like Kadian beads, little beads that are in the capsule,

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

23

1   those work a little differently.  Or the OxyContin delivery

2   system has this immediate release component in it. And more

3   of a singular matrix that releases the drug consistently over

4   time.

5           Ours is more of a singular matrix that releases the

6   drug consistently over time.

7   Q.   Could you describe what happens to OPANA ER

8   prescriptions after the launch?

9   A.   They grew.  We've had consistent growth quarter on

10  quarter, year every year.

11  Q.   And what is this chart?

12  A.   That is our total prescription volume since launch

13  through March 2010.

14  Q.   At this point what share of the market does OPANA ER

15  have?

16  A.   If you're looking at the entire market as including the

17  theralgisic (ph) patch, right now our market share actually

18  just this week is 3.55 percent market share, which is kind of

19  interesting because it is yet another all time high for the

20  product.  And actually Kadian and Embeda and the latest

21  product Exalgo combined.

22          So we're pretty excited about that.  But if you

23  were to take the patches out, it would push our market share

24  for March close to five percent.

25  Q.   Did there come a time when Endo began receiving notices

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001517

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

24

1    from generics that they had filed ANDA with the FDA?

2    A.   Yes.

3    Q.   And what was the first ANDA that Endo received?

4    A.   In June 2007.

5    Q.   Actually?

6    A.   Well--

7    Q.   Look at that.

8    A.   October.

9    Q.   Yes.

10   A.   October 2007.

11   Q.   And since then, have you received notices from

12   additional companies?

13   A.   Yes.

14   Q.   Which companies have filed to make generic versions of

15   OPANA ER?

16   A.   Actavis, Sandoz, Barr, Proxan, Watson.

17   Q.   What will happen to the brand of sales if generic

18   launches a product?

19   A.   Well what typically happens is you will lose significant

20   market share very quickly.  Maybe 70 to 80 percent over the

21   first quarter, the four months of the generic's

22   introduction.

23   Q.   Would that have any affect on Endo's ability to promote

24   the OPANA ER products to doctors effectively?

25   A.   Sure.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

25

1   Q.   What would the effect be?

2   A.   Well, when generics are present and we are losing share,

3   we won't put the same amount of sales presence on that

4   product, if at all, which of course creates excess capacity

5   and of course then produces some of the educational materials

6   that we would put out there programing that type of thing.

7   So it would reduce the overall, our overall standing in the

8   pain community.

9   Q.   Would the loss of OPANA ER as a brand of product have an

10  affect on the ability of Endo to sell products other than

11  OPANA ER?

12  A.   It may.  Because with the excess capacity you start to

13  look at things like sales force sizing, and therefore where

14  you might have had broader coverage vis-a-vis a larger sales

15  force, you may now turn that back and that may have an impact

16  on the other products as well.

17  Q.   Would the business disruption caused by a premature

18  launch potentially jeopardize jobs at Endo?

19  A.   I believe so.

20          MR. BLACK:  Nothing further, your Honor.

21          THE COURT:  Okay.

22          (RECESS TAKEN).

23          THE COURT:  Thank you.  You may cross, Mr. Berta.

24          MR. BERTA:  Thank you, your Honor.

25          This my witness now?

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

26

```
 1          THE COURT: Yes.

 2  ^ CROSS EXAMINATION

 3  BY MR. BERTA:

 4  Q.   Mr. Bingol, good morning.

 5  A.   Good morning.

 6  Q.   We have met once previously at the deposition which was

 7  I think in last October?

 8  A.   That's correct.

 9  Q.   Okay.  In your direct testimony you talked a little bit

10  about the sales for OPANA ER, which I think you may

11  characterize successful over the years, is that generally

12  correct?

13  A.   Yes.

14  Q.   Okay.  Now, you would agree with me though that the

15  historical market share trend for OPANA ER has been less than

16  what was originally anticipated for OPANA ER, correct?

17  A.   Yes.

18  Q.   Okay.  And would you agree that even with respect to

19  recent sales planning for OPANA ER, OPANA ER's actual sales

20  for 2009 didn't meet the projections for 2009 that were

21  developed just at the beginning of the year of 2009,

22  correct?

23  A.   Yes.  But those are sales versus total prescription.  We

24  actually hit our prescription goal which is the key indicator

25  of our demand generation.  The sales, of course, are
```

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

27

1   mitigated a bit by the cost of doing business through manage

2   care contracting and other things that may bring those

3   dollars down if you are getting a larger percent from one

4   source than another.

5   Q.   You missed your sales goals for 2009, correct?

6   A.   Ah--

7   Q.   Dollar sales?

8   A.   Dollar sales were slightly off.

9   Q.   Now you also had a chart in your district that talked

10  about prescription growth in sales for OPANA ER, right, which

11  was what you were just talking about?

12  A.   Yes.

13  Q.   Now, I want to direct your attention in a little bit of

14  a different chart, one that was actually in Endo's internal

15  documents.  If you could look at tab DTX-46 in the binder,

16  the large white binder.

17  A.   Yes.

18  Q.   Do you see that tab also up on the screen for

19  convenience?

20  A.   Yes.

21  Q.   Okay.  And it's got a page in there at Bates number

22  ending in 901, which I will put up on the screen.

23  A.   Yes.

24  Q.   Sort of towards the back.

25  A.   Yes.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

28

1  Q.   Okay.  Do you see that?

2  A.   I do.

3  Q.   Okay.  Now, this chart, which is an Endo internal, is

4  called OPANA ER versus competitive launches, correct?

5  A.   Correct.

6  Q.   And you agree with me that numerically with respect to

7  prescription growth, this chart shows that at 21 months OPANA

8  ER had a slower launch than Avinza, Dirogesic (ph) and

9  OxyContin based on the number of prescriptions, correct?

10 A.   Yes.  But that, of course, is a little bit out -- we

11 could make these comparisons because we're always interested,

12 but you have to take into account when these other products

13 were launched and the market dynamics at that time.  So it's

14 really launching into a little different marketplace than

15 when you're the first long acting opioid using OxyContin or

16 versus Fentanyl patch, those are different trends.

17 Q.   Funny you should say that actually because -- you

18 mentioned Embeda in your direct testimony?

19 A.   Yes.

20 Q.   And Embeda was launched in December 2009, correct?

21 A.   No, September.

22 Q.   Okay.  Yes.  September, October.  I guess September 29

23 or something like had?

24 A.   Yes.

25 Q.   First full month October 2009?

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001522

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

29

1  A.  Yes.

2  Q.  Well after the launch of OPANA ER, correct?

3  A.  Yes.

4  Q.  Okay.  And I went ahead and added Embeda into this chart

5  here.  If you could just pull up 006-A.  And if you look at

6  versus a later launch Embeda?

7  A.  Yes.

8  Q.  OPANA ER has a slower launch in the month since

9  launched, correct, that's what the numbers show?

10  A.  That's not my understanding.  When I look at IMS data at

11  the office, our launch curves were very similar in shape and

12  trajectory but ours is ahead of theirs, so I'm not sure what

13  this is representing.  But it's not wholly inconsistent that

14  they have same trajectory as we are.

15  Q.  On this chart it shows, and someone will correct if we

16  have the numbers wrong from your PX-340-A.  On this chart, it

17  is correct that it shows six months, Embeda is doing better

18  than OPANA ER?

19  A.  On this chart that's what that shows.

20  Q.  Okay.  Now you had talked a little bit about the

21  competitive market shares of the different products?

22  A.  Yes.

23  Q.  And I want to put what you said about OPANA ER market

24  share in perspective?

25  A.  Yes.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

30

1    Q.   There's a document -- you mentioned, you may have

2    mentioned on your direct your sales tracker, Endo monthly

3    monitor, are you familiar with that document?

4    A.   Yes, I am.

5    Q.   And it's an interactive spread sheet.  We can pull up

6    different pieces of information?

7    A.   Yes.

8    Q.   One of the ones we pulled up out of that is the sales

9    chart.

10   A.   Yes.

11   Q.   We've marked this PX-34O-A.1.  This is through March

12   2010, prescription volume of different competitors that are

13   in the market that you mentioned, correct?

14   A.   Yes.

15   Q.   Okay.  And although hard to make it out here, OPANA ER

16   is one of the squiggles across the bottom of that graph,

17   correct?

18   A.   Yes, typically the red box.  Yes.

19   Q.   And you had mentioned in your direct, that one of the

20   things that you thought dose important, that dose OPANA ER

21   had overtaken one of the other squiggles along the bottom

22   which is Kadian, correct?

23   A.   I think I said our market share this past week dose

24   combined, the combined market shares of Embeda and Kadian

25   since they are analogous to one another.  And the newest

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

31

1  launched products Exalgo launched in April.

2  Q.   And that is because the promotion, one of the reasons is

3  because the promotion dollars for Kadian have gone way down

4  since 2009, correct?

5  A.   I believe that is the case.  I wouldn't say that's the

6  reason.

7  Q.   You spoke on direct about sales figures for OPANA ER?

8  A.   Yes.

9  Q.   Those are net sales or gross sales?

10  A.   Net sales.

11  Q.   Okay.  And if I wanted to calculate the gross dollar

12  sales for OPANA ER, what I would do essentially is multiply

13  the number of doses sold by the list price to get to a dollar

14  figure, correct?

15  A.   Yes, I think that's correct.

16  Q.   But as you noted in your direct, to look at actual

17  dollars that Endo made you've got to look at the net sales

18  and those are same percentage lower than gross sales,

19  correct?

20  A.   That's correct.

21  Q.   Okay.  Because sometimes Endo doesn't get full list

22  prices for OPANA ER, right?

23  A.   There are lots of things that take your products price

24  from gross to net and part and partial managing discounts.

25  Q.   It's less than full price, fair?

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                    IMPAX-OPANA00001525

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

32

1  A.   Yes.

2  Q.   Now in 2006, OPANA ER had net sales of about $7 million

3  dollars, correct?

4  A.   Sounds about right.

5  Q.   Right.  And in 2006, the percentage difference between

6  gross sales and net sales dose about 10 to 12 percent,

7  correct?

8  A.   That sounds correct.

9  Q.   So for whatever reason Endo netted 10 to 12 percent off

10 of full list price for OPANA ER in 2006, correct?

11 A.   Yes, because it was the launch year.

12 Q.   Correct or incorrect?

13 A.   That's correct.

14 Q.   That is the only question now.  Correct?

15 A.   Correct.

16 Q.   Okay.  And you said obviously OPANA sales have grown in

17 recent years, right?

18 A.   Yes.

19 Q.   And in 2009 though, the percentage difference between

20 gross sales for OPANA ER and net sales, that percentage

21 difference grew to 31 percent, correct?

22 A.   Yes.

23 Q.   Okay.  In addition, one of the discounts that you have

24 offered for OPANA ER dose something called an instant savings

25 card; is that correct?

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

33

1   A.   Yes.

2   Q.   And that's a card that gives patients a discount on

3   their co-pay for OPANA ER.  I think you called it a co-pay

4   relief card in the deposition, right?

5   A.   Yes.

6   Q.   Okay.  And you agree that the instant savings card, the

7   co-pay relief card has incrementally increased sales of OPANA

8   ER, right?

9   A.   Yes.

10  Q.   Okay.  And you've done an analysis of that benefit.  Let

11  me show you.  DTX-377 in your binder.

12  A.   Yes.

13  Q.   If you could go to -- I'm sorry -- that's you there on

14  the front, Mr. Bingol?

15  A.   That is me.

16  Q.   And this an Endo document?

17  A.   Yes.

18  Q.   Okay.  Go ahead and look at page 28 of the presentation,

19  although we will put it on the screen for you as well.

20  A.   Okay.

21  Q.   Do you see that?

22  A.   Yes.

23  Q.   Okay.  And there at the bottom left, it says the return

24  on investment for the OPANA ER instant savings card programs

25  ranges from 1600 percent to 9700 percent; is that what that

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

34

1   says?

2   A.   Yes.

3   Q.   Okay.  Those are not small.  Okay.  I don't want that

4   question answered.  That's fine.

5           Let me go to a different issue on matrix for sales

6   success?

7   A.   Okay.

8   Q.   It's your understanding, especially on the equivalent

9   dose basis, that OPANA ER is currently cheaper than

10  OxyContin, correct?

11  A.   Currently it is by a small margin.

12  Q.   But when Endo launched OPANA ER, it was priced the same

13  as OxyContin, correct?

14  A.   On a equa analgesic basis our 5 dose equal to their 10

15  and those were priced comparatively.

16  Q.   So on an equivalent dose basis, it was priced the same,

17  now it's a little cheaper?

18  A.   On -- I'm sorry -- on the list price, correct.

19  Q.   So there's a higher percentage discount off of the list

20  price, off of the gross sales numbers.  It's cheaper than

21  OxyContin and have the instant savings card.  So that could

22  explain some of the sales growth for OPANA ER?

23  A.   It could explain some of it.

24  Q.   Okay.  Now, I want to talk about promotion as well a

25  little.  You mentioned I believe in your direct that Endo

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

35

1  still currently has about 700 Endo employees selling OPANA

2  ER, right?

3  A.   That's correct.

4  Q.   And it's your understanding that Endo probably has the

5  largest sales force dedicated to selling long acting opioids

6  versus any other competitor?

7  A.   I think that's currently true.

8  Q.   And Endo, you would agree, has certainly been at least

9  competitive in getting its promotional message out as

10  measured by such things as the share of voice in the

11  marketplace, correct?

12  A.   Yes.

13  Q.   Okay.  And that means that if you have more promotion,

14  you agree, you get more sales activity in your business,

15  right?

16  A.   Sometimes.

17  Q.   Okay.  We'll go ahead, and I guess for your convenience

18  I've attached your deposition at the back of your binder

19  right there.

20  A.   Sure.

21  Q.   You were deposed?

22  A.   Yes.

23  Q.   It was under oath?

24  A.   Yes.

25  Q.   Do you recall it?

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

36

1  A.   Yes.

2  Q.   Go ahead and look at page 171 in your deposition.

3  A.   Okay.

4  Q.   I'm going to read this and I want you to tell me if I

5  read it correctly.

6          Question: Okay, is there a correlation between

7  sharer voice and sales in your opinion?

8          Mr. Rhoad objected to the form.

9          Answer: Yes.  It's promotion sensitive market.  By

10  definition if you have more promotion, you will tend to see

11  more activity on your business.

12         Is that what you said at your deposition?

13  A.   Yes.

14  Q.   Okay.  Because you agree that the opioid market is in

15  fact promotion sensitive, correct?

16  A.   Yes.  Also indicated you tend to see more which is not

17  an absolute.

18  Q.   Correct or incorrect?

19  A.   Yes.

20  Q.   You had mentioned in your direct testimony something

21  about true 12 hour dosing as a potential benefit for OPANA

22  ER?

23  A.   Yes.

24  Q.   And you may or may not have said that that had something

25  to do with TIMERx technology?

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

37

1  A.   I believe it does.

2  Q.   Okay.  Well let's start with the claim about this 12

3  hour dosing.

4       You agree with me that with respect to 12 hour

5  dosing for opioid competitors, OPANA ER is one of many 12

6  hour or more extended release opioids that offer 12 hour

7  dosing, correct?

8  A.   One of several.

9  Q.   Okay.  And I went ahead and pulled back up a list of

10 competitors.

11      Could you go about 340-A-1.  Just pull up the

12 bottom, the names at the bottom (indicating).

13      So I just -- I have to move over here.  So OPANA ER

14 12 hours, right?

15 A.   Yes.

16 Q.   OPANA ER is labeled for 12 hour dosing, correct?

17 A.   Yes.

18 Q.   Avinza is labeled by the FDA for 24 hour dosing,

19 correct?

20 A.   Yes.

21 Q.   And Kadian is approved by the FDA for 12 or 24 hour

22 dosing, correct?

23 A.   Yes.

24 Q.   And Oxycodone ER and OxyContin, which are four and six,

25 those are approved by FDA on the label for 12 hour dosing,

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

38

1   correct?

2   A.   Yes.

3   Q.   Analgesic is approved for 72 hour dosing, correct?

4   A.   Yes.

5   Q.   As is the Fentanyl patch a generic analgesic?

6   A.   Yes.

7   Q.   And MS Contin, morphine sulfate, 12 hours, correct?

8   A.   Yes.

9   Q.   Twice a day?

10  A.   Yes.

11  Q.   And Embeda 12 hours or 24 hours, correct?

12  A.   I thought 12 hours only.

13  Q.   At least 12?

14  A.   Yes.

15  Q.   Okay.  And you yourself, when you were with AAI

16  Pharmacy, you worked on Cloramore, which is another

17  long-acting opioid?

18  A.   Indeed.

19  Q.   That's labeled for twice a day dosing by the FDA, right?

20  A.   Yes.

21  Q.   So it's fair to assume also, as I think you may have

22  mentioned on direct, that none of these products used the

23  technology claimed in the patents at issue in this litigation

24  to achieve their 12 hours or more dosing, correct?

25  A.   I don't know if they did or not.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                                    IMPAX-OPANA00001532

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

39

1   Q.   Fair to assume?

2   A.   I don't know if they did or not.

3   Q.   They have their own delivery system that enables them to

4   deliver 12 hour dosing, correct?

5   A.   Well, clinically.  What you see in a clinical trial and

6   what they are labeled for and what gets used in clinical

7   practice, those drugs are -- actually dosage are really two

8   different things.  But that's what their label indication

9   is.

10  Q.   Right.  So let me go ahead and go back to your

11  deposition transcript at page 68.

12  A.   Okay.

13  Q.   Well, forget that.  That's okay. I don't want to keep

14  you here all day.

15       You agree with me that TIMERx technology is not

16  required to achieve 12 hour dosing for an opioid, correct?

17  A.   Per the FDA.

18  Q.   Yes.

19  A.   I guess I would have to say yes.

20  Q.   And you would agree Endo cannot market or claim that

21  OPANA ER is comparatively better than any other long-acting

22  modified release opioid with respect to its 12 hour dosing

23  equal, right?

24  A.   Cannot make a promotional claim.  We have studies in

25  other settings, Daycon data from IMS, etc., so differences in

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

40

1  amount of dosing.

2  Q.   I'm sorry, could you go back to deposition again.

3  A.   Sure.

4  Q.   At page 56.  Tell me if I've read it right.

5       Question: But you would agree with me that Endo

6  cannot market or promote any comparative claims with respect

7  to OPANA ER over whether it does or doesn't match its dosing

8  intervals better or worse than any other long-acting modified

9  release opioid, correct?

10      Objection to form.

11      Answer: That's correct.

12      Did I read that correctly?

13 A.   Yes.

14 Q.   Okay.  So you would also agree with me, that Endo has

15 not done any clinical trials to show a difference between

16 OPANA ER and any other long-acting opioid with respect to its

17 12 hour dosing intervals, correct?

18 A.   We have not done a clinical trial.

19 Q.   Okay.  And there's nothing in FDA approved label with

20 respect to whether OPANA ER maintains a 12-hour dosing

21 intervals differently than any other long-acting modified

22 release opioid, correct?

23 A.   That's correct.

24 Q.   Okay.  Now, you had talked a little bit about the

25 Penwest licenses to Endo?

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  A.   Yes.

2  Q.   And I went ahead and put up the PX-25, which is the

3  amended and restated 2002 agreement.  I went and put the list

4  of patents.  This is the agreement you were testifying to.

5         This slide has a set of all of the patents, U.S.

6  patents that are listed in Penwest license to Endo.  Up there

7  at the top, do you see that?

8  A.   Yes.

9  Q.   Any reason to think that's not correct?

10  A.   No.

11  Q.   Okay.  And I went ahead and found for you all of the

12  patents that have issued from continuations or -- from

13  continuations or applications that were listed in the Penwest

14  license to Endo.  And that is up on the bottom there; do you

15  see that?

16  A.   I see it.

17        THE COURT:  Wait. Is there an objection?

18        MR. BLACK:  Your Honor, there's an objection.

19  There's no foundation that this witness knows what

20  continuations are, let alone what these patents are.

21        THE COURT:  Let's get a little context.

22        MR. BERTA:  Okay.

23  Q.   Sure.  Look at the Exhibit 1.32 to your binder at

24  PX-25.  Exhibit 1.32 to PX-15.

25  A.   Yes.  Okay.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001535

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

42

1  Q.   Up on screen.  You see there is whole long list of U.S.

2  Patents?

3  A.   Yes.

4  Q.   Okay.  So if we go back to the slide.  Those are the

5  listed patents up in the first block.  Take my word for it,

6  or don't, but let me ask you this question with respect to

7  the continuation that are part of the Penwest intellectual

8  property portfolio.

9          But among even the top listed patents on this page,

10 you don't have any knowledge as to what particular patents

11 were implicated in the development of OPANA ER, correct?

12 A.   I don't.

13 Q.   Okay.  So as we sit here today, you cannot tie the

14 benefits of OPANA ER, if there are any, to any particular

15 patents in the Penwest patent portfolio, correct?

16 A.   I can't.

17 Q.   Do you know what the orange book is?

18          THE COURT:  I can't hear you.

19          MR. BERTA:  I'm sorry, the orange book.

20 A.   Yes.

21 Q.   And it's correct that Endo listed four different patents

22 in the orange book as pertaining to OPANA ER, right?

23 A.   There's two that I'm aware of that have been listed to

24 that.

25 Q.   Okay.  Which ones are you aware of?

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

43

1  A.   The one I think that expires 2013 September and sometime

2  after that they list the patent numbers, so I am not

3  intimately familiar with-- to what each one refers to.

4  Q.   I have a copy of it.  I'm happy to give it to you.  It

5  is your 10-K from March 1, 2010.  Have you seen this before?

6  A.   I have not seen this particular version.

7  Q.   Okay.  It's just very large.  I am happy to give it to

8  you.  I will not ask you to read this, certainly not all of

9  this.

10        MR. BERTA:  I don't think you need a copy, but

11  could certainly have one.

12        THE COURT:  Off the record.

13        (Discussion held off the record).

14        THE COURT: Back on the record.

15  Q.   Go and pull up page F-67.  F-63 is what it is.  There in

16  the paragraph that starts February 2008, do you see that?

17  A.   Yes.

18  Q.   Okay.  The third line down: The Actavis paragraph 4

19  certifications notice refers to Penwest's U.S. Patent numbers

20  5128143, the 143 patents.  The 933 patent, the 456 patent and

21  250 patent, which allegedly covered the formulation OPANA

22  ER.

23        Then you see the next says quote:

24        These patents are listed in FDA's Orange book and

25  expire or expired in 2008, 2013, 2013 and 2023 respectively.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

44

1          Do you see that sentence?

2  A.   Yes.

3  Q.   Any reason to doubt the truth of Endo's 10-K?

4  A.   No.

5  Q.   Okay. There's four patents listed in there, correct?

6  A.   According to this document, yes. When I look at the

7  Orange book I noticed two that maybe overlap 2013 and 2023.

8  Q.   I went ahead and pulled up the four patents.  The 143,

9  the 923, the 456, and the 250.  Amongst these four patents,

10 you cannot tell me which particular patents are explanatory

11 of the commercial success of OPANA ER, correct?

12 A.   I cannot.  I am not familiar with the patents in that

13 level of detail.

14 Q.   Let me ask you.  Do you know whether Endo has ever

15 stated the patent office that the commercial success of OPANA

16 ER can be attributed to any particular claimed invention?

17 A.   I don't know if they have or not.

18 Q.   Who is Nancy Wysenski?

19 A.   She's our former chief operating officer.

20 Q.   She's no longer at Endo?

21 A.   That's correct.

22 Q.   Where was she versus you in Endo hierarchy?

23 A.   She would have been my manager's, manager's, manager.

24 Maybe three levels.

25 Q.   Okay.  Distant.  Did you know Ms. Wysenski filed the

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

45

1  declaration with the patent office discussing the commercial

2  sales of OPANA ER?

3  A.   I don't recall that.

4  Q.   Go ahead and look at DTX-O755-B in your binder?

5  A.   Okay.

6  Q.   Do you see her name there?

7  A.   Yes.

8  Q.   And you can flip through if you want, absolutely in your

9  binder, but 13 pages of text and 11 exhibits about the sales

10 of OPANA ER?

11 A.   Okay.

12 Q.   Now, let's look at the Endo patent office submission

13 that attaches that declaration.  And that's in your binder at

14 tab DTX-0755-A.  Go to page 12 of DTX-0755-A.

15 A.   Okay.

16 Q.   And this is what Endo said to the patent office under

17 the heading commercial success.  I put it up on the screen

18 for you:

19         Furthermore, any perceived case of prima facie

20 obviousness is readily rebutted by the commercial success of

21 OPANA ER, a product line embodying the analgesically

22 effective controlled release pharmaceutical compositions of

23 oxymorphone claimed herein.

24         Do you see that?

25 A.   Yes.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

46

1   Q.   So Ms. Wysenski apparently declared to the patent office

2   that the commercial success of OPANA ER is tied to inventions

3   claimed in this patent application which is 680432.  At least

4   it appears so, right?

5   A.   It appears to be.

6   Q.   Do you know Ms. Wysenski filed four more declarations

7   for four other Endo patent applications before the U.S.

8   Patent Office?

9   A.   No, I'm not aware of those.

10  Q.   They are as well in your binder at DTX-752 to 756.  So

11  at least according to Endo before the patent office, the

12  commercial success of OPANA ER is attributable to the

13  inventions claimed in those five patents, correct?

14  A.   It appears to be.

15  Q.   Okay.  Not the patents at issue in this litigation,

16  correct?

17       Let me ask it differently.  You are not aware Ms.

18  Wysenski filed any declaration for 933 or 456 patents which

19  are at issue in this litigation, correct?

20  A.   I am not aware of any.

21  Q.   And especially in light of this, you would agree that

22  you cannot make any connection between OPANA ER and the

23  patents in suit in this litigation, correct?

24  A.   I guess not.

25  Q.   Okay.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

47

1          MR. BERTA:  I have no further questions.  I would

2   want to move some things into evidence, but I am not sure

3   whether I should do that now or later, your Honor.

4          THE COURT:  Why don't we do it now.  We'll

5   establish a pattern.  While thinking of it, let's do it now.

6          MR. BERTA:  I appreciate that, your Honor.

7          THE COURT:  Yes.

8          MR. BERTA:  I would like to move in DTX-46.

9          MR. BLACK:  We didn't have notice, your Honor, what

10  they were introducing.  Just a moment.  We have no

11  objection.

12         MR. BERTA:  I'd also like to move in DTX-46 A-which

13  is the thing that has Embeda on it.  The extra slide.

14         MR. BLACK:  The excerpt--

15         MR. BERTA:  From that document -- 340--

16         THE COURT:  Let's go off the record.

17         (Discussion held off the record).

18         MR. MCTIGUE:  Your Honor, for the record, I am not

19  going to ask additional questions of the witness.

20         THE COURT:  Thank you, Mr. McTigue.

21         MR. BLACK:  Redirect, your Honor.

22         THE COURT:  Yes.

23  ^ REDIRECT EXAMINATION

24  BY MR. BLACK:

25  Q.   Mr. Bingol, what were your sales of OPANA ER in 2005?

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

48

1  A.   Zero.

2  Q.   What are your sales going to be of OPANA ER in 2010?

3  A.   Net sales would be about 215 million.

4  Q.   Who's the big dog in this market of OPANA -- excuse

5  me--  of the tablet market?

6  A.   OxyContin.

7  Q.   What percentage of the market does OxyContin have?

8  A.   Of the tablet space, they own about 60 percent whether

9  it's branded or generic.

10  Q.   And who is number two?

11  A.   Would be Morphine in terms of its use, but number two in

12  terms of branded products is OPANA ER.

13  Q.   Are you -- strike that.  How long has OxyContin been on

14  the market?

15  A.   I think the first approval was 1995.

16  Q.   Do you consider OPANA ER to be a success?

17  A.   Absolutely.

18       MR. BLACK:  No further questions, your Honor.

19       THE COURT:  Any recross examination?

20       MR. BERTA:  I do not, your Honor.

21       THE COURT:  Okay.

22       MR. BLACK:  There are a number of exhibits I should

23  move in at this point.

24       THE COURT:  Let's take a moment and regroup, make

25  sure everybody is ready to read the exhibits on each side.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER          IMPAX-OPANA00001542

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

49

1  Let the plaintiffs introduce their exhibits and then the

2  defendant the exhibit that you want.

3          MR. SHULMAN:  Should we break, your Honor?

4          THE COURT:  Very good.

5          Pick up again at 5 to 12.

6          Thank you.

7          (RECESS TAKEN).

8          THE COURT:  Good morning.  Okay.  We finished our

9  break.  We have a new witness in the witness box, introduce

10 us.

11         MR. BERTA:  Your Honor, could I wrap up with that

12 we met and conferred with with respect to the exhibit, and I

13 would like to move them in at this time.

14         THE COURT:  Sure.

15         MR. BERTA:  Thank you, your Honor. Defendant Impax

16 would like to move in the following exhibits: DTX-46,

17 DTX-46-A, DTX-3, DTX-117, DTX- 377, DTX-752-A, 752-B, 753-A,

18 753-B, 754-A, 754-B, and 755-A, 755-B, 756-A, 756-B and

19 PX-340-A-1.

20         THE COURT:  Thank you.

21         MR. BERTA:  Thank you.

22         MR. BLACK:  Your Honor, plaintiffs also move into

23 evidence stipulation the following exhibits: PX-4A.  PX-72.

24 PX-340, PX-340A, PX-396.  And then we'll have two with new

25 numbers.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

50

1      The slide deck, which in the binder, for Mr. Bingol

2 will be now PX-2173 and 10-K used in cross examination will

3 be PX-2174; stickers put on that and provide it to the

4 Court.

5      THE COURT:  Okay, good.

6      MR. BLACK:  Plaintiffs' next witness is Dr. Anthony

7 Lowman.

8      ^ (SO MARKED).

9      THE COURT:  Dr. Lowman

10 ^ DR. ANTHONY LOWMAN, the witness herein, having been first

11 duly sworn by the Courtroom Deputy, was examined and

12 testified as follows:

13      MS. GUILLOTY:  Please state your name and spell it

14 for the record.

15      THE WITNESS:  My name is A.M. Lowman,

16 L-O-W-M-A-N.

17      THE COURT:  Your witness.

18      MR. RHOAD:  Thank you, your Honor.

19 ^ DIRECT EXAMINATION

20 BY MR. RHOAD:

21 Q.  Good morning, Dr. Lowman.  It is still technically

22 morning-- so how are you?

23 A.  Great.

24 Q.  Good.  Where are you currently employed?

25 A.  I am employed at Drexel University.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER      IMPAX-OPANA00001544

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

51

1  Q.   What positions do you hold there?

2  A.   I'm a professor of Chemical and Biomedical in the

3  College of Engineering.  I'm the Director of Biodrug Delivery

4  Laboratory and also the Associate Dean for Research and

5  Graduate Studies.

6  Q.   How long you been with Drexel?

7  A.   About 13 years.

8  Q.   What are your responsibilities as professor of chemical

9  engineering?

10  A.   My two main duties are teaching and research.

11  Q.   And can you describe to the Court the teaching

12  responsibilities that you have related to drug delivery

13  systems and control delivery release drug systems in

14  particular?

15  A.   Yes. I taught a number of engineering classes in the

16  field of drug delivery, including a course entitled Smart

17  Pharmaceuticals.  I taught that a couple of times.  It's a

18  new course that I developed for the College of Engineering.

19        And I also taught -- lectured on drug delivery

20  systems in our biomaterials sequence at Drexel University.

21  Q.   What are your research interests?

22  A.   My research interests involve the use of polymer

23  systems, generic polymer systems and drug delivery

24  applications, tissue engineering and joint repair.

25  Q.   You mentioned the Biomedical and Drug Delivery

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

52

1   Laboratory; what is that?

2   A.   That's the laboratory where I conduct my research.

3   Q.   And what are your responsibilities as the director of

4   that laboratory?

5   A.   My responsibilities are to supervise the graduate,

6   undergraduate students working in the laboratory.  I'm

7   responsible for preparing and submitting journal publications

8   as well as submitting grant applications for funding the

9   laboratory.

10  Q.   Can you give the Court an example of one of the products

11  of the research that's performed in your laboratory?

12  A.   Sure.  One of longest going projects in our laboratory

13  right now is a project that's been funded by the National

14  Institute of Health for about a dozens years.  It involves

15  the design of hydrogen bonded hydrogel systems for oral drug

16  delivery.

17  Q.   And can you describe for the Court your educational

18  background, please.

19  A.   Yes.  I received my Bachelors of Science at University

20  of Virginia in Chemical Engineering.  And I received my Ph.D.

21  in Chemical Engineering from Perdue University.

22  Q.   What was the subject of your Ph.D. research?

23  A.   My Ph.D. research is on the use of hydrogen bonding,

24  hydrogen oral protein delivery.

25  Q.   And what other background and experience, if any, do you

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

53

1   have relating to pharmaceutical formulations and drug

2   development?

3   A.    During my time as a graduate student, Ph.D. student, I

4   spent time as a visiting researcher at the laboratory

5   pharmacy, one at Hoshi University in Tokyo, Japan and the

6   University of Parma, Department of Pharmacy.  And later,

7   after I became a professor I spent time in the laboratory as

8   a visiting professor.

9   Q.    Are you a member of professional organizations relating

10  to drug delivery systems or pharmaceutical products?

11  A.    Yes. I am member of the Control Release Society, and I'm

12  also a member of Society of Bio Materials.  In that society I

13  was in charge or the chair of the Drug Delivery Interest

14  Group for three years, I believe.

15  Q.    And we have up there a binder that has some of the

16  exhibits that we may be talking with you this morning about.

17          Can you look in there.  Is PX-30 a copy of

18  curriculum vite?

19  A.    Yes, it is.

20  Q.    And does your CV describe in more detail your background

21  and experience in the field of drug delivery systems and gel

22  matrix based delivery systems?

23  A.    Yes, it does.

24  Q.    And have you published papers in the areas of controlled

25  drug delivery systems and gel matrix based delivery systems

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

54

1  in particular?

2  A.   Yes.

3  Q.   And does your CV provide a more comprehensive listing of

4  your publications in those areas?

5  A.   Yes.

6        MR. RHOAD:  Your Honor, plaintiffs offer Dr. Lowman

7  as an expert in pharmaceutical formulation in development,

8  particularly controlled release, drug release systems and gel

9  matrix based systems.

10        THE COURT:  And I believe there's no objection.  Am

11  I correct about that, Mr. Shulman?

12        MR. SHULMAN:  Yes, your Honor.

13        THE COURT:  Any voir dire requested?

14        MR. MCTIGUE:  No, your Honor.

15        MR. SHULMAN:  No, your Honor.

16        THE COURT:  Thank you.

17  Q.   Dr. Lowman, in connection with your work in this case,

18  did you study the patents in suit?

19  A.   Yes.

20  Q.   And have you also reviewed abbreviated and drug

21  applications filed by Impax and Sandoz in this case?

22  A.   Yes.

23  Q.   As a result of your work, have you formed any opinion as

24  to whether the drug products described infringe any claims in

25  the patents-in-suit?

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001548

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

55

1  A.  Yes, I have.

2  Q.  With respect to Impax, what are your opinions?

3  A.  Well that they infringe.

4  Q.  And with respect to Sandoz, what is your opinion?

5  A.  That they infringe one of the patents.

6  Q.  Did you prepare a report that set forth more

7  specifically the opinion you have with respect to

8  infringement by the Impact and Sandoz ANDA tablets?

9  A.  Yes, I have.

10 Q.  Is PX-1022 a copy of your initial infringement report

11 relating to infringement Impax ANDA tablets?

12 A.  Yes, it is.

13 Q.  And is PX-23 a copy of your supplement infringement

14 report relating to the Impax ANDA tablets?

15 A.  Yes.

16 Q.  And is PX-2016 a copy of your infringement report

17 relating to the Sandoz ANDA tablets?

18 A.  Yes.

19 Q.  And do those reports accurately set forth your opinions

20 and the basis for those opinions with respect to infringement

21 of the patents-in-suit by Impax and Sandoz?

22 A.  Yes, they do.

23 Q.  And are the statements in these reports truthful and

24 accurate to the best of your knowledge and belief?

25 A.  Yes.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

56

1    Q.    And have you prepared some slides to help you explain to

2    the Court what your opinions are and the basis for those

3    opinions?

4    A.    Yes, I have.

5    Q.    Okay.  Can we go to the next, probably two slides

6    there.  Let's start with a bit of background of the patents

7    and technology?

8    A.    Yes.

9    Q.    Can you briefly summarize for the Court the technology

10   to which the-- the patents in suit are directed?

11   A.    Yes.  The patents-in-suit involved solid oral controlled

12   release dosage forms, specifically designed to release their

13   active ingredient into the stomach and the small-- excuse me

14   -- the intestines over time.  They are quite different from

15   immediate release formulations which release drugs completely

16   at once.

17   Q.    Could you explain to the Court some differences between

18   immediate release and extended release formulations?

19   A.    Yes. I have a slide for that.  Pull that up.  So I

20   prepared this slide actually from some of my classroom

21   teachings.  This slide represents the behavior of the two

22   types of systems we are talking about, immediate release and

23   extended release.

24            So the first is the left-hand side, which would

25   represent the in vitro dissolution curve that would typically

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001550

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

57

1  be extend release system.

2  Q.  When does an in vitro dissolution occur?

3  A.  Out of the body -- not in vivo.  It's in a beaker is

4  what it means.

5  Q.  And measures?

6  A.  Measured outside of the body and measured in a simulated

7  lab setting in different types of media, could be water,

8  buffered solutions or simulated gastric intestinal solution.

9        This represents outside of the body how much of the

10  drug product is released from the dosage form as a function

11  of time.  And the red curve, instant release curve, we see

12  this is where the drugs immediately released from tablet

13  formulation.  And the blue represents the extended release

14  curve where the drug is released in a controlled or more

15  slower sustained fashion from the tablet.

16        What that translates into, is that this translates

17  to this type of behavior when administered into a patient and

18  you see that the immediate release, because releases the drug

19  so fast, provides quick speak in the drug or plasma

20  concentration and then tips off rather quickly.

21        Where the extended release is designed to allow for

22  dosing that gets the blood plasma concentration up and it

23  maintains it at a much higher level for a significant period

24  of time.

25  Q.  So the blood plasma concentration, that's the amounts of

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001551

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

58

1    drug that actually gets into the patient's bloodstream?

2    A.    Correct.

3    Q.    And what are the advantages of controlled release dosage

4    forms?

5    A.    So, the advantage is that -- the big advantage is that

6    it can be a more effective treatment system because it

7    maintains the desired blood levels over the longer periods of

8    time over an immediate release system.  Because it does that,

9    it reduces the dosage frequency or how many times a patient

10   has to take a given medicine and that leads to better patient

11   compliance.

12          So these patents now we are talking to that

13   advantage and directed specifically to a matrix based

14   delivery system that would provide for a medicine that would

15   be taken once or twice a daily.

16   Q.    And can you summarize for the Court how these gel matrix

17   based delivery systems work?

18   A.    Yes. I put up another picture here of some sample

19   tablets that, which we tested and I'll be describing later.

20          This shows a gel matrix based delivery system that

21   we tested, represents one of Impax 40 milligram formulation.

22   And the first picture right here is a slice away of the

23   tablet, the cross section slice of tablet where all the

24   excipients are compressed and white so that you could see

25   it's dry.  So that it's dry state surrounded by the yellow

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                    IMPAX-OPANA00001552

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

59

1   coating.

2          THE COURT:  Now, I'm going to interrupt to ask what

3   is obvious to you and kind of getting to be obvious to me.

4   Just so the record is nice, just tell us what a matrix is,

5   tell us what the excipient is and tell us what medicament is,

6   and all other standard language.

7          THE WITNESS:  Yes.

8          THE COURT:  If you wouldn't mind.

9          THE WITNESS:  Yes.  So a matrix is the part of a

10  tablet, which is the controlling release behavior.  I

11  actually depicted it on the chemical structure, the matrix.

12         The matrix in these gel based systems are polymer

13  chains.  So they are long chains of repeated polymer units

14  that are linked together through either permanent chemical

15  cross-links, or in many cases, physical interactions between

16  the polymer chains.  So they could be tied together and glued

17  together and hydrogen bonded, other types of interactions

18  between polymer change.

19         What happens in matrix based, these components that

20  makes up the matrix system would be considered excipients, so

21  they are the nonactive ingredients.  The nonactive

22  ingredients.  Excipients.  The word medicament refers to the

23  drug or the--

24         THE COURT:  Off the record.

25         (Discussion held off the record).

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                     IMPAX-OPANA00001553

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

60

1          THE COURT:  Back on the record.

2          THE WITNESS:  Thank you.

3

4   CONTINUED EXAMINATION

5   BY MR. RHOAD.

6   Q.   Dr. Lowman, could you then explain how this gel matrix

7   system works over the time to deliver the drug?

8   A.   Okay. So I think now we've got the basic terminology

9   down.  So we see the tablet here in its dry state so it has

10  not been exposed to the fluid.  So there's no gel matrix

11  formed.

12          We will show a time course of it being exposed to

13  food at different times.

14          The first picture the tablet has been exposed to

15  the environmental fluid for a half hour.  Now we could see

16  the outer core of the gel laying forming.  The yellow is

17  simply coating as well the excipient.  As the time increases,

18  the thickness of that gel layer also increases because the

19  gel layer flows from the inside out and gets to point even at

20  four hours we have a significant gel layer that we still see

21  the presence after dry core.  So it takes quite sometime for

22  tablets to completely hydrate all the way through the

23  system.

24          Now, this picture I think is important to then kind

25  of understand what is going on with the gel matrix and why

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

61

1   these things happen and why it provides for controlled drug

2   delivery.

3           The defining factors on the gel matrix would be its

4   pore structure.  Looking at this kind of square shape right

5   here, that represents the polymer chains that makes up the

6   pore.  So when it's hydrated at one degree, the pores have a

7   certain size.  But as we go from let's say half hour to four

8   hours, more water is taken up into the matrix system, the

9   pores get larger.  So released behavior changes as these

10  pores continue to grow.

11  Q.   What is the mechanism by which the drug is release out

12  of-- of the gel matrix based tablets?

13  A.   In these tablets, the drug, as water hits them, the

14  drugs will solubilize and then defused through the polymer

15  matrix and be released from the system.

16          But also as the outer layer becomes sufficiently

17  hydrated-- the higher later also could erode off allowing for

18  additional release of the drug.

19  Q.   Okay.  With that background, let's turn first to the

20  Impax tablets and your opinions about infringement with

21  respect to those tablets?

22  A.   Yes.

23  Q.   First of all, what Impax ANDA tablets?

24  A.   So the Impax ANDA tablets are gel matrix based sustained

25  release tablets for delivery oxymorphone.  And up here I put

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

62

1   together the listing of the components in each of the

2   different dosage ANDA tablets.

3   Q.   What relationship, if any, between the Impax ANDA

4   tablets and the plaintiff's OPANA ER that Mr. Bingol was

5   testifying about this morning?

6   A.   The Impax ANDA tablets--

7        MR. SHULMAN:  I'm sorry, can I hear the question

8   back.

9   Q.   What relationship, if any, is there between the Impax

10  ANDA tablets and the OPANA ER product?

11  A.   So the Impax ANDA tablets have been designed to function

12  in the same way as the OPANA ER tablets and it's been

13  submitted to the FDA and there is a filing that they are the

14  bioequivalent to the OPANA tablets.

15  Q.   And what is bioequivalent mean in that context?

16  A.   In this sense, very simple is that they function the

17  same way.  The drug taken up in the body the same way and the

18  response is the same.

19  Q.   And in your opinion which claims are the 456 patent, if

20  any, do the Impax ANDA tablets infringe?

21  A.   For the 456 tablets, they infringe Claims 1 through 3

22  and 5 and 7.

23  Q.   And in your opinion which claims, if any, of the 933

24  patent do the Impax ANDA tablets infringe?

25  A.   They infringe Claims 1 through 3, 5, 7, 8, 10 and 41

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

63

1   through 43.

2   Q.   Okay.  And let's turn to discuss those opinions in a

3   little bit more detail.  Let's turn to 456 Claim 1 first.

4   What's your basis for the opinion that Impax ANDA tablets

5   infringe that claim?

6   A.   So, I would look at this slide I built right here and

7   the left-hand column is the claim broken down and in the

8   right-hand column kind of put together the ideas on how the

9   Impax tablets, each of these parts of the claim.

10  Q.   Okay.  What's the significance of the yellow

11  highlighting on this first slide?

12  A.   Well, the yellow highlighted sections are parts of the

13  claims that I were told were not in dispute.

14  Q.   And before we move on to the disputed claims, I wanted

15  to touch base gelling agents since that may come up later on

16  in your testimony.

17          What's the basis for your opinion, that, as listed

18  there, Xanthan Gum and HPMC are gelling agents as they are

19  used in the Impax ANDA tablets?

20  A.   Could I get the next slide.  So in the field one:

21  Xanthan Gum and HPMC well known as being suitable to use as

22  gelling agents in appropriate compositions and formulations

23  and weights.

24          That's known in the state of the art as well by

25  reading Impax.  And I note that they say their product is

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

64

1  designed to use hydrogel matrix system for delivery.  And

2  they refer to these cases are the rate controlling polymers.

3          And as these systems function, as matrix systems

4  function, the rates controlling polymer form the hydrogel

5  matrix, and therefore they must be the matrix that controls

6  the release.

7  Q.  All right.  Let's turn to the next claim limitation.  So

8  if we could go to the next chart.

9          You have highlighted here the limitation of a

10 pharmaceutical acceptable hydrophobic material.  You

11 indicated that in your opinion the Avicel (PH) 101 MCC in the

12 Impax ANDA tablets is a hydrophobic material as used tablets;

13 is that right?

14 A.  Yes.

15 Q.  What's basis for your opinion that Avicel is a

16 hydrophobic material as it's used in-- in Impax ANDA tablets?

17 A.  So are used -- what is told, the claim's core

18 construction of term hydrophobic material in this case means

19 a material that is effective to slow the hydration of the

20 gelling agent without disrupting hydrophobic matrix.

21 Q.  And we note the Court's construction uses the term

22 hydration?

23 A.  Hydration would mean, in this case, uptake of water into

24 the system.

25 Q.  And it's talking about something that slows the

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

65

1  hydration.  What is hydration rate then?

2  A.   They hydration rate would be the amount of water taken

3  up per time.

4  Q.   And what did you do to determine whether any component

5  of Impax ANDA tablets was a hydrophobic material in

6  accordance with the claim inventions?

7  A.   I looked at each of the components that was listed in

8  the NDA and I performed a literature search on these

9  components to see what could be slowing hydration of the

10 gelling agent and I found two papers that pointed me towards

11 the role of MCC as showing the performing of this function.

12        The first paper by Theragel (ph) which was put in

13 tablets and investigated the effects of various excipients in

14 tablets and how they affected the rate of hydration in gels

15 and tablets erosion on certain gel matrixes.

16        And the main conclusion of that was that out of

17 excipients use, the presence of MCC significantly slowed

18 water-uptake of those tablets.

19        And also a paper I found by Lee Toll (ph) studies

20 with MCC in HPMC matrixes.  And they concluded that MCC

21 slowed the swelling hydration in their formulation.

22        So that led me to look further into the role of MCC

23 in the Impax ANDA tablets.

24 Q.   And the MCC Impax ANDA tablets would be Avicel; is that

25 right?

IMPAX-OPANA00001559

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

66

1    A.    Yes.

2    Q.    And can you summarize for the Court what Avicel is?

3    A.    Avicel pH101, which is used in tablets, just a trade

4    name for their specific rate of MCC which is microcrystalline

5    cellulose.  A microcrystalline cellulose is semi crystalline

6    that's derivative from cellulose.  That's used in

7    pharmaceutical formulations.  Because it's partially semi

8    crystalline, it's water insoluble and it can absorb water but

9    it tends to agglomerate.

10         The thing about MCCs and any other excipient is

11   that's well known that could serve many functions.

12   Q.    And what are some of the different functions that MCC is

13   known to be able to perform?

14   A.    It's been known to serve as a diluent filler, binder, it

15   has many roles in tablets.

16   Q.    And can MCC perform different functions in different

17   pharmaceutical formulations?

18   A.    Yes.

19   Q.    Okay.  What influences, which of those functions it will

20   perform in particular formulations?

21   A.    So the way they are going to function in a given

22   formulation is going to depend upon a number of factors.  It

23   will depend on other excipients in tablets.  It's going to

24   depend on the compositions of the MCC in the tablet.  It's

25   going to depend on how the tablets are made.  Really the

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001560

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

67

1   whole compositions and makes up of the tablet will determine

2   how it functions.

3   Q.   And during the course of the investigating the role of

4   the Avicel in Impax ANDA tablets, did you come across any

5   literature discussing the facts that MCC can be used in

6   tablets as a diluent?

7   A.   Yes.

8   Q.   And do the patents-in-suit include MCC and what's the

9   substances that may be suitable for use as a diluent?

10  A.   Yes.

11  Q.   And did those facts cause to you stop investigating

12  whether MCC may be a hydrophobic material as it's used in

13  Impax ANDA tablets?

14  A.   No.

15  Q.   Why not?

16  A.   Because, well one, it's known that such excipients could

17  be multi functional.  And also the definition here of

18  hydrophobic material defines something very specific, and

19  that is something that slows hydration.  And evidence that I

20  had found was pointing me to the fact that MCC could slow

21  hydration in tablets.

22  Q.   With that background, what did you do to determine

23  whether or not Avicel, as it's used in Impax ANDA tablets, is

24  a hydrophobic material in accordance with the Court's

25  construction of that term?

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                    IMPAX-OPANA00001561

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

68

1  A.   So I asked to have hydration and dissolution tests

2  performed on tablets.

3  Q.   There's another name for hydration test, water-uptake

4  test?

5  A.   Yes.

6  Q.   Could you describe for the Court what a water-uptake

7  test is?

8  A.   A water-uptake test is a very simple test.  It's done in

9  vitro, in a beaker again. Aqueous media.  It's quite simple.

10        The tablets are dropped into asserted media, and at

11  a given time a tablet is removed, weighed so we could

12  determine the weight at any given time, then dried to remove

13  all of the water and that allows us to determine how much

14  water is taken up into the tablets at any given time.

15  Q.   You weigh -- when it's wet and you dry it, the

16  difference is going to be the amount of water that was taken

17  up by the tablet?

18  A.   Correct.

19  Q.   And why was that an appropriate test to perform in

20  connection with investigating whether the Avicel was a

21  hydrophobic material?

22  A.   Because the definition of hydrophobic materials was that

23  it slows the hydration of the tablet.  So to me this is a

24  direct measurement of how water taken up in the tablet what's

25  really the hydration rate of a tablet is.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                    IMPAX-OPANA00001562

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

69

1  Q.  And have you done that type of testing before in your

2  lab?

3  A.  Yes.  We have done hydration testing.

4  Q.  How often and in what context?

5  A.  We do it quite regularly when we're looking at new gel

6  matrix systems.  So any time we look at a new gel that we are

7  trying to study, we want to learn about its behavior aqueous

8  media.  We make our tablets and we swell them in different

9  buffers and determine how they take up water.

10  Q.  In any of your publications have you ever reported on

11  the results of water-uptake testing that you've done?

12  A.  Yes.

13  Q.  Could you give us an example?

14  A.  I could give you an example of my very first journal

15  publication.  The first data figure was water-uptake test.

16  Q.  When was that publication published?

17  A.  That publication was submitted 1996 and actually

18  published in 1997.

19  Q.  Are you aware of others who have done water-uptake tests

20  on pharmaceutical drug products?

21  A.  Yes.

22  Q.  In what context?

23  A.  It's quite a common test to determine the swelling of a

24  gel base system.

25  Q.  And what was the composition -- strike that.  Did you do

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

70

1    the water-uptake testing yourself in your own lab?

2    A.   No, I didn't.

3    Q.   Are you authorized by the DEA to handle schedule 2

4    opioid products?

5    A.   No, I'm not.

6    Q.   Who did you have conduct the testing for you?

7    A.   Emerson Lab was contracted to do the testing.

8    Q.   What compositions, what was the compositions of the

9    tablets that you had Emerson labs perform this testing on?

10   A.   I think I have that next slide.  So, Emerson lab with 40

11   milligram tablets prepared four different compositions for

12   us.  So it has an active ingredient, the oxymorphone in

13   appropriate amounts.

14        We kept the amount of gelling agents in each of the

15   tablets the same as the Impax ANDA tablets.  The same amounts

16   of magnesium, the same amounts of it.

17        What we changed in the tablets was the ratio of

18   microcrystalline cellulose to lactose.  In each case, we kept

19   the total amount of lactose in microcrystalline cellulose so

20   it's constant. So what that did it allowed us to generate

21   four sets of tablets that had the same weight, hardness and

22   size.

23   Q.   And do any of these four formulations correspond to the

24   formulation that Impax uses to make its ANDA tablets?

25   A.   Yes.  That would be this column right here, the 40-A.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

71

1  Q.   And in column 40-D is a tablet had none of Avicel in it;

2  is that correct?

3  A.   That's correct.  So as we go from B to C to D we

4  decrease the amount of MCC and we relax it with lactose.

5  Q.   And what were the results of the water-uptake testing

6  that you had Emerson perform?

7  A.   So this actually plots now of the water-uptake for the

8  tablets.  The purple curve represents the Impax ANDA

9  tablets.  And see it has the lowest amounts of water taken,

10 so therefore the lowest rates.

11        And as we decrease the amounts of MCC, the tablets

12 that had no MCC, controlled tablets took up the most water.

13 And calculated the rates -- hydration rates -- to get to the

14 next slide -- and I calculated the two end points and the

15 hydration rate through the first half hour, the initial slop,

16 as well as through the end of testing.

17        I found the hydration rates, both initially and

18 overall, were greater in tablets that had no MCC.

19 Q.   So in the two tablets that you're referencing there, the

20 Impax ANDA tablets that have the hydrophobic material and the

21 no MCC controlled tablets that do not have the hydrophobic

22 material; is that right?

23 A.   Right.  I have the data to support that hydration rate

24 of Impax tablets was slower than the hydration rates of

25 tablets with no MCC, thereby MCC had the effects of

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001565

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

72

1   hydration.

2   Q.   And was a result of that testing set forth in a report

3   that Emerson Labs prepared?

4   A.   Yes.

5   Q.   And it is Exhibit PX-1010 a copy of that report?

6   A.   Yes.

7   Q.   What conclusions do you draw from the water-uptake

8   testing results?

9   A.   So my conclusion is that MCC is serving as a hydrophobic

10  material or serving as a hydrophobic material in the sense

11  that it's slowing hydration.

12  Q.   Did you test any other dosage strengths besides the 40

13  milligram strength?

14  A.   Yes, I did.  We tested also the 5 milligram strength.

15  Q.   Why did you test the 5 milligram strength and the 40

16  milligram strength?

17  A.   Because we had a window of seven dosage strengths that

18  had proportional amounts of the Avicel MCC throughout the

19  systems.

20       So we felt if we did testing on the lowest dosage

21  strength and highest dosage strength, and given the

22  proponents were proportional, if I saw the same results at 5

23  and 40, I know that in the middle we would see also the same

24  results.

25  Q.   And in your opinion is Avicel slowing hydration of the

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

73

1   gelling agent as it's used in all dosage strengths of the

2   Impax ANDA tablets?

3   A.   Yes, that's my opinion.

4   Q.   Let's turn to the second part of the Court's claim

5   construction which was slow hydration gelling agents and does

6   so without disrupting the hydrophilic matrix.

7            First of all, what is the hydrophilic matrix that

8   the definition is referring to?

9   A.   The hydrophobic matrix is that gel matrix -- you said

10  hydrophilic matrix?

11  Q.   The Court's language is that it slows hydration without

12  disrupting the hydrophilic matrix.  And what is the

13  hydrophilic matrix?

14  A.   The hydrophilic matrix is what I described earlier, the

15  swellable gel matrix that forms between Xanthan Gum and HPMC.

16  Q.   And what does it mean to slow hydration without

17  disrupting that hydrophilic matrix?

18  A.   It would mean that slows down the amount of water that's

19  taken up by the gel matrix but does not prevent the stable

20  gel matrix from performing.

21  Q.   Do you have an opinion as to Avicel, as it's used in

22  Impax ANDA tablets, is slowing hydration without disrupting

23  hydrophilic matrix formed by the gelling agent?

24  A.   Yes, I do.

25  Q.   And what is your opinion?

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

74

1   A.   My opinion is that it's slowing hydration, as we saw

2   earlier, but also that's it's not disrupting the gel matrix.

3   Q.   And what's the basis for that opinion?

4   A.   So I know that the Impax ANDA tablets provide the

5   sustained release of oxymorphone, that they are reported to

6   provide to get the benefits.

7          That means that there's a gelling agent present to

8   control the release of oxymorphone.

9          That type of controlled release behavior would not

10  occur without the presence of a gel matrix.

11          Also, I could rely also on the photographs I have.

12  If I look again and bring the pictures back up of the Impax

13  40 milligram tablet, I could see I go from a dry tablet and

14  over time formation of a gel layer around the dry core.  And

15  that's confirmation for me of the formulation of a gel matrix

16  as it moves inwards towards the core throughout the test.

17  Q.   In light of what you told us, in your opinion is Avicel,

18  as used in Impax ANDA tablets, a hydrophobic material in

19  accordance with Claim 1 of 456 patent?

20  A.   Yes.

21  Q.   And that is true for all dosage strengths?

22  A.   Yes.

23  Q.   All right.  In the patents-in-suit, did the inventors

24  describe the use of the water-uptake tests as a way to

25  measure hydration?

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

75

1  A.   No, they did not.

2  Q.   Is there any testing that described in the

3  patents-in-suit that measured hydration?

4  A.   No.

5  Q.   Is there any testing at all that's described in the

6  patents-in-suit?

7  A.   There's dissolution testing performed in the patents.

8  Q.   And how is that dissolution testing different from the

9  water-uptake testing that you've told us about so far?

10  A.   The dissolution tests are completely different tests and

11  they give you a completely different result.

12       The goal of dissolution test is to determine how

13  quickly the drug is released from the tablet.

14  Q.   And what is the point of doing the water-uptake test?

15  A.   To determine the rate that water enters the tablet.

16  Q.   And why did you decide to conduct water-uptake testing

17  to determine the Avicel and the Impax ANDA tablets was

18  slowing hydration?

19  A.   Because water-uptake test is a direct measurement of the

20  rate of hydration.

21  Q.   Okay.  In addition to the water-uptake testing you did,

22  you also direct Emerson dissolution test to on the Impax ANDA

23  tablet?

24  A.   Yes, I did.

25  Q.   And if you're already doing the water-uptake testing,

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                                        IMPAX-OPANA00001569

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  why did you also have them do the dissolution testing?

2  A.   Because the water-uptake testing and dissolution testing

3  together can give me a complete picture of everything that is

4  happening in the tablet.

5  Q.   And what were the results of the dissolution testing

6  that you did on the Impax ANDA tablets?

7  A.   The dissolution behavior for all of the samples were

8  quite similar.

9  Q.   Did those results cause you to change your opinion based

10  on the water-uptake tests that the Avicel was showing

11  hydration?

12  A.   No.

13  Q.   Why not?

14  A.   Because dissolution tests are not direct indicators of

15  the water-uptake.

16  Q.   What is the direct measure of water-uptake?

17  A.   The hydration or swelling or water-uptake testing, that

18  directly measures the water that goes into the system.

19  Q.   Are the results of the water-uptake testing and

20  dissolution testing that Emerson did inconsistent with one

21  another?

22  A.   No, they are not.

23  Q.   Why not?

24  A.   Because the rate of water-uptake won't necessarily be

25  the only thing controls the drug releases.  So in both of

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

77

1    these cases it's likely that the two gel matrix in each

2    system have substantial water that the drug could defuse out

3    of the system.  While hydrating at different rates, it

4    doesn't necessarily mean that the dissolution -- is going to

5    come out with different dissolution rates.

6              Then that's with the pore size and pore structures

7    in pictures that I drew a little bit earlier.

8    Q.   And have you seen similar results during the course of

9    your research in this field where testing showed that there

10   was a difference in the rate of hydration yet there was a

11   similar dissolution curve?

12   A.   Yes, I have seen that.  I have seen that in a couple of

13   my own papers where we have highly swellable polymer systems

14   that swell in different rates, but the rate of drug release

15   is similar in each of their cases.

16   Q.   And let's revisit for a moment the design of the

17   controlled tablets that you used for the water-uptake test.

18             I think you testified earlier that you substituted

19   lactose for the Avicel in those tablets; is that right?

20   A.   Yes.

21   Q.   Okay.  And you have been criticized by Impax's expert as

22   that being an inappropriate design for the control tablets.

23   In your opinion, was it appropriate to use lactose in a

24   control tablet to replace the Avicel in Impax ANDA tablets?

25   A.   Yes.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                                   IMPAX-OPANA00001571

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

78

1  Q.   And why was that appropriate?

2  A.   Because that was one of excipients that was present in

3  the tablet, and I did not want to introduce another variable

4  into the study design.

5  Q.   Did you look to the teachings in the patents-in-suit in

6  coming up with a design of those controlled tablets?

7  A.   Yes, I did.  I believe I have a slide for this.  Yes.

8        So by not wanting to change the variables, I looked

9  at what the patent would show us what to do.  And this is the

10 case of an example at table 4 that shows the hydrophobic

11 material cap and dextrose is the excipient described in this

12 one.

13       So we go from example 3 to 4 in this table.  When

14 they increased the amount of hydrophobic material they

15 decreased the amounts of dextrose by the exact same amount.

16       So by trying and following this, that allowed us to

17 go about how to design our tablets.

18 Q.   What is dextrose?

19 A.   Dextrose is a water soluble sugar.

20 Q.   And what is lactose?

21 A.   Also a water soluble sugar.

22 Q.   And why did you choose to replace Avicel Impax ANDA

23 tablets with lactose rather than dextrose as is shown in

24 table 4?

25 A.   Because the patents talks about replacing hydrophobic

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER          IMPAX-OPANA00001572

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

79

1    material with water soluble sugar.  And in this case lactose
2    was water soluble sugar.  And by replacing the lactose with
3    MCC, it allowed me -- or by switching out the lactose and
4    MCC, it followed the patents but it also kept me from having
5    to introduce another variable.  If I introduce dextrose, I
6    would introduce another variable.
7    Q.   By that another variable, you mean the tablets already
8    have lactose in them?
9    A.   Yes.
10   Q.   And you simply put in more lactose?
11   A.   That's correct.
12   Q.   Are you aware of any scientific literature that call
13   into question your use of lactose in the control tablets?
14   A.   No.
15   Q.   Did you review the literature cited in Impax's expert
16   reports on this issue?
17   A.   Yes.
18   Q.   And did any of those literature cited there cause you to
19   have any doubts about the appropriateness of your test
20   design?
21   A.   No.
22   Q.   Another issue raised by Impax in this case is that the
23   water-uptake data you've need to be normalized to account for
24   the water holding capacity of the tablets.  Do you agree with
25   the fact that the data would need to be normalized in that

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

80

1   way?

2   A.   No.

3   Q.   Why not?

4   A.   Because simply by definition of rate, a rate is defined

5   as an amount per time.  And talking about hydration, we are

6   talking about amounts of water per time.

7           If we normalized the amount of water at given time

8   to the water holding capacity, we are no longer talking about

9   a rate.

10  Q.   And water-uptake testing you've done during the course

11  of your own research, have you ever normalized the data based

12  upon overall water holding capacity of the tablets?

13  A.   No.

14  Q.   In any of the papers you've published which mentioned

15  water-uptake testing, have you normalized the data based on

16  the overall capacity of the tablets?

17  A.   No.

18  Q.   Let's go to the next slide and turn back to the

19  infringement claim chart and talk about the last limitation

20  at issue on the Claim One of 456 patents, which requires that

21  the dosage form provides a sustained release of medicament

22  when exposed to an environmental fluid.

23           What construction of the term sustained release did

24  you use in reaching your opinions with respect to claim

25  limitation?

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                                                            IMPAX-OPANA00001574

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

81

1  A.   I used the Court's claim construction again, which is on

2  the next slide.

3          So the construction that it's released at a rate

4  such that they were beneficial blood levels medicament are

5  maintained over a period of 12 hours.

6  Q.   What's the basis for your opinion that the Impax ANDA

7  tablets provide the required sustained release of

8  oxymorphone?

9  A.   So in Impax ANDA they represent the FDA as tablets

10  bioequivalent to the polymer tablets.  And the FDA

11  submissions and clinic data showed that both products provide

12  sustained release of oxymorphone and they're in submissions

13  in clinical data.

14  Q.   And let's first take a look at OPANA ER labeling that's

15  been approved by the FDA.  The next line.

16          Anything in OPANA ER information that you relied

17  upon?

18  A.   Yes.  So these three points here were key.  Indication

19  that the relief of moderation to severe pain.  The patients

20  are required the continuous round the clock opioid

21  treatment.  And that's achieved with a dosage of once every

22  12 hours.  And it's label say that clinical trials have

23  demonstrated the effectiveness in this formulation in

24  managing the pain as indicated when dosed every 12 hours.

25  Q.   And let's take a look at Impax ANDA labeling

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001575

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

82

1   information.  Is there anything there that you rely upon?

2   A.   So the label there proposes the same situation, the same

3   dosing schedule and clinical trial information and describes

4   its own label here as highlighted, same dosage form strengths

5   administration twice a day (every 12 hours).

6   Q.   And is it your understanding that the Impax ANDA tablets

7   have received tentative approval from the FDA?

8   A.   Yes.  In fact, they have and highlighted here that the

9   FDA concluded that the drug safe and effective for use as

10  recommended in submitted label.  Therefore, the FDA has

11  agreed this label is correct and correctly described the

12  system.

13  Q.   Was there any clinical data relating to the equivalent

14  OPANA ER and Impax ANDA tablets you relied on?

15  A.   Yes. I looked at the bioequivalence data.  And in fact,

16  this is the data from the Impax ANDA.  Here's the actual

17  figure.  It's modified slightly to put a better legend up for

18  reading purpose.

19          You could seeing the curves are similar and both

20  provides substantial blood levels 12 hours after

21  administration through 12 hours and beyond.  And they are

22  shown in the data that they are equivalent.

23  Q.   And then if we could have the next slide.  What's the

24  basis for your opinion that the Impax ANDA tablets will

25  provide the sustained release of the oxymorphone?

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                                              IMPAX-OPANA00001576

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

83

1  A.   I think it's important.  Just simply by reading the FDA

2  approved label and looking at the data that they have the

3  curves, you could highlight that they both provide for a

4  sustained release, they both indicated for management of

5  moderate to severe pain with a continuous around the clock

6  opioid analgesic needed for extended period of time.  And it

7  says take the tablets 12 hours a day.  And that's the way to

8  achieve it.

9  Q.   And the Court's opinion talks about maintaining

10 therapeutic blood levels for 12 hours.  How do you get from

11 this information to the conclusion that it provides those

12 blood levels?

13 A.   Between the clinic trials and the data and the fact that

14 it's approved for managing the pain when taken as shown in

15 the label, which is once every 12 hours, it provides the

16 continuous around the clock that-- benefits that is needed,

17 therefore, there must be therapeutically beneficial amounts

18 of blood in the body when it's taken as prescribed every 12

19 hours.

20 Q.   Let's move on to the next and the dependents claims in

21 the 456 patent.  We can go to the next slide.

22        If you could remind us, what are the other claims

23 of the 456 patents that are infringing in your opinion?

24 A.   Two, three, five and seven.

25 Q.   Okay.  And for the sake of time, we're going to rely on

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

84

1   Dr. Lowman's expert report with respect to the basis for his

2   opinion as those dependent claims.

3           MR. RHODE: And I think we're probably at a

4   convenient breaking point.  We're done with 456 patent and

5   few minutes before wanting to break at one o'clock.  I could

6   start into the 933, if your Honor wishes or we can take our

7   lunch break now.

8           THE COURT:  One moment.

9           Off the record.

10          (LUNCH RECESS). ^ take D.

11          THE COURT:  Everybody may be seated.

12          Thank you.  You may continue, Mr. Rhoad.

13          MR. RHOAD:  Thank you, your Honor.

14  ^ DIRECT EXAMINATION

15  BY MR. RHOAD:  (CONTINUED).

16  Q.   Good afternoon, Dr. Lowman.

17  A.   Good afternoon.

18  Q.   If we could turn, let's turn to independent Claim I of

19  the 933 patent.  If we could get the next slide up.

20          Does this claim incorporate many of the same

21  limitations that we saw when we were talking about Claim I of

22  the 456 patent?

23  A.   Yes, it does.

24  Q.   And are there any new limitations in this claim that to

25  your understanding are in dispute between the parties?

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001578

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

85

1  A.   Yes.  Specifically that which is highlighted in yellow.

2  And specifically the term that is written in red letters.

3  Highlighted in red.  That is homopolysaccharide gum capable

4  of reciprocal cross link.

5  Q.   All right.  And what is the definition of

6  homopolysaccharide that you apply in arriving at your opinion

7  with respect to infringement of this claim?

8  A.   I used the Court's definition, on the next slide.  That

9  is homopolysaccharide would be made up of a polysaccharide

10  proposed of one type monosaccharide and also galactomannans.

11  Q.   Okay. And did you have an opinion as to whether HPMC

12  that was used in the Impax ANDA tablets is a

13  homopolysaccharide in accordance with that definition?

14  A.   Yes, I believe it is under that definition.

15  Q.   And before moving on to the basis of your opinion, could

16  you give the Court some background on what a monosaccharide

17  is and what a polysaccharide is.

18  A.   Yes, I have it on the next slide.  So the current slide

19  shows that the top examples of three monopolysaccharides.

20  Those are three single sugar units.  It appears on various

21  common sugar units, fructose which is on the left, glucose is

22  in the middle and galactose on the right.

23  Q.   What is depicted in those three diagrams above each of

24  those monopolysaccharides?

25  A.   What is depicted is the carbon ring structure that we

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                    IMPAX-OPANA00001579

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

86

1    don't see the C representing the carbon which is just the

2    points where the lines are coming together.  And the side

3    grips which are consistent of oxygen and hydrogen and we see

4    it as OX, that is-- would be a hydrosol group.

5            So it just depicts the chemical ring structure of

6    each of these monopolysaccharide units.

7    Q.   And the O represents the oxygen unit and the H

8    represents the hydrogen unit?

9    A.   That's correct.

10   Q.   And then what is a polysaccharide?

11   A.   A polysaccharide would be monosaccharides linked

12   together on a given chain.  It could be chains long as

13   hundreds of thousands or even millions of monopolysaccharides

14   hooked together and that would be a polysaccharide.

15   Q.   And when is a polysaccharide characterized as a

16   homopolysaccharide?

17   A.   It's characterized as a homopolysaccharide when it is

18   composed of only one type of monopolysaccharide.

19   Q.   Okay. And could you explain to the Court what HPMC is

20   please.

21   A.   Yes.  So HPMC is derived from cellulose.  Cellulose is a

22   natural occurring in a common polysaccharide.  It is

23   comprising of entirely glucose units that we saw earlier. So

24   true a definition it is a homopolysaccharide.  And what is

25   depicted here is just the structure of a homopolysaccharide

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

87

1   chain of glucose where the dash lines at each end represents

2   connections to additional glucose units.

3   Q.   And then in turn what is HPMC?

4   A.   HPMC is derived from cellulose.  The next slide please.

5   It's hydroxypropylmethylcellulose, also known as hypomelose

6   (ph).  It is derived from cellulose in that the starting

7   point is the polysaccharide cellulose.  And that

8   polysaccharide could be treated chemically in a way that

9   causes the hydrogen atoms along the side groups of glucose

10   are substituted with units such as hydroxyproply as shown

11   here, which is carbon and oxygen hydrogen.  Or metho groups

12   which are just carbon and hydrogen.  And so that is how it is

13   called, or known as a substituted cellulose.

14   Q.   And you have a slide to show the chemical structure of

15   hydroxypropymethycellulose?

16   A.    So now we can kind of translate it from the glucose to

17   the substituted hydroxypropylmethylcellulose or HPMC. And

18   this is the basic structure where it looks quite like the

19   cellulose except that I replaced all the hydrogens in the

20   hydroxy with an R.  R represents a chemical entity where the

21   R could be the hydrogen, in that case it's just the hydroxy

22   group and there's no substitution. CH3, where the R could be

23   the CH3, which represents a metal group.  Or R could be the

24   hydroxpropyl group which is represented here.

25   Q.   Okay. And with that background and understanding, what

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                          IMPAX-OPANA00001581

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

88

1  is the basis of your opinion that HPMC is a

2  homopolysaccharide?

3  A.   It's because HPMC is comprised of a single

4  monosaccharide backbone unit.  So it's all glucose units.  It

5  just happens to be a substituted glucose side groups.

6  Q.   And are each and every one of the individual sub units

7  on the HPMC, are they going to be entirely identical?

8  A.   No, they are not.

9  Q.   And if they're not entirely identical then why is it

10  still considered to be a homopolysaccharide?

11  A.   Because it's comprised from a single monosaccharide

12  unit.

13  Q.   And what are those?

14  A.   It's comprised of completely of glucose.

15  Q.   And can we go to the next slide.

16  A.   Yes.

17  Q.   And then, therefore, what's the basis then for the

18  conclusion that this is a homopolysaccharide?

19  A.   Okay.  So as we go through this, like I said it's made

20  up entirely of glucose units, so by definition it is a

21  homopolysaccharide.  When we have the substitutions on the

22  glucose all we are doing is substituting the side units of

23  the glucose units.  The substitution don't convert the basic

24  glucose units are any type of sugar units.  And it doesn't

25  change the fact that HPMC is still comprised of only one type

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

89

1   of sugar units, which is a monosaccharide glucose just like

2   cellulose.

3   Q.   Now, when we saw some of the monosaccharides, some of

4   their structures look fairly similar-- when looking at

5   fructose or glucose or galactose, would any of those be

6   considered a substituted version of one or the other of

7   monosaccharides?

8   A.   No.

9   Q.   Why not?

10  A.   Because those have their own entity.  They are not

11  substituted in any way.

12  Q.   And can you make xylose for example from glucose?

13  A.   No, no.

14  Q.   Would a construction that required that each and every

15  subunit on the HPMC chain be identical, would that be

16  consistent with a common usage of the term

17  homopolysaccharide?

18  A.   I didn't hear the first part of your question.

19  Q.   Sorry. My question was, would a requirement that each

20  and every subunits of a polysaccharide be entirely chemically

21  identical in order to be a homopolysaccharide, would that

22  construction be consistent with the common usage of the term

23  homopolysaccharide?

24        MR. SHULMAN:  Your Honor, I object.  Your Honor has

25  excluded the term that says it must be identical and so

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                                    IMPAX-OPANA00001583

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

90

```
 1   common usage is irrelevant.
 2            THE COURT:  I was just going to start pawing
 3   through it because I thought we were treading on it a little
 4   bit.
 5            MR. RHOAD:  Can we go back to the slide with the
 6   Court's construction for a minute?
 7            THE COURT:  Okay. Yes.
 8            MR. RHOAD:  Okay.
 9   Q.   Do you see the term identical anywhere in the Court's
10   construction?
11   A.   No, I just see-- just composed of one type of
12   monosaccharide.
13   Q.   And what type of monosaccharides are present in HPMC?
14   A.   Glucose.
15   Q.   And are there any other type of monosaccharide present
16   in HPMC?
17   A.   No.
18   Q.   Okay.  And so I come back to my question.  Would a
19   requirement of that each and every-- that each and every
20   subunit along the chain be chemically identical, be
21   consistent with the common usage of the term
22   homopolysaccharide?
23            MR. SHULMAN:  Your Honor, we have a definition here
24   and in another context it is irrelevant.  It is irrelevant
25   because your Honor has defined it and it is a stipulated
```

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001584

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

91

1   definition and I object to this.

2          THE COURT:  One moment. As I recall during the

3   claim construction presentation, before we took a break, it

4   became apparent that the homopolysaccharide term was

5   seriously at issue because of this problem of only one sugar

6   or several sugars.  Counsel consulted and essentially fit the

7   square peg into the round hole by adding the galactomannans

8   which were specified in-- I am using it a little less in the

9   patent.  And as it were wrenched open whatever was at issue

10  and stuck them in even if they didn't fit.  And that seemed

11  to be the thrust of the claim dispute as to whether or not

12  this embraced the galactomannans or it didn't.  And when it

13  seemed that logically it didn't everybody agreed to throw

14  them in there any way.

15         Now, it appears to me that either we should have

16  done more with the term homopolysaccharide or everybody is

17  just stuck with what you came up with, which is the law of

18  the case as it were, and an attempt to do an end run around

19  that I think is going to create another issue; is it not, Mr.

20  Rhoad?

21         MR. RHOAD:  Let me explain, your Honor, because we

22  are not trying to do an end run.

23         As you may recall, you know, the issue was whether

24  or not they were using the term kind of-- consistent with its

25  ordinary meaning or not.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                    IMPAX-OPANA00001585

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

92

```
 1          THE COURT:  That's right.
 2          MR. RHOAD:  The defendants cited dictionary
 3  definitions, okay. But then if you look back at the briefs,
 4  the language of-- composed of only one type of monosaccharide
 5  was consistent with those definitions in the dictionary.
 6  When you look back at their briefs they tried to insert the
 7  term identical into that the definition which is not found in
 8  any of the dictionaries that they cited.  So if you read our
 9  briefs--
10          THE COURT:  Now, are you saying now that the briefs
11  before the claim construction?
12          MR. RHOAD:  Yes, and I'll bring around why that's
13  relevant, your Honor.
14          THE COURT:  Okay.
15          MR. RHOAD:  And so one of our criticisms was that
16  they were trying to insert the word identical into the claim
17  construction.  Because in our view all along, HPMC meets the
18  ordinary definition of homopolysaccharide.  And part of the
19  complication was that you had these galactomannans that
20  didn't fit the ordinary meaning and so could you come up with
21  a construction.
22          THE COURT:  That's right.
23          MR. RHOAD:  And so in our view HPMC comes within
24  the ordinary every day meaning of homopolysaccharide.  So you
25  wouldn't need to do those-- the gymnastics to get why a
```

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                                           IMPAX-OPANA00001586

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

93

1   galactomannan is in there.

2        THE COURT:  Okay. What is the pending question

3   that's creating the objection?  Just so giving me all of the

4   other information.

5        MR. RHOAD:  Sure. The question is whether or not a

6   requirement that each individual unit along the chain would

7   be identical, would that be consistent with the common use of

8   the term, would that be part of the ordinary meaning of the

9   term homopolysaccharide.

10        THE COURT:  All right then continue.

11        MR. RHOAD:  And just one other thing. If you look

12   at the Markman transcript at the time-- at the time we agreed

13   to this stipulation, I specifically said to your Honor that

14   there's a latent claim construction issue that we thought

15   would be appropriate to be stipulated to this definition, but

16   then you would be able to identify the latent claim

17   construction issue in the context of what the actual dispute

18   was.  And so what I was basically telling you--

19        THE COURT:  Did I ever do that?  Did it ever come

20   to that?

21        MR. RHOAD:  Well, that's what is coming here now

22   is, sort of what does one type of monosaccharide does.  It

23   means every unit has to be entirely identical?  Or does each

24   unit have to be a-- have the same base unit of galatose unit

25   or a fructose unit or a mannose unit.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                    IMPAX-OPANA00001587

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

94

1       THE COURT:  Which is kind of the bigger issue--

2       MR. RHOAD:  That ultimately is the issue, your

3  Honor.

4       THE COURT:  Yes.  Well, so how come we didn't get

5  that done in the claim construction phase, not to be too

6  concrete thinking about this.

7       MR. RHOAD:  Because all of the briefs were focusing

8  on essentially, where they're using the ordinary meaning or

9  trying to incorporate the galatose or where they're using the

10  ordinary meaning.  And we felt that it would be better for

11  your Honor to make that ultimate call once you heard what a

12  homo-- once you learned about HPMC.

13       THE COURT:  Did your adversary know that that was

14  your thinking?  Was that understood?

15       MR. SHULMAN: Not at all, your Honor.

16       MR. RHOAD:  That's exactly what I said on the

17  record.  And if you go back and look at the Markman record,

18  your Honor, from the Markman hearing, I specifically said

19  there is a latent-- I haven't checked the transcript, but I

20  remember very clearly that there's a latent issue.  I

21  remember clearly, a claim construction issue that we think it

22  would be easier for your Honor to make the call once you see

23  exactly what the infringement dispute is.  Because our

24  position has been and always has been that HPMC is a

25  homopolysaccharide in accordance with the ordinary meaning of

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER       IMPAX-OPANA00001588

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

95

```
 1   that term.  In accordance with the dictionary definitions
 2   that they cited for their definitions, but then they tried to
 3   insert this requirement of identical.
 4           THE COURT:  Mr. Shulman?
 5           MR. SHULMAN:  Yes, it's very simple.  I mean, that
 6   we did have a dispute.
 7           THE COURT:  Nothing in this case is simple.
 8           MR. SHULMAN:  Well, this issue-- this issue is--
 9   actually is quite simple.  And the reason it is simple is,
10   they had a view of what homopolysaccharide should mean. And
11   they said that the ordinary meaning was X and whatever they
12   put forth in their brief.  We have a different view about
13   what the ordinary--
14           THE COURT:  I need to stick you at the podium.
15           MR. SHULMAN:  Yes.  What I said was, or what I
16   began to say was during the briefing, long before we reached
17   the stipulated construction, they had a view which they
18   presented in their brief as to what homopolysaccharide
19   means.  And they said that was their understanding of the
20   ordinary meaning.  And we had a different view of the
21   ordinary meaning.
22           So we were both putting forth what we believed to
23   be the ordinary meaning of this term.  Then we got to the
24   claim construction and we started arguing it. I think your
25   Honor called us into chambers at one point and asked us if we
```

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                    IMPAX-OPANA00001589

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

96

1    could try and work things out.  And we came out here and

2    reached a stipulated construction which neither they or we

3    had put forward.  And what you see on the screen is the

4    stipulated construction.  It doesn't resemble what they put

5    forward as the ordinary meaning or how it's used ordinarily

6    out in the industry, and it doesn't resemble what we said was

7    the ordinary meaning.  Instead it was stipulated.  It exists

8    only in this case because we agreed upon it.

9          So it would be improper at this point for them to

10   try and rely upon what they say is the ordinary meaning in

11   other context, to alter the definition that we stipulated to,

12   which doesn't resemble what they put forward or what we put

13   forward as the ordinary meaning.

14         THE COURT:  Okay. And again the disputed question

15   was-- is it a requirement?

16         MR. RHOAD:  The disputed question was, would a

17   construction that would require that each unit would be

18   identical along the chain, would that construction be

19   consistent with the common usage of the term

20   homopolysaccharide.

21         THE COURT:  And the objection is, we don't care

22   what the common usage is any more because we've already

23   defined it for the purposes of our lawsuit?

24         MR. SHULMAN:  Precisely.

25         THE COURT:  I think Mr. Shulman has got the better

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001590

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

97

1   argument on that, Mr. Rhoad.

2          MR. BLACK:  Your Honor, there's a very specific

3   reference at the Markman hearing.  I remember handing up the

4   agreement, the agreed language and specifically saying, your

5   Honor, this leaves a latent claim construction issue for

6   later to be dealt with at trial.  We're now here and the

7   question was--

8          THE COURT:  Wait. Then I think what we have to do

9   is-- is Dr. Lowman disappearing or is he going to be around

10  as part of your trial team?

11         MR. BLACK:  He will be around.

12         MR. RHOAD:  He will be-- he was planning to be here

13  Tuesday as well.

14         THE COURT:  Okay. Because I think you need a ruling

15  on this and you've got to show me the transcript references.

16  Everybody is relying upon what happened at that moment and

17  let's see what happened at that moment and let's see whether

18  your argument has legs or despite that, Mr. Shulman, or in

19  conjunction with it.

20         So we will leap-frog over this issue right now.

21         MR. RHOAD:  Okay.

22         THE COURT:  Okay.

23  Q.  Dr. Lowman, are you aware of any literature which

24  suggests that a material may be a homopolysaccharide when it

25  has the same type of monosaccharide units but is not--

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

98

1          THE COURT:  Wait. Ask that again.  Because you have
2    a hovering and there is about to be verbal objection.
3          MR. RHOAD:  Okay. The question is whether he's
4    aware of any literature which is consistent with calling a
5    material a homopolysaccharide when it has substitutions along
6    its chain like HPMC has substitutions on its chain.
7          THE COURT:  I think we're kind in the same zone.
8    And I could see that this is an issue that has meritorious
9    arguments on both sides.  I don't want to dodge it. I don't
10   want to side step it, but I don't want to touch it until we
11   have an argument on it.  And we'll schedule that so we don't
12   rob time from everybody, but we're losing time now by getting
13   stuck on the objections.
14         MR. SHULMAN:  Thank you, your Honor.
15         MR. RHOAD:  Okay.
16   Q.   Dr. Lowman, with respect to the Court's construction of
17   the type of monosaccharide, if we put back up the structure
18   of HPMC.
19   A.   Yes.
20   Q.   Go to the next one-- next one.  And then flip to next
21   one?
22         Dr. Lowman, is HPMC applying the Court's
23   construction that a homopolysaccharide is comprised of only
24   one type of monosaccharide; is HPMC comprised of only one
25   type of monosaccharide?

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                              IMPAX-OPANA00001592

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

99

1  A.   Yes.

2  Q.   What type of monosaccharide is it comprised of?

3  A.   Glucose.

4  Q.   Now, are all the units along the chain for HPMC, are

5  they all glucose units?

6  A.   Yes, they are substituted.  Yes, substituted glucose.

7  Q.   Let's turn to the other part of this claim limitation.

8  It must be a homopolysaccharide capable of cross linking with

9  a heteropolysaccharide.  So we can go on.  Let's start with

10  background.

11          What is reciprocal cross-linking?

12  A.   So reciprocal cross-linking would be the interactions of

13  groups on two different polymer chains.  And they can be

14  either permanent chemical interactions or they can be

15  non-permanent physical interactions such as hydrogen bonding

16  or entanglements.

17  Q.   And do you have any background or experience in

18  evaluating the extent to which substances are capable of

19  cross-linking with one another?

20  A.   Yes.

21  Q.   And is that one of the focuses of your research?

22  A.   Yes, that's a big focus in my research.

23  Q.   And what have you done in that area?

24  A.   I worked on hydrogel matrix system that reciprocally

25  cross-linked hydrogen bonding for proteins.  I worked on

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                                           IMPAX-OPANA00001593

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

100

1   polymer systems that hydrogen bond and delivering analgesics.

2   I tend to work in gel-based matrix systems that reciprocally

3   react to hydrogen bonding.

4           THE COURT:  Okay, I'm going to ask you to unpackage

5   that a little bit for me, Dr. Lowman.  Just explain to the

6   reasonably bright sixth grader that you have sitting here.

7           What hydrogen bonding means.  You earlier

8   referenced it when you were talking about different ways in

9   which the matrix was created through the polymer chains

10  linking up with each other, grabbing each other, etc.

11          You mentioned hydrogen bonding and I thought to

12  interrupt you then, but I thought you would never come back

13  to it again.  Okay, go ahead.

14          THE WITNESS:  We could go through hydrogen

15  bonding.  It's a physical interaction between two types of

16  chemical groups.  It typically occurs between groups that

17  donate protons, such as hydrogen atom has a proton.  And

18  groups that accept protons.  And many times it's oxygen which

19  is present in the group which is called an ether group. So

20  there is very common interactions between those types of

21  groups such as a hydrosol group or ether oxygen group that's

22  present in some chemical images.

23          THE COURT:  So they attract each other?

24          THE WITNESS:  Yes.  And it's not a permanent bond.

25  So it can be dissolved if there's sufficient water.  That

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                                    IMPAX-OPANA00001594

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

101

1   could drive it.

2            THE COURT:  Okay.  And that's distinguishable from

3   the chain or?

4            THE WITNESS:  Yes. Chemicals.  Such as the tires on

5   your car, it's vulcanized rubber that is chemically crossed

6   and so the chain never dissolves.

7            THE COURT:  All right, that's helpful.  Thank you.

8   Q.   And based on your knowledge and experience, do you have

9   an opinion as to whether or not HPMC is capable of

10  cross-linking with Xanthan gum which is undisputed

11  heteropolysaccharide gum that's in the Xanthan gum tablets?

12  A.   Yes, in my own experience I look at the chemical

13  structure that both polymer chains a large density as a

14  proton donors and acceptance of construction.  So it is a

15  hydrogen bond.  And actually the HPMC literature itself

16  confirms that the synergistic interactions occur.  And it

17  specifically cites a reference in the article.  HPMC cites

18  that's when you mix these two polymers in solution they

19  interact synergistically.  So if you take a polymer solution

20  of one and let's say the Xanthan gum, the solution of HPMC

21  alone, they have their own set low viscosity.  And if you mix

22  those two solutions together, the viscosity dramatically

23  increases.  And that is because the polymer chains are coming

24  together and approaching gel formation.  And that is

25  evidenced by the viscosity.  It's thicker and it can't be

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

102

1   stirred as well because you are forming a gel.

2   Q.   All right.  Let's turn then to the other asserted claims

3   of the 933 patent with respect to the Impax ANDA tablets.

4        So the next slide.

5        In your opinion what other claims of 933 patent, if

6   any, do the Impax ANDA tablets infringe?

7   A.   So they infringe 2, 3, 5, 7, 8 and 10.  As well as 41

8   through 43.

9   Q.   For the sake of time, we will rely on his expert report

10  with respect to 2, 3, 5, 7, and 8 and 10.

11       Dr. Lowman, will address claims 41 to 43 here this

12  afternoon.  What are these claims directed to?

13  A.   So these claims are directed to the time to meet

14  concentration or Tmax that occurs when these tablets are

15  administered.

16       The first claim 41 gives Tmax values of 3 to 10 for

17  a patient.  The second, the next claim 42, references Tmax

18  values for a fasting patient.  And the third claim references

19  the Tmax values for a fed patient.

20  Q.   And the next slide.  Can you explain to the Court what

21  Tmax is?

22  A.   Yes.  Tmax, we have to think about this slide here

23  references, Tmax is calculated from the blood response

24  curve.  Here we are at the blood concentration, at the time

25  at which the maximum concentration occurs.  So the red line

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

103

1   here dotted is the peak of the curve which is the maximum

2   blood concentration, to the time which that occurs is our

3   Tmax.

4   Q.   And if we could go to the next slide.  What is the basis

5   for your assertion that the limitation here is directed to

6   Tmax?

7           MR. SHULMAN:  Your Honor, I have an objection.  As

8   your Honor could see on the slide, which we saw for the first

9   time yesterday, he is construing the term as set forth down

10  at the bottom of the page and I have two problems with that.

11          First of all, during claim construction the

12  plaintiffs did not ask your Honor to construe claims 41

13  through 43 or any term in them.  That's first.

14          Second, in his opening, the expert report submitted

15  last December, Dr. Lowman did not offer a construction of

16  claims 41 through 43.  Then when he submitted a supplemental

17  report, voluntarily I might add in January of 2010, he did

18  not offer a construction of any terms in claims 41 through

19  43.

20          Then we took his deposition on March 2d and he

21  didn't tell us about any new construction.  Then your Honor

22  ruled, I believe on March 19th, on the claim construction

23  issues and apparently he's basing his new construction based

24  on that construction.  But did we hear about his construction

25  in March?  No, we did not.  Did we hear about it in April?

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

104

1   No, we did not. Did we hear about it in May?  No, we did not.

2   We heard about it yesterday at 9 a.m. when they sent us this

3   slide.

4          So I think it's improper and it's tardy at this

5   point for him to offer any construction.  And they never

6   requested a construction and I think it ought to be stricken.

7          THE COURT:  Yes.

8          MR. RHOAD:  Your Honor, we didn't ask for a

9   construction of this term because we thought it was blatantly

10  obvious that this refers to Tmax and everybody understands it

11  refers to Tmax.  In his expert report he recited the basis

12  for the fact that these claims, that these tablets meet these

13  limitations and in support of that he cited Tmax data.  He

14  said that, the data in-- that what it is that allows me to

15  conclude that these tablets meet this limitation is the fact

16  that when you look at data the Tmax values for the patients

17  that were studied in the clinical studies conducted by both

18  Impax and plaintiffs, show that the Tmax values are recited

19  within the range of the claim.

20         The only way it has been altered at all is, at the

21  time we construed that to mean that it says to a patient,

22  when administered to a patient it would have this Tmax

23  range.  We interpreted that to mean that individual

24  patients.

25         Now, when your Honor construed the term medicament

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001598

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

105

1  plasma concentration time curve, as your Honor may recall,

2  your Honor said that that was something that would be derived

3  from a studied population.

4       So the medicament plasma concentration time curve,

5  related to another pharmacokinetic variable, called area

6  under the curve or AUC.  And that claim said that you had an

7  area under the curve within certain ranges.  And we took the

8  position that that related to individual patient values and

9  therefore we cited individual AUC values, Dr. Lowman cited

10 individual AUC values in his infringement report.

11      We took the same view with respect to Cmax claims

12 which were claims, I think, 38 to 40 of the claim.  And then

13 the claims 41 to 43 refer to this third pharmacokinetic

14 parameters Tmax.  We believe that that term as properly

15 construed could refer to individual values.  So Dr. Lowman

16 referred to individual Tmax.  He also referred to mean Tmax

17 values.

18      Now, on the basis of your Honor's construction that

19 the term medicament plasma concentration time curve was

20 looking at a study population we said, well, if you applied

21 the logic that your Honor used in arriving at that

22 conclusion, that same logic would apply not only to the AUC

23 pharmacokinetic rounder, but it would also apply to the Cmax

24 and the Tmax pharmacokinetic parameters, that were in some of

25 these other dependent claims.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                                   IMPAX-OPANA00001599

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

106

1              So Dr. Lowman, consistent with your Honor's claim

2    construction of the other pharmacokinetic parameters, has

3    said, he's basing his conclusion on the mean Tmax values for

4    patients across a studied population.  So in other words

5    originally in his report he cited, support for the fact that

6    these tablets infringes claim, both Tmax values for

7    individuals and mean values across the study population.

8              At this point, in light of your Honor's

9    construction, we're only relying on the mean Tmax values

10   across the study population.  So they have been aware since

11   December of last year that Dr. Lowman would be opining that

12   these-- their tablets infringe these claims because their

13   mean Tmax values is within the recited range.  That is

14   expressly and unequivocally disclosed in his expert report.

15             MR. SHULMAN:  If may I be heard briefly, your

16   Honor.

17             First of all, Tmax is never mentioned in his expert

18   report.  The word doesn't appear and that's first.  It's not

19   in there.  In the section that deals with these claims.  It

20   just is not there.  You can look until we are blue in the

21   face and you wouldn't find it.

22             Second and more importantly.  Even if everything

23   that he says is true, it was incumbent upon them after your

24   Honor ruled that if he was going to change the construction

25   and now call it mean Tmax, which nowhere appears in the

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001600

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

107

1    patent.  It's a brand new term that we learned of yesterday.

2    It was incumbent upon them to tell us.  Just like after we

3    reached the stipulated construction that we just spoke about

4    a few minutes ago, your Honor, what did Dr. Lowman do?  He

5    put in a supplemental report to address the infringement

6    issue in light of what was now the agreed upon construction.

7    And that is the proper thing to do.

8           If they came to the conclusion after your Honor

9    ruled with a completely different claim limitation, that this

10   somehow impacts claims 41 through 43 that was their theory,

11   then what should they have done? They should have called us

12   up and should have said, you know what, we have a new theory

13   in the case that is based upon what your Honor has ruled.

14   Here it is, you get another shot at asking him some questions

15   because he has a new opinion.  You don't wait until 24 hours

16   before the trial begins to let us know.  And that's what they

17   did here and they did it deliberately.

18          In fact, I would love to find out when it is that

19   he came up with this new claim construction and how long have

20   you known about it and not told us about it.  I intend to ask

21   him that on cross.  Perhaps we could find out the answer

22   right now.

23          THE COURT:  It's the nice thing about not having a

24   jury.

25          MR. RHOAD:  Your Honor, I completely disagree with

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

108

1  Mr. Shulman.  He cited-- there's nowhere-- anywhere the

2  medicament time plasma time concentration curve appears in

3  claims 35 to 37.  Okay.  If we could go to column 24 of that,

4  which would be the second or third to the last page PX 0002.

5  If you could blow up claims 36 and 37 on the upper right hand

6  corner for us please.

7          You see, your Honor, this is the claim that your

8  Honor was construing at the time of the Markman hearing.

9  Where it says, medicament plasma concentration time curve.

10 Okay.  The fight at that time was whether or not that

11 referred to, and it's talking about that-- the area under the

12 curve to infinity.  You may recall that is what we called

13 AUC, area under the curve.

14          The question was, did the area under the curve have

15 to be a mean AUC value so for a study population?  Or did

16 that have to be-- or was that just for a single patient when

17 it says administer to a fasting patient.  Your Honor

18 construed that to mean that it had to be across the study

19 population.  The word mean appears nowhere in claims 36 or

20 37.

21          As a result of your Honor's claim we relied for

22 purposes of asserting infringements on individual patients'

23 AUC values that fell within this range.  As a result of your

24 Honor's claim construction we are no longer asserting that

25 claim based upon the construction because there aren't mean

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

109

1  AUC values that fall within that range.  So we are no longer

2  asserting that claim because the basis for infringement was

3  construction that said that if you have individual patient

4  values that would infringe.  Okay.

5          Now, if we go to claim 41 please.  Now, this is a

6  time to mean peak plasma concentration, which Dr. Lowman has

7  testified and has always believed meant Tmax.  He talked to

8  you about Tmax.  Now, at the time we believed that the proper

9  construction was that, because when it says administered to a

10  patient, that could apply to individual patient data.  So in

11  his infringement reports, if we look at Exhibit 1023-- I'm

12  sorry, 1022-- I'm sorry.  If you would go to page 41 please.

13  And if you would pull up the first half of paragraph 158.

14  There.

15          So as you see here when he's explaining the basis

16  for his infringement opinion.  He says in the second

17  sentence, when Impax has 40 milligrams oxymorphone

18  hydrochloride extended, these tablets were administered as

19  part of the above bio studies.  At least 37 patients had time

20  to meet peak plasma concentration within the claim range.  So

21  that again is our construction which said, individual patient

22  data is relevant here.

23          But we also said, and the mean time to meet peak

24  plasma concentration for the study population was also within

25  the claimed range.  All we're saying now your Honor is that,

IMPAX-OPANA00001603

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

110

1    in light of your construction, the first part of that would

2    not provide a basis for infringement.  Because the individual

3    patient values are not values across the study population.

4    And so applying the logic of your Honor's claim construction

5    from the other claims would seemly apply to the same

6    pharmacokinetic parameters here. So what he is saying is, in

7    the other case we only had individual data, we didn't have

8    mean across the population data.  Here he's saying, we have

9    both individual data and mean data across the population.

10   And he's relying on both for purposes of infringement.

11          Here today we've just discarded the first half of

12   that proof and we're now claiming that this infringes because

13   the mean time to peak plasma concentration for the study

14   population is within the claimed range.

15          THE COURT:  And you're saying that your adversaries

16   had notice from that?

17          MR. RHOAD:  This was served on them in December of

18   last year.

19          THE COURT:  Did they have notice that you were

20   shifting gears on population study import on the individual

21   patient import?

22          MR. RHOAD:  We're applying the Court's claim

23   construction.  All we've done is taken away half of our

24   infringement proofs.  Our infringement proofs used to be,

25   your Honor look at the individual data, that's within the

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

111

1  cited range.  Your Honor, look at the mean data and that's
2  also within the cited range.
3          Now, what we're saying is, look at the mean data,
4  it's within the cited range.  We haven't changed our
5  position.  We haven't added anything new.  We've just deleted
6  part of what we believe that is the basis that would be
7  allowing your Honor to conclude based upon your claim
8  construction that these tablets infringe.
9          MR. SHULMAN:  And that's not so, your Honor. If we
10  could go to their slide number 43, your Honor.  Now he
11  introduced this whole new term Tmax.  It never appeared in
12  reports, never heard about it until yesterday.  And if we
13  could go to slide 43 please.  The chart that they put up on
14  the board.  Yes, this one.  And what he told your Honor was,
15  that Tmax is the time at which the plasma concentration is
16  the highest in the blood.  Tmax is defined in the patent as
17  the time to mean peak plasma concentration, not the time to
18  peak plasma concentration. Peak plasma is, if I measure your
19  Honor's blood I find out what it is.  If we have a population
20  then we could find what the mean is for the population.  And
21  Tmax is not defined as he said here.  For the first time ever
22  in this case, but rather it's defined in the patent in column
23  13 as the time to mean peak plasma concentration.
24          So what they're doing here, your Honor, and if we
25  go to the next slide, is a slight-of-hand.  They're trying to

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

112

1   tell your Honor that Tmax is really just peak plasma

2   concentration.  And all that we're saying is now is mean

3   Tmax.  It's the mean time for people, individual patients to

4   get to their individual peak concentrations, but that's not

5   what the term is in the claim.  The term in the claim is time

6   to mean peak plasma concentration.

7           And the reason we're having this fight, your Honor,

8   is because there's no evidence that we have a time to mean

9   peak plasma concentration as recited in the claim within the

10  ranges.  So what they have done is create this new

11  construction by misleading, I suggest to your Honor about

12  what Tmax is, and then inventing this mean Tmax term, which

13  isn't even in the claim.  And then saying, mean Tmax we'll

14  substitute that for what is actually in the claim.  This is

15  brand new.

16          MR. RHOAD:  This is not brand new at all, your

17  Honor.  He said that the-- there is no time to mean peak

18  plasma concentration data in the OPANA Yard Clinical Trials.

19  If you construe time to mean peak plasma concentration as

20  anything other than what Dr. Lowman says it is, there's no

21  values for that in the OPANA Yard Clinical Trials and in the

22  Impax Clinical Trials because that-- the way they want to

23  construe it is not measured by anybody in this field.  They

24  want you to construe this term in a way that is not something

25  that anybody in this field measures.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

113

```
 1          Mr. Shulman asked him, he says this is all new, he
 2   asked him in deposition, he was asking doesn't this mean
 3   exactly what he just told you it means.  And Dr. Lowman said,
 4   no, it doesn't mean that. That is not something that gets
 5   measured in this field. This is not something new.  Mr.
 6   Shulman asked him extensively about it at his deposition and
 7   he understood that this is what he meant when he said the
 8   time to meet mean plasma concentration is within the range.
 9          The only mean values that Dr. Lowman could be
10   citing to in his expert report are the mean Tmax values which
11   is exactly what he is saying here today.  His expert could
12   come here and tell you that's not what it means, your Honor,
13   it means something different.  That's different than Mr.
14   Shulman coming here and arguing to you as a lawyer being an
15   expert witness and trying to tell you what it means.
16          MR. SHULMAN:  I'm not suggesting a definition.
17   Could we have the 933 patent on the screen Polymer 13.
18          MR. RHOAD:  It tells you that that is Tmax.
19          MR. SHULMAN:  No, it doesn't say that Tmax--
20          MR. RHOAD:  Let his expert witness tell you. He's
21   making arguments.
22          THE COURT:  Are you calling up the language of the
23   patent right now?
24          MR. SHULMAN:  Yes.  I'm not making up this
25   definition it's explicit in the patents.  The bioability
```

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001607

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

114

1   study paragraph.  Can we have the line numbers to call it
2   up.  It's column 13 of the patent.  Down at line 41-42
3   defines quote, "Tmax" unquote as quote, "time to mean peak
4   plasma concentration." I'm not making this up.  That's what
5   is set forth explicitly.  And if you go to column 5 of the
6   patent.  Sorry, column 4 of the patent.  Yes, that paragraph
7   that you have, no, the next paragraph.  This is column 4
8   line's call it 48 to 50.  Once again it says Tmax is quote,
9    "time to mean peak plasma concentration." They do have a
10  problem here.  That's a difficult-- that can be measured, but
11  there's no evidence in this case that we have that value.
12  But they defined it that way.  And so what they're doing is
13  creating this slight-of-hand redefinition that we never heard
14  of before in order to get around the proof problem.  And
15  irrespective of whether I am right or wrong about their
16  motives, that's not really the issue here, your Honor.
17          The issue is if they came up with that, and I still
18  haven't heard when he came up with the new construction, but
19  if they came up with that after your Honor ruled on March
20  19th, then both the rules and a common courtesy would have
21  required them to get in touch with us and say, hey, look,
22  we've reconsidered in light of what the Judge has done,
23  here's our new position.  Do you want another hour to examine
24  him about it? Great.  If you don't, here's his report.  And
25  they didn't do that-- they let us know yesterday.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001608

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

115

1       MR. RHOAD:  Again, your Honor, we have not changed

2  our claim construction of this term in terms of what time to

3  mean peak plasma concentration means.  That was what the

4  evidence, the data cited and he's referring to in his report

5  is data of Tmax.  Everybody in the industry knows what Tmax

6  is.  Everybody knows what Tmax is when they say Tmax.

7  Everybody in the industry knows what that means.

8       Dr. Lowman relied on a data and hasn't changed his

9  opinion one iota as to what the fact that time to mean peak

10  plasma concentration refers to Tmax. The only thing that has

11  changed is whether we're relying on individual patient data

12  or data across the study population.

13       If you would go to--

14       THE COURT:  Mr. Shulman, do you agree that that's

15  the fight here?  Are you arguing that your adversary is

16  tweaking the record and the expert's opinion to weaken

17  whatever benefit it was to your client or to the detriment

18  that there was to your client-- or his client, on the Court's

19  claim construction?  Is that what you're saying?

20       MR. SHULMAN:  I am having trouble hearing you, your

21  Honor.

22       THE COURT:  Are you saying that there's an effort

23  here to get around the Court's claim construction insofar as

24  there is a finding that we're talking about the study

25  population?  And that somehow this expert is walking away

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001609

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

116

1   from that and creating some kind of different ultimate

2   reading of the patent?  Or are you claiming that all of this

3   is a lot of bells and whistles and fru, fru, but you haven't

4   had a chance to nail him down because you haven't had a

5   chance to depose him on this issue?

6        MR. SHULMAN:  I am saying both to your Honor.  What

7   happened when your Honor ruled on claim construction which is

8   the AUC claims that your Honor heard about. We called them up

9   and said, hey, look, you lost on that claim construction, you

10  sure you're still asserting 35 to 37?  And they wrote back

11  and they said, no, we wouldn't.  And there's been a

12  stipulation that's done away with those.

13        And then I wrote to them and said, claim 48 which

14  you also asserted here and has the same problem, are you

15  going to assert that?  Bob wrote back and said, no, we will

16  not assert that.  And then 3 or 4 days ago before trial, hey,

17  we're not asserting 38 through 40 either because of the

18  Court's claim construction, and now we're down to three.

19        What they're trying to do here is to take advantage

20  of the Court's claim construction to boot strap themselves

21  into an argument by having him opine for the first time

22  today, I had no opportunity to examine him on this, that Tmax

23  means something entirely different than what is set forth in

24  the patent.  And what is in claim 41 through 43 ought to be

25  interpreted not as what he is calling Tmax but something

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER                                              IMPAX-OPANA00001610

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

117

1   called mean Tmax which nowhere appears in the patent.

2          So we had no notice of it as well as no

3   opportunity.  We haven't an opportunity for our expert--

4          THE COURT:  Wait a minute.  Now I am getting

5   confused.  You just said-- I'm sorry.  Mean Tmax I got it.

6   Yes.

7          MR. SHULMAN:  Now, what they've done is, we saw

8   this for the first time, I thought I was done. I had done my

9   cross examination outline and I was ready to rock and roll

10  with Dr. Lowman when it gets to be my turn.  And then I look

11  at this-- actually 1 o'clock yesterday afternoon, I said, Oh,

12  my God, I spent six hours getting ready for the cross on

13  something I had never heard of before.  And that's the way it

14  worked.

15         So we had no prior notice of it.  And they could

16  have given us notice and we wouldn't have had a problem here.

17         THE COURT:  All right.  Wait.

18         MR. RHOAD:  Your Honor--

19         THE COURT:  Wait.  We are drilling down into an

20  examination of this expert and an import of what he says,

21  applied to the plaintiff's arguments of infringement, that at

22  this point-- not because I am not trying, but is simply not

23  as clear to me as it is to you folks.

24         The testimony has to be linear in this situation.

25  And for all of you it's all bound up because you all know

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001611

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

118

1  where things are going.  And you know what the buzz words are

2  and you know how people are using them and you know

3  ultimately how you will sum up on them-- I don't.  I don't.

4          So I think, Mr. Shulman, I understand your

5  objection, you want to have him stop and muzzle him right

6  here, but I would prefer to make the ruling on whether it

7  gets stricken and is not to be used by me after I hear the

8  cross examination.

9          MR. SHULMAN:  Very well, your Honor.

10          THE COURT:  Let's continue.

11          Mr. Rhoad.

12          MR. RHOAD:  Thank you, your Honor.

13  BY MR. RHOAD:

14  Q.   If we could go back to the slides.  And can you explain

15  for the Court the basis for your understanding that time to

16  mean peak plasma concentration refers to what everybody calls

17  Tmax?

18  A.   Yes.  So based on how I've read it and the discussion.

19  To me it looked, to me it is clear that Tmax meant the

20  pharmacokinetic parameter commonly called Tmax.  And if I go

21  to the ranges that are cited in the 3 claims, they are taken

22  from Tmax data which is in table 19 of the patent.  And that

23  data is actually outlined there and defined as Tmax.

24          It is also defined in the specification as Tmax.

25  And as we've talked about it, it works with the Court's

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

119

1    argument of the medicament plasma concentration time curve.

2              So that's really how we came across Tmax as the

3    study population.  As Mr. Rhoad said that was something said

4    and presented early on in my very first expert report.

5    Q.   And if you could take a look at your expert report

6    Exhibit 1022?

7    A.   Yes, I have it.

8    Q.   And are you able to pull that up?  What we've pulled up

9    earlier on page 41.

10   A.   Yes.

11   Q.   Okay.  Blow up the first half again of that.

12             When you said in your report that at least 37

13   patients had a time to meet peak plasma concentration within

14   the claim range.  What pharmacokinetic parameter were you

15   referring to?

16   A.   I was referring to the common parameter known as Tmax.

17   That Tmax for each individual patient which meant the time to

18   the maximum concentration in each individual patient.

19   Q.   And that could be confirmed by going to look at the

20   Impax bioequivalent data?

21   A.   That's correct.  We went through the Impax data patient

22   by patient and identified each one that fell within the

23   range.

24   Q.   And when you referred to and it said, that the mean time

25   to peak plasma concentration for the study population was

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001613

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

120

1  also within the claim range. What pharmacokinetic parameter

2  were you referring to?

3  A.  I was the referring to the Tmax, the average for the

4  study population.

5  Q.  And if we went and looked at the bioavailability study

6  for the Impax ANDA products we see that's within the range?

7  A.  Yes.

8  Q.  Okay.  And is that also true with the data that you

9  cited as the basis for your infringement opinion with respect

10  to claims 42 and 43?

11  A.  Yes.

12  Q.  And for your infringement opinions with respect to these

13  claims here today, what data are you relying upon to say that

14  the Impax ANDA tablets meet this limitation?

15  A.  I am relying on the data from memoranda.  And actually

16  can we get to my slide there?

17  Q.  Okay.

18  A.  Next one.  So I'm relying on the ANDA data for the 40

19  milligram dosage strengths within the ranges because that's

20  all the data that is available in the ANDA.  Since no other

21  data is there for Impax they asked for the bioequivalent

22  waiver.  I looked at the OPANA data that was given to me and

23  given that Impax is said to be bioequivalent, has tentative

24  approval of bioequivalent.  I looked at mean Tmax data for

25  the 5, 10, 20 milligrams strengths.  And that Tmax data was

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

121

1  also within the range for fasting patients.  And for the fed

2  patients, also in the range for the 20 milligrams dosage

3  strength.

4          So it's my belief as this-- these have the dose

5  responses are proportional, that intermediate dosage

6  strengths that we didn't see, but also have similar Tmax

7  values.

8          So I believed that Impax is bioequivalent and would

9  be bioequivalent they infringe on the claims as well.

10  Q.   And the particular strength as recited in your report?

11  A.   I believe at all strengths, it doesn't matter.

12  Q.   For the claim 43 as set forth in your report, are you

13  only asserting that the 20 and 40 milligrams tablets infringe

14  on page 43 of your report?

15  A.   Yes, that's correct.

16  Q.   But the other two claims, it's your opinion that all the

17  dosage strengths infringe?

18  A.   Yes, that's correct.

19  Q.   And you're relying upon the same data here today that

20  you relied upon in your initial infringement report?

21  A.   Yes.

22  Q.   Let's move on to your opinion with respect to the

23  Sandoz.

24  A.   Okay.

25  Q.   If we could go to the next slide.  First of all, what

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

122

1   are the Sandoz ANDA tablets formulations?

2   A.   So the Sandoz ANDA formulations are also oxymorphone

3   hydrochloride extended release tablets that are bioequivalent

4   to the OPANA tablets.

5   Q.   And so the Sandoz ANDA tablets bioequivalent to OPANA ER

6   in the same way that the Impax ANDA tablets are?

7   A.   Yes.

8   Q.   In your opinion which claims, if any, of the 456 patent

9   do Sandoz ANDA tablets infringe?

10  A.   Claims 1 through 3 and 5 and 7 of the 456 patent.

11  Q.   And let's turn Claim I of the 456 patent please.  What

12  was shown here on this chart?

13  A.   So here is again the breakdown of the claims and parts

14  of the Sandoz tablets that would infringe on the claim.  And

15  in this case the yellow highlighted yellow section is the one

16  that's in dispute.

17  Q.   Okay.  And your understanding is that the rest of those

18  are covered by the stipulation of facts that the parties

19  entered into in this case?

20  A.   Yes.

21  Q.   Including with respect to the sustained release term?

22  A.   Yes.

23  Q.   In your opinion do the Sandoz ANDA tablets include a

24  hydrophobic material?

25  A.   Yes.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

123

1  Q.  And what is that hydrophobic material?

2  A.  ProSolv SMCC.

3  Q.  And in what construction in the term of hydrophobic

4  material did you use in reaching your conclusion?

5  A.  The same claim construction as discussed with the Impax.

6  Q.  Going to the next slide.  So you're interpreting the

7  hydrophobic material in the same way you did as Impax that

8  you testified about earlier?

9  A.  Yes, that's correct.

10 Q.  And how did you come to the conclusion that ProSolv is a

11 hydrophobic material that is used in the Sandoz ANDA tablets?

12 A.  So through the similar process that I went through with

13 the Impax tablets.  I reviewed the literature.  In fact, go

14 to the next slide.

15      I reviewed the components.  I noted that ProSolv

16 SMCC, is 98 percent microcrystalline cellulose.  So a

17 majority of that excipient is microcrystalline cellulose.

18 And the prior literature supported idea and suggested that

19 MCC may be showing hydration in Sandoz tablets as well.

20      Then I did a specific search on ProSolv alone and

21 found another paper which showed that ProSolv with slow

22 penetration water and with tablets even more so than it

23 does-- then MCC alone was.  So it was natural for me then to

24 investigate the role of ProSolv to Sandoz.

25 Q.  Could you give the Court exactly on what ProSolv is?

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

124

1    A.    The next slide please. ProSolv is the trade name a

2    solidified microcrystalline-- actually it's called SMCC.

3    It's a physical blend, a physical mixture of two components,

4    98 percent of the microcrystalline cellulose.  And 2 percent

5    of a colloidal silicon dioxide.  So it's a little bit

6    different than the traditional MCC.

7              And again I'm going back to well known excipients

8    of ProSolv, a known multi-functional.  And the ProSolv

9    literature-- actually manufacturing promotes ProSolv as

10   multi-functional excipient.

11   Q.    And could we look at exactly what the MCC and colloidal

12   silicon dioxide are?

13   A.    MCC is a cellulose derivative, it's water insoluble and

14   conglomerate.  It's also known to be multi-functional.  It's

15   smaller in fraction which is the colloidal silicon dioxide,

16   is the form of silicon which is commonly found in sand and

17   used as a formulation to help manufacturing and like MCC it

18   is actually water and soluble.

19   Q.    And what did you do determine whether or not ProSolv as

20   used in Sandoz ANDA tablet as a hydrophobic material in

21   accordance with the Court's construction?

22   A.    We performed the same test that we did with the Impax

23   tablets.

24   Q.    And going to the next slide.  Was that the same

25   water-uptake testing that you did with respect to the Impax

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

125

1  Sandoz tablets?

2  A.   Yes.  We performed identical water-uptake tests and also

3  dissolution tests.

4  Q.   And what was the composition of the tablets that you had

5  Emerson Lab Manufacturing test with respect to these Sandoz

6  ANDA tablets?

7  A.   So the-- since the formulations were different and we

8  had to look at manufacturing tablets, so we used two test

9  tablets, the first tablet contained the ProSolv SMCC.  And in

10  the second set of tablets we removed the ProSolv SMCC which

11  we believed slowed hydration and we replaced it with

12  dextrose.

13  Q.   And what were the results of that testing?

14  A.   The next slide please.  So we have two formulations

15  tested here at the 40 milligrams strength.  The lower curve

16  would be the same Sandoz ANDA tablets that the ProSolv.  And

17  the control tablets, the tablets where we removed the ProSolv

18  and replaced it with dextrose.  And to see the rate of

19  hydration that control tablets hydrated faster than the

20  tablets with the ProSolv.  Go to the next slide.

21        We calculated the initial hydration rates and

22  overall hydration rate again based on the points.  And we saw

23  that the control tablets with no ProSolv had higher initial

24  and overall hydration rates and, therefore, we believed that

25  the hydration rate of Sandoz was lower than the control

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

126

1   tablets rate.

2   Q.   Okay. Were the results of water-uptake testing that

3   Emerson performed set forth in a report?

4   A.   Yes.

5   Q.   And is Exhibit 2002 a copy of that report?

6   A.   Yes.

7   Q.   And did you test testing on anything other than the 40

8   milligram strength of the Sandoz?

9   A.   Yes, we did five milligrams strength.  We did a similar

10  test on the 5 milligrams strengths and we saw the same

11  result, that the tablets with ProSolv were slower to hydrate

12  than the control tablets.

13  Q.   And based on the testing, do you have an opinion whether

14  the ProSolv was showing hydration of the gelling agent as

15  used in all dosage strength of Sandoz ANDA tablets?

16  A.   Yes.  The last thing that we talked about Impax, the way

17  the compositions are going proportionally, looking at the

18  types of the types of formulations, I believe that the other

19  dosage strengths would have the same behavior.

20  Q.   And did Emerson also conduct dissolution tests at your

21  direction?

22  A.   Yes.

23  Q.   Was that the same dissolution testing that you had done

24  on the Impax ANDA tablets?

25  A.   Yes, it is.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

127

1  Q.   And what was the result of that dissolution testing?

2  A.   The results of this dissolution testing showed that

3  tablets with ProSolv released the drug at a slower rate than

4  tablets without ProSolv.

5  Q.   All right.  And let's turn to the second part of the

6  Court's definition of the term hydrophobic material, without

7  the part of the definition that relates, without disrupting

8  the hydrophilic matrix.

9       Do you have an opinion as to whether or not the

10  ProSolv that is used in the Sandoz ANDA tablets is slowing

11  hydration without disrupting the hydrophilic matrix?

12  A.   Yes.  Similar to the last one.  And you can walk through

13  the reasons, is that again what has been interpreted to mean,

14  and we know that the Sandoz tablets provide the sustained

15  release, which means that we have a gelling agent within the

16  matrix that is needed to control the release of oxymorphone,

17  and that data tells us that.  And again, looking at the

18  photographs, we see the initially dry tablet and as is

19  exposed to fluid we could see a formation of a gel layer

20  which moves to the inside of the core and flows throughout

21  the excipient.  We are seeing visually the presence of a gel

22  layer.

23  Q.   In light of what you've told us, in your opinion is

24  ProSolv as is used in the Sandoz ANDA tablets, a hydrophobic

25  material in accordance with Claim I of the 933 patent.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

128

1   A.   Yes.

2   Q.   And is that true for all dosage strengths?

3   A.   Yes.

4   Q.   Now we've talked before about the design of the

5   controlled tablets in the testing that you did with respect

6   to Impax ANDA tablets.  And Sandoz has also criticized your

7   use-- your design of those control tablets, which as you

8   testified earlier you substituted dextrose for the ProSolv.

9            In your opinion was it appropriate to use dextrose

10  in the control tablets to replace the ProSolv as included in

11  the Sandoz ANDA tablets?

12  A.   Yes.

13  Q.   And why is that?

14  A.   So for the same rational as we made our selection on the

15  last.  We only wanted to change one variable and that is

16  ProSolv.  And we replaced the hydrophobic material dextrose,

17  which as listed as a water soluble sugar as in the patent.

18  So again, I look at table 4 and our methodology is exactly in

19  line with what the patent shows. That is, when you vary the

20  hydrophobic agent, you vary equivocally the soluble the sugar

21  in the case which here is dextrose.

22           So if we look at the table, when we removed 20

23  percent of our hydrophobic agent we replaced it with 20

24  percent dextrose.  And we did it in line with the patent

25  while keeping all the other variables constant, shape, weight

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

129

1   and hardness.

2   Q.   Are you aware of any scientific literature that would

3   call into question your use of dextrose in the controlled

4   tablet?

5   A.   No.

6   Q.   Did you review the literature cited in Sandoz's expert

7   reports in this issue?

8   A.   Yes.

9   Q.   And did any of that literature cause you to have any

10  doubts about the appropriateness of your testifying?

11  A.   No, it didn't.

12  Q.   Let's turn to the other asserted claims of the 456

13  patent.

14          What other claims, if any, of the 456 patent do you

15  believe the Sandoz ANDA tablets infringe?

16  A.   2, 3, 5, and 7.

17  Q.   And is the basis for those opinions set forth in your

18  expert report?

19  A.   Yes.

20          MR. RHOAD:  Your Honor, I have no further questions

21  for Dr. Lowman at this time.  I would, I guess, move to admit

22  into evidence all of the exhibits that are included in the

23  two binders for the witness that we included, which I believe

24  are all within the scope of the parties' agreement of

25  documents that could be admitted into evidence without

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

130

1   objection.

2          MR. SHULMAN:  So can we have that over the break?

3          THE COURT:  Sure. You can renew that offer after

4   your adversary had a chance to review the material.  Okay.

5          (RECESS TAKEN).

6          THE COURT:  Good afternoon.  One of the concerns

7   that the Court has is that this record be as specific as

8   possible with respect to the documents that are coming in.

9   For example, earlier today and it was the document that you,

10  the 10 K, counsel said I probably won't need it, but handed

11  me up a pound and a half of material and then it was admitted

12  in evidence.  So I think we're already getting a little too

13  causal about what's going in and not going in.  And I'm not

14  pointing fingers.  I just want us to be pretty rigorous.  So

15  the same thing when you, Mr. Rhoad said, everything in the

16  witness binder subject to my adversary's objection will go

17  in, we just can't have everything in the witness binder as

18  reflected on the transcript.

19         So I will direct that counsel specify for the

20  transcript sake as well as for courtroom deputy's sake and my

21  sake what is in.  Okay?

22         MR. RHOAD:  Certainly, your Honor.

23         So what was this in the binder and what I would

24  like to move in is PX 1, 2 and 4-A are already in evidence.

25         So I would move PX 4-B, 4-C, 30, 322, 343, 372,

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

131

1  375, 1010, 1014, 1015, 1022, 1023, 1026, 1027, 1028, 1029,

2  1031, 1032, 1035, 1036, 1037, 1038, 1039, 1040, 1047, 2001-J,

3  2001-P, 2002, 2008, 2009, 2016, 2020, 2023, 2024, 2026, 2027,

4  2028, 2029, 2030, 2031 and 2034.

5          MR. SHULMAN:  I have no objection to any of those

6  other than--

7          MR. RHOAD:  Your Honor, there are six exhibits that

8  relate to this issue that relate to this issue of

9  homopolysaccharide.

10         THE COURT:  And we will deal with those particular

11  exhibits at the time that we continue after the cross

12  examination.

13         MR. RHOAD:  So we would reserve the right to move

14  several of the exhibits that are in the binder once we get

15  clarity on that issue.

16         MR. SHULMAN:  And that includes number 375 which he

17  offered.

18         MR. RHOAD:  Yes. And so to correct the record 375

19  which I listed is before one of those that is not being moved

20  into evidence at this point.

21         ^ (SO MARKED).

22         THE COURT:  Now you have completed your direct

23  examination of Dr. Lowman; is that correct?

24         MR. RHOAD:  Yes, your Honor, that is correct.

25         THE COURT:  Okay. Mr. Shulman, you will be crossing

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER        IMPAX-OPANA00001625

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

132

1   Dr. Lowman on a variety of issues, including the under the
2   curve and population study Tmax and mean Tmax issue that came
3   up, correct?
4           MR. SHULMAN:  Yes.
5           THE COURT:  I will make two discrete rulings.  One,
6   I am not prepared to rule on the fight about the identity
7   within the polysaccharide, monosaccharide issue.  And I don't
8   know whether I want additional briefing on it or what. I
9   really want to think about that and I will get in touch with
10  counsel if I need additional briefing.  But I see that as a
11  discrete piece that might involve some voir dire of this
12  witness and so on.
13          As far as the Tmax mean Tmax issue, that will come
14  up during the cross of cross examination and that will be
15  subject to later, if you want to seek a ruling, to strike
16  that issue.  But I am not-- I am ruling against your
17  objection at this point, Mr. Shulman, on the ability of the
18  witness to offer an opinion on it.  Am I clear about that?
19          MR. SHULMAN:  Yes.
20          THE COURT:  Now, I would anticipate then, given
21  both issues, that we're not going to finish with Dr. Lowman
22  today since I have to leave at 4:30 am; I right about that?
23          Now that I have to leave earlier than 4:30 it ain't
24  going to happen any way.
25          MR. SHULMAN:  It would take a major miracle.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER        IMPAX-OPANA00001626

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

133

1          THE COURT:  So since we're starting cross
2   examination I want to be thinking about everything, my
3   suggestion is that I will let you go four and I will let you
4   go now 20 of 4 and pick up with the trial on our next
5   scheduled day.
6          MR. SHULMAN:  Your Honor, one last thing the order
7   sealing the transcript.
8          THE COURT:  Yes.  Mr. Black, that was your issue or
9   did you have something else?
10          MR. BLACK:  No, we looked at it and it is fine,
11   your Honor.
12          THE COURT:  Okay.  I will let you step down, Dr.
13   Lowman then since we are not continuing with his
14   examination.  Thank you.
15          THE WITNESS:  Thank you, your Honor.
16
17
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

IMPAX-OPANA00001627