**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE OPANA ER ANTITRUST LITIGATION | MDL No. 2580 |
| | Lead Case No. 14-cv-10150 |
| THIS DOCUMENT RELATES TO: | Hon. Harry D. Leinenweber |
| All Actions | **FILED UNDER SEAL** |
| | **PUBLIC VERSION** |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' CAUSATION/DAMAGES MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................... 1

FACTUAL BACKGROUND ...................................................................... 4

I.     THE UNDERLYING PATENT LITIGATION. .................................. 5

    A.     Endo's '456 and '933 patents. .............................................. 5

    B.     The Settlement and License Agreement. ............................... 6

II.    ENDO'S LATER-ACQUIRED PATENTS COVERING OPANA ER. .......... 8

ARGUMENT ...................................................................................... 10

I.     Applicable Legal Standard ..................................................... 10

II.    The Undisputed Facts Demonstrate that the SLA Benefitted Plaintiffs. ......... 12

III.   Class Plaintiffs' Theory of Antitrust Injury is Speculative, Unsupported by the Record, and Contradicted by Undisputed Facts .................................. 15

    A.     Nothing in the record supports Class Plaintiffs' claim that an alternative settlement would have included the Broad License to future patents ................ 17

    B.     Nothing in the record supports Class Plaintiffs' claim that a hypothetical, alternative settlement would have included an entry date between April and July 2011. ........................................................ 22

IV.    The Retailer Plaintiffs' Theories of Antitrust Injury are Similarly Speculative and Unsupported by the Record. ......................................... 26

    A.     Retailer Plaintiffs have presented no facts from which a reasonable jury could find that Endo and Impax would have entered into an alternative settlement. ........................................................... 27

        1.     Nothing in the record supports the Retailer Plaintiffs' claim that an alternative settlement would have included a Broad License. ........... 27

        2.     Nothing in the record supports Retailer Plaintiffs' claim that an alternative settlement would have had a July 15, 2011 entry date ........... 28

            a.     Dr. Leffler's profitability model fails to account for the costs and benefits of the Broad License and thus does not fit the facts ............. 29

            b.     Dr. Leffler's model is not capable of identifying the generic entry date he offers in his opinion ............................ 30

    B.     Retailer Plaintiffs' "continued litigation" theory does not show antitrust injury. ........................................................... 32

V.     Summary Judgment is Appropriate Because Plaintiffs Cannot Show Damages Resulting from the SLA. .......................................... 33

i

## TABLE OF CONTENTS
(continued)

Page

A. Plaintiffs' failure of proof with respect to their "alternative" settlement theories means they cannot show damages...........................34

B. Retailer Plaintiffs' "continued litigation" damages models fail because they do not account for the benefit Retailer Plaintiffs received from the Broad License. ...........................................35

VI. Summary Judgment is Appropriate for Certain of EPPs' State Law Claims. .................37

A. EPPs' unjust enrichment claims under Arizona, Massachusetts, and Mississippi law are limited to purchases made within three years of the filing of the first Complaint. ...........................................37

CONCLUSION.............................................................39

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*AA Sales & Assoc., Inc. v. Coni–Seal, Inc.*,
    550 F.3d 606 (7th Cir. 2008) ................................................................................3

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*,
    141 F.3d 947 (9th Cir. 1998) ..............................................................................32

*Amadio v. Ford Motor Co.*,
    238 F.3d 919 (7th Cir. 2001) ..............................................................................11

*Anderson v. LaVere*,
    135 So. 3d 404 (Miss. 2014) ..............................................................................38

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................................11

*Austin v. Walgreen Co.*,
    885 F.3d 1085 (7th Cir. 2018) ............................................................................16

*Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*,
    152 F.3d 588 (7th Cir. 1998) ..............................................................................34

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ............................................................................................21

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*,
    429 U.S. 477 (1977) ............................................................................................33

*Cambridge Literary Props., Ltd. v. W. Goebel Porzellenfabrik G.m.b.H. & Co.
Kg.*,
    448 F. Supp. 2d 244 (D. Mass. 2006) ................................................................38

*Collins v. Associated Pathologists, Ltd.*,
    844 F.2d 473 (7th Cir. 1988) ..............................................................................10

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ..............................................................................................35

*Costanzo v. Stewart*,
    453 P.2d 526 (Ariz. Ct. App. 1969) ..................................................................38

*Dana Corp. v. Am. Standard, Inc.*,
    866 F. Supp. 1481 (N.D. Ind.1994) ..................................................................18

*DiPerna v. Chicago Sch. of Prof'l Psy.*,
893 F.3d 1001 (7th Cir. 2018) ........................................................................11

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000)............................................................................19

*Essex Ins. Co. v. Structural Shop, Ltd.*,
No. 15-2806, 2017 WL 2224879 (N.D. Ill. May 22, 2017)............................25

*Good v. Univ. of Chi. Med. Ctr.*,
673 F.3d 670 (7th Cir. 2012) ..........................................................................33

*Grant v. Trustees of Indiana Univ.*,
870 F.3d 562 (7th Cir. 2017) ..........................................................................33

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
998 F.2d 391 (7th Cir. 1993) ...............................................................11, 12, 30

*Grip-Pak, Inc. v. Illinois Tool Works, Inc.*,
651 F. Supp. 1482 (N.D. Ill. 1986) .................................................................15

*Grp. Health Plan, Inc. v. Phillip Morris, Inc.*,
188 F. Supp. 2d 1122 (D. Minn. 2002)......................................................21, 35

*In re Aggrenox Antitrust Litig.*,
94 F. Supp. 3d 224, 248 (D. Conn. 2015) .......................................................38

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
No. 11-2262, 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) ..........................36

*In re Loestrin 24 Fe Antitrust Litig.*,
No. 13-md-2472, 2019 WL 7286764 (D.R.I. Dec. 17, 2019)..........................38

*In re Nexium (Esomeprazole) Antitrust Litig.*,
842 F.3d 34 (1st Cir. 2016)........................................................................12, 30

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 914 (9th Cir. 2015) ..........................................................................21

*In re Opana ER Antitrust Litig.*,
162 F. Supp. 3d 704 (N.D. Ill. 2016) ...................................................37, 38, 39

*In re Optical Disc Drive Antitrust Litig.*,
No. 10-2143, 2017 WL 6451711 (N.D. Cal. 2019) ........................................21

*In re Wellbutrin XL Antitrust Litig.*,
133 F. Supp. 3d 734, 764 (E.D. Pa. 2015) ............................................. passim

*In re Wellbutrin XL Antitrust Litig.*,
    868 F.3d 132 (3d Cir. 2017)................................................................... passim

*James Cape & Sons Co. v. PCC Const. Co.*,
    453 F.3d 396 (7th Cir. 2006) ...................................................................32

*JetAway Aviation, LLC v. Bd. of Cty. Comm'rs of Cty. of Montrose, Colo.*,
    754 F.3d 824 (10th Cir. 2014) .................................................................32

*Kelley v. Microsoft Corp.*,
    No. C07-0475 MJP, 2009 WL 413509 (W.D. Wash. Feb 18, 2009)......................28

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)................................................................................38

*Kochert v. Greater Lafayette Health Servs., Inc.*,
    463 F.3d 710 (7th Cir. 2006) ...................................................................12

*Kottaras v. Whole Foods Mkt., Inc.*,
    281 F.R.D. 16 (D.D.C. 2012).....................................................................36

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
    791 F.2d 1356 (9th Cir. 1986) .................................................................36

*MCI Comms. Corp. v. Am. Tel. & Tel. Co.*,
    703 F.2d 1081 (7th Cir. 1983) .................................................................34

*McNamara v. Kmart Corp.*,
    380 F. App'x 148 (3d Cir. 2010) ...............................................................25

*The Medicines Co. v. Mylan Inc.*,
    11-1285, 2014 WL 1979261 (N.D. Ill. May 15, 2014)........................................25

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
    238 F. Supp. 2d 1024 (N.D. Ill. 2003) (Leinenweber, J.)......................................11

*Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chicago*,
    877 F. 2d 1333 (7th Cir. 1989) .................................................................33

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
    676 F. Supp. 486 (S.D.N.Y. 1987)................................................................36

*Monarch Mrkg. Sys., Inc. v. Duncan Parking Meter Maint. Co.*,
    No. 82-2599, 1988 WL 5038 (N.D. Ill. Jan. 19, 1988)........................................13

*Morrison v. Quest Diagnostics Inc.*,
    No. 14-01207, 2016 WL 3457725 (D. Nev. June 23, 2016)...................................19

*Pharmanetics, Inc. v. Aventis Pharm., Inc.*,
No. 5:03-CV-817, 2005 WL 6000369 (E.D.N.C. May 4, 2005) ............................................35

*Procaps S.A. v. Patheon, Inc*.,
141 F. Supp. 3d 1246, 1281-82 (S.D. Fla. 2015) ....................................................................32

*Reserve Supply Corp. v. Owens–Corning Fiberglas Corp.*,
971 F.2d 37 (7th Cir. 1992) ..................................................................................................11

*Sheehan v. Daily Racing Form, Inc.*,
104 F.3d 940 (7th Cir. 1997) ................................................................................................19

*SportFuel, Inc. v. PepsiCo, Inc.*,
932 F.3d 589 (7th Cir. 2019) ................................................................................11, 16, 28

*Three Crown Ltd. P'ship v. Salomon Bros.*,
906 F. Supp. 876 (S.D.N.Y. 1995).......................................................................................34

*Tyger Const. Co. Inc. v. Pensacola Const. Co.*,
29 F.3d 137 (4th Cir. 1994) .............................................................................................19, 35

*U.S. Futures Ex., LLC v. Board of Trade of City of Chicago, Inc.*,
346 F. Supp. 3d 1230 (N.D. Ill. 2018) ..................................................................................10

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
627 F.3d 85 (3d Cir. 2010)....................................................................................................33

*Weigel v. Target Stores*,
122 F.3d 461 (7th Cir. 1997) .............................................................................................3, 21

## STATUTES

21 U.S.C. § 355(b)(1) ...................................................................................................................5

35 U.S.C. § 271(e)(2).....................................................................................................................5

Ariz. Rev. Stat. § 12-543(1)........................................................................................................38

Mass. Gen. Laws c. 260, § 2A ....................................................................................................38

Miss. Code Ann. § 15-1-49(1).....................................................................................................38

## OTHER AUTHORITIES

Daniel M. Hausman, *Ceteris Paribus Clauses and Causality in Economics*, 2
PSA: Proceedings Biennial Meeting Phil. Sci. Ass'n 308, 308 (1988) ..................................20

Gregory Mitchell, *Tendencies Versus Boundaries: Levels of Generality in
Behavioral Law and Economics*, 56 VNLR 1781 (2003).......................................................20

Defendants Endo Health Solutions Inc., Endo Pharmaceuticals Inc., Penwest Pharmaceuticals Co. (collectively "Endo") and Impax Laboratories, Inc. ("Impax") submit this Memorandum of Law in Support of Defendants' Causation/Damages Motion for Summary Judgment. The Court should grant summary judgment in favor of Defendants because Plaintiffs have presented no evidence that would allow a reasonable jury to find that the alleged unlawful agreement caused Plaintiffs antitrust injury, an essential element of their claims. Summary judgment is appropriate for the additional reason that Plaintiffs' damages models fail to create a genuine issue of material fact as to whether they sustained damages by reason the SLA.

## PRELIMINARY STATEMENT

Plaintiffs[1] challenge a 2010 Settlement and License Agreement ("SLA") resolving patent litigation between Endo and Impax related to Opana ER, Endo's long-acting opioid pain reliever. Plaintiffs claim that, in the SLA, Endo made alleged "payments" to Impax in return for delayed entry of Impax's generic version of Opana ER, harming competition and causing them injury. The undisputed facts, however, demonstrate that the SLA did the opposite. It hastened generic competition, benefitting, not injuring, the Plaintiffs. If not for the SLA, Impax, like every other potential generic competitor, would have been unable to sell an oxymorphone product until at least November 2029. But because of the SLA, Impax was able to launch its competing generic product almost 17 years earlier, in January 2013, and is able to remain on the market today.

Impax was the only generic company able to do so because of undisputed circumstances that set this case apart from other "reverse payment" cases. *First*, the SLA included a right that Impax could not have secured through continued litigation: A license not only to the patents in

---

[1] Defendants seek summary judgment as to all claims brought by the putative classes of Direct Purchaser Plaintiffs and End Payor Plaintiffs, and the Retailer Plaintiffs.

1

suit, but also to Endo's later-acquired patents covering Opana ER.  There is no dispute that Impax was the ***only*** generic filer to obtain from Endo such a broad license covering future patents.  *Second*, Endo later acquired and successfully enforced additional patents for Opana ER.  As a result, it is undisputed that no company other than Impax is currently able to sell a generic version of Opana ER until November 2029.  Put another way, the only reason Plaintiffs can choose to purchase generic oxymorphone today—and not wait until November 2029—is because of the SLA.

In an effort to demonstrate antitrust injury, Plaintiffs make different—but equally ineffective—attempts to overcome these undisputed facts.  They fail to do so.

Direct Purchaser Plaintiffs and End Payor Plaintiffs (collectively, "Class Plaintiffs") rely on a single speculative theory.[2]  They hypothesize that, if the SLA had not contained certain alleged "payments" to Impax, the parties would have negotiated a different settlement agreement.  And they purport to predict the outcome of these hypothetical negotiations, speculating that they would have resulted in an agreement with both an earlier entry date for Impax ***and*** the same broad license to future patents.  Thus, Class Plaintiffs imagine a settlement that allows them to have their cake and eat it too, providing an earlier entry date than the SLA but still preserving the benefits of the SLA's broad license.

---

[2]  Class Plaintiffs are not pursuing two theories of antitrust injury that are typical in these types of cases, *i.e.*, that, in the absence of the SLA, the litigation would have continued and that Impax would have entered earlier because (a) it would have won and launched after confirming the victory on appeal or, alternatively, (b) it would have won but launched at risk while the patent litigation was still ongoing.  The Class Plaintiffs apparently recognize that under either of these theories Impax could not have obtained a broad license to future patents covering Opana ER, and thus would have been subject to Endo's successful enforcement of those patents (like every other would-be generic entrant).

The problem for Class Plaintiffs is that years of discovery have yielded no record *evidence* supporting this theory. The evidence is actually to the contrary. It is undisputed that no other settlement related to Opana ER contains a broad license, that Endo rejected all other requests for such a license, and that Endo rejected Impax's request for a settlement with an earlier entry date.

Instead of evidence, the Class Plaintiffs rely entirely on a model developed by their expert, Dr. McGuire, that supposedly predicts the outcome of negotiations that never occurred. That model, however, does not, and cannot, demonstrate that any hypothetical alternative settlement would have contained a broad license. ███████████████████████ ███████████████. Similarly, with respect to the supposed alternative entry dates, Dr. McGuire's model is based on speculation and unsupported assumptions, not evidence. But the time for such conjecture has passed. *AA Sales & Associates, Inc. v. Coni–Seal, Inc.,* 550 F.3d 606, 612–13 (7th Cir. 2008) ("As we have often observed, summary judgment is the 'put up or shut up' moment in the life of a case."); *Weigel v. Target Stores*, 122 F.3d 461, 466 (7th Cir. 1997) ("theoretical speculations" are not a bar to summary judgment).

Retailer Plaintiffs assert a different but similarly defective alternative settlement theory, which fails for many of the same reasons. In addition, they also rely on a theory under which Impax did not settle with Endo but instead pursued the 2010 patent litigation to a conclusion (the "continued litigation" theory that the Class Plaintiffs apparently concluded—with good reason— was not worth pursuing). But a litigation victory for Impax in the 2010 trial would have left it without a license to the patents Endo later acquired. As a result, even if Impax had enjoyed such a temporary victory, and a short-term presence on the market, it would have infringed the additional patents and been enjoined from selling its generic Opana ER product until November 2029.

Instead, as a result of the SLA, Retailer Plaintiffs have received the benefit of almost 17 additional years of lawful generic competition. Their purported "answer" to this problem with the continued litigation theory is to cut off damages as of November 2012, when the first additional patents issued. However, that merely ignores—but does not eliminate—the benefit they received under the SLA. Their approach is improper as a matter of law.

In short, neither the Class Plaintiffs nor the Retailer Plaintiffs can come forward with any record evidence or admissible expert opinion demonstrating antitrust injury or their purported damages. Consequently, the Court should enter summary judgment in favor of Defendants.

## FACTUAL BACKGROUND

Endo developed and sold two formulations of Opana ER, an extended-release oxymorphone medication indicated for the management of severe pain requiring around-the-clock treatment: Original Opana ER, sold from 2006 until May 2012, and Reformulated Opana ER, designed to be more crush-resistant to address abuse by crushing and snorting, sold from March 2012 to September 2017. Defendants' Statement of Undisputed Facts in Support of Causation/Damages Motion for Summary Judgment [hereafter "SUF"] ¶ 11. In the SLA, Impax secured a license beginning in January 2013 to sell a generic version of Original Opana ER under existing ***and future*** patents covering Opana ER. SUF ¶ 20.

Impax was the only company to receive a license from Endo that included future patents covering Opana ER. SUF ¶¶ 33-34, 56. Moreover, due to Endo's successful enforcement of its later-acquired patents, no other generic company may lawfully sell a generic version of Opana ER until at least November 2029. SUF ¶¶ 49-54, 56. As a result of the SLA, however, Impax has been able to do so since January 2013, almost 17 years earlier. SUF ¶¶ 20, 22, 56. Thus, the very

4

SLA that Class Plaintiffs challenge as supposedly delaying generic competition actually enabled it. SUF ¶¶ 55-56.

## I.     The Underlying Patent Litigation.

### A.     Endo's '456 and '933 patents.

Endo listed several patents covering Opana ER in the FDA's "Orange Book," as contemplated by the Hatch Waxman Act, including U.S. Patents 6,958,456 (the "'456 patent") and 5,662,933 (the "'933 patent"). The Orange Book is an FDA publication that lists the patents covering approved drugs or the method of using such drugs. 21 U.S.C. § 355(b)(1). When a generic applicant files an Abbreviated New Drug Application ("ANDA") for approval of a generic version of a branded pharmaceutical, it must make one of four certifications related to any patents listed in the Orange Book: (i) that there are no patents listed in the Orange Book that cover the branded pharmaceutical; (ii) that any listed patents have expired; (iii) that the generic is not seeking approval before the expiration of any listed patents; or (iv) that any listed patents are not infringed, are invalid, and/or are unenforceable (a "Paragraph IV certification"). *Id.* § 355(j)(2)(A)(vii). The filing of a Paragraph IV certification is, by statute, an act of infringement, allowing the patent holder to file infringement litigation, if appropriate. 35 U.S.C. § 271(e)(2).

In 2007, Impax filed an ANDA for approval of certain strengths of a generic version of Opana ER. SUF ¶ 14. Impax included a Paragraph IV certification claiming that, among other things, Impax's sale of its generic Opana ER product would not infringe the '456 and '933 patents and that these patents were invalid. SUF ¶ 14. As the first ANDA filer with a Paragraph IV certification, Impax was entitled to 180 days of marketing exclusivity, meaning that the FDA

would not approve another generic during the exclusivity period (as to all dosage strengths except 7.5 mg and 15 mg).[3]  SUF ¶ 10.

In response, Endo filed a patent infringement action, alleging that Impax's generic product would infringe the '933 patent and the '456 patent.  SUF ¶ 15.  The parties vigorously litigated the case for two and a half years.  SUF ¶ 18.  Trial commenced on June 3, 2010.  SUF ¶ 18.

### B.    The Settlement and License Agreement.

Endo and Impax entered into the SLA settling the patent litigation on June 8, 2010.  The SLA provided that (1) Impax would obtain a license from Endo to market and sell generic versions of Opana ER on January 1, 2013; (2) Endo would not market (or authorize a third-party to market) a generic version of Original Opana ER during Impax's 180-day exclusivity period; (3) Impax would pay Endo a 28.5% royalty on the net sales of Impax's generic Opana ER during its 180-day exclusivity period if Endo's sales in the last quarter before Impax's launch exceeded a certain threshold; and (4) if the net sales of Original Opana ER in the last quarter before Impax's launch fell below a threshold defined in the SLA, Endo would pay Impax an "Endo Credit".[4]  SUF ¶¶ 20-21.

Importantly, Impax also received something in the SLA it could not have obtained even if it had won the patent litigation:  a license not only to the patents at issue in the litigation, but also to future patents covering Opana ER (the "Broad License").  SUF ¶ 22 (Endo-Impax SLA § 4.1).

---

[3]    Opana ER has seven strengths: 5 mg, 7.5 mg, 10 mg, 15 mg, 20 mg, 30 mg, and 40 mg. SUF ¶ 11.

[4]    The day before Endo and Impax executed the SLA, they also entered into a Development and Co-Promotion Agreement ("DCA") for a Parkinson's product that Impax was developing. The Plaintiffs allege that Endo's payment under the DCA was also a "reverse payment," but the terms of the DCA are not at issue for purposes of this Motion because the DCA has no bearing on Plaintiffs' failure to show antitrust injury and is not at issue in this Motion.

Impax was the only ANDA filer to obtain a Broad License. Endo also settled patent infringement actions against other ANDA applicants for Original Opana ER, including Actavis, Barr (now Teva), Sandoz, Watson, and Roxane. Each of those settlements included a license to the '456 and '933 patents, but *none* included a license to patents other than the '456 and '933 patents. Endo refused to include broader patent licenses in the other settlement agreements even where the generic companies insisted upon it during negotiations. SUF ¶¶ 32-33. Specifically:

- <u>Actavis</u>: Endo settled its patent litigation with Actavis, which was the first filer for the 7.5 and 15mg strengths of Opana ER, on February 20, 2009. SUF ¶ 32. ███████████████████████████████ *Id.*

- <u>Teva</u>: 

in March of 2010 and the parties reached an agreement on April 13, 2010 (just two months before the SLA)—██ ██████████████████████. *Id.*

- <u>Watson</u>: Endo settled its patent litigation with Watson on October 4, 2010 █████████████████. SUF ¶ 32.

- <u>Roxane</u>: Endo settled with Roxane on May 4, 2011. SUF ¶ 32. Roxane later claimed in litigation that it had a license to future patents, but the Federal Circuit disagreed. *Id.*

- <u>Sandoz</u>: Endo settled its patent litigation with Sandoz on June 7, 2010, the day before Endo settled with Impax. SUF ¶ 32. ██████████████

SUF ¶ 32 n.6. ███████████

The benefit to Impax of the Broad License was very real. As explained below, Endo later obtained additional patents covering Opana ER and successfully enforced those patents. As a

result, no other company can sell a generic version of Opana ER until at least November 2029. Because of the SLA, however, Impax did not suffer that same fate. To the contrary, and as permitted by the Broad License, Impax launched its generic versions of Original Opana ER in January 2013.

## II.    Endo's Later-Acquired Patents Covering Opana ER.

The additional patents Endo obtained covering Original Opana ER included, among others, U.S. patent number 8,309,122 (the '122 patent), expiring February 4, 2023; U.S. patent number 8,329,216 (the '216 patent), expiring February 4, 2023; and U.S. patent number 8,871,779 (the '779 patent)[5], expiring November 22, 2029 (the "Additional Patents"). SUF ¶ 35. Endo enforced the Additional Patents in two different sets of litigation. As a result, every generic defendant[6] either withdrew its ANDA(s), committed not to launch before expiration of the relevant patents, or proceeded to trial, lost, and was enjoined from entering with generic versions of Original Opana ER or Reformulated Opana ER (Actavis, which launched at risk, was also ordered to remove its product from the market). The actions are summarized below:

**The SDNY Actions.** Endo asserted claims for infringement based on the '122 and '216 patents in the U.S. District Court for the Southern District of New York (the "SDNY Actions"). A number of generic defendants either withdrew their ANDAs, converted their ANDAs to a

---

[5]     The '779 patent was issued to Mallinckrodt, with Endo as the exclusive licensee.

[6]     The defendants in those cases included Amneal Pharmaceuticals of New York, LLC and Amneal Pharmaceuticals LLC ("Amneal"); Mallinckrodt Pharmaceutical Co. ("Mallinckdrodt"); Par Pharmaceutical ("Par"); ThoRx Laboratories, Inc. ("ThoRx"); Sun Pharmaceutical Industries, Ltd., Ranbaxy, Inc., and Ranbaxy Pharmaceuticals, Inc. ("Sun"); Roxane Laboratories, Inc. ("Roxane"); Actavis Inc. and Actavis South Atlantic LLC ("Actavis"); Sandoz, Inc. ("Sandoz"); Teva Pharmaceuticals USA, Inc. ("Teva"); Barr Laboratories, Inc. ("Barr"); Watson Pharmaceuticals, Inc. ("Watson"); and Impax (with respect to Reformulated Opana ER only). Because of the SLA, Impax was sued only with respect to its generic version of Reformulated Opana ER, not the Original Opana ER.

Paragraph III certification, or otherwise committed not to enter before the expiration of Endo's patents. Endo dismissed its claims with respect to those defendants, but proceeded to trial against all of the other remaining ANDA filers: Actavis/Watson (Original and Reformulated), Amneal (Reformulated), Roxane (Original), Sun Pharma (Original and Reformulated), Barr/Teva (Reformulated), ThoRx (Reformulated), and Impax (Reformulated) (the "SDNY defendants"). SUF ¶¶ 36-38.

After trial, the district court (1) ruled that the SDNY defendants' products infringed all but two asserted claims of the '122 and '216 patents and that those patents were not invalid; (2) ordered Actavis to remove its generic product from the market; and (3) enjoined each of the SDNY defendants from making or selling their generic versions of Opana ER until the expiration of the '122 and '216 patents on February 4, 2023. SUF ¶ 41.

On April 29, 2016, the district court enjoined Actavis and certain other moving SDNY defendants from making or selling their generic products prior to expiration of the '122 and '216 patents, and again ordered Actavis to remove its products from the market. SUF ¶ 42. On May 16, 2018, the Federal Circuit affirmed the district court's finding that the '122 and '216 patents were valid and infringed by manufacturers of generic Original Opana ER and Reformulated Opana ER, and affirmed the injunctive relief issued by the district court. SUF ¶ 43.

**The Delaware Actions.** Endo also asserted the '779 patent in a separate litigation before the United States District Court for the District of Delaware against Actavis, Amneal, Barr/Teva, Impax (with respect to its generic version of Reformulated Opana ER only), Par, Roxane, ThoRx, Sandoz, and Sun (the "Delaware Actions"). Endo subsequently dismissed its claims against Sandoz and Par after they took certain actions ensuring that they would not enter prior to the expiration of the patents at issue in the Delaware Actions. Endo pursued the case to judgment

9

against the remaining generic defendants. Amneal, Barr/Teva, and Actavis stipulated to infringement, but chose to litigate the issue of the patent's validity through trial. Impax, ThoRx, Sun, and Roxane entered into stipulations that the judgments with respect to the other defendants would be binding on them. SUF ¶¶ 45-48.

On October 7, 2016, after the first trial against Amneal and Barr/Teva, the district court held that Amneal and Barr/Teva had failed to prove the '779 patent was invalid. SUF ¶ 49. The district court enjoined Amneal, Teva, and Barr from making or selling their generic products before the expiration of the '779 patent in November 2029. SUF ¶ 49. On August 30, 2017, after a separate trial against Actavis, the district court similarly held that Actavis had failed to prove the '779 patent was invalid. SUF ¶ 50. The district court accordingly also enjoined Actavis from making or selling its generic Opana ER product prior to expiration of the '779 patent in November 2029. SUF ¶ 50. On May 3, 2019, the Federal Circuit affirmed the district court's decision that the '779 patent was not invalid, and affirmed the district court's grant of injunctive relief. SUF ¶ 52.

In sum, as a result of Endo's successful enforcement of the Additional Patents in the SDNY Actions and the Delaware Actions, no company—other than Impax—may sell a generic version of Opana ER until November 2029. SUF ¶¶ 55-56. Impax is able to do so only because of the SLA, the very agreement that Plaintiffs contend somehow excluded competition.

## ARGUMENT

## I. Applicable Legal Standard.

"In the field of antitrust law, summary judgment serves a vital function—it avoids wasteful trials and prevents lengthy litigation that may have a chilling effect on pro-competitive market forces." *U.S. Futures Ex., LLC v. Board of Trade of City of Chicago, Inc.*, 346 F. Supp. 3d 1230, 1248 (N.D. Ill. 2018) (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 98 (2d

Cir. 2018)) (citation, modifications, and quotations omitted), *aff'd* No. 18-3558, 2020 WL 1426596 (7th Cir. Mar. 23, 2020). While there is no heightened summary judgment standard for antitrust cases, "the very nature of antitrust litigation encourages summary disposition of such cases when permissible." *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 475-76 (7th Cir. 1988); *see also Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1032 (N.D. Ill. 2003) (Leinenweber, J.), *aff'd*, 354 F.3d 661 (7th Cir. 2004) ("Summary judgment may be especially appropriate in the antitrust context because of the chill antitrust litigation can have on legitimate competition.") (citations omitted).

To survive summary judgment, a plaintiff must present evidence sufficient to demonstrate the existence of each element of its claim. *Reserve Supply Corp. v. Owens–Corning Fiberglas Corp.*, 971 F.2d 37, 48–49 (7th Cir. 1992). "Summary judgment is warranted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 394 (7th Cir. 1993) (citing *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)); *Menasha Corp.*, 238 F. Supp. 2d at 1031–32.

A mere "scintilla of evidence" is not enough to create a genuine issue of material fact; rather, "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). That is, the nonmoving party "must point to specific facts showing that there is a genuine issue for trial, and inferences relying on mere speculation or conjecture will not suffice." *DiPerna v. Chicago Sch. of Prof'l Psy.*, 893 F.3d 1001, 1006 (7th Cir. 2018); *see also SportFuel, Inc. v. PepsiCo, Inc.*, 932 F.3d 589, 601 (7th Cir. 2019) (explaining that "assumption or speculation" is insufficient to defeat summary judgment); *Amadio*

*v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001) ("It is well-settled that speculation may not be used to manufacture a genuine issue of fact.").

Here, as explained below, Plaintiffs have no evidence from which a reasonable jury could find that the SLA caused them antitrust injury, an essential element of their claims. Accordingly, the Court should grant summary judgment in favor of Defendants.

## II.    The Undisputed Facts Demonstrate that the SLA Benefitted Plaintiffs.

To prevail on their antitrust claims, Plaintiffs must prove that the SLA caused them antitrust injury by delaying generic sales of Opana ER—that is, that the SLA was "the cause-in-fact of the injury" and "but for the [SLA], the injury would not have occurred."[7] *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 718 (7th Cir. 2006) (internal citation and quotation omitted); *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co*., 998 F.2d 391, 401–02 (7th Cir. 1993). Antitrust injury cannot simply be presumed. *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 764 (E.D. Pa. 2015), *aff'd* 868 F.3d 132 (3d Cir. 2017); *see also In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 60 (1st Cir. 2016) (explaining that the question of the existence of a reverse payment is separate from the question of whether generic entry would have occurred earlier "but for the antitrust violation"). Plaintiffs must prove that their alleged harm "was caused by the settlement they are complaining about." *In re Wellbutrin XL Antitrust Litig*., 868 F.3d 132, 164-65 (3d Cir. 2017); *see also Nexium*, 842 F.3d at 60 ("A private plaintiff seeking monetary relief must show actual, quantifiable damages '***by reason of***' the antitrust violation.").

---

[7]    Plaintiffs' need to show antitrust injury sets this private action apart from the administrative action before the Federal Trade Commission, *In the Matter of Impax Pharmaceuticals*, and from the Supreme Court's decision in *Actavis* itself. "[N]othing in *Actavis* altered the Clayton Act's causation requirement." *Wellbutrin*, 133 F. Supp. 3d at 764.

The problem for the Plaintiffs is that the undisputed evidence demonstrates that the SLA benefitted them.  But for the Broad License in the SLA, Endo's Additional Patents would have prevented Impax from selling generic Opana ER until November 2029.  Put another way, the Additional Patents would have been an independent barrier to generic competition for Opana ER. It is well-settled that such an independent barrier to competition breaks the chain of causation necessary to show antitrust injury.  *See Wellbutrin*, 868 F.3d at 165 (collecting cases); *see also Monarch Mrkg. Sys., Inc. v. Duncan Parking Meter Maint. Co*., No. 82-2599, 1988 WL 5038, at *5 (N.D. Ill. Jan. 19, 1988), *vacated in part on other grounds*, 1988 WL 23830 (N.D. Ill. Mar. 8, 1988); *cf*. Richard A. Posner, Economic Analysis of Law 91 (5th Ed. 1998) ("We do not want an efficient market in stolen goods.").  The SLA, with its Broad License, offered Impax a path around that barrier, thus enabling competition.

The following facts are not in dispute:  After the SLA, Endo acquired the Additional Patents covering Opana ER and filed patent infringement lawsuits in the SDNY and Delaware against all other generic manufacturers who had filed ANDAs relating to any form of Opana ER.  Endo also sued Impax with respect to Impax's ANDA for a generic version of Reformulated Opana ER (the "Reformulated ANDA"), but Endo did not sue Impax with respect to its ANDA for a generic version of Original Opana ER (the "Original ANDA") precisely because the Original ANDA was covered by the Broad License in the SLA.  Endo prevailed in those lawsuits both at trial and on appeal.  As a result, except for Impax, all generic manufacturers that have pending or approved ANDAs cannot market their respective ANDA tablets until the last of the Additional Patents have expired—*i.e.*, until 2029.

If not for the SLA, Impax would have suffered the same fate as the other generics with respect to its Original ANDA, and as Impax itself with respect to its Reformulated ANDA.  Endo

13

has submitted uncontroverted expert evidence demonstrating that (i) but for the Broad License to future patents in the SLA, Endo would have sued Impax in the SDNY and Delaware not only with respect to its Reformulated ANDA, but also its Original ANDA; and (ii) Impax would have been enjoined from selling its Original Opana ER for the same reasons that the other manufacturers of generic Opana ER were enjoined.  SUF ¶¶ 55-56.

Plaintiffs do not and cannot dispute these basic facts.  Their patent litigation expert cited the Additional Patents in his opening report, and acknowledged that █████████████████ ██████████████████████████████████████████████████████████ Ex. A, March 25, 2019 Expert Report of Glen P. Belvis [hereafter "Belvis Rep."] ¶¶ 451-58.  He did not dispute that, once those patents issued, but for the SLA, Endo would have been successful in enjoining Impax from selling its Original ANDA tablets until 2029.  Nor could he, because the outcomes of the later litigations are reflected in the public record—Endo prevailed, at trial and on appeal, against Impax's Reformulated ANDA tablets and all of the other generics' ANDA Tablets.  As demonstrated by the uncontroverted opinions of Endo's experts, Endo would have similarly prevailed with respect to Impax's Original ANDA tablets.

The import of these undisputed facts is clear:  Plaintiffs benefitted from the SLA.  The Broad License in the SLA is the reason Plaintiffs have been able to lawfully purchase generic Opana ER since January 2013.  And the Broad License is the reason Impax is the only company selling generic Opana ER today.  As explained below—first with respect to the Class Plaintiffs and then with respect to the Retailer Plaintiffs—Plaintiffs have no evidence suggesting they would have secured that benefit in any but-for world.

### III. Class Plaintiffs' Theory of Antitrust Injury is Speculative, Unsupported by the Record, and Contradicted by Undisputed Facts.

Class Plaintiffs do not attempt to advance any theory of antitrust injury based on arguments that (1) absent the settlement, Impax would have won the patent case and launched before patent expiration, or (2) absent the settlement, Impax would have "launched at risk" even before the patent case was decided. This makes sense: Neither scenario would have provided Impax with the Broad License.

Class Plaintiffs have instead crafted a single, limited theory of antitrust injury in an attempt to get around the undisputed evidence demonstrating that they benefitted from the SLA. They theorize that, but for the SLA, Endo and Impax would have entered into a different, "alternative" settlement of Class Plaintiffs' own design. Class Plaintiffs contend that their hypothetical, alternative settlement would have contained the same Broad License included in the SLA, but *also* an even earlier generic entry date, sometime between April and July 2011.

To prevail on this theory, Class Plaintiffs would need to present evidence from which a reasonable jury could find that Endo and Impax would have agreed to ***both*** aspects of their hypothetical alternative settlement: (a) the Broad License covering Endo's future patents; and (b) an earlier entry date. Proving both aspects is critical to Class Plaintiffs' theory. Without the Broad License, Impax would have been unable to lawfully sell generic Opana ER from November 2012, when Endo's first Additional Patent issued, through November 2029, when the last of the Additional Patents expires.[8] Without an entry date before January 1, 2013, the hypothetical alternative settlement would not allow for entry any earlier than the actual SLA.

---

[8] Class Plaintiffs speculate that the hypothetical alternative settlement would include an entry date between April and July of 2011, before Endo obtained the first Additional Patent in November 2012, but such early entry alone would mean little if Impax would then be unable to lawfully sell generic Opana ER from November 2012 through November 2029.

Moreover, Class Plaintiffs must point to "specific or concrete evidence" affirmatively showing that the parties to the patent litigation would have negotiated an alternative settlement in the specific form Plaintiffs imagine. *See Wellbutrin*, 868 F.3d at 167 (emphasis added); *cf. Grip-Pak, Inc. v. Illinois Tool Works, Inc.*, 651 F. Supp. 1482, 1500–04 (N.D. Ill. 1986) (granting summary judgment where plaintiffs presented insufficient evidence in support of their but-for world). It is not enough to speculate that they might have done so. *Wellbutrin*, 868 F.3d at 166-67 ("A plaintiff cannot satisfy the summary judgment burden based on speculation alone."); *see also SportFuel*, 932 F.3d at 601 ("[S]peculation will not suffice to defeat summary judgment.") (internal citations and quotations omitted); *Austin v. Walgreen Co.*, 885 F.3d 1085, 1089 (7th Cir. 2018) ("Speculation does not defeat summary judgment.").

The Class Plaintiffs cannot meet this burden. After *years* of extensive discovery, there is no evidence of record from which a reasonable jury could find that Endo and Impax would have entered into Class Plaintiffs' purported alternative settlement featuring *both* a Broad License *and* a generic entry date earlier than January 2013. And Class Plaintiffs' expert, Dr. McGuire, cannot fill those evidentiary holes. Dr. McGuire does nothing to analyze whether a hypothetical alternative settlement would have included a Broad License. ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██

Further, Dr. McGuire's proffered "profitability" model cannot reliably predict what, if any, entry dates the parties would have agreed to in a hypothetical alternative settlement. In short, Class Plaintiffs have failed to come forward with any evidence that would allow a reasonable jury to

find that Endo and Impax would have negotiated Plaintiffs' imagined alternative settlement. As a result, Plaintiffs cannot demonstrate antitrust injury.

### A. Nothing in the record supports Class Plaintiffs' claim that an alternative settlement would have included the Broad License to future patents.

Class Plaintiffs have presented no record evidence that would allow a reasonable jury to find that Endo and Impax would have agreed to a hypothetical alternative settlement including the same Broad License as the SLA, *i.e.*, one covering Endo's Additional Patents. Instead, they can offer only conjecture and unsupported assumptions. That is not sufficient. To survive summary judgment, Class Plaintiffs cannot simply assume into existence the terms of their hypothetical alternative settlement that forms the foundation of their theory of antitrust injury. *See Wellbutrin*, 868 F.3d at 166 (requiring affirmative evidence of fact supporting causal theory at summary judgment stage).

The Third Circuit's decision affirming summary judgment in *Wellbutrin* is instructive. *Id.* at 169–70. As in this case, in *Wellbutrin* there was another patent, beyond those at issue in the underlying patent litigation, that would have independently blocked lawful generic sales. *See In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 745, 747 (E.D. Pa. 2015). Also as here, the settlement challenged in *Wellbutrin* provided the generic defendant not only with a license to the patents in suit, but also with a sublicense to that additional blocking patent. *Id.* at 747–48. Without that sublicense, the additional patent would have been an *independent* bar to generic sales, cutting off any antitrust injury. *Id.*

The *Wellbutrin* plaintiffs argued, similar to the Class Plaintiffs here, that the generic defendants would have received the same sublicense to the additional patent independent of the challenged settlement. According to the *Wellbutrin* plaintiffs, it would have been "rational" for the parties to include such a sublicense in an alternative settlement, because the parties had been

17

negotiating such a license before the challenged settlement was reached. *Wellbutrin*, 868 F.3d at 166–67. The plaintiffs also argued that, because the actual settlement included a sublicense, it was defendants' burden to show that they would not have included a sublicense in an alternative settlement. The court rejected these arguments because plaintiffs offered no evidence supporting their assertions, but were instead trying to "flip[] the burden of proof." *Id*. The court accordingly affirmed the grant of summary judgment to the defendants.

The Third Circuit held that the plaintiffs lacked the necessary "specific or concrete evidence" that the parties would have negotiated an alternative agreement including the patent sublicense. *Id*. The court noted that "[m]any a contract has foundered on a ***single deal-breaker point***" and plaintiffs consequently could not rely on mere assumptions or speculation about the terms of a hypothetical, alternative agreement for in order to survive summary judgment. *Id*. at 167 (emphasis added).

Class Plaintiffs here similarly have no "specific or concrete evidence" that their alternative settlement would have included a Broad License covering future patents. To the contrary, the undisputed evidence shows that Endo consistently refused to include such a license in *any* of the other settlements resolving litigation over the '933 and '456 patents, even when some of the generic defendants insisted on one. SUF ¶¶ 31-33. *Only* the SLA included the Broad License. *Id*.

Moreover, the record is clear that, in negotiations, Endo ***rejected*** Impax's proposal for exactly the type of settlement Class Plaintiffs now claim Endo would have agreed to: one with no alleged "payment," a Broad License, and an earlier entry date. SUF ¶¶ 27-28. Specifically, in early June 2010 Impax proposed a "simple settlement" with a generic entry date of July 15, 2011. SUF ¶ 27. According to Impax, that "simple settlement" would have also included the Broad

18

License.  Endo rejected this proposal during the same call on which Impax raised it, and the parties never discussed it again.  SUF ¶¶ 27-28.

Lacking any factual support for their theory, Class Plaintiffs turn instead to their expert Dr. McGuire.[9]  But Dr. McGuire's opinion is sheer speculation.  Dr. McGuire merely ████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████.

In his Report, Dr. McGuire purports to model what an alternative settlement would look like, had Endo and Impax not entered into the SLA.  Dr. McGuire's model, however, ████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████.[10]  *See* Ex. B, March 25, 2019 Expert Report of Thomas G. McGuire ["McGuire Rep."] ¶¶ 196-98; *see also* Ex. C, December 10, 2019 Deposition of Thomas G. McGuire 190:24-191:3;[11] *id.* at 192:5-10, 199:4-11.  He does nothing to analyze or

---

[9]    Defendants have also filed a *Daubert* motion to exclude Dr. McGuire's opinion on the grounds that he has failed to use a reliable methodology in reaching his proffered opinions.  As explained therein, an expert cannot base his opinion on a foundation of unsupported assumptions.  *See Dana Corp. v. Am. Standard, Inc.*, 866 F. Supp. 1481, 1499 (N.D. Ind.1994) ("Expert opinions premised upon speculation and conjecture are insufficient to create a genuine issue of material fact to survive summary judgment."); *see also Elcock v. Kmart Corp.*, 233 F.3d 734, 755 (3d Cir. 2000) (explaining that expert testimony cannot be premised on impermissible assumptions); *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994) ("An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record."); *Morrison v. Quest Diagnostics Inc.*, No. 14-01207, 2016 WL 3457725, at *4 (D. Nev. June 23, 2016) (collecting cases).  Exclusion of Dr. McGuire's opinion, however, is not a prerequisite to summary judgment.

[10]    Dr. McGuire's failure to apply any reliable methodology to answer the question of whether an alternative settlement would have included the Broad License is also one of the bases for Defendants' *Daubert* motion to exclude Dr. McGuire.  The exclusion of Dr. McGuire's testimony on this issue would be an independent grounds for summary judgment.  *See Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) (expert testimony must be admissible at trial to be considered in a motion for summary judgment).

[11]    For the reasons discussed in Section III.B, *infra*, Dr. McGuire's model fails even to do this.

test *whether* a hypothetical, "alternative" settlement would have included a Broad License.  *Id.*
Dr. McGuire explains that ███████████████████████████████████  *See* Ex. C, Dec.
2019 McGuire Dep. 191:4-192:10.

To the contrary, Dr. McGuire admits that ████████████████████████████████
█████████████████████████████████████  *See* Ex. D, May 16,
2019 Deposition of Thomas G. McGuire 161:6-162:23; *see also id.* at 163:22-164:3.  ████████
██████████████████████████████████████.  *See* Ex. C, Dec. 2019
McGuire Dep. 190:1-16.

In his rebuttal report, Dr. McGuire attempts to justify ████████████████████████
████████████████████████████████████████"  *See*
Ex. E, November 5, 2019 Rebuttal Report of Thomas G. McGuire [hereafter "McGuire Rebuttal
Rep."] ¶¶ 50-52.  He asserts tautologically that the parties would have included a Broad License
in an alternative settlement simply because it was in the actual SLA.  *Id.*  The concept of "*ceteris
paribus*", however is not a methodology for proving the elements of a hypothetical settlement, or
anything else for that matter.  It is rather a simplifying principle of economics, science, and
philosophy that *artificially* holds all other things constant in order to allow for generalizations.  *See*
Daniel M. Hausman, *Ceteris Paribus Clauses and Causality in Economics*, 2 PSA: Proceedings
Biennial Meeting Phil. Sci. Ass'n 308, 308 (1988); Gregory Mitchell, *Tendencies Versus
Boundaries: Levels of Generality in Behavioral Law and Economics*, 56 VNLR 1781 (2003).
*Ceteris paribus* at best allows one to ask, "what would happen to variable A if you change variable
B and hold all other factors constant?"  But that approach assumes, and ***does not prove***, that the
other factors would, in fact, remain constant.  Dr. McGuire cannot rely on *ceteris paribus* to turn
an assumption into a conclusion.

20

Moreover, that same reasoning was rejected in *Wellbutrin*. In that case, plaintiffs contended that the defendants should show that the license to the additional patent would *not* have been included in an alternative settlement, since it had been included in the challenged settlement. *Wellbutrin*, 868 F.3d at 166-67. The Third Circuit rejected that argument, stating that plaintiffs had the burden to show that the license would be included in any alternative settlement. *Id*.

Ultimately, Dr. McGuire offers nothing but unsupported assumptions, flawed circular reasoning, and speculation that a hypothetical, alternative settlement would have included a Broad License. *See* May 2019 McGuire Dep. 161:6-162:12. Such an "opinion based on 'unsupported assumptions' and 'theoretical speculations' is no bar to summary judgment." *Weigel v. Target Stores*, 122 F.3d 461, 469 (7th Cir. 1997) (quoting *Am. Int'l Adjustment Co. v. Galvin*, 86 F.3d 1455, 1464 (7th Cir. 1996) (Posner C.J., dissenting)); *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 923-24 (9th Cir. 2015) ("[T]he mere proffering of unsupported expert testimony does not create a triable issue as to antitrust injury-in-fact," particularly where expert testimony is contrary to the undisputed facts); *Grp. Health Plan, Inc. v. Phillip Morris, Inc.*, 188 F. Supp. 2d 1122, 1134 (D. Minn. 2002) ("[T]he proffering of an expert . . . who will bless a guess-based theory will not suffice to withstand summary judgment.") (internal quotations and citations omitted) (collecting cases); *see also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) (while expert testimony can interpret facts "it is not a substitute for them."); *In re Optical Disc Drive Antitrust Litig.*, No. 10-2143, 2017 WL 6451711, at *3 (N.D. Cal. 2019) (expert opinion is not itself a substitute for "concrete evidence showing that [the] opinion is in fact based in reality").

The absence of any record evidence demonstrating that the alternative settlement would have included a Broad License is sufficient, by itself, to require summary judgment in this case.

Without such evidence, the Class Plaintiffs cannot prove that the SLA caused them antitrust injury. This alone requires dismissal of their claims. But, as explained below, the Class Plaintiffs also lack evidence demonstrating that a hypothetical, alternative settlement would have included another feature essential to their theory: an earlier entry date than the SLA.

> **B.      Nothing in the record supports Class Plaintiffs' claim that a hypothetical, alternative settlement would have included an entry date between April and July 2011**.

Class Plaintiffs also have no record evidence that would allow a reasonable jury to find that Endo and Impax would have agreed to an entry date between April and July 2011 in a hypothetical, alternative settlement. Rather, the record is again to the contrary. There is no evidence that Endo considered granting Impax a licensed entry date prior to January 2013. *See* SUF ¶¶ 24-29. Moreover, as noted above, Endo unequivocally rejected—on the same call on which it was offered—a proposal from Impax for a settlement with an entry date of July 2011. SUF ¶ 27.[12] The undisputed evidence thus reflects an "express[] and unwavering[]" refusal by Endo to agree to a settlement with an earlier generic entry date. *Wellbutrin*, 133 F. Supp. 3d at 757.

Instead of evidence, Class Plaintiffs again rely on Dr. McGuire, this time to predict the generic entry dates that the parties might have agreed to in an alternative no-payment settlement. *See* Ex. B, McGuire Rep. ¶¶ 196-98, Figs. 9-10. To do that, Dr. McGuire offers a "profitability model," which purports to estimate the relative value of a hypothetical alternative no-payment settlement with a given entry date compared to continued litigation for Endo and Impax. The

---

[12]      Further, ███████████████████████████████████████

███████████████████████████████████████████████████

purpose of this exercise is to identify the overlapping range of entry dates, if any, that would have been more profitable than a litigated outcome for both Endo and Impax.

Dr. McGuire's model, however, is inherently unreliable because it fails to account for an important, and unique, aspect of this case: the impact of the Broad License to the Additional Patents on the relative value of settlement compared to continued litigation. It fails, for example, to account for the value of the Additional Patents that Endo would have given up by granting a Broad License. Likewise, it fails to account for the value to Impax of securing, through the Broad License, the freedom to operate despite the Additional Patents. As a result, Dr. McGuire ████

██████████████████████████████████████████████████████████████████

████████████████████████████. *See* Ex. B, McGuire Rep. ¶¶ 199-203; Ex. C, Dec. 2019 McGuire Dep. 196:6-199:17. ███████████████████████████████████████

████████████████████████████████████████████████████████████ Ex. B, McGuire Rep. ¶¶ 204-06; Ex. C, Dec. 2019 McGuire Dep. 198:22-199:17.

It is undisputed that the Broad License had value. For Endo, the anticipation of the Additional Patents would have made continued litigation relatively more attractive and a settlement with a Broad License relatively less attractive; without a Broad License Endo could have asserted the Additional Patents against Impax. Under Dr. McGuire's model, this would have the effect of moving the earliest generic entry date that Endo would accept later in time. For Impax, the anticipation of Endo's Additional Patents would make litigation relatively less attractive and make a settlement with a Broad License relatively more attractive at any given entry date; without a Broad License, Impax would have faced the possibility of being blocked by the Additional Patents. This would have the effect of also moving later in time the latest generic entry

date that Impax would accept (although a later entry date would, other things being equal, be less valuable for Impax, the benefit of a Broad License would offset some or all of that difference).

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ *see, e.g.*, McGuire Rep. ¶¶ 196-98, ████████████████████████████████████████████████████

████████████████████████████████████████████. *See* Ex. C, Dec. 2019 McGuire Dep. 191:4-15. Dr. McGuire's failure to do so means that his model cannot reliably estimate the entry dates that Endo and Impax would have included in an alternative settlement. Class Plaintiffs thus cannot rely on Dr. McGuire's profitability model to support their claim that an alternative no-payment settlement would have included an earlier entry date than the SLA.

Dr. McGuire's model also fails because it relies on implausible and unsupported assumptions regarding the parties' likelihood of success in the underlying litigation. ██████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████. *See* Ex. B, McGuire Rep. ¶ 184. These assumptions enable Dr. McGuire to substantially discount the profitability to Endo of continuing litigation, thus moving earlier in time the earliest generic entry date that Endo would find acceptable. Conversely, the assumption that Impax believed it had an ██████ chance of success allows Dr. McGuire to inflate the profits Impax would have expected from continuing the litigation, which means that, under Dr. McGuire's model, Impax would be less likely to accept a later entry date because it would be more comfortable litigating. The net effect is to move earlier the entry dates that both Impax and Endo would find acceptable in a hypothetical, alternative entry. *See id.* ¶¶ 199-203 & Fig. 9; 204-06 & Fig. 10. But the percentages Dr. McGuire applies are the product of unreliable—and inadmissible—expert testimony.

24

Dr. McGuire admits that ████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████. *See* Ex. D, May 2019 McGuire Dep. 36:11-22. ████████████

███████████████████████████████████████. *See id.* at 36:11-22, 50:8-13. Mr. Belvis's

opinion on this point, however, is inadmissible for the reasons explained in the motion to exclude

his opinions and testimony. And once Mr. Belvis's opinion as to Impax's chance of success is

excluded, Dr. McGuire's opinions as to the possible range of early entry dates in the alternative

settlement must be set aside, because ███████████████████████████████████████████.

*See McNamara v. Kmart Corp.*, 380 F. App'x 148, 154 (3d Cir. 2010) (finding that expert

testimony was properly excluded when that testimony was based on the opinion of a different

excluded expert); *The Medicines Co. v. Mylan Inc.*, 11-1285, 2014 WL 1979261, at *8 (N.D. Ill.

May 15, 2014) (prohibiting expert from offering opinions based on opinion of other expert that

had been excluded).

Dr. McGuire's alternative model also relies on █████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████. *See* Ex. B, McGuire Rep. ¶¶ 184, 187-88, 201.

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

*See id.* ¶¶ 201, 204, 207.

Dr. McGuire, however, has no support for ███████████████████████████████████

█████████████████████████████████████████████████████████████

Mr. Belvis does not offer that opinion, and nothing in the record, economic literature, or common sense supports such an assumption.[13]  Without that ████████████████████████████ ███████████████████, Dr. McGuire's model falls apart.

## IV. The Retailer Plaintiffs' Theories of Antitrust Injury are Similarly Speculative and Unsupported by the Record.

The Retailer Plaintiffs rely on two alternative theories in their attempt to show antitrust injury.  One theory, similar to Class Plaintiffs', is built upon the assumption that—in the absence of the alleged payments in the SLA—Endo and Impax would have entered into an alternative settlement with both the Broad License and an earlier entry date.  Like the Class Plaintiffs, the Retailer Plaintiffs have failed to come forward with any evidence that would allow a reasonable jury to find that the parties would have agreed to the specific terms they imagine.

In the alternative, Retailer Plaintiffs also proffer an additional theory (one that Class Plaintiffs do not pursue):  That if Endo and Impax had not entered into the SLA, Impax would have pursued the underlying patent litigation to conclusion, launching its generic either "at risk" during the litigation or after a favorable Federal Circuit decision.  These alternative "continued litigation" scenarios, however, fail to reckon with the undisputed, real-world benefit Retailer Plaintiffs received as a result of the Broad License.  Accordingly, for the reasons set forth below, the Retailer Plaintiffs cannot survive summary judgment under their "continued litigation" theory of antitrust injury.

---

[13]     Indeed, speculating about a party's subjective belief or state of mind or how that belief would have affected hypothetical negotiations—let alone that both parties in a negotiation would share that same subjective belief—falls far outside the realm of acceptable expert opinion and Dr. McGuire's expertise as an economist.  *See Essex Ins. Co. v. Structural Shop, Ltd.*, No. 15-2806, 2017 WL 2224879, at *4 (N.D. Ill. May 22, 2017) (expert "cannot testify as to what [an executive] believed or would have done had [a company] acted differently").

**A.      Retailer Plaintiffs have presented no facts from which a reasonable jury could find that Endo and Impax would have entered into an alternative settlement.**

Like Class Plaintiffs, the Retailer Plaintiffs have designed a "have their cake and eat it too" theory of antitrust injury in an attempt to escape the real-world consequences of Endo's Additional Patents:  They contemplate that, but for the SLA, Endo and Impax would have entered into an alternative settlement that included ***both*** (a) the Broad License covering Endo's Additional Patents and (b) an earlier generic entry date of July 15, 2011.  As explained in Section III, *supra*, both of these features are necessary for this theory of antitrust injury.  Retailer Plaintiffs, however, have produced evidence of neither.

**1.      Nothing in the record supports the Retailer Plaintiffs' claim that an alternative settlement would have included a Broad License.**

The Retailer Plaintiffs are faced with the same barren factual record as the Class Plaintiffs when it comes to their argument that Endo and Impax would have included the Broad License in an alternative settlement.  As explained above, the undisputed evidence is to the contrary.

Retailer Plaintiffs' expert Dr. Keith Leffler does not help their case.  Like Dr. McGuire, Dr. Leffler purports to offer an ████████████████████ Ex. F, March 25, 2019 Expert Report of Keith Leffler [hereafter "Leffler Rep."] ¶ 87 n.121.  Dr. Leffler, however, █

██████████████████████████████████████████████

█████████████. *See* Ex. G, June 27, 2019 Deposition of Keith Leffler 105:11-106:5

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████ And  he  explains  that  ████████████████

████████████████████████████. Ex. H, December 9, 2019

27

Deposition of Keith Leffler 52:2-14 ███████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

██████████████.

Against that record—or lack thereof—Retailer Plaintiffs have nothing but their own unsupported assertion that their contemplated alternative settlement would have included the Broad License. That is not enough. *See SportFuel*, 932 F.3d at 601 (7th Cir. 2019) ("[S]peculation will not suffice to defeat summary judgment.") (internal citations and quotations omitted); *cf. Kelley v. Microsoft Corp.*, No. C07-0475 MJP, 2009 WL 413509, *7 (W.D. Wash. Feb 18, 2009) (finding that Dr. Leffler's expert "assumption" cannot itself be "proof of causation"). Without any proof that an alternative settlement would have included a Broad License, the Retailer Plaintiffs cannot proceed on their alternative settlement theory of antitrust injury. Summary judgment is appropriate as to Retailer Plaintiffs' alternative settlement theory for this reason alone.

### 2. Nothing in the record supports Retailer Plaintiffs' claim that an alternative settlement would have had a July 15, 2011 entry date.

The Retailer Plaintiffs similarly have no record support for their position that their hypothetical, alternative settlement would have included a July 15, 2011 entry date. Retailer Plaintiffs rely on the "simple settlement"[14] offer made by Impax in June 2010—with no payment, a July 15, 2011 entry date, and the Broad License—as the template for their own theoretical alternative settlement. *See* Ex. F, Leffler Rep. ¶¶ 85-87. This reliance is misplaced. As detailed in Section III.A, *supra*, Endo rejected this "simple" settlement out of hand. SUF ¶ 27. The

---

[14] Notably, the details of this "simple settlement" were never discussed. For example, it is unclear whether this simple settlement would also have required Endo to make a no-authorized generic commitment. SUF ¶ 27.

undisputed record, therefore, is that Endo would not have accepted these terms. Retailer Plaintiffs have presented no evidence to the contrary.

Dr. Leffler's speculative opinion that an alternative settlement would have included an entry date of July 15, 2011 is similarly insufficient to satisfy the Retailer Plaintiff's burden for at least two independent reasons.[15]

### a. Dr. Leffler's profitability model fails to account for the costs and benefits of the Broad License and thus does not fit the facts.

Dr. Leffler, like Dr. McGuire, relies on a profitability model in an attempt to determine an alternative generic entry date. Ex. F, Leffler Rep. ¶ 87 n.121. Also like Dr. McGuire, Dr. Leffler critically fails to account for the value of the Broad License[16] in evaluating the relative profitability of settling versus litigating to conclusion. *See* Ex. G, June 2019 Leffler Dep. 79:13-19 ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████, 80:6-81:15 ████████████████████████

████████████████████████████████████████████████████, 106:6-

---

[15]    Defendants have filed a motion to exclude Dr. Leffler's "profitability" model on multiple grounds, including failure to account for the costs and benefits of granting the Broad License, failure to show that the settlement would have included an entry date earlier than the actual SLA, and because it is riddled with computational errors.

[16]    As explained in Section III, *supra*, the Broad License had undisputed value. Absent a broad license, an alternative settlement involving a July 2011 entry by Impax would have been only temporary as Impax's sales would have become unlawful again as of November 13, 2012. This is in fact what happened to generic manufacturer Actavis, which settled with Endo for a July 15, 2011 generic entry date but did ***not*** obtain a broad license to Endo's subsequent patents, such that Actavis's sales of generic Opana ER became unlawful again as of November 13, 2012. The failure to obtain a Broad License would have come at significant costs to Impax, and the grant of a Broad License would have come at significant opportunity cost to Endo, but these costs and benefits are nowhere to be found in Dr. Leffler's modeling.

13 ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

This is not a harmless oversight. As explained *supra* Section III.B, accounting for the impact of a Broad License on the parties' profitability would have had the effect of making Endo relatively less likely to accept settlement over litigation and making Impax more likely to accept settlement over litigation. These incentives would both work in the same direction—pushing out later in time the range of generic entry dates that would be acceptable to both parties. Having failed to account for these factors, Dr. Leffler's model cannot reliably estimate the range of generic entry dates that the parties might have agreed to in an alternative settlement that included the Broad License.

**b.      Dr. Leffler's model is not capable of identifying the generic entry date he offers in his opinion**.

Dr. Leffler also fails to offer a principled basis for selecting July 15, 2011 as the parties' alternative entry date, as opposed to any of the other supposedly "profitable" entry dates generated by his model, including dates *later* than January 1, 2013.[17] That failure is not insignificant; it is an independent reason why Retailer Plaintiffs have failed to offer any evidence of antitrust injury.

To demonstrate that they suffered antitrust injury based on the alternative settlement theory, Retailer Plaintiffs must show that, but for the challenged SLA, Endo and Impax would have agreed to a settlement with an ***earlier*** entry date than the January 1, 2013 entry date in the

---

[17]      Defendants do not concede that Dr. Leffler's model is sufficiently reliable to withstand scrutiny under Rule 702 and *Daubert*, for the reasons set forth in their accompanying motion to exclude Dr. Leffler. But even if Dr. Leffler is not excluded, his model fails to offer the factual support Retailer Plaintiffs need to survive summary judgment, as set forth herein.

SLA. *See Wellbutrin*, 868 F.3d at 164-65; *Nexium*, 842 F.3d at 60; *Greater Rockford Energy & Tech. Corp.*, 998 F.2d at 401-02. Dr. Leffler's model, however, yields a range that would allow for an alternative settlement ███████████████████████████████.

Dr. Leffler's "profitability model" purports to ████████████████████ ████████████████████████████████████████████████████████ ██████████████████████" Ex. F, Leffler Rep. ¶ 87 n.121. The backup data[18] to his Report reveals that, ███████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████ *See* Ex. F, Leffler Rep. ¶ 43 & n.90; Ex. H, Dec. 2019 Leffler Dep. 50:8-12 ████████████████████████████████████████████████████ █████████████████████. In other words, the range of alternative entry dates that Dr. Leffler's own model suggests would have been acceptable to both parties in an alternative settlement includes ███████████████████████████████████████████████ ███████████████. *Id.*

Dr. Leffler conveniently—and unsurprisingly—ignores this output and instead puts forth a single date certain: July 15, 2011. Retailer Plaintiffs pick that date to support their theory of antitrust injury. But that July 15, 2011 entry date offered by Dr. Leffler—and relied on in Retailer Plaintiffs' alternative settlement—███████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████.



---

[18]     *See* Ex. L, June 2019 Leffler Dep. 126:16-132:23, Exhibit 3 (printout of Microsoft Excel file from Dr. Leffler's backup data titled "AltSettleAnalysisOPANA ER.xlsx").

Accordingly, Retailer Plaintiffs cannot rely on Dr. Leffler to prove that the parties would have agreed to an entry date earlier than January 1, 2013, let alone a specific entry date of July 15, 2011. Retailer Plaintiffs thus have no proof of antitrust injury under their alternative settlement theory.

### B. Retailer Plaintiffs' "continued litigation" theory does not show antitrust injury.

Retailer Plaintiffs put forth an alternative theory of antitrust injury, premised on a theory that Endo and Impax continued to litigate the underlying patent litigation to conclusion, rather than reaching any settlement. Under this theory, Retailer Plaintiffs' claim that the parties would have continued the patent litigation and Impax would have either (a) launched generic Opana ER "at risk" on August 10, 2010, shortly after receiving FDA approval or (b) launched generic Opana ER on December 17, 2011, after succeeding in the underlying litigation. Neither scenario, however, sufficiently confronts the real-world implications of Endo's Additional Patents.

It is undisputed that in Retailer Plaintiffs' continued litigation scenarios Impax's legal presence on the market would be temporary. Impax would not have received a license to the Additional Patents and there, as explained above, would have been enjoined from selling its generic Opana ER products until November 2029. Under the SLA, by contrast, Impax was able to begin lawfully selling generic Opana ER nearly 17 years earlier[19]—a reality that would be erased

---

[19]    Courts have recognized that alleged "temporary" harm cannot serve as the basis for an antitrust claim. *See Adaptive Power Sols., LLC v. Hughes Missile Sys. Co*., 141 F.3d 947, 951–52 (9th Cir. 1998) (affirming grant of summary judgment because "any harmful effect on competition…was, at most, temporary"); *JetAway Aviation, LLC v. Bd. of Cty. Comm'rs of Cty. of Montrose, Colo.*, 754 F.3d 824, 841 (10th Cir. 2014) (internal citations omitted) (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984)); *Procaps S.A. v. Patheon, Inc*., 141 F. Supp. 3d 1246, 1281-82 (S.D. Fla. 2015) (granting summary judgment because plaintiffs claimed anticompetitive harm was, among other things, too short to constitute "substantial" anticompetitive effects as a matter of law); *see also James Cape & Sons Co. v. PCC*

entirely under Retailer Plaintiffs' continued-litigation theories of harm. Plaintiffs were better off in the real world than they would have been in this hypothetical "but-for" world. As a result, Retailer Plaintiffs do not, and cannot, provide evidence that they would have been "better off absent the violation." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 101 (3d Cir. 2010) (describing the Supreme Court's holding in *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477 (1977)).

***

In short, for all of the reasons explained above, neither Class Plaintiffs' nor Retailer Plaintiffs' theories of antitrust injury find support in the record. Instead, they are based on assumptions and speculation that are actually contrary to undisputed facts. At the "'put up or shut up' moment" of summary judgment, that does not suffice. *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017); *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012) ("[G]uesswork and speculation are not enough to avoid summary judgment."), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 673 F.3d 670 (7th Cir. 2016). Consequently, this Court should grant summary judgment based on Class Plaintiffs' and Retailer Plaintiffs' failure of proof that they suffered any antitrust injury as a result of the SLA. *See Wellbutrin*, 868 F.3d. 169-70.

## V. Summary Judgment is Appropriate Because Plaintiffs Cannot Show Damages Resulting from the SLA.

Plaintiffs' collective failure to reckon with the impact of the Additional Patents and the Broad License has additional consequences: They have failed to create a genuine issue of material fact as to whether they sustained damages by reason of the SLA. That failure is an independent

---

*Const. Co.*, 453 F.3d 396, 399 (7th Cir. 2006) (no antitrust injury where defendants' activities "actually *increased*, rather than restricted, competition, albeit in an illegal manner").

basis for granting summary judgment for all Plaintiffs. *See Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chicago*, 877 F. 2d 1333, 1338-39 (7th Cir. 1989).

A. **Plaintiffs' failure of proof with respect to their "alternative" settlement theories means they cannot show damages.**

The Direct Purchasers', End Payors', and Retailer Plaintiffs' damages models, prepared by Drs. Jeffrey Leitzinger, Meredith Rosenthal, and Keith Leffler,[20] respectively, rely on the assumption (among others) that Endo and Impax would have entered into an alternative settlement with a Broad License, allowing Impax to continue to sell generic Opana ER starting between April-July 2011 free from any patent risk. *See* Ex. I, August 29, 2019 Expert Report of Margaret E. Guerin-Calvert ¶¶ 46, 52, 60, Tables II-4, II-5, III-8. Drs. Leitzinger and Rosenthal each admitted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *see* Ex. J, June 20, 2019 Deposition of Jeffery Leitzinger 66:17-68:8; Ex. K, May 23, 2019 Deposition of Meredith Rosenthal 80:7-84:1, and Dr. Leffler admitted ▮▮▮▮▮▮▮▮▮▮▮▮, Ex. G, June 2019 Leffler Dep. 105:19-106:2. As explained in Sections III.A and IV.A.1, *supra*, Plaintiffs have failed to come forward with any evidence in support of such an assumption. And no Plaintiff group has presented a model for estimating damages in an "alternative settlement" scenario *without* the assumption of a Broad License. *See* Ex. J, June 2019 Leitzinger Dep. 162:2-17; Ex. K, May 2019 Rosenthal Dep. 84:2-85:11; Ex. G, June 2019 Leffler Dep. 101:18-22.

Damages models built upon unsupported assumptions are insufficient to create a genuine issue of material fact. *See Three Crown Ltd. P'ship v. Salomon Bros.*, 906 F. Supp. 876, 888 (S.D.N.Y. 1995) (requiring that damages be "based upon adequate proof"); *Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 152 F.3d 588 (7th Cir. 1998) (affirming grant of

---

[20] Dr. Leffler relies on this assumption only with respect to Scenario 3.

summary judgment where plaintiff's proffered expert damages models were flawed such that "no reasonable jury could estimate the plaintiff's damages models from the reports"); *cf. MCI Comms. Corp. v. Am. Tel. & Tel. Co.*, 703 F.2d 1081, 1162-63, 1165-66 (7th Cir. 1983) (rejecting damages methodology where the basis of underlying assumption was "lacking in substance" and "lacking in foundation").[21] This is consistent with the Supreme Court's direction that "[a]ny model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (citing ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues 57, 62 (2d ed. 2010)).

Without evidence supporting the assumption that a hypothetical, alternative settlement would have included a Broad License, Plaintiffs' damages models fail this test. Accordingly, Plaintiffs have no basis from which a reasonable jury could determine that they suffered damages. Summary judgment is appropriate on this ground as well.

**B.   Retailer Plaintiffs' "continued litigation" damages models fail because they do not account for the benefit Retailer Plaintiffs received from the Broad License.**

The Retailer Plaintiffs also purport to present damages models for their "continued litigation" scenarios. Those models, however, also fail to create a genuine issue of material fact

---

[21]   Defendants have separately moved to exclude the opinions of Drs. Leitzinger, Rosenthal, and Leffler's under Rule 702 and *Daubert* for the same reliance on unsupported assumptions; exclusion of those opinions offers further grounds for summary judgment. *See Grp. Health Plan, Inc.* 188 F. Supp. 2d 1131-32 (granting summary judgment after excluding expert model built upon unsupported assumptions); *see also Tyger Const. Co.,* 29 F.3d at 142 (holding that "expert opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record"); *Pharmanetics, Inc. v. Aventis Pharm., Inc.*, No. 5:03-CV-817, 2005 WL 6000369, at *11 (E.D.N.C. May 4, 2005), *aff'd*, 182 F. App'x 267 (4th Cir. 2006) (excluding damages model "not sufficiently tied to the facts of the case" to be helpful to the jury). But even if the motions are not granted, the opinions offered by these experts are not sufficient to create a genuine issue of material fact.

because they do not analyze the right question.  In particular, they do not account for the undisputed benefit Retailer Plaintiffs received from the SLA's Broad License, which covered the Additional Patents—a benefit that Retailer Plaintiffs could have received had Impax continued with the underlying patent case, even if it was successful.

"An antitrust plaintiff may recover only to the 'net' extent of its injury; if benefits accrued to it because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct."  *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1367 (9th Cir. 1986); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig*., No. 11-2262, 2016 WL 7378980, at *18 (S.D.N.Y. Dec. 20, 2016) ("we agree that *plaintiffs may ultimately recover only to the extent of their net injury*, given that plaintiffs may have benefited from LIBOR suppression in the same transaction or in a different transaction."  (emphasis added)); *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 25 (D.D.C. 2012) (declining to certify a class "[s]ince *benefits must be offset against losses*" and "[d]etermining what proportion of shoppers suffered net harm due to price movements caused by the merger requires an analysis of each putative class member's purchases" (emphasis added)); *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 676 F. Supp. 486, 488 (S.D.N.Y. 1987) ("[I]t is clear that a plaintiff both injured and enriched by illegal activity cannot choose to recover for his injuries yet retain his windfall.").  Plaintiffs bear the burden of establishing the offset.  *Id*. at 490.

Here, Retailer Plaintiffs' "continued litigation" damages models fail to account for the benefit from the SLA they challenge.  The Broad License in the SLA guaranteed the Retailer Plaintiffs almost seventeen years of access to generic Opana ER—from January 1, 2013 through November 2029—that would have otherwise been blocked by Endo's Additional Patents.  Retailer Plaintiffs' damages models for the continued litigation scenarios are designed to avoid accounting

for this undisputed benefit, as is evident by the undisputed fact that they cut off the damages period as of November 2012. Thus, those models would improperly allow the Retailer Plaintiffs "to recover [their alleged] injuries yet retain [their] windfall." *Minpeco, S.A.*, 676 F. Supp. at 488. Because Retailer Plaintiffs have failed to show that they sustained a net injury under their continued litigation scenarios, they lack proof as to this essential element of their claim and summary judgment is warranted.

## VI. **Summary Judgment is Appropriate for Certain of EPPs' State Law Claims**.

End Payor Plaintiffs ("EPPs") assert claims under: (1) the antitrust law of 21 jurisdictions, (2) the consumer protection laws of two jurisdictions, and (3) the unjust enrichment laws of 21 jurisdictions. EPPs' claims fail in their entirety—as all Plaintiffs' claims fail—because they have failed to come forward with evidence of antitrust injury or damages, as set forth above. Summary judgment is also appropriate as to certain of EPPs' unjust enrichment claims for an additional reason: they fall outside the applicable three-year statutes of limitations.[22]

### A. **EPPs' unjust enrichment claims under Arizona, Massachusetts, and Mississippi law are limited to purchases made within three years of the filing of the first Complaint.**

In EPPs' imagined but-for world, Endo and Impax would have entered into an alternative settlement agreement that would have allowed Impax to launch its generic version of Opana ER

---

[22] At the motion to dismiss stage, Defendants argued that many of EPPs' state law claims should be dismissed for lack of Article III standing, failure to comply with limitations on class actions and indirect purchaser suits, and failure to plead facts required by certain state statutes. *See In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 721-26 (N.D. Ill. 2016). This Court dismissed certain claims but allowed most claims to proceed, concluding that Defendants' Article III standing arguments were properly a matter of class certification and that EPPs had alleged adequate facts to proceed with most of their state law claims. Defendants continue to assert, and preserve for appeal, their arguments related to EPPs' lack of Article III standing, failure to comply with limitations on class actions and indirect purchaser suits, and failure to meet the requirements of certain state statutes (including the requirements to show intrastate conduct, conferral of a direct benefit, and unconscionable conduct).

earlier than January 1, 2013. Specifically, EPPs claim that Endo and Impax would have entered into an alternative settlement with a generic launch date of, at the earliest, April 2011. *See* EPPs' Mem. In Support Of Motion for Class Certification 7-8 (Dkt. No. 441) (stating that Defendants would have been "economically motivated" to settle on an entry date between April and July 2011); *id.* at vii, ix (defining the class period as beginning in April 2011).[23]

Unjust enrichment claims under the laws of Arizona, Massachusetts, and Mississippi are subject to three-year statutes of limitations.[24] The first EPP complaint in this matter was filed on June 4, 2014, more than three years after the April 2011 but-for launch date. Thus, EPPs' unjust enrichment claims under Arizona, Massachusetts, and Mississippi law must be limited to purchases made within three years of June 4, 2014. *See In re Loestrin 24 Fe Antitrust Litig.*, No. 13-md-2472, 2019 WL 7286764, at *32 (D.R.I. Dec. 17, 2019) (limiting plaintiffs' claims to purchases made within limitations period, measured from filing of first complaint); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 248 (D. Conn. 2015) ("Claims are therefore not time-barred that stem from alleged overcharges incurred within the relevant statutory period, whatever that period may be for a particular statute, measured backward from the filing of the claims."); *see also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside

---

[23]     EPPs originally alleged that, in the but-for world, Impax could have begun marketing and selling its generic as early as June and July 2010. *See* EPPs' First Amended Consolidated Complaint ¶¶ 141, 187. At the motion to dismiss stage, Defendants argued that EPPs' antitrust claims under Tennessee, Kansas, and Mississippi law were untimely when measured from those but-for-world dates. The Court agreed as to Kansas and Mississippi and dismissed those claims. *See In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d at 725.

[24]     *See* Ariz. Rev. Stat. § 12-543(1); *Costanzo v. Stewart*, 453 P.2d 526, 529 (Ariz. Ct. App. 1969); Mass. Gen. Laws c. 260, § 2A; *Cambridge Literary Props., Ltd. v. W. Goebel Porzellenfabrik G.m.b.H. & Co. Kg.*, 448 F. Supp. 2d 244, 262-64 (D. Mass. 2006); Miss. Code Ann. § 15-1-49(1); *Anderson v. LaVere*, 135 So. 3d 404, 411 & n.20 (Miss. 2014).

38

the limitations period.").[25]  To the extent EPPs seek damages for alleged overcharges outside that three-year period, the Court should grant summary judgment as to those claims.

## CONCLUSION

Plaintiffs have failed to present any facts from which a reasonable jury could find that the challenged Settlement and License Agreement caused them antitrust injury or damages, essential elements of any antitrust claim.  Defendants therefore respectfully request that this Court grant their motion for summary judgment.

---

[25]     At the motion to dismiss stage, Defendants argued that EPPs' claim under Tennessee antitrust law should be barred (or at least limited) because Tennessee antitrust law has a three-year statute of limitations.  *See In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d at 724-25.  This Court declined to dismiss the Tennessee antitrust claim after concluding that Tennessee law on the relevant statute of limitations was unsettled.  *See id.* at 725.  Defendants renew (and preserve for appeal) their argument that EPPs' Tennessee antitrust claim is barred (or at least limited) by the applicable three-year statute of limitations.

Dated:  April 15, 2020

Respectfully submitted,

*/s/ George G. Gordon*
George G. Gordon (admitted *pro hac vice*)
Julia Chapman (admitted *pro hac vice*)
Thomas J. Miller (admitted *pro hac vice*)
John P. McClam (admitted *pro hac vice*)
**DECHERT LLP**
Cira Centre, 2929 Arch Street
Philadelphia, PA  19104
Tel.:  (215) 994 4000
Fax:  (215) 994-2222
george.gordon@dechert.com
thomas.miller@dechert.com

Craig Falls (admitted *pro hac vice*)
**DECHERT LLP**
1900 K Street, NW
Washington, DC 20006
Tel.:  (202) 261-3300
Fax:  (202) 261-3333
craig.falls@dechert.com

Angela Liu
**DECHERT LLP**
35 West Wacker Drive, Suite 3400
Chicago, IL  60601
Tel.:  (312) 646-5800
Fax:  (312) 646-5858
angela.liu@dechert.com

*Counsel for Defendants Endo Health Solutions*
*Inc., Endo Pharmaceuticals Inc., and*
*Penwest Pharmaceuticals Co.*

*/s/ Devora Allon*
Jay P. Lefkowitz, P.C. (admitted *pro hac vice*)
Devora W. Allon, P.C. (admitted *pro hac vice*)
Evelyn Blacklock (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
jay.lefkowitz@kirkland.com
devora.allon@kirkland.com
evelyn.blacklock@kirkland.com

James R.P. Hileman
**KIRKLAND & ELLIS LLP**
300 North LaSalle Street
Chicago, IL 60654
(312) 862-7090
jhileman@kirkland.com

*Counsel for Defendant Impax Laboratories, Inc.*