# EXHIBIT 21

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF NEW JERSEY
 2                            CIVIL NO. 09-831
    ENDO PHARMACEUTICALS, INC., and     :
 3  PENWEST PHARMACEUTICALS, CO.,        :
                            Plaintiffs, :
 4  -vs-                                 :
                                         :
 5  IMPAX LABORATORIES, INC., et al      :
                                         :
 6                                       : OPINION
                            Defendants   :
 7  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:
                              Newark, New Jersey
 8                            March 19, 2010 11:00 a.m.
    B E F O R E:
 9
            THE HONORABLE KATHARINE S. HAYDEN, U.S.D.J.
10
    A p p e a r a n c e s:
11
    DECHERT LLP
12  Attorneys for Plaintiffs
    Suite 500 902
13  Carnegie Center
    Princeton, New Jersey 08540-6531
14  EY: MARTIN J. BLACK, ESQ.
        ROBERT D. RHOAD, ESQ.
15      THOMAS P. LIHAN, ESQ.

16  CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO PC
    Attorneys for Defendant-IMPAX
17  5 Becker Farm Road
    Roseland, New Jersey 07068-1739
18  EY: MELISSA E. FLAX, ESQ.

19  WILSON SONSINI GOODRICH & ROSATI PA
    Attorneys for Plaintiff-IMPAX LABORATORIES, INC.
20  One Market Street
    Spear Tower, Suite 3300
21  San Francisco, CA 94105-1126
    EY: ROGER J. CHIN, M.D., ESQ.

22
_____
                   Pursuant to Section 753 Title 28 United States Code,
23  the following transcript is certified to be an accurate
    record as taken stenographically in the above-entitled
24  proceedings.

25                              s\ RALPH F. FLORIO
                                Official Court Reporter


          U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101
```

CONFIDENTIAL

EPI001606264

ENDO-OPANA-000066151

2

1

2  DUANE MORRIS

3  Attorneys for Defendants

4  505 9th Street, N.W., Suite 1000

5  Washington, D.C. 20004-2166

6  EY: KERRY B. MCTIGUE, ESQ.

7

8  DUANE MORRIS LLP

9  Attorneys for Defendants

10 470 Atlantic Avenue, Suite 300

11 Boston, MA 02210-2243

12 EY: VINCENT L. CAPUANO, ESQ.

13

14 DUANE MORRIS LLP

15 Attorneys for Defendants 744

16 Broad Street, Suite 1200

17 Newark, New Jersey 07102-3889

18 EY: INGRID E. MELNICHUK, ESQ.

19

20 LITE DEPALMA GREENBERG, LLC

21 Attorneys for Defendants-BARR LABORATORIES

22 Two Gateway Center, 12th Floor,

23 Newark, New Jersey 07102

24 EY: MICHAEL E. PATUNAS, ESQ.

25

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606265

ENDO-OPANA-000066152

3

```
 1

 2

 3    WINSTON & STRAWN

 4    Attorneys for BARR LABORATORIES

 5    BY: TODD EHLMAN, ESQ.

 6

 7

 8

 9    ALSO PRESENT

10

11    NONE

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

**CONFIDENTIAL**

**EPI001606266**

**ENDO-OPANA-000066153**

4

```
1              I N D E X

2

3   WITNESSES:                    PAGES:

4   NONE                          NONE

5

6

7

8          E X H I B I T S

9   NUMBER        DESCRIPTION       PAGE

10  SEE ATTACHED INDEXING

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606267

ENDO-OPANA-000066154

5

1          THE COURT:  Good morning.  Counsel, I think you've

2    given your appearances to Mr. Florio and so that I could link

3    up some of the new faces and old faces I'll ask you to put

4    your appearances on the record now.

5          MR. BLACK:  Certainly, your Honor.  Martin Black,

6    Bob Rhoad and Tom Lihan from Dechert for the plaintiffs.

7          MS. FLAX:  Good morning, your Honor. Melissa Flax

8    from Carella Byrne on behalf of Impax Laboratories.

9          MR. CHIN:  Good morning, your Honor. Roger Chin of

10   Wilson Sonsini Goodrich & Rosati on behalf of Impax

11   Laboratories as well.

12         MR. MCTIGUE:  Good morning, your Honor. Kerry

13   McTigue from Duane Morris on behalf of Sandoz with Vince

14   Capuano, also from Duane Morris.  And our local counsel is

15   from our Newark office Ms. Ingrid Melnichuk.

16         MS. MELNICHUK:  Good morning, your Honor.

17         MR. PATUNAS:  Good morning, your Honor. Michael

18   Patunas from Lite DePalma Greenberg & Rivas, with me, Todd

19   Ehlman from Winston & Strawn.

20         THE COURT:  Okay.  Thank you very much.  And thank

21   you for your patience gentlemen and ladies.  I know you have

22   been here for a while.

23         What I'm going to do is give you my claim

24   construction on the disputed terms, and then let you all go.

25   We have had argument and briefing, and I found that the

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606268

ENDO-OPANA-000066155

1   materials presented at the time of the argument, as well as

2   the briefs leading up to the argument to be very helpful.

3           How many people are flying to far away places?  If

4   so, what time are the airplanes?  Anybody flying away to far

5   away places?

6           MR. CHIN:  California.  I have a late flight, so

7   it's okay.

8           THE COURT:  Okay.  Good, thank you.  With some

9   humility, district courts approach the task of claim

10  construction, because of course, particularly in a

11  pharmaceutical case we are kind of out of our element.  If we

12  could have done this we would all be doctors and we all know

13  that.  And Dr. Chin did the reverse, I guess, because I saw

14  the MD.  But I think you are the rarity, Dr. Chin.

15          And so I will tackle this quite frankly privileged

16  position of bringing the skills of a judge to bear, because

17  the law that has come about.  And I am talking now about the

18  bedrock law that governs claim construction, is in the long

19  run compatible with what judges do every day.

20          We're doing them in an area that is not our own,

21  but I think that the whole idea of construction, intrinsic

22  versus extrinsic evidence and an attempt to embrace what is

23  going on in the particular problem, or dispute, or thing on

24  the bench, and the thing on the bench is the patent, right?

25          Now, a judge has a certain way of doing things, and

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606269

ENDO-OPANA-000066156

7

1    I will attempt to do it in a way that is productive today,

2    and we'll take it from there.

3            Let's talk about what the law is in a Markman claim

4    construction.  The Court must construe disputed terms with

5    what the inventors intended to envelop within the claim.

6    That's right out of Phillips, which is cited frequently in

7    the field and frequently by both sides: 415 F.3d 1303 at

8    1312, Federal Circuit 2005.

9            In doing so -- and this is from Phillips at page

10   1313 -- the court must read the claim term, not only in the

11   context of the particular claim in which the disputed term

12   appears, but in the context of the entire patent including

13   the specification.

14           In Markman, the seminal case, the Federal Circuit

15   explained that a specification contains a written description

16   cf the invention and that must enable one of ordinary skill

17   in the art to make and use the invention.

18           For claim construction purposes, the description

19   may act as a sort of dictionary which explains the invention

20   and may define terms used in the claims.  Accordingly, the

21   Federal Circuit held in Renishaw PLC v. Marposs Societa' per

22   Azioni, 158 F.3d 1243, 1250, Federal Circuit 1998.

23           Ultimately, "The construction that stays true to

24   the claim language and most naturally aligns with patent

25   description of the invention will be in the end the correct

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606270

ENDO-OPANA-000066157

8

1    instruction." End quote.

2          It is well established that intrinsic evidence

3    comprised of the patent itself, including the claims and

4    specification as well as the prosecution history is the,

5    quote, "Most significant source of the legally operative

6    meaning of disputed claim language." End quote.

7          As such, Philip instructs, quote, "The claims must

8    be read in view of the specification of which they are a

9    part." And noted as well that the specification is always

10   highly relevant to the claim construction analysis usually it

11   is dispositive, it as single best guide to the meaning of a

12   disputed term.

13         In construing terms generally, words of a claim are

14   given their ordinary and customary meaning -- and again,

15   that's Phillips -- a patentee can act as his own

16   lexicographer to specifically define terms of a claim

17   contrary to their ordinary meaning.  And that concept of the

18   patentee acting as his own lexicographer is referred to again

19   by both sides in their brief.

20         All that is required is that the patent applicant

21   set out the different meaning in the specification in a

22   manner sufficient to give one of ordinary skill in the art,

23   notice of the change from ordinary meaning.  In Novis/Pure

24   Water, Inc. and that is 381 F.3d 1111 at page 1117.

25         This new definition need not be explicit though

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606271

ENDO-OPANA-000066158

9

1  because even when guidance is not provided in explicit

2  definitional format, the specification may define claims term

3  by implication, such that the meaning may be found in or

4  ascertained in or by the patent documents.  Again, from

5  Phillips.

6        Extrinsic evidence, such as dictionary or treatises

7  may be consulted by the court to assist in claim

8  construction, but it is to be given less weight because it

9  gives less meaning to claim terms only in the abstract,

10 rather than within the specialized context of the patent

11 itself.

12       Also the Federal Circuit instructs extrinsic

13 evidence cannot be used to contradict a claim meaning that is

14 unambiguous in view of the intrinsic record but may be used

15 to help give meaning to an ambiguous term.  All of that is

16 cut of Phillips.

17       So let's turn to the disputed terms, which I'm

18 going to take, not necessarily in the order in which we

19 argued them, we argued them talking about the hydrophobic

20 material first.

21       I think counsel had in your own minds organized

22 things around sustained release being the first term.  But

23 let me go according to my notes here and begin with the

24 specific term having to do with the medicament concentration

25 time curve.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606272

ENDO-OPANA-000066159

1          Before I do that, let me just review generally what

2    I see in the patent.  We have two:  the '933 patent and the

3    '456 patent.

4          The lawsuit here originates, and I'm going to be

5    using, just to kind of put us in context, the slides

6    presented by the plaintiff just to talk about the technology

7    a little bit here.  And that doesn't mean that I disagree

8    with the slides of the defendants, or that the defendants

9    didn't give me good slides, it's a little easier for me to

10   refer to what the origin of this lawsuit is and the

11   technology to -- just a minimal extent -- so we know we are

12   not talking about airplanes or ladders or watches.  Let's

13   just get into what we're talking about.

14         The plaintiffs are Endo Pharmaceuticals and

15   Penwest.  Endo holds the FDA approval OR OPANA ER.  Penwest

16   owns the patents in suit and licensed them to Endo.

17         The defendants, Impax, Barr Labs and Sandoz, seek

18   FDA approval to market generic versions of OPANA ER.  And the

19   plaintiffs have sued under the Hatch-Waxman Act.

20         I don't think we have to go into what OPANA ER so

21   much, as what I want to do is talk patent overview.  And more

22   importantly right now the technology overview.

23         We're talking about obviously sustained release or

24   controlled release medication.  And the technology for that

25   that is described beginning on page 8 of the plaintiffs'

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606273

ENDO-OPANA-000066160

11

1   slides disclosed to me in the slides a dissolution vessel and

2   a tablet.

3        Prior to being exposed to water, active drug and

4   gelling agent are mixed together and compacted into a

5   tablet.  At that point there is no gel matrix presence

6   because the gelling agent is not hydrated.

7        Now, we're talking really about art that was in

8   being before the invention came along.

9        Then in the next slide, slide number 9, describes

10  how water is absorbed into the outer portion of the tablet

11  begins to swell and slowly break down.  The center core

12  remains unhydrated and releases slightly as some of the drug

13  is released.

14       The gelling agent in the outer portion of that

15  tablet hydrates and forms the gel matrix.  The gel matrix is

16  an interconnected network structure that traps fluids within

17  the pores of the network.

18       I don't think any of this is in dispute.  I'm

19  asking counsel for the defense, but I don't think what's

20  going on in this particular technology is in dispute.

21       MR. CAPUANO:  Your Honor, Vince Capuano for

22  Sandoz.  I would point out to your Honor, the claims aren't

23  limited to tablets.

24       THE COURT:  I understand that.  I'm talking about

25  this whole idea.  There's capsules as well, I understand

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606274

ENDO-OPANA-000066161

1    that.

2           I'm talking now about this idea of the gel matrix

3    and the idea of the release of medicament over time.

4           MR. CHIN:  From Impax's perspective, we agree to

5    that description generally, that the technology that of

6    course is only one embodiment as opposed to there may not be

7    subtlies in the claim language that may go beyond that, for

8    example.

9           THE COURT:  I think what I am trying to do is kind

10   cf put a face on the technology, so when we're talking about

11   some of the disputed terms we have something to hang this

12   cn.  Okay.

13          If I am saying anything that is in dispute, just

14   jump up and let me know.  But I'm not doing this for purposes

15   cf claim construction as much as I am for the context of the

16   disputed terms.  Okay.

17          Anything from plaintiffs so far?

18          MR. BLACK:  No, your Honor.

19          THE COURT:  Okay.  I'm using your slides so that

20   would be kind of odd.  Okay.

21          Then there is a slide number 10, an illustration of

22   the tablet hydration over time which demonstrates, at least

23   with this tablet formulation, that as water is absorbed, the

24   tablet begins to swell and slowly break down. The center core

25   remains unhydrated and releases slightly as some of the drug

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606275

ENDO-OPANA-000066162

13

1    is released.  And as water penetrates the matrix, the active

2    dissolves and slowly defuses out of the matrix.

3              And then there are slides that indicate further

4    diffusion and erosion of the outer portions of the gel

5    matrix.  More and more of the gelling agent becomes hydrated

6    and gels, the active is released via a combination of

7    diffusion and erosion.

8              Now, turning to the patent.  It would help me,

9    counsel, now if, and I hope this isn't leading into a

10   dispute, but in reading over the materials, slides, and

11   looking over argument and looking over briefs, there didn't

12   seem to be any pattern or strategy as to either sides'

13   reference to '456 and '933 patent.

14             And it would helpful to me for both sides to

15   indicate that obviously this is a family of patents.  And if

16   you would just indicate to me the kind of ebb and flow of

17   reference to the '933 and the '456, it would help me to do

18   the same when I am trying to give you my claim construction.

19             We'll let plaintiff go first and then the

20   defendant.

21             MR. BLACK:  Both patents have exactly the same

22   specification and claims differ of course, but there really

23   should be no difference in how your Honor construes the two

24   patents.

25             THE COURT:  So in trying to explain, and using

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

14

1    intrinsic evidence, for instance, if I were to be using that

2    in any claim construction as the guide, as it were, I could

3    jump from '456 to '933 without offending any of your

4    positions; is that correct?

5            MR. BLACK:  That's correct, your Honor.

6            MR. CHIN: We agree with that as well.  I think just

7    the source of jumping back and forth, just to explain that,

8    while the patent specification description is up until the

9    claims are the same, medicament concentration time, for

10   example, that language appears only in the '933.  So I

11   imagine when we cited to '933 in that section.

12           On the other hand, only the '456 patent, for

13   example, against Sandoz.  So I understand in their section

14   they probably cite to that patent.

15           THE COURT:  That's helpful.  I didn't quite see

16   that and that is helpful to me.

17           I will just continue along as I came upon my

18   decision on the various disputed terms without worrying that

19   I am doing '456 or'933.

20           I'm going to talk about '933, because I have most

21   of my notes on that particular patent.  But I was satisfied

22   that both are written with the same headings, as it were, and

23   in the same order of materials.

24           The patents referred to the field of invention.

25   And in the '933 that is expressed as the present invention

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606277

ENDO-OPANA-000066164

1  relates to controlled release formulation which may be

2  blended with the wide range of therapeutically active

3  medicaments and made into controlled release solid dosage

4  forms for oral administration.  And then we get into the

5  background of the invention.

6          Beginning first with the advantages of controlled

7  release products.  That they are well known in the

8  pharmaceutical field and include the ability to maintain a

9  desired blood level of a medicament over a comparatively

10  longer period of time while increasing patient compliance by

11  reducing the number of administration.

12          And then in the second paragraph oral controlled

13  release delivery system should be adaptable so the release

14  rates and profiles can be mapped to physiological and

15  chronotherapeutic requirements.

16          Then there's a discussion of controlled release,

17  excipients disclosed in other patents and under certain trade

18  names.

19          And the beginning column 1, line 66, quote:

20   "However, heretofore there has been no teaching of a

21  controlled release formulation providing a novel and

22  unexpected combination of suitable proportions of a

23  homopolysaccharide such as xanthan gum, a

24  heteropolysaccharide such as e.g. locust bean gum together

25  with inert diluent and a pharmacologically acceptable

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606278

ENDO-OPANA-000066165

16

1   hydrophobic material so as to provide an improvement in

2   controlled release properties for such an active medicament."

3         So from the language of the patent, the patentees

4   are writing that nothing until now provided an improvement in

5   controlled release properties.

6         Immediately thereafter objects and summary of the

7   invention section begins.  And the language is, it is

8   therefore an object of the present invention to provide a

9   controlled release formulation for a therapeutically active

10   medicament.  It is a further object of the present invention

11   to provide a method for preparing a controlled release

12   formulation for a therapeutically active medicament.  It is

13   yet another object of the present invention to provide a

14   controlled release excipient which may be used in the

15   preparation of a sustained release oral solid dosage form of

16   a therapeutically active medicament that provides an even

17   rate of release of an active medicament.

18         It is the further object of the present invention

19   to provide a controlled release excipient, which when

20   combined with an effective amount of bronchodilators, such as

21   Albuterol, is suitable for providing a sustained release of

22   that medicament so as to provide a therapeutically effective

23   blood level of the medicament for e.g. 12 or 24 hours without

24   allowing an excessive early release of medication.  And where

25   the released kinetics are unaffected by the contents of the

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606279

ENDO-OPANA-000066166

17

1  patient's gastrointestinal track.

2           And then it is yet a further object of the present

3  invention to provide a method of, for treating patients with

4  an active medication in controlled release form.  The

5  above-mentioned object and others are achieved by virtue of

6  the present invention which relates in part to a controlled

7  release formulation comprising therapeutically effective

8  amount of the medicament and a controlled release excipient

9  comprising gelling agent and a swelling agent such as, for

10 example, homopolysaccharide, a heteropolysaccharide and inert

11 diluent.

12          I promise I'm not going to read every paragraph.

13 But it kind of should give you some comfort that I was kind

14 of interested at this point and that's a wonderful thing,

15 because the language of the patent and the way in which it's

16 leading up identifies early on within its borders, as it

17 were, what the advantages of controlled release are.  What

18 controlled release is to begin with, its advantages, and then

19 the improvements that are sought and the object and goals

20 that are sought within the patent.

21          Moving on with the summary, we come onto some of

22 what we are here about, which is those terms:  sustained

23 release and hydrophobic material.

24          So I have to go back into that the paragraphs.  In

25 these paragraphs that talk about the objects of the present

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606280

ENDO-OPANA-000066167

1 invention and how the objects are achieved through the

2 controlled release formulation comprised of those ingredients

3 just described, the patent in column 2 line 65 reads:

4    The dosage form optionally includes a

5 pharmaceutically acceptable hydrophobic material.  Any

6 pharmaceutically acceptable hydrophobic material may be

7 suitably employed.

8    Suitable hydrophobic materials include, and then

9 there is a list of what the patentees describes as suitable

10 hydrophobic materials.

11    And then after a list comes the sentence:

12 Preferably the hydrophobic material selected from cellulose

13 ether to the cellulose ester, and alco cellulose such as

14 ethyl cellulose, and carboxyl methyl cellulose.

15    The hydrophobic material may be included in dosage

16 forms in amounts selected to slow dehydration of a gelling

17 agent when exposed to environmental fluid.

18    And then the patent goes on to talk about the

19 percentages by way of the solid dosage form that hydrophobic

20 material is present in, indicating it can be present in an

21 amount ranging from about 25 percent through about 50 percent

22 by weight of the solid dosage forms.

23    So pretty quickly we come into three of the four

24 terms that are in dispute:  What a hydrophobic material term

25 shall be construed as?  What the percentages mean, the word

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606281

ENDO-OPANA-000066168

19

1  about means in an amount ranging from about 25 percent

2  through about 50 percent, and what sustained release means.

3        A little further down, after talking about the

4  range of weight of the hydrophobic material present in the

5  solid dosage form, the medicament is described as any

6  medicament.  The controlled release solid dosage form can be

7  prepared in any convention orally administered dosage form,

8  including a tablet.  When the hydrophobic material option

9  will be applied, which will be before during or after the

10 process of tableting.

11       And then beginning on line 44 column 3, quote:  The

12 invention also relates to methods for preparing a controlled

13 release solid dosage form as described above for providing an

14 active medicament in an amount effective for treating a

15 patient for from 12 to about 24 hours.  The method includes

16 the steps of preparing a sustained release excipient

17 comprised, and then goes on.

18       And then in column 4 line 10:  Preferably

19 medicament is Albuterol or the derivative thereof in an

20 amount effective to provide therapeutically effective blood

21 levels of said medicament for at least 24 hours.  The present

22 invention is further related to a method of treating a

23 patient comprising orally administering the sustained

24 Albuterol tablets to a patient thereby providing

25 therapeutically effective blood levels of medicament for at

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606282

ENDO-OPANA-000066169

20

1    least 24 hours.

2            And then a paragraph that consumes us here today,

3    somewhat, quote: "By sustained release, it is meant for

4    purposes of the present invention that the therapeutically

5    active medicament is released from the formulation at a

6    controlled rate such that therapeutically beneficial blood

7    levels but below toxic levels of medicament are maintained

8    over an extended period of time, e.g., providing a 24 hour

9    dosage form."

10           Now I realize it would be very logical for me to

11   leap into that sustained release, but let me take care of the

12   term that I said we would be begin with.

13           I think that I have put on the record and made my

14   own mind comfortably with the technology that we're talking

15   about and with enough of the claim language to understand

16   where we are at.  And all of this is before the section that

17   begins the column 5 line 11, the detailed description

18   section.

19           Right before the claims begin, which is in column

20   21 line 1, and before the conclusion that is drawn in column

21   20 line 50.  That in fact the formulation, according to the

22   invention, do provide a controlled release of an active

23   medicament without any significant differences induced by a

24   fed or fast effect due to the presence of food in the

25   gastrointestinal track comes a series of tables that are


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606283

ENDO-OPANA-000066170

1  critical to that conclusion that is drawn:  That the fed/fast

2  effect doesn't induce significant differences in terms of the

3  controlled release of the active medicament.

4          And along with invitro studies there was an in viro

5  study called or talked about, it is referenced on line 29 of

6  column 13 and called the bioavailability study, quote: "A

7  study was conducted to evaluate the viability of the test

8  formulation about numeral sulfates, using a randomized

9  balanced open labeled, single dose crossover design.  This

10 study was performed using 12 healthy male and female

11 volunteers," and so on.

12         And the data from that study, am I correct in my

13 understanding, that's the data from that study appears in

14 table 19?

15         MR. RHOAD:  Yes, your Honor, that is correct.

16         THE COURT:  That's agreed upon, yes?

17         MR. CHIN: That's our understanding as well.

18         THE COURT:  Okay, fine.  And that leads to the one

19 cf the terms that the Court is asked to construe, and it

20 appears in claim 35 of the '933 patent at column 23 line 58:

21 The controlled release solid dosage form of claim 1, which

22 when orally administered to a patient provides a medicament

23 plasma concentration time curve with an area under the curve

24 to infinity ranging from about 89 to 150.

25         And that medicament plasma concentration time curve

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606284

ENDO-OPANA-000066171

22

1    is repeated in the claim 36, 37.  And then in 38 there is a

2    slight change: The controlled release solid dosage form of

3    claim 1 which when orally administered to a patient provides

4    a mean plasma concentration ranging from about 7 to about

5    12.  But the issue between the parties is whether or not the

6    medicament plasma concentration time curve refers to a

7    patient or a population study.

8              Let me just put the competing claims -- competing

9    instructions on the record.

10             Defendants proposed construction is a curve

11   representing the relationship of medicament plasma

12   concentration versus time in a study population.

13             So I don't misrepresent what the plaintiffs'

14   instruction is:  It's a plot of the concentration of active

15   medicament in the plasma of a patient over time.

16             And I believe that the intrinsic evidence, and

17   that's why I began with this particular term, leads me pretty

18   confidently to the construction consistent with the one

19   offered by the defendants.

20             In this case, the information gathered for the

21   particular claim 35, and I believe illustrated in 38, with a

22   reference to a mean, is set forth through the intrinsic

23   evidence in the patent that the bioavailability study that

24   leads to the specific recitals of the concentration time

25   curve in 35 comes from the bioavailability study referenced

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606285

ENDO-OPANA-000066172

1  cn column 13 line 28:  Using 12 healthy male and female

2  volunteers.  In other words, a study population.

3        Now the defendants support as well their

4  construction, not only with the reference in '933 patent, but

5  also extrinsic evidence, the bioavailability studies that are

6  set forth by the Food and Drug Administration, and also the

7  language of 35 where they say that the idea of range would

8  not make sense if you were talking about just one patient.

9        They also cite law that says from the Federal

10 Circuit, quote: "This Court has repeatedly emphasized that an

11 indefinite article a or an in patent parlance carries a

12 meaning one or more in open-ended claims containing the

13 transitional phrase "comprising".  And that case is EJ Corp.,

14 v. Connecticut Concept 223 F.3d 1351.

15       But I believe that the common sense intrinsic

16 evidence of the patent specification, as well as the claim,

17 leads, as I said, without too much trouble to the conclusion

18 that it was a study population that is meant.  And I construe

19 the claim to mean that it is the plasma concentration, the

20 medicament plasma concentration time curve that was derived

21 from the population study as opposed to the reference point

22 being a patient.

23       And so the Court will adopt for purposes of claim

24 construction, the defendants' construction that the time

25 curve is a curve representing the relationship of medicament

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606286

ENDO-OPANA-000066173

1  plasma concentration versus time in a study population as

2  opposed to the medicament in the plasma of a patient over

3  time.  And I begin as I said with that finding and that

4  construction because it yields easily from the intrinsic

5  evidence, i.e., the claims, the specification and to the

6  extent relevant to the prior art.

7          Now, the next term to discuss is that slippery

8  little word about.  I referenced it already in talking

9  through or walking through relevant portions of the patent

10  for purposes of setting context here.

11          The claim term is, quote: "From about 25 percent

12  through about 50 percent, the plaintiffs' proposed

13  construction is within the stated range of 25 percent to 50

14  percent plus or minus five percent." And the defendants have

15  a narrower range and talk about rounding out in the almost

16  default available to science generally.  Acceptable science.

17          So defendants' construction is, "From about 25

18  percent to about 50 percent is from 24.5 percent to 50.4

19  percent." And here, I do not find aid within the language of

20  the patent.  The defendants point me right to standard of

21  scientific rounding preventions and provided material and in

22  the slides extracted from Wikipedia, which is the instruction

23  for quantity, weights or measures, which must have an

24  accuracy and indicated with the degree of precision.

25          And it goes onto say, for example, in the case of

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606287

ENDO-OPANA-000066174

1    weighing precision correspondence, plus or minus 5 units

2    after the last figure stated plus 2.5 grams interpreted as

3    2.45 grams to 2.55 grams.  This is an example of rounding the

4    degree of precision is implied by the number of significant

5    figures.  And frankly, the law really isn't all that

6    different.

7            The plaintiff gave me good cases that would suggest

8    that the leeway to be given arises out particulars of the

9    specification.

10           Plaintiff refers to the Paul Corp., v. Micron

11   Separation's decision, 66 F.3d 1211 and 1217 from Federal

12   Circuit in 1995, which states, the term about, quote: "Does

13   not have universal meaning in patent claims and its meaning

14   depends on technological facts of the particular case." End

15   quote.

16           In Ortho-McNeil Pharm, Inc. v. Caraco Pharm Labs,

17   Ltd. 476 F.3d 1321, 1327, the Federal Circuit wrote in 2007,

18   that that must be, that the whole idea of the leeway must be

19   interpreted in light of the teachings of the specification

20   and the criticality of the recited numerical limitation to

21   the claimed inventions.

22           Where frankly the Court is not assisted in looking

23   at the extrinsic evidence, the problem identified is that

24   while plaintiffs claim that a lot of the numerical jumps are

25   in 5 to 10 percent increments, that's really not necessarily

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606288

ENDO-OPANA-000066175

1   so.  In column 3, the '933 patent at line 13, the hydrophobic

2   material is preferably present in an amount ranging from

3   about 1 through 90 percent by weight of the solid dosage form

4   and can also be present in an amount ranging from about 25

5   percent to about 50 percent by weight of the solid dosage

6   form.

7          In claim 7, the controlled release solid dosage

8   form according to claim 1, wherein said hydrophobic material

9   is present in an amount ranging from about 1 to about 90

10  percent by weight of the solid dosage form.

11         The defendants point out that the patentees did not

12  uniformly use increments of 5 or 10.  And I must agree.

13         In the '933 patent column 3 at line 14 the patent

14  recites from about 1 to 90 percent, at line 32 from about 1

15  to about 20 percent.  At line 34 from about 1 percent to

16  about 20 percent.

17         There was a point where, and the defendants

18  advanced this in support of their position, Dr. Banker was on

19  the ropes because the questioning was as follows, quote:

20         "Question: The term about would be interpreted by a

21  person of ordinary skill in the art to mean plus or minus 5

22  percent follows that a person skilled in the art would read

23  claim 7 of the '933 patent to cover a range from the negative

24  4 percent to 95 percent; is that is correct?

25         "Answer: You haven't asked my opinion.  And my

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606289

ENDO-OPANA-000066176

1  opinion is that's not how a person skilled in the art would

2  read it.  They would read it as ranging from somewhere

3  between zero and one percent through about 95 percent.

4            "Question: Because it would be impossible to have

5  material present in the amount of negative 4 percent by

6  weight in a solid dosage form, correct?

7            "Answer: That would be correct."

8            I am simply reluctant to go down the path of

9  assuming that at the bottom of that range one would know that

10  it is between zero and one percent, which is obvious.  And at

11  the top one would suddenly know that it's between 90 and 95

12  percent.

13            That just simply does not arise out of the patent

14  sufficiently to convince me, particularly when there is

15  really no uniform increment used throughout the patent.  And

16  therefore, while both sides are, I believe imposing their

17  own, and I would assume strategic interpretations.  Because

18  this is after all claim construction that's in aid of the

19  ultimate dispute, not the ultimate dispute, I have to accept

20  the defendants' reference -- I don't have to, I am accepting

21  the defendants external evidence taken from the scientific

22  rounding convention they referred to.

23            Not because I'm knocked off my chair with the

24  perfection of it all, but because we simply have about used

25  in a variety of context in such a manner that I believe the

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

28

1   Court is best advised since it is not binding guidance within

2   the patent to go to extrinsic evidence that is solid and

3   sure.  And to that extent the standard scientific rounding

4   convention of this very frequently used term, plus or minus

5   cr about, I believe is the appropriate claim construction to

6   give this particular term.

7            So in that respect I am accepting the defendants'

8   claimed construction, that the term from about 25 percent to

9   about 50 percent in claim 5 of the '456 patent will be

10  construed as meaning from about 25 percent to about -- I'm

11  sorry -- from about 24.5 percent to 50.4 percent.

12           So as counsel can see, the Court has been quite

13  confident that the intrinsic evidence leads to a construction

14  cf one term, the medicament plasma time curve and does not

15  aid the Court, and in fact extrinsic evidence is necessary to

16  construe the other term, which is about 25 percent to about

17  50 percent.

18           Now, I don't believe that those are the make it or

19  break it of the four claim terms.  And I believe that when we

20  first began oral argument, I don't know if that's still on

21  counsel's mind, but I think hydrophobic material that people

22  felt would be the claim term most in dispute between the

23  parties, or at least would drive the parties to shape the

24  case one way or the other, so I will lead up to that one and

25  we'll do sustained release.


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101


CONFIDENTIAL

EPI001606291

ENDO-OPANA-000066178

29

1          And I think one of the pleasant parts of this
2    particular task for district courts is we sort of don't know
3    where we're going with this.  We're just giving you the best
4    we have and then you take it back to the office and you make
5    your phone call.
6          So with respect to sustained release.  And the
7    hydrophobic material, again, I'm confident and comfortable
8    with making my claim construction based upon the intrinsic
9    evidence.  Based upon the claim language.  Based upon the
10   specification in the patent.  The only time I am inclined to
11   go outside, I've already done so.  And that may lead people
12   to predict where I'm going.  But let me tell you what I see
13   with respect to those particular terms.
14         Sustained release.  Going back into the patent
15   specification, and where the parties are resting their
16   proposed construction.  I've already read from the-- well
17   referring to the '456 patent now, I read you from the '933
18   patent.  But at column 4 line 20, comes the definition of
19   sustained release and it's also in the '933 patent.  Quote,
20    "By sustained release it is meant for purposes of the
21   present invention that the therapeutically active medicament
22   is released from the formulation at the control rate such as
23   therapeutically beneficial blood levels, but below the toxic
24   levels of the medicament are maintained over an extended
25   period of time." And as I understand it that's the

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606292
ENDO-OPANA-000066179

30

1    defendants' construction.

2            Out of patent and the plaintiff goes no, no, we've

3    lopped off the e.g. that appears in the patent, which is

4    e.g., providing a 24 hour dosage form.  And the plaintiffs

5    argue that that's improper to simply lop it off.  And instead

6    the right approach is to review the specification to

7    determine what time periods were intended.  And the

8    defendants go, we don't agree with you, but any way you're

9    not doing that-- you're not just doing that e.g., you are

10   saying for at least 12 hours.

11           So that the plaintiffs construction is, "the active

12   medicament is released at a controlled rate such that

13   therapeutically beneficial blood levels of the medicament are

14   maintained over a period of at least 12 hours." And as

15   indicated the defendants construction is, "the

16   therapeutically active medicament is released from the

17   formulation at the controlled rate such that therapeutically

18   beneficial blood levels, but below toxic levels of the

19   medicament are maintained over an extended period of time."

20           It would be very interesting to see what a whole

21   room full of law students would do with this.  Because it

22   really is a dispute that calls for a resolution, but each

23   side has good arguments.  And as I said, I believe that the

24   intrinsic evidence guides the Court.  The issue really

25   becomes whatever the Court may believe, does the Court make

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606293

ENDO-OPANA-000066180

31

1    that call now or later?  And I would like to turn to the

2    parties just very briefly-- I'm not asking for oral argument

3    but just for simply a clarification.

4            In the slide 26 of the plaintiffs' presentation,

5    they define the parties dispute as follows.  Should the Court

6    (A), clarify the meaning of "extended period of time" now as

7    part of the Markman process.  Which is what they want.  Or,

8    defer resolution, and re-visit claim construction again in

9    the future.  Which they attribute to the defendants.

10           Is that the defendants' position that, and anybody

11   who wants to tackle this? And if it is your position what do

12   you mean?

13           MR. CAPUANO:  Well, you read their slide-- you want

14   my view of their slide?

15           THE COURT:  No. What do you mean by defer?  When

16   would this magic moment come again?  When do you see it as

17   something I would be in a position to do?

18           MR. CAPUANO:  We don't think that you need to give

19   it a number, they say that you might have to defer to give it

20   a number.

21           THE COURT:  Later on?

22           MR. CAPUANO:  Our view is that it's clear from

23   patent, the intrinsic evidence, that the extended period of

24   time is relative to an immediate release form.

25           So if you get release longer than you would get

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606294

ENDO-OPANA-000066181

1   what within the immediate release form then that that's an
2   extended period of time.  It may be 24 hours, in some cases
3   and it could be 12-- 6 and 8.
4           THE COURT:  I understand.  But you're saying call
5   it, now, we're not waiting for you to do it later; is that
6   correct?
7           So when the plaintiffs say that the defendants want
8   me to defer resolution and re-visit claim construction again
9   in the future; that's not your position.  You're saying that
10  that's not what the claim term mean, correct?
11          MR. CAPUANO:  That's correct.
12          THE COURT:  All right. As long as it clarified it.
13  I'm trying to find out if people think there are some other
14  moment, Mr. Black, when I'm going to be in the position that
15  I am in now.?
16          MR. BLACK:  Well, the difficulty would be, if your
17  Honor just said extended period of time, we would then have
18  to construe extended period of time at the trial.
19          The definition that your Honor read, sustained
20  release says, over an extended period of time e.g. providing
21  a 24 hour dosage form.  If you could take that sentence and
22  then have the experts opine on their view as to whether or
23  not particular products fell within that definition.  But if
24  you just use the word extended period of time I think you're
25  leaving open an issue which would not be resolved.


            U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606295

ENDO-OPANA-000066182

1          THE COURT:  Okay.  That's fine.  I understand

2     better.  And I do understand what the parties have differing

3     views on.

4          The plaintiffs illustrate the proposed construction

5     as the preferred construction, the one that the Court should

6     adopt, by reference to language in the patent under the

7     argument that, the patentees made clear that the invention

8     relates to 12 or 24 hour formulation.  And in slide 29 and

9     30, they refer to places within the patent where the

10    patentees talk about this specific period of time 12 to 24

11    hours, 12 or 24 hours.  And that would be '456 patent at

12    column 3, line 43 to 47.  '456 patent at column 5, lines 21

13    to 37.  At column 2, to 30.  Column 11, 15 to 19.  And again,

14    at column 5, 21 to 29 and column 5, 30 to 37.

15         In deciding whether to leave it as the defendants

16    proposed and argue strongly, that sustained release refers to

17    therapeutically beneficial blood levels of the medicament

18    being maintained over an extended period of time as opposed

19    to over a period of at least 12 hours.  The Court looks at

20    what I believe is important language in the patents.  That's

21    contained in background of the invention.  The objects in

22    summary of the invention.  And the detailed description of

23    the invention.

24         When I read the beginning paragraphs of the '933

25    patent, the significance of what was going on in this patent

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

1  began to take form with the paragraph at line 6 of column 1,

2  quote, "However, heretofore there's been no teaching of the

3  controlled release formulation providing a novel and

4  unexpected combination of suitable proportions of a

5  homopolysaccharide, a heteropolysaccharide, together with an

6  inert diluent and a pharmaceutically acceptable hydrophobic

7  material so as to provide an improvement in controlled

8  release properties for such an active medicament." That's the

9  way the section background of the invention ends.

10        The beginning of that section begins quote, "The

11 advantages of controlled release products are well known in

12 the pharmaceutical field and include the ability to maintain

13 a desired blood level of a medicament over a comparatively

14 longer period of time while increasing patient compliance by

15 reducing the number of administration.  These advantages have

16 been attained by a wide variety of methods.  For example,

17 different hydrogels have been described for use in controlled

18 releases medicines, some of which are synthetic, but most of

19 which are semi-synthetic or of natural origin.  A few contain

20 both synthetic and non-synthetic material, however some of

21 the system provide special process production equipment and

22 in addition some of these systems are susceptible to variable

23 drug release."

24        So right away the patent talks about problems that

25 attend an already existing art and that is controlled

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606297

ENDO-OPANA-000066184

35

```
 1   release.  Some of the problems have to do with special
 2   process.  Some of the problems have to do with systems that
 3   are susceptible to variable drug release.  And the whole idea
 4   as we know is sustained release, controlled release, not an
 5   up and down release.  And the next paragraph begins right
 6   away with the observation. "Oral control of release delivery
 7   systems should ideally be adaptable so that release rates and
 8   profiles could be match psychological and chronotherapeutic
 9   requirements." And then as I said, this section ends with the
10   observation, "that nothing up until the invention that is
11   claimed within the '933 patent and the '456 patent, has there
12   been something that would provide an improvement in
13   controlled release properties." And with that language, the
14   Court moved into an appreciation for the argument the
15   plaintiff is making which is that, over an extended period of
16   time would as it were suggest that the invention is more or
17   less reinventing the wheel, because there is something
18   already in place, there's something that is well described
19   that's in place.  There's something that is called a good
20   thing and that is the idea of controlled release.  The
21   advantages of controlled release products are well known in
22   the pharmaceutical field.
23           So if all we're saying is that what is being
24   invented here is something that's better and longer in
25   release than the immediate release, that flies in the face of
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606298

ENDO-OPANA-000066185

1   the language of the patent right up front.  And then we come

2   to the objects and summary of the invention, which comes

3   right after that section that I've been talking about and

4   those are the objects.  And I read that to you and you could

5   see how each time the paragraphs go something else is added.

6         So it is there for an object to provide a

7   controlled release formulation for a therapeutically active

8   medicament.  It is a further object to provide a method for

9   preparing a controlled release formulation for a

10  therapeutically active medicament.

11        It is yet another object to provide a controlled

12  release excipient which may be used in the preparation of a

13  sustained release oral solid dosage form.  And I think that

14  language is important.  That second paragraph talks about

15  providing a method as the object, one of the objects of the

16  present invention.  And the third is to provide a form, a

17  solid dosage form that provides an even rate of release of an

18  active medicament.

19        Then paragraph 4 of the object is, it is a further

20  cbject to provide a controlled release excipient, which when

21  combined with an effective amount of a bronchdilator such as

22  Albuterol, is suitable of providing a sustained release of

23  that medicament so as to provide a therapeutically effective

24  blood level of the medicament for e.g. 12 or 24 hours,

25  without allowing an excessively early release of medication

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606299

ENDO-OPANA-000066186

1   and where the released kinetics are unaffected by the

2   contents of the patient's gastrointestinal track.  And then

3   finally, "It is yet a further object of the present invention

4   to provide a method for treating patients with an active

5   medication in a controlled release form."

6           So I believe that the unfolding of the object with

7   the accretion of the invention's objects and the invention of

8   a method and an invention of a form.  It is important to note

9   that it is arising out of an acceptable and in fact good

10  existing formulation of delivery of medication, i.e., over

11  time.  And improves it and talks about a method of providing

12  that even distribution into the system of a therapeutically

13  effective dosage.  And defines that therapeutically effective

14  dosage as a sustained release for e.g. 12 or 24 hours,

15  without allowing an excessive early release of medication and

16  where the release kinetics are unaffected by the contents of

17  the patient's gastrointestinal track.

18          Now, if we move to the claims, claim one.  What is

19  claimed is, one, a controlled release solid dosage form for

20  oral administration of a therapeutically active medicament to

21  a patient in need thereof comprising. And then a

22  pharmaceutically effective amount of a medicament, a

23  sustained release excipient and what it's comprised of.  And

24  a pharmaceutically acceptable hydrophobic material.  And then

25  there are dependent claims that are set forth.


                U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

1           Paragraph 21, which the plaintiffs rely on reads,
2    that what is claimed is 21, a method of preparing a
3    controlled release solid dosage form, comprising of a
4    medicament for oral administration, the method comprising,
5    preparing a sustained release excipient comprising from about
6    10 to 99 percent by weight of a gelling agent and what that's
7    comprised of.  And from about 1 to 90 percent by weight of a
8    pharmaceutically acceptable hydrophobic material.
9           And then the second subparagraph of 21, and adding
10   an effective amount of a medicament thereto, such that a
11   final product is obtained having a ratio of said medicament
12   to said gelling agent from about 1 to 3 to about 1 to 8, such
13   that a gel matrix is created when said formulation is exposed
14   to environmental fluid and said formulation provides
15   therapeutically effective blood levels of said medicament for
16   at least 12 hours.  And I see that that is in keeping with
17   the objects and summary of the invention.
18          In other words, the specification and the claims
19   are harmonious with respect to that 12 to 24 or even that 12
20   cr 24 reference point because it's both.  Depending upon
21   where it appears.
22          So that the plaintiffs' construction, post
23   construction of at least 12 hours is consistent with the
24   language of 12 or 24 or the language of 12 to 24.  To the
25   extent that that means different things.  And arguably one

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606301

ENDO-OPANA-000066188

39

1  could see that it does.

2       Now there's another point in the patent that I

3  found assisted me.

4       Off the record for a moment.

5       (RECESS TAKEN).

6       THE COURT:  Back on the record.  I indicated that

7  there was another part of the patent that-- another area of

8  the patent that assisted me.  In a detailed description that

9  begins at column 5 line 12.  Patentees referenced other

10 patents and incorporate their disclosures.  And in these

11 patents gelling agents, or a gelling agent is described,

12 which produce a higher viscosity and faster hydration than

13 would be expected by either of the gums in the gelling agent

14 alone.  The resulting gelling is faster forming and more

15 rigid.

16       And then the second paragraph. "In the present

17 invention it has been found that a sustained release

18 excipient comprising of only the gelling agent may not be

19 sufficient to provide a suitable sustained release and an

20 active medicament to provide a 12 or 24 hour formulation,

21 when the formulation is exposed to a fluid in an environment

22 of use, e.g. an aqueous solution or gastrointestinal fluid."

23       Next paragraph. "In certain embodiments the present

24 invention is related to the surprising discovery that by

25 granulating the sustained release excipient of the solution

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606302

ENDO-OPANA-000066189

40

1   cr dispersion of a pharmaceutically acceptable hydrophobic

2   material prior to add mixture of a sustained release

3   excipient with a medicament.  The medicament may provide

4   therapeutically effective blood levels for extended periods

5   cf time, e.g., from about 12 to about 24 hours.  The

6   hydrophobic material was present in a range from about 0 to

7   about 90 percent by weight of the sustained release excipient

8   and a preferred embodiment is present in a range from about 1

9   to 20 percent of the sustained release excipient, or from

10  about 25 to 75 percent of a sustained release excipient.

11          But again in that series of paragraphs under

12  detailed description, the progression that I noted before

13  that's referenced right from the beginning at the patent,

14  from gels that were providing for a gelling agent in aid of

15  sustained release or controlled release is improved and

16  couldn't before the invention provide a 12 or 24 hour

17  formulation.  The gels in existence, the gel formulation is

18  in the earlier art.

19          Now, with the addition of the hydrophobic material

20  those gelling agents are able to provide for a longer and

21  extended period of time defined as from about 12 to about 24

22  hours.

23          And I find that that again is other intrinsic

24  evidence as to the object and the specification of the

25  invention related to a 12 to 24 hour period as opposed to a

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606303

ENDO-OPANA-000066190

41

1    simple extended period of time.  In other words, as a logical

2    observation it would appear that the object, the goal, and

3    the discovery even described as the surprising discovery of

4    the addition of a hydrophobic material, gains as it were for

5    the patentee-- gains for the improvement of the delivery

6    system.  A longer period of time defined as a 12 hour dose,

7    or a 24 hour dose, or released for a period of time of at

8    least 12 to 24 hours.

9              Now, I am aware and I think it's a very important

10   argument that the plaintiff makes, that the paragraph that

11   defines what is sustained release means and which appears in

12   column 4 at line 20, gives an example of a 24 hour dosage

13   form and I'll read it again. By sustained release it is meant

14   for purposes of the present invention that the agent's active

15   medicament is released from the formulation at a controlled

16   rate such that therapeutically beneficial blood levels, but

17   below toxic levels of the medicament are maintained over an

18   extended period of time e.g. providing a 24 hour dosable

19   form.  There are other parts of the patent, other paragraphs

20   in the patent, where the amount of time is at least 24 hours

21   or a 24 hour dose, and I understand that.  But there is also

22   the refrain as it were of the sustained release providing a

23   therapeutically effective blood level of the medicament for

24   12 or 24 hours or for 12 to 24 hours.

25              Again, on line 44 of column 3, under the section

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606304

ENDO-OPANA-000066191

1   entitled object in summary of the invention, quote, "The

2   invention also relates to methods for preparing a controlled

3   release solid dosage form as described above, for providing

4   an active medicament in an amount effective for treating a

5   patient for from 12 to about 24 hours."

6          And finally, going back to that very first term

7   that was in dispute, the profiles gained from the

8   bioavailability study and the conclusion that begins on line

9   50 of column 20, right before the claims are set forth.  From

10  the results provided in above examples it can be seen,

11  meaning the various tables. "It can be seen that the

12  formulations according to the invention provides controlled

13  release of an active medicament, such as Albuterol sulfate

14  without any significant differences, induced by a fed/fast

15  effect, due to the presence of food in the gastrointestinal

16  track.  Accordingly, the results provide that the tablets

17  produced according to the invention are suitable for

18  delivering medicaments as an oral solid dosage form over a 24

19  hour oral period of time."

20          I see the intrinsic evidence in the patent

21  language, the claims and specifications as the defining for

22  us, for purposes of this claim construction, a period of at

23  least 12 hours.  As opposed to the construction offered by

24  the defendant, that sustained release refers to a release of

25  a therapeutically active medicament at a controlled rate such

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606305

ENDO-OPANA-000066192

43

1  that the therapeutically beneficial blood levels are

2  maintained over an extended period of time.  And I believe

3  that the law that I cited that is at the beginning of this

4  case which says, that the Court must construe disputed terms

5  with what the inventors quote, "Intended to envelop within

6  the claim." End quote.  Drives the conclusion that I am

7  making.

8          And to define the period time that is sought and

9  claimed in this invention as at least 12 hours.  Because it

10  is harmonious, not only in the context of the particular

11  claim in which the disputed term appears, but in the context

12  of the entire patent including the specification.  And

13  therefore, I am adopting the plaintiffs' construction that

14  sustained release means the active medicament is released at

15  a controlled rate such that the therapeutically beneficial

16  levels of the medicament are maintained over a period of at

17  least 12 hours.

18          Finally, we come to the hydrophobic material.  And

19  it's interesting, in the sustained release dispute the

20  defendants have tagged plaintiff as importing a term from

21  claim 21 and putting it in claim 1, or otherwise offending

22  some of the rules of claim construction, which I find they

23  are not doing because I am finding that the intrinsic

24  evidence allows me to say that that particular time frame is

25  enveloped within the claim.  But here the dispute on

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606306

ENDO-OPANA-000066193

44

1  hydrophobic material finds plaintiffs kind of applying the

2  same argument against the defendants.

3          So in that final term here are the parties'

4  respective construction.  Plaintiffs' construction of the

5  term hydrophobic material is a material which is effective to

6  slow the hydration of the gelling agent without disrupting

7  the hydrophilic matrix.  And the defendants' construction is

8  that hydrophobic material quote, "A material which lacks

9  affinity for water e.g. is resistant to or avoids wetting,

10 and which is effective to slow hydration of the gelling agent

11 cr gums, without disrupting the hydrophilic matrix."

12         Now, plaintiff says that, essentially the parties

13 are in agreement that the term hydrophobic material is

14 effective to slow hydration of the gelling agent with gums

15 without disrupting the hydrophilic matrix.  And that is

16 pretty obvious from the language that each sets forth.  It is

17 the defendants' inclusion of the language that it is a

18 material quote, "Which lacks affinity for water e.g. is

19 resistant to or avoids wetting." Defendants maintain that the

20 simple language itself hydrophobic, hydro water, phobic

21 fearful and, you know, resistant to-- backing off of, are all

22 incorporated in their construction.  That a material which

23 lacks affinity for water, it is resistant to or avoids

24 wetting.

25         Plaintiffs argue essentially two things.  First,

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606307

ENDO-OPANA-000066194

1   that hydrophobic material is as it were probably too

2   simplified to say it's a made up term.  But I think the

3   plaintiffs are saying, it's a term that is specifically

4   relevant in this particular patent.

5           Am I right about that, Mr. Black?  That it has no

6   dictionary definition, it's the patentee's own term?

7           MR. BLACK:  Yes, your Honor.

8           THE COURT:  And, therefore, it's not susceptible to

9   being construed by reference to a dictionary definition or

10  some other assistance such as we did with the word about.

11  And I don't think that the defendants are actually doing

12  that.  They're saying, what is hydrophobic mean, by a logical

13  extension of the roots, hydrophobic means a material that

14  lacks affinity for water and is resistant to avoid wetting.

15          So the defendants are saying, we're not going

16  cutside of the plaintiff, we're trying to construe the terms

17  as the patent sets forth and it is a made up term; let's talk

18  about what the language bears by way of construction.

19          And the plaintiffs say back, well, let's go further

20  into the specification and note that that hydrophobic

21  material when it's first mentioned quickly moves into a list

22  cf acceptable hydrophobic materials.  Bottom of the first

23  page of the patent column 2, lines 55 quote, "The dosage form

24  cptionally includes a pharmaceutically acceptable hydrophobic

25  material, any pharmaceutically acceptable hydrophobic

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606308
ENDO-OPANA-000066195

46

```
 1   material may be suitably employed.  Suitable hydrophobic

 2   material--" we're on column 3 now. "Includes," and there's a

 3   whole list of them, it goes on for about 5 lines.  And then

 4   it talks about a preferred hydrophobic material, but selected

 5   from cellulose ether.  And then ends the paragraph with, "the

 6   hydrophobic material maybe included in the dosage form in an

 7   amount effective to slow the hydration of the gelling agent

 8   when exposed to an environmental fluid."

 9           So the plaintiffs say, within that list of suitable

10   hydrophobic materials is sitting material that in fact has an

11   affinity for water and, therefore, the defendants' additional

12   language, that the hydrophobic material is material which

13   lacks affinity for water e.g. is resistant to or avoids

14   wetting, would read out of the patent language in the patent

15   as to suitable hydrophobic material.  And to that the

16   defendants' response, that the plaintiffs are savaging the

17   language of the term because hydrophobic means lacking an

18   affinity for water.  The plaintiffs say hydrophobic is a

19   relative term.  Its meaning and use will vary depending upon

20   the circumstances.

21           The parties' dispute in my mind echo a little bit

22   cf what was going on when the fifth disputed term was up here

23   cn the bench with me before the parties took it back and

24   settled it.  And that was the homopolysaccharide gum term.

25           Does everybody remember that?  Where the parties
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606309

ENDO-OPANA-000066196

47

1    were disputing how the galactomannan, which is a

2    heteropolysaccharide, could be referred to as a

3    homopolysaccharide and it is.  And ultimately the parties

4    took that issue back and-- how did you ultimately resolve

5    it?  That you left the term in as long as the galactomannan

6    was the reference point?

7             MR. CHIN:  That's correct.  Galactomannan was

8    tagged on to the end of the agreed definition.

9             THE COURT:  Right. Mr. Black.

10            MR. BLACK:  It's a little bit different than that,

11   your Honor.

12            There is a question and issue about whether the

13   subunit has to be identical at the level of the entire unit

14   or the things which are attached to it.

15            THE COURT:  Right.  I understand that.

16            MR. BLACK:  And we resolved that and was to leave

17   that for trial.

18            THE COURT:  Okay.  I thought we were all finished

19   with that.

20            MR. BLACK:  No, we have had a definition and of

21   course the second part of the case would be applying it.

22            THE COURT:  And what happens next?

23            MR. CHIN:  I think he was describing the second

24   part of the case for which there may be a technical dispute.

25   I'm not sure we agree that it's materially a claim

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606310

ENDO-OPANA-000066197

48

1 construction dispute, but plainly that's an issue that will

2 be resolved at a different time.

3    THE COURT:  All right.  But when we were going back

4 and forth about it I think that everybody was aware, no

5 matter which side of the story you were on, that there was a

6 tension between what the patentees were talking about in

7 talking-- in calling galactomannans homopolysaccharides.  But

8 they came right out and said that homopolysaccharides include

9 galactomannans.  And clearly a preferred embodiment is an

10 important part of the art that's taught in the patent is the

11 use of xanthan gum and whatever one could make of it.  I

12 believe that one was brought back to one of the essential

13 tenants of claim construction, which is that the patentee can

14 act as their own lexicographer, to specifically define terms

15 of the claim contrary to their ordinary meaning.

16    Now, I think that was a far more defined dispute,

17 because any scientist would probably be a little bit

18 perturbed at calling the galactomannans homopolysaccharide,

19 and we're not bringing in a reasonably competent scientist to

20 prove that, but I believe that what I read in the materials

21 it just doesn't sit.  But we're allowing these patentees, not

22 just because the parties have taken the term back and

23 resolved it, but because the Court could have under existing

24 law construed that term not giving it its ordinary meaning

25 but rather giving it the meaning that the patentee gives it

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606311

ENDO-OPANA-000066198

49

1   as his own lexicographer.

2          And I find that it's actually an easier mental

3   exercise to do here, where it's an agreement that the term

4   hydrophobic material is very much bound up with the invention

5   here, and the surprising discovery that is recited in the

6   patent and the novel invention of adding a hydrophobic

7   material.

8          That leads to the final reason why the defendants

9   say, you have all of that, but then you're saying it's any

10  cld material on the face of the planet and therefore you are

11  adopting a construction that really has no meaning because

12  all you're talking about is function.  And I've looked at the

13  case that's relied on for that principal which is in Westlaw

14  and I will get to it on the defendants' materials.

15         The York Products case.

16         That's relied on by the defendants in indicating

17  that the plaintiffs' definition, the plaintiffs' instruction

18  is wrong because under the York Products case quote, "The

19  language in the syntax of the claim precluded a functional

20  definition." And that specifically had to do with the latter

21  and how the court construed one of the claims.  And the

22  federal circuit indicated in the quote, "substantial part"

23  end quote, which was the term meant only ample height to

24  accomplish a purpose the claim would need to read, only so

25  much height as necessary to affix a structure against

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606312

ENDO-OPANA-000066199

1   movement.  This redraft would essentially strip many words in

2   the claim of their meaning.

3           Further, the defendants argue, that the function

4   does not expunge the expressed requirement that the material

5   is hydrophobic.  And again coming back to what a hydrophobic

6   material is.  And the defendants line up the analysis in K-2

7   Corp. v Solomon, 191 F.3d 1356, 1363, a 1999 decision of the

8   federal circuit and argued, that the claim language in the

9   patent in suit requires that the material is hydrophobic, the

10  function is to slow hydration without disrupting the

11  hydrophilic matrix.  The functional language is fully

12  consistent with the hydrophobic properties and the material

13  must be hydrophobic in addition to performing the function.

14  And that is the defendants' response to the plaintiffs' point

15  cr argument that hydrophobic is a relative term.

16          The Court, after weighing and evaluating both

17  arguments, concludes that in this case the patentees as they

18  did with the homopolysaccharides were active as their own

19  lexicographers.  We begin with that overall observation when

20  we say that hydrophobic material is a term used in this

21  patent to describe what the invention in the discovery is,

22  taking those gels that were already claimed in other patents

23  and adding a hydrophobic material.  And coming up with a form

24  cf sustained release that brought us to a longer period of

25  time which therapeutically effective levels of medicaments

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

51

 1  could be maintained in the patient's system.

 2          The phrase as plaintiffs put it, that slows the

 3  hydration of the gelling agent, does not appear in any

 4  dictionary under the definition of hydrophobic.  Plaintiffs

 5  argued none of the experts have said that that is the

 6  definition of hydrophobic that's normally used by the

 7  pharmaceutical chemists.  But I think everybody and

 8  plaintiffs argued and both sides, and I agree would say that

 9  the language appears in both parties' constructions as what's

10  going on when this hydrophobic material is added to the gel

11  matrix-- I'm sorry to the compound, and the plaintiffs

12  conclude that is the language the inventor chose.

13          In the '933 patent at column 7, lines 44 to 47

14  quote, "The sustained release excipient of the present

15  invention may be further modified by incorporation of the

16  hydrophobic material which slows the hydration of the gums

17  without disrupting the hydrophilic matrix." And it's helpful

18  to just think about what's going on here and that's why at

19  the very beginning of the construction I talk about what the

20  overall technology is.  That slow release of the therapeutic

21  medicament-- or the medicine in a therapeutically effective

22  way by diffusion and erosion, and the invention that permits

23  for this over a longer period of time so that the hydration

24  of the gums in that matrix is slowed to the addition of the

25  material, but the hydrophilic matrix is not disrupted,

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

**CONFIDENTIAL**

**EPI001606314**

**ENDO-OPANA-000066201**

52

1 because then the whole idea of getting this stuff into the

2 patient wouldn't happen.

3         So again, in the '933 patent at column 3, lines 9

4 to 12, quote, "The hydrophobic material may be included in

5 the dosage form in an amount effective to slow the hydration

6 of the gelling agent when exposed to an environmental fluid."

7 End quote.  And the plaintiffs are unabashed about saying the

8 definition is a functional one.  Requiring the use of a

9 substance to slow hydration of the gelling agent or gums.

10         "The plaintiffs argue that the language lacks

11 affinity for water e.g. is resistance to or avoids wetting

12 does not come from the patent specification--" and I agree it

13 does not, it is the defendants' insertion.  Phillips comes up

14 again where plaintiffs rely on it for the proposition that it

15 rejects the line of cases that rely on the dictionary

16 definitions and directed district courts to consider the

17 specifications of the patent.

18         Finally, the plaintiffs indicate that only Dr.

19 Banker is offered to construe that particular construction--

20 or that particular term as one of skill in the art, and the

21 defendants' expert did not perform that analysis.  I'm aware

22 that there is some dispute about whether or not the Court had

23 the benefit of the defendants' expert.  And I'm not saying

24 that it is because Dr. Banker said so that I'm going this

25 way.


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

**CONFIDENTIAL**

**EPI001606315**

**ENDO-OPANA-000066202**

1          I'm rather relying on the specific language of a

2   patent and the preferred embodiments and the specification.

3   Enrico Company v. Katun.  I read it Katun, anybody?  Katun

4   K-A-T-U-N Corp., 486 F.Supp 2d from our district 2007 quote,

5    "As the specification expressly or implicitly defines term

6   and use of the claim differently than their ordinary meaning,

7   then the definition derived from the specification will

8   govern how the claims terms are to be interpreted." But I

9   think it's even broader than that.  We don't have an ordinary

10  meaning here.  We're not talking about hydrophobic materials

11  are commonly talked about.  We're talking about a functional

12  definition that is offered within this patent to explain how

13  come there is an improvement in the sustained release that

14  the patentees have claimed as part of their invention.

15         And in the federal circuit decision of Oatey v. IPS

16  Corp. 514 F.3d 1271, I think it's important that we come back

17  to the practical point quote, "We normally do not interpret

18  claims in a way that excludes embodiments disclosed in the

19  specifications and it's very clear that several of the

20  compounds identified as hydrophobic material in the invention

21  are hydroscopic and have an affinity for water and absorb

22  it."

23         So without going further into the arguments of the

24  parties, I'm satisfied that from the intrinsic evidence of

25  the patent language, the patentees have acted as their own

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

EPI001606316

ENDO-OPANA-000066203

54

```
 1   lexicographer, that this is inferred and accepted by
 2   everybody approaching the dispute in this case, the term
 3   hydrophobic material must be read in the context of this
 4   patent.  It is the, as it were, touchstone of much of what is
 5   going on in the claims and in the specification.  And for
 6   that reason the patentees may act as their own lexicographers
 7   in terms of how they define the particular material, and it
 8   is defined in terms of function.  And I find a significant
 9   difference between the particularity of what's going on here
10   with the hydrophobic material, that slows done the hydration
11   without disturbing the hydrophilic matrix versus the language
12   that flattened out other language in the York Products case.
13          I see this as not falling into that problem, but
14   rather that there is a value and a better argument to the
15   plaintiffs' side of this particular issue.
16          And, therefore, with respect to that last term
17   hydrophobic material, the Court accepts the plaintiffs'
18   proposed construction that a quote, "A material which is
19   effective to slow the hydration of the gelling agent without
20   disrupting the hydrophilic matrix is the preferred
21   construction." It's adopted by the Court.  It is not unduly
22   related simply to function so as to have no meaning.  And
23   that the specification and number of preferred embodiments
24   and interrelationship of that particular term with others
25   that are not in dispute, all suggest to the Court that that
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

CONFIDENTIAL

55

1   is the preferred construction as opposed to the importation

2   of the language quote, "A material which lacks affinity for

3   water e.g. is resistant to avoids wetting," which would

4   necessarily exclude some of the suitable and acceptable

5   hydrophobic material that is identified in the patent.

6          Those are the four terms construed by the Court.

7          Now, let's go off the record and talk about the

8   next steps in this case.

9          Thank you all.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

**CONFIDENTIAL**

**EPI001606318**

**ENDO-OPANA-000066205**