# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ENDO PHARMACEUTICALS INC. <br><br>      Plaintiff, <br><br>    v. <br><br> U.S. FOOD AND DRUG <br> ADMINISTRATION, *et al.* <br><br>      Defendants. | Civil Action No. _____ |

## DECLARATION OF TARA CHAPMAN IN SUPPORT OF
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

I, TARA CHAPMAN, hereby declare under penalty of perjury as follows:

1.     I am a citizen and resident of the Commonwealth of Pennsylvania, I am over the age of 21 years, and I suffer from no mental or physical infirmities that would render me incompetent to testify in this matter. I have personal knowledge of matters set forth in this declaration and I have reviewed records maintained by Endo Pharmaceuticals Inc. ("Endo") in the ordinary course of business and I have reviewed data referenced herein collected from reliable and authoritative sources.

2.     I earned a B.S. degree in Pharmacy in 1998 and a Doctor of Pharmacy degree in 1999 from the University of Sciences in Philadelphia. I have been employed at Endo since 2008 and have held the position of Director of Regulatory Affairs at Endo since October 2010. In both my previous and my current position here, I led the Endo team during the New Drug Application ("NDA") process for Opana® ER Crush Resistant Formulation ("CRF"), and was also directly involved in the discontinuation of the Original Formulation of Opana® ER.

CONFIDENTIAL ENDO-OPANA-000009311

3.      Original Formulation Opana® ER, an extended-release pain reliever containing oxymorphone HCl (a semi-synthetic opioid analgesic), was approved by FDA in July 2006. Original Formulation Opana® ER was initially available in 5 mg, 10 mg, 20 mg, and 40 mg strengths and Endo later received approval for 7.5 mg, 15 mg, and 30 mg strengths in February 2008; Opana® ER was approved by FDA for prescription use for the relief of moderate to severe pain in patients requiring continuous around-the-clock opioid treatment for an extended period of time.

4.      In recognition of the abuse risks of the Original Formulation Opana® ER, Endo sought to improve Original Formulation Opana® ER by reformulating the drug to strengthen its safety profile to make it less susceptible to tampering. To that end, Endo entered into a product development agreement with a German company, Grunenthal GMBH, in December 2007. In May 2009, before Endo filed an Investigational New Drug ("IND") Application for Opana® ER CRF, Endo met with FDA to discuss Endo's goals of reformulating the drug, including to protect against medical errors and thwart at least some would-be abusers from defeating Opana® ER's controlled-release mechanisms. At that time, FDA had not provided any guidelines or criteria to gauge or quantify crush resistance or tamper resistance (and still has not done so to this day); at the May 2009 meeting, FDA acknowledged, however, that even an incremental improvement over the non-crush-resistant formulation could be beneficial.

5.      In May 2009, Endo had a pre-IND meeting with FDA to discuss the development of Opana® ER CRF. In advance of this meeting, Endo submitted a substantive "Pre-IND Meeting Background/Briefing Materials" to FDA which provided plans for studies Endo intended to conduct to collect data on the physicochemical properties of Opana® ER CRF that could lead to safety benefits with the CRF formulation. In July 2010, Endo filed its NDA for

2

                                                    ENDO-OPANA-000009312

Opana® ER CRF and presented FDA with a substantial amount of data to demonstrate the improved safety properties of the new formulation. A true and correct copy of the cover letter that accompanied the July 2010 NDA for Opana® ER CRF is attached to this declaration as **Exhibit A**.

6. In August 2010, Purdue Pharma launched a crush-resistant formulation of OxyContin®, and discontinued its non-crush-resistant formulation of the drug. This experience provided FDA with a good precedent for understanding how Endo's withdrawal of another opioid pain relief drug, Opana® ER, in May 2012, and the related introduction of Opana® ER CRF, in February 2012, would promote public safety.

7. Endo received FDA approval to market the reformulated version of Opana® ER on December 9, 2011. Shortly thereafter, in February 2012, Endo stopped manufacturing Original Formulation Opana® ER after the plant that produced the pills (run by Novartis AG) encountered production problems. The last batch of Original Formulation Opana® ER was released in March 2012.

8. Endo did not recall the Original Formulation Opana® ER that already had been released into the marketplace because of Endo's concerns (concerns which I understood to be shared by FDA based on conversations between Endo and FDA at that time) that, if Endo were to abruptly recall the Original Formulation of the drug before Opana® ER CRF was available to be dispensed in quantities sufficient to cover patient needs, it would cause an Opana® ER shortage and place patients who had been prescribed the drug at risk of severe withdrawal symptoms and/or other negative consequences such as side effects or underdosing/overdosing associated with switching such patients to a different opioid-based drug. Accordingly, Endo coordinated with FDA to allow the existing supply of Original Formulation Opana® ER to be

3

 ENDO-OPANA-000009313

drawn down as Endo undertook an accelerated effort to quickly bring the crush-resistant formulation to market. Endo began shipping Opana® ER CRF in February 2012.

9.      In March 2011, Endo made a business decision to discontinue the sale and distribution of Original Formulation Opana® ER in the 7.5 and 15 mg strengths. These low dosage forms, which were used primarily for titration purposes (*i.e.*, increasing dosages gradually), were abused less often than the higher strength dosages.

10.     On May 31, 2012, Endo sent a formal notification to FDA that it had discontinued Original Formulation Opana® ER for safety reasons because the original formulation was subject to both intentional and inadvertent abuse and misuse and the reformulated Opana® ER CRF, which is designed to be crush-resistant, offered safety advantages over the original formulation of the drug. A true and correct copy of the May 31, 2012 notification e-mail to FDA is attached to this Declaration at **Exhibit B**.

11.     After Endo sent FDA formal notification of such withdrawal on May 31, 2012, in an effort to prod FDA into action and ensure a timely withdrawn-for-safety determination by FDA, on August 10, 2012, Endo filed a Citizen Petition, which FDA received on August 13, 2012. A true and correct copy of the August 13 Citizen Petition is attached to this Declaration as **Exhibit C**. The non-confidential attachments to the August 13 Citizen Petition can be found at: http://www.regulations.gov/#!documentDetail;D=FDA-2012-P-0895-0001

12.     On August 31, 2012, Endo filed a second Citizen Petition. A true and correct copy of the August 31, 2012 Citizen Petition is attached to this Declaration as **Exhibit D**. The non-confidential attachments to the August 31 Citizen Petition can be found at: http://www.regulations.gov/#!documentDetail;D=FDA-2012-P-0951-0001

4

CONFIDENTIAL                                                      ENDO-OPANA-000009314

13.     On November 13, 2012, Endo submitted a supplement to its August 13 Citizen Petition ("Supplement").  In the Supplement, Endo provided statistical data gathered after the February 2012 introduction of Opana® ER CRF, which demonstrated that the introduction of Opana® ER CRF has curbed abuse and misuse of the drug.  A true and correct copy of the November 13 Supplement is attached to this Declaration as **Exhibit E**.  The non-confidential attachments to the November 13, 2012 Supplement can be found at: http://www.regulations.gov/#!documentDetail;D=FDA-2012-P-0895-0003.

14.     If generic non-crush-resistant Original Formulation Opana® ER is permitted to come onto the market, but must later be recalled, recalling the released generic drugs from countless wholesaler and retail pharmacy shelves, as well as from innumerable homes, would be a monumental, perhaps impossible, task.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on this 30ᵗʰ day of November, 2012.

Tara Chapman
Tara Chapman, PharmD

5

CONFIDENTIAL                                                    ENDO-OPANA-000009315

Exhibit A to

Chapman Declaration

CONFIDENTIAL

ENDO-OPANA-000009316



July 7, 2010

Bob Rappaport, MD
Division of Anesthesia and Analgesia Products
Food and Drug Administration
Center for Drug Evaluation and Research
Central Document Room
5901-B Ammendale Road
Beltsville, MD 20705-1266

**Re:**    **NDA 201655**: Oxymorphone HCl tamper-resistant extended-release tablet
          **Original NDA Application**
          **Priority Review Request**
          **Proposed Risk Evaluation and Mitigation Strategy**

Dear Dr. Rappaport,

In accordance with 21 CRF 314 and Section 505(b)(1) of the Federal Food, Drug and Cosmetic Act,
Endo Pharmaceuticals Inc. is submitting an Original New Drug Application for oxymorphone
hydrochloride tamper-resistant extended-release tablets.

As a pharmaceutical company with a focus on pain management, Endo Pharmaceuticals Inc. strives to
improve the treatment of pain in patients while at the same time safeguarding against potential misuse,
abuse, overdose, and addiction associated with use of its products. Improving pain management includes
the development of new effective analgesics and also supporting the proper and appropriate use of its
medication.

Endo Pharmaceuticals Inc. and its partner Grünenthal GmbH (Aachen, Germany) have developed a
tamper-resistant extended-release formulation of oxymorphone hydrochloride (HCl) to reduce accidental
misuse (ie, breaking, and/or crushing for patient convenience) and to deter certain methods of intended
abuse (ie, crushing for snorting and/or injection).

The oxymorphone HCl tamper-resistant extended-release tablet New Drug Application is based on
establishing bioequivalence to OPANA® ER (NDA 21-610), which was approved by FDA on June 22,
2006. The oxymorphone HCl extended-release tamper-resistant tablets also contain the same drug
substance found in immediate-release (IR; OPANA®, NDA 21-611), which was also approved by FDA
on June 22, 2006. The tamper-resistant formulation product is intended to be dosed twice-daily and will
be available in the same dosage strengths as OPANA ER (5 mg, 7.5 mg, 10 mg, 15 mg, 20 mg, 30 mg,
40 mg).

CONFIDENTIAL                ENDO-OPANA-000009317

NDA 201655
July 7, 2010
Page 2 of 3

The oxymorphone HCl tamper-resistant extended-release tablet is intended to be indicated for the relief of moderate to severe pain in patients requiring continuous, around-the-clock opioid treatment for an extended period of time. It is proposed that the dosing and administration will be identical to the reference OPANA ER (oxymorphone HCl) Extended-Release Tablets.

By demonstrating bioequivalence to the marketed OPANA ER, the safety and efficacy profile of oxymorphone HCl tamper-resistant extended-release tablet has been established.

Based on the known abuse patterns for opioids, and specifically for OPANA ER, a development program was designed to show both the benefits and limitations of the new oxymorphone tamper-resistant extended-release tablets.

The in vitro and in vivo studies, including the human laboratory studies, demonstrated oxymorphone HCl extended-release tamper-resistant tablets are resistant to crushing, breaking, powdering or pulverization. Additionally, the oxymorphone HCl tamper-resistant extended-release formulation had no new adverse events observed versus OPANA ER in the studied parameters which demonstrated that no new safety, misuse, and/or abuse concerns are being introduced with the new formulation. In in vivo studies designed to evaluate the tamper-resistant properties, the oxymorphone HCl tamper-resistant extended-release formulation was shown to retain all of its extended-release characteristics after manipulation with a pill crusher, whereas the extended-release character of OPANA ER was reduced. Limitations of the new formulation were shown in the program; however, the oxymorphone HCl extended-release tamper-resistant tablet retained some extended-release characteristics even under aggressive methods of tampering, including cutting, grinding or mastication.

Based on currently reported OPANA ER abuse patterns and human laboratory studies, the development program supports that the oxymorphone HCl tamper-resistant extended-release formulation of oxymorphone HCl will provide an incremental benefit in raising the hurdle for manipulation of the tablet for abuse by the demonstrated resistance to crushing, breaking, pulverization or powdering. Oxymorphone HCl tamper-resistant extended-release tablets will also continue to maintain the safety and efficacy necessary for the relief of moderate to severe pain in patients requiring continuous, around-the-clock opioid treatment for an extended period of time.

Endo Pharmaceuticals Inc. requests that the Division of Anesthesia and Analgesia Products grant a priority review for the enclosed original NDA for a new tamper-resistant extended-release formulation of oxymorphone hydrochloride. Please refer to the enclosed Priority Review Request.

A proposed Risk Evaluation and Mitigation Strategy (REMS) is included in this NDA. This REMS is considered to be an interim REMS. Endo commits to this product being part of the class-wide opioid REMS, when applicable.

A Reviewer's Guide is provided which provides key information on agreements made with the Division and also location of identified components of the NDA. Additionally, full details of the development program, including the bioequivalence and relative bioavailability studies and the tamper-resistant properties program, are available in 2.7.3 Summary of Clinical Efficacy (Development Program Summary).

CONFIDENTIAL

NDA 201655
July 7, 2010
Page 3 of 3

If there are any questions concerning this submission, please do not hesitate to contact me at 484-840-4262 or via email at Barto.Bob@Endo.com. In my absence, please contact Tara Chapman, Associate Director, Regulatory Affairs, at 610-459-7102 or via email at Chapman.Tara@endo.com.

Sincerely,

Robert A. Barto

Robert A. Barto, MBA
Vice President, Regulatory Affairs

CONFIDENTIAL

ENDO-OPANA-000009319

# Exhibit B to

# Chapman Declaration

CONFIDENTIAL

ENDO-OPANA-000009320

## Chapman, Tara

| | |
|---|---|
| **From:** | Chapman, Tara |
| **Sent:** | Thursday, May 31, 2012 9:55 AM |
| **To:** | maryann.holovac@fda.hhs.gov |
| **Cc:** | lisa.basham@fda.hhs.gov |
| **Subject:** | Request to move Opana ER NDA 21-610 to the Orange Book Discontinued List |

Dear Ms. Holovac,

The purpose of this correspondence is to notify the Orange Book Staff and Division that Endo has discontinued marketing of the OPANA ER (oxymorphone hydrochloride) formulation in NDA 21-610 and as such would like to move the product to the Discontinued List in the Orange Book.

While the original formulation of OPANA ER (under NDA 21-610) was deemed by FDA to be safe and effective when taken according to the prescribing information, the original formulation was subject to both intentional and inadvertent abuse and misuse. Endo believes that the new formulation of OPANA ER (under NDA 201655), which is designed to be crush resistant, offers safety advantages over the original formulation (NDA 21-610) and that the original formulation (under NDA 21-610) should be discontinued for safety reasons.

This request to move Opana ER (NDA 21-610) to the Orange Book Discontinued List applies to the following dosage strengths: 5 mg, 10 mg, 20 mg, 30 mg, and 40 mg. The Opana ER (NDA 21-610) 7.5 mg and 15 mg dosage strengths were moved to the Discontinued List previously. The Opana ER (under NDA 201655) should remain on the approved prescription drug product list as it is the currently available formulation.

If you have any questions, please contact me.

Thank you!

Kind Regards,
Tara

Tara N. Chapman, PharmD
Director, Regulatory Affairs / Liaison
100 Endo Boulevard, Chadds Ford, PA 19317
**610.459.7102**   484.840.4290 fax
chapman.tara@endo.com



*endo* | *AMS   Endo Pharmaceuticals   HealthTronics   Qualitest*

1

CONFIDENTIAL

ENDO-OPANA-000009321

2

CONFIDENTIAL

ENDO-OPANA-000009322

Exhibit C to

Chapman Declaration

CONFIDENTIAL

ENDO-OPANA-000009323



9971  12  AUG 13  AM 11: 2

*Endo*
*100 Endo Boulevard*
*Chadds Ford, PA 19317*
*610 558.9800*
*484 840.4290 fax*

*endo.com*

August 10, 2012

Division of Dockets Management
Food and Drug Administration
5630 Fishers Lane
Room 1061, HFA-305
Rockville, Maryland 20852

## CITIZEN PETITION

Endo Pharmaceuticals Inc. ("Endo") submits this Citizen Petition under Sections 505(j) and 505(q) of the Federal Food, Drug, and Cosmetic Act ("FDCA") and in accordance with the Food and Drug Administration's ("FDA's" or the "Agency's") implementing regulations set forth at 21 C.F.R. § 10.30 and 21 C.F.R. § 314.161 to request that the Commissioner of Food and Drugs take the actions described below with respect to Endo's discontinued Opana® ER (oxymorphone HCl) Extended-release Tablets approved under New Drug Application ("NDA") No. 021610 and any pending or approved Abbreviated New Drug Applications ("ANDAs") for which Opana® ER approved under NDA No. 021610 serves as the Reference Listed Drug ("RLD").

## I.    ACTION REQUESTED

Endo requests that FDA:

(1)    Determine that the discontinued, non-crush-resistant version of Opana® ER approved under NDA No. 021610 was discontinued for reasons of safety and can no longer serve as an RLD for an ANDA applicant;

(2)    Refuse to approve any pending ANDA for a generic version of the non-crush-resistant version of Opana® ER approved under NDA No. 021610; and

(3)    Suspend and withdraw the approval of any ANDA referencing Opana® ER approved under NDA No. 021610 as the RLD.

FDA · 2012 · P · 0895

2012 - 6160
CP

endo | AMS  Endo Pharmaceuticals  HealthTronics  Qualitest

CONFIDENTIAL                                                                                   ENDO-OPANA-000009324

Division of Dockets Management
August 10, 2012
Page 2


## II.    STATEMENT OF GROUNDS

### A.    Factual Background

#### 1.    Opioid analgesics

Opioid analgesics, such as oxycodone, oxymorphone, morphine, hydromorphone and methadone, are effective in the treatment of chronic and moderate to severe pain, but abuse of prescription opioid analgesics is "at the center of a major public health crisis of addiction, misuse, abuse, overdose and death."[1]  The number of first-time abusers of prescription opioids rose from 628,000 in 1990 to 2.4 million in 2004.[2]  Prescription opioid-related deaths in 2008 have nearly quadrupled from 1999 figures, according to the Center for Disease Control and Prevention.[3]  Over a five-year period, the number of estimated emergency department visits related to opioid analgesic abuse more than doubled from 144,644 in 2004 to 305,885 in 2008, an increase of 111 percent.[4]  Data from the Researched Abuse, Diversion and Addiction-Related Surveillance system

---

[1]    FDA, Opioid Drugs and Risk Evaluation and Mitigation Strategies (REMS), available at http://www.fda.gov/Drugs/DrugSafety/InformationbyDrugClass/ucm163647.htm.

[2]    See Jane C. Ballantyne, U.S. Opioid Risk Management Initiatives, Int'l Assoc. for the Study of Pain, Clinical Updates, Vol. 17, Issue 6, at 1 (2009), available at http://www.iasp-pain.org/AM/AMTemplate.cfm?Section=Home&TEMPLATE=/CM/ContentDisplay.cfm&CONTENTID=15080&SECTION=Home; Andrew Rosenblum et al., Opioids and the Treatment of Chronic Pain: Controversies, Current Status, and Future Directions, 16(5) Exp. Clin. Psychopharmacol. 405, 406 (2009), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2711509/pdf/nihms97365.pdf; Office of Applied Studies, Substance Abuse and Mental Health Services Administration (SAMHSA), Patterns and Trends in Nonmedical Prescription Pain Reliever Use: 2002 to 2005, The National Survey on Drug Use and Health Report (April 6, 2007), available at http://www.samhsa.gov/data/2k7/Pain/Pain.pdf.

[3]    See Centers for Disease Control and Prevention, Vital Signs: Overdoses of Prescription Opioid Pain Relievers – United States, 1999-2008, 60 Morbidity and Mortality Weekly Report, at 3 (Nov. 1, 2011), available at http://www.cdc.gov/mmwr/PDF/wk/mm60e1101.pdf.

[4]    See SAMHSA, Trends in Emergency Department Visits Involving Nonmedical Use of Narcotic Pain Relievers, The Drug Abuse Warning Network Report, at 2 (June 18, 2010), available at http://oas.samhsa.gov/2k10/DAWN016/OpioidEdHTML.pdf.

Division of Dockets Management
August 10, 2012
Page 3

("RADARS") in 2010 indicate that prescription opioid abuse, misuse and diversion rates continue to increase.[5]

In response to these public health concerns, FDA has undertaken numerous initiatives to prevent opioid misuse and abuse, including the release of a class-wide Risk Evaluation and Mitigation Strategy ("REMS") for all extended-release opioid medications, which was in development between the Agency and stakeholders since at least November 2009 and recently finalized.[6] Implementation of the REMS should mitigate abuse and misuse of prescription opioid analgesics. As FDA recognizes, however, more action is needed to reduce abuse and misuse. The Agency "has been looking for novel interventions to prevent [opioid] abuse" and supports the development of drug products with abuse deterrent properties.[7]

In addition to FDA, Congress has also recognized the need to address the public health concern involving opioid analgesics. Specifically, Congress has encouraged the development of drugs with abuse-resistant characteristics and directed FDA to expedite the filing and review of such drugs.[8] Congress has also encouraged dissemination of information that differentiates these drugs.[9]

## 2. Opana® ER Regulatory History and Background

FDA approved NDA No. 021610 for Opana® ER (oxymorphone HCl) Extended-release Tablets on June 22, 2006 for the management of moderate to severe pain in patients requiring an around-the-clock opioid analgesic. Opana® ER under NDA No. 021610 was marketed in 5 mg, 7.5 mg, 10, mg, 15 mg, 20 mg, 30 mg, and 40 mg

---

[5]  See RADARS® System 5th Annual Meeting Slides (Apr. 28, 2011), available at http://www.radars.org/Portals/1/Dart-1.pdf.

[6]  See FDA, Opioid Drugs and REMS, supra note 1; FDA, Blueprint for Prescriber Continuing Education Program (Oct. 25, 2011); FDA, Opioid and REMS: November 2009 Update.

[7]  Memorandum from Bob A. Rappaport, M.D., Director, Division of Anesthesia and Analgesia Products, Office of Drug Evaluation II, CDER, FDA, to the Anesthetic and Life Support Drugs Advisory Committee and the Drug Safety and Risk Management Advisory Committee, as part of the April 22, 2010 Advisory Committee Meeting Background Materials, at 1 (Mar. 26, 2010).

[8]  See S. Rep. No. 109-266, at 142 (2006).

[9]  See H. Rep. No. 109-102, at 81 (2005).

          ENDO-OPANA-000009326

Division of Dockets Management
August 10, 2012
Page 4

strengths. Oxymorphone (14-hydroxydihydro-morphinone) is a semi-synthetic opioid analgesic that is structurally related to morphine and is a metabolite of oxycodone. It is controlled under Schedule II of the Controlled Substances Act.[10]

Endo subsequently developed a crush-resistant version of Opana® ER in order to offer a meaningful benefit in reducing the potential for abuse, misuse and diversion as compared to non-crush-resistant products. Endo submitted NDA No. 201655 to FDA on July 7, 2010 for the company's new design of Opana® ER incorporating physical and physiochemical barriers to tampering (referred to as "Opana® ER Crush-Resistant Formulation" or "Opana® ER CRF").[11] Opana® ER CRF contains oxymorphone embedded in a hard polyethylene oxide matrix that is resistant to crushing. The manufacturing process for Opana® ER CRF imparts mechanical strength to the tablets through a heat extrusion process. Characteristics of the tablets include high breaking force that resists crushing and pulverizing, and resistance to aqueous extraction (i.e., poor syringeability). FDA approved NDA No. 201655 for Opana® ER CRF on December 9, 2011. Opana® ER CRF is approved in 5 mg, 7.5 mg, 10, mg, 15 mg, 20 mg, 30 mg, and 40 mg strengths. The 7.5 mg and 15 mg strengths are not currently marketed.

Opana® ER CRF offers resistance to crushing, which can deter abuse where recreational and experienced abusers attempt to crush the tablets for ingestion or further manipulation. The tablets also offer resistance in situations of misuse – for example, where patients or healthcare providers attempt to crush tablets to facilitate swallowing or gastric tube administration, where patients intentionally or unintentionally attempt to

---

[10]  FDA also approved an immediate-release formulation of Opana® Tablets (NDA No. 021611) on June 22, 2006. Oxymorphone immediate-release tablets were previously approved and marketed in the early 1960s but were removed from the market for commercial reasons. Opana® is also available in an injectable dosage form (NDA No. 011707).

[11]  FDA's draft guidance on abuse potential of new drugs refers to "[f]ormulations that deter abuse," including those that have "physical barriers to tampering," as "abuse deterrent formulations." FDA Draft Guidance for Industry, Assessment of Abuse Potential of Drugs, at 8 (Jan. 2010). Endo uses the term "crush-resistant" rather than "abuse deterrent" to reflect that the new design of Opana® ER is more resistant to crushing, which serves as an impediment to both intranasal and intravenous abuse. Crushing tablets is the preferred method by which abusers prepare oxymorphone tablets for administration. See Stephen F. Butler et al., Abuse Risks and Routes of Administration of Different Prescription Opioid Compounds and Formulations, 8 Harm Reduction J. 1, 14 (2011) (Attachment 1).

Division of Dockets Management
August 10, 2012
Page 5

chew the tablets to facilitate swallowing or where children unintentionally chew the tablets prior to an accidental ingestion.

Endo recently discontinued from sale for safety reasons all strengths of Opana® ER approved under NDA No. 021610 and notified FDA of the discontinuation. As a result, FDA moved Opana® ER to the Discontinued List section of the Agency's *Approved Drug Products with Therapeutic Equivalence Evaluations* ("Orange Book"). Opana® ER CRF (NDA No. 201655) remains in the Prescription Drug Product List section of the Orange Book and is the only currently marketed Opana® ER drug product.

Prior to FDA's approval of NDA No. 201655 for Opana® ER CRF, and prior to the discontinuation of Opana® ER approved under NDA No. 021610, FDA approved two ANDAs for generic versions of Opana® ER that cite NDA No. 021610 as their respective RLD. Specifically, FDA approved Impax Laboratories' ("Impax's") ANDA No. 079087 on December 21, 2010 for all Opana® ER strengths, and Actavis South Atlantic LLC's ("Actavis'") ANDA No. 079046 on December 13, 2010 for the 7.5 mg and 15 mg strengths of Opana® ER. Because both ANDAs are directed to the original Opana® ER NDA, none of the drug products approved under either application likely have a crush-resistant design.

Under a patent license agreement with Endo, the earliest time by which Impax could come to market with its non-crush-resistant formulation is January 1, 2013. Thus, the issues raised in this petition are of immediate importance.

### 3. Applicable Law

FDA's regulations implementing the FDC Act require the Agency to determine either on FDA's own initiative or in response to citizen petition – "whether a listed drug that has been voluntarily withdrawn from sale was withdrawn for safety or effectiveness reasons. . . ."[12] FDA must make such a determination prior to approving a pending ANDA that refers to the discontinued drug, and "[w]henever a listed drug is voluntarily withdrawn from sale and [ANDAs] that referred to the listed drug have been approved." See id. Pursuant to recent amendments made to the FDC Act by the FDA Safety and Innovation Act ("FDASIA"),[13] FDA must issue a final, substantive determination on a petition submitted pursuant to 21 C.F.R. § 314.161(b) "no later than 270 days after the

---

[12]   21 C.F.R. §§ 314.161(a), (b).

[13]   Pub. L. No. 112-144, 126 Stat. 993 (2012).

CONFIDENTIAL                                                    ENDO-OPANA-000009328

Division of Dockets Management
August 10, 2012
Page 6

date the petition is submitted." FDC Act § 505(w), as amended by FDASIA § 1134(a).
The new requirement applies to any petition that is submitted pursuant to 21 C.F.R.
§ 314.161(b) on or after July 9, 2012.[14]

Under FDC Act § 505(j)(4)(I) and FDA's implementing regulations at 21 C.F.R.
§ 314.127, FDA may refuse to approve an ANDA if the Agency determines that the RLD
was withdrawn from sale for reasons of safety or effectiveness. If FDA makes such a
determination, then the RLD is removed from the Orange Book.[15] In addition, FDA can
suspend and withdraw approval of an ANDA if the Agency determines that the RLD was
withdrawn from sale for reasons of safety or effectiveness.[16]

### B. Opana® ER (NDA No. 21610) Was Discontinued from Sale for Reasons of Safety

Endo requests that FDA determine that Opana® ER approved under NDA No.
021610 was discontinued from sale for safety reasons. Upon making such a
determination, FDA must remove the product from the Orange Book and should take
appropriate action with respect to pending and approved ANDAs that cite Opana® ER as
the RLD. Endo also requests that FDA promptly make such decisions. The potential
widespread availability of non-tamper-resistant generics of all strengths of Opana® ER in
early 2013 calls into question whether these generics can be properly marketed in view of
the discontinuation of Opana® ER for safety reasons.

The intent of the manufacturer is a "focus" of FDA's decision on whether a drug
was discontinued from sale for reasons of safety or effectiveness.[17] FDA discerns the
actual intent of the manufacturer based on the reasons given by the manufacturer,

---

[14] See FDASIA § 1134(b). FDASIA also amended FDC Act § 505(q) to require FDA to
respond to certain petitions, including petitions affecting pending ANDAs, within 150 days
after receiving such a petition. See FDASIA § 1135. Insofar as FDA considers this petition
to be a petition covered by FDC Act § 505(q), then Endo expects FDA to take final agency
action prior to the 270-day timeframe required by FDC Act § 505(w). In either case, Endo
requests that FDA make a final determination with respect to the issues raised in this petition
prior to the January 1, 2013 date on which an ANDA sponsor could begin marketing its
generic version of Opana® ER approved under NDA No. 021610.

[15] FDC Act § 505(j)(7)(C); see also 21 C.F.R. § 314.162.

[16] FDC Act § 505(j)(6); see also 21 C.F.R. §§ 314.150, 314.151, 314.153.

[17] FDA, Proposed Rule, ANDA Regulations, 54 Fed. Reg. 28,872, 28,907 (July 10, 1989).

CONFIDENTIAL

ENDO-OPANA-000009329

Division of Dockets Management
August 10, 2012
Page 7

whether the manufacturer had concerns with safety or effectiveness of the product, and "circumstantial evidence and logical inference."[18] For example, in 1986, Hoechst-Roussel discontinued the antidepressant Merital (nomifensine maleate) from sale "as a precautionary measure" due to increased reports of serious hypersensitivity reactions occurring in patients in the United Kingdom.[19] FDA "confirmed that the manufacturer's decision to withdraw the product from sale was base[d] on safety concerns," and, "[a]s a consequence," FDA removed nomifensine maleate from the list of approved drugs.[20] Similarly, in deciding that Janssen Pharmaceutical discontinued Hismanal (astemizole) 10 mg tablets for reasons of safety, FDA "considered the sponsor's explanation of the basis for the withdrawal of the product and information available to the agency regarding Hismanal."[21]

Endo discontinued Opana® ER (NDA No. 021610) for reasons of safety. While Opana® ER is safe and effective when taken as prescribed, it was nevertheless subject to abuse, misuse and diversion. And recent data and reports suggest that rates of abuse, misuse, and diversion of opioid analgesics, such as Opana® ER, continue to rise.[22] Notably, abuse of extended-release oxymorphone has risen by approximately 139% since the introduction of abuse-deterrent OxyContin (oxycodone HCl) on the market in 2010.[23] This suggests that, among intentional abusers of opioids, the difficulty in abusing the new formulation of OxyContin has driven abusers to formulations that lack similar abuse-deterrent technologies. The increase in Opana® ER abuse rates are attributed to the ease of defeating the extended release properties of Opana® ER.[24] The recent spike in Opana®

---

[18] Id.

[19] FDA, Removal of Nomifensine Maleate From List of Approved Drug Products, 51 Fed. Reg. 21,981, 21,982 (June 10, 1986).

[20] Id.

[21] FDA, Determination That Astemizole 10-Milligram Tablets Were Withdrawn From Sale for Safety Reasons, 64 Fed. Reg. 45,973 (Aug. 23, 1999).

[22] See RADARS System Slides, supra note 5.

[23] R. Black et al., Effects of Reformulated OxyContin® Among Patients Assessed for Substance Abuse Treatment in the NAVIPPRO Sentinel Surveillance Network, American Pain Society 31st Annual Scientific Meeting Abstract (Apr. 2012), available at http://www.ampainsoc.org/abstract/view/5104/.

[24] See, e.g., Drug Enforcement Agency, Philadelphia Division Intelligence Program, Drug Intelligence Brief: Opana (Oxymorphone) Abuse (May 2011) ("Users are reportedly switching from Oxycontin to Oxymorphone for ease of use (crushable)"), available at http://www.justice.gov/dea/pubs/states/phila_opana.pdf; New York Nassau County,

Division of Dockets Management
August 10, 2012
Page 8

ER abuse has been accompanied by a rise in overdoses from Opana® ER.[25] Non-crush-resistant formulations are becoming increasingly attractive targets of abuse and diversion.

Endo remains committed to addressing patient safety and appropriate uses of opioids. Endo developed Opana® ER CRF to provide a crush-resistant product, equally as effective as Opana® ER, which would discourage abuse, misuse and diversion. Endo devoted extensive resources to develop Opana® ER CRF. Because Opana® ER presents a greater risk of abuse, misuse and diversion than Opana® ER CRF, Endo discontinued Opana® ER from sale for safety reasons within the meaning of FDC Act § 505(j)(7)(C) and 21 C.F.R. § 314.161.

Opana® ER CRF provides safety advantages over Opana® ER. It is resistant to crushing by common methods and tools employed by abusers of prescription opioids. The presence of both Opana® ER CRF and generic, non-crush-resistant oxymorphone formulations on the market simultaneously would allow abuse or diversion to continue, limiting the potential benefits that can be provided by Opana® ER CRF. Furthermore, Opana® ER CRF is less likely to be chewed or crushed even in situations where there is no intent for abuse, such as where patients inadvertently chew the tablets, or where caregivers attempt to crush the tablets for easier administration with food or by gastric tubes, or where children accidentally gain access to the tablets. The new formulation reduces the risk of an immediate release of a potentially lethal dose of oxymorphone in these situations.

FDA has previously compared the safety risks of a discontinued product with its closest substitute to determine whether the withdrawn product was discontinued for reasons of safety. For example, when FDA determined that HalfLytely Bisacodyl Tablet Bowel Prep Kit, 10 mg, was discontinued for safety or effectiveness reasons after the NDA-holder, Braintree Laboratories, received approval for a 5 mg version of the product, the Agency took into consideration the safety advantages of the newer 5 mg version. Data comparing the 5 mg and 10 mg versions of the product showed comparable

---

Mangano Issues Dependency Public Health Alert On Increasing Usage Of The Narcotic Drug Opana (May 2011), available at http://www.nassaucountyny.gov/agencies/CountyExecutive/NewsRelease/2010/5-9-2011.htm; Donna Leinwand Leger, Opana Abuse in USA Overtakes OxyContin, USA Today (July 10, 2012), available at http://www.usatoday.com/news/nation/story/2012-07-10/opana-painkiller-addiction/56137086/1.

[25]  See Leinwand, supra note 24.

CONFIDENTIAL  ENDO-OPANA-000009331

Division of Dockets Management
August 10, 2012
Page 9

effectiveness, however, the 5 mg product had "a safety advantage over the 10-mg product because there is less abdominal fullness and cramping . . . ."[26] When FDA concluded that Brevibloc (esmolol HCl), 10 mL ampule concentrate, was discontinued for reasons of safety because the product posed a higher risk of medication errors that could lead to serious outcomes, the Agency took into account that "alternative presentations of the product," like a ready-to-use vial, were available that did not have the same potential for medication errors.[27]

From a risk management perspective, when a product is introduced by a sponsor that is **more safe** than its discontinued predecessor product, that safety advantage should be considered by FDA in determining why the product was discontinued. FDA's practice reflects that it will consider comparative safety advantages offered by an alternative product. Furthermore, FDA considers risks from products used in contravention to their labels when deciding whether a product was discontinued for safety reasons.[28] For example, in July 2005, FDA suspended marketing of Palladone (hydromorphone HCl) Extended-release Capsules due to the "potential for severe side effects" when Palladone

---

[26] FDA, Determination That Halflytely and Bisacodyl Tablets Bowel Prep Kit (Containing Two Bisacodyl Delayed Release Tablets, 5 Milligrams) Was Withdrawn From Sale for Reasons of Safety or Effectiveness, 76 Fed. Reg. 51,037 (Aug. 17, 2011).

[27] See FDA, Determination That BREVIBLOC (Esmolol Hydrochloride) Injection, 250 Milligrams/Milliliter, 10-Milliliter Ampule, Was Withdrawn From Sale for Reasons of Safety or Effectiveness, 75 Fed. Reg. 24,710, 24,711 (May 5, 2010); see also FDA, Determination That Halflytely and Bisacodyl Tablets Bowel Prep Kit (Containing Two Bisacodyl Delayed Release Tablets, 5 Milligrams) Was Withdrawn From Sale for Reasons of Safety or Effectiveness, 76 Fed. Reg. 51,037 (Aug. 17, 2011).

[28] The approved conditions of use do not limit FDA's safety determination. FDC Act § 505(e) describes when FDA may withdraw an application for safety reasons related to the application's "conditions of use" after notice and opportunity for a hearing. FDC Act § 505(e). The grounds described in Section 505(e) for withdrawal of a drug are distinct from a determination by FDA that a drug has been withdrawn by the manufacturer for reasons of safety or effectiveness. See FDC Act § 505(j)(6) (an ANDA cannot be approved if the listed drug was withdrawn by FDA on grounds described in Section 505(e) "*or* was withdrawn or suspended under this paragraph *or* which, as determined by the Secretary, has been withdrawn from sale for safety or effectiveness reasons") (emphases added); § 505(j)(7) (FDA shall remove a drug from the list of approved drugs if the drug was withdrawn by FDA on grounds described in Section 505(e) "*or* was withdrawn or suspended under paragraph (6) *or* if the Secretary determines that a drug has been withdrawn from sale for safety or effectiveness reasons") (emphases added).

  ENDO-OPANA-000009332

Division of Dockets Management
August 10, 2012
Page 10

is taken with alcohol.[29]  Although the Palladone label in numerous places directed patients not to combine the drug with alcohol and warned providers of the effects of alcohol, the potential for severe side effects due to "dose dumping" led FDA to suspend marketing and sales of the drug.[30]

Opana® ER CRF provides safety advantages over Opana® ER based on the *in vitro* and bioavailability data and studies involving experienced opioid abusers provided by Endo to FDA.  The sudden and dramatic increase in abuse and overdose of non-crush-resistant oxymorphone formulations following the introduction of a tamper-resistant formulation of OxyContin also demonstrate that these formulations are less safe than Opana® ER CRF.

### C.  Conclusion

For the reasons set forth above, FDA should determine that Opana® ER was discontinued for safety reasons in light of Endo's intent in discontinuing Opana® ER and in light of the crush-resistance and attendant safety advantages provided by Opana® ER CRF in comparison to the original formulation and remove the product from the Orange Book.  Upon determining that Opana® ER was discontinued for safety reasons, FDA should refuse to approve any pending ANDA for a generic version of the drug and promptly move to suspend and withdraw the approval of any ANDA referencing Opana® ER (NDA No. 021610) as the RLD.

### III.  ENVIRONMENTAL IMPACT

Petitioner claims a categorical exclusion under 21 C.F.R. § 25.31.

---

[29]  FDA Public Health Advisory: Suspended Marketing of Palladone (hydromorphone hydrochloride, extended-release capsules) (July 13, 2005), available at http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/DrugSafetyInformationforHeathcareProfessionals/PublicHealthAdvisories/ucm051743.htm.

[30]  Palladone Prescribing Information, at 14, 15, 17, 18 (Sept. 2004), available at http://www.accessdata.fda.gov/drugsatfda_docs/label/2004/021044lbl.pdf.

CONFIDENTIAL

ENDO-OPANA-000009333

Division of Dockets Management
August 10, 2012
Page 11

## IV.    ECONOMIC IMPACT STATEMENT

Petitioner will, upon request by the Commissioner, submit economic impact
information, in accordance with 21 C.F.R. § 10.30(b).

## V.    CERTIFICATIONS

The undersigned certifies that, to the best knowledge and belief of the
undersigned, this Petition includes all information and views on which the Petition relies,
and that it includes representative data and information known to the Petitioner which are
unfavorable to the Petition.

Endo makes the following certification pursuant to FDC Act § 505(q)(1)(H): I
certify that, to my best knowledge and belief: (a) this petition includes all information
and views upon which the petition relies; (b) this petition includes representative data
and/or information known to the petitioner which are unfavorable to the petition; and (c) I
have taken reasonable steps to ensure that any representative data and/or information
which are unfavorable to the petition were disclosed to me. I further certify that the
information upon which I have based the action requested herein first became known to
the party on whose behalf this petition is submitted on or about the following date: May
31, 2012. If I received or expect to receive payments, including cash and other forms of
consideration, to file this information or its contents, I received or expect to receive those
payments from the following persons or organizations: Endo. I verify under penalty of
perjury that the foregoing is true and correct as of the date of the submission of this
petition.

Respectfully submitted,

Robert Barto/prc

Robert Barto
Vice President, Regulatory Affairs
Endo Pharmaceuticals Inc.

Attachment

Exhibit D to

Chapman Declaration

CONFIDENTIAL

ENDO-OPANA-000009335

**Endo**
*100 Endo Boulevard*
*Chadds Ford, PA  19317*
*610.558.9800*
*610.558.8979 fax*
*endo.com*

0035   12  AUG 31  PM2:35



August 31, 2012

Division of Dockets Management
Food and Drug Administration
5630 Fishers Lane
Room 1061, HFA-305
Rockville, Maryland  20852

## CITIZEN PETITION

Endo Pharmaceuticals Inc. ("Endo") submits this Citizen Petition under Section 505(q) of the Federal Food, Drug, and Cosmetic Act ("FDC Act") and in accordance with the Food and Drug Administration's ("FDA's" or the "Agency's") regulation set forth at 21 C.F.R. § 10.30 to request that the Commissioner of Food and Drugs take the actions described below with respect to Endo's crush-resistant formulation of Opana® ER (oxymorphone HCl) Extended-release Tablets approved under New Drug Application ("NDA") No. 201655 (hereinafter referred to as "Opana® ER CRF") and any Abbreviated New Drug Applications ("ANDAs") for which Opana® ER CRF serves as the Reference Listed Drug ("RLD").

## I.   ACTION REQUESTED

Endo requests that FDA:

(1)   Require that any ANDA referencing Opana® ER CRF contain data and information demonstrating that the proposed ANDA product is similarly crush-resistant as Opana® ER CRF by establishing:

(a)   an average tablet breaking force of at least 500 Newtons;

(b)   a reduced ability to prepare a formulation for intranasal abuse using standard tools (in studies of experienced opioid abusers), where no more than 10% by weight of all the resulting particles of the crush-resistant formulation should be smaller than 1.7 mm;

*endo* | *AMS   Endo Pharmaceuticals   HealthTronics   Qualitest*



FDA-2012-P-0951

2012-7522

CP

**CONFIDENTIAL**                                                                                 **ENDO-OPANA-000009336**

Division of Dockets Management
August 31, 2012
Page 2

    (c)  an extended-release profile that is not compromised when the formulation is tampered with using a commercial pill crusher. The submitted bioavailability data (from healthy fasted subjects) should establish 90% confidence intervals within 0.80 to 1.25 for $AUC_{0-t}$, $AUC_{0-inf}$ and $C_{max}$ for the tampered formulation when compared to the intact formulation as well as when compared to Opana® ER CRF, for oxymorphone;

    (d)  resistance of the formulation to crushing, through qualitative data, with standard tools, including metal spoons, a pill crusher and a hammer, and the effect of freezing on the hardness of and ability to crush the tablets; and

    (e)  that the extended-release profile of the formulation, based on *in vitro* data, is not compromised by attempts at crushing with standard tools, including metal spoons, a hammer, and pill crusher.

(2)  Classify extended-release opioid formulations incorporating crush-resistant technologies, such as Opana® ER CRF, as a new dosage form in Appendix C of FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* (the "Orange Book"); and

(3)  Confirm that any ANDA referencing Opana® ER approved under NDA No. 021610 ***will not*** be identified in the Orange Book as therapeutically equivalent to Opana® ER CRF approved under NDA No. 201655.

## II.   STATEMENT OF GROUNDS

### A.   Factual Background

#### 1.   Opioid analgesics

Opioid analgesics, such as oxycodone, oxymorphone, morphine, hydromorphone and methadone, are effective in the treatment of chronic and moderate to severe pain, but abuse of prescription opioid analgesics is "at the center of a major public health crisis of

CONFIDENTIAL    ENDO-OPANA-000009337

Division of Dockets Management
August 31, 2012
Page 3

addiction, misuse, abuse, overdose and death."[1] The number of first-time abusers of
prescription opioids rose from 628,000 in 1990 to 2.4 million in 2004.[2] Prescription
opioid-related deaths in 2008 have nearly quadrupled from 1999 figures, according to the
Center for Disease Control and Prevention.[3] Over a five-year period, the number of
estimated emergency department visits related to opioid analgesic abuse more than
doubled from 144,644 in 2004 to 305,885 in 2008, an increase of 111%.[4] Data from the
Researched Abuse, Diversion and Addiction-Related Surveillance system ("RADARS")
in 2010 indicate that prescription opioid abuse, misuse and diversion rates continue to
increase.[5]

In response to these public health concerns, FDA has undertaken numerous
initiatives to prevent opioid misuse and abuse, including the release of a class-wide Risk
Evaluation and Mitigation Strategy ("REMS") for all extended-release opioid
medications, which was in development between the Agency and stakeholders since at

---

[1] FDA, Opioid Drugs and Risk Evaluation and Mitigation Strategies (REMS), *available at*
http://www.fda.gov/Drugs/DrugSafety/InformationbyDrugClass/ucm163647.htm.

[2] See Jane C. Ballantyne, U.S. Opioid Risk Management Initiatives, Int'l Assoc. for the Study
of Pain, Clinical Updates, Vol. 17, Issue 6, at 1 (2009), *available at* http://www.iasp-
pain.org/AM/AMTemplate.cfm?Section=Home&TEMPLATE=/CM/ContentDisplay.cfm&C
ONTENTID=15080&SECTION=Home; Andrew Rosenblum et al., Opioids and the
Treatment of Chronic Pain: Controversies, Current Status, and Future Directions, 16(5) Exp.
Clin. Psychopharmacol, 405, 406 (2009), *available at*
http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2711509/pdf/nihms97365.pdf; Office of
Applied Studies, Substance Abuse and Mental Health Services Administration (SAMHSA),
Patterns and Trends in Nonmedical Prescription Pain Reliever Use: 2002 to 2005, The
National Survey on Drug Use and Health Report (April 6, 2007), *available at*
http://www.samhsa.gov/data/2k7/Pain/Pain.pdf.

[3] See Centers for Disease Control and Prevention, Vital Signs: Overdoses of Prescription
Opioid Pain Relievers – United States, 1999-2008, 60 Morbidity and Mortality Weekly
Report, at 3 (Nov. 1, 2011), *available at*
http://www.cdc.gov/mmwr/PDF/wk/mm60e1101.pdf.

[4] See SAMHSA, Trends in Emergency Department Visits Involving Nonmedical Use of
Narcotic Pain Relievers, The Drug Abuse Warning Network Report, at 2 (June 18, 2010),
*available at* http://oas.samhsa.gov/2k10/DAWN016/OpioidEdHTML.pdf.

[5] See RADARS® System 5th Annual Meeting Slides (Apr. 28, 2011), *available at*
http://www.radars.org/Portals/1/Dart-1.pdf.

CONFIDENTIAL
ENDO-OPANA-000009338

Division of Dockets Management
August 31, 2012
Page 4

least November 2009 and recently finalized.[6]  Implementation of the REMS should
mitigate abuse and misuse of prescription opioid analgesics.  As FDA recognizes,
however, more action is needed to reduce abuse and misuse.  The Agency "has been
looking for novel interventions to prevent [opioid] abuse" and supports the development
of drug products with abuse deterrent properties.[7]

In addition to FDA, Congress has also recognized the need to address the public
health concern involving opioid analgesics.  Specifically, Congress has encouraged the
development of drugs with abuse-resistant characteristics and directed FDA to expedite
the filing and review of such drugs.[8]  Congress has also encouraged dissemination of
information that differentiates these drugs.[9]

> 2.  **NDAs for Opana® ER Tablets – Regulatory History and
>     Background**

FDA approved NDA No. 021610 for Opana® ER (oxymorphone HCl) Extended-
release Tablets on June 22, 2006 for the management of moderate to severe pain in
patients requiring an around-the-clock opioid analgesic.  Opana® ER under NDA No.
021610 was marketed in 5 mg, 7.5 mg, 10, mg, 15 mg, 20 mg, 30 mg, and 40 mg
strengths.  Oxymorphone (14-hydroxydihydro-morphinone) is a semi-synthetic opioid
analgesic that is structurally related to morphine and is a metabolite of oxycodone.  It is
controlled under Schedule II of the Controlled Substances Act.[10]

---

[6]  See FDA, Opioid Drugs and REMS, supra note 1; FDA, Blueprint for Prescriber Continuing
Education Program (Oct. 25, 2011); FDA, Opioid and REMS: November 2009 Update.

[7]  Memorandum from Bob A. Rappaport, M.D., Director, Division of Anesthesia and Analgesia
Products, Office of Drug Evaluation II, CDER, FDA, to the Anesthetic and Life Support
Drugs Advisory Committee and the Drug Safety and Risk Management Advisory
Committee, as part of the April 22, 2010 Advisory Committee Meeting Background
Materials, at 1 (Mar. 26, 2010) available at
http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/A
nestheticAndAnalgesicDrugProductsAdvisoryCommittee/UCM209141.pdf.

[8]  See S. Rep. No. 109-266, at 142 (2006).

[9]  See H. Rep. No. 109-102, at 81 (2005).

[10]  FDA also approved an immediate-release formulation of Opana® Tablets (NDA No. 021611)
on June 22, 2006.  Oxymorphone immediate-release tablets were previously approved and
marketed in the early 1960s but were removed from the market for commercial reasons.
Opana® is also available in an injectable dosage form (NDA No. 011707).

CONFIDENTIAL

Division of Dockets Management
August 31, 2012
Page 5

Endo subsequently developed a crush-resistant version of Opana® ER in order to offer a meaningful benefit in reducing the potential for abuse, misuse and diversion as compared to non-crush-resistant products. Endo submitted NDA No. 201655 to FDA on July 7, 2010 for Opana® ER CRF, a new design of Opana® ER incorporating physical and physiochemical barriers to tampering.[11] Opana® ER CRF contains oxymorphone embedded in a hard polyethylene oxide matrix that is resistant to crushing. The manufacturing process for Opana® ER CRF imparts mechanical strength to the tablets through a heat extrusion process.[12] Characteristics of the tablets include high breaking force that resists crushing and pulverizing, and resistance to aqueous extraction (i.e., poor syringeability).[13] FDA approved NDA No. 201655 for Opana® ER CRF on December 9, 2011. Opana® ER CRF is approved in 5 mg, 7.5 mg, 10, mg, 15 mg, 20 mg, 30 mg, and 40 mg strengths. The 7.5 mg and 15 mg strengths are not currently marketed.

Opana® ER CRF offers resistance to crushing, which can deter abuse where recreational and experienced abusers attempt to crush the tablets for ingestion or further manipulation. The tablets also offer resistance in situations of misuse – for example, where patients or healthcare providers attempt to crush tablets to facilitate swallowing or gastric tube administration, where patients intentionally or unintentionally attempt to

---

[11] FDA's draft guidance on abuse potential of new drugs refers to "[f]ormulations that deter abuse," including those that have "physical barriers to tampering," as "abuse deterrent formulations." FDA Draft Guidance for Industry, Assessment of Abuse Potential of Drugs, at 8 (Jan. 2010). Endo uses the term "crush-resistant" rather than "abuse deterrent" to reflect that the new design of Opana® ER is more resistant to crushing, which serves as an impediment to both intranasal and intravenous abuse. Crushing tablets is the preferred method by which abusers prepare oxymorphone tablets for administration. See Stephen F. Butler et al., Abuse Risks and Routes of Administration of Different Prescription Opioid Compounds and Formulations, 8 Harm Reduction J. 1, 14 (2011) (Attachment 1).

[12] See William Fiske et al., Bioavailability of Oxymorphone Extended Release 40 mg and Crush-Resistant Oxymorphone Extended Release 40 mg With Ethanol Under Fasted Conditions, Poster, American Academy of Pain Medicine Annual Meeting (Feb. 2012), available at http://www.painmed.org/2012posters/poster282.pdf; see also Grünenthal Press Release (Apr. 30, 2012) (discussing characteristics of INTAC™ technology), available at http://grunenthal.com/cms/cda/_common/inc/display_file.jsp?fileID=211500066.

[13] See Grünenthal Oxymorphone Hydrochloride Tamper-Resistant Extended-Release Tablets Pharm. Development Report, at 11 (May 11, 2010) (part of NDA No. 201655) (Attachment 2).

                                                                ENDO-OPANA-000009340

Division of Dockets Management
August 31, 2012
Page 6

chew the tablets to facilitate swallowing or where children unintentionally chew the tablets prior to an accidental ingestion.

On May 31, 2012, Endo notified FDA that the company discontinued marketing all strengths of Opana® ER approved under NDA No. 021610. As discussed in Endo's August 10, 2012 citizen petition, the discontinuation was for safety reasons. As a result of the discontinuation, FDA moved Opana® ER to the Discontinued List section of the Orange Book. Opana® ER CRF (NDA No. 201655) remains in the Prescription Drug Product List section of the Orange Book and is the only currently marketed Opana® extended release tablets drug product.

Prior to FDA's approval of NDA No. 201655 for Opana® ER CRF, and prior to the discontinuation of Opana® ER approved under NDA No. 021610, FDA approved two ANDAs for generic versions of Opana® ER that cite NDA No. 021610 as their respective RLD. Specifically, FDA approved Impax Laboratories' ("Impax's") ANDA No. 079087 on December 21, 2010 for all Opana® ER strengths, and Actavis South Atlantic LLC's ANDA No. 079046 on December 13, 2010 for the 7.5 mg and 15 mg strengths of Opana® ER. Because both ANDAs are directed to the original Opana® ER NDA, none of the drug products approved under either application likely have a crush-resistant design. Under a patent license agreement with Endo, the earliest time by which Impax could come to market with its non-crush-resistant formulation is January 1, 2013.

>               *a.     Studies with Experienced Opioid Abusers*

In support of NDA No. 201655, Endo submitted data to FDA demonstrating that Opana® ER CRF is resistant to crushing as compared to Opana® ER using many of the same types of tools and solvents that experienced opioid abusers would use for manipulating a prescription opioid tablet for intranasal or injectable use.[14] Users found it difficult to manipulate Opana® ER CRF, and attempts at crushing it with the tools typically employed by abusers resulted in larger particles distributed within a very narrow range, as compared to Opana® ER (see Fig. 1 below). Of all Opana® ER samples, 97.7%

---

[14]   See EN3288-902 Study Report, Assessment of the ease with which experienced controlled-release prescription opioid abusers prepare a tamper-resistant formulation for intranasal use; comparison between Opana® ER and oxymorphone HCl extended-release tamper-resistant tablets (May 28, 2010) (Attachment 3); EN3288-901 Study Report, Assessment of the ease with which experienced controlled-release prescription opioid abusers prepare a tamper-resistant formulation for intravenous use; comparison between Opana® ER and oxymorphone HCl extended-release tamper-resistant tablets (May 28, 2010) (Attachment 4).

Division of Dockets Management
August 31, 2012
Page 7

(by weight) of the particles were smaller than 1.705 mm. Of all Opana® ER CRF
samples, 8.8% (by weight) of the particles were smaller than 1.705 mm.

**Figure 1: Comparison of Tampered Opana® ER vs. Tampered
Opana® ER CRF[15]**



Users in this study were largely unwilling to snort the resulting broken material
made from Opana® ER CRF.[16] Approximately 96% of subjects were willing to snort

---

[15] See Suzanne K. Vosburg et al., Experienced Opioid Abusers' Attempts to Prepare a Crush-
Resistant Oxymorphone Extended-Release Formulation for Intranasal or Intravenous Use,
American College of Neuropsychopharmacology 50th Annual Meeting Poster (Dec. 5, 2011)
(Attachment 5). The Vosburg poster reports that, of all Opana® ER CRF samples, 9.8% (by
weight) were smaller than 1.705 mm based on the results of the first attempt by users.

[16] The studies also demonstrate that Opana® ER CRF does not pose an additional risk of abuse
by injection, compared to Opana® ER, because both designs will gel upon exposure to water
(see Fig. 1 above), making intravenous abuse with either design unattractive. The majority
of subjects were unwilling to inject either tampered product, and the willingness to inject the
tampered product was similar between subjects for both products. No subject was permitted
to snort or inject the products.

ENDO-OPANA-000009342

Division of Dockets Management
August 31, 2012
Page 8

tampered Opana® ER compared to 11% of subjects for Opana® ER CRF. When surveyed, most of the experienced opioid abusers from these studies said that they would be willing to pay nothing or less for Opana® ER CRF compared to Opana® ER, reflecting the challenges in overcoming its tamper-resistant qualities.

### b.    *Bioavailability Study for Crushed Tablets*

Endo also submitted bioavailability data in healthy patients under fasted conditions demonstrating that attempted crushing of Opana® ER CRF with a commercial pill crusher had no effect on the relative bioavailability and extended-release profile of the formulation.[17] The bioavailability of Opana® ER CRF, 40 mg, that had been tampered with a pill crusher was compared to:  intact Opana® ER CRF, 40 mg; Opana® ER, 40 mg, that had been tampered with a pill crusher; and immediate-release Opana® (4 x 10 mg tablets).

Bioavailability data demonstrated that mean oxymorphone concentrations increased most rapidly after treatment with immediate-release Opana® (to a maximum of $8.2 \pm 7.23$ ng/mL at 0.5 hours after dosing), followed by Opana® ER tampered with a pill crusher (to a maximum of $6.5 \pm 2.30$ ng/mL at 0.75 hours). These data sharply contrasts with the gradual rise to mean oxymorphone concentrations for intact Opana® ER CRF (2.2 ng/mL at 2 hours after dosing) and Opana® ER CRF tampered with a pill crusher (2.6 ng/mL at 2 hours after dosing). The mean concentrations for intact Opana® ER CRF and crushed Opana® ER CRF reached a maximum of 3.2 ng/mL and 2.9 ng/mL, respectively, after five hours of dosing.[18]  Data for the active metabolite, 6-hydroxy-oxymorphone, similarly show a gradual rise to mean maximum values at 3 and 2 hours for intact and crushed Opana® ER CRF, respectively, and significantly lower peak values.[19]

Despite attempts at crushing, there was no effect on the systemic exposure to oxymorphone.  The measures of $AUC_{0-t}$, $AUC_{0-inf}$, and $C_{max}$ for Opana® ER CRF

---

[17]    See EN3288-108 Clinical Study Report, An Open-Label, Randomized, Single-Dose, Six-Period, Crossover Study to Evaluate the Relative Bioavailability of EN3288 40 mg Intact and After Physical Tampering Using Various Methods Compared with Opana® 10 mg (4 × 10 mg) in Healthy Adult Subjects (June 2, 2010) (Attachment 6).

[18]    See id. at 42-45.

[19]    See id. at 46-48.

CONFIDENTIAL
ENDO-OPANA-000009343

Division of Dockets Management
August 31, 2012
Page 9

tampered with a pill crusher compared to intact Opana® ER CRF had 90% confidence intervals ("CIs") of 0.88 to 0.98, 0.89 to 0.99, and 0.86 to 1.12, which all fell within the range of 0.80 to 1.25.[20] The $C_{max}$ for oxymorphone and its active metabolite for Opana® ER CRF tampered with a pill crusher was lower than the $C_{max}$ for Opana® ER tampered with a pill crusher (a ratio of 0.51), indicating that Opana® ER CRF was more resistant than Opana® ER to crushing using a pill crusher.[21] Based on the data, crushing with a pill crusher did not significantly affect the relative bioavailability or extended-release profile of Opana® ER CRF.

### c. *Simulated Manipulation Studies*

#### i. *Crushing With Metal Spoons*

In another study where the tablets were crushed between two metal spoons, Opana® ER CRF was demonstrated to offer markedly improved resistance over Opana® ER to abuse and misuse. Specifically, the Opana® ER CRF tablets were hardly affected by the crushing, while comparators (Opana® ER and non-tamper-resistant oxycodone HCl controlled-release tablets[22]) were pulverized with only some pieces of the comparators being held together by the film coating (see Fig. 2 below).[23] The resistance to crushing of Opana® ER CRF can deter recreational abusers who attempt to crush the tablets to increase surface area and accelerate release of the drug from the tablet in order to get a "high." In addition, the resistance of Opana® ER CRF to crushing deters misuse that can occur when patients and/or healthcare providers crush tablets to facilitate swallowing or administration via a gastric tube.

---

[20]  See id. at 64.

[21]  See id. at 64-65.

[22]  All OxyContin (oxycodone HCl) Controlled-release Tablets used in the studies conducted by Endo was Purdue Pharma's original non-tamper-resistant version of OxyContin approved under NDA No. 020553. Subsequent to the date of the studies, Purdue launched a tamper-resistant version of OxyContin Controlled-release Tablets approved under NDA No. 022272.

[23]  See Grünenthal Pharm. Dev. Rep., supra note 13, at 14-18.

CONFIDENTIAL                                    ENDO-OPANA-000009344

Division of Dockets Management
August 31, 2012
Page 10

### Figure 2: Appearance of Representative Samples Tampered With Metal Spoons

 

OPANA® ER CRF Tablets, 40 mg    OPANA® ER Tablets, 40 mg



OxyContin Tablets, 40 mg

    Dissolution profiles for the tampered tablets in this study were determined using FDA's published dissolution method for oxymorphone HCl extended-release tablets. The dissolution data demonstrate that the comparator tablets (Opana® ER and non-tamper-resistant OxyContin) lost their extended-release properties. This suggests that if a

Division of Dockets Management
August 31, 2012
Page 11

person were to consume the resulting powder, the person would experience a rapid
release of the drug, allowing an abuser to get "high" and subjecting the user to the
absorption of a potentially fatal dose of the drug. On the other hand, the dissolution
profiles of intact and manipulated Opana® ER CRF remained similar,[24] meaning that the
manipulation did not cause the rapid release of the opioid from the tablet (see Fig. 5
below). This strongly suggests that Opana® ER CRF could be a less attractive target for
recreational abuse and helps to prevent accidental overdoses through misuse of the drug
when the tablet is crushed prior to ingestion.

### ii.   *Crushing With a Pill Crusher*

Likewise, in another study, Opana® ER CRF withstood crushing from a
professional pill crusher by flattening without any cracks (see Fig. 3 below) and largely
maintaining its extended-release profile (see Fig. 5). In contrast, Opana® ER was
pulverized by the pill crusher, and non-tamper-resistant OxyContin was flattened and
cracked (see Fig. 3 below). Dissolution studies demonstrated that tampered Opana® ER
exhibited an immediate-release profile, and the extended-release profile of tampered
OxyContin was severely compromised.[25] This too strongly suggests that Opana® ER
CRF is more physically resistant to misuse using a tool such as a pill crusher and that
such manipulation will not compromise the release profile of Opana® ER CRF. That the
extended-release profile is preserved, even after these manipulations, indicates that
Opana® ER CRF offers greater protection against the release of a large dose of drug in
the event of misuse. Thus, Opana® ER CRF is a less attractive target for abuse than a
non-CRF version of the drug product.

**Figure 3:  Appearance of Representative Samples
Tampered With a Pill Crusher**

---

[24]  See Grünenthal Pharm. Dev. Rep., supra note 13, at 16-18.
[25]  See Grünenthal Pharm. Dev. Rep., supra note 13, at 19-24.

CONFIDENTIAL                                    ENDO-OPANA-000009346

Division of Dockets Management
August 31, 2012
Page 12




OPANA® ER CRF Tablets, 40 mg      OPANA® ER Tablets, 40 mg



OxyContin Tablets, 40 mg

### iii. *Crushing With a Hammer*

In another study, Opana® ER CRF tablets were subjected to a standardized hammering apparatus,[26] which was used to simulate tampering by recreational abusers. The tablets were slightly flattened (see Fig. 4 below) but largely maintained their extended-release profile (see Fig. 5 below). On the other hand, Opana® ER and non-tamper-resistant OxyContin tablets were crushed, and their extended-release profiles were altered to immediate-release.[27] This indicates that Opana® ER CRF provides greater resistance to recreational abusers who seek to compromise its extended-release profile by hammering the product.

### Figure 4: Appearance of Representative Hammered Samples

---

[26] The hammer apparatus applied a standardized impact energy of 5 Joules (J) (500 g steel weight drops from a height of 100 cm onto the tablet).

[27] See Grünenthal Pharm. Dev. Rep., supra note 13, at 35-40.

Division of Dockets Management
August 31, 2012
Page 13



OPANA® ER CRF Tablets, 40 mg



OPANA® ER Tablets, 40 mg



OxyContin Tablets, 40 mg

**Figure 5: *In vitro* Dissolution of Opana® ER CRF 40 mg Tablets
After Mechanical Manipulation[28]**

---

28 See Eric Galia et al., Oxymorphone ER Extended-Release Tablets With Improved Tamper-
Resistant Properties, American Pain Society 31st Annual Scientific Meeting Poster
(presented May 2012) (Attachment 7).

ENDO-OPANA-000009348

Division of Dockets Management
August 31, 2012
Page 14



#### iv.   *Breaking Force Measurements*

The average breaking force of Opana® ER CRF was also determined in another study using a standardized pharmacopeial breaking force tester, which provides a quantitative measurement of the tablet's breaking force (i.e., hardness). After more than 1,000 Newtons (N) of force was applied, far greater than estimated average chewing forces,[29] Opana® ER CRF tablets were not crushed or broken, but merely deformed. In contrast, Opana® ER tablets broke into halves at an average force of 90-120 N.[30] These characteristics suggest that Opana® ER CRF offers greater protection against accidental misuse by crushing or chewing, e.g., where patients who have trouble swallowing will chew tablets for ease of oral administration, where healthcare providers mistakenly crush tablets for ease of oral administration or administration through a nasogastric tube, or where tablets are unintentionally chewed and ingested by children.

#### v.   *Freezing Effects on Crush-Resistance*

---

[29]   The average mean chewing force is about 220 N. See P.A. Proeschel & T. Morneburg, Task-Dependence of Activity/Bite-force Relations and its Impact on Estimation of Chewing Force from EMG, 81(7) J. Dental Res. 464, 466 (2002) (Attachment 8).

[30]   See Grünenthal Pharm. Dev. Rep., supra note 13, at 25-26.

CONFIDENTIAL                                            ENDO-OPANA-000009349

Division of Dockets Management
August 31, 2012
Page 15

Another study performed by Endo also demonstrated that freezing Opana® ER CRF does not render the tablets more brittle and easier to crush. After freezing the tablets for at least eight hours, they were subject to crushing using the standardized pharmacopeial breaking force tester. Some tablets deformed but did not crush. The breaking force of a frozen tablet was measured at greater than 800 N, which is also greater than estimated average chewing forces.[31] Thus, freezing does not alter the tamper-resistant properties of Opana® ER CRF.

### vi. _Beverage Extractability/Dissolution Studies for Crushed Tablets_

Endo also submitted in support of NDA No. 201655 the results of an extraction/dissolution study for both intact tablets and tablets that had been subject to a pill crusher to simulate attempts by recreational abusers at extracting the drug from Opana® ER CRF in beverages, including distilled alcohol, wine, beer, carbonated soft drinks, and water.[32] Dissolution profiles of intact and tampered tablets were collected after 15 minutes of shaking in the simulated beverages, and the appearance of the tablets was observed. The intact and tampered tablets begin to form a hydrogel layer in all media after shaking,[33] delaying release of the drug when exposed to the media. Shaking of intact tablets in various simulated beverages had no effect on dissolution compared with dissolution in water, although pill crushing accelerated drug release from the tablets due to an increase in surface area.[34] Nevertheless, the extraction and dissolution data show that the extended-release characteristics of the tablets were not severely affected, that drug release is lower in higher alcohol content, and that the tamper-resistant properties of Opana® ER CRF are not significantly compromised by exposure to commonly used beverages, including alcohol.

### 3. Applicable Law

Under the FDC Act and FDA's implementing regulations, in order for FDA to "receive" (i.e., file) an ANDA for a proposed generic version of an innovator drug product, the application must contain, among other things, information showing that the proposed generic drug product is "bioequivalent" to the drug identified in the Orange

---

[31] See id. at 44-45.

[32] See id. at 46-57.

[33] See id. at 57.

[34] See id. at 52-57.

CONFIDENTIAL                                                                                  ENDO-OPANA-000009350

Division of Dockets Management
August 31, 2012
Page 16

Book as the RLD.[35]  FDA will refuse to approve an ANDA if information submitted is
insufficient to show that the drug product is bioequivalent to the listed drug referenced in
the ANDA.[36]  A generic drug product is bioequivalent to the RLD if "the rate and extent
of absorption of the drug do not show a significant difference from the rate and extent of
absorption of the [RLD] when administered at the same molar dose of the therapeutic
ingredient under similar experimental conditions in either single dose or multiple
doses."[37]

        The purpose of demonstrating bioequivalence is to determine whether changes in a
proposed drug product's formulation or manufacturing affect the rate or extent to which
the active ingredient reaches the primary site of action.  It is presumed that a drug product
containing the identical active ingredient will behave in the same way as the RLD if it
reaches the primary site of action at the same rate and to the same extent as the RLD.[38]
FDA's regulations state that "bioequivalence may be demonstrated by several *in vivo* and
*in vitro* methods," which are described at 21 C.F.R. § 320.24 in descending order of
preference.  In particular:

        FDA may, notwithstanding prior requirements for measuring
        bioavailability or establishing bioequivalence, require *in vivo* testing in
        humans of a product at any time if the agency has evidence that the
        product: (1) May not produce therapeutic effects comparable to a
        pharmaceutical equivalent or alternative with which it is intended to be
        used interchangeably; [or] (2) May not be bioequivalent to a
        pharmaceutical equivalent or alternative with which it is intended to be
        used interchangeably.[39]

        To establish bioequivalence, FDA generally requires that the 90% confidence
intervals surrounding the mean ratios of the test drug to the RLD for $C_{max}$ and AUC (both
$AUC_{0-t}$ and $AUC_{0-inf}$) fit entirely within the boundaries of 80% to 125%.

        Drug products that meet the FDC Act's ANDA approval requirements generally
will be considered by FDA to be "therapeutically equivalent" to the RLD.  The term

---

[35]  See FDC Act §§ 505(j)(2)(A)(iv), 505(j)(4)(F); 21 C.F.R. §§ 314.94(a)(7).

[36]  See 21 C.F.R. § 314.127(a)(6)(i)

[37]  See FDC Act § 505(j)(8)(B)(i).

[38]  See 21 C.F.R. § 320.1(e).

[39]  Id. at § 320.24(c).

                                                    ENDO-OPANA-000009351

Division of Dockets Management
August 31, 2012
Page 17

"therapeutic equivalence" is not defined in the FDC Act or in FDA's ANDA regulations;
however, "[d]rug products are considered to be therapeutic equivalents only if they are
pharmaceutical equivalents and if they can be expected to have the *same clinical effect
and safety profile* when administered to patients under the conditions specified in the
labeling."[40]  Products classified as therapeutically equivalent can be substituted with the
expectation that the substituted product will produce the same clinical effect and safety
profile as the prescribed product.

**B.      Generic Versions of Opana® ER CRF Must Demonstrate That They
         Are Bioequivalent to Opana® ER CRF and Similarly Crush-Resistant**

An ANDA submitted to FDA for a generic version of Opana® ER CRF should
demonstrate bioequivalence to Opana® ER CRF under fed and fasted conditions.  It is not
sufficient for ANDA applicants to test Opana® ER (or generic versions thereof) as the
reference product.  FDA has repeatedly required ANDA applicants to demonstrate
bioequivalence directly to the product for which the applicants are seeking a designation
of therapeutic equivalence.[41]

For example, FDA faced a similar situation for Wellbutrin XL (bupropion
hydrochloride) Extended-release Tablets, when the sponsor requested that ANDA
applicants that were seeking approval for generic versions of Wellbutrin XL demonstrate
bioequivalence to Wellbutrin (bupropion hydrochloride) Immediate-release Tablets and
Wellbutrin SR (bupropion hydrochloride) Sustained-release Tablets in addition to the
RLD.  Where products are not designated as therapeutically equivalent, as was the case
with Wellbutrin XL and SR/IR, FDA concluded that bioequivalence must be
demonstrated to the innovator product for which the ANDA product is intended to be a
therapeutic equivalent and for which it will be substitutable.[42]  Thus, following FDA's
longstanding practice, bioequivalence should be demonstrated by comparing the
proposed ANDA product to Opana® ER CRF, and not Opana® ER, in order to be eligible
for an "AB" therapeutic equivalence rating.

---

[40]   See Orange Book Preface at vii (32nd ed. 2012) (emphasis added).

[41]   See, e.g., Letter from Gary J. Buehler, FDA, to WE Pharmaceuticals, Inc., ANDA No.
       075250 (Jan. 17, 2002).

[42]   See Letter from Randall W. Lutter, Ph.D., to Keller and Heckman LLP, Citizen Petition
       Docket No. 2005P-0498, at 7 (Dec. 14, 2006).

CONFIDENTIAL                                                    ENDO-OPANA-000009352

Division of Dockets Management
August 31, 2012
Page 18

Moreover, for the reasons previously described, substitution of a non-crush-resistant formulation where a crush-resistant formulation is desired by the healthcare provider (e.g., where there is a risk of abuse or misuse) can place patients at grave risk. Therefore, it is critical that any product purporting to be substitutable for a crush-resistant formulation demonstrate that it is similarly crush-resistant.

Objective criteria are required to evaluate whether a formulation is truly crush-resistant. Endo requests that FDA require *in vitro* analytical tests, bioavailability studies and studies in relevant populations of opioid abusers to ensure that a generic version of Opana® ER CRF has similar crush-resistant characteristics as Opana® ER CRF. Any differences in abuse potential of an innovator and generic product would result in a potentially different safety profile and, in such a case, FDA should not approve the ANDA.

Specifically, FDA should require an ANDA applicant to submit data demonstrating the resistance of the proposed formulation to crushing, including the following:

- Data demonstrating the average breaking force of its tablets is greater than or equal to 500 N;

- Studies in experienced opioid abusers to evaluate the ability of the users to prepare a formulation for intranasal abuse using standard tools, such as hammers, razors, wax paper, spoons, and strainers. No more than 10% by weight of all the resulting particles of the crush-resistant formulation should be smaller than 1.7 mm, thereby making the product an unattractive candidate for abuse. The number of attempts at manipulation, time spent attempting to manipulate the tablet, and willingness of subjects to snort the resulting particles should also be reported;

- Bioavailability studies in healthy fasted subjects comparing the relative bioavailability of the intact tablets to tablets that have been tampered using a commercial pill crusher and Opana® ER CRF. $AUC_{0-t}$, $AUC_{0-inf}$, and $C_{max}$ for the intact tablets compared to both tampered tablets and Opana® ER CRF should have 90% confidence intervals within 0.80 and 1.25 for oxymorphone;

- Qualitative data demonstrating the resistance of the formulation to crushing and breaking with standard tools, including metal spoons, a hammer and pill

CONFIDENTIAL

Division of Dockets Management
August 31, 2012
Page 19

crusher, when compared with Opana® ER, and the effect of freezing on the hardness of and ability to crush the tablets; and

- *In vitro* data demonstrating that the extended-release profile of the tablets is not compromised by attempts at crushing with standard tools, including metal spoons, a hammer, and pill crusher.

All studies should also compare the proposed drug to the RLD, Opana® ER CRF. In addition, the ANDA applicant should submit any other studies that it believes demonstrate crush-resistance of its formulation and resistance of its formulation to intravenous abuse.

### C.   Drug Products Incorporating a Crush-Resistant Technology Should be Classified as a New Dosage Form

Extended-release formulations incorporating crush-resistant technologies, such as Opana® ER CRF, should be classified by FDA as a new dosage form in Appendix C of the Orange Book. FDA has acknowledged that there is a need to recognize new dosage forms that can accurately describe new products as product technologies develop and where existing dosage form nomenclature cannot accurately describe critical product attributes. Demonstrated differences in abuse potential offered by a crush-resistant product design support the addition of a new dosage form applicable to Opana® ER CRF in the Orange Book. New dosage form nomenclature can capture the characteristics of the product that offer improved safety over non-crush-resistant products. Furthermore, a new dosage form designation applicable to Opana® ER CRF and similar products will demarcate between crush-resistant formulations and those that are not, thereby preventing confusion and providing for greater safety in prescribing and dispensing activities. Classifying CRF and similarly abuse-resistant products like Opana® ER CRF as their own dosage form will help ensure that non-CRF version are not substituted where a provider specifically desires the crush-resistant formulation, for example, when there is a risk of misuse or abuse of the drug.

### 1.   New Dosage Forms are Identified by FDA on a Fact-Specific Basis

ENDO-OPANA-000009354

Division of Dockets Management
August 31, 2012
Page 20

Although only three examples of dosage forms are recited in FDA's regulations[43] (i.e., tablets, capsules, and solutions), continued scientific innovation has brought about new dosage forms. In response to these innovations, FDA's list of recognized dosage forms in Appendix C of the Orange Book has expanded over time. For example, the appendix identified 41 dosage forms in 1981, 44 dosage forms in 1985, 62 dosage forms in 1992, 72 dosage forms in 1998, and now identifies 80 different dosage forms. Some of the listed dosage forms are broad, e.g., "liquid," while others are comparatively narrow, e.g., "injectable, liposomal" and "tablet, orally disintegrating." When defining a new dosage form, FDA believes that the new dosage form should be "sufficiently differentiated" while not being so narrow as to be "virtually product-specific."[44]

FDA describes considerations that go into identifying a dosage form as follows:

> A dosage form is the way of identifying the drug in its physical form. In determining dosage form, FDA examines such factors as (1) physical appearance of the drug product, (2) physical form of the drug product prior to dispensing to the patient, (3) the way the product is administered, (4) frequency of dosing, and (5) how pharmacists and other health professionals might recognize and handle the product.[45]

In addition, when determining whether a unique dosage form exists, FDA may also take into consideration whether different dosage forms correspond to clinical distinctions.[46] Accordingly, the list of dosage forms is not fixed. As new technologies develop and are incorporated into new drug products, it is proper for FDA to add new dosage forms to Appendix C where existing definitions do not capture critical attributes of a drug product.

---

[43] See 21 C.F.R. 314.3(b).

[44] See Pfizer Inc. v. Shalala, 1 F. Supp. 2d 38, 44 (D.D.C. 1998), rev'd on other grounds 182 F.3d 975 (D.C. Cir. 1999).

[45] FDA Drug Nomenclature Monograph for "Dosage Form", C-DRG-00201 (rev. Dec. 15, 2006), *available at* http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/El ectronicSubmissions/DataStandardsManualmonographs/ucm071666.htm; see also Pfizer, 1 F.Supp.2d at 44 -45 ("According to the FDA, a drug's dosage form is not based on its release mechanism, but on its physical appearance and the way the drug is administered.").

[46] See FDA Response to Pfizer, Citizen Petition Docket No. 93P-0421 at 7 (Aug. 12, 1997).

CONFIDENTIAL

Division of Dockets Management
August 31, 2012
Page 21

## 2. Crush-Resistance Warrants Designation of a New Dosage Form

Physicochemical differences between crush-resistant and non-crush-resistant products support the designation of a crush-resistant dosage form by FDA. Additionally, as discussed above, given that data from *in vitro* and human studies strongly suggest that these differences can reduce abuse, misuse and diversion, FDA should designate Opana® ER CRF as a crush-resistant dosage form.

FDA has recognized that differences in abuse potential between two drug products can justify designating a new dosage form where data support a difference in abuse potential. Specifically, when addressing the classification of certain fentanyl transdermal systems, FDA determined that a different dosage form classification should not be made because there were only "*theoretical* differences in potential abuse liability."[47] This determination, however, did not foreclose FDA from classifying a distinct dosage form where *actual* differences in abuse potential exist such as is the case with Opana® ER CRF as compared to Opana® ER.

As discussed above, data submitted by Endo demonstrate that there is an *actual* reduction in the potential for misuse and abuse of Opana® ER CRF as compared to Opana® ER based on its resistance to crushing and other manipulations with various common tools used by patients, healthcare providers, and recreational and experienced opioid abusers:

- In studies amongst actual opioid abusers, subjects found it difficult to crush Opana® ER CRF for intranasal or intravenous abuse and were largely unwilling to snort or inject the tampered product.[48] This was in marked contrast to the subjects' willingness to snort Opana® ER that was altered for intranasal abuse. Subjects also expressed unwillingness to pay for Opana® ER CRF.[49] The physicochemical qualities of Opana® ER CRF clearly translate into its reduced attractiveness for abuse or diversion by experienced abusers.

---

[47] FDA Consol. Resp. to Fentanyl Transdermal Systems Citizen Petitions, Citizen Petition Docket Nos. 2004P-0506, 2004P-0472, 2004P-0540, 2004P-0340, at 5 (Jan. 28, 2005) (emphasis added). FDA determined that the raw data submitted by Alza did not support a difference in abuse potential between the two delivery systems. See id. at 6.

[48] See EN3288-901 and EN3288-902, supra note 14.

[49] See id.

CONFIDENTIAL

ENDO-OPANA-000009356

Division of Dockets Management
August 31, 2012
Page 22

- Bioavailability data demonstrated Opana ER® CRF's resistance to crushing compared to Opana® ER. Attempted crushing of Opana® ER CRF does not significantly impact the bioavailability and release profile of the drug.

- The high breaking force of Opana® ER CRF makes the tablets able to withstand inadvertent crushing or breaking or intentional crushing with tools such as spoons, pill crushers or hammers.[50] Such tampering does not compromise the extended-release profile of the product and does not cause the sudden release of a potentially fatal dose of oxymorphone. This suggests that Opana® ER CRF is safer than its predecessor and reduces its attractiveness for abuse.

- *In vitro* studies indicate that recreational abusers' attempts to tamper with Opana® ER by freezing do not circumvent the crush-resistance of the tablets.[51]

Moreover, crush-resistance is an attribute that can be significant to physicians and pharmacists whenever there is concern of misuse, abuse, or diversion. New dosage form nomenclature would aid healthcare providers and make a clear demarcation between formulations that are crush-resistant and those that are not. This is particularly important given that it is difficult to explain such differences in drug product labels. Having a clear demarcation between such dosage forms will prevent confusion and provide for greater safety in prescription and dispensing activities. Classification of a new dosage form will enhance the ability of healthcare providers to select a product that is tamper-resistant, and will ensure that non-tamper-resistant formulations will not be substituted where a provider specifically desires the tamper-resistant formulation. From a compliance perspective, identification of a new dosage form also reduces risk of confusion between tamper-resistant and non-tamper-resistant formulations.

Indeed, FDA acknowledged the importance of "performance characteristics" when the Agency recognized orally disintegrating tablets as a unique dosage form. In that case, FDA determined that orally disintegrating tablets are a unique dosage form:

> because of the specific, intended performance characteristics of such a
> product, which are rapid oral disintegration in saliva with no need for

---

[50] See Grünenthal Pharm. Dev. Rep., supra note 13, at 14-24, 35-40; Galia Abstract, supra note 28.

[51] See Grünenthal Pharm. Dev. Rep., supra note 13, at 44-57, 72.

CONFIDENTIAL

ENDO-OPANA-000009357

Division of Dockets Management
August 31, 2012
Page 23

> chewing or drinking liquids to ingest these products. These characteristics,
> which are an aid to patient use and compliance, are the primary
> characteristics that constitute the basis for classifying a product as an ODT.[52]

Similarly, tamper-resistant formulations, like Opana® ER CRF, have performance
characteristics that aid physicians and pharmacists and that provide more than an
adequate basis for identification as a unique dosage form.

Importantly, identifying a crush-resistant extended-release dosage form would not
be so narrow as to specify only one particular product. The goal of a crush-resistant
formulation could be achieved by numerous technologies or processing steps, and need
not be specific to Endo's technology or that of any other manufacturer. As such,
designation of a new dosage form should not create a category of proprietary products
and would not confer any special advantages to any particular company. Nor would it
foreclose generic substitution. Instead, ANDA applicants would need to demonstrate that
their generic products have crush-resistant characteristics similar to the innovator
product, in addition to proving bioequivalence, in order to be deemed therapeutically
equivalent.

Tamper-resistant designs are a critical tool to address abuse, misuse, and diversion
of prescription drugs. As reflected by post-marketing data for the new formulation of
OxyContin that is similarly resistant to crushing, a crush-resistant design can deter
improper use and diversion of a product.[53] Similarly, Opana® ER CRF exemplifies the
type of therapeutic alternative to existing formulations that can deter abuse, misuse and
diversion. Creating a new dosage form for crush-resistant extended-release opioid
formulations comports with Congress' directive that FDA "take all appropriate steps" to

---

[52]   FDA, Guidance for Industry - Orally Disintegrating Tablets (Dec. 2008).

[53]   See P. Coplan et al., Effects of Reformulated OxyContin® on Opioid Abuse in the National
       Poison Data System, American Pain Society 31st Annual Scientific Meeting Abstract (Apr.
       2012), *available at* http://www.ampainsoc.org/abstract/view/5203/; S. Severtson et al., A
       Comparison of the Street Price of Original and Reformulated OxyContin® and Immediate
       Release (IR) Oxycodone Products, American Pain Society 31st Annual Scientific Meeting
       Abstract (Apr. 2012), *available at* http://www.ampainsoc.org/abstract/view/4977/; R. Black
       et al., Effects of Reformulated OxyContin® Among Patients Assessed for Substance Abuse
       Treatment in the NAVIPPRO Sentinel Surveillance Network, American Pain Society 31st
       Annual Scientific Meeting Abstract (Apr. 2012), *available at*
       http://www.ampainsoc.org/abstract/view/5104/.

CONFIDENTIAL                                                                      ENDO-OPANA-000009358

Division of Dockets Management
August 31, 2012
Page 24

ensure that healthcare providers have all the information they need to differentiate tamper-resistant opioid formulations and prescribe appropriately.[54]

### D. Generic Versions of Opana® ER Are Not Therapeutically Equivalent to Opana® ER CRF

Products that FDA classifies as "therapeutically equivalent" in the Orange Book can be substituted with the full expectation that the substituted product will produce the *same clinical effect and safety profile* as the prescribed product.[55] Opana® ER and Opana® ER CRF were not rated as therapeutically equivalent to one another in the Orange Book prior to the discontinuation of Opana® ER. As such, a generic version of Opana® ER would not have been rated as therapeutically equivalent and substitutable for Opana® ER CRF.[56] Opana® ER has now been moved to the Discontinued List section of the Orange Book and cannot serve as the listed drug for an ANDA if FDA determines that the drug was discontinued for safety reasons. If, however, FDA determines that Opana® ER was discontinued for reasons other than safety or effectiveness, Endo requests that FDA confirm that any ANDA citing Opana® ER as the RLD *will not* be rated as therapeutically equivalent to Opana® ER CRF.

Differences in crush-resistance between Opana® ER and Opana® ER CRF support FDA's determination that the two products, including any respective generic versions, are not therapeutically equivalent. Although Opana® ER and Opana® ER CRF are bioequivalent to one another, Opana® ER CRF is a safer product than its predecessor

---

[54] H. Rep. No. 109-102, at 81 (2005).

[55] See Orange Book Preface at viii.

[56] Pharmacy substitution is regulated on a state level. Some, but not all, states have given legal effect to the Orange Book classifications on therapeutic equivalence by allowing drugs that are deemed equivalent to be substituted and barring drugs not listed in the Orange Book as equivalents from being substituted. Nevertheless, the Orange Book therapeutic equivalence ratings are informative to substitutability of generics for innovator drugs. See Jesse C. Vivian, Generic-Substitution Laws, 33(6) U.S. Pharmacist 30 (2008), *available at* http://www.uspharmacist.com/content/s/44/c/9787; see also Pediamed Pharms. v. Breckenridge Pharm., Inc., 419 F. Supp. 2d 715, 720-21 (D. Md. 2006) (discussing generic substitution and role of the Orange Book); U.S. Pharm. Corp. v. Trigen Labs., Civ. No. 1:10-0544-WSD, 2011 WL 446148, *5 (N.D. Ga. Jan. 27, 2011) (slip. op.) ("The therapeutic equivalences published in the Orange Book are reported in the drug information databases, allowing pharmacists viewing a list of pharmaceutically equivalent drugs to also see which drugs the FDA has determined are therapeutically equivalent.").

ENDO-OPANA-000009359

Division of Dockets Management
August 31, 2012
Page 25

because it resists crushing. FDA's decision not to designate Opana® ER CRF and Opana® ER as therapeutically prior to the discontinuation of Opana® ER reflects these differences.

The most common route of administration for abuse of immediate-release and extended-release oxymorphone prescription drugs is intranasal by crushing and snorting the resulting powder.[57] The formulation and manufacturing process of Opana® ER CRF impart a high breaking force to the tablets, thereby providing significant resistance to crushing and intranasal abuse, as well as crushing in situations of misuse. As discussed above, studies submitted by Endo to FDA demonstrate the product's resistance to tampering and crushing with standard tools, including a bioavailability study and studies conducted with subjects who are opioid abusers. In contrast to crushed Opana® ER, most subjects were unwilling to inhale Opana® ER CRF that had been manipulated with such tools.[58] Moreover, attempted crushing of Opana® ER CRF also did not significantly increase systemic exposure to the drug or alter its release profile.[59]

Because Opana® ER CRF results in an improved safety profile in patients who are at risk of abuse and misuse, treating the CRF and non-CRF products interchangeably could have serious consequences. The medical judgment of physicians who prescribe Opana® ER CRF for patients at risk of abuse, those with addictive tendencies, or those who may chew or crush their pills, could be thwarted when the prescriptions are substituted with non-crush- resistant generic formulations, placing a subset of patients at greater risk. In addition, Opana® ER CRF is a safer alternative when considering unintended users of the drug, such as people who obtain the drug through illegal channels for abuse or in the case of accidental ingestion by children. As such, generic versions of Opana® ER should not be considered therapeutically equivalent to, and substitutable for, Opana® ER CRF.

Post-marketing data for a crush-resistant formulation of another extended-release opioid analgesic, OxyContin, confirm that crush-resistant designs reduce abuse or misuse potential, are less attractive targets for abuse and offer improved safety over non-crush-resistant opioids. These studies are relevant here because, similar to Opana® ER,

---

[57]    See Butler, supra note 11, at 14; see also U.S. Dep't of Justice, Drug Alert Watch: Oxymorphone Abuse: A Growing Threat Nationwide, at 2 (May 19, 2011), *available at* http://www.justice.gov/archive/ndic/pubs44/44817/sw0011p.pdf.

[58]    See EN3288-902, supra note 14.

[59]    See EN3288-108, supra note 17.

CONFIDENTIAL                                                                      ENDO-OPANA-000009360

Division of Dockets Management
August 31, 2012
Page 26

physical crushing of the original formulation of OxyContin was the route by which the drug was prepared for abuse and misuse.[60] Non-tamper-resistant OxyContin and Opana® ER offered little resistance to abuse or misuse by crushing. Like Opana® ER CRF, however, OxyContin was reformulated into a tamper-resistant formulation in which polyethylene oxide is used to confer hardness to the tablets. According to two surveys conducted in the United States, abuse of OxyContin decreased after the reformulation was introduced on the market in 2010. Abuse of OxyContin dropped by 49%, and non-oral abuse, i.e., snorting, injecting and smoking, declined by 73% in a National Addictions Vigilance Intervention and Prevention Program ("NAVIPPRO") survey of drug abusers.[61] Intentional exposures, which include misuse and abuse, declined 16%, according to National Poison Data System.[62] These data suggest that crush-resistant designs mitigate abuse and misuse of a drug. A comparison of the street prices of original and reformulated OxyContin and other drugs within the oxycodone drug class further suggests that reformulated OxyContin has a lower street value than other drugs within its class, reflecting its reduced demand compared to non-tamper-resistant formulations.[63]

Where products that are considered by FDA to have the same active ingredient, strength, dosage form, and route of administration have "differences that have significant therapeutic implications or otherwise require additional clinical studies to establish safety and effectiveness," those products will not be treated as therapeutically equivalent by FDA and will not meet the standards for ANDA approval.[64] For example, oral contraceptives supplied in 21-tablet and 28-tablet packets, despite being pharmaceutically

---

[60] See FDA Advisory Committee on Reformulated OxyContin, Presentation by Purdue Pharma, at slide 5 (Sept. 24, 2009), *available at* http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/A nestheticAndLifeSupportDrugsAdvisoryCommittee/UCM249272.pdf.

[61] See Black Abstract, supra note 45.

[62] See P. Coplan et al., Effects of Reformulated OxyContin® on Opioid Abuse in the National Poison Data System, American Pain Society 31st Annual Scientific Meeting Abstract (Apr. 2012), *available at* http://www.ampainsoc.org/abstract/view/5203/.

[63] See S. Severtson et al., A Comparison of the Street Price of Original and Reformulated OxyContin® and Immediate Release (IR) Oxycodone Products, American Pain Society 31st Annual Scientific Meeting Abstract (Apr. 2012), available at http://www.ampainsoc.org/abstract/view/4977/.

[64] Letter from Janet Woodcock, M.D., to King Pharmaceuticals, Inc., Citizen Petition Docket No. FDA-2007-P-0128, at 4 (July 29, 2009).

CONFIDENTIAL

Division of Dockets Management
August 31, 2012
Page 27

the same, are not A-rated by FDA, because the packaging variations have therapeutic implications.[65] Similarly, FDA has determined that formulation differences – specifically, differences in penetration enhancers – between a proposed generic and the brand-name version of transdermal testosterone gel requires clinical studies, thereby precluding ANDA approval.[66] Likewise, FDA has acknowledged that differences in auto-injector release mechanisms may compel disapproval of an ANDA if those differences "may lead to differences in safety or efficacy."[67] Similarly, FDA must determine that any ANDA citing Opana® ER as the RLD is not therapeutically equivalent to Opana® ER CRF

### E.    Conclusion

For the reasons set forth above, FDA should not approve an ANDA for a generic version of Opana® ER CRF unless and until the ANDA applicant demonstrates that its proposed drug product is similarly crush-resistant as Opana® ER CRF.  In addition, FDA should classify extended-release opioid formulations incorporating crush-resistant technologies, such as Opana® ER CRF, as a new dosage form in Appendix C of the Orange Book, and confirm that any ANDA referencing Opana® ER will not be identified in the Orange Book as therapeutically equivalent to Opana® ER CRF.

## III.    ENVIRONMENTAL IMPACT

Petitioner claims a categorical exclusion under 21 C.F.R. § 25.31.

## IV.    ECONOMIC IMPACT STATEMENT

Petitioner will, upon request by the Commissioner, submit economic impact information, in accordance with 21 C.F.R. § 10.30(b).

---

[65]    Orange Book Preface at xv; see also King Pharms, Petition Response, supra note 64, at 4.

[66]    See Letter from Janet Woodcock, M.D., to Anthony DelConte, M.D., Auxilium Pharmaceuticals, Inc., Citizen Petition Docket No. FDA-2009-P-0123 (Aug. 26, 2009); Letter from Janet Woodcock, M.D., to Philip Katz, Hogan & Hartson LLP, Citizen Petition Docket No. FDA-2010-P-0196 (Oct. 4, 2010).

[67]    King Pharms Petition Response, supra note 64, at 10.

CONFIDENTIAL                                                        ENDO-OPANA-000009362

Division of Dockets Management
August 31, 2012
Page 28


## V.  CERTIFICATIONS

The undersigned certifies that, to the best knowledge and belief of the undersigned, this Petition includes all information and views on which the Petition relies, and that it includes representative data and information known to the Petitioner which are unfavorable to the Petition.

Endo makes the following certification pursuant to FDC Act § 505(q)(1)(H):  I certify that, to my best knowledge and belief: (a) this petition includes all information and views upon which the petition relies; (b) this petition includes representative data and/or information known to the petitioner which are unfavorable to the petition; and (c) I have taken reasonable steps to ensure that any representative data and/or information which are unfavorable to the petition were disclosed to me.  I further certify that the information upon which I have based the action requested herein first became known to the party on whose behalf this petition is submitted on or about the following date: May 31, 2012.  If I received or expect to receive payments, including cash and other forms of consideration, to file this information or its contents, I received or expect to receive those payments from the following persons or organizations: Endo.  I verify under penalty of perjury that the foregoing is true and correct as of the date of the submission of this petition.


Respectfully submitted,

Robert a Barto

Robert Barto
Vice President, Regulatory Affairs
Endo Pharmaceuticals Inc.


Attachments

CONFIDENTIAL

Exhibit E to

Chapman Declaration

CONFIDENTIAL

ENDO-OPANA-000009364



November 13, 2012

Division of Dockets Management
Food and Drug Administration
5630 Fishers Lane
Room 1061, HFA-305
Rockville, Maryland 20852

**Re:    Docket No. FDA-2012-P-0895-0001; Supplemental New Safety Information**

Endo Pharmaceuticals Inc. ("Endo") submits this Supplement to the above-referenced Docket.
Endo submitted a Citizen Petition to the Food and Drug Administration ("FDA" or "the
Agency") on August 13, 2012 requesting that the Agency:

(1) determine that the discontinued, non-crush-resistant version of Opana® ER
(oxymorphone HCl) Extended-release Tablets approved under New Drug Application
("NDA") No. 021610 (also referred to as "original formulation Opana ER" or "Opana ER
OF") was discontinued for reasons of safety and can no longer serve as the Reference
Listed Drug ("RLD") for an Abbreviated New Drug Application ("ANDA");

(2) refuse to approve any pending ANDA for which Opana ER OF serves as the RLD; and

(3) suspend and withdraw the approval of any ANDA referencing Opana ER OF as the RLD.

As Endo explained in the Petition, FDA should determine that Opana ER OF was discontinued
for safety reasons in light of Endo's intent in discontinuing Opana ER OF and in light of the
crush-resistance and attendant safety advantages provided by Opana ER Crush-Resistant
Formulation ("Opana ER CRF," "crush-resistant Opana ER," or "reformulated Opana ER") in
comparison to Opana ER OF.

Endo now has approximately seven months of experience since the introduction of Opana ER
CRF. Data concerning the abuse rates of oxymorphone products from this time period are being
submitted in this Supplement to better inform FDA's judgment regarding the safety profile of
original formulation Opana ER and the reason for its withdrawal from the market. Although
preliminary, this important new safety information indicates that the reformulated Opana ER is
having the desired effect on the rates and routes of abuse of the product. Because of the urgency
of the matter and the significant impact on public health, FDA must not delay any further in
issuing its determination that the original formulation Opana ER was withdrawn from sale for
safety reasons.

CONFIDENTIAL ENDO-OPANA-000009365

Division of Dockets Management
November 13, 2012
Page 2

Absent a decision on this issue by FDA by January 1, 2013, ANDA approved non-crush-resistant extended-release oxymorphone tablets in all strengths may enter the market. The information in this Supplement suggests that availability of these approved non-crush-resistant extended-release products will result in increases in drug abuse, misuse and diversion. Serious and predictable public health harm would flow from the entry and continued sale of additional non-tamper-resistant versions of Opana ER. Accordingly, FDA must act quickly to grant the petition stating that the original Opana ER formulation approved under NDA No. 021610 was discontinued and withdrawn from sale for safety reasons within the meaning of 21 U.S.C. § 505(j)(6)(C) and 21 C.F.R. § 314.161, and can no longer serve as an RLD for an ANDA applicant, and notify the holders of any approved ANDAs referencing NDA No. 021610 that their approval is suspended.

FDA approved Opana ER CRF on December 9, 2011 under NDA No. 201655, and Endo introduced the drug product into retail trade on February 20, 2012. Endo notified FDA on May 31, 2012 of the discontinuation of Opana ER OF, and on August 13, 2012 filed a Citizen Petition requesting that the Agency clarify that the NDA was discontinued for safety reasons. While the original Petition was supported by extensive in vitro and in vivo testing,[1] this Supplement provides additional post-marketing data and information supporting Endo's Citizen Petition, in particular, its arguments that Opana ER OF was discontinued for reasons of safety.

The new data provided in this Supplement concern abuse rates of oxymorphone products after the reformulated Opana ER CRF was introduced to the market. These data were collected since the introduction of crush-resistant Opana ER in 1Q2012 and are acutely relevant to the actions requested in Endo's petition. The data distinguish abuse rates for (1) Opana ER OF (available in 5, 10, 20, 30, and 40 mg strengths), (2) Opana ER CRF (available in 5, 10, 20, 30, and 40 mg strengths), and (3) generic versions of Opana ER OF (non-crush-resistant - available in 7.5 and 15 mg strengths).

These data (and new analyses of existing data) demonstrate that:

(1) abuse of the original formulation of Opana ER increased significantly after a crush-resistant formulation of OxyContin® was introduced in 2010;

---

[1]      Endo also submitted a Citizen Petition, Docket No. FDA-2012-P-0951, on August 31, 2012 requesting that the Agency recognize a distinct dosage form for crush-resistant technologies, and further that the Agency not allow any ANDA to be therapeutically equivalent to crush-resistant Opana ER unless appropriate criteria are satisfied to qualify as crush-resistant.

CONFIDENTIAL                                                                ENDO-OPANA-000009366

Division of Dockets Management
November 13, 2012
Page 3

(2) after a crush-resistant formulation of Opana ER was introduced in early 2012, the
reported abuse of Opana ER CRF was reduced significantly versus Opana ER OF; and

(3) abuse of non-tamper-resistant ANDA versions of oxymorphone extended-release tablets
has increased significantly since Opana ER CRF was introduced in 2012.

These data indicate a significant environmental change since FDA approved ANDA extended-
release oxymorphone products referencing the original Opana ER in 2010. The introduction of
crush-resistant formulations of both OxyContin and Opana ER caused a dramatic decrease in the
rates of abuse. The ANDA products referencing Opana ER approved in 2010 were approved
prior to the introduction of crush-resistant formulations of OxyContin and Opana ER. Given the
current environment, these data suggest that public harm will result with the availability of
additional ANDA products approved prior to the introduction of Opana ER CRF.

Accordingly, Endo restates its request that FDA:

(1) determine that the discontinued, original Opana ER approved under NDA No. 021610 was
discontinued for reasons of safety and can no longer serve as an RLD for an ANDA applicant;

(2) refuse to approve any pending ANDA for a generic version of the non-tamper-resistant
version of Opana ER approved under NDA No. 021610; and

(3) suspend and withdraw the approval of any ANDA referencing Opana ER approved under
NDA No. 021610 as the RLD.

## I.  SUMMARY OF THE DATA

As part of the pharmacovigilance and risk management activities for Opana ER, Endo subscribes
to the National Addictions Vigilance Intervention and Prevention Program ("NAVIPPRO") and
to the Researched Abuse Diversion and Addiction-Related Surveillance ("RADARS") System.
These two systems have recently provided important new safety information for Opana ER.

### A.  Impact of Leaving Crushable Formulations on the Market

In the period since the introduction of crush-resistant Opana® ER CRF, there has been an
increase in the reported rates of abuse and in the proportion of abusers who reported crushing

Division of Dockets Management
November 13, 2012
Page 4

and snorting (nasal insufflation) the non-tamper-resistant ANDA approved extended-release oxymorphone tablets compared to Opana® ER CRF:

- For the six month period of April 2012 through September 2012, the rate of abuse was highest for the non-tamper-resistant, ANDA approved extended-release oxymorphone tablets compared to Opana® ER CRF, when measured as the number of cases of abuse per 100,000 prescriptions dispensed. By this measure, abuse of the generic extended-release oxymorphone product was reported at the highest rate (270.55 cases per 100,000 prescriptions dispensed), followed by rate of abuse of the original formulation Opana ER (120.34 cases per 100,000 prescriptions dispensed); while Opana ER CRF abuse was reported at the lowest rate (49.20 cases per 100,000 prescriptions dispensed) over the six-month period reviewed. The rate of abuse of the non-tamper-resistant ANDA product was *five* times the rate of abuse of Opana ER CRF when cases were normalized by the number of prescriptions dispenses.

- During 3Q2012, during which period the market changeover from the original formulation of Opana ER to the reformulated product was essentially complete, the reported rate of abuse of Opana ER CRF was significantly reduced (82%) versus the rate observed for the non-tamper-resistant generic extended-release oxymorphone tablets based on the total number of prescriptions dispensed.

- The proportion of abuse of the non-tamper-resistant generic extended-release oxymorphone tablets via snorting has risen consistently in 2012, and now matches the level for snorting of the original formulation of Opana ER, which reinforces the importance of crush resistance in deterring that route of abuse.

### B. Effect of Introduction of Opana® ER CRF on Measures of Abuse

The rates of abuse of Opana ER OF, as measured by the total NAVIPPRO Addiction Severity Index-Multimedia Version (ASI-MV®)[2] sample of all drug abusers; and the subset of the ASI-MV sample tracking prescription opioid abusers, declined in 2Q2012 and 3Q2012 versus 2011 and 1Q2012. This is consistent with the decline in Opana ER OF prescriptions as a proportion of

---

[2]     ASI-MV® CONNECT. Available at http://www.inflexxion.com/NAVIPPRO_ASI-MVConnect/. Accessed October 10, 2012.

CONFIDENTIAL                                                                                                ENDO-OPANA-000009368

Division of Dockets Management
November 13, 2012
Page 5

all Opana ER dispensed at the retail level from 100% to <8% during 2012. The rate of abuse of
Opana ER OF, based on the total number of prescriptions dispensed (through 2Q2012), and the
proportion of abusers who reported crushing and snorting the product has remained constant
during 2011 and 2012.

Comparisons of three different measurements from before and after the introduction of crush-
resistant Opana ER were made. The "Before Period" (7/1/2011 – 9/30/2012) was used as the
baseline, and the "After Period" was 4/1/2012 – 9/30/2012. Comparisons of abuse rates for
Opana ER were analyzed through multiple measures including: (1) the total ASI-MV sample of
all drug abusers; (2) the subset of the ASI-MV sample tracking prescription opioid abusers; and
(3) based upon the total prescriptions dispensed for the reporting period. Comparing the Before
and After periods for each of the three measurements showed a significant decrease. Decreases
in abuse rates of Opana ER between the two periods were (1) 66%, (2) 66%, and (3) 59%,
respectively. This reduction in abuse of the product is attributable to introduction of the crush-
resistant product.

Furthermore, RADARS data show that abuse rates of Opana ER OF increased in the wake of the
introduction of crush-resistant OxyContin. These data demonstrate that the intentional exposure
rates (measured per 1,000 Unique Recipients of Dispensed Drug ["URDD"]) of abuse of Opana
ER OF had increased significantly (46%, $p < 0.05$) coincident with and subsequent to the
introduction of crush-resistant OxyContin[®] by Purdue Pharma in 2010.

With the introduction of Opana ER CRF, significant reductions versus baseline (before the
introduction of Opana ER CRF) periods were observed in 2Q2012 in the intentional exposure
and diversion incident rates (crush-resistant and original Opana ER combined) in the Poison
Center and Drug Diversion programs. The reports of misuse (measured per 1,000 URDD)
decreased by 35% and 45%, respectively, $p < 0.05$.

These data demonstrate that the introduction of crush-resistant Opana ER has resulted in
**significant reductions** in:

(1) the reported rates of abuse of crush-resistant Opana ER in 3Q2012 versus original Opana
ER in the ASI-MV at various time points (see Table 1 for a summary of reduction rates);

(2) the reported rates of abuse of Opana ER before (using time period 7/1/2011 – 9/30/2012
as the baseline) and after introduction of the crush-resistant Opana ER (time period

CONFIDENTIAL

Division of Dockets Management
November 13, 2012
Page 6

4/1/2012 – 9/30/2012) in the total ASI-MV (see Table 2 for a summary of reduction rates);

(3) the proportion of abusers who reported crushing and snorting reformulated Opana ER in 3Q2012 versus the original formulation in the ASI-MV at various time points (see Table 3 for a summary of reduction rates); and

(4) intentional exposure and diversion incident rates (per 100,000 population and per 1,000 URDD) reported in 2Q2012 compared to baseline rates in the RADARS Poison Center and Drug Diversion programs (see Table 4 for a summary of reduction rates).

**Table 1:** Reduction (%) in rates of past 30-day abuse of Opana ER CRF reported in 3Q2012 versus Opana ER OF at various time points.

| Source | 2011 | 1Q2012 | 2Q2012 |
|---|---|---|---|
| Total ASI-MV sample of all drug abusers | 60% | 67% | 21%* |
| The subset of the ASI-MV sample tracking prescription opioid abusers | 64% | 71% | 29%* |
| The total number of prescriptions dispensed | 31% | 50% | 56% |

* non-significant reduction

Table 1 shows the percent reduction in abuse rates that were observed in the third quarter of 2012 compared to the listed time period in the Table. In the 3rd quarter, the rate was 50% reduced from the first quarter when normalized to the total number of prescriptions dispensed evaluations.

**Table 2:** Comparisons of abuse rates for Opana ER (and significant reductions [%]) before (time period 7/1/2011 to 9/30/2012) and after (time period 4/1/2012 to 9/30/2012) the introduction of crush-resistant Opana ER.

| Source | Formulation | | Reduction (%) |
|---|---|---|---|
| | Original | Reformulated | |
| Total ASI-MV sample of all drug abusers | 1.3 | 0.44 | 66 |
| Subset of ASI-MV sample reporting prescription opioid abusers | 6.35 | 2.17 | 66 |
| Total number of Opana ER prescriptions dispensed | 120.34 | 49.20 | 59 |

ENDO-OPANA-000009370

Division of Dockets Management
November 13, 2012
Page 7

In Table 2, the reported rates of abuse of crush-resistant Opana ER versus original Opana ER as measured by the three measures in the ASI-MV show a significant reduction in abuse rates with the introduction of the crush-resistant formulation.

**Table 3:** Significant reduction (%) in the proportion of abusers who reported crushing and snorting reformulated Opana ER versus the original formulation.

| Time Period | 2011 | 1Q2012 | 2Q2012 | 3Q2012 |
|---|---|---|---|---|
| 3Q2012 | 70% | 72% | 70% | 69% |
| Before (7/1/2011 to 9/30/2012) and After (4/1/2012 to 9/30/2012) comparison | 74% | | | |

Table 3 shows the proportion of abusers who reported crushing and snorting reformulated Opana ER in 3Q2012 was significantly reduced compared to the proportion of abusers who reported crushing and snorting the original formulation in the ASI-MV at various time points. This is exactly the result desired by the Agency when FDA encouraged industry to develop tamper-resistant technology for those prescription drug products susceptible to abuse.

**Table 4:** Significant ($p<0.05$) reduction (%) in the intentional exposure and diversion incident rates in the RADARS Poison Center and Drug Diversion programs for 2Q2012 versus baseline rates.

| | Rate per 100,000 population | Rate per 1,000 URDD |
|---|---|---|
| Poison Center program | 44% | 35% |
| Drug Diversion program | 58% | 45% |

The data in Table 4 demonstrate that the introduction of crush-resistant Opana ER has resulted in significant reductions in intentional exposure and diversion incident rates (per 100,000 population and per 1,000 URDD) reported in 2Q2012 compared to baseline rates in the RADARS Poison Center and Drug Diversion programs.

CONFIDENTIAL

Division of Dockets Management
November 13, 2012
Page 8


## II.    IMPORTANT NEW SAFETY INFORMATION FOR OPANA® ER

### A.    NAVIPPRO

NAVIPPRO® is a national program that includes surveillance of substance abuse as well as prevention and intervention educational programs for substance abuse. NAVIPPRO surveillance involves analyses of multiple data sources for indicators of prescription medication abuse. Continuous examination of these data streams allows monitoring of trends over time for drug abuse at a product-specific level.

On August 31, 2012[3] and November 2, 2012,[4] Endo received data from NAVIPPRO drawn from adults being evaluated for substance abuse problems using the Addiction Severity Index Multimedia Version (ASI-MV®). These data cover the period April 1, 2012 to September 30, 2012. The first date that images of the reformulated Opana® ER tablets were made available in the ASI-MV system – and thus the first opportunity for drug abusers who were entering treatment to select the new Opana ER CRF as a drug that they had abused during the past 30 days – was April 8, 2012.

The Addiction Severity Index, or ASI, is a standard tool used in the assessment of substance abuse and several psychosocial problem areas typically associated with substance use problems, including: medical, employment, psychiatric, and legal status, as well as family and social functioning. It is traditionally administered by clinicians in a treatment setting upon intake for substance abuse treatment to adults, aged 17 and older (although some sites administer the ASI to children as young as 14).

This is new and important safety information on the effect of the introduction of the reformulated Opana ER on the rates of abuse of the product and the proportion of abusers who crush the product in order to ingest by snorting. Although these data are preliminary, Endo is providing this important new safety information at this time to ensure that the Agency has access to the most relevant current data as it considers the Citizen Petition dated August 13, 2012.

---

[3]    NAVIPPRO® Surveillance Report. Analysis of Data for Reformulated OPANA® ER. Reporting Period: 4/1/2012 - 7/9/2012. (Issue Date: 8/31/2012) (*Confidential Attachment No. 1*) ("Aug. 31, 2012 NAVIPPRO® Surveillance Report").

[4]    NAVIPPRO® Data brief. Analysis of ASI-MV data: Abuse of reformulated OPANA® ER, original formulation OPANA® ER and generic oxymorphone ER (4/1/2012 – 9/30/2012) (Issue Date 11/2/2012) (*Confidential Attachment No. 2*) ("Nov. 2, 2012 NAVIPPRO® Data Brief").

ENDO-OPANA-000009372

Division of Dockets Management
November 13, 2012
Page 9

These new data summarize:

1) Past 30-day abuse of Opana ER CRF and selected comparators as rates based on:

    a.     the total ASI-MV sample tracking Opana ER CRF;

    b.     the subset of the ASI-MV sample tracking Opana ER CRF and reporting prescription opioid abuse; and

    c.     the total number of prescriptions dispensed;

2) Distribution of routes of administration reported by individuals within the ASI-MV network who indicated past 30-day abuse of Opana ER CRF and comparators.

The number of assessments in the ASI-MV during each time period is shown in Table 5.

**Table 5:** ASI-MV participant characteristics per period.

| | 2011[5] | 1Q2012[6] | 2Q2012[7] | 3Q2012[7] |
|---|---|---|---|---|
| All respondents | 70,744 | 18,108 | 11,095 | 14,371 |
| Respondents reporting any past 30-day Rx opioid abuse | 14,437 | 3,610 | 2,222 | 2,988 |

The rates for 2011 and 1Q2012 establish a baseline for the level of abuse of original formulation (OF) Opana ER prior to the introduction of the reformulated product. The data for 2Q2012 and 3Q2012 cover the time period when both formulations were on the market. The reformulated Opana ER now accounts for >92% of dispensed prescriptions for Opana ER (Chart 1).

---

[5]     NAVIPPRO® Surveillance Report. Analysis of Data for OPANA® ER. Reporting Period: 10/1/2011 - 12/31/2011 and 1/1/2011 - 12/31/2011; Table 7. (Issue Date: 2/22/2012) (*Confidential Attachment No. 3*) ("Feb. 22, 2012 NAVIPPRO® Surveillance Report").

[6]     NAVIPPRO® Surveillance Report. Analysis of Data for OPANA® ER. Reporting Period: 1/1/2012 - 3/31/2012; Table 5. (Issue Date: 5/18/2012) (*Confidential Attachment No. 4*) ("May 18, 2012 NAVIPPRO® Surveillance Report").

[7]     Nov. 2, 2012 NAVIPPRO® Data brief at Tables A1 and A2.

CONFIDENTIAL     ENDO-OPANA-000009373

Division of Dockets Management
November 13, 2012
Page 10

**Chart 1**: Proportion (%) of dispensed prescriptions each month that were filled with the reformulated OPANA ER.



1.    **Past 30-day abuse of Opana® ER CRF and selected comparators**

   *(a)    Past 30-day abuse of Opana® ER CRF and comparators as rates based on the total ASI-MV sample tracking Opana® ER CRF*

Table 6 and Chart 2 illustrate the rates of abuse and 95% confidence intervals of Opana ER (original and crush-resistant product) and generic oxymorphone ER over several reporting periods. The rates of abuse for each product are calculated as the number of abuse cases per 100 ASI-MV assessments; denominator = all ASI-MV assessments in the data set for the reporting period.

Division of Dockets Management
November 13, 2012
Page 11

**Table 6:** Rates of past 30-day abuse for crush-resistant Opana ER and selected comparators within the ASI-MV network as measured by number of abuse cases per 100 ASI-MV assessments.

| | 2011[8] | | 1Q2012[9] | | 2Q2012[10] | | 3Q2012[10] | |
|---|---|---|---|---|---|---|---|---|
| | Rate (95% CI) | | Rate (95% CI) | | Rate (95% CI) | | Rate (95% CI) | |
| Opana ER OF | 1.35 | | 1.63 | | 0.68 | | 0.5 | |
| | 1.27 | 1.44 | 1.45 | 1.82 | 0.52 | 0.83 | 0.39 | 0.62 |
| Opana ER CRF | – | | – | | 0.32 | | 0.54 | |
| | – | – | – | – | 0.21 | 0.42 | 0.42 | 0.66 |
| Generic oxymorphone ER[11] | – | | 0.06 | | 0.14 | | 0.36 | |
| | – | – | 0.03 | 0.10 | 0.08 | 0.22 | 0.26 | 0.46 |

---

[8]    Feb. 22, 2012 NAVIPPRO® Surveillance Report at Table 9.
[9]    May 18, 2012 NAVIPPRO® Surveillance Report at Table 7.
[10]   Nov. 2, 2102 NAVIPPRO® Data brief at Table A1.

CONFIDENTIAL          ENDO-OPANA-000009375

Division of Dockets Management
November 13, 2012
Page 12

**Chart 2**: Rates of past 30-day abuse for crush-resistant Opana ER and selected comparators within the ASI-MV network as measured by number of abuse cases per 100 ASI-MV assessments.[11]



  *i)  2Q2012*

These data demonstrate a significantly lower rate of reported abuse of crush-resistant Opana ER versus the original formulation (approximate 53% reduction) in 2Q2012 by this measure. In comparison to the baseline levels observed in 2011 and 1Q2012, the reduction is even more pronounced (76% and 80%, respectively). The reduction in reported abuse of the original formulation by this measure is an expected outcome of the reduced availability of Opana ER OF during this period as the market changeover to Opana ER CRF occurred.

In the same period, there has been an observed increase in the trend of the reported abuse of the non-tamper-resistant generic oxymorphone hydrochloride ER.

---

[11]     Data for generic oxymorphone ER are not available prior to 1Q2012.

**CONFIDENTIAL**                                                               **ENDO-OPANA-000009376**

Division of Dockets Management
November 13, 2012
Page 13

*ii) 3Q2012*

The reported decline in the rate of abuse by this measure of the original formulation, and the increase in the rate of abuse of the crush-resistant Opana ER over that reported in 2Q2012 is an expected outcome of the replacement of Opana ER OF in the market by the reformulated product. These data demonstrate a significantly lower rate of reported abuse of crush-resistant Opana ER versus the original formulation in comparison to the baseline levels observed in 2011 and 1Q2012, 60% and 67%, respectively. The rate was also 21% lower (non-significant) than the rate for the original formulation observed in 2Q2012 as the changeover from the original to the reformulated product was underway.

The rate of abuse of the non-tamper-resistant generic oxymorphone hydrochloride ER increased significantly (157%) in this period versus 2Q2012.

*iii) Before and After Comparison*

A before (using time period 7/1/2011 – 9/30/2012 as the baseline) and after (time period 4/1/2012 – 9/30/2012) comparison of abuse rates for Opana ER OF versus Opana ER CRF to determine the effect of the introduction of crush-resistant Opana ER on abuse of the product demonstrates a significant reduction (66%) in abuse of the product that is attributable to introduction of the reformulated product (Chart 2a).[12]

---

[12]   Nov. 2, 2012 NAVIPPRO® Data brief at Table 1.

Division of Dockets Management
November 13, 2012
Page 14

**Chart 2a**:  Before and after rates of past 30-day abuse for Opana ER per 100 ASI-MV assessments.



*(b)*     *Past 30-day abuse of Opana® ER CRF and comparators as*
          *rates based on the subset of the ASI-MV sample tracking*
          *Opana® ER CRF and reporting prescription opioid abuse*

Table 7 and Chart 3 illustrate the rates of abuse and 95% confidence intervals of Opana ER
(original and reformulated product) and non-tamper-resistant generic oxymorphone ER over
several reporting periods.  The rates of abuse for each product are calculated as the number of
abuse cases per 100 individuals who reported past 30-day abuse of any prescription opioid in the
ASI-MV; denominator = all prescription opioid abusers in the ASI-MV dataset for the reporting
period.

CONFIDENTIAL                                                    ENDO-OPANA-000009378

Division of Dockets Management
November 13, 2012
Page 15

**Table 7:** Rates of past 30-day abuse for crush-resistant Opana ER and selected comparators within the ASI-MV network as measured by the number of abuse cases per 100 individuals who reported past 30-day abuse of any prescription opioid in the ASI-MV.

| | 2011[8] | | 1Q2012[9] | | 2Q2012[13] | | 3Q2012[13] | |
|---|---|---|---|---|---|---|---|---|
| | Rate (95% CI) | | Rate (95% CI) | | Rate (95% CI) | | Rate (95% CI) | |
| Opana ER OF | 6.62 | | 8.20 | | 3.38 | | 2.41 | |
| | 6.22 | 7.03 | 7.30 | 9.09 | 2.62 | 4.13 | 1.86 | 2.96 |
| Opana ER CRF | – | | – | | 1.58 | | 2.61 | |
| | – | – | – | – | 1.06 | 2.09 | 2.04 | 3.18 |
| Generic oxymorphone ER | – | | 0.28 | | 0.68 | | 1.74 | |
| | – | – | 0.13 | 0.51 | 0.38 | 1.11 | 1.27 | 2.21 |

**Chart 3:** Rates of past 30-day abuse for crush-resistant Opana ER and selected comparators within the ASI-MV network as measured by the number of abuse cases per 100 individuals who reported past 30-day abuse of any prescription opioid in the ASI-MV.



---

[13]   Nov. 2, 2012 NAVIPPRO® Data brief at Table A2.

CONFIDENTIAL   ENDO-OPANA-000009379

Division of Dockets Management
November 13, 2012
Page 16

*i) 2Q2012*

These data demonstrate a significantly lower rate of reported abuse of crush-resistant Opana ER versus the original formulation (approximate 53% reduction) in 2Q2012 by this measure. In comparison to the baseline levels observed in 2011 and 1Q2012, the reduction is even more pronounced (76% and 81%, respectively). The reduction in reported abuse of the original formulation by this measure is an expected outcome of the reduced availability of Opana ER OF during this period as the market changeover to Opana ER CRF occurred.

In the same period, there has been an observed increase in the trend of the reported abuse of the non-tamper-resistant generic oxymorphone hydrochloride ER.

*ii) 3Q2012*

The reported decline in the rate of abuse by this measure of the original formulation, and the increase in the rate of abuse of the crush-resistant Opana ER over that reported in 2Q2012 is an expected outcome of the replacement of Opana ER OF in the market by the reformulated product. These data demonstrate a significantly lower rate of reported abuse of crush-resistant Opana ER versus the original formulation in comparison to the baseline levels observed in 2011 and 1Q2012, 64% and 71%, respectively. The rate was also 29% lower (non-significant) than the rate for the original formulation observed in 2Q2012 as the changeover from the original to the reformulated product was underway.

The rate of abuse of the non-tamper-resistant generic oxymorphone hydrochloride ER increased significantly (156%) in this period versus 2Q2012.

*iii) Before and After Comparison*

A Before (using time period 7/1/2011 – 9/30/2012 as the baseline) and After (time period 4/1/2012 – 9/30/2012) comparison of abuse rates for Opana ER OF versus Opana ER CRF to determine the effect of the introduction of crush-resistant Opana ER on abuse of the product demonstrates a significant reduction (66%) in abuse of the product that is attributable to introduction of the reformulated product (Chart 3a).[12]

ENDO-OPANA-000009380

Division of Dockets Management
November 13, 2012
Page 17

**Chart 3a**: Before and after rates of past 30-day abuse for Opana ER per 100 individuals who reported past 30-day abuse of any prescription opioid in the ASI-MV.



*(c)* *Past 30-day abuse of Opana® ER CRF and comparators as rates based on the total number of prescriptions dispensed*

Table 9 and Chart 4 illustrate the rates of abuse and 95% confidence intervals of Opana ER (original and reformulated product) and generic oxymorphone ER over several reporting periods. The rates of abuse for each product are calculated as the rates based the total number of prescriptions dispensed; denominator = total prescriptions dispensed for the target product and comparators for the reporting period. The number of dispensed prescriptions for Opana ER (original and reformulated product) and generic oxymorphone ER in each time period is shown in Table 8.

CONFIDENTIAL

Division of Dockets Management
November 13, 2012
Page 18

Table 8:  Total dispensed prescriptions per time period.*

| | 2011[14] | 1Q2012[15] | 2Q2012[16] | 3Q2012[16] |
|---|---|---|---|---|
| Opana ER OF | 1,069,867 | 238,103 | 54,129 | 14,652 |
| Opana ER CRF | – | – | 102,960 | 126,700 |
| Generic oxymorphone ER | N/A | 6,334 | 9,670 | 15,094 |

* Prescription data are derived from IMS Health, and only include prescriptions dispensed in states that
contributed data to the ASI-MV network during the current reporting period.

Table 9:  Rates of past 30-day abuse for reformulated Opana ER and selected comparators
within the ASI-MV network per 100,000 prescriptions dispensed.

| | 2011[8] | | 1Q2012[9] | | 2Q2012[17] | | 3Q2012[17] | |
|---|---|---|---|---|---|---|---|---|
| | Rate (95% CI) | | Rate (95% CI) | | Rate (95% CI) | | Rate (95% CI) | |
| Opana ER OF | 89.36 | | 124.32 | | 138.56 | | 491.40 | |
| | 83.70 | 95.02 | 110.16 | 138.47 | 107.22 | 169.89 | 378.17 | 604.63 |
| Opana ER CRF | – | | – | | 33.99 | | 61.56 | |
| | – | – | – | – | 22.73 | 45.25 | 47.90 | 75.22 |
| Generic oxymorphone ER | – | | 157.88 | | 155.12 | | 344.51 | |
| | – | – | 75.78 | 290.50 | 86.87 | 255.95 | 251.03 | 437.98 |

---

[14]  Feb. 22, 2012 NAVIPPRO® Surveillance Report at Table 8.
[15]  May 18, 2012 NAVIPPRO® Surveillance Report at Table 6.
[16]  Nov. 2, 2012 NAVIPPRO® Data brief at Table A3.
[17]  Nov. 2, 2012 NAVIPPRO® Data brief at Table A3.

CONFIDENTIAL
ENDO-OPANA-000009382

Division of Dockets Management
November 13, 2012
Page 19

**Chart 4:** Rates of past 30-day abuse for reformulated Opana ER and selected comparators within the ASI-MV network per 100,000 prescriptions dispensed.



*i)* *2Q2012*

These data demonstrate a significantly lower rate of reported abuse of crush-resistant Opana ER versus the original formulation (approximate 75% reduction) in 2Q2012 by this measure. In comparison to the baseline levels observed in 2011 and 1Q2012, the reduction is also significant (62% and 73%, respectively). The constant rate of reported abuse of the original formulation by this measure is consistent with the continued availability of the product in the marketplace when adjusted for the number of prescriptions dispensed.

*ii)* *3Q2012*

These data demonstrate a significant reduction in the rate of reported abuse of crush-resistant Opana ER versus the original formulation (87%). Significant reductions were also observed versus the baseline rates for the original formulation observed in 2011 and 1Q2012 (31% and 50%, respectively), and in 2Q2012 (56%) as the changeover from the original to the reformulated product was underway. The rate of reported abuse of crush-resistant Opana ER

CONFIDENTIAL

Division of Dockets Management
November 13, 2012
Page 20

was also significantly reduced (82%) versus the rate observed for the non-tamper-resistant generic oxymorphone hydrochloride ER.

The rate of abuse of the non-tamper-resistant generic oxymorphone hydrochloride ER increased by 122% in this period versus 2Q2012.

*iii) Before and After Comparison*

A Before (using time period 7/1/2011 – 9/30/2012 as the baseline) and After (time period 4/1/2012 – 9/30/2012) comparison of abuse rates for Opana ER OF versus Opana ER CRF to determine the effect of the introduction of crush-resistant Opana ER on abuse of the product demonstrates a significant reduction (59%) in abuse of the product that is attributable to introduction of the reformulated product (Chart 4a).[12]

**Chart 4a**:  Before and after rates of past 30-day abuse for Opana ER within the ASI-MV network per 100,000 prescriptions dispensed.



ENDO-OPANA-000009384

Division of Dockets Management
November 13, 2012
Page 21

2.  **Distribution of routes of administration reported by individuals within the ASI-MV network who indicated past 30-day abuse of Opana® ER CRF and comparators**

Each drug has its own pattern of abuse based on route of administration (Chart 5).[18] The pattern for Opana ER OF is snorting followed by oral ingestion followed by intravenous administration. Over extended periods of observation by Inflexxion via the ASI-MV, approximately three-quarters of all Opana ER OF reports are of abuse by snorting.[18]

**Chart 5:** Frequency (%) of specific routes of administration by drug.



Table 10 and Chart 6 illustrate the distribution of routes of administration and 95% confidence intervals[19] reported by individuals within the ASI-MV network who indicated past 30-day abuse of Opana ER (original and reformulated product) and generic oxymorphone ER over several reporting periods.

---

[18]    Source: Butler S, Black R, Cassidy T, et al, Abuse risks and routes of administration of different prescription opioid compounds and formulations, Harm Reduction Journal. 2011;8:29.(Enclosed Attachment A)
[19]    Confidence Interval Calculator For Proportions. Available at http://www.mccallum-layton.co.uk/stats/Confidence IntervalCalcProportions.aspx. Accessed October 23, 2012.

Division of Dockets Management
November 13, 2012
Page 22

**Table 10:** Proportion (%) of abusers who reported crushing and snorting Opana ER and selected comparators within the ASI-MV network.

| | 2011[19,20] | | 1Q2012[19,21] | | 2Q2012[19,22] | | 3Q2012[19,23] | |
|---|---|---|---|---|---|---|---|---|
| | Rate (95% CI) | | Rate (95% CI) | | Rate (95% CI) | | Rate (95% CI) | |
| Opana ER OF | 76.7 | | 82.8 | | 76.0 | | 75.0 | |
| | 79.4 | 74.0 | 87.1 | 78.5 | 85.7 | 66.3 | 85.0 | 65.0 |
| Opana ER CRF | – | | – | | 14.3 | | 23.1 | |
| | | | | | 25.9 | 2.7 | 32.5 | 13.8 |
| Generic oxymorphone ER | – | | 20.0 | | 40.2 | | 71.2 | |
| | | | 44.8 | -4.8 | 64.8 | 15.2 | 83.5 | 58.9 |

**Chart 6**: Proportion (%) of abusers who reported crushing and snorting Opana ER and selected comparators.[11]



---

20      Feb. 22, 2012 NAVIPPRO® Surveillance Report at Table 12.
21      May 18, 2012 NAVIPPRO® Surveillance Report at Table 10.
22      Nov. 2, 2012 NAVIPPRO® Data brief at Table B1.
23      Nov. 2, 2012 NAVIPPRO® Data brief at Table B3.

Division of Dockets Management
November 13, 2012
Page 23

### i) 2Q2012

These data demonstrate a significantly lower proportion of abusers who reported crushing and
snorting crush-resistant Opana ER versus the original formulation (approximate 81% reduction)
in 2Q2012. In comparison to the baseline levels observed in 2011 and 1Q2012, the reduction is
also significant (81% and 83%, respectively). In the same period, there has been an increase in
the proportion of abusers who reported crushing and snorting the non-tamper-resistant generic
oxymorphone hydrochloride ER, while the proportion of abusers who reported crushing and
snorting the original Opana ER remained constant.

### ii) 3Q2012

These data demonstrate a significantly lower proportion of abusers who reported crushing and
snorting crush-resistant Opana ER versus the rates observed for the original formulation
observed in the baseline levels 2011 and 1Q2012, approximately 70% and 72%, respectively. In
comparison to the rates observed for the original formulation in 2Q2012 and 3Q2012, the
observed reduction was also significant: 70% and 69%, respectively. There was a significantly
lower proportion (68%) of abusers who reported crushing and snorting crush-resistant Opana ER
versus the rate observed for the non-tamper-resistant generic oxymorphone hydrochloride ER.

In the same period, there has been a non-significant increase (71% versus 40%) in the proportion
of abusers who reported crushing and snorting the non-tamper-resistant generic oxymorphone
hydrochloride ER, while the proportion of abusers who reported crushing and snorting the
original Opana ER remained constant.

### iii) Before and After Comparison

A Before (using time period 7/1/2011 – 9/30/2012 as the baseline) and After (time period
4/1/2012 – 9/30/2012) comparison of the proportion of abusers who reported crushing and
snorting Opana ER demonstrates a significant reduction (74%) in abuse of the product that is
attributable to introduction of the reformulated product (Chart 6a).[24]

---

[24]     Nov. 2, 2012 NAVIPPRO® Data brief at Table 2.

CONFIDENTIAL                                                                          ENDO-OPANA-000009387

Division of Dockets Management
November 13, 2012
Page 24

**Chart 6a**: Before and after rates (%) of the proportion of abusers who reported crushing and snorting Opana ER within the ASI-MV network.



## B.  RADARS[®]

The RADARS System provides surveillance data to meet the needs of pharmaceutical companies, policymakers, regulatory agencies, medical/public health officials, and the public in addressing the concerns of prescription drug abuse.  The RADARS System is comprised of six programs, a central database, and a Scientific Advisory Board that provides strategic direction and scientific interpretation of the data.  The RADARS System collects de-identified instances/reports of prescription drug abuse, misuse, and diversion for specific drug products occurring in a three digit ZIP code.  Rates of abuse in each three digit ZIP code are then calculated based upon population and drug availability.

 ENDO-OPANA-000009388

Division of Dockets Management
November 13, 2012
Page 25

On October 30, 2012[25] Endo received data from RADARS drawn from the RADARS Poison Center[26] and Drug Diversion[27] Programs during the period from before introduction of crush-resistant Opana ER to June 30, 2012. The Poison Center program is composed of 50 of 57 U.S. Poison Centers. Participating poison centers send the coordinating center cases for the RADARS System drugs of interest on a weekly basis. Each case undergoes a rigorous quality control process. Cases are defined as any intentional exposure managed by participating poison centers for the drugs of interest. Intentional exposures are used as surrogates for misuse and abuse. These intentional exposure reasons include suicide, intentional misuse, abuse, intentional unknown, and withdrawal cases. Cases are assigned to the reported 3-digit ZIP code of the exposed individual's residence.

The Drug Diversion program is composed of 300 prescription drug diversion investigators or regulatory agencies who are surveyed quarterly and asked to report the number of new diversion cases investigated in that quarter. Cases are defined as the number of new instances of pharmaceutical diversion reported to or investigated by the diversion unit or regulatory board during the previous quarter. These must be official cases initiated during the previous quarter. As such, only cases in which there is a new written complaint or report are included. Cases are assigned to the 3-digit ZIP code where the case occurred or, when the 3-digit ZIP code where the case occurred is unknown, are redistributed across the informant's jurisdiction.

Prescription drug abuse, misuse and diversion rate calculations in RADARS are performed using two denominators:

1. Rates per 100,000 persons provide a community-based perspective of prescription drug abuse, misuse and diversion; and
2. Rates per 1,000 Unique Recipients of Dispensed Drug (URDD) accounts for availability of the prescribed product in a given community.

The average of intentional exposure and drug diversion quarterly rates before the introduction of the reformulated product was compared to each quarterly rate during and after the introduction of the reformulated Opana ER.

---

[25]    RADARS® System Report. Analysis of Reformulated Opana ER in the RADARS System Programs. Report date October 30, 2012 (*Confidential Attachment 5*).
[26]    RADARS Poison Center Program. Available at http://www.radars.org/Home2/Programs/PoisonCenter Program.aspx. Accessed October 16, 2012.
[27]    RADARS Drug Diversion Program. Available at http://www.radars.org/Home2/Programs/DrugDiversion Program.aspx. Accessed October 16, 2012.

ENDO-OPANA-000009389

Division of Dockets Management
November 13, 2012
Page 26

## 1. Poison Center Program

The period before introduction of crush-resistant Opana ER included the 4th quarter of 2010 through the 4th quarter of 2011 (4Q2010 to 4Q2011). The effect of introduction of Opana ER CRF on the rate of intentional exposure cases for Opana ER (combined original and reformulated) in the Poison Center program for 1Q2012 and 2Q2012 is described in Table 11 and Charts 7 and 8.[25] By the end of 1Q2012, 10% of dispensed prescriptions for Opana ER were for the reformulated product. By the end of 2Q2012, the proportion had risen to 82% (Chart 1). These data do not distinguish between the original and crush-resistant formulations per incident. The data presented are organized by time period, knowing the prevalence of each formulation available during that period.

**Table 11:** Intentional exposure rates for Opana ER (combined original and crush-resistant) and changes (%) versus baseline (4Q2010 to 4Q2011) in the Poison Center program.

| | 4Q2010 to 4Q2011 | 1Q2012 | 2Q2012 |
|---|---|---|---|
| Per 100,000 population | 0.0436 | 0.0491 | 0.0246 |
| Change (%) versus baseline | – | 13 | -44* |
| Per 1,000 URDD | 1.0952 | 1.0951 | 0.7078 |
| Change (%) versus baseline | – | No change | -35* |

\* Statistically different (p<0.05)

These results demonstrate that introduction of crush-resistant Opana ER significantly reduced the rate of intentional exposure cases in the Poison Center program in 2Q2012 versus the baseline rate (4Q2010 to 4Q2011) measured per 100,000 population and by 1,000 URDD by 44% and 35%, respectively. In Charts 7 and 8 below, the red dashed horizontal line represents the basline of intentional exposure cases for Opana ER as measured from during 4Q2010 to 4Q2011.

An important event impacting the rates of abuse and diversion of Opana ER occurred in 2010 with the introduction of crush-resistant OxyContin® (ORF). The average of quarterly rates of intentional exposure cases of Opana ER before the introduction of crush-resistant OxyContin (ORF) is shown as the blue horizontal line, and average of quarterly rates after the introduction of crush-reistant OxyContin, but before the introduction of crush-resistant Opana ER is shown as the red horizontal line.

ENDO-OPANA-000009390

Division of Dockets Management
November 13, 2012
Page 27

**Chart 7**: Intentional exposure rates per 100,000 population by year/quarter for Opana ER in the Poison Center program.[28]



**Chart 8**: Intentional exposure rates per 1,000 URDD by year/quarter for Opana ER in the Poison Center program.[28]



---

[28]   "ORF® Introduction" refers to the introduction of crush-resistant OxyContin® in 2010.

CONFIDENTIAL                                                         ENDO-OPANA-000009391

Division of Dockets Management
November 13, 2012
Page 28

RADARS investigations also demonstrated the historical effect on the average rate of Opana ER
intentional exposure cases coincident with the reformulation of another prescription opioid
(OxyContin®) that was reformulated to be crush-resistant.[25] The average rate of Opana ER
intentional exposure cases before the introduction of crush-resistant OxyContin (ORF) was
compared to the average Opana ER intentional exposure cases rate after introduction of ORF, but
before reformulation of Opana ER. The period before introduction of ORF included rates from
the 3rd quarter of 2009 through the 3rd quarter of 2010. The period after introduction of ORF
but before reformulation of Opana ER included rates from 4th quarter of 2010 through 4th
quarter of 2011. These results are described in Table 12 and Charts 7 and 8.

**Table 12:** Intentional exposure rates for Opana ER before the introduction of crush-resistant
OxyContin® (ORF) compared to the intentional exposure rates after introduction
of ORF in the Poison Center program.

| | Before 3Q2009 to 3Q2010 | After 4Q2010 to 4Q2011 |
|---|---|---|
| Per 100,000 population | 0.0183 | 0.0439 |
| Change (%) versus baseline | – | 140* |
| Per 1,000 URDD | 0.7477 | 1.0952 |
| Change (%) versus baseline | – | 46* |

* Statistically different (p<0.05)

These results demonstrate that introduction of crush-resistant OxyContin prior to the
reformulation of Opana ER to be crush resistant was coincident with significantly (p<0.05)
increased intentional exposure rates for Opana ER measured per 100,000 population by 140%
and increased intentional exposure rates for Opana ER measured per 1,000 URDD by 46%. The
subsequent fall in intentional exposure rates after the introduction of crush-resistant Opana ER
demonstrates the value of crush resistance at a time when increasing abuse rates for original
Opana ER have been demonstrated (Table 12).

## 2. Drug Diversion Program

The effect of introduction of crush-resistant Opana ER on the rate of diversion incidents for
Opana ER (combined original and reformulated) in the Drug Diversion program for 1Q2012 and

CONFIDENTIAL

Division of Dockets Management
November 13, 2012
Page 29

2Q2012 are described in Table 13 and Charts 9 and 10.[25] The average of quarterly rates before the introduction of crush-resistant Opana ER is shown as the red dashed horizontal line.

**Table 13:** Diversion incident rates for Opana ER and changes (%) versus baseline (1Q2011 to 4Q2011) in the Drug Diversion program.

|  | 1Q2011 to 4Q2011 | 1Q2012 | 2Q2012 |
|---|---|---|---|
| Per 100,000 population | 0.0666 | 0.0755 | 0.0276 |
| Change (%) versus baseline | – | 13 | -58* |
| Per 1,000 URDD | 1.3445 | 1.4193 | 0.7383 |
| Change (%) versus baseline | – | 6 | -45* |

* Statistically different (p<0.05)

**Chart 9:** Diversion incident rates per 100,000 population by year/quarter for Opana ER in the Drug Diversion program.



ENDO-OPANA-000009393

Division of Dockets Management
November 13, 2012
Page 30

**Chart 10**: Diversion incident rates per 1,000 URDD by year/quarter for Opana ER in the Drug
Diversion program.



These results demonstrate that the introduction of crush-resistant Opana ER significantly reduced
the diversion incident rates in the Drug Diversion program in 2Q2012 versus the baseline rate
(4Q2010 to 4Q2011) by 58% and 45%, measured per 100,000 population and by 1,000 URDD
respectively.

                                                                    ENDO-OPANA-000009394

Division of Dockets Management
November 13, 2012
Page 31

## III.   **CONCLUSION**

In summary, Endo is providing this preliminary important new safety information to the Agency to assist with the Agency's review of the Citizen Petition filed on August 13, 2012. Endo believes that these data indicate that the reformulation of Opana® ER is having the desired effect on the rates and routes of abuse of the product. The significant increase observed (by ASI-MV) in abuse of the ANDA approved extended-release oxymorphone tablets coincident with the introduction of crush-resistant Opana ER replicates the significant increase in abuse rates that were observed (by the RADARS Poison Center program) for original Opana ER when crush-resistant OxyContin® was introduced.

The data presented in this submission strongly support the Citizen Petition, by predicting public health harm if the Agency fails to take the actions requested in the Petition. By allowing the non-tamper-resistant ANDA approved extended-release oxymorphone tablets to enter or remain on the market, FDA will essentially negate the attendant safety advantages of Opana ER CRF. These data show that if both CRF and non-tamper resistant generic oxymorphone ER products are available in the marketplace, abuse of the non-tamper resistant products increases.

The preliminary data support Endo's position that the original non-crush-resistant formulation was withdrawn from marketing as a safety measure and support Endo's request that FDA take immediate actions, including determining that the original non-crush-resistant formulation was discontinued for reasons of safety and can no longer serve as an RLD for an ANDA applicant. Furthermore, FDA should suspend approval for any currently approved ANDA products that reference the original formulation.

## IV.   **VERIFICATION**

Endo makes the following verification pursuant to FDC Act § 505(q)(1)(I): I certify that, to my best knowledge and belief: (a) I have not intentionally delayed submission of this document or its contents; and (b) the information upon which I have based the action requested herein first became known to me on or about February 22, 2012 (NAVIPPRO® Surveillance Report), May 18, 2012 (NAVIPPRO® Surveillance Report), August 31, 2012 (NAVIPPRO® Surveillance Report), November 2, 2012 (NAVIPPRO® Data Brief), and October 30, 2012 (RADARS® System Report). If I received or expect to receive payments, including cash and other forms of consideration, to file this information or its contents, I received or expect to receive those

Division of Dockets Management
November 13, 2012
Page 32

payments from the following persons or organizations: Endo. I verify under penalty of perjury that the foregoing is true and correct as of the date of the submission of this petition.

Respectfully submitted,

Robert Barto
Vice President, Regulatory Affairs
Endo Pharmaceuticals Inc.

Attachment
(*Confidential Attachments will be sent under separate cover*)

CONFIDENTIAL

ENDO-OPANA-000009396

Butler S, Black R, Cassidy T, et al. Abuse risks and routes of administration of different prescription opioid compounds and formulations. Harm Reduction Journal. 2011;8:29.(Enclosed Attachment A)

ENDO-OPANA-000009397

Butler *et al. Harm Reduction Journal* 2011, **8**:29
http://www.harmreductionjournal.com/content/8/1/29



HARM REDUCTION
JOURNAL

**RESEARCH**                                                              **Open Access**

# Abuse risks and routes of administration of different prescription opioid compounds and formulations

Stephen F Butler*, Ryan A Black, Theresa A Cassidy, Taryn M Dailey and Simon H Budman

## Abstract

**Background:** Evaluation of tamper resistant formulations (TRFs) and classwide Risk Evaluation and Mitigation Strategies (REMS) for prescription opioid analgesics will require baseline descriptions of abuse patterns of existing opioid analgesics, including the relative risk of abuse of existing prescription opioids and characteristic patterns of abuse by alternate routes of administration (ROAs). This article presents, for one population at high risk for abuse of prescription opioids, the unadjusted relative risk of abuse of hydrocodone, immediate release (IR) and extended release (ER) oxycodone, methadone, IR and ER morphine, hydromorphone, IR and ER fentanyl, IR and ER oxymorphone. How relative risks change when adjusted for prescription volume of the products was examined along with patterns of abuse via ROAs for the products.

**Methods:** Using data on prescription opioid abuse and ROAs used from 2009 Addiction Severity Index-Multimedia Version (ASI-MV®) Connect assessments of 59,792 patients entering treatment for substance use disorders at 464 treatment facilities in 34 states and prescription volume data from SDI Health LLC, unadjusted and adjusted risk for abuse were estimated using log-binomial regression models. A random effects binary logistic regression model estimated the predicted probabilities of abusing a product by one of five ROAs, intended ROA (i.e., swallowing whole), snorting, injection, chewing, and other.

**Results:** Unadjusted relative risk of abuse for the 11 compound/formulations determined hydrocodone and IR oxycodone to be most highly abused while IR oxymorphone and IR fentanyl were least often abused. Adjusting for prescription volume suggested hydrocodone and IR oxycodone were least often abused on a prescription-by-prescription basis. Methadone and morphine, especially IR morphine, showed increases in relative risk of abuse. Examination of the data without methadone revealed ER oxycodone as the drug with greatest risk after adjusting for prescription volume. Specific ROA patterns were identified for the compounds/formulations, with morphine and hydromorphone most likely to be injected.

**Conclusions:** Unadjusted risks observed here were consistent with rankings of prescription opioid abuse obtained by others using different populations/methods. Adjusted risk estimates suggest that some, less widely prescribed analgesics are more often abused than prescription volume would predict. The compounds/formulations investigated evidenced unique ROA patterns. Baseline abuse patterns will be important for future evaluations of TRFs and REMS.

## Background

This article uses self-report data collected from individuals entering substance abuse treatment from a large number of treatment facilities across the country to examine the relative risks of abuse of specific prescription opioid compounds and formulations and to describe

route of administration (ROAs) patterns that are characteristic of the different opioid compounds and formulations. A more comprehensive understanding of the abuse patterns of these medications is critical to inform current public health efforts intended to manage the risk for abuse of these important medications. While long-term opioid therapy for chronic noncancer pain remains controversial, such use has increased substantially over the past few decades [1], as has prescribed availability of

* Correspondence: sfbutler@inflexxion.com
Inflexxion, Inc. 320 Needham St. Suite 100, Newton, MA 02464, USA



© 2011 Butler et al; licensee BioMed Central Ltd. This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/2.0), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited.

Butler *et al. Harm Reduction Journal* 2011, **8**:29
http://www.harmreductionjournal.com/content/8/1/29

these medications [2]. The beneficial impact of this is presumably improved pain management for many patients. Unfortunately, one negative consequence of increased availability is that abuse of and addiction to prescription opioids has also increased dramatically over the past decade. A recent national survey finds that nearly 12 million persons (4.8%) 12 years of age or older indicate nonmedical use of prescription pain relievers in the past year [3]. The number of ER visits due to the nonmedical use of opioids has more than doubled from 2004 to 2008; from 144,600 to 305,900 visits, respectively [4]. The US death rate due to drug overdoses has never been higher and this increase is largely due to prescription opioid painkillers [5]. According to the annual national survey, 70% of nonmedically used analgesics are obtained from friends or family [3].

Most published statistics regarding nonmedical use/abuse of prescription opioids are limited to a general examination of any prescription opioid e.g., [3] or, at best, descriptions of one or two compounds such as oxycodone (usually OxyContin® or other oxycodone preparation (e.g., Percocet® or Percodan®) or the hydrocodone combination products (especially Vicodin®) (e.g., [6]). This likely reflects a primary interest in the most widely prescribed opioid compounds (namely oxycodone and hydrocodone) as well as the fact that some data streams do not differentiate among the various prescription opioid compounds (e.g., the Treatment Episode Dataset or TEDS: [7]). Similarly, discussions of ROAs employed by abusers of prescription opioids typically do not examine differential ROA patterns that may be characteristic of various products, compounds or formulations (e.g., [2,7,8]).

The premise of this article is that it is important to differentiate the relative risks of abuse of various prescription opioid compounds and formulations as well as the characteristic ROA patterns of the various compounds. The need for such specific data has increased due to two, relatively recent developments: the advent of the so-called abuse deterrent (ADF) or tamper resistant formulations (TRF) and the Food and Drug Administration's (FDA) recent efforts to employ Risk Evaluation and Mitigation Strategies (REMS) for specific prescription opioids and formulations.

Several pharmaceutical companies have begun to introduce ADFs or TRFs that are intended to decrease levels of abuse of prescription opioid medications (e.g., [9-13]). Many of these formulations propose some mechanism to thwart abusers' attempts to modify the tablet, capsule or patch in order to render the active ingredient immediately available for abuse and conducive for use via unintended or alternate ROAs (e.g., snorting/insufflation, injection) that have been associated with serious health consequences (e.g., [14-16]). Since these formulations are designed to resist tampering but can readily be abused by swallowing whole, the most accurate term to use is tamper

resistant (TRF), which we use in this article. Note that at the time of this writing, no formulation has been granted a claim of either abuse deterrent or tamper resistant by the FDA. Clearly, evaluation of the public health impact of these TRFs is warranted once these products are on the market and available in communities to be abused. Given the long history of opioid abuse, it is not expected that the TRFs will eradicate abuse of prescription opioids or even tampering [11]. Thus, abuse deterrence or tamper resistance is generally discussed in terms of comparators; (i.e., abuse deterrent or tamper resistant compared to what? [17]). It will therefore be important to establish baseline relative risks of abuse of comparator compound(s) for a given TRF. And, since the focus of most TRFs is to inhibit unintended or alternate ROAs that require tampering, it is important to have established characteristic ROA patterns of comparator compounds or formulations in order to evaluate whether a TRF impacts the original ROA patterns of the comparator(s).

The second development suggesting the need to discriminate abuse patterns of compounds and formulations are recent efforts by the FDA to subject specific prescription opioids and formulations to REMS, as well as efforts to establish a classwide REMS for extended-release opioids [18]. Current REMS for prescription opioids, and the proposed classwide REMS, are applied to particular compounds and/or formulations (such as extended-release formulations). Thus, in principle, in order to measure the impact of these REMS, it is essential to differentiate abuse patterns of one compound or formulation from other compounds, since different compounds/formulations that may be subjected to a REMS have different a priori abuse patterns. Without such metrics it would be difficult to determine whether observed changes in abuse levels and ROA patterns due to REMS have occurred, and if so, whether the impact is on all drugs in a class or only for certain drugs. Furthermore, given the introduction of TRFs, there may be reason to go beyond the compound and general formulation (e.g., immediate-release [IR] versus extended-release[ER]) to ascertain differences in abuse patterns at the product specific level.

There are, to be sure, several articles that examine abuse patterns of specific compounds, formulations or products. For example, Kelly and colleagues (2008)[2] conducted a random telephone survey of households in the US. These authors differentiated 11 specific compounds and some formulations (i.e., combinations with acetaminophen) along with an "other" category. They reported the relative percentages of those who had taken one of these drugs in the past week. Their sample and methods did not address misuse or abuse, but rather served to report on the prevalence within the general population of individuals who had taken a prescription opioid for any reason (i.e., legitimate and illegitimate) in the past week. Another article by

CONFIDENTIAL

ENDO-OPANA-000009399

Butler *et al. Harm Reduction Journal* 2011, **8**:29
http://www.harmreductionjournal.com/content/8/1/29

Rosenblum and colleagues (2007)[19] examined participants in 72 methadone maintenance treatment programs in 33 states. Respondents completed a checklist of lifetime and past 30 days abuse ("used to get high") of heroin and seven prescription opioids, including buprenorphine, fentanyl, hydrocodone, hydromorphone, oxycodone (ER and IR), methadone, morphine, and other opioid drug. They present the relative risks for abuse for respondents' primary problem and any abuse in the past 30 days for the compounds and formulations in their questionnaire. The presentation of ROAs in this study is confined to reports of injecting one's primary drug of abuse.

An extensive review of the public datasets administered by SAMHSA is beyond the scope of this brief review. However, two SAMHSA datasets do provide some compound and product-specific data: the Drug Abuse Warning Network (DAWN) dataset, which monitors drug-related visits to hospital emergency departments and drug-related deaths investigated by medical examiners and coroners, and the National Survey on Drug Use and Health [20], which provides national and state data on the extent and patterns of substance abuse (alcohol, tobacco, and illicit and prescription drugs) by conducting annual surveys of the general US population. One report from DAWN [21] examined relative rates of nonmedical use of six compounds (oxycodone, hydrocodone, methadone, fentanyl and hydromorphone) mentioned in emergency room visits, as well as change in number of mentions from 2004 to 2008. These datasets also collect information on ROAs, however, this is typically reported at the level of prescription opioids overall. We could find no report that distinguished ROA patterns among the various compounds or products.

The only published report, of which we are aware, that explicitly presents data on relative rankings of abuse of prescription opioid compounds and products, as well as compound-specific ROA patterns is Butler and colleagues' (2008)[22] report on the NAVIPPRO® data stream, the ASI-MV® Connect network. These authors present the relative percentages of individuals entering treatment for substance abuse at participating treatment centers across the country who report abuse specific compounds and products in the past 30 days. These data suggest that most prescription opioid abusers reported using a hydrocodone product in the past 30 days, followed closely by any oxycodone (both IR and ER), and followed more distantly by analgesic methadone, morphine, fentanyl and hydromorphone products. These authors report data showing that hydrocodone products are most always taken orally and almost never snorted or injected. Other compounds are also taken orally, but oxycodone ER products tend to be snorted and injected more often in this population of presumably hard core abusers, while morphine products are

injected more often than taken orally. While these results are interesting and useful, there is no literature of which we are aware that specifically compares the relative risk of abuse of prescription opioid compounds and formulations. Nor is there a comprehensive comparison of ROA pattern differences among these compounds and formulations.

When considering the issue of relative abuse of compounds and formulations of prescription opioids, it is critical to consider how the raw counts of abuse cases or events are adjusted in order to compare risk of abuse across medications. In the literature on prescription opioid abuse, there is considerable discussion on this topic along with various proposals for the "best" denominator (e.g., [17,23,24]). We contend that abuse may be productively viewed from a variety of angles, since each adjustment may tell a different story regarding abuse patterns. Furthermore, the most "appropriate" adjustment likely depends on characteristics of the data source, and most importantly, the question or questions being asked of the data. Questions of prevalence usually address the likelihood that a given individual in some specified population will abuse the target substance (cf. [25]). Thus, one might examine the likelihood a product is to be abused in the general population or in a population of individuals known to abuse such drugs. Another important question relevant to prescription opioid abuse reflects the notion that the amount of abuse observed is strongly related to the prescribed availability within a community [26], raising questions of the level of abuse in a given community given the amount of prescribed drug in that community. Or, one might consider how likely it is that a prescription for a given analgesic will end up being abused. The answers to such questions often require data that are not readily available in the field of prescription opioid abuse, so that selection of suitable proxy measures (e.g., [17]) is required.

In the work reported here, we are interested in examining the unadjusted relative risks of abuse of seven prescription opioid compounds and, when appropriate, their immediate release and extended release formulations, similar to the relative rankings reported by Butler et al. (2008)[22]. We also go beyond these analyses to determine how these relative risks change when adjusted for the number of prescriptions written for the compared compounds/formulations. In a sense, this question asks: how likely is a particular prescription for an opioid analgesic to end up in the hands of an abuser? In addition, we provide descriptive information on patterns of abuse via routes of administration characteristic of the various prescription opioid compounds/formulations. We address these questions using data from a population of individuals entering substance abuse treatment programs who report abuse of these medications in the past 30 days.

CONFIDENTIAL

Case: 1:14-cv-10150 Document #: 584-2 Filed: 04/29/20 Page 92 of 105 PageID #:32592
Case 1:12-cv-01936-RBW Document 5-6 Filed 11/30/12 Page 91 of 104

## Methods

### Data sources

#### ASI-MV® Connect

ASI-MV Connect is a proprietary data stream of the National Addiction Vigilance Intervention and Prevention Program (NAVIPPRO®) that collects data on substances used and abused by individuals in treatment for substance use disorders within a national network of substance abuse treatment centers. The Addiction Severity Index (ASI) is a standard intake assessment designed for use on admission to drug and alcohol treatment [27,28] that has demonstrated reliability and validity [29]. The Addiction Severity Index-Multimedia Version (ASI-MV®) is a computer-administered version of the ASI that has demonstrated good reliability (test-retest) along with discriminant validity for both English and Spanish versions [30-32]. The ASI-MV employs audio and video components to enhance respondent engagement in the assessment tasks and facilitates completion of the assessment by those with literacy issues. The ASI-MV Connect is a modified version of the ASI-MV in which respondents who indicate use/abuse of a prescription opioid are guided to questions about use and abuse of specific pharmaceutical products using screens with names (trade, generic, and slang names) and pictures of the products. Follow-up questions make specific inquiries for each product on all ROAs.

The patient-level de-identified data captured in the ASI-MV Connect are HIPAA (Health Insurance Portability and Accountability Act) compliant. Research conducted on these data are exempt from IRB policy [33].

Typically, the disadvantage of de-identified data, however, is that it prevents longitudinal analysis of cases. To address this issue, the ASI-MV Connect utilizes an algorithm which assigns each case a unique, 128-character identifier that is a concatenation of data entered by patients and are unlikely to change (e.g., gender, year of birth, mother's name, etc.). Using cryptographic techniques, the identifier is converted into a unique linking code for each patient and is maintained in the dataset but no longer reveals any elements of the personally identifying information. The nature of the ID permits linking of assessments by the same individual who completes the ASI-MV Connect assessment at different times and even at different places. Testing of a similar system with census data found an unduplicated rate of 99.845% [34]. The unique ID retains patient privacy while permitting longitudinal tracking of patients within and across treatment centers.

#### SDI Health LLC

SDI Health LLC provides data on prescriptions dispensed at the 3-digit ZIP code level on a monthly basis. SDI (Vector One National) is a national level projected prescription and patient-centric tracking service.

Prescription data are obtained from a sample of approximately 59,000 pharmacies throughout the U.S. accounting for nearly all retail pharmacies, including national retail chains, mass merchandisers, pharmacy benefits managers and their data systems, and provider groups, and represent nearly half of retail prescriptions dispensed nationwide.

### Definition of abuse

Since prescription opioids are used legitimately with a prescription for pain, there is disagreement around what constitutes "abuse," per se, and how that is different from "misuse" of a prescription (e.g., [35]). In the case of individuals who are in substance abuse treatment, any strictly non-medical use of a mind altering substance is generally considered a relapse and would be classified as abuse. Thus, since some individuals in treatment for addictive disorders may also be prescribed and legitimately take medications, a series of questions establishes that the person has a current chronic pain problem and has taken prescribed opioid medication for pain in the past 30 days, that they have obtained their medications only from their own physician, and they have not used the drug via an alternate ROA. They are also asked if they have used a prescription opioid in the past 30 days "not in a way prescribed by your doctor, that is, for the way it makes you feel and not for pain relief." An algorithm based on answers to these questions identifies the patient as having engaged in non-medical use and are assumed to be abusing the medication.

### Medications selected for comparison

Although the ASI-MV Connect assessment differentiates medications at the product level, for present purposes specific products were aggregated to the compound and, within compound, to the respective immediate release (IR) and extended release (ER) versions of these compounds, as appropriate. Seven prescription opioid analgesic compounds and their IR and ER versions were selected for examination, resulting in a total of 11 different compound/formulations included in the analyses (Table 1). This list represents the primary Schedule II compounds prescribed in the US for pain, along with one Schedule III compound, hydrocodone, which is known to be widely prescribed and widely abused (e.g., [6,22]). Note that, during 2009, no ER hydromorphone was available in the US. Although methadone does not have an ER version, it is considered a long-acting opioid due to its long half-life (average half-life of twenty-four hours; [36]), and is therefore included with the extended release formulations. Extended release fentanyl products refer to the transdermal formulations.

### Statistical analyses

Data analysis was carried out in the following steps: (1) compute descriptive statistics of demographic variables

CONFIDENTIAL

ENDO-OPANA-000009401

Case: 1:14-cv-10150 Document #: 584-2 Filed: 04/29/20 Page 93 of 105 PageID #:32593

Butler *et al. Harm Reduction Journal* 2011, **8**:29
http://www.harmreductionjournal.com/content/8/1/29

**Table 1 Compounds/formulations included in the analyses**

| Generic Name | Immediate release | Extended release or long acting |
|---|---|---|
| hydrocodone | IR | NA |
| oxycodone | IR | ER |
| fentanyl | IR | ER/transdermal |
| hydromorphone | IR | Not available in US in 2009 |
| methadone | NA | Long Acting |
| morphine | IR | ER |
| oxymorphone | IR | ER |

to examine the sample characteristics; (2) fit two log-binomial regression models to estimate the unadjusted risk of abuse and prescription-adjusted risk of abuse of each IR and ER compound; and (3) fit a random effects binary logistic regression model to estimate the predicted probabilities of abusing each IR and ER compound by one of five ROAs, intended ROA (usually swallowing whole), inhalation or snorting, injection, chewing and then swallowing, and other. In addition to estimating the predicted probabilities from the random effects binary logistic regression model, we also estimated the predicted odds of abusing ER and IR morphine via each of ROA relative to the other compounds.

To carry out the second step, the original data set was structured such that each case line was associated with the proportion of sampled patients from one of the four US Census regions of the country (based on patient home 3-digit ZIP code) who endorsed abusing each compound. Since there were 11 compounds and 4 regions, the data set included exactly 11 × 4 or 44 cases. The first log-binomial model was fit to estimate the unadjusted risk of abuse of each compound, with the categorical indicator variable (compound) as the independent variable and the number of abuse cases per compound per region over the total number of cases sampled per compound per region as the dependent variable. The second log-binomial model was fit to estimate the prescription-adjusted risk of abuse of each compound, with the categorical indicator variable (compound) as the independent variable, log (number of prescriptions dispensed per region/100,000) as the offset, and the number of abuse cases per compound per region over the total number of cases sampled per compound per region as the dependent variable. A log-binomial model was selected over the more standard Poisson model to estimate risk of abuse since there was a finite number of patients sampled, which varied substantially across regions. The log-binomial model can directly account for the varying finite number of cases sampled in the dependent variable (38 events/total # of trials), while still accounting for an offset variable. Of note, in this paper we

refer to the unadjusted estimates derived from the first log-binomial model as "risk" estimates, since these estimates reflect the number of abuse cases over the number of cases sampled. To be consistent, we also describe the prescription-adjusted estimates derived from the second log-binomial model as "risk per 100,000 prescriptions" estimates.

To carry out the 3rd step, the data set was structured such that each case line was associated with a patient's yes = 1/no = 0 response on abuse of a compound through a specific ROA. A random effects binary logistic regression model was fit with the categorical indicator variables (compound, route, and compound-BY-route) as the independent variables and the binary variable (yes/no abuse via a specific ROA) as the dependent variable. A random intercept was incorporated in this model to account for co-variation due to multiple observations per patient, since each patient is measured on abuse via each route of administration for each compound. This model was fit using only data from substance abuse treatment patients who reported having abused the compound(s). Limiting the sample in this way allowed us to estimate the probability of abusing a particular compound via a specific route of administration among those who reported having abused that particular compound. Analyses were performed using the generalized linear modeling procedure (GENMOD) and the generalized linear mixed modeling (GLIMMIX) procedure in SAS/STAT 9.22 software.

## Results

### Respondent characteristics

Data from 69,002 patients in substance abuse treatment within the ASI-MV Connect system were collected during the calendar year of 2009. Of the total sample, 13.3% represented follow-up assessments and were not included in the analyses, leaving a total N of 59,792 unique patients included in the analyses. Of these, 14.6% reported abusing at least one prescription opioid in the past 30 days and 4.8% reported appropriate medical use of a prescription opioid in the past 30 days. With respect to geographic coverage, data are collected on patients' 3-digit home ZIP code. In the total sample, patients reside in 571 unique 3-digit ZIP codes (64% of 886 U.S.3-digit ZIP codes), while individuals reporting past 30 day abuse of any prescription opioid reside in 354 unique 3-digit ZIP codes (38%; see Figure 1). Table 2 presents respondent characteristics separately for the entire sample of unique patients and those who report abusing prescription opioids in the past 30 days. As can be seen, the prescription opioid abuser sample contains a greater percentage of women and whites and fewer African Americans than the ASI-MV Connect substance abuse treatment sample as a whole.

CONFIDENTIAL

ENDO-OPANA-000009402

Butler *et al. Harm Reduction Journal* 2011, **8:**29
http://www.harmreductionjournal.com/content/8/1/29



**Figure 1 Map of Home 3-digit ZIP Codes of 2009 ASI-MV Connect Patients**. Shaded blue regions show 3-digit home zip codes for patients included in the 2009 ASI-MV Connect database.

### The ASI-MV Connect Network

Treatment sites purchase the ASI-MV Connect software, which generates a psychosocial report and other documentation that is important clinically. As such, this assessment is part of the clinical flow and is not a separate survey or questionnaire (Butler et al., 2008). All 59,792 unique patients assessed during 2009 at 464 ASI-MV Connect network treatment facilities in 34 states were included in the total sample. This can be compared with, for example, 2009 data from the SAMHSA National Survey of Substance Abuse Treatment Services (N-SSATS; [37], the annual census of substance abuse treatment facilities in the US, which reported a one-day census of 1,182,077 clients enrolled in substance abuse treatment in 13,513 facilities nationwide. Figure 2 presents a map of the geographic distribution of the treatment facilities within the ASI-MV Connect network across the US. These treatment facilities are a combination of state, federal and local (e.g., county) government agencies as well as and private non-profit and private for-profit organizations. During 2009, payors for about 20% of the patients were public sources,

with about 4% commercial payors, 43% "self-pay", 9% uninsured or exhausted benefits, and 24% other. About 16% of patients were in residential or inpatient settings, 34% in outpatient/non-methadone, 2% in methadone treatment programs, 34% in a corrections setting (e.g., drug court, probation/parole and DUI/DWI evaluation) and 14% other.

### General Abuse

Results from the first log-binomial model revealed that the highest unadjusted risk of abuse was associated with (1) hydrocodone, followed by (2) IR oxycodone, (3) ER oxycodone, (4) methadone, (5) ER morphine, (6) ER hydromorphone, (7) IR morphine, (8) ER fentanyl, (9) ER oxymorphone, (10) IR fentanyl, and (11) IR oxymorphone (Table 3). After adjusting for prescriptions in the second log-binomial model, (1) methadone was estimated to be the most highly abused compound, followed by (2) ER oxycodone, (3) IR morphine, (4) ER oxymorphone, (5) IR oxymorphone, (6) IR hydromorphone, (7) IR fentanyl, (8) ER morphine, (9) ER fentanyl, (10) IR oxycodone and

CONFIDENTIAL

ENDO-OPANA-000009403

Case: 1:14-cv-10150 Document #: 584-2 Filed: 04/29/20 Page 95 of 105 PageID #:32595

**Table 2 Demographic Characteristics of Participants**

| Characteristic | Entire Sample N = 59,792 | | Prescription Opioid Abusers N = 8,739 | |
|---|---|---|---|---|
| Age | **M** | **SD** | **M** | **SD** |
| | 33.7 | 11.5 | 33.0 | 10.8 |
| | **N** | **%** | **N** | **%** |
| Gender | | | | |
| Male | 40,147 | 67.1 | 5,178 | 59.3 |
| Female | 19,644 | 32.9 | 3,561 | 40.7 |
| Race | | | | |
| Caucasian | 31,690 | 53.0 | 5,755 | 65.9 |
| Hispanic/Latino | 11,212 | 18.8 | 1,534 | 17.6 |
| African American | 13,063 | 21.8 | 1,092 | 12.5 |
| Native American/Alaskan Native | 3,407 | 5.7 | 301 | 3.4 |
| Asian/Pacific Islander | 415 | 0.7 | 55 | .6 |
| Current treatment episode prompted by criminal justice system | 36,984 | 62.0% | 3,471 | 39.9 |

(11) hydrocodone (Table 3). It is clear that when one adjusts for prescriptions, several compounds that are initially estimated to have comparatively low abuse (e.g., IR morphine) are estimated to have much higher relative levels of abuse. Moreover, based on the second log-binomial model, most of these prescription-adjusted abuse risk estimates are significantly different from each other (Table 4). Figure 3 presents a ladder graph that



**Figure 2** Map of the ASI-MV Connect Network of Participating Treatment Facilities.

CONFIDENTIAL

ENDO-OPANA-000009404

Butler *et al. Harm Reduction Journal* 2011, **8**:29
http://www.harmreductionjournal.com/content/8/1/29

**Table 3 Unadjusted Abuse Risk, Abuse Risk per 100,000 Prescriptions, and Total Number of Prescriptions per 100,000**

| Compound | Abuse Risk | (+) Abuse Risk per 100,000 Prescriptions[£] | Total Number of Prescriptions per 100,000 |
|---|---|---|---|
| hydrocodone | 0.473 | 0.0022 | 585.620 |
| IR oxycodone | 0.375 | 0.0055 | 211.821 |
| IR fentanyl | 0.005 | 0.0114 | 1.212 |
| IR hydromorphone | 0.072 | 0.0129 | 18.433 |
| IR morphine | 0.047 | 0.0220 | 6.675 |
| IR oxymorphone | 0.003 | 0.0150 | 0.706 |
| ER oxycodone | 0.374 | 0.0320 | 37.167 |
| ER fentanyl | 0.044 | 0.0063 | 22.934 |
| Methadone | 0.278 | 0.0411 | 20.028 |
| ER morphine | 0.091 | 0.0111 | 26.059 |
| ER oxymorphone | 0.017 | 0.0177 | 2.896 |

[£]To show the differences in prescription-adjusted risks, it was necessary to round to the 4th decimal place due to the magnitude of the prescription volume for some compounds.

normalizes the unadjusted and adjusted risk estimates in Table 3 to a range of 0 and 1. This graph illustrates how the estimates change for each compound/formulation when adjusting for prescription volume.

The increase in the relative abuse risk of methadone was somewhat unexpected and, upon reflection, may be related to some of the challenges presented by unique characteristics of methadone, particularly in the context of a substance abuse treatment population. Like the other prescription opioid compounds examined here, methadone is used for the treatment of pain, however, it is also used medically as part of methadone maintenance programs to help those with opioid addiction function more effectively. Methadone dispensing in opioid treatment programs (OTPs) and other formulations of methadone (i.e., elixir) may have affected the above analyses in unknown ways. However, methadone is a long acting opioid and as such is also attractive for abuse by these populations. Figure 4 presents the same data as Figure 3 albeit without methadone in order to present clearly the impact of removing methadone from the analyses.

**Abuse via Specific ROAs**
Results from the random effects binary logistic regression model revealed varying patterns of abuse across compounds (See Table 5 for the model-predicted probabilities of abusing each compound through each ROA as well as the actual number of abuse cases associated with each compound through each ROA). As seen in Table 5, while on one hand hydrocodone is most likely to be abused through the intended/swallowed whole route (prob. = 0.896), morphine (prob. IR = 0.558, prob. ER = 0.451) and IR hydromorphone (prob. = 0.554) have a comparatively high probability of being abused by injection.

It is certainly possible when fitting the random effects binary logistic regression model in the GLIMMIX

procedure to estimate the odds of abusing one compound via a specific route relative to another compound. As an example, Tables 6 and 7 provide the model-predicted odds of abusing IR and ER morphine through each ROA relative to all other compounds. Examining these tables, it becomes clear that the ROAs associated with IR and ER morphine can be significantly differentiated from other drugs. In particular, morphine in either IR or ER formulation is more likely to be abused via injection than all other compounds/formulation with the exception of hydromorphone.

**Discussion**
This paper presents the relative abuse risks of 11 prescription opioid compounds/formulations, both unadjusted as well as adjusted by the number of retail pharmacy-dispensed prescriptions for a particular high risk sample of substance abusers in treatment. Compound/formulation patterns of abuse via specific ROAs were also examined. Self-report data were drawn from nearly 60,000 substance abuse treatment patients who completed the ASI-MV Connect assessment at one of the 464 substance abuse treatment centers in the ASI-MV Connect network. In the present study, the unadjusted risks observed replicated the general findings of other studies. For example, Rosenblum and colleagues (2007)[19] in their survey of prescription opioid and heroin abusers in methadone maintenance programs found that both groups reported highest abuse (ever and in past 30 days) of hydrocodone as well as ER and IR oxycodone at similar levels. These three were followed by methadone, morphine, hydromorphone and fentanyl. Although these authors did not distinguish ER from IR morphine, their relative ranking of the drugs maps well with the order found in this study (see Figure 3). The DAWN report [21] found a similar pattern of the six compounds on which they reported, such that oxycodone

ENDO-OPANA-000009405

Butler et al. Harm Reduction Journal 2011, 8:29
http://www.harmreductionjournal.com/content/8/1/29

**Table 4 Prescription-Adjusted[£] Relative Risk of Abusing each Compound**

| Compound | hydrocodone | IR oxycodone | IR fentanyl | IR hydromorphone | IR morphine | IR oxymorphone | ER oxycodone | ER fentanyl | methadone | ER morphine | ER oxymorphone |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **hydrocodone** | 1.000 | – | – | – | – | – | – | – | – | – | – |
| **IR oxycodone** | 2.494[v] | 1.000 | – | – | – | – | – | – | – | – | – |
| **IR fentanyl** | 5.154[v] | 2.066[v] | 1.000 | – | – | – | – | – | – | – | – |
| **IR hydromorphone** | 5.828[v] | 2.336[v] | 1.131 | 1.000 | – | – | – | – | – | – | – |
| **IR morphine** | 9.976[v] | 3.999[v] | 1.936[v] | 1.712[v] | 1.000 | – | – | – | – | – | – |
| **IR oxymorphone** | 6.781[v] | 2.7?8[v] | 1.316 | 1.164 | 0.680[v] | 1.000 | – | – | – | – | – |
| **ER oxycodone** | 14.520[v] | 5.821[v] | 2.817[v] | 2.492[v] | 1.456[v] | 2.141[v] | 1.000 | – | – | – | – |
| **ER fentanyl** | 2.846[v] | 1.411[v] | 0.552[c] | 0.488[c] | 0.285[v] | 0.420[v] | 0.196[v] | 1.000 | – | – | – |
| **methadone** | 18.645[v] | 7.475[v] | 3.617[v] | 3.199[v] | 1.869[v] | 2.750[v] | 1.284[v] | 6.551[v] | 1.000 | – | – |
| **ER morphine** | 5.051[v] | 2.025[v] | 0.980 | 0.876[t] | 0.506[v] | 0.745 | 0.348[v] | 1.775[v] | 0.271[v] | 1.000 | – |
| **ER oxymorphone** | 8.010[v] | 3.2?1[v] | 1.554[t] | 1.374[c] | 0.803[t] | 1.181 | 0.552[v] | 2.814[v] | 0.430[v] | 1.586[v] | 1.000 |

[£] per 100,000 Prescriptions
[v] $p < .0001$
[c] $p < .001$
[t] $p < .05$

Page 9 of 17

CONFIDENTIAL

Case: 1:14-cv-10150 Document #: 584-2 Filed: 04/29/20 Page 98 of 105 PageID #:32598
Case 1:12-cv-01936-RBW Document 5-6 Filed 11/30/12 Page 97 of 104



**Figure 3 Ladder Graph of Normalized Unadjusted and Adjusted Abuse Risk Estimates for 11 Prescription Opioid Compounds and Formulations.** This figure presents a ladder graph that normalizes the unadjusted and adjusted risk estimates in Table 3 to a range of 0 and 1. This graph illustrates how the estimates change for each compound/formulation when adjusting for prescription volume.

products were highest followed closely by hydrocodone, then methadone and morphine, with fentanyl having somewhat larger numbers than hydromorphone. The relative rankings of compounds and formulations observed here are also similar to those reported by Butler and colleagues (2008)[22] who used ASI-MV Connect data collected between November 2005 and July 2008. Since the data used in this study are from 2009 only, it seems likely that the observed relative rankings are stable over time. Hydrocodone products were reported as most abused in the past

Case: 1:14-cv-10150 Document #: 584-2 Filed: 04/29/20 Page 99 of 105 PageID #:32599
Case 1:12-cv-01936-RBW Document 5-6 Filed 11/30/12 Page 98 of 104



**Figure 4 Ladder Graph of Normalized Unadjusted and Adjusted Abuse Risk Estimates for the Prescription Opioid Compounds and Formulations Excluding Methadone**. This figure presents the same data as Figure 3 albeit without methadone in order to present clearly the impact of removing methadone from the analyses.

30 days, followed by ER and IR oxycodone products, methadone and ER morphine products, hydromorphone, IR morphine, ER fentanyl and IR fentanyl products. Finally, Kelly and colleagues (2008)[2] looked at a very different population, namely a general public sample, and they used a household-based, telephone survey asking about any use (including legitimate use). These authors reported hydrocodone products to be more widely used than oxycodone products, again followed by methadone, with fentanyl and morphine at the same, lower level. Taken together, these

ENDO-OPANA-000009408

Butler *et al. Harm Reduction Journal* 2011, **8**:29
http://www.harmreductionjournal.com/content/8/1/29

**Table 5 Frequency (n) and Predicted Probability with 95% CI of Specific Routes of Administration by Compound/Formulation**

| Generic name | | Immediate release | | | Extended-release/long-acting[1] | |
|---|---|---|---|---|---|---|
| | Number | Predicted Probability | 95% CI | Number | Predicted Probability | 95% CI |
| **Hydrocodone** | 4,136 | - | - | - | - | - |
| Intended ROA | 3,668 | 0.896 | 0.887,0.905 | - | - | - |
| Injection | 49 | 0.010 | 0.007,0.013 | - | - | - |
| Inhalation | 795 | 0.171 | 0.160,0.183 | - | - | - |
| Chew | 759 | 0.163 | 0.152,0.175 | - | - | - |
| Other | 240 | 0.048 | 0.042,0.055 | - | - | - |
| **Oxycodone** | 3,279 | - | - | 3,271 | – | – |
| Intended ROA | 2,671 | 0.824 | 0.810,0.837 | 2,034 | 0.621 | 0.603,0.639 |
| Injection | 208 | 0.052 | 0.045,0.059 | 803 | 0.221 | 0.207,0.236 |
| Inhalation | 932 | 0.260 | 0.245,0.276 | 1,502 | 0.444 | 0.426,0.463 |
| Chew | 650 | 0.175 | 0.162,0.188 | 605 | 0.162 | 0.150,0.175 |
| Other | 242 | 0.063 | 0.056,0.072 | 346 | 0.089 | 0.080,0.099 |
| **Fentanyl** | 39 | - | - | 383 | - | - |
| Intended ROA | 5 | 0.081 | 0.032,0.090 | 33 | 0.060 | 0.043,0.085 |
| Injection | 4 | 0.062 | 0.022,0.163 | 85 | 0.171 | 0.138,0.210 |
| Inhalation | 7 | 0.120 | 0.054,0.244 | 6 | 0.010 | 0.004,0.023 |
| Chew | 7 | 0.119 | 0.054,0.243 | 39 | 0.072 | 0.052,0.098 |
| Other | 27 | 0.630 | 0.453,0.778 | 270 | 0.676 | 0.623,0.725 |
| **Hydromorphone** | 626 | - | - | - | - | - |
| Intended ROA | 208 | 0.295 | 0.259,0.333 | - | - | - |
| Injection | 361 | 0.554 | 0.512,0.595 | - | - | - |
| Inhalation | 153 | 0.208 | 0.178,0.242 | - | - | - |
| Chew | 49 | 0.061 | 0.046,0.080 | - | - | - |
| Other | 5 | 0.064 | 0.048,0.084 | - | - | - |
| **Methadone** | - | - | - | 2,426 | - | - |
| Intended ROA | - | - | - | 2,009 | 0.836 | 0.820,0.850 |
| Injection | - | - | - | 179 | 0.060 | 0.052,0.070 |
| Inhalation | - | - | - | 366 | 0.129 | 0.116,0.143 |
| Chew | - | - | - | 351 | 0.123 | 0.111,0.137 |
| Other | - | - | - | 350 | 0.123 | 0.111,0.136 |
| **Morphine** | 408 | - | - | 792 | - | - |
| Intended ROA | 146 | 0.332 | 0.286,0.381 | 336 | 0.389 | 0.354,0.425 |
| Injection | 232 | 0.558 | 0.506,0.608 | 382 | 0.451 | 0.415,0.488 |
| Inhalation | 8 | 0.173 | 0.140,0.213 | 222 | 0.242 | 0.213,0.274 |
| Chew | 45 | 0.092 | 0.069,0.123 | 89 | 0.089 | 0.072,0.109 |
| Other | 33 | 0.066 | 0.047,0.093 | 38 | 0.036 | 0.026,0.050 |
| **Oxymorphone** | 30 | - | - | 149 | - | - |
| Intended ROA | 14 | 0.388 | 0.226,0.578 | 47 | 0.249 | 0.187,0.324 |
| Injection | 6 | 0.129 | 0.054,0.280 | 2 | 0.055 | 0.031,0.096 |
| Inhalation | 18 | 0.535 | 0.344,0.716 | 114 | 0.738 | 0.654,0.807 |
| Chew | 4 | 0.081 | 0.028,0.212 | 23 | 0.109 | 0.072,0.163 |
| Other | 4 | 0.089 | 0.031,0.224 | 4 | 0.120 | 0.008,0.049 |

[1]Intended routes of administration: Fentanyl ER patch; Fentanyl IR, sublingual; all others, swallowed whole. Methadone is the only long-acting opioid; all other opioids are extended-release.

results compare favorably with the present findings of relative risk of abuse based on unadjusted values observed in the present study. As these studies involve different populations, timeframes, and data collection methods, the general correspondence of findings suggest a certain robustness of the relative degree to which various prescription opioid compounds/formulations are used or abused in the US.

One goal of the present study was to go beyond the prior work to examine the effect on relative risks of

CONFIDENTIAL

ENDO-OPANA-000009409

Case: 1:14-cv-10150 Document #: 584-2 Filed: 04/29/20 Page 101 of 105 PageID #:32601

Butler *et al. Harm Reduction Journal* 2011, **8**:29
http://www.harmreductionjournal.com/content/8/1/29

**Table 6 Odds of Abusing IR Morphine Via Specific Routes of Administration Relative to other Compounds**

| IR morphine *vs.* | Route of Administration | | | | |
|---|---|---|---|---|---|
| | Intended | Snort | Inject | Chew | Other |
| Hydrocodone | 0.058[¥] | 1.014 | 125.00[¥] | 0.522[¥] | 1.404 |
| IR oxycodone | 0.106[¥] | 0.600[¥] | 23.256[¥] | 0.480[¥] | 1.050 |
| IR fentanyl | 5.682[£] | 1.537 | 19.231[¥] | 0.750 | 0.042[τ] |
| IR hydromorphone | 1.188 | 0.797 | 1.014 | 1.570[τ] | 1.043 |
| IR oxymorphone | 0.785 | 0.182[¥] | 8.479[¥] | 1.161 | 0.732 |
| ER oxycodone | 0.303[¥] | 0.262[¥] | 4.443[¥] | 0.526[£] | 0.731 |
| ER fentanyl | 7.717[¥] | 20.806[¥] | 6.111[¥] | 1.312 | 0.034[¥] |
| Methadone | 0.098[¥] | 1.416[£] | 19.590[¥] | 0.723 | 0.508[£] |
| ER morphine | 0.780 | 0.656[£] | 1.533[£] | 1.041 | 1.887[τ] |
| ER oxymorphone | 1.498 | 0.075[¥] | 21.552[¥] | 0.829 | 3.561[τ] |

[¥] p ≤ .0001
[£] p ≤ .001
[τ] p ≤ .05

abuse of prescription opioid compounds and formulations by adjusting for the number of prescriptions written in the local areas where the abusers reside. This question was stimulated in part by awareness that risk of abuse appears to be related to the prescribed availability within a community (e.g., [26]). Another major reason for investigating adjusted risks of abuse is the magnitude of differences between prescriptions for the different compounds and formulations. As can be seen in Table 3, the compound/formulation with the least amount of prescriptions in the patient home ZIP codes represented here (IR oxymorphone) has about 825 times fewer prescriptions than hydrocodone. This, in turn, raised the question of how relative risks of abuse of the prescription opioid compounds/formulations would change if level of prescribed availability were taken into account. It is not surprising that abuse risks are associated with prescription

**Table 7 Odds of Abusing ER Morphine via Specific Routes of Administration Relative to other Compounds**

| ER morphine *vs.* | Route of Administration | | | | |
|---|---|---|---|---|---|
| | Intended | Snort | Inject | Chew | Other |
| hydrocodone | 0.074[¥] | 1.546[¥] | 83.333[¥] | 0.502[¥] | 0.744 |
| IR oxycodone | 0.136[¥] | 0.908 | 14.925[¥] | 0.461[¥] | 0.556[£] |
| IR fentanyl | 7.246[¥] | 2.342 | 12.500[¥] | 0.720 | 0.022[¥] |
| IR hydromorphone | 1.522[£] | 1.215 | 0.662[£] | 0.663[£] | 0.552[τ] |
| IR oxymorphone | 1.006 | 0.278[£] | 5.525[£] | 1.115 | 0.388 |
| ER oxycodone | 0.389[¥] | 0.399[¥] | 2.899[¥] | 0.506[¥] | 0.387[¥] |
| ER fentanyl | 9.901[¥] | 31.250[¥] | 3.984[¥] | 1.261 | 0.018[¥] |
| methadone | 0.125[¥] | 2.160[£] | 12.821[¥] | 0.694[£] | 0.269[¥] |
| ER oxymorphone | 0.521[τ] | 0.114[¥] | 14.060[¥] | 0.797 | 1.886 |

[¥] p ≤ .0001
[£] p ≤ .001
[τ] p ≤ .05

volume, since a drug must first be available before it can be abused. However, in practical terms, it may be helpful to examine the impact of prescription volume on abuse for particular compounds/formulations. From the prescriber's perspective, such an analysis may capture the extent to which a given prescription is likely to end up in the hands of an abuser. Consistent with this reasoning, the present study revealed clear differences in the impact of prescription volume on risk of abuse of the various prescription opioid compounds/formulations observed in the ASI-MV Connect data. As seen in Figure 3, the impact of prescription volume on abuse risks is largest for two of the most widely prescribed and widely abused compounds/formulations, hydrocodone and IR oxycodone. These drugs decline from the top of the ranking to the bottom after adjusting for prescription availability. This suggests that, despite the well-known high levels of abuse of these drugs, on a prescription-by-prescription basis, they are not as likely to be abused. Shifts in the other direction are seen for methadone and IR morphine, implying that the converse may be true for these drugs—namely prescriptions for these drugs may be more likely to end up being abused. Methadone, in this analysis, increased dramatically in abuse risk as did ER oxycodone. The risk of abuse of ER morphine increases slightly when adjusted for prescription volume. When considered together with IR morphine, this suggests a somewhat greater likelihood of abuse of any morphine product on a prescription-by-prescription basis. ER morphine, however, falls in the overall ranking from an unadjusted position of fifth drug abused to eighth in the analyses adjusted for prescription volume, behind several other, much less often prescribed compound/formulations (e.g., ER oxymorphone, IR oxymorphone, IR hydromorphone, and IR fentanyl). ER fentanyl (transdermal fentanyl), like ER morphine increases somewhat in absolute terms but is only above IR oxycodone and hydrocodone in the ranking of adjusted risk of abuse.

The finding of differential impact of prescribed volume on different prescription opioid compounds and formulations may have a variety of explanations. The large decline in the relative ranking of adjusted abuse risks for hydrocodone and IR oxycodone may be something of an artifact of the fact that these drugs are very widely prescribed and much more so than any of the other compound/formulations included in this study. Commonly prescribed for acute pain and minor surgery, these medications are likely to be found in many households in the US. When adjusting levels of prescription opioid abuse by prescription volume values with such large differences between the drugs compared, dramatic shifts in the adjusted levels may be expected. The low adjusted abuse risks of hydrocodone and IR oxycodone do not suggest that these drugs present less public health concern. Rather, we would conclude that, on a prescription-by-prescription basis, these drugs

CONFIDENTIAL
ENDO-OPANA-000009410

are comparatively less likely to be abused. In contrast to hydrocodone and IR oxycodone, many of the other opioid analgesics examined here are intended for and presumably prescribed for much smaller populations, such as chronic pain patients, and for specialized purposes, such as breakthrough pain in highly opioid tolerant pain patients (e.g., IR fentanyl products). The adjusted risks for abuse suggest that these more difficult to obtain products (based on lower prescribed volume) are more abused in the ASI-MV Connect population than would be expected based on availability alone. This may suggest that these products are highly sought after and successfully obtained by the hardcore abusers represented in this treatment population. These data also suggest that a given prescription for one of these prescription opioids that are presumably highly desirable for abuse may be more likely to end up involved in abuse activity.

As noted in the Results section, methadone presents some unique challenges when compared directly with other prescription opioids. Current ASI-MV Connect screens for methadone present pictures and names of methadone preparations that come in pill or "wafer" forms. Almost half (44.5%) of the methadone abuse cases in this ASI-MV Connect sample indicated abuse of methadone by selecting only the "other not shown" category. Examination of 2010 data, where the ROA option of "drinking" is available, suggests that this option is chosen by the preponderance of respondents who select the other methadone option. This, in turn, suggests that these respondents may be using the solution or elixir formulation of methadone. Another issue regards the extent to which retail pharmacy volume as captured by the SDI Health data accurately depicts "prescription volume" for methadone in a way that is comparable to the other compounds and formulations examined here. Finally, given the use of methadone as a treatment modality in substance abuse treatment, it is difficult to know the extent to which respondents misidentified such use in the past 30 days as misuse. Examination of the data suggests that at least a quarter of respondents who indicated use of methadone as "other not shown" also indicated use by an alternate ROA, such as snorting or injecting. However, it is possible that those who are indicating they "swallowed" methadone are doing so as part of their treatment. The present configuration of ASI-MV Connect questions do not allow for a clear differentiation of individuals using methadone as part of their treatment. Changes in the screens are planned to allow for this differentiation in the future. For present purposes, however, the findings reported here regarding the impact of prescription volume on relative abuse risk estimates for methadone should be interpreted cautiously. These issues may be important considerations when evaluating the suitability of methadone as a candidate comparator for TRFs of other prescription opioid compounds. As illustrated in Figure 4, the relative

standing of the prescription opioids presented without methadone reveals ER oxycodone as the compound/formulation with the greatest risk level after adjusting for prescription volume. In this Figure, the other compounds/formulations retain their relative positions with respect to ER oxycodone.

We also intended to describe different route of administration (ROA) patterns of the prescription opioids examined in this study. The findings here are consistent with those reported by Butler and colleagues (2008)[22] who presented ROA patters for hydrocodone, oxycodone, morphine, methadone and fentanyl. These authors found hydrocodone to be mostly abused orally, oxycodone mostly abused nasally (by snorting or inhalation), morphine mostly likely injected, and fentanyl to be most likely smoked or "other." These findings are similar to the ones presented here, although the present analyses examine more compounds/formulations. In the present study, "oral ingestion" was more precisely broken down into swallowing whole (the "intended" route for all drugs except the fentanyl products) and chewing. The ASI-MV Connect now collects data on dissolving in mouth like a cough drop and drinking after dissolving in liquid, although these options were added in 2009 and not available for entire year examined here.

In the present study, it was clear that hydrocodone, IR oxycodone, and methadone had high levels of respondents (> .80 predicted probability) reporting swallowing the drug whole (intended ROA). Oxymorphone IR and ER had the highest levels of abusers reporting inhalation (prob. = .54 and prob. = .74 respectively) with abusers of ER oxycodone having a predicted probability of inhalation of about .44. As Butler et al. (2008)[22] observed, morphine abusers tend to inject the drug, with IR morphine having a .56 predicted probability of injection and ER morphine at .45. Examination of the odd ratios comparing morphine (IR and ER) ROAs with all other drugs, highlights that morphine is significantly more likely to be injected than any other prescription opioid, with the exception of IR hydromorphone which had a predicted probability of injection of .55 (see "inject" column in Tables 6 and 7). Of note also is that IR morphine was significantly more likely to be injected than ER morphine. It is possible, given the consistency with patterns observed in earlier analyses [22] that the ROA patterns observed in this study are robust over time and reliably differentiate certain compounds/formulations. Such baseline information will be essential when evaluating TRFs of prescription opioid compounds. As noted above, TRFs are intended to inhibit efforts to modify the product to make its active ingredients available for alternative ROAs, such as snorting or injection. The extent to which a TRF can be determined to be successful will require a clear understanding of the ROA patterns characteristic of the TRF's parent drug or other comparators.

CONFIDENTIAL

ENDO-OPANA-000009411

Case: 1:14-cv-10150 Document #: 584-2 Filed: 04/29/20 Page 103 of 105 PageID #:32603

Clearly, a TRF whose parent product is rarely injected will be unlikely to have a large impact on its use by that ROA. The present analyses are a step in the direction of delineating such ROA patterns for specific compounds and their ER/IR formulations.

There are several limitations of the present study. To begin with, important limitations of the ASI-MV Connect data should be highlighted. These data represent self-reports of persons entering treatment for substance use disorders. Self-report data are subject to recall bias or reluctance to report accurately. Despite this, it is unclear what other source of information about use and routes of administration can be reliably obtained. Over the years, research continues to support the reliability and validity of self-report of patients entering treatment (e.g., [38-43]). Although such literature generally supports the validity of self-report, it should be acknowledged that a few studies have found self-report to be under-report drug use (e.g., [44,45]). A further consideration is that individuals in this particular patient population have an acknowledged difficulty with substance abuse—a difficulty that has developed to the degree of necessitating treatment—and thus they may have less motivation to lie about their drug abuse in comparison with people who are not in treatment. In addition to the general support for the validity of self-reported substance use in the treatment setting, there is evidence that reporting via computer self-administration is as valid as reporting to a live interviewer. Where discrepancies exist, computer self-administration tends to elicit reports of more, rather than fewer, psychosocial and substance use problems [46]. Finally, the ASI-MV Connect assessment uses a methodology for questioning respondents about use/abuse of particular prescription medications that is similar to methods employed by the NSDUH survey [3]. NSDUH utilizes pictures of prescription products, names, slang and so forth as well as other widely accepted methodological practices for increasing the accuracy of self-reports, such as audio computer-assisted self-interviewing (as does the ASI-MV Connect). Examinations of these NSDUH methods have shown that they reduce reporting bias [47] in general populations.

Another limitation of the ASI-MV Connect data is that this dataset does not draw from a probability-based sample and, while having broad, national reach, does not provide comprehensive coverage of the US. The data collected by the ASI-MV Connect system are intended to provide sentinel population surveillance of substance abuse patterns in the US, but these data are yet to achieve national representativeness. The presented results are not nationally representative and are not intended to be used for estimating national incidence and prevalence rates. Furthermore, the population represented is not randomly selected. It consists of those who seek treatment for substance abuse and who have access to a substance abuse facility. The sample utilized is a convenience sample of patients assessed at treatment facilities that are part of the ASI-MV Connect network. The sample does not represent individuals who misuse or abuse prescription opioids but are not in treatment, nor does it include those in treatment but at treatment facilities not included in the ASI-MV Connect network, and the findings may not be generalizable to all patients with substance use disorders in treatment. Approximately 60% of cases in the ASI-MV Connect data (about 40% of the prescription opioid abusers—see Table 2) represent individuals whose treatment episode has been prompted by the criminal justice system. Thus, this database may have a socioeconomic bias against those who do not have access to such care.

These aspects of the ASI-MV Connect data serve as unavoidable limitations to any effort to establish population-based estimates. We believe, however, the present effort to examine relative risks of abuse and to describe abuse patterns observed in a saturated population, the ASI-MV Connect data may allow reliable estimates of large trends in abuse that would be relevant to the evaluation of TRFs and REMS. This is supported by the consistency with which the relative risks of abuse reported here and those reported in the other studies using different methods and populations, as mentioned above. Furthermore, the ASI-MV Connect dataset is the only source of data that provides systematic, prospective, and comprehensive information at the product-specific level necessary to answer questions regarding route of administration and other abuse patterns. Such information will be essential in addressing specific questions around tamper resistance and the effectiveness of REMS. Nevertheless, limitations of the data are acknowledged and present results should not be generalized beyond the population sampled. With this in mind, it should be noted that similar limitations apply to all public health data streams. Mortality data, for instance, suffer from underreporting and a lack of standardized procedures for attributing and coding poisoning deaths [48-50], yet these data have been used to support nationwide alerts from the FDA [51,52].

On a final note, the evaluation of tamper resistance and the effectiveness of REMS will require analysis of a variety of available data streams. It is unlikely that any single data stream alone will capture all relevant data to necessary to adequately evaluate misuse and abuse of prescription opioids [24]. Other methods, such as laboratory testing of abuse liability, could be particularly useful in evaluating tamper resistant properties of new formulations [53]. However, the FDA has made clear that any product claims of abuse deterrence or tamper resistance would not be made without "long-term epidemiological data from community-based observational studies that document changes in abuse and addiction and the consequences of those behaviors" [54]. Such epidemiological

CONFIDENTIAL

Butler et al. Harm Reduction Journal 2011, 8:29
http://www.harmreductionjournal.com/content/8/1/29

Page 16 of 17

data will necessarily require samples of saturated populations such as those in substance abuse treatment and will need to obtain product-specific and route-specific data.

Finally, it is worth noting that while log-binomial models are recommended to estimate risk, these models are prone to either non-convergence or converging to invalid estimates (e.g., predicted probabilities greater than one) [55]. As generally recommended, we monitored model convergence and confirmed that all predicted probabilities fell within the bounds of 0 and 1. Also, use of maximum likelihood estimation to fit logistic regression models tends to produce unreliable estimates when the number of events (or nonevents) is small for some categories (e.g. injection of IR fentanyl). As a result, very low predicted probabilities estimated from the random effects logistic regression model should be interpreted with caution. While exact logistic regression has been proposed for such scenarios, this approach was deemed infeasible and inappropriate since (1) several of the other categories were associated with a reasonably large number of events (e.g. injection of IR morphine) and (2) co-variation among observations due to repeated measures was present.

## Summary and Conclusions

This study provides a comprehensive examination of the relative risks of abuse and ROA patterns of 11 compounds and formulations of prescription opioids in an at risk population of substance abusers in treatment. Using data from the ASI-MV Connect network of treatment centers across the country, relative risks of abuse were examined using unadjusted risks (based on the number of abusers of a particular compound/formulation relative to other prescription opioid abusers) and after adjusting for prescription volume. Results suggest that some drugs known to be widely abused, especially hydrocodone and IR oxycodone products, are abused less often than their prescribed volume would predict, while other drugs, such as methadone, morphine, hydromorphone, fentanyl and oxymorphone, are abused more often than their prescribed volume would predict. In addition, these data were examined to elicit ROA patterns that distinguish the various compounds/formulations, some of which (e.g., hydrocodone, IR oxycodone, methadone) tend to be used through the intended ROA (i.e., swallowed whole), while others (morphine, hydromorphone) are significantly more likely to be injected than other prescription analgesics. Establishing baselines of abuse risk and ROA patterns is necessary in order to adequately test the impact of the recently approved and marketed TRFs and to evaluate the effectiveness of classwide REMS for prescription opioids.

## Acknowledgements
The writing of this paper was funded by King Pharmaceuticals, Inc., which was acquired by Pfizer Inc. in March 2011. Stephen F. Butler, Ryan A. Black,

Theresa A. Cassidy, and Simon H. Budman, who are employees of Inflexxion, were paid consultants to King Pharmaceuticals, Inc., in connection with the development of this manuscript. The views expressed in this paper are those of the authors and do not necessarily represent the views of Pfizer Inc. The authors had sole editorial rights over the contents of the article.

## Authors' contributions
SFB, RB, TAC, and TD participated in the design of the study and performed the statistical analysis. SFB, RB, and SHB conceived the study, and participated in its design and coordination and helped to draft the manuscript. All authors read and approved the final manuscript.

## Competing interests
The authors declare that they have no competing interests.

Received: 1 September 2010 Accepted: 19 October 2011
Published: 19 October 2011

## References
1. Chou R, Fanciullo GJ, Fine PG, Adler JA, Ballantyne JC, Davies P: Clinical guidelines for the use of chronic opioid therapy in chronic noncancer pain. J Pain 2009, 10:113-130.
2. Kelly J, Cook SF, Kaufman DW, Anderson T, Rosenberg L, Mitchell AA: Prevalence and characteristics of opioid use in the US adult population. Pain 2008, 138:507-513.
3. Substance Abuse and Mental Health Services Administration: Results from the 2008 National Survey on Drug Use and Health: National Findings. NSHUD Series H-36 Rockville, MD: Office of Applied Studies; 2009.
4. Centers for Disease Control and Prevention: Morbidity and Mortality Weekly Report 2010.
5. Centers for Disease Control and Prevention: Unintentional Drug Poisoning in the United States 2010.
6. Johnston LD, O'Malley PM, Bachman JG, Schulenburg JE: Monitoring the Future national results on adolescent drug use: Overview of key findings, 2008. Bethesda: National Institutes on Drug Abuse, National Institutes of Health; 2009.
7. Substance Abuse and Mental Health Services Administration: Treatment Episode Data Set (TEDS) 1996-2006. National admissions to substance abuse treatment services Rockville, MD: Department of Health and Human Services; 2008.
8. National Institute on Drug Abuse: Epidemiologic trends in drug abuse. Proceedings of the Community Epidemiology Work Group 2007.
9. Budman SH, Grimes Serrano JM, Butler SF: Can abuse deterrent formulations make a difference? Expectation and speculation. Harm Reduction 2009, 6.
10. Raffa RB, Pergolizzi JV: Opioid formulations designed to resist/deter abuse. Drugs 2010, 70:1657-1675.
11. Katz N: Abuse-deterrent opioid formulations: are they a pipe dream? Curr Rheumatol Rep 2008, 10:11-18.
12. Webster L: Update on abuse-resistant and abuse-deterrent approaches to opioid formulations. Pain Med 2009, 10:S134-133.
13. Wick JY: Drug-abuse deterrent formulations. Consult Pharm 2009, 24:356-362.
14. Chitwood DD, Comerford M, Sanchez J: Prevalence and risk factors for HIV among sniffers, short-term injectors, and long-term injectors of heroin. J Psychoactive Drugs 2003, 35:445-453.
15. Latkin CA, Knowlton AR, Sherman S: Routes of drug administration, differential affiliation, and lifestyle stability among cocaine and opiate users: implications to HIV prevention. J Subst Abuse 2001, 13:89-102.
16. Razak MH, Jittiwutikarn J, Suriyanon V, Vongchak T, Srirak N, Beyrer C, Kawichai S, Tovanabutra S, Rungruengthanakit K, Sawanpanyalert P, Celentano DD: HIV prevalence and risks among injection and noninjection drug users in northern Thailand: need for comprehensive HIV prevention programs. J Acquir Immune Defic Syndr 2003, 33:259-266.
17. Wright C, Kramer ED, Zalman MA, Smith MY, Haddox JD: Risk identification, risk assessment, and risk management of abusable drug formulations. Drug Alcohol Depend 2006, 83(Suppl 1):S68-76.
18. Food and Drug Administration: Briefing Information for the July 22-23, 2010 Joint Meeting of the Anesthetic and Life Support Drugs Advisory Committee and Drug Safety and Risk Management Advisory Committee Bethesda, MD; 2010.

19. Rosenblum A, Parrino M, Schnoll SH, Fong C, Maxwell C, Cleland CM, Magura S, Haddox JD: Prescription opioid abuse among enrollees into methadone maintenance treatment. *Drug Alcohol Depend* 2007, 90:64-71.

20. NSDUH: *2007 National Survey on Drug Use & Health:National Results* Rockville, MD: Substance Abuse Mental Health Services Administration; 2007.

21. Substance Abuse and Mental Health Services Administration: *The DAWN Report: Trends in Emergency Department Visits Involving Nonmedical Use of Narcotic Pain Relievers* Rockville, MD: Office of Applied Studies; 2010.

22. Butler SF, Budman SH, Licari A, Cassidy TA, Lioy K, Dickinson J, Brownstein JS, Benneyan JC, Green TC, Katz N: National Addictions Vigilance Intervention and Prevention Program (NAVIPPRO™): A real-time, product-specific, public health surveillance system for monitoring prescription drug abuse. *Pharmacoepidemiology and Drug Safety* 2008, 17:1142-1154.

23. Cicero TJ, Adams EH, Geller A, Inciardi JA, Munoz A, Schnoll SH, Senay EC, Woody GE: A postmarketing surveillance program to monitor Ultram (tramadol hydrochloride) abuse in the United States. *Drug Alcohol Depend* 1999, 57:7-22.

24. Aitken CL, Cicero TJ: Postmarketing surveillance for drug abuse. *Drug Alcohol Depend* 2003, 70:S97-105.

25. Hennekens CH, Buring JE: *Epidemiology in medicine* Boston: Little, Brown, and Co; 1987.

26. Dasgupta N, Kramer ED, Zalman MA, Carino S Jr, Smith MY, Haddox JD, Wright CL: Association between non-medical and prescriptive usage of opioids. *Drug Alcohol Depend* 2006, 82:135-142.

27. McLellan AT, Luborsky L, Woody GE, O'Brien CP: An improved diagnostic evaluation instrument for substance abuse patients. *Journal of Nervous and Mental Disease* 1980, 168:26-33.

28. McLellan AT, Kushner H, Metzger D, Peters R: The fifth edition of the Addiction Severity Index. *Journal of Substance Abuse Treatment* 1992, 9:199-213.

29. Hendricks VM, Kaplan CD, VanLimbeek J, Geerlings P: The Addiction Severity Index: Reliability and validity in a Dutch addict population. *Journal of Substance Abuse Treatment* 1989, 6:133-141.

30. Butler SF, Newman FL, Cacciola JS, Frank A, Budman SH, McLellan AT, Ford S, Blaine J, Gastfriend D, Moras K, *et al*: Predicting Addiction Severity Index (ASI) interviewer severity ratings for a computer-administered ASI. *Psychological Assessment* 1998, 10:399-407.

31. Butler SF, Budman SH, Goldman RJ, Newman FL, Beckley KE, Trottier D, Cacciola JS: Initial validation of a computer-administered Addiction Severity Index: the ASI-MV. *Psychol Addict Behav* 2001, 15:4-12.

32. Butler SF, Redondo JP, Fernandez KC, Villapiano A: Validation of the Spanish Addiction Severity Index Multimedia Version (S-ASI-MV). *Drug and Alcohol Dependence* 2009, 99:18-27.

33. United States Department of Health & Human Services (HHS): *Basic HHS Policy for Protection of Human Research Subjects* Office for Human Research Protections (OHRP); 2005.

34. FHOP: *Family health outcomes project unique identifiers, discussion, recommendations and testing* 1995.

35. Katz NP, Adams EH, Benneyan JC, Birnbaum HG, Budman SH, Buzzeo RW, Carr DB, Cicero TJ, Gourlay D, Inciardi JA, *et al*: Foundations of opioid risk management. *Clin J Pain* 2007, 23:103-118.

36. Fainsinger R, Schoeller T, Bruera E: Methadone in the management of cancer pain: A review. *Pain* 1993, 52:137-147.

37. Substance Abuse and Mental Health Services Administration Office of Applied Studies: *National Survey of Substance Abuse Treatment Services (N-SSATS): 2009. Data on Substance Abuse Treatment Facilities* Rockville, MD; 2010.

38. Connors GJ, Maisto SA: Drinking reports from collateral individuals. *Addiction* 2003, 98:21-29.

39. Del Boca FK, Darkes J: The validity of self-reports of alcohol consumption: state of the science and challenges for research. *Addiction* 2003, 98:1-12.

40. Neale J, Robertson M: Comparisons of self-report data and oral fluid testing in detecting drug use amongst new treatment clients. *Drug Alcohol Depend* 2003, 71:57-64.

41. Secades-Villa R, Fernandez-Hermida JR: The validity of self-reports in a follow-up study with drug addicts. *Addict Behav* 2003, 28:1175-1182.

42. Yacoubian GS Jr, Urbach BJ: To pee or not to pee: reconsidering the need for urinalysis. *Drug Educ* 2002, 32:261-270.

43. Solbergsdottir E, Bjornsson G, Gudmundsson LS, Tyrfingsson T, Kristinsson J: Validity of self-reports and drug use among young people seeking treatment for substance abuse or dependence. *J Addict Dis* 2004, 23:29-38.

44. Chermack ST, Roll JJ, Reilly MM, Davis L, Kilaru U, Grabowski J: Comparison of patient self-reports and urinalysis results obtained under naturalistic methadone treatment conditions. *Drug Alcohol Depend* 2000, 59:43-49.

45. Tassiopoulos K, Bernstein J, Heeren T, Levenson S, Hingson R, Bernstein E: Hair testing and self-report of cocaine use by heroin users. *Addiction* 2004, 99:590-597.

46. Butler SF, Villapiano A, Malinow A: The effect of computer-mediated administration on self-disclosure of problems on the Addiction Severity Index. *J Addiction Med* 2009, 3:194-203.

47. Groerer J, Eyerman J, Chromy J: *Redesigning an ongoing national household survey: Methodological issues* Rockville, MD: Substance Abuse and Mental Health Services Administration, Office of Applied Studies; 2002.

48. Paulozzi LJ, Budnitz DS, Xi Y: Increasing deaths from opioid analgesics in the United States. *Pharmacoepidemiol Drug Saf* 2006, 15:618-627.

49. Wysowski DK: Surveillance of prescription drug-related mortality using death certificate data. *Drug Safety* 2007, 30:533-540.

50. Jauncey M, Taylor L, Degenhardt L: Classification of opioid-induced deaths in Australia: Implications for surveillance. *Drug and Alcohol Review* 2005, 24:401-409.

51. Food and Drug Administration: *FDA Public Health Advisory, Important Information for the Safe Use of Fentora (fentanyl buccal tablets)* Bethesda, MD: Center for Drug Evaluation and Research; 2007.

52. Food and Drug Administration: *FDA Public Health Advisory, Methadone Use for Pain Control May Result in Death and Life-Threatening Changes in Breathing and Heart Beat* Bethesda, MD: Center for Drug Evaluation and Research; 2007.

53. Comer SD, Ashworth JB, Foltin RW, Johanson CE, Zacny JP, Walsh SL: The role of human drug self-administration procedures in the development of medications. *Drug Alcohol Depend* 2008, 96:1-15.

54. Rappeport BA: *Joint Meeting of the Anesthetic and Life Support Drug Advisory Committee and Drug Safety & Risk Management Advisory Committee* FDA: Center for Drug Evaluation and Research; 2008.

55. Deddens J, Petersen M, X L: Estimation of prevalence ratios when PROC GENMOD does not converge, SUGI28. 2003.

doi:10.1186/1477-7517-8-29
**Cite this article as:** Butler *et al.*: **Abuse risks and routes of administration of different prescription opioid compounds and formulations.** *Harm Reduction Journal* 2011 **8**:29.

**Submit your next manuscript to BioMed Central and take full advantage of:**

• Convenient online submission

• Thorough peer review

• No space constraints or color figure charges

• Immediate publication on acceptance

• Inclusion in PubMed, CAS, Scopus and Google Scholar

• Research which is freely available for redistribution

Submit your manuscript at
www.biomedcentral.com/submit

**BioMed** Central