**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE OPANA ER ANTITRUST LITIGATION | MDL No. 2580 |
| | Lead Case No. 14-cv-10150 |
| THIS DOCUMENT RELATES TO: | Hon. Harry D. Leinenweber |
| All Actions | **PUBLIC VERSION** |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS REQUIRING THE DENIAL OF DEFENDANTS' DAMAGES/CAUSATION MOTION FOR SUMMARY JUDGMENT**

Endo Pharmaceuticals Inc., Endo Health Solutions Inc., Penwest Pharmaceuticals Co. (collectively, "Endo") and Impax Laboratories, Inc. ("Impax," and together with Endo, "Defendants") submit this response to Plaintiffs' Statement of Additional Facts (ECF No. 618) submitted in opposition to Defendants' Motion for Summary Judgment.[*]

## PRELIMINARY STATEMENT

Defendants submit this response in further support for their Motion for Summary Judgment, and pursuant to Local Rule 56.1(a). Plaintiffs purport to have submitted a statement pursuant to Local Rule 56.1(b)(3)(C) of "additional facts that require the denial of summary judgment." None of the "facts" asserted by Plaintiffs, however, preclude summary judgment. This is because each of Plaintiffs' statements of additional facts falls into one or more of the following categories.

---

[*] References to Defendants' Exhibits #1 through #57 correspond to documents filed with Defendants' Rule 56.1 Statement (ECF No. 558-14). Exhibits #58 through #79 are attached hereto. References to Plaintiffs' Exhibits correspond to documents filed with Plaintiffs' Rule 56.1 Statement (ECF No. 618).

First, many of Plaintiffs' purported additional "facts" are not material for the purposes of summary judgment—that is, even if true, the asserted fact would not affect the outcome of the summary judgment arguments before the Court. Defendants moved for summary judgment on the grounds that Plaintiffs have presented no evidence that would allow a reasonable jury to find that the Settlement and License Agreement ("SLA") Plaintiffs challenge caused them antitrust injury or damages. *See* ECF No. 558 (Defendants' Memorandum of Law in Support of Defendants' Causation/Damages Motion for Summary Judgment [hereafter, "Defs.' Causation SJ Brief"]). To the contrary, the undisputed record evidence demonstrates that the Broad License in the SLA benefitted Plaintiffs by enhancing, not reducing, competition. *Id.* Most of Plaintiffs' "additional facts" have no bearing on the question of causation or damages raised in Defendants' motion. Even if a dispute as to these facts existed, it would not preclude summary judgment because its resolution would not affect the outcome of Defendants' motion. *See Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (explaining that "irrelevant or unnecessary" factual disputes are not material and do not preclude summary judgment); *JPM, Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996) ("[T]he dispute over this issue does not preclude summary judgment, for to do so a fact must be not only genuinely disputed, but material. A fact is material for purposes of summary judgment only if it might affect the outcome of a case under governing law.").

Second, certain of the purported "facts" merely repeat or characterize the conclusions offered by Plaintiffs' experts which, themselves, reflect nothing more than assumption and speculation unsupported by analysis or the record itself. Plaintiffs cannot rely on unfounded and unsupported expert conclusions to create a genuine issue of material fact for purposes of surviving summary judgment. *See* ECF No. 558 (Defs.' Causation SJ Brief) at 19–21; *Weigel v. Target Stores*, 122 F.3d 461, 469 (7th Cir. 1997) (explaining that an expert opinion based on

"'unsupported assumptions' and 'theoretical speculations' is no bar to summary judgment." (quoting *American Int'l Adjustment Co. v. Galvin*, 86 F.3d 1455, 1464 (7th Cir.1996) (Posner, C.J., dissenting)); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 923-24 (9th Cir. 2015) ("[T]he mere proffering of unsupported expert testimony does not create a triable issue as to antitrust injury-in-fact," particularly where expert testimony is contrary to the undisputed facts); *Dana Corp. v. American Standard, Inc.*, 866 F. Supp. 1481, 1499 (N.D. Ind. 1994) ("Expert opinions premised upon speculation and conjecture are insufficient to create a genuine issue of material fact to survive summary judgment.").

Third, certain of the purported "facts" are otherwise based on Plaintiffs' own unsupported assumptions, lacking in record support, and/or contrary to undisputed evidence. It is axiomatic that such purported assertions of "fact" cannot preclude summary judgment. Rather, the nonmoving party "must point to specific facts showing that there is a genuine issue for trial, and inferences relying on mere speculation or conjecture will not suffice." *DiPerna v. Chicago Sch. of Prof'l Psy.*, 893 F.3d 1001, 1006 (7th Cir. 2018); *SportFuel, Inc. v. PepsiCo, Inc.*, 932 F.3d 589, 601 (7th Cir. 2019) (explaining that "assumption or speculation" is insufficient to defeat summary judgment); *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012) ("[G]uesswork and speculation are not enough to avoid summary judgment."), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016).

Accordingly, none of Plaintiffs' statements of additional fact supports denial of Defendants' motion for summary judgment. Further, as explained in Defendants' Specific Responses below, Plaintiffs' additional facts are controverted and/or unsupported by the record and therefore cannot be deemed admissions for purposes of Local Rule 56.1(a). Defendants object to Plaintiffs' characterization of documents and testimony in the record, and nothing in this

response should be deemed agreement with Plaintiffs' characterizations or interpretations of evidence in the record. Moreover, although Defendants' Specific Responses address the inaccuracy and lack of evidentiary support for many of Plaintiffs' purported facts, nothing in those Specific Responses should be construed as an admission by Defendants that any of Plaintiffs' assertions are relevant to the summary judgment motions before the Court. This response is not intended to serve as Defendants' complete response to the assertions below for the purposes of any trial, and Defendants reserve the right to address particular assertions below with additional evidence and/or testimony from expert or fact witnesses.

<u>**SPECIFIC RESPONSES**</u>

**PLAINTIFFS' PARAGRAPH 1**: On June 8, 2010, Endo and Impax executed a settlement agreement resolving a patent infringement lawsuit in which Endo alleged that Impax's generic version of Original Opana ER[1]–Endo's branded opioid product–infringed two of Endo's patents: U.S. Patent Nos. 6,958,456 (the "'456 patent") and 5,662,933 (the "'933 patent") (the "Patent Litigation"). The settlement consisted of two interrelated agreements: the SLA and the

---

[1] For purposes of this Statement of Facts, Plaintiffs adopt Defendants' defined terms for Original Opana ER, Reformulated Opana ER, Generic Original Opana ER, Generic Reformulated Opana ER, as set forth in footnote 1 of Defendants' Local Rule 56.1 Statement of Material Facts as to Which There Is No Genuine Issue.

DCA.[2] Both were negotiated contemporaneously[3] and were finalized on the same day–June 8, 2010.[4]

**DEFENDANTS' RESPONSE TO PARAGRAPH 1**: Plaintiffs' assertions in this paragraph are not material to Defendants' motion for summary judgment because the asserted facts, even if true, would not affect the outcome of the issues raised in Defendants' motion. Defendants have moved for summary judgment on the grounds that Plaintiffs have presented no record evidence that would allow a reasonable jury to find that the SLA caused them antitrust injury or damages and that, to the contrary, the undisputed record evidence demonstrates that the SLA and its Broad License benefitted Plaintiffs by enhancing, not reducing, competition. *See* ECF

---

[2] Causation DSUF, Ex. 22 (SLA § 9.3: "<u>Entire Agreement; Waiver</u>: This Agreement, including the Appendix attached hereto, ***together with the Development Agreement between Endo and Impax***, dated as of the date hereof, ***contains the entire agreement*** between the Parties with respect to the subject matter hereof and supersedes all prior drafts or understandings.") (emphasis added; underline in original).

[3] *See, e.g.*, Ex. 1, Snowden 12/19/18 Tr. 193:5-8 ████████████████████████████ Ex. 2, Mengler 8/1/18 Tr. 74:17-21 ████████████████████ ████ Ex. 3, Koch 6/21/18 Tr. 109:5-9 ██████████████████████████████. *See also* Ex. 4, ENDO-OPANA-00002745, at -2748-751 (Manogue Ex. 20) (Endo Response to Feb. 20, 2014 FTC CID Specification 2 reflecting May 26, █████████████, 2010 calls with Impax discussing both potential settlement and development deal); Ex. 5, IMPAX-OPANA00035633, at - 637-638 (Snowden Ex. 14) (Sept. 5, 2018 Impax response to FTC CID Specification 5, reflecting call on ███████████, and in-person meeting on ████████ where both potential settlement and development deal were discussed).

[4] *See* Ex. 1, Snowden 12/19/18 Tr. 193:13-14 ████████████████████████████████ ████████████████████ *In the Matter of Impax Labs. Inc.*, Dkt. 9373, 2019 WL 1552939, at *8 (FTC Mar. 28, 2019) ██████████████████████ ███████████████████████████████████████████; Ex. 6, Second Set of Joint Stipulations ¶ 28, *In the Matter of Impax Labs. Inc.*, Dkt. 9373 (FTC Dec. 19, 2017) ("On June 8, 2010, Impax and Endo entered into the Settlement and License Agreement and the Development and Co-Promotion Agreement."). *See also* Causation DSUF ¶ 18 ("Endo and Impax executed a Settlement and License Agreement on June 8, 2010."); Ex. 7, EPI001448440 (Cobuzzi Ex. 27) (June 8, 2010 email from Robert Cobuzzi to Endo's Board of Directors states that ████████████ ██████████████████████████████████████

No. 558 (Defs.' Causation SJ Br.). Plaintiffs' assertions in this paragraph that Endo and Impax entered into the SLA to resolve patent litigation and also entered into the DCA do not create any genuine dispute of material fact as to whether Plaintiffs have evidence to support their causation or damages theories. Accordingly, even to the extent a dispute exists about Plaintiffs' assertions in this paragraph, such a dispute does not preclude summary judgment.

While Plaintiffs' assertions in this paragraph are immaterial, Defendants also dispute Plaintiffs' characterizations of the SLA and DCA. The SLA and DCA speak for themselves. Plaintiffs' characterization of the SLA and DCA as "interrelated" is misleading because the SLA and DCA were negotiated at arm's length by Endo and Impax. *See, e.g.*, Defs.' Ex. 58, June 21, 2018 Deposition of Art Koch 317:22-318:4 (Impax CFO explaining that instructions from CEO were to ███████████████████████████████████████. Likewise, the DCA was evaluated by an Endo team that was not involved in negotiating the SLA. *See, e.g.*, Defs.' Ex. 59, October 18, 2018 Deposition of Mark Bradley 31:20-24 ██████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████; Defs.' Ex. 60, October 11, 2018 Deposition of Robert Cobuzzi 259:12-18 (Dr. Cobuzzi, head of Endo's team evaluating the DCA, explaining that he wasn't part of conversations about settling patent litigation). The DCA, although executed on a similar timeline to the SLA, was a commercially reasonable agreement on its own. *See* Defs.' Ex. 61, August 29, 2019 Expert Report of Louis Berneman [hereafter "Berneman Rep."] ¶ 12.

**PLAINTIFFS' PARAGRAPH 2**: Under the terms of the SLA and DCA, Endo paid Impax for delaying its launch of Generic Original Opana ER until January 2013 by agreeing to: (1) a provision in which Endo agreed not to sell its own authorized generic of Original Opana ER during Impax's 180-day marketing exclusivity period (the "no-AG agreement"); (2) a provision that the parties called the "Endo Credit," in which Endo insured the value of the no-AG agreement by agreeing to make a cash payment to Impax if at the time Impax's Generic Original Opana ER entered the market, the sales of Original Opana ER had declined below a certain threshold defined in the SLA; and (3) a series of payments including a nonrefundable $10 million "upfront payment"

as part of the DCA that was incorporated into the SLA[5] (collectively, the SLA and DCA are the "reverse payment agreement").

**DEFENDANTS' RESPONSE TO PARAGRAPH 2**:  Plaintiffs' assertions in this paragraph are not material to Defendants' motion for summary judgment because the asserted facts, even if true, would not affect the outcome of the issues raised in Defendants' motion. Defendants have moved for summary judgment on the grounds that Plaintiffs have presented no record evidence that would allow a reasonable jury to find that the SLA caused them antitrust injury or damages and that, to the contrary, the undisputed record evidence demonstrates that the SLA and its Broad License benefitted Plaintiffs by enhancing, not reducing, competition.  *See* ECF No. 558 (Defs.' Causation SJ Br.).  Plaintiffs' assertions in this paragraph about the "value" of alleged payments in the DCA and SLA do not create any genuine dispute of material fact as to whether Plaintiffs have evidence to support their causation or damages theories.  Accordingly, even to the extent a dispute exists about Plaintiffs' assertions in this paragraph, such a dispute does not preclude summary judgment.

While Plaintiffs' assertions in this paragraph are immaterial, they are also incorrect.  First, neither the SLA nor the DCA contained any "payments" from Endo to Impax to delay Impax's launch of Generic Opana ER.  At the time of the SLA, the provision Plaintiffs describe as a "no-AG agreement" did not provide value to Impax because Endo was planning to launch Reformulated Opana ER and would have had no incentive to launch an authorized generic of original Opana ER while transitioning to its reformulated version of the product.  *See* Defs.' Ex. 62, August 29, 2019 Expert Report of Sumanth Addanki [hereafter "Addanki Rep."] ¶ 116; Defs' Ex. 63, November 7, 2018 Deposition of Brian Lortie 467:15-468:22 ███████████████

---

[5] *See* Causation DSUF, Ex. 22 (SLA § 4.1(c) (the no-AG agreement), SLA § 4.4 (the Endo Credit)), SLA § 9.3 (defining the agreement as inclusive of the DCA); Causation DSUF, Ex. 31 (DCA § 3.1 (the $10 million upfront payment)).

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████  Defs.' Ex. 64 (EPI000977725) (July 15, 2011 email from Alicia Logan to Mahen Gundecha and Brian Lortie explaining ██████████████ reason behind decision not to launch AG of 7.5 and 15mg strengths: ██████████████████████████████████

███████████████████████████████████  Likewise, the Endo Credit provision did not ████████████████████████████ and in fact did not guarantee any payment from Endo to Impax whatsoever.  *See* Defs.' Ex. 62, Addanki Rep. ¶ 118.  Plaintiffs have cited no evidence to support their statement that the Endo Credit was intended to or that it did "insure the value of the no-AG."  In particular, there is no evidence in the record that the no-AG was tied to or negotiated in tandem with the Endo Credit.  In addition, evidence shows that the Endo Credit was ultimately triggered by unforeseen circumstances, including manufacturing problems at a Novartis plant.  *See* Defs.' Ex. 62, Addanki Rep. ¶ 122.  Moreover, there was no "series of payments" under the DCA.  Endo only ever made one payment under the DCA: a $10 million upfront payment.  Endo's upfront payment under the DCA was made in exchange for the valuable profit-sharing rights Endo received under the DCA.  *See* Defs.' Ex. 61, Berneman Rep. ¶¶ 57-63.

**PLAINTIFFS' PARAGRAPH 3**: Dr. Thomas McGuire, Class Plaintiffs' economist, opined that, at the time of the SLA's execution, the value of the no-AG agreement and the Endo Credit were between $31.9 million and $79.9 million.[6] Dr. Keith Leffler, the Retailer Plaintiffs' economist, opined that, at the time of the SLA's execution, the benefit/cost of the payments from the no-AG agreement and the Endo Credit provision was between $17.2 million and $75.6 million.[7]

---

[6] *See* McClam Ex. B, McGuire 3/25/19 Rpt. ¶¶ 125-129 (Endo expected payments to Impax under the no-AG agreement and Endo Credit to be between $31.9 million and $79.9 million), ¶¶ 139-140 (Impax expected to receive payments under the no-AG agreement and Endo Credit of $58.7 million).

[7] In his opening report, Dr. Leffler concluded that ███████████████████████████████████████████ ████████████████████████████████████████████████  *See* McClam Ex. F, Leffler 3/25/19 Rpt.

**DEFENDANTS' RESPONSE TO PARAGRAPH 3:** Plaintiffs' assertions in this paragraph are not material to Defendants' motion for summary judgment because the asserted facts, even if true, would not affect the outcome of the issues raised in Defendants' motion. Defendants have moved for summary judgment on the grounds that Plaintiffs have presented no record evidence that would allow a reasonable jury to find that the SLA caused them antitrust injury or damages and that, to the contrary, the undisputed record evidence demonstrates that the SLA and its Broad License benefitted Plaintiffs by enhancing, not reducing, competition. *See* ECF No. 558 (Defs.' Causation SJ Br.). Plaintiffs' assertions in this paragraph about the alleged "value" of particular provisions in the SLA do not create any genuine dispute of material fact as to whether Plaintiffs have evidence to support their causation or damages theories. Accordingly, even to the extent a dispute exists about Plaintiffs' assertions in this paragraph, such a dispute does not preclude summary judgment.

While Plaintiffs' assertions in this paragraph are immaterial, they are also unfounded. There is no basis for Plaintiffs' assertion that the provision they describe as the "no-AG agreement" and Endo Credit "guaranteed" that Endo would pay Impax anything. *See* Defs.' Ex. 62, Addanki Rep. ¶ 115; *see also* Defs.' Ex. 22, (SLA) at §§ 4.1, 4.4. On the contrary, it is entirely possible that these provisions would have provided zero value to Impax and not imposed any costs on Endo. *See* Defs.' Ex. 62, Addanki Rep. ¶¶ 115-16. It was impossible to predict at the time of the SLA whether there would be any "payment" to Impax at all because any future "payment" depended on future marketplace events that could not have been predicted at the time of the settlement. *See* Defs.' Ex. 62, Addanki Rep. ¶¶ 114-15. Dr. McGuire's and Dr. Leffler's efforts to value these

---

¶ 77. In his reply to Defendants' experts, he revised the benefit to Impax to between $17.2 million and $75.6 million and the cost to Endo to between $22.0 and $73.7 million. *See* Ex. 8, Leffler 11/5/19 Rpt. ¶¶ 28-36 & Tables 1-2.

provisions in the SLA fail to account for this uncertainty and are otherwise flawed. For example, Dr. McGuire and Dr. Leffler each failed to consider the possibility that the "no-AG agreement" and Endo Credit provisions, whether assessed individually or together, could have represented zero value to Impax and imposed no cost on Endo. *See* Defs.' Ex. 62, Addanki Rep. ¶¶ 124-27. Moreover, Dr. McGuire relies on Endo data post-dating the SLA that was never intended to be used for Dr. McGuire's purposes in valuing the Endo Credit or no-AG. *See* Defs.' Ex. 62, Addanki Rep. ¶ 124.

   **PLAINTIFFS' PARAGRAPH 4**:   At various times during the negotiations, Impax referred to the Endo Credit as a ███████████ or ███████████████ provision.[8] The Endo Credit was triggered if Endo's sales of Original Opana ER dropped below a certain threshold set forth in the SLA before Impax's delayed launch.[9] To Impax, the Endo Credit served as ████████[10] or ██████████████████████"[11] for Impax to sell its generic product in

---

[8] *See, e.g.*, Ex. 9, IMPAX-OPANA00028602 (Mengler Ex. 20) (June 1, 2010 email from Chris Mengler to Larry Hsu and others: ████████████████████████████ ████████████████████████████████████████ Ex. 10, IMPAX-OPANA00125679, at -680-81 (Koch. Ex. 16) (June 3, 2010 email from Chris Mengler to Larry Hsu and others: ████████ ████████████████████████████ Ex. 11, Koch 6/21/18 Tr. 161:5-9 (testifying about Koch Ex. 16: ████████████████████████████ ████████████████████████ Ex. 2, Mengler 8/1/18 Tr. 290:18-291:2 ████████████████████████ ████████████████████████████████████ Ex. 12, IMPAX-OPANA00028617 (Mengler Ex. 21) (June 2, 2010 email from Chris Mengler to Larry Hsu and others: ██████████████████████████████████; Ex. 2, Mengler 8/1/18 Tr. 270:16-273:4 (testifying about Mengler Ex. 21 and that the ████████████████ refers to the make good payment, which became the Endo Credit).
[9] *See* Causation DSUF, Ex. 22 (SLA § 4.4); Ex. 9, IMPAX-OPANA00028602 (Mengler Ex. 20) (June 1, 2010 email from Chris Mengler to Larry Hsu and others: ██████████████████████████ ████████; Ex. 12, IMPAX-OPANA00028617 (Mengler Ex. 21) (June 2, 2010 email from Chris Mengler to Larry Hsu and others: ████████████████ Ex. 2, Mengler 8/1/18 Tr. 266:5-273:9 (testifying about Mengler Exs. 20 & 21, addressing the make good payment).
[10] Ex. 3, Koch 6/21/18 Tr. 165:25-166:3.
[11] Ex. 3, Koch 6/21/18 Tr. 160:22-161:4. *See also* Ex. 3, Koch 6/21/18 Tr. 135:16-23 ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

a ████████ Original Opana ER market.[12] Endo had a similar understanding.[13] If Original Opana ER sales declined for any reason–for example, because Endo introduced a reformulated version of Opana ER to replace Original Opana ER[14]–it was designed to provide Impax with a payment roughly equivalent to what it would have received as revenue from its generic launch had Original Opana ER sales not dropped below the threshold.[15] Ultimately, the Endo Credit was triggered, and



[12] Ex. 2, Mengler 8/1/18 Tr. 267:19-268:12 (testifying that the ████████████████████ was to enable Impax to ████ ████████████ Ex. 2, Mengler 8/1/18 Tr. 290:18-291:2 (testifying that the ██████████ /Endo Credit as downside protection in the event that Opana ER market degrades before Impax launches); Ex. 2, Mengler 8/1/18 Tr. 273:15-278:19 (testifying that although Endo's CFO Alan Levin ████████████████████████████████████████████████████ .

[13] Ex. 13, Cuca 10/26/17 Tr. 617:8-618:19 (testifying that the Endo Credit's purpose was to ████████████████████████████████████████████ Ex. 14, Cuca 9/6/18 Tr. 70:5-71:8 (confirming FTC trial testimony). *See also* Ex. 15, Levin 11/13/14 Tr. 169:11-170: 5 (Levin Ex. 1A) (testifying that the Endo Credit was a replacement for the acceleration trigger and provided ██████ Ex. 16, Levin 9/20/18 Tr. 21:9-15 ████████████████

[14] Ex. 17, EPI000874025 (Mengler Ex. 23) (June 3, 2010 email from Chris Mengler to Alan Levin: ████████████████████████████████████

[15] *See, e.g.*, DSUF Ex. 22 (SLA § 4.4 (the Endo Credit)); Ex. 2, Mengler 8/1/18 Tr. 267:19-268:12 (testifying that the ████████ was to enable Impax to ████████████████████ Ex. 2, Mengler 8/1/18 Tr. 296:17-23 ████████████████████████████████████████████████████ ; Ex. 2, Mengler 8/1/18 Tr. 290:18-291:2 (testifying that the ██████████ /Endo Credit as downside protection in the event that Original Opana ER market degraded before Impax launched); Ex. 2, Mengler 8/1/18 Tr. 273:15-278:19 (testifying that although Endo's CFO Alan Levin ████████████ Mr. Mengler did not believe him and it was why he wanted the Endo Credit provision); Ex. 2, Mengler 8/1/18 Tr. 290:18291:2 ████████████████████████████████████ ; Ex. 11, Koch 6/21/18 Tr. 160:22-161:4 (testifying that the make good payment in the Endo Credit was intended to be ████████ to sell its Generic Original Opana ER in the event Endo switched the market); Ex. 18, Engle 6/14/18 Tr. 235:8236:18 (testifying that the Endo Credit's market share profit factor includes a gross margin percentage that ██████████████████████████████

Endo paid Impax over $102 million.[16]

**DEFENDANTS' RESPONSE TO PARAGRAPH 4:** Plaintiffs' assertions in this paragraph are not material to Defendants' motion for summary judgment because the asserted facts, even if true, would not affect the outcome of the issues raised in Defendants' motion. Defendants have moved for summary judgment on the grounds that Plaintiffs have presented no record evidence that would allow a reasonable jury to find that the SLA caused them antitrust injury or damages and that, to the contrary, the undisputed record evidence demonstrates that the SLA and its Broad License benefitted Plaintiffs by enhancing, not reducing, competition. *See* ECF No. 558 (Defs.' Causation SJ Br.). Plaintiffs' assertions in this paragraph characterizing the negotiation and value of the SLA's Endo Credit provision do not create any genuine dispute of material fact as to whether Plaintiffs have evidence to support their causation or damages theories. Accordingly, even to the extent a dispute exists about Plaintiffs' assertions in this paragraph, such a dispute does not preclude summary judgment.

While Plaintiffs' assertions in this paragraph are immaterial, they are also unsupported, and indeed contradicted by the record. The terms of the SLA, including the Endo Credit provision,

_____

█████████████████████████ Ex. 19, Mengler 10/25/17 Tr. 533:1-535:4 (Mengler Ex. 3) (testifying that if Endo did not switch the market, Impax would receive the benefit of the no-AG agreement, but that if Endo did switch the market, Impax would receive ████████████ ███████████████████████████████████████; Ex. 19, Mengler 10/25/17 Tr. 582:21-583:1 (Mengler Ex. 3) (testifying that the Endo Credit was ████████████████ █████████████████████████████████████████████; Ex. 13, Cuca 10/26/17 Tr. 617:8-618:19 (Cuca Ex. 2) (testifying that the Endo Credit's purpose was to ██████████████████████████████████████████████████████████ Ex. 14, Cuca 9/6/18 Tr. 70:5-71:8 (confirming FTC trial testimony); Ex. 15, Levin 11/13/14 Tr. 169:11-170: 5 (Levin Ex. 1A) (testifying that the Endo Credit was a replacement for the acceleration trigger and provided █████████████████ that kept the value of Impax's 180-day exclusivity period

[16] *See* Ex. 20, IMPAX-OPANA00014819, at -922 (Snowden Ex. 57) (Jan. 22, 2013 email from Huong Nguyen, attaching Jan. 18, 2013 letter from Meg Snowden calculating the Endo Credit payment to be $102,049,199.64).

speak for themselves and Plaintiffs mischaracterize the evidence concerning the intent of and effect of these terms. The Endo Credit provision in the SLA did not guarantee any payment to Impax. The record demonstrates that, at the time of the SLA, Endo and Impax employees believed that the value of the Endo Credit provision was uncertain and could have been zero. *See* Defs.' Ex. 65, August 2, 2017 Deposition of Margaret Snowden 205:17-206:5; Defs.' Ex. 66, December 20, 2018 Deposition of Margaret Snowden 23:4-24:15; Defs.' Ex. 67, September 20, 2018 Deposition of Alan Levin 283:24-286:11; Defs.' Ex. 68, September 6, 2018 Deposition of Roberto Cuca 186:13-195:17. In addition, there were scenarios where Endo could have launched its Reformulated Opana ER product and would not have been obligated to make any payment under the Endo Credit provision. *See* Defs.' Ex. 62, Addanki Rep. ¶ 118; *see also* Defs.' Ex. 69, May 11, 2018 Deposition of Ted Smolenski 194:13-195:4 ████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████ Plaintiffs' assertion also ignores the fact that the SLA provided that *Impax would pay Endo* under certain scenarios based on Opana ER sales. *See* Defs.' Ex. 62, Addanki Rep. ¶¶ 20(c), 119; Defs.' Ex. 22 (SLA) at § 4.3.

In addition, the circumstances that triggered the Endo Credit were not anticipated by the parties. At the time of the SLA, Endo had no expectation that it would pay anything under the Endo Credit provision. *See, e.g.*, Defs.' Ex. 68, Sept. 2018 Cuca Dep. 186:13-188:3; Defs.' Ex. 67, Sept. 2018 Levin Dep. 283:24-285:5. As explained by Defendants' expert Dr. Addanki, Endo did not expect the sales of Original Opana ER to increase as substantially as they actually did following the launch of reformulated OxyContin in 2010. *See* Defs.' Ex. 62, Addanki Rep. ¶ 122; *see also* Defs.' Ex. 70, Sept. 2018 Levin Dep. Ex. 30 (EPI001595260) (April 2012 memo from

Dan Rudio to Files describing the circumstances that caused the Endo Credit to be estimable and probable as a liability). Nor did Endo expect that in December 2011 the FDA would temporarily shut down the Novartis plant that had been manufacturing Original Opana ER, resulting in a supply disruption of Original Opana ER and prompting Endo to launch Reformulated Opana ER earlier than it had originally planned. *See* Defs.' Ex. 62, Addanki Rep. ¶ 122; Defs.' Ex. 67, Sept. 2018 Levin Dep. 283:24-295:7.

**PLAINTIFFS' PARAGRAPH 5**: In the DCA, Impax agreed to develop a Parkinson's disease treatment that Endo would then have rights to co-promote to non-neurologists.[17] Endo agreed to make several payments to Impax under this agreement, including a $10 million nonrefundable upfront payment.[18] Plaintiffs' business development expert, John Tupman, concluded that the DCA was not subjected to the kind of due diligence that pharmaceutical agreements are typically subjected, did not contain the terms that would typically be included in such an agreement, and would not have been entered into by a reasonable pharmaceutical company in Endo's position as a standalone agreement.[19] As a result, Endo overpaid by at least $10 million–the amount of the nonrefundable upfront payment to Impax under the DCA–than it would have, had it considered the DCA as a standalone agreement.[20]

**DEFENDANTS' RESPONSE TO PARAGRAPH 5**: Plaintiffs' assertions in this paragraph are not material to Defendants' motion for summary judgment because the asserted facts, even if true, would not affect the outcome of the issues raised in Defendants' motion. Defendants have moved for summary judgment on the grounds that Plaintiffs have presented no record evidence that would allow a reasonable jury to find that the SLA caused them antitrust injury or damages and that, to the contrary, the undisputed record evidence demonstrates that the

---

[17] Causation DSUF, Ex. 31 (DCA §§ 3, 4).

[18] Causation DSUF, Ex. 31 (DCA §§ 3.1, 3.2); Ex. 47, Cobuzzi 10/11/18 Tr. 256:18-24) (testifying that upfront payment was nonrefundable).

[19] *See* Ex. 21, Tupman 3/25/19 Rpt. pp. 2-3, 63 █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

[20] Ex. 21, Tupman 3/25/19 Rpt. pp. 3, 63 (overpayment by at least $10 million).

SLA and its Broad License benefitted Plaintiffs by enhancing, not reducing, competition. *See* ECF No. 558 (Defs.' Causation SJ Br.). Plaintiffs' assertions in this paragraph about Endo's evaluation of the DCA, the terms of the DCA, and whether Endo overpaid for the rights it received under the DCA do not create any genuine dispute of material fact as to whether Plaintiffs have evidence to support their causation or damages theories. Accordingly, even to the extent a dispute exists about Plaintiffs' assertions in this paragraph, such a dispute does not preclude summary judgment. Moreover, Plaintiffs' assertions in this paragraph contain recitations of conclusions offered by Plaintiffs' experts that have no basis in the evidentiary record. While Defendants dispute the content of those expert opinions on various grounds, such unsupported expert opinions are not sufficient to create a genuine dispute of material fact to preclude summary judgment.

While Plaintiffs' assertions in this paragraph are immaterial, they are also misleading and incorrect. In particular, Paragraph 5 is misleading to the extent it suggests that Endo made more than one payment under the DCA. Endo made only a single $10 million upfront payment to Impax under the DCA, with other payments contingent on certain developmental and sales milestones. *See* Defs.' Ex. 61, Berneman Rep. ¶ 18. Moreover, Defendants dispute Mr. Tupman's assessment of the DCA. Endo engaged in robust due diligence in evaluating the DCA and employed practices consistent with other pharmaceutical companies. *See* Defs.' Ex. 61, Berneman Rep. at 26–30. Moreover, Mr. Tupman's opinions are flawed and unreliable. *See* Defs.' Ex. 61, Berneman Rep. ¶¶ 47-52; *see also* ECF No. 512 (Memorandum in Support of Defendants' Motion to Exclude Opinions and Proposed Testimony of John R. Tupman, Jr. [hereafter "Tupman *Daubert* Br."]). Among other things, Mr. Tupman's opinion that Endo "overpaid" for the DCA makes no sense because Mr. Tupman never valued the profit-sharing rights that Endo received under the DCA. *See* Defs.' Ex. 61, Berneman Rep. ¶ 66; Tupman *Daubert* Br. at 5–6. To the contrary, the evidence

shows that the DCA's financial terms, including the $10 million upfront payment, were consistent with Endo's reasonable valuation of the opportunity, and with the principal financial terms of other pharmaceutical alliance agreements. *See See* Defs.' Ex. 61, Berneman Rep. ¶¶ 57-63.

**PLAINTIFFS' PARAGRAPH 6**: The total value of Endo's reverse payments to Impax at the time of the reverse payment agreement was between $27.2 and $89.9 million.[21]

**DEFENDANTS' RESPONSE TO PARAGRAPH 6**: Plaintiffs' assertions in this paragraph are not material to Defendants' motion for summary judgment because the asserted facts, even if true, would not affect the outcome of the issues raised in Defendants' motion. Defendants have moved for summary judgment on the grounds that Plaintiffs have presented no record evidence that would allow a reasonable jury to find that the SLA caused them antitrust injury or damages and that, to the contrary, the undisputed record evidence demonstrates that the SLA and its Broad License benefitted Plaintiffs by enhancing, not reducing, competition. *See* ECF No. 558 (Defs.' Causation SJ Br.). Plaintiffs' assertions in this paragraph about the "total value" of alleged payments from Endo to Impax do not create any genuine dispute of material fact as to whether Plaintiffs have evidence to support their causation or damages theories. Accordingly, even to the extent a dispute exists about Plaintiffs' assertions in this paragraph, such a dispute does not preclude summary judgment.

While Plaintiffs' assertions in this paragraph are immaterial, they are also incorrect and unfounded. Paragraph 6 is incorrect because it suggests Endo made payments to Impax to delay the launch of Impax's generic Opana ER product. As explained in response to Plaintiffs' Paragraphs 3 and 4, Plaintiffs' experts' purported valuations of the "no-AG agreement" and Endo

---

[21] This range is based on (1) Dr. McGuire's estimate of the value of the no-AG agreement and Endo Credit of between $31.9 and $79.9 million, *supra* ¶ 3, (2) Dr. Leffler's estimate of the value of the no-AG agreement and Endo Credit of between $17.2 and $75.6 million, *supra* ¶ 3, and (3) the $10 million nonrefundable upfront payment under the DCA that Mr. Tupman opined Impax would not have received had the DCA been negotiated on a standalone basis, *supra* ¶ 5.

Credit provision of the SLA are speculative and unreliable, and not based on facts in the evidentiary record.  As explained in response to Plaintiffs' Paragraph 4, the value of the Endo Credit was uncertain, and could have been zero, at the time the SLA was executed.  As explained in response to Plaintiffs' Paragraph 5, the $10 million upfront payment made by Endo to Impax in connection with the DCA was made in exchange for the valuable profit-sharing rights that Endo received under the DCA, and Mr. Tupman lacks any basis for his opinion that Endo overpaid for the DCA because he did no nothing to value those profit-sharing rights.

**PLAINTIFFS' PARAGRAPH 7**:  To show that Defendants' reverse payment agreement caused damages, all Plaintiffs rely on a causation benchmark based on an alternative no-payment entry date that would have been economically rational for both Endo and Impax to accept absent the reverse payments.[22]  In determining the economically rational alternative no-payment entry date, Dr. McGuire and Dr. Leffler compare the expected profits from the no-payment settlement to the expected profits from continued litigation.[23]  This does not mean that an earlier entry date without a reverse payment is more profitable than the actual entry date with the reverse payments.[24]  It is virtually always more profitable for brand and generic companies to share the brand's monopoly profits through a reverse payment agreement than to compete vigorously.[25]

**DEFENDANTS' RESPONSE TO PARAGRAPH 7:**  Nothing in Plaintiffs' assertions in this paragraph, even if true, would preclude summary judgment.  This paragraph does not contain "statements of additional facts that require denial of summary judgment" as required by Local

---

[22] McClam Ex. B, McGuire 3/25/19 Rpt. ¶ 4; McClam Ex. F, Leffler 3/25/19 Rpt. ¶ 11.

[23] McClam Ex. B, McGuire 3/25/19 Rpt. ¶¶ 196-210; McClam Ex. F, Leffler 3/25/19 Rpt. ¶¶ 80-82.

[24] McClam Ex. F, Leffler 3/25/19 Rpt. ¶ 79 & n.107

¶ 86

*cf.* McClam Ex. B, McGuire 3/25/19 Rpt. ¶¶ 80, 84 (brand and generic companies make more in profits through reverse payment settlements that they could absent them).

[25] *See* McClam Ex. F, Leffler 3/25/19 Rpt. ¶¶ 63-64; McClam Ex. B, McGuire 3/25/19 Rpt. ¶¶ 80, 84.

Rule 56.1(b)(3)(C). Rather, Plaintiffs offer only a description of their "alternative settlement" theory of causation and damages and a superficial discussion of the analyses their proffered experts purportedly performed. Even if these were accurate characterizations of Plaintiffs' theory and their expert analyses, summary judgment remains appropriate because Plaintiffs provide no evidence material to any of the issues raised in Defendants' motion for summary judgment. In addition, none of the conclusions that Dr. McGuire and Dr. Leffler reached based on these analyses precludes summary judgment for all the reasons explained in Defendants' memoranda of law in support of their motion for summary judgment. *See* ECF No. 558 (Defs.' Causation SJ Br.); *see also* ECF No. 668 (Reply in Support of Defendants' Motion for Summary Judgment on Causation/Damages [hereafter, "Defs.' Causation Reply Br."]).

**PLAINTIFFS' PARAGRAPH 8**: Dr. McGuire, Class Plaintiffs' economist, conservatively estimated a range of no-payment entry dates between April 2011 and July 2011 that would have been in the economic interests of Endo and Impax to accept.[26] Dr. McGuire's model treats Endo and Impax as rational, profit seeking companies.[27] In calculating the expected value of continued litigation, Dr. McGuire relied on the opinion of Plaintiffs' patent expert, Glen Belvis, who opined that a reasonable patent attorney would have objectively believed (and advised the client—whether it be the brand plaintiff or generic defendant) that Impax had an ▮▮▮▮ chance of success in the Patent Litigation at the time of the settlement.[28] In this litigation, Endo and Impax asserted privilege to block discovery of their actual expectations about their chances of success in the Patent Litigation.[29]

**DEFENDANTS' RESPONSE TO PARAGRAPH 8**: Plaintiffs' assertions in this paragraph do not provide admissible evidence sufficient to create a genuine issue of material fact

---

[26] McClam Ex. B, McGuire 3/25/19 Rpt. ¶¶ 196-210.

[27] McClam Ex. B, McGuire 3/25/19 Rpt. ¶¶ 4, 117-140, 196-210.

[28] McClam Ex. B, McGuire 3/25/19 Rpt. ¶ 184; McClam Ex. A, Belvis 3/25/19 Rpt. ¶¶ 426-431. *See also* Ex. 22, Koch Ex. 8 (June 10, 2010 Impax's Art Koch's Needham Ninth Annual Healthcare Conference Tr. at 5: "Well, the question was how has our [Impax's] patent track record been? We haven't lost one yet. Now we have settled quite a few of them. . . . A key feature to consider though is that our analysis of the intellectual property occurs very early in those development. So if we're unsure ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[29] *See* Endo's Opp. to Pls.' Mot. to Compel, ECF No. 364; Impax's Opp. to Pls.' Mot. to Compel, ECF No. 324.

related to any issue raised in Defendants' motion for summary judgment, and therefore summary judgment remains appropriate for all the reasons explained in Defendants' memoranda of law in support of their motions for summary judgment. *See* ECF No. 558 (Defs.' Causation SJ Br.); ECF No. 668 (Defs.' Causation Reply Br.). As explained in those memoranda of law, Dr. McGuire's analysis of supposed "no payment entry dates" fails to fit the facts of this case, relies on unsupported assumptions, and is otherwise unreliable and inadmissible. *See* ECF No. 558 (Defs.' Causation SJ Br.) at 22-26; ECF No. 668 (Defs.' Causation Reply Br.) at 12-14. Plaintiffs cannot rely on such opinions to create a material factual dispute for purposes of summary judgment. *See Weigel*, 122 F.3d at 469 (explaining that an expert opinion based on "'unsupported assumptions' and 'theoretical speculations' is no bar to summary judgment.").

In addition, as also explained in those memoranda of law, Plaintiffs have no fact or expert evidence demonstrating that their hypothetical alternative settlement would have included a Broad License, which is an independently sufficient ground for summary judgment. *See* ECF No. 558 (Defs.' Causation SJ Br.) at 17-22; ECF No. 668 (Defs.' Causation Reply Br.) at 7-11. Accordingly, Plaintiffs' descriptions of Dr. McGuire's opinions in Paragraph 8 related to his purported estimates of "no-payment entry dates" are immaterial because they would not affect the outcome of the issues raised in Defendants' motion for summary judgment.

Moreover, Defendants have properly asserted privilege claims in this case in accordance with prevailing law and the Federal Rules of Civil Procedure. Plaintiffs cannot create a genuine issue of material fact by speculating about the contents of privileged information that Defendants properly withheld.

**PLAINTIFFS' PARAGRAPH 9**: As a rational economic actor, Endo would only settle without a reverse payment if the value of the settlement were at least equal to the expected value

of the litigation if it did not settle.[30] Dr. McGuire determined that this date was April 2011.[31] Similarly, as a rational economic actor, Impax would only settle if the value of the settlement to it were at least equal to the expected value of the litigation if it did not settle.[32] Dr. McGuire determined that this date was July 31, 2011.[33] Thus, Dr. McGuire concludes that absent any reverse payments, it would have been economically rational for Endo and Impax to reach agreement on an entry date between April 2011 and July 31, 2011 because between these dates both Endo and Impax would earn profits equal to or greater than they expected from continued litigation.[34]

**DEFENDANTS' RESPONSE TO PARAGRAPH 9**:   Plaintiffs' assertions in this paragraph do not provide admissible evidence sufficient to create a genuine issue of material fact related to any issue raised in Defendants' motion for summary judgment, and therefore summary judgment remains appropriate for all the reasons explained in Defendants' memoranda of law in support of their motions for summary judgment.  *See* ECF No. 558 (Defs.' Causation SJ Br.); ECF No. 668 (Defs.' Causation Reply Br.).  As explained in those memoranda of law, Dr. McGuire's analysis of supposed "no payment entry dates" fails to fit the facts of this case, relies on unsupported assumptions, and is otherwise unreliable and inadmissible.  *See* ECF No. 558 (Defs.' Causation SJ Br.) at 22-26; ECF No. 668 (Defs.' Causation Reply Br.) at 12-14.  Plaintiffs cannot rely on such opinions to create a material factual dispute for purposes of summary judgment.  *See Weigel,* 122 F.3d at 469 (explaining that an expert opinion based on "'unsupported assumptions' and 'theoretical speculations' is no bar to summary judgment.").

In addition, as also explained in those memoranda of law, Plaintiffs have no fact or expert evidence demonstrating that their hypothetical alternative settlement would have included a Broad License, which is an independently sufficient ground for summary judgment.  *See* ECF No. 558 (Defs.' Causation SJ Br.) at 17-22; ECF No. 668 (Defs.' Causation Reply Br.) at 7-11.

---

[30] McClam Ex. B, McGuire 3/25/19 Rpt. ¶ 202.
[31] *Id.*
[32] McClam Ex. B, McGuire 3/25/19 Rpt. ¶ 207.
[33] *Id.*
[34] McClam Ex. B, McGuire 3/25/19 Rpt. ¶ 208.

Accordingly, Plaintiffs' descriptions of Dr. McGuire's opinions in Paragraph 9 related to his purported estimates of "no-payment entry dates" are immaterial because they would not affect the outcome of the issues raised in Defendants' motion for summary judgment.

**PLAINTIFFS' PARAGRAPH 10**: Dr. Leffler, the Retailer Plaintiffs' economist, demonstrated that the no-payment entry date of July 15, 2011[35] that Impax proposed during settlement negotiations as an alternative to the reverse payment agreement, would have been economically rational for both Endo and Impax to accept had they not ultimately agreed on the reverse payments.[36] This date was clearly acceptable to Impax given that it proposed it to Endo.[37] Dr. Leffler demonstrated that Endo would prefer this entry date so long as it was reasonably certain that it could launch Reformulated Opana ER prior to that date–a position supported by Endo's internal forecasts.[38] Dr. Leffler confirmed this result using an expected value analysis similar to that used by Dr. McGuire.[39] In connection with this expected value analysis, Dr. Leffler noted that both parties were likely to share similar evaluations of the merits of the patent case because it settled in the middle of trial and the parties had the full benefit of discovery at that time.[40]

**DEFENDANTS' RESPONSE TO PARAGRAPH 10**: Plaintiffs' assertions in this paragraph do not provide admissible evidence sufficient to create a genuine issue of material fact related to any issue raised in Defendants' motion for summary judgment, and therefore summary judgment remains appropriate for all the reasons explained in Defendants' memoranda of law in support of their motions for summary judgment. *See* ECF No. 558 (Defs.' Causation SJ Br.); ECF

---

[35] *See infra* ¶¶ 25-27.

[36] McClam Ex. F, Leffler 3/25/19 Rpt. ¶¶ 85-88.

[37] *Id.*

[38] McClam Ex. F, Leffler 3/25/19 Rpt. ¶ 87 & n.120. *See also* Ex. 23, EPI001897442, at -7451 (Cuca Ex. 12) (Aug. 6, 2010 ███████████████████████ projecting launch of Reformulated Opana ER ("TRF") in "████████ Ex. 24, EPI000772166, at -167 (Chapman Ex. 7) (Sept. 1, 2009 ████████████, slide 39, reflecting Reformulated Opana ER approval in Q1 2011), Ex. 25, EPI000637446 (Bingol Ex. 18) (Mar. 5, 2009 email from Demir Bingol to James Bradley, assuming ████████ launch for Reformulated Opana ER); Ex. 26, EPI000308839, -840 (Bingol Ex. 21) (Dec. 4, 2009 ███████████████ presentation; slide 16, projecting █████ launch for Reformulated Opana ER); Ex. 27, EPI001786545, -546 (Bingol Ex. 23) (Dec. 22, 2009 email from Demir Bingol to Debbie Travers, attaching Reformulated Opana ER forecast, projecting launch in ████████); Ex. 28, EPI000188850, at -851 (Bingol Ex. 24) (Jan. 27, 2010 email from Demir Bingol to Dave Holveck and others, attaching ██████████████ ██████████████; slide 3 projecting launch of Reformulated Opana ER between ██████ ████ ahead of Generic Original Opana ER).

[39] *Id.* & n.121. *See also* Ex. 8, Leffler 11/5/19 Rpt. ¶¶ 31-36, Tables 1-2.

[40] Ex. 8, Leffler 11/5/19 Rpt. ¶ 40.

No. 668 (Defs.' Causation Reply Br.).  As explained in those memoranda of law, Dr. Leffler's analysis of supposed "no payment entry dates" fails to fit the facts of this case, is based on an unscientific "pick-a-date-and-check-it methodology, relies on unsupported assumptions, and is otherwise unreliable and inadmissible.  *See* ECF No. 558 (Defs.' Causation SJ Br.) at 27-32; ECF No. 668 (Defs.' Causation Reply Br.) at 12-14.  Plaintiffs cannot rely on such opinions to create a material factual dispute for purposes of summary judgment.  *See Weigel,* 122 F.3d at 469 (explaining that an expert opinion based on "'unsupported assumptions" and 'theoretical speculations' is no bar to summary judgment.").

In addition, as also explained in those memoranda of law, Plaintiffs have no fact or expert evidence demonstrating that their hypothetical alternative settlement would have included a Broad License, which is an independently sufficient ground for summary judgment.  *See* ECF No. 558 (Defs.' Causation SJ Br.) at 27-28; ECF No. 668 (Defs.' Causation Reply Br.) at 7-11.  Accordingly, Plaintiffs' descriptions of Dr. Leffler's opinions in Paragraph 10 related to his purported estimates of "no-payment entry dates" are immaterial because they would not affect the outcome of the issues raised in Defendants' motion for summary judgment.

**PLAINTIFFS' PARAGRAPH 11**: The Retailer Plaintiffs also offer two additional benchmarks to evaluate the impact of Endo's reverse payments: (1) August 17, 2010, shortly after Impax received final FDA approval, when it could have entered during the pendency of the patent litigation "at risk" of having to pay damages if Impax lost the case; and (2) December 17, 2011, the expected date of an appellate decision in the patent case, when Impax would have been able to launch free of any threat of damages.[41] In neither case do the Retailer Plaintiffs claim any overcharge damages after November 13, 2012, when Impax [sic] obtained the first of the Later-Issued Patents (defined below at paragraph 35).[42]

---

[41] McClam Ex. F, Leffler 3/25/19 Rpt. ¶ 93.

[42] *See* McClam Ex. F, Leffler 3/25/19 Rpt. ¶ 93; Pls. *Daubert* Motion to Exclude Certain Expert Opinions Concerning Patents and Lawsuits That Post-Date the Challenged Reverse Payment Agreement (ECF No. 523), at 2-3, 10-11.

**DEFENDANTS' RESPONSE TO PARAGRAPH 11:** None of Plaintiffs' assertions in this paragraph, even if true, would preclude summary judgment. This paragraph does not contain "statements of additional facts that require denial of summary judgment" as required by Local Rule 56.1(b)(3)(C). Rather, Retailer Plaintiffs offer only a description of their "continued litigation" theories of causation and damages and describe their methodology in which they cut off damages in November 2012 when Endo's additional patents issued. Such descriptions of their theories and methodology do not create a genuine issue of material fact; they provide no evidence material to any of the issues raised in Defendants' motion for summary judgment.

To the extent Retailer Plaintiffs assert that Impax would have launched on either August 17, 2010 or on December 11, 2011 but for the SLA, such an assertion does not preclude summary judgment. As discussed in Defendants' motion for summary judgment, Retailer Plaintiffs have not been able to show that they would have been better off in either of their continued litigation scenarios than they are in the actual world as a result of the SLA. *See* ECF No. 558 (Defs.' Causation SJ Br.) at 32-33; ECF No. 668 (Defs.' Causation Reply Br.) at 14-16. In particular, even if were true that Impax would have continued its litigation against Endo, prevailed in that litigation, and then launched in either August 2010 or December 2011, such entry by Impax would have been only temporary as Impax's sales would have been unlawful by November 2012 when Endo's additional patents issued. *See* ECF No. 558 (Defs.' Causation SJ Br.) at 32-33; ECF No. 668 (Defs.' Causation Reply Br.) at 2, 14-16. Plaintiffs are unable to show that they would be better off under this temporary entry scenario than under the SLA. *See* ECF No. 558 (Defs.' Causation SJ Br.) at 32-33; ECF No. 668 (Defs.' Causation Reply Br.) at 2, 14-16. Even if Retailer Plaintiffs could show that either of their continued litigation scenarios would have occurred in the

but-for world, they still would not be able to show antitrust injury caused by the SLA, and Defendants would still be entitled to summary judgment.

While Plaintiffs' assertions in this paragraph are immaterial to Defendants' summary judgment motion, Plaintiffs are also incorrect that Impax would have launched "at risk"—that is, prior to the final resolution of the Patent Litigation—or that Impax would have entered prior to January 2013 (*i.e.*, when Impax actually entered with the Broad License it received under the SLA). The evidence in this case shows that Impax would not have launched "at risk," which means Impax would not have launched prior to the final resolution of the Patent Litigation. *See* Ex. 62, Addanki Rep. ¶¶ 155-166; *see also* Defs.' Ex. 71, August 29, 2019 Expert Report of Anthony Figg [hereafter "Figg Rep."] ¶¶ 257-78; Defs.' Ex. 66, Dec. 20, 2018 Snowden Dep. 132:20-133:4; Defs.' Ex. 72, October 23, 2018 Deposition of A. Demir Bingol, Exhibit 39; Defs.' Ex. 73, Nov. 2018 Lortie Dep., Exhibit 50; Defs.' Ex. 74, August 29, 2019 Expert Report of Nita Patel [hereafter "Patel Rep."] ¶¶ 14, 56-60; Defs.' Ex. 75, May 22, 2018 Deposition of John P. Anthony 179:20-22 ████████████████████████████████████████████████████████████

Because Impax would not have prevailed in the underlying Patent Litigation, Plaintiffs are also incorrect that Impax could have launched as early as December 17, 2011 "free of any threat of damages." *See* Defs.' Ex. 51, Singer Rep. ¶ 120. Moreover, even if Impax ultimately prevailed in the Patent Litigation, Impax would have faced the risk of Endo's Later-Acquired Patents. ECF No. 558-14 (Defs.' Causation SUF) at ¶¶ 35–56.

**PLAINTIFFS' PARAGRAPH 12**: Prior to Defendants' discussions of the reverse payments to Impax, Dr. Larry Hsu, Impax's President and CEO, ████████████████████████████████████████████████████████████[43] At the

---

[43] Ex. 29, IMPAX-OPANA00192601, at -601 (Engle Ex. 5) (May 14, 2010 email from Larry Hsu to Chris Mengler stating ████████████████████████████████████████████████████████████

Board meeting, Chris Mengler, President of Impax's Generic Division, made a presentation in which he identified Generic Original Opana ER as ███████████████████████████.″[44] Impax's pre-settlement forecasts for Generic Original Opana ER reflected ██████████████████ *i.e.*, before the patent litigation would have concluded.[45] ████████████████████████████████.[46]

**DEFENDANTS' RESPONSE TO PARAGRAPH 12**: Retailer Plaintiffs' assertions in this paragraph are not material to Defendants' motion for summary judgment because the asserted facts, even if true, would not affect the outcome of the issues raised in Defendants' motion. Defendants have moved for summary judgment on the grounds that Plaintiffs have presented no record evidence that would allow a reasonable jury to find that the SLA caused them antitrust injury or damages and that, to the contrary, the undisputed record evidence demonstrates that the SLA and its Broad License benefitted Plaintiffs by enhancing, not reducing, competition. *See* ECF No. 558 (Defs.' Causation SJ Br.). Plaintiffs' assertions in this paragraph about a launch at risk do not create any genuine dispute of material fact as to whether Plaintiffs have evidence to support their causation or damages theories. Accordingly, even to the extent a dispute exists about Plaintiffs' assertions in this paragraph, such a dispute does not preclude summary judgment.

While Plaintiffs' assertions in this paragraph are immaterial, they are also incorrect to the extent that they suggest that Impax would have launched its Generic Opana ER product at risk. As discussed above in Defendants' response to Plaintiffs' Paragraph 11, *supra*, evidence in the record demonstrates that Impax would not have launched at risk.

**PLAINTIFFS' PARAGRAPH 13:** Impax suspected ██████████████████████████ ██████████████████████████████████████████

---

[44] Ex. 30, IMPAXOPANA00125767, -767 (Mengler Ex. 13) (May 25-26, 2010 Minutes of the Meeting of the Board of Directors of Impax Laboratories, Inc.).

[45] *See, e.g.*, Ex. 31, IMPAX-OPANA00015747, at -748 (Engle Ex. 3) (May 21, 2010 email from Ted Smolenski to Art Koch, attaching 5-year forecast spreadsheet; Tab ████████████ reflecting June 2010 launch).

[46] Ex. 29, IMPAX-OPANA00192601 (Engle Ex. 5) (May 14, 2010 email from Todd Engle to Chris Mengler and others attaching ██████████████████ spreadsheet reflecting ████ ████████ for Generic Original Opana ER).

████████████████████████████████████████████████.[47] Impax also told the patent court that the tentative approval of its generic would "likely result in a preliminary injunction motion."[48]

**DEFENDANTS' RESPONSE TO PARAGRAPH 13**: Plaintiffs' assertions in this paragraph are not material to Defendants' motion for summary judgment because the asserted facts, even if true, would not affect the outcome of the issues raised in Defendants' motion. Defendants have moved for summary judgment on the grounds that Plaintiffs have presented no record evidence that would allow a reasonable jury to find that the SLA caused them antitrust injury or damages and that, to the contrary, the undisputed record evidence demonstrates that the

---

[47] *See, e.g.*, Ex. 2, Mengler 8/1/18 Tr. 273:15-278:19 (testifying that although Endo's CFO Alan Levin ████████████████████████████████████████ Mr. Mengler did not believe him and was why he wanted the Endo Credit provision; he wanted to sell Impax's product in a ████████████████████████████████████████████████████████; Ex. 3, Koch 6/21/18 Tr. 132:21-134:4 (testifying that Impax was concerned about the possibility that Original Opana ER sales could diminish ahead of an Impax launch because ██████████████████████████

█████████████████████████████████████████████ Ex. 32, Hsu 12/18/18 Tr. 130:2-134:1 (confirming prior FTC testimony that Impax ███████████████████████████████████████

██████████████████████████████████ *See also* Ex. 2, Mengler 8/1/18 Tr. 267:19-268:12 (testifying that the ████████████████ was to enable Impax to ████████████████████████; Ex. 2, Mengler 8/1/18 Tr. 290:18-291:2 (testifying that the ████████████ Endo Credit as downside protection in the event that Opana ER market goes away before Impax launches); Ex. 3, Koch 6/21/18 Tr. 165:25-166:3 ██████████████ Ex. 3, Koch 6/21/18 Tr. 173:23-174:1 ██████████████

██████; Ex. 3, Koch 6/21/18 Tr. 160:22-161:4 ████████████████████████████████████████

████████████████████████ Ex. 13, Cuca 10/26/17 Tr. 617:8-618:19 (testifying that the Endo Credit's purpose was to ████████████████████████████████████████████████

Ex. 14, Cuca 9/6/18 Tr. 70:5-71:8 (confirming FTC trial testimony).
[48] Ex. 33, IMPAX-OPANA00001169 (Snowden Ex. 20) (Apr. 15, 2010 letter from Impax's outside counsel to Judge Hayden).

SLA and its Broad License benefitted Plaintiffs by enhancing, not reducing, competition. *See* ECF No. 558 (Defs.' Causation SJ Br.). Plaintiffs' assertions in this paragraph about the incentives for Impax to launch at risk do not create any genuine dispute of material fact as to whether Plaintiffs have evidence to support their causation or damages theories. Accordingly, even to the extent a dispute exists about Plaintiffs' assertions in this paragraph, such a dispute does not preclude summary judgment.

Defendants dispute this paragraph to the extent it suggests Impax would have launched its generic Opana ER product "as soon as possible." As explained in Defendants' response to Paragraphs 11 and 12, *supra*, Impax would not have launched its generic Opana ER product at risk. Defendants do not otherwise dispute the contentions in Paragraph 13.

**PLAINTIFFS' PARAGRAPH 14**: On May 21, 2010, Impax sent a letter to FDA: (1) stating that Impax's ANDA for the 5, 10, 20, and 40 mg strengths[49] was eligible for final approval, (2) explaining the legal and regulatory bases supporting Impax's eligibility for final approval, and (3) requesting that FDA grant final approval of Impax's ANDA upon the expiration of the 30-month stay for those strengths–*i.e.*, June 14, 2010.[50]

**DEFENDANTS' RESPONSE TO PARAGRAPH 14:** Plaintiffs' assertions in this paragraph are not material to Defendants' motion for summary judgment because the asserted facts, even if true, would not affect the outcome of the issues raised in Defendants' motion. Defendants have moved for summary judgment on the grounds that Retailer Plaintiffs have presented no record evidence that would allow a reasonable jury to find that the SLA caused them

---

[49] Impax was the first company to submit an ANDA for Generic Original Opana ER in the 5, 10, 20, 30, and 40 mg strengths and thus, was eligible for 180 days of marketing exclusivity to other ANDA generics. Causation DSUF ¶ 14. These strengths represented the vast majority of Original Opana ER sales. *See* Ex. 11, Koch 6/21/18 Tr. 73:3-16.

[50] *See* Ex. 34, IMPAX-OPANA00031405 (Snowden Ex. 61). *See also* Ex. 35, IMPAX-OPANA00205323, at -328 (Anthony Ex. 7) (Jan. 18, 2010 letter from John Anthony to DEA, attaching two DEA Form 250s and a Jan. 11, 2010 email from Meg Snowden, stating: ███████████████████████████████████████████████████████████████████

antitrust injury in either continued litigation scenario. As discussed in Defendants' Specific

Response to Paragraph 11, even if Impax would have launched at risk, Retailer Plaintiffs would

still not be able to show antitrust injury and Defendants would be entitled to summary judgment.

Plaintiffs' statements in this paragraph about Impax's communications with the FDA regarding

the approval of Impax's Opana ER product in 2010 do not create any genuine dispute of material

fact as to whether Plaintiffs have evidence to support their causation or damages theories.

Accordingly, even to the extent a dispute exists about Plaintiffs' assertions in this paragraph, such

a dispute does not preclude summary judgment.

While Plaintiffs' assertions in this paragraph are immaterial, they are also incorrect to the

extent that they suggest that Impax would have launched its Generic Opana ER product at risk.

As discussed above in Defendants' response to Plaintiffs' Paragraph 11, *supra*, evidence in the

record demonstrates that Impax would not have launched at risk.

**PLAINTIFFS' PARAGRAPH 15**: Impax readied itself to launch its generic product by
summer 2010. By May 17, 2010, Impax had completed process validation for its Generic Original
Opana ER. Process validation is a necessary procedure that a generic manufacturer must undertake
to show that it can use a specific manufacturing process to produce the ANDA product in a
consistent manner and scale it up to launch quantities.[51] The ██████████████████████
███████████████████████████████████[52]

**DEFENDANTS' RESPONSE TO PARAGRAPH 15:** Plaintiffs' assertions in this

paragraph are not material to Defendants' motion for summary judgment because the asserted

facts, even if true, would not affect the outcome of the issues raised in Defendants'

---

[51] *See* Ex. 11, Koch 6/21/18 Tr. 252:1-21; Ex. 36, Camargo 9/7/18 Tr. 63:12-64:23 (explaining
process validation); Ex. 77, IMPAX-OPANA00136689, at -737 (Mengler Ex. 12) (May 17, 2017
email from Chris Mengler to Laura Bisbing and others at Impax, attaching presentation slides for
board of directors meeting; noting that process validation was ████████. *See also* Ex. 37,
IMPAX-OPANA00011319, at -321 (Camargo Ex. 7) (May 20, 2010 email from Todd Engle to
Chris Mengler and others, attaching Quarterly Launch Planning Meeting agenda; noting that
███████████████████" of June 14, 2010 and ████████████████████████
[52] *See* Ex. 2, Mengler 8/1/18 Tr. 88:4-89:12.

motion. Defendants have moved for summary judgment on the grounds that Retailer Plaintiffs have presented no record evidence that would allow a reasonable jury to find that the SLA caused them antitrust injury in either continued litigation scenario. As discussed in Defendants' Specific Response to Paragraph 11, even if Impax would have launched at risk, Retailer Plaintiffs would still not be able to show antitrust injury and Defendants would be entitled to summary judgment. Plaintiffs' statements in this paragraph about Impax's alleged undertaking of a process validation process in connection with an at-risk launch do not create any genuine dispute of material fact as to whether Plaintiffs have evidence to support their causation or damages theories. Accordingly, even to the extent a dispute exists about Plaintiffs' assertions in this paragraph, such a dispute does not preclude summary judgment.

While Plaintiffs' assertions in this paragraph are immaterial, they are also incorrect to the extent that they suggest that Impax would have launched its Generic Opana ER product at risk. As discussed above in Defendants' response to Plaintiffs' Paragraph 11, *supra*, evidence in the record demonstrates that Impax would not have launched at risk.

**PLAINTIFFS' PARAGRAPH 16**: Impax also obtained quota from the Drug Enforcement Administration ("DEA") to support its generic launch and had an application pending before the DEA to increase its quota allotment at the time it executed the reverse payment agreement.[53] Impax advised the DEA that (1) the 30-month stay ███████████████████████ ███████ preventing Impax's receipt of final approval and launching its ANDA product, and (2)

---

[53] *See, e.g.*, Ex. 36, Camargo 9/7/18 Tr. 53:02-54:24 (testifying that Impax's generic required quota grants from DEA) Ex. 38, Bruno 3/25/19 Rpt. ¶ 57 ████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████ Ex. 39, IMPAX-OPANA00123377 (Anthony Ex. 18) (June 14, 2010 email from John Anthony to DEA advising that ████████████████████████ ████████████████████████████████████████████████████ Ex. 40, Anthony 5/22/18 Tr. 146:10-147:20 (testifying about June 14 email withdrawing pending quota increase application); Ex. 41, IMPAX-OPANA00123394, at -95 (Anthony Ex. 12) (Mar 3, 2010 Letter from DEA granting 2010 procurement quota); Ex. 42, IMPAX-OPANA00122942, at -43 (Anthony Ex. 17) (June 15, 2010 Letter from DEA granting additional 2010 procurement quota).

Impax would ███████████████████████████████.”[54] It also supported its request for a quota increase with letters of intent from prospective customers reflecting those customers' intent to purchase Impax's Generic Original Opana ER when it becomes commercially available.[55] After entering into the reverse payment agreement with Endo, Impax withdrew its application.[56] Plaintiffs' expert, James Bruno, opined that Impax had taken the steps necessary to have launch quantities of its generic product by August 17, 2010.[57]

**DEFENDANTS' RESPONSE TO PARAGRAPH 16**: Plaintiffs' assertions in this paragraph are not material to Defendants' motion for summary judgment because the asserted facts, even if true, would not affect the outcome of the issues raised in Defendants' motion. Defendants have moved for summary judgment on the grounds that Retailer Plaintiffs have presented no record evidence that would allow a reasonable jury to find that the SLA caused them antitrust injury in either continued litigation scenario. As discussed in Defendants' Specific Response to Paragraph 11, even if Impax would have launched at risk, Retailer Plaintiffs would still not be able to show antitrust injury and Defendants would be entitled to summary judgment. Plaintiffs' statements in this paragraph about Impax's communications with the FDA about obtaining DEA quota do not create any genuine dispute of material fact as to whether Plaintiffs have evidence to support their causation or damages theories. Accordingly, even to the extent a dispute exists about Plaintiffs' assertions in this paragraph, such a dispute does not preclude summary judgment.

---

[54] Ex. 35, IMPAX-OPANA00205323 (Anthony Ex. 7) (Jan. 18, 2010 letter from Jon Anthony to DEA, attaching a January 11, 2010 email from Meg Snowden concerning final approval timeline).
[55] *See* Ex. 43, IMPAX-OPANA00123370 (Anthony Ex. 14) ████████████████████████ ████████████████ letters of intent); Ex. 44, IMPAX-OPANA00123417 (Anthony Ex. 15) ██████████ letter of intent); Ex. 45, IMPAX-OPANA00205343 (Anthony Ex. 16) (listing these letters of intent submitted by Impax to DEA in their request for additional 2010 oxymorphone procurement quota).
[56] *See* Ex. 39, IMPAX-OPANA00123377 (Anthony Ex. 18) (June 14, 2010 email from John Anthony to DEA advising that ████████████████████████████████████████████ ██████████████████████████████ Ex. 46, IMPAX-OPANA00129463 (Camargo Ex. 11). Despite withdrawing the application, ██████████████████████████████████. *Id.*
[57] *See* Ex. 38, Bruno 3/25/19 Rpt. ¶¶ 24, 60-98.

While Plaintiffs' assertions in this paragraph are immaterial, they are also incorrect to the extent that they suggest that Impax would have launched its Generic Opana ER product at risk. As discussed above in Defendants' response to Plaintiffs' Paragraph 11, *supra*, evidence in the record demonstrates that Impax would not have launched at risk.

Moreover, Plaintiffs' assertions are also incorrect to the extent they suggest that Impax ever acquired sufficient DEA quota to launch its Generic Opana ER product, or that Impax planned to launch its generic Opana ER product at risk. In fact, Impax never received all of the quota it requested from the DEA. *See* Defs.' Ex. 75, May 2018 Anthony Dep. 179:20-22 ████████████
████████████████████████████████.

**PLAINTIFFS' PARAGRAPH 17**: Documents dated after the reverse payment agreement was executed show that Impax was prepared for an at-risk launch. Impax had manufactured over ████████ Generic Opana ER tablets (inventory worth over ████████), as well as over ████████ in packaging labels and outserts[58] and over ████████ in oxymorphone (the active ingredient in Opana ER) –for a total inventory value of approximately ████████.[59] Accordingly, Impax was ████████ for its Generic Original Opana ER product in the 5, 10, 20, and 40 mg strengths.[60] However, with the reverse payment agreement executed, ████████ ████████ and Impax destroyed its Generic Original Opana ER inventory.[61]

**DEFENDANTS' RESPONSE TO PARAGRAPH 17**: Plaintiffs' assertions in this paragraph are not material to Defendants' motion for summary judgment because the asserted facts, even if true, would not affect the outcome of the issues raised in Defendants' motion.

---

[58] Outserts are ████████████████████████████████
████████████████████ Ex. 11, Koch 6/21/18 Tr. 292:11-18.
[59] *See* Ex. 48, IMPAX-OPANA00017187 (Koch Ex. 29) (June 21, 2010 internal Impax email from Ray Smith, discussing inventory relating to Generic Original Opana ER: ████████
████████████████████████████████████████
████████████████████████████████
Ex. 48, IMPAX-OPANA00017187 (Koch Ex. 29) (June 21, 2010 email from Jim Devlin, stating that ████████████████████████████████ Ex. 36, Camargo 9/7/18 Tr. at 142:5-10, 143:24-144:24, 145:12-18 (testifying about the number of tablets produced).
[60] Ex. 49, IMPAX-OPANA00032375, at -376 (Smolenski Ex. 27) (June 15, 2010 internal Impax email, attaching document reflecting operations activities for Generic Original Opana ER).
[61] *See id.*; Ex. 36, Camargo 9/7/18 Tr. 178:21-179:21; 220:1-20.

Defendants have moved for summary judgment on the grounds that Retailer Plaintiffs have presented no record evidence that would allow a reasonable jury to find that the SLA caused them antitrust injury in either continued litigation scenario. As discussed in Defendants' Specific Response to Paragraph 11, even if Impax would have launched at risk, Retailer Plaintiffs would still not be able to show antitrust injury and Defendants would be entitled to summary judgment. Plaintiffs' statements in this paragraph that Impax prepared some quantity of generic Opana ER product do not create any genuine dispute of material fact as to whether Plaintiffs have evidence to support their causation or damages theories. Accordingly, even to the extent a dispute exists about Plaintiffs' assertions in this paragraph, such a dispute does not preclude summary judgment.

While Plaintiffs' assertions in this paragraph are immaterial, they are also incorrect to the extent that they suggest that Impax would have launched its Generic Opana ER product at risk. As discussed above in Defendants' response to Plaintiffs' Paragraph 11, *supra*, evidence in the record demonstrates that Impax would not have launched at risk.

**PLAINTIFFS' PARAGRAPH 18**: Plaintiffs' expert, Mr. Bruno, opines that a reasonable pharmaceutical company in Impax's position would have not undertaken these cost-intensive steps if it had no intention to launch its product.[62] He also opines that no reasonable pharmaceutical company would have made representations to the DEA in support of their quota (increase) applications about their readiness and intent to launch their generic product, if that company had no intent to use it.[63]

**DEFENDANTS' RESPONSE TO PARAGRAPH 18**: Plaintiffs' assertions in this paragraph are not material to Defendants' motion for summary judgment because the asserted

---

[62] *See, e.g.*, Ex. 38, Bruno 3/25/19 Rpt. ¶ 63 (Impax's destruction of its generic product after signing SLA is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ¶¶ 77-78 (process validation is ▓▓▓▓▓▓ and as a result, ▓▓▓▓▓

[63] *See generally* Ex. 50, Bruno 11/4/19 Rpt. ¶¶ 13-23 (opining that Impax's representations to the DEA demonstrated an intent to launch its Generic Original Opana ER product in 2010; ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

facts, even if true, would not affect the outcome of the issues raised in Defendants' motion. Defendants have moved for summary judgment on the grounds that Retailer Plaintiffs have presented no record evidence that would allow a reasonable jury to find that the SLA caused them antitrust injury in either continued litigation scenario. As discussed in Defendants' Specific Response to Paragraph 11, even if Impax would have launched at risk, Retailer Plaintiffs would still not be able to show antitrust injury and Defendants would be entitled to summary judgment. Plaintiffs' characterizations of the opinions of Mr. Bruno about Impax's conduct do not create any genuine dispute of material fact as to whether Plaintiffs have evidence to support their causation or damages theories. Accordingly, even to the extent a dispute exists about Plaintiffs' assertions in this paragraph, such a dispute does not preclude summary judgment.

While Plaintiffs' assertions in this paragraph are immaterial, they are also incorrect to the extent that they suggest that Impax would have launched its Generic Opana ER product at risk. As discussed above in Defendants' response to Plaintiffs' Paragraph 11, *supra*, evidence in the record demonstrates that Impax would not have launched at risk.



**PLAINTIFFS' PARAGRAPH 19**. In the last quarter 2009, Endo and Impax discussed a possible settlement of the Patent Litigation.[64] On ▇▇▇▇▇▇▇, there was an in-person meeting between Defendants' representatives, and on ▇▇▇▇▇▇▇, there was a telephonic discussion between Defendants' in-house counsel.[65] On at least one occasion, Impax raised with Endo a potential ▇▇▇▇▇▇ settlement with a July 2011 entry date for Impax's Generic Original Opana ER.[66]

---

[64] *See* Ex. 4, ENDO-OPANA-000002745, at -746-47 (Manogue Ex. 20) (Endo Response to Feb. 20, 2014 FTC CID Specification 2) (reflecting Oct. 5, 2009 in person meeting and Dec. 7, 2009 telephonic meeting); Ex. 5, IMPAX-OPANA00035633, at -635-636 (Snowden Ex. 14) (Sept. 5, 2014 Impax Response to FTC CID Specification 5) (reflecting Oct. 5, 2009 in person meeting).

[65] *See* Ex. 4, ENDO-OPANA-000002745, at -746-47 (Manogue Ex. 20) (Endo Response to Feb. 20, 2014 FTC CID Specification 2).

[66] *See* Ex. 1, Snowden 10/15/14 Tr. 53:4-58:5 (Snowden Ex. 1) (testifying that around the time of an in-person Oct. 5, 2009 meeting to discuss potential settlement of patent litigation, Ms. Snowden and Mr. Donatiello of Endo discussed an Impax entry date of July 2011); Ex. 1, Snowden 12/19/18 Tr. 113:21115:21 (acknowledging an Oct. 2009 meeting where one of the subjects was ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇; Ex. 1, Snowden 12/19/18 Tr. 215:20-217:20 (testifying that it

**DEFENDANTS' RESPONSE TO PARAGRAPH 19**:  None of Plaintiffs' assertions in this paragraph support denial of Defendants' summary judgment motion.  As discussed in Defendants' memoranda of law in support of summary judgment, the fact that Impax, at one stage of the negotiation, proposed a July 2011 entry date is not evidence that Endo would have accepted an earlier entry date in a "no payment" alternative settlement.  *See* ECF No. 558 (Defs.' Causation SJ Br.) at 18-19, 22, 28-29; ECF No. 668 (Defs.' Causation Reply Br.) at 8.  In fact, Endo and Impax never seriously negotiated an entry date prior to January 2013.  ECF No. 558-14 (Defs.' Causation SUF) ¶¶ 27–29.  It is undisputed that, to the extent an earlier date was ever mentioned by Impax, Endo rejected it.  As Impax counsel Margaret Snowden noted, Impax's proposed July 2011 entry date ▮▮▮▮▮▮▮▮▮▮▮▮  *See* Defs.' Ex. 66, December 20, 2018 Snowden Dep. 147:10–148:9.  In fact, Plaintiffs concede that Endo rejected Impax's proposal for a July 2011 entry date.  See ECF No. 618-1 (Plaintiffs' Response to Defendants' Rule 56.1 Statement) ¶ 27.  Accordingly, Plaintiffs' assertions in this paragraph support Defendants' motion for summary judgment.  Moreover, the fact that Impax may have suggested an earlier entry date does not suggest that the parties ever negotiated an earlier entry date **with a Broad License**.  *See* ECF No. 558 (Defs.' Causation SJ Br.) at 17-22, 27-28; ECF No. 668 (Defs.' Causation Reply Br.) at 6-14.

**PLAINTIFFS' PARAGRAPH 20**:  Ultimately, no agreement was reached concerning a potential settlement in 2009, and settlement discussions did not resume until May 2010 when Impax received tentative FDA approval for its Generic Original Opana ER product.[67]

---

▮▮▮▮▮▮▮▮▮▮ that Impax and Endo first discussed a potential ▮▮▮▮▮▮▮▮▮▮ using July 2011 as the Impax entry date).

[67] *See* Ex. 1, Snowden 12/19/18 Tr. 118:24-119:13 (testifying that 2009 settlement discussions did not result in settlement but those discussions resumed after Impax received tentative approval of its ANDA, which occurred in May 2010); Ex. 4, ENDO-OPANA-000002745, at -747 (Manogue Ex. 20) (Endo Response to Feb. 20, 2014 FTC CID Specification 2) (reflecting cessation of settlement discussions in Dec. 2009 and resumption in May 2010); Ex. 5, IMPAX-OPANA00035633, at -636 (Snowden Ex. 14) (Sept. 5, 2014 Impax Response to FTC CID Specification 5; reflecting cessation of settlement discussion in ▮▮▮ and resumption in ▮▮▮ ▮.

**DEFENDANTS' RESPONSE TO PARAGRAPH 20**:  Plaintiffs' assertions in this paragraph are not material to Defendants' motion for summary judgment because the asserted facts, even if true, would not affect the outcome of the issues raised in Defendants' motion. Defendants have moved for summary judgment on the grounds that Plaintiffs have presented no record evidence that would allow a reasonable jury to find that the SLA caused them antitrust injury or damages and that, to the contrary, the undisputed record evidence demonstrates that the SLA and its Broad License benefitted Plaintiffs by enhancing, not reducing, competition.  *See* ECF No. 558 (Defs.' Causation SJ Br.).  Plaintiffs' assertions in this paragraph about the history of settlement do not create any genuine dispute of material fact as to whether Plaintiffs have evidence to support their causation or damages theories.  Accordingly, even to the extent a dispute exists about Plaintiffs' assertions in this paragraph, such a dispute does not preclude summary judgment. Defendants do not dispute the assertions in this paragraph for the purposes of this summary judgment motion.

**PLAINTIFFS' PARAGRAPH 21**:  After Impax received tentative approval of its ANDA for its Generic Original Opana ER on May 13, 2010,[68] Endo and Impax resumed their negotiations.[69] Following multiple discussions,[70] on May 26, 2010, Endo circulated draft term sheets for both a patent settlement and a product development deal.[71] The settlement term sheet included, among other things, ███████████████t.[72]

---

[68] Ex. 52, IMPAX-OPANA00082375, at -376 (Snowden Ex. 60) (May 13, 2010 FDA tentative approval letter).

[69] *See* Ex. 5, IMPAX-OPANA00035633, at -636 (Snowden Ex. 14) (Sept. 5, 2014 Impax Response to FTC CID, Specification 5; identifying a ████████ teleconference between Meg Snowden of Impax and Guy Donatiello concerning potential settlement); Ex. 1, Snowden 12/19/18 Tr. Tr. 119:7-13 (testifying that settlement discussion resumed after Impax obtained tentative approval); Ex. 53, Levin 11/14/14 Tr. 191-193 (Ex. 1B) (testifying that Impax's receipt of tentative approval provided a ██████████████████████████████████ particularly given that the parties █████████████████████████████████.

[70] *See* Ex. 4, ENDO-OPANA-000002745, at -747-748 (Manogue Ex. 20) (Endo Response to Feb. 20, 2014 FTC CID Specification 2); Ex. 5, IMPAX-OPANA00035633, at -636 (Snowden Ex. 14) (Sept. 5, 2014 Impax Response to FTC CID Specification 5).

[71] *See* Causation DSUF, Ex. 32.

[72] *See id.*

**DEFENDANTS' RESPONSE TO PARAGRAPH 21**: Plaintiffs' assertions in this paragraph are not material to Defendants' motion for summary judgment because the asserted facts, even if true, would not affect the outcome of the issues raised in Defendants' motion. Defendants have moved for summary judgment on the grounds that Plaintiffs have presented no record evidence that would allow a reasonable jury to find that the SLA caused them antitrust injury or damages and that, to the contrary, the undisputed record evidence demonstrates that the SLA and its Broad License benefitted Plaintiffs by enhancing, not reducing, competition. *See* ECF No. 558 (Defs.' Causation SJ Br.). Plaintiffs' assertions in this paragraph about the negotiation of particular SLA provisions do not create any genuine dispute of material fact as to whether Plaintiffs have evidence to support their causation or damages theories. Accordingly, even to the extent a dispute exists about Plaintiffs' assertions in this paragraph, such a dispute does not preclude summary judgment.

While Plaintiffs' assertions in this paragraph are immaterial, Plaintiffs' use of "no-AG agreement" is also misleading because Endo retained the ability under the SLA to launch an authorized generic version of Original Opana ER in certain circumstances. Defendants do not otherwise dispute this paragraph for the purposes of this summary judgment motion.

**PLAINTIFFS' PARAGRAPH 22**: On May 27, 2010, Impax's Chris Mengler told Endo that the ███████████████████████████████████████████████████████████████████████ [73] Specifically, for the settlement, Impax proposed a January 1, 2013 "launch date" ████████████████████████████████████████████ [74] Impax feared that if it agreed to a delayed launch, Endo would use the delay to introduce a new formulation of Original Opana ER that would significantly impact the sales of the original formulation and decrease the value of the no-AG agreement.[75] To

---

[73] *See* Causation DSUF, Ex. 33.

[74] *See id.*

[75] *See, e.g.*, Ex. 2, Mengler 8/1/18 Tr. 249:10-251:25 (testifying that because Impax makes money on automatic generic substitution, a no-AG agreement without market protection may cause Impax to make less money during its exclusivity period if the ████████████████████████ Ex. 2, Mengler 8/1/18 Tr. 273:15-278:19 (testifying that although Endo's CFO Alan Levin

guard against this possibility, Impax proposed ███████████████████████████████

███████████████████████████████████ [76]

**DEFENDANTS' RESPONSE TO PARAGRAPH 22**: Plaintiffs' assertions in this paragraph are not material to Defendants' motion for summary judgment because the asserted facts, even if true, would not affect the outcome of the issues raised in Defendants' motion. Defendants have moved for summary judgment on the grounds that Plaintiffs have presented no record evidence that would allow a reasonable jury to find that the SLA caused them antitrust injury or damages and that, to the contrary, the undisputed record evidence demonstrates that the SLA and its Broad License benefitted Plaintiffs by enhancing, not reducing, competition. *See* ECF

---

████████████████████████████████████████ Mr. Mengler did not believe him and it was why he wanted the Endo Credit provision; he wanted to sell Impax's product in a ████████████████████████████ Ex. 3, Koch 6/21/18 Tr. 132:21-134:4 (testifying that Impax was concerned about the possibility that Original Opana ER sales could diminish ahead of an Impax launch because ███████████████████████████████████████████ Ex. 3, Koch 6/21/18 Tr. 135:16-23 (testifying that if Endo switched the market ahead of Impax's launch, the no-AG agreement would diminish the value); Ex. 32, Hsu 12/18/18 Tr. 130:2-134:1 (confirming FTC testimony that Impax ██████████████████████████████████████████████████.

[76] *See, e.g.*, DSUF Ex. 33, (Mengler Ex. 19) (May 27, 2010 email from Chris Mengler to Alan Levin and others regarding settlement and stating that Impax wanted a ████████████████████ Ex. 2, Mengler 8/1/18 Tr. 256:12-257:13 ████████████████████████████████████ Ex. 1, Snowden 12/19/18 Tr. 187:22-188:2 ██████████████████████████ Ex. 11, Koch 6/21/18 Tr. 132:21-134:4 ██████████████████████████████████████████

No. 558 (Defs.' Causation SJ Br.). Plaintiffs' assertions in this paragraph about the negotiating history of the SLA or Endo's launch of Reformulated Opana ER do not create any genuine dispute of material fact as to whether Plaintiffs have evidence to support their causation or damages theories. Accordingly, even to the extent a dispute exists about Plaintiffs' assertions in this paragraph, such a dispute does not preclude summary judgment.

While Plaintiffs' assertions in this paragraph are immaterial, they are also unfounded. Plaintiffs mischaracterize Impax's concerns as being about "decreas[ing] the value of the no-AG agreement." As explained in Defendants' response to Paragraph 2, *supra*, there is no basis for Plaintiffs' suggestion that the alleged "no-AG agreement" provided any guarantee of value to Impax, and in fact it was entirely possible that the provision would have provided zero value to Impax and not imposed any costs on Endo.

**PLAINTIFFS' PARAGRAPH 23**: Endo ███████████████" Impax's proposal of an ████████████████"[77] Instead, Endo and Impax negotiated what they called the ████████ – also referred to as a ████████████ or ████████" provision–in which Endo agreed to pay Impax in the event that Original Opana ER sales declined below a certain threshold prior to Impax's launch.[78] The amount of the Endo Credit was intended to approximate the value of the

---

[77] *See* Ex. 11, Koch 6/21/18 Tr. 171:23-173:3 ████████████████████████████
████████████████████████████████████████████
██████████; Ex. 11, Koch 6/21/18 Tr. 135:24-136:1 ████████████; Ex. 2, Mengler 8/1/18 Tr. 270:5-15 ████████████████████████████████████████████ Ex. 1, Snowden 12/19/18 Tr. 187:22-188:12 ████████████████████████████████████
████████████.

[78] *See, e.g.*, Causation DSUF, Ex. 22 (SLA § 4.4 (Endo Credit)); Ex. 55, IMPAX-OPANA00028613 (Koch Ex. 14) (June 1, 2010 email from Chris Mengler discussing current proposal, which included a ████████████ if Opana ER sales ████████ ████ Ex. 12, IMPAX-OPANA00028617 (Mengler Ex. 21) (June 2, 2010 email from Chris Mengler to Larry Hsu and others: ████████████████; Ex. 2, Mengler 8/1/18 Tr. 270:16-273:4 (testifying about Mengler Ex. 21 and that the ████████ refers to the ████████ which became the Endo Credit); Ex. 10, IMPAX-OPANA00125679, at -680-681 (Koch Ex. 16) (June 3, 2010 email from Chris Mengler, discussing current proposal, which included ████████

no-AG agreement to Impax absent any degradation of the Original Opana ER market.[79] As a result

_____

██████████████████████████████████████ if ███████████████████████████████████████" by Impax's launch); Ex. 2, Mengler 8/1/18 Tr. 270:5-15 ███████████████████████████████

██████████████████████████████████████████████████████████████████████ Ex. 19, Mengler 10/25/17 Tr. 532:18-25 (Mengler Ex. 3) (testifying that discussions regarding the acceleration trigger resulted in the Endo Credit); Ex. 2, Mengler 8/1/18 Tr. 266:13-267:11 (testifying that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 32, Hsu 12/18/18 Tr. 138:23-139:20 (confirming FTC testimony that the ████████████" provision was to protect against the likely loss of Impax Generic Original Opana ER sales if Endo launched a reformulated product that caused Original Opana ER sales to decline); Ex. 11, Koch 6/21/18 Tr. 172:16-173:3 █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

[79] _See, e.g._, Causation DSUF, Ex. 22 (SLA § 4.4 (Endo Credit)); Ex. 2, Mengler 8/1/18 Tr. 266:13-267:11 (testifying that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 2, Mengler 8/1/18 Tr. 296:17-23 ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 1, Snowden 12/19/18 Tr. 182:10-21 █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 18, Engle 6/14/18 Tr. 235:8-236:18 (testifying that the Endo Credit's market share profit factor includes a gross margin percentage that ████████████████████████████████████████████ Ex. 19, Mengler 10/25/17 Tr. 533:1-535:4 (Mengler Ex. 3) █████████████████████████████████████████████████████████████████████████████████; Ex. 19, Mengler 10/25/17 Tr. 582:21-583:1 (Mengler Ex. 3) (testifying that the Endo Credit was ██████████████████████████████████████████████████████████████████████████████████████████████████; Ex. 13, Cuca 10/26/17 Tr. 617:8618:19 (Cuca Ex. 2) (testifying that the Endo Credit's purpose was to ███████████████████████████████████████████████████████████████████████████████████████ Ex. 14, Cuca

of the parties' discussion, and ultimate agreement, on the Endo Credit provision, Impax ███████
█████████████████████████."[80]

**DEFENDANTS' RESPONSE TO PARAGRAPH 23**:  Plaintiffs' assertions in this paragraph are not material to Defendants' motion for summary judgment because the asserted facts, even if true, would not affect the outcome of the issues raised in Defendants' motion. Defendants have moved for summary judgment on the grounds that Plaintiffs have presented no record evidence that would allow a reasonable jury to find that the SLA caused them antitrust injury or damages and that, to the contrary, the undisputed record evidence demonstrates that the SLA and its Broad License benefitted Plaintiffs by enhancing, not reducing, competition.  *See* ECF No. 558 (Defs.' Causation SJ Br.).  Plaintiffs' assertions in this paragraph about the negotiating history of the Endo Credit provision do not create any genuine dispute of material fact as to whether Plaintiffs have evidence to support their causation or damages theories.  Accordingly, even to the extent a dispute exists about Plaintiffs' assertions in this paragraph, such a dispute does not preclude summary judgment.

While Plaintiffs' assertions in this paragraph are immaterial, they are also incorrect to the extent they suggest that the Endo Credit was designed to guarantee some payment to Impax.  As discussed in Defendants' response to Paragraph 4, *supra*, both Endo and Impax employees at the time of the SLA understood that there were scenarios under which the Endo Credit provision would

---

9/6/18 Tr. 70:5-71:8 (confirming FTC trial testimony); Ex. 15, Levin 11/13/14 Tr. 169:11-170: 5 (Levin Ex. 1A) (testifying that the Endo Credit was a replacement for the acceleration trigger and provided ███████████████████████ that kept the value of Impax's 180-day exclusivity period

[80] *See* Ex. 56, Koch 6/6/17 Tr. 71:15-23 (Koch Ex. 2) ██████████████████████████
████████████████████████████████████████████████████████
██████████████████████ Ex. 57, Koch 10/24/17 Tr. 239 (Koch Ex. 3) (confirming FTC deposition testimony); Ex. 3, Koch 6/21/18 Tr. 169:4-22 (same).

not result in any payment from Endo to Impax and Endo personnel testified that they did not expect Endo to make any payment under the Endo Credit.

**PLAINTIFFS' PARAGRAPH 24**:  Prior to settling the patent litigation with Impax, in February 2009, Endo settled a patent infringement action against Actavis.[81]  At the time of settlement, Actavis had first-to-file exclusivity on the 7.5 and 15 mg strengths of Original Opana ER.[82]  This settlement did not include any reverse payment, but allowed Actavis to begin selling its Generic Original Opana ER in the 7.5 and 15 mg strengths on July 15, 2011–approximately 18 months earlier than the entry date Impax received under the SLA.[83]

**DEFENDANTS' RESPONSE TO PARAGRAPH 24:** None of Plaintiffs' assertions in this paragraph support denial of Defendants' summary judgment motion.  Further, Plaintiffs' assertions are misleading and unsupported by the record to the extent they imply that *any* settlement that Endo entered with an ANDA-filer for Opana ER contained a "reverse payment." Plaintiffs' assertions are also misleading because they fail to mention the undisputed fact that the settlement with Actavis did not include a "Broad License" to Endo's Later-Acquired Patents.  *See* ECF No. 558-14 (Defs.' Causation SUF) ¶ 32.  Defendants do not otherwise dispute the contentions in this paragraph, which generally support Defendants' Motion for Summary Judgment for the reasons explained in their opening and reply briefs.  *See* ECF No. 558 (Defs.' Causation SJ Br.); ECF No. 668 (Defs.' Causation Reply Br.).

**PLAINTIFFS' PARAGRAPH 25**: By June 3, 2010, Endo's and Impax's primary negotiators believed ████████████████████ on the terms of the SLA and DCA.[84] But other Impax executives were not satisfied with the proposed terms of the DCA.[85]  On June 4,

---

[81] *See* Causation DSUF, Ex. 23 (Feb. 2009 Endo-Actavis settlement).

[82] *See* Ex. 58, Myer Ex. 5 (Dec. 13, 2010 FDA letter to Actavis, at 3).

[83] *See* Causation DSUF, Ex. 23, at -89234 (Feb. 2009 Endo-Actavis settlement).

[84] Ex. 10, IMPAX-OPANA00125679, at -680 (Koch Ex. 16) (June 3, 2010 email from Chris Mengler to Larry Hsu and others); Ex. 59, EPI001379279 (June 3, 2010 email from Alan Levin to Julie McHugh of Endo, with the subject line ████████████████████████████████.

[85] *See* Ex. 10, IMPAX-OPANA00125679, at -680 (Koch Ex. 16) (June 3, 2010 email from Art Koch to Chris Mengler and others).

2010, ██████████████████████████████████████████████████████████████████████████████████ [86]

**DEFENDANTS' RESPONSE TO PARAGRAPH 25**: Plaintiffs' assertions in this paragraph are not material to Defendants' motion for summary judgment because the asserted facts, even if true, would not affect the outcome of the issues raised in Defendants' motion. Defendants have moved for summary judgment on the grounds that Plaintiffs have presented no record evidence that would allow a reasonable jury to find that the SLA caused them antitrust injury or damages and that, to the contrary, the undisputed record evidence demonstrates that the SLA and its Broad License benefitted Plaintiffs by enhancing, not reducing, competition. *See* ECF No. 558 (Defs.' Causation SJ Br.). Plaintiffs' assertions in this paragraph about the negotiating history of the SLA do not create any genuine dispute of material fact as to whether Plaintiffs have evidence to support their causation or damages theories. Accordingly, even to the extent a dispute exists about Plaintiffs' assertions in this paragraph, such a dispute does not preclude summary judgment.

While Plaintiffs' assertions in this paragraph are immaterial, Plaintiffs' assertion that Impax's primary negotiator believed that he had reached an agreement in principle on the terms of the SLA and DCA is also not supported by the cited evidence. *See* Pls.' Ex. 10, IMPAX-OPANA00125679 at -680 (June 3, 2010 email from Chris Mengler to Larry Hsu and others that does not refer to any "agreement in principle" with Endo).

**PLAINTIFFS' PARAGRAPH 26**: At Larry Hsu's direction, Meg Snowden and Art Koch called Endo's Alan Levin to discuss a ████████████████ that provided for a generic entry date of July 2011 without the no-AG agreement, Endo Credit, or DCA.[87] Mr. Levin angrily rejected the proposal because he ██████████████████████████████ with Mr. Mengler on

---

[86] Ex. 10, IMPAX-OPANA00125679 (Koch Ex. 16) (June 4, 2010 email from Larry Hsu to Chris Mengler).

[87] Ex. 1, Snowden 12/19/18 Tr. 193:22-194:12, 196:24-197:15.

the terms of the settlement, which included the January 2013 entry date, the no-AG agreement, and ███████████████ (*i.e.*, the Endo Credit).[88]

 **DEFENDANTS' RESPONSE TO PARAGRAPH 26**: None of Plaintiffs' assertions in this paragraph support denial of Defendants' summary judgment motion, and instead support Defendants' arguments. The undisputed fact that Endo rejected the proposed July 2011 generic entry date supports Defendants' summary judgment motion for the reasons explained in their opening and reply briefs. *See* ECF No. 558 (Defs.' Causation SJ Br.); ECF No. 668 (Defs.' Causation Reply Br.).

 **PLAINTIFFS' PARAGRAPH 27**: After Impax's ███████████ proposal failed, Endo and Impax continued negotiating a settlement based on the terms that had been on the table as of June 3. All subsequent discussions concerning the settlement agreement, including SLA drafts, retained the later January 2013 entry date, the no-AG agreement, and the ███████ ███████/Endo Credit provision[89]–all of which were included in the executed SLA.[90] Endo and Impax also continued their negotiations over the DCA.[91]

 **DEFENDANTS' RESPONSE TO PARAGRAPH 27**: Plaintiffs' assertions in this paragraph are not material to Defendants' motion for summary judgment because the asserted facts, even if true, would not affect the outcome of the issues raised in Defendants' motion. Defendants have moved for summary judgment on the grounds that Plaintiffs have presented no record evidence that would allow a reasonable jury to find that the SLA caused them antitrust

---

[88] Ex. 1, Snowden 12/19/18 Tr. 197:19-198:16.

[89] *See, e.g.*, Ex. 60, IMPAX-OPANA00014805, at -806-807, -813-814, -848-850 (Snowden Ex. 37) (June 5, 2010 email from Elliot Choy, Impax's outside counsel, attaching Impax revisions to SLA and proposal for Endo Credit terms); Ex. 61, IMPAX-OPANA00031007, at -1008 (Snowden Ex. 39) (June 6, 2010 email from Alan Levin and Art Koch discussing terms of both SLA and DCA); Ex. 62, IMPAX-OPANA00014718, at -720 (Snowden Ex. 40) (June 7, 2010 email from Jennifer Saionz, attaching blackline of Endo's June 6, 2010 draft of SLA); Ex. 63, IMPAX-OPANA00010608, at -611 (Snowden Ex. 41) (June 7, 2010 email from Guy Donatiello, attaching redline of June 7, 2010 Impax draft SLA).

[90] *See* Causation DSUF, Ex. 22 (SLA).

[91] *See, e.g.*, Ex. 64, IMPAX-OPANA00015534, at -535 (Snowden Ex. 34) (June 4, 2010 email from Guy Donatiello to Meg Snowden, attaching draft DCA); Ex. 65, IMPAX-OPANA00010984 (Snowden Ex. 38) (June 6, 2010 email chain between Endo and Impax, discussing DCA, including milestone payments).

injury or damages and that, to the contrary, the undisputed record evidence demonstrates that the SLA and its Broad License benefitted Plaintiffs by enhancing, not reducing, competition. *See* ECF No. 558 (Defs.' Causation SJ Br.). Plaintiffs' assertions in this paragraph about the settlement negotiations do not create any genuine dispute of material fact as to whether Plaintiffs have evidence to support their causation or damages theories. Accordingly, even to the extent a dispute exists about Plaintiffs' assertions in this paragraph, such a dispute does not preclude summary judgment.

In addition, Plaintiffs' assertion about a "later 2013 entry date" is misleading and unsupported by the record to the extent it purports to suggest that Endo and Impax considered an earlier entry date. It is undisputed that Endo rejected dates prior to January 2013. *See* ECF No. 558-14 (Defs.' Causation SUF) ¶¶ 27–29. The contentions in this paragraph do not support denial of—and generally support—Defendants' summary judgment motion for the reasons explained in their opening and reply briefs. See ECF No. 558 (Defs.' Causation SJ Br.); ECF No. 668 (Defs.' Causation Reply Br.).

**PLAINTIFFS' PARAGRAPH 28**: On June 5, 2010, Impax revised and expanded the patent license terms in SLA § 4.1 to include ███████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████[92]████████████████████████

**DEFENDANTS' RESPONSE TO PARAGRAPH 28**: Defendants do not dispute the assertions in this paragraph for the purposes of this summary judgment motion, but the Broad License described in this paragraph supports granting, not denying, Defendants' motion for

---

[92] *See* Ex. 60, IMPAX-OPANA00014805, at -834 (Snowden Ex. 37) (June 5, 2010 email from Elliot Choy, attaching Impax revisions to SLA); *see also* Ex. 66, Nguyen 6/29/17 Tr. at 150:2-155:6 (testifying about the revisions to expand the patent license in the SLA).

summary judgment for the reasons explained in their opening and reply briefs. *See* ECF No. 558 (Defs.' Causation SJ Br.); ECF No. 668 (Defs.' Causation Reply Br.).

**PLAINTIFFS' PARAGRAPH 29**: On June 6, 2010, Art Koch, Impax's CFO, emailed Alan Levin, Endo's CFO, to discuss ███████████████████████████████████ ███████████[93] Mr. Levin testified ███████████████████████████████████████ ██████████████████████████[94] A subsequent draft of the SLA sent by Guy Donatiello, Endo's general counsel, on June 7, 2010, included ███████████████████████ ████████████████████████████████ but added language requiring that ███████████ ████████████████████████████████████████████████[5] The patent license in the executed SLA did not change materially from Mr. Donatiello's June 7, 2010 draft.[96]

**DEFENDANTS' RESPONSE TO PARAGRAPH 29**: Defendants do not dispute the assertions in this paragraph, but the Broad License described in this paragraph, supports granting, not denying, Defendants' motion for summary judgment for the reasons explained in their opening and reply briefs. *See* ECF No. 558 (Defs.' Causation SJ Br.); ECF No. 668 (Defs.' Causation Reply Br.).

**PLAINTIFFS' PARAGRAPH 30**: Dr. Larry Hsu, Impax's former President and CEO, testified that Impax required any settlement with a generic entry date to provide ███████ ██████████ and that therefore every agreement ███████████████████████████████████ ███████████████████████████████████████[97] Margaret Snowden, Impax's general counsel, agreed that, during the settlement negotiations with Endo, ████████████████████ █████████████████████████████████████████[98]

**DEFENDANTS' RESPONSE TO PARAGRAPH 30:** Plaintiffs' assertions in Paragraph 30 fail to create a genuine issue of material fact with respect to any of the issues raised

---

[93] *See* Ex. 67, EPI000874095 (Levin Ex. 24) (June 6, 2010 email from Art Koch to Alan Levin).
[94] *See* Ex. 16, Levin 9/20/18 Tr. 228:18-21 ███████████████████████████████████████████
[95] *See* Ex. 63, IMPAX-OPANA00010608, at -619-621 (Snowden Ex. 41) (June 7, 2010 SLA draft § 4.1(a), (d)).
[96] *Compare* Ex. 63, IMPAX-OPANA00010608, at -619-621 (Snowden Ex. 41) (June 7, 2010 SLA draft § 4.1(a), (d)) *with* Causation DSUF, Ex. 22 (SLA §§ 4.1(a), (d)).
[97] Ex. 32, Hsu 12/18/18 Tr. 239:4-239:16.
[98] Ex. 1, Snowden 12/19/18 Tr. 266:7-10.

in Defendants' motion for summary judgment and, in addition, they are unsupported by the record. For the reasons explained in the memoranda in support of Defendants' motion for summary judgment, Impax's desire for the Broad License cannot establish that both parties would have agreed to the Broad License in an alternative settlement. *See* ECF No. 558 (Defs.' Causation SJ Br.) at 17-22, 27-28; ECF No. 668 (Defs.' Causation Reply Br.) at 8. Further, the undisputed evidence demonstrates that Endo refused to provide such a Broad License to Later-Acquired Patents to any other generic company, although others had insisted on it. *See* ECF No. 558-14 (Defs.' Causation SUF) ¶¶ 31–33; *see also* ECF No. 668 (Defs.' Causation Reply Br.) at 8 n.6.

In addition, the assertions in this paragraph are unsupported by the record to the extent Plaintiffs suggest that Impax would have received the Broad License under different negotiating circumstances. Plaintiffs mischaracterize the testimony of Dr. Larry Hsu, who did not testify that Impax "required any settlement" to include a Broad License. *See* Defs.' Ex. 76, December 18, 2018 Deposition of Larry Hsu 237:15-24 (discussing license to Endo's patents, ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████ *id.* at 239:17-21 ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████.

**PLAINTIFFS' PARAGRAPH 31**: Contemporaneous with the Endo-Impax patent settlement, Endo also entered into a patent settlement concerning Original Opana ER with Sandoz, which granted ████████████████████████████████████.[99] Sandoz's

---

[99] Causation DSUF, n.6 & Ex. 40 (Endo-Sandoz settlement § 4.4).

broad patent license permitted it the option ████████████████████████████████
████████████████████████████████████.”[100]

**DEFENDANTS' RESPONSE TO PARAGRAPH 31**: Plaintiffs' assertions in this paragraph do not create a genuine issue of material fact and are unsupported by, and contrary to, the undisputed record evidence. Endo's patent litigation settlement with Sandoz did not include a license to Endo's Later-Acquired Patents. *See* ECF No. 558-14 (Defs.' Causation SUF) ¶ 32 n.6. Rather, Sandoz received an option to receive a license to Endo's Later-Acquired Patents, along with an entry date *after* the January 1, 2013 date agreed to by Impax. Sandoz never exercised that option and never received a license. Further, the option Sandoz received did not prevent Endo from suing and successfully enforcing its Later-Acquired Patents against Sandoz, forcing it to withdraw its ANDA. ECF No. 558-14 (Defs.' Causation SUF) ¶¶ 36–43. For the reasons explained in Defendants' Reply, the option Sandoz received does not create a material dispute for the purpose of summary judgment. *See* ECF No. 668 (Defs.' Causation Reply Br.) at 8-9 n.6.

**PLAINTIFFS' PARAGRAPH 32**: At the time that Endo and Impax executed the settlement agreement, Endo did not possess any patents subject to the Broad License.[101] ████████████████████████████████████████████████████████████████████
████████████████████████████████████.[102] Mr. Belvis, Plaintiffs' patent expert, opined that the risks of these applications at the time of the settlement were "minimal."[103]

**DEFENDANTS' RESPONSE TO PARAGRAPH 32**: Plaintiffs' assertions in this paragraph are not material to Defendants' motion for summary judgment because the asserted facts, even if true, would not affect the outcome of the issues raised in Defendants' motion.

---

[100] *See* Dft. Br. at 7; Causation DSUF, n.6; Causation DSUF, Ex. 40 (Endo-Sandoz settlement § 4.4).

[101] McClam Ex. A, Belvis 3/25/19 Rpt. ¶¶ 451-452; Ex. 8, Leffler 11/5/19 Rpt. ¶ 51.

[102] *See* Ex. 68, Defendant Impax Laboratories, Inc.'s Second Supplemental Objections and Response to Plaintiffs' Interrogatory No. 11 and Supplemental Objections and Response to Plaintiffs' Interrogatory Nos. 13 and 14, at 6-8 ████████████████████████████████
███████████████████ McClam Ex. A, Belvis 3/25/19 Rpt. ¶ 454; Ex. 69 (patent examiner's notice of rejection).

[103] McClam Ex. A, Belvis 3/25/19 Rpt. ¶ 112.

Defendants have moved for summary judgment on the grounds that Plaintiffs have presented no record evidence that would allow a reasonable jury to find that the SLA caused them antitrust injury or damages and that, to the contrary, the undisputed record evidence demonstrates that the SLA and its Broad License benefitted Plaintiffs by enhancing, not reducing, competition. *See* ECF No. 558 (Defs.' Causation SJ Br.). Plaintiffs' assertions in this paragraph about Impax's awareness of Endo's patent applications do not create any genuine dispute of material fact as to whether Plaintiffs have evidence to support their causation theories. Specifically, Impax's level of "awareness" of Endo's applications for additional patents at the time of settlement has no bearing on the fact that the Broad License in the SLA gave Impax freedom to operate from any additional patents covering Original Opana ER. Moreover, Plaintiffs' assertions in this paragraph contain recitations of conclusions offered by Plaintiffs' experts that have no basis—and are contradicted by—the evidentiary record. While Defendants dispute the content of those expert opinions on various grounds, such unsupported expert opinions are not sufficient to create a genuine dispute of material fact.

While Plaintiffs' assertions in this paragraph are immaterial, they are also unsupported by the undisputed record evidence. Among other things, the Broad License covered the '456 and '933 patents that were at issue in the Patent Litigation. At the time that the Broad License was granted, the patent applications for what would later issue as the '122, '216, and '779 patents had already been submitted and published. *See* Defs.' Ex. 43 ('122 Patent) at 1 (published June 14, 2007); Defs.' Ex. 45 ('216 Patent) at 1 (published May 3, 2007); Defs.' Ex. 46 ('779 Patent) at 1 (published December 18, 2008). While the patent applications for the '122 and '216 patents were initially rejected, it is common for patents to be initially rejected and later approved. It is undisputed that, at the time leading up to the SLA, Impax employees were concerned about the

possibility of Endo's acquiring additional patents covering Opana ER.  *See* ECF No. 558-14 (Defs.' Causation SUF) ¶ 30; *see also* ECF No. 618-1 (Plaintiffs' Response to Defendants' Rule 56.1 Statement) ¶ 30 ("Plaintiffs do not dispute that at the time of the settlement, that Impax was aware of two patent applications that were potentially relevant to Original Opana ER").

**PLAINTIFFS' PARAGRAPH 33**: Dr. McGuire, Class Plaintiffs' economist, also opined that any alternative settlement would include the Broad License.[104] Dr. Leffler, the Retailer Plaintiffs' economist, similarly stated that ████████████████████████████████████████████████████████████████████ ."[105]

**DEFENDANTS' RESPONSE TO PARAGRAPH 33**:  Plaintiffs' assertions in this paragraph do not provide admissible evidence sufficient to create a genuine issue of material fact related to any issue raised in Defendants' motion for summary judgment. Summary judgment remains appropriate for all the reasons explained in Defendants' memoranda of law in support of their motions for summary judgment.  *See* ECF No. 558 (Defs.' Causation SJ Br.); ECF No. 668 (Defs.' Causation Reply Br.).

As explained in those memoranda of law, neither Dr. McGuire nor Dr. Leffler relied on any record facts, or conducted any expert analysis, to show that an alternative settlement would include a Broad License.  *See* ECF No. 558 (Defs.' Causation SJ Br.) at 16-22, 26-28; ECF No. 668 (Defs.' Causation Reply Br.) at 7-11.  Rather, they merely assumed it at request of counsel. *Id. see also* Defs.' Ex. 77, June 27, 2019 Deposition of Keith Leffler 105:11-106:5; Defs.' Ex. 78, May 16, 2019 Deposition of Thomas McGuire 162:8-22.  Unsupported assumptions—even if cast as expert "opinion," as Plaintiffs do here—are insufficient to create an issue of material fact for summary judgment.  *See* ECF No. 558 (Defs.' Causation SJ Br.) at 21.

**PLAINTIFFS' PARAGRAPH 34**: Dr. McGuire testified it was not necessary to put a value on the Broad License at the time of the settlement because any such value would not affect

---

[104] McClam Ex. B, McGuire 3/25/19 Rpt. ¶¶ 146-147; McClam Ex. E, McGuire 11/5/19 Rpt. ¶¶ 66-67.
[105] Ex. 8, Leffler Expert 11/5/19 Rpt. ¶ 54.

his conclusions.[106] Dr. Leffler testified that he did not include any value of the Broad License in his alternative no-payment entry date analysis because he did not see evidence that the parties analyzed and assigned such value in settling the patent litigation.[107]

**DEFENDANTS' RESPONSE TO PARAGRAPH 34:** None of Plaintiffs' assertions in this paragraph, even if true, would preclude summary judgment. This paragraph does not contain "statements of additional facts that require denial of summary judgment" as required by Local Rule 56.1(b)(3)(C). Rather, Plaintiffs offer only descriptions of their experts' testimony. Such descriptions of their experts' respective failures to account for the value of the Broad License do not create a genuine issue of material fact for the reasons explained in Defendants' summary judgment briefing. *See* ECF No. 558 (Defs.' Causation SJ Br.) at 23-24, 29-30; ECF No. 668 (Defs.' Causation Reply Br.) at 13.

**PLAINTIFFS' PARAGRAPH 35**: Following its settlement with Impax, Endo acquired additional patents that it claimed covered Opana ER, including U.S. Patent No. 8,309,122 (the "'122 patent"); U.S. Patent No. 8,329,216 (the "'216 patent"); and U.S. Patent No. 8,871,779 (the "'779 patent") (collectively, the "Later-Issued Patents").[108] Endo asserted these Later-Issued Patents against all generic manufacturers including Impax seeking to sell generic versions of Original or Reformulated Opana ER and brought lawsuits in three separate courts: the U.S. District Courts for the Southern District of New York, the District of Delaware, and the District of New Jersey.

**DEFENDANTS' RESPONSE TO PARAGRAPH 35:** Defendants do not dispute this Paragraph for the purposes of this summary judgment motion, except to clarify that it is undisputed that Endo did not assert the Later-Issued Patents against Impax's Generic Original Opana ER product in the Southern District of New York or the District of Delaware patent litigations. Impax was able to sell its Generic Original Opana ER product notwithstanding Endo's Later-Acquired Patents because of the broad patent license it received in the SLA. Endo asserted the Later-Acquired Patents against Impax's Generic Original Opana ER product only in subsequent

---

[106] Ex. 70, McGuire 5/16/19 Tr. 64:8-21; Ex. 71, McGuire 12/10/19 Tr. 108:11-109:1.
[107] Ex. 72, Leffler 6/27/19 Tr. 81:16-82:10.
[108] *See* Causation DSUF, Ex. 44.

litigation in the District of New Jersey in which Endo claimed that Impax had breached its obligation under the SLA to negotiate a royalty for the Later-Acquired Patents.

Endo has moved for partial summary judgment asserting that (i) but for the Broad License, Endo would have sued Impax in the Southern District of New York and Delaware proceedings not only as to Impax's Reformulated ANDA Tablets, but also its Original ANDA Tablets; (ii) that Impax's Original ANDA Tablets infringe the Later-Acquired Patents for the same reasons that all of the other accused ANDA Tablets (including Impax's Reformulated ANDA Tablets) were found to infringe; and (iii) that as a result, but for the Broad License, Endo would have successfully enjoined Impax from making or selling its Original ANDA Tablets until the '779 patent expires in 2029. *See* ECF No. 535 (Endo's Patent MSJ Br.). In opposition, Plaintiffs did not dispute any of those facts, instead arguing only that the Court should decline to grant summary judgment because those facts purportedly are immaterial to any disputed issue in this antitrust case. ECF No. 615 (Pls. Opp. to Endo's Patent MSJ) at 5-8. This paragraph, and other paragraphs set forth in Plaintiffs' Statement of Additional Facts, belie that assertion.

**PLAINTIFFS' PARAGRAPH 36**: In the Southern District of New York, Endo asserted claims against Impax's Generic Reformulated Opana ER product for infringing the '122 and '216 patents.[109] It also sued other generic manufacturers to enjoin them from introducing generic versions of Original and Reformulated versions of Opana ER.[110] Endo ultimately went to trial against Impax (Reformulated) and Actavis/Watson (Original and Reformulated), Amneal (Reformulated), Roxane (Original), Sun Pharma (Original and Reformulated), Barr/Teva (Reformulated), ThoRx (Reformulated), and Impax (Reformulated).[111] On April 29, 2016, the district court enjoined Actavis and certain other moving generic manufacturer defendants from

---

[109] *See Endo Pharm. Inc. v. Impax Labs., Inc.*, No. 12-cv-8317 (S.D.N.Y. Nov. 14, 2012), ECF No. 1 (Complaint).

[110] *Endo Pharm. Inc. v. Amneal Pharms., LLC*, 2015 WL 9459823, at *5 (S.D.N.Y. Aug. 18, 2015) (the "*Infringement Decision*"), *amended in part*, 2016 WL 1732751 (S.D.N.Y. Apr. 29, 2016) (the "*Omnibus Injunction*").

[111] *Infringement Decision*, at *5. ("Actavis and Sun Pharma sought FDA approval to market both crushable and crush-resistant generic versions of OPANA®ER. Roxane sought approval solely for the crushable version. Amneal, Teva, Impax, and ThoRx sought approval solely to manufacture crush-resistant generic products.") (citations omitted).

making or selling their generic products prior to expiration of the '122 and '216 patents, and ordered Actavis to remove its Generic Original Opana ER product from the market.[112]

**DEFENDANTS' RESPONSE TO PARAGRAPH 36:** The assertions in this paragraph support Defendants' motion for summary judgment. Endo's successful assertion of its Later-Acquired Patents against all other manufacturers of generic Original Opana ER (except Impax) and all manufacturers of generic Reformulated Opana ER (including Impax) makes two things clear. First, it was only by reason of Impax's Broad License to the Later-Acquired Patents that it was able to remain on the market with generic Original Opana ER. Second, because it allowed Impax to remain on the market, the Broad License had value to Impax.

**PLAINTIFFS' PARAGRAPH 37**: In the District of Delaware, Endo asserted patent infringement claims against Impax's Generic Reformulated Opana ER product for infringing the '779 patent.[113] It also sued Actavis, Amneal, Barr/Teva, Par, Roxane, ThoRx, Sandoz, and Sun.[114] Endo dismissed Sandoz and Par after they committed not to enter the market before the expiration of the '779 patent.[115] Ultimately the court enjoined Amneal, Teva, Barr, and Actavis from selling their generic products before expiration of the '779 patent.[116]

---

[112] *Omnibus Injunction*, at *11.

[113] *See Endo Pharm. Inc. v. Impax Labs., Inc.*, No. 14-cv-1384 (D. Del. Nov. 7, 2014), ECF No. 1 (Complaint).

[114] *Endo Pharm. Inc. v. Actavis LLC*, No. 14-cv-1381 (D. Del.); *Endo Pharm. Inc. v. Amneal Pharm. LLC*, No. 14-cv-1382 (D. Del.); *Endo Pharm. Inc. v. Teva Pharm. USA Inc.*, No. 14-cv-1389 (D. Del.); *Endo Pharm. Inc. v. Par Pharm. Cos., Inc.*, No. 14-cv-1385 (D. Del.); *Endo Pharm. Inc. v. Roxane Labs., Inc.*, No. 14-cv-1387 (D. Del.); *Endo Pharm. Inc. v. Sandoz Inc.*, No. 14-cv-1388 (D. Del.); *Endo Pharm. Inc. v. Sun Pharm. Labs. Ltd.*, No. 14-cv-1386 (D. Del.).

[115] *Endo Pharm. v. Sandoz*, No. 14-cv-1388 (D. Del. July 2, 2015), ECF No. 19 (Notice of Voluntary Dismissal Without Prejudice); *Endo Pharm. v. Par Pharm.*, No. 14-cv-1385 (D. Del. Mar. 31, 2015), ECF No. 16 (Joint Stipulated Order of Dismissal Without Prejudice). Impax, ThoRX, Sun, and Roxane agreed to be bound by judgments with respect to the other defendants. *See* Causation DSUF, Ex. 55 (Stipulation and Order), at 3; *Endo Pharm. v. Sun Pharm. Labs.*, No. 14-cv-1386 (D. Del. Feb. 17, 2016), ECF No. 95 (Stipulation and Order Requesting Stay of Proceedings in 14-1386 (RGA)), at 3; *Endo Pharm. v. Roxane Labs.*, No. 14-cv-1387 (D. Del. Feb. 24, 2016), ECF No. 88 (Stipulation and Order), at 3.

[116] *See Endo Pharm. v. Amneal Pharm.*, No. 14-cv-1382 (D. Del. Oct. 21, 2016), ECF No. 156 (Final Judgment), at 2-3; *Endo Pharm. v. Teva Pharm.*, No. 14-cv-1389 (D. Del. Nov. 30, 2016), ECF No. 203 (Final Judgment), at 2; *Endo Pharm. v. Actavis*, No. 14-cv-1381 (D. Del. Sept. 15, 2017), ECF No. 234 (Final Judgment), at 2.

**DEFENDANTS' RESPONSE TO PARAGRAPH 37**:  Defendants do not dispute this Paragraph for the purposes of this summary judgment motion, but clarify that the District of Delaware also enjoined Roxane from selling its generic products before expiration of the '779 patent.  *See Endo Pharm. v. Roxane Labs.*, No. 14-cv-1387 (D. Del. July 16, 2019), ECF No. 103 (Final Judgment).  But the assertions in this paragraph do not require denial of summary judgment and instead support Defendants' motion for summary judgment.  Endo's successful assertion of its Later-Acquired Patents against all other manufacturers of generic Original Opana ER (except Impax) and all manufacturers of generic Reformulated Opana ER (including Impax) makes two things clear.  First, it was only by reason of Impax's Broad License to the Later-Acquired Patents that it was able to remain on the market with generic Original Opana ER.  Second, because it allowed Impax to remain on the market, the Broad License had value to Impax.

**PLAINTIFFS' PARAGRAPH 38**:  On August 1, 2016, Endo sued Impax in the District of New Jersey with respect to Impax's Generic Original Opana ER.[117] Endo alleged that Impax had breached the SLA and that Impax's sales of Generic Original Opana ER infringed the '122 patent, the '216 patent, and U.S. Patent No. 8,808,737.[118] This lawsuit arose because Endo and Impax disputed whether the SLA's patent license was intended to be royalty-free or imposed on the parties an obligation to negotiate a reasonable royalty rate at the time that Endo actually acquired the Later-Issued Patents.[119] Impax's position was that the Broad License granted a royalty-free license to exercise the Later-Issued Patents.[120] Endo's position was that the parties had agreed to negotiate the royalties to be paid on the Broad License in the event that any patents

---

[117] *See* Causation DSUF, Ex. 49 (Compl., *Endo Pharms. Inc. v. Impax Labs., Inc.*, C.A. No. 2:16-02526, (D.N.J. Aug. 1, 2016)).

[118] Causation DSUF, Ex. 49, ¶¶ 64-106.

[119] *See* Ex. 73, ENDO-OPANA000150419-422 (Snowden Ex. 46) (email correspondence between Meg Snowden and Guy Donatiello concerning negotiation of amended SLA patent license); Ex. 1, Snowden 12/19/18 Tr. 258:20-267:16 (testifying about Snowden Ex. 46 and positions taken by Endo and Impax concerning the dispute over SLA § 4.1(d)).

[120] *See* Ex. 1, Snowden 12/19/18 Tr. at 46:14-47:18, 258:21-260:5; Ex. 73, ENDO-OPANA-000150419-422 (Snowden Ex. 46) (Nov. 2, 2015 email from Meg Snowden to Guy Donatiello, stating that ████████████████████████████████████████████████████████████

ultimately issued.[121] Endo filed the lawsuit when Impax refused to negotiate a royalty rate for the SLA patent license.[122] During this subsequent litigation, ██████████████████████████
███████████████████████████ [123]

**DEFENDANTS' RESPONSE TO PARAGRAPH 38**:  Defendants do not dispute the substance of Plaintiffs' assertions in this Paragraph for the purposes of this summary judgment motion, but clarify that Endo asserted its patent infringement claims against Impax's Generic Original Opana ER product solely in the context of Endo's claim that the SLA was terminated upon Impax's contract infringement.  Further, for the reasons explained in Defendants' summary judgment reply, Endo and Impax's contractual dispute regarding royalties due under the SLA does not change the fact that the Broad License permitted and continues to permit Impax to remain on the market with its Generic Original Opana ER product.  *See* ECF No. 668 (Defs.' Causation Reply Br.) at 7 n.5.  The assertions in this paragraph do not require denial of summary judgment and instead support Defendants' motion for summary judgment.

**PLAINTIFFS' PARAGRAPH 39**:  During the course of the litigation, the FDA asked Impax to pull its Reformulated Opana ER from the market for safety reasons.[124] Following the withdrawal of the reformulated product from the market, Endo and Impax negotiated a settlement of this subsequent litigation in which Impax agreed to pay royalties on the Later-Issued Patents, and, in return, Endo made Impax the exclusive distributor of Opana ER.[125]

---

[121] Causation DSUF, Ex. 49 (Compl., *Endo Pharms. Inc. v. Impax Labs., Inc.*, C.A. No. 2:16-02526 (D.N.J.), ¶¶ 32-33; Ex. 73, ENDO-OPANA000150419-422 (Snowden Ex. 46) (Apr. 19, 2016 email from Guy Donatiello to Meg Snowden concerning Endo's position that the SLA required the negotiation of a royalty-bearing license if Endo obtained additional patents covering Original Opana ER).

[122] *See* Ex. 1, Snowden 12/19/18 Tr. 267:17-20 ██████████████████████████████████████████
████████████████████████████████████████████████████████████████

[123] *See* Causation DSUF, Ex. 49, at ¶ 4; Ex. 76, ENDO-OPANA-000150436, at -437 (Snowden Ex. 49) (Oct. 31, 2016 letter from Guy Donatiello to Chris Mengler and Meg Snowden ██████████
█████████████████████ Ex. 1, Snowden 12/19/18 Tr. 272:1-275:6 (testifying about Endo's letter ██████████████████████

[124] Ex. 74, June 8, 2017 FDA News Release, "FDA requests removal of Opana ER for risks related to abuse" (Lortie Ex. 30) ("In 2012, Endo replaced the original formulation of Opana ER with a new formulation intended to make the drug resistant to physical and chemical manipulation for abuse by snorting or injecting").

[125] Ex. 75, IMPAX-OPANA00205252-303 (Snowden Ex. 51) (Aug. 5, 2017 Endo-Impax

**DEFENDANTS' RESPONSE TO PARAGRAPH 39**: Plaintiffs' assertions in this paragraph are not material to Defendants' motion for summary judgment because the asserted facts, even if true, would not affect the outcome of the issues raised in Defendants' motion. Defendants have moved for summary judgment on the grounds that Plaintiffs have presented no record evidence that would allow a reasonable jury to find that the SLA caused them antitrust injury or damages and that, to the contrary, the undisputed record evidence demonstrates that the SLA and its Broad License benefitted Plaintiffs by enhancing, not reducing, competition. *See* ECF No. 558 (Defs.' Causation SJ Br.). Plaintiffs' assertions in this paragraph about FDA decisions or subsequent litigation over a royalty provision in the SLA do not create any genuine dispute of material fact as to whether Plaintiffs have evidence to support their causation or damages theories. Accordingly, even to the extent a dispute exists about Plaintiffs' assertions in this paragraph, such a dispute does not preclude summary judgment.

While Plaintiffs' assertions in this paragraph are immaterial, they are also incorrect. The FDA requested that Endo, not Impax, remove its Reformulated Opana ER product from the market. Further, Endo did not make Impax an exclusive distributor of Opana ER. In the SLA, Endo had granted Impax a license to the Later-Issued Patents to allow Impax to make, use, and sell its generic version of Original Opana ER, and the parties amended the provisions of the SLA providing for a royalty from Impax to Endo under that license. *See* Defs.' Ex. 79 (ENDO-OPANA-000005677, Amended SLA) at 3–5.

---

settlement agreement).

55

Dated: August 4, 2020

/s/ George G. Gordon
George G. Gordon (admitted *pro hac vice*)
Julia Chapman (admitted *pro hac vice*)
Thomas J. Miller (admitted *pro hac vice*)
John P. McClam (admitted *pro hac vice*)
Sharon K. Gagliardi (admitted *pro hac vice*)
**DECHERT LLP**
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104
Tel.: (215) 994 4000
Fax: (215) 994-2222
george.gordon@dechert.com
julia.chapman@dechert.com
thomas.miller@dechert.com
john.mcclam@dechert.com
sharon.gagliardi@dechert.com

Craig Falls (admitted *pro hac vice*)
**DECHERT LLP**
1900 K Street, NW
Washington, DC 20006
Tel.: (202) 261-3300
Fax: (202) 261-3333
craig.falls@dechert.com

Robert D. Rhoad (admitted *pro hac vice*)
**DECHERT LLP**
502 Carnegie Center, Suite 104
Princeton, NJ 08540
Tel.: (609) 955-3269
Fax.: (609) 873-9142
robert.rhoad@dechert.com

Angela Liu
**DECHERT LLP**
35 West Wacker Drive, Suite 3400
Chicago, IL 60601
Tel.: (312) 646-5800
Fax: (312) 646-5858
angela.liu@dechert.com

*Counsel for Defendants Endo Health Solutions*
*Inc., Endo Pharmaceuticals Inc., and*
*Penwest Pharmaceuticals Co.*

Respectfully submitted,

/s/ Devora W. Allon
Devora W. Allon, P.C. (admitted *pro hac vice*)
Jay P. Lefkowitz, P.C. (admitted *pro hac vice*)
Evelyn Blacklock (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-4800
devora.allon@kirkland.com
lefkowitz@kirkland.com
evelyn.blacklock@kirkland.com

James R.P. Hileman
**KIRKLAND & ELLIS LLP**
300 North LaSalle Street
Chicago, IL 60654
Tel.: (312) 862-7090
jhileman@kirkland.com

*Counsel for Defendant Impax*
*Laboratories, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2020, I caused to be filed the foregoing document with the United States District Court for the Northern District of Illinois using the CM/ECF system, and caused it to be served on all registered participants via the notice of electronic filing and by emailing a copy of the moving papers to counsel for Plaintiffs.

/s/ Angela Liu
**DECHERT LLP**
35 West Wacker Drive, Suite 3400
Chicago, IL 60601
Tel.: (312) 646-5800
Fax: (312) 646-5858
angela.liu@dechert.com