**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE OPANA ER ANTITRUST LITIGATION | MDL No. 2580 |
| | Lead Case No. 14-cv-10150 |
| THIS DOCUMENT RELATES TO: | Hon. Harry D. Leinenweber |
| All End-Payor Actions | |

**END-PAYOR PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL**
**OF PROPOSED SETTLEMENT, FORM AND MANNER OF NOTICE TO THE**
**CLASSES, AND PROPOSED SCHEDULE FOR A FINAL FAIRNESS HEARING**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ......................................................... 2

   A.   Plaintiffs' Allegations ......................................................................................... 2

   B.   The Risks of Impax's Defenses .......................................................................... 3

   C.   Litigation and Procedural History ...................................................................... 4

   D.   The Settlement Agreement ................................................................................. 6

      1.   Proposed Class Definition........................................................................ 6

      2.   Monetary Relief ....................................................................................... 7

      3.   Plan of Allocation ................................................................................... 8

      4.   Notice and Settlement Administration Costs .......................................... 8

      5.   Release .................................................................................................... 9

      6.   Attorneys' Fees and Costs for Class Counsel, and Service Awards for Class Representatives ....................................................................................... 9

ARGUMENT ................................................................................................................... 10

   A.   The Settlement Easily Meets the Seventh Circuit's Standards for Approval ............... 10

   B.   The Settlement should be preliminarily approved ......................................... 11

      1.   The Settlement provides substantial relief to the Class, particularly given the risks posed by continued litigation ................................................. 12

      2.   Continued litigation would be risky, costly, and lengthy ......................... 13

      3.   Co-Lead Counsel are competent, well-informed, and experienced, and they strongly endorse the Settlement .............................................................. 13

      4.   The Settlement was reached after significant analysis and arm's-length negotiation 14

   C.   The Proposed Form and Manner of Notice Are Appropriate........................... 15

   D.   An Additional Opt-Out Period Is Unnecessary.............................................. 16

   E.   A.B. Data, Ltd. and Huntington Bank Should Be Appointed Respectively as Claims Administrator and Escrow Agent.................................................................... 17

   F.   The Plan of Allocation Is Fair, Reasonable, and Adequate ........................... 18

   G.   The Court Should Schedule a Fairness Hearing to Finally Approve the Settlement ..... 19

CONCLUSION ................................................................................................................. 20

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*,
2011 WL 3290302 (N.D. Ill. July 26, 2011)..............................................................14

*Archbold v. Wells Fargo Bank, N.A.*,
2015 WL 4276295 (S.D. W. Va. July 14, 2015) ......................................................10

*Armstrong v. Bd. of Sch. Dirs. Of the City of Milwaukee*,
616 F.2d 305 (7th Cir. 1980) .........................................................................11, 12, 14

*Borcea v. Carnival Corp.*,
238 F.R.D. 664 (S.D. Fla. 2006).................................................................................13

*Cent. States Grp. v. AIG Glob. Inv. Corp. (In re Healthsouth Corp. Sec. Litig.)*,
334 F. App'x 248, 250 n.4 (11th Cir. 2009).................................................................17

*Denney v. Deutsche Bank AG*, 443 F.3d 253, 270-71 (2d Cir. 2006)...........................16

*Felzen v. Andreas*, 134 F.3d 873, 875 (7th Cir. 1998)...................................................11

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
270 F.R.D. 330, 345 (N.D. Ill. 2010).................................................................12. 15

*In re Brand Name Prescription Drugs Antitrust Litig.*,
1996 WL 167347 at *3 (N.D. Ill. Apr. 4, 1996) .....................................................16

*In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices & Antitrust Litig.*,
No. 2:17-md-02785, ECF No. 2594 (slip op.) (D. Kan. Mar. 11, 2022) .........................17, 18

*In re Lidoderm Antitrust Litig.*,
No. 3:14-md-02521, ECF No. 1055 (slip op.) (N.D. Cal. Sept. 20, 2018) .............................10

*In re Loestrin Fe Antitrust Litig.*,
No. 1:13-md-2472, ECF No. 1427 (slip op.) (D. R.I. Mar. 23, 2020) ....................................17

*In re Mexico Money Transfer Litig.*,
164 F. Supp. 2d 1002 (N.D. Ill. 2000)........................................................................14

*In re Namenda Direct Purchaser Antitrust Litig.*,
No. 1:15-cv-07488, ECF No. 920 (slip op.) (S.D.N.Y. Jan. 6, 2020) ....................................17

*In re Northfield Labs., Inc. Securities Litig.*,
2012 WL 366852 (N.D. Ill. Jan. 31, 2012) .................................................................17

*In re Opana ER Antitrust Litig.*,
2016 WL 4245516 (N.D. Ill. Aug. 11, 2016) ........................................................ 4

*In re Opana ER Antitrust Litig.*,
2021 WL 2291067 (N.D. Ill. June 4, 2021) ........................................................ 5

*In re Opana ER Antitrust Litig.*,
2021 WL 3627733 (N.D. Ill. June 4, 2021) ........................................................ 5

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
No. 1:18-md-02819, ECF No. 716 (slip op.) (E.D.N.Y. Jan 18, 2022) .................................. 17

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
No. 1:14-md-02503, ECF No. 1145 (slip op.) (D. Mass. Apr. 5, 2018) .......................... 17, 18

*In re Southwest Airlines Voucher Litig.*,
2013 WL 4510197 (N.D. Ill. Aug. 26, 2013) ........................................................ 12

*In re Warner Commc'ns Sec. Litig.*,
618 F. Supp. 735 (S.D.N.Y. 1985) ........................................................ 14

*Isby v. Bayh*,
75 F.3d 1191 (7th Cir. 1996) ........................................................ 11, 12, 13

*Kessler v. Am. Resorts International's Holiday Network, Ltd.*,
2007 WL 4105204 (N.D. Ill. Nov. 14, 2007) ........................................................ 12

*Lane v. Facebook, Inc.*,
696 F.3d 811 (9th Cir. 2012) ........................................................ 13

*Mullane v. Cent. Hanover Bank & Trust Co.*,
339 U.S. 306 (1950) ........................................................ 15

*Officers For Justice v. Civil Service Com'n*,
688 F.2d 615, 634-35 (9th Cir. 1982) ........................................................ 16

*Retsky Family Ltd. P'ship v. Price Waterhouse LLP*,
2001 WL 1568856 (N.D. Ill. Dec. 10, 2001) ........................................................ 18

*Schulte v. Fifth Third Bank*,
805 F. Supp. 2d 560 (N.D. Ill. 2011) ........................................................ 13

*Schulte v. Fifth Third Bank*,
2010 WL 8816289 (N.D. Ill. Sept. 10, 2010) ........................................................ 18

*Summers v. UAL Corp. ESOP Committee,*
2005 WL 3159450 (N.D. Ill. Nov. 22, 2005) ............................................................. 18

*Synfuel Techs, Inc. v. DHL Express (USA), Inc.,*
    463 F.3d 646 (7th Cir. 2006) .................................................... 11, 12, 14

*Young v. Rolling in the Dough, Inc.,*
    2020 WL 969616 (N.D. Ill. Feb. 27, 2020) ............................................. 11

**Statutes**

28 U.S.C. § 1715 ................................................................................................. 2

**Rules**

Federal Rule of Civil Procedure 23 ........................................................ *passim*

**Other Authorities**

*Newberg on Class Actions* § 11.41 (4th ed. 2002) ................................ 11, 14

Manual for Complex Litigation, Fourth ........................................................ 15

## **INTRODUCTION**

After more than eight years of litigation, completion of fact and expert discovery, a Rule 23(f) appeal to the Seventh Circuit, and on the fifth day of a hard-fought trial, End-Payor Plaintiffs ("EPPs")[1] agreed to a $15 million cash settlement ("Settlement") with Defendant Impax Laboratories, Inc. ("Impax") on behalf of the certified EPP Classes.[2] Reached in the context of a fully developed record and concrete trial risks for both sides, the Settlement represents a meaningful recovery for the Classes. Indeed, EPPs faced material risks of an adverse outcome throughout litigation and trial. This case involves complex facts and legal claims and multiple technical experts. From inception, EPPs were unrelenting in their pursuit of the best possible class-wide relief.

As detailed below and in the supporting documents, the Settlement was negotiated at arm's length by counsel experienced in antitrust class actions. Particularly in light of the verdict in favor of Impax's co-defendant, it is clear that the Settlement's immediate relief and avoidance of the potential risks and delay of trial and appeals is a huge benefit to the Classes. Further, the proposed plan for providing notice of the Settlement to the EPP Classes is substantially similar to the class certification notice plan previously approved by the Court and will provide the best notice practicable. The plan includes an online media campaign, publication, and direct mail to third-party payors ("TPPs"). The forms that Class Members will submit to claim a share of the Settlement are straightforward and easy to complete. Further, the proposed Plan of Allocation is

---

[1] Plumbers and Pipefitters Local 178 Health & Welfare Trust Fund; Louisiana Health Service & Indemnity Company, d/b/a Blue Cross and Blue Shield of Louisiana; Fraternal Order of Police, Miami Lodge 20, Insurance Trust Fund; Wisconsin Masons' Health Care Fund; Pennsylvania Employees Benefit Trust Fund; and International Union of Operating Engineers, Local 138 Welfare Fund.

[2] Capitalized terms have the same meanings set forth in the July 19, 2022 Settlement Agreement attached hereto as **Exhibit 1**.

reasonable and fair. It divides the settlement proceeds into pools for the different types of Class Members (consumers and TPPs), and distributes funds within each pool on a *pro rata* basis.

Balancing the risks against the substantial attendant benefits, the Court should find that the Settlement is fair, adequate, and reasonable and enter an Order (i) granting preliminary approval of the Settlement Agreement; (ii) approving the form and manner of the Notice Plan; (iii) appointing A.B. Data as Claims Administrator and Huntington Bank as Escrow Agent; (iv) establishing deadlines for filing of objections to the proposed settlement; and (v) scheduling a final Fairness Hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Plaintiffs' Allegations

This case involves allegations that Defendants Impax and Endo Health Solutions Inc., Endo Pharmaceuticals Inc., Penwest Pharmaceuticals Co. (together, "Endo") unreasonably restrained competition in the market for Opana ER and its AB-rated generic equivalents sold in the United States. Final Pretrial Order, ECF No. 895, at 2

Specifically, EPPs allege that in June 2010, Endo and Impax entered into a "pay for delay" or "reverse payment" agreement, delaying the launch of Impax's generic version of Opana ER until January 2013. Plaintiffs allege that Endo paid Impax to stay off the market in three ways. First, Endo promised Impax that it would not launch an authorized generic version of Opana ER to compete with Impax's generic version of Opana ER when Impax's product finally entered the market (the "no-AG agreement"). *Id.* at 2. Second, Impax and Endo agreed to a provision known as the "Endo Credit," which was designed to ensure the value of the no-AG agreement and would result in a cash payment to Impax if Endo's sales dropped below a predetermined threshold prior to Impax's launch of generic Opana ER. That provision was ultimately triggered by Endo's launch of a reformulated version of Opana ER and resulted in Impax receiving over $102 million from

2

Endo. *Id.* at 2-3. Finally, Impax and Endo hastily negotiated a Development & Co-Promotion Agreement ("DCA") which included an upfront, guaranteed $10 million cash payment to Impax. *Id.* at 3. EPPs allege that these payments violated various state antitrust, consumer, and unjust enrichment laws and caused EPPs to pay more for Opana ER and generic Opana ER than they would have absent Defendants' unlawful agreement. *Id.* at 3-4.

### B. The Risks of Impax's Defenses

Impax asserted multiple defenses to the merits of End-Payor Plaintiffs' claims. *See* Impax's Answer to End-Payor Plaintiffs' Second Consolidated Amended Class Action Complaint ("Answer"), ECF No. 212. In support of its position that it did not violate any antitrust, consumer protection, or unjust enrichment laws, Impax asserted that the 2010 Settlement and License Agreement resolving patent litigation between Endo and Impax promoted competition, insofar as it enabled risk-free generic competition from Impax, which benefitted, EPPs and did not cause them any injury. *Id.* at 144-45; *see also* Memorandum of Law in Support of Defendants' Causation/Damages Motion for Summary Judgment ("Mot. for Summary Judgment"), ECF No. 539. With respect to EPPs' damages claims, Impax argued numerous times to the Court before trial that Dr. Meredith Rosenthal's damages model was flawed and could not prove EPPs suffered any economic damages. *See* Mot. for Summary Judgment; *Daubert* motions directed at Dr. Rosenthal, ECF Nos. 545/560/563; 759/760. As evidenced by Endo's trial victory, the risk that these defenses posed to EPPs at trial were substantial.[3]

---

[3] On July 27, 2022, all Plaintiffs filed a Post-Trial Motion for Judgment as a Matter of Law or for a New Trial. ECF No. 1048.

## C. Litigation and Procedural History

On December 12, 2014, the Judicial Panel on Multidistrict Litigation centralized all six then-pending actions (three direct purchaser and three indirect purchaser) in this District and assigned them to this Court. *See* MDL No. 2580, Doc. 54 (Transfer Order). On April 2, 2015, the Court appointed Freed Kanner London & Millen, LLC and Labaton Sucharow LLP[4] as Interim Co-Lead Counsel for the then-proposed End-Payor Plaintiff Class. *See* ECF No. 78.

For the next seven years, the case was extensively litigated. From July 2015 through June 2016, the parties engaged in two rounds of motion to dismiss briefing, with Defendants advancing both liability and state-law specific arguments. On February 10, 2016, the Court rejected Defendants' arguments and largely denied Defendants' motion to dismiss EPPs' First Consolidated Amended Class Action Complaint, dismissing several state law claims but granting EPPs' leave to replead. *See In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704 (N.D. Ill. 2016). On August 11, 2016, the Court largely rejected Defendants' arguments seeking dismissal of unjust enrichment claims under the laws of numerous states. *See In re Opana ER Antitrust Litig.*, 2016 WL 4245516 (N.D. Ill. Aug. 11, 2016).

Thereafter, the parties began fact discovery. In prosecuting this case, EPPs secured the production of approximately 4.5 million pages of documents from Defendants and another 20,000 documents from third parties, took 23 fact depositions and defended six plaintiff-witness depositions. The parties also engaged in extensive motion practice concerning numerous discovery disputes. Subsequently, the parties completed expert discovery (with a total of 23 experts on both sides submitting reports relevant to EPPs' claims) and class certification briefing. In February

---

[4] On March 9, 2022, the Court granted EPPs' Motion to Amend Appointment of Co-Lead Counsel to substitute DiCello Levitt Gutzler LLC for Labaton Sucharow LLP when the attorneys principally working on the case switched law firm affiliations. *See* ECF No. 786.

2020, the Court set a schedule for *Daubert* and summary judgment motions. *See* ECF No. 501. Defendants filed two summary judgment motions, and the parties collectively filed 21 *Daubert* motions, with briefing largely concluding in August 2020.

On June 4, 2021, the Court issued an 83-page opinion ruling on the parties' *Daubert* motions and denying Defendants' summary judgment motions and a separate opinion granting EPPs' motion for class certification. *See In re Opana ER Antitrust Litig.*, 2021 WL 2291067 (*Daubert* and summary judgment) & 2021 WL 3627733 (class certification).

On June 21, 2021, Defendants filed a petition for permission to appeal pursuant to Fed. R. Civ. P. 23(f). *See In Re: Opana ER Antitrust Litigation*, No. 21-8017, (7th Cir.), CA7 Dkt. 2. On July 1, 2021, EPPs' filed a response in opposition. CA7 Dkt. 14. On July 13, 2021, the Seventh Circuit issued its ruling remanding the case to this Court for consideration on EPPs' proposed amended class definition. CA7 Dkt. 17. On August 11, 2021, the Court amended its June 4, 2021 order certifying class to include EPPs' proposed exclusions to the class definition. ECF No. 746.

On July 29, 2021, the Court rescheduled trial for June 2022. *See* ECF No. 744. On September 23, 2021, the Court granted EPPs' motion to approve providing notice to the certified Classes. That notice explained, *inter alia*, that the Classes had been certified, what the litigation was about, and that Class Members could elect to opt out if they wished. ECF No. 752. A.B. Data, Ltd. Class Administration Company ("A.B. Data") effected notice pursuant to the Notice Plan by (a) direct mail to potential third-party payor ("TPP") Class Members using A.B. Data's proprietary database; (b) a digital advertising campaign on numerous digital and social media platforms; (c) a news release disseminated over PR Newswire; and (d) a toll-free telephone number and class notice website to address potential Class Member inquiries. ECF No. 774 at ¶ 3; ECF No. 773-1

(copy of mailed notice). Class Members were told that the deadline to opt-out of the Classes was December 6, 2021. ECF No. 774 ¶ 10. A.B. Data received three requests for exclusion. *Id*. ¶ 11.

On May 24, 2022, the parties filed the Joint Final Pretrial Order, which included, *inter alia*, witness lists, exhibit lists, deposition designations (including counter and rebuttal designations), and proposed jury instructions and verdict forms. *See* ECF No. 895. The parties also filed a total of 24 motions *in limine*.

On June 2, 2022, the Court held a final pretrial conference, and on June 6, 2022 the Court ruled on motions *in limine*. *See* ECF Nos. 921, 937, respectively. Trial began on June 9, 2022. Ultimately, EPPs and Impax reached an agreement-in-principle five days into trial, on June 15, 2022, that resulted in the Settlement Agreement.

## D. The Settlement Agreement

The Settlement Agreement contains the following key terms:

### 1. Proposed Class Definition

The Court certified the following Classes[5] under Rule 23(b)(3) of the Federal Rules of Civil Procedure:

> **Antitrust/Consumer Protection Class**: All persons or entities who indirectly purchased, paid for, and/or provided reimbursement for some or all of the purchase

---

[5] Excluded from the Classes are (a) Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates; (b) persons or entities whose only purchases of or reimbursements or payments for brand or generic Opana ER were of or for the generic Opana ER product sold by Actavis South Atlantic LLC or its successors; (c) all governmental entities and Medicare Part D plans and beneficiaries, except for non-Medicare Part D government-funded employee benefit plans; (d) all persons or entities who purchased Opana ER for purposes of resale or directly from Defendants or their affiliates; (e) fully-insured health plans (plans that purchased insurance from another third-party payor covering 100 percent of the plan's reimbursement obligations to its members); (f) flat co-payers (consumers who paid the same co-payment amount for brand and generic drugs); (g) any consumer who purchased only Endo's brand version of Opana ER after the AB-rated generic version became available in January 2013 (i.e., "brand loyalists"); (h) consumers with copay insurance plans who purchased only generic versions of Opana ER (*i.e.*, "generic-only copay consumers"); (i) pharmacy Benefit Managers; (j) all Counsel of Record; and (k) the Court, Court personnel and any member of their immediate families.

6

price for brand or generic Opana ER 5 mg, 10 mg, 20 mg, 30 mg, and/or 40 mg sold by Defendants, other than for resale, in the states and commonwealths of Arizona, California, Florida, Hawaii, Iowa, Maine, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Vermont, West Virginia, Wisconsin, and the District of Columbia from April 2011 through September 2018; and

**Unjust Enrichment Subclasses**: All persons or entities who from April 2011 through September 2018 indirectly purchased, paid for, and/or provided reimbursement for some or all of the purchase price for brand or generic Opana ER 5 mg, 10 mg, 20 mg, 30 mg, and/or 40 mg sold by Defendants, other than for resale, in the following states and commonwealths:[6]

| | |
|---|---|
| **Subclass 1**: | Iowa, Michigan, Oregon, West Virginia |
| **Subclass 2**: | Maine, New Mexico, Wisconsin |
| **Subclass 3**: | Hawaii, Massachusetts, Mississippi, Nebraska, Vermont |
| **Subclass 4**: | Florida, Minnesota, Missouri, Nevada, Pennsylvania, South Dakota, Utah |
| **Subclass 5**: | Arizona, North Dakota. |

2. **Monetary Relief**

Impax agreed to pay cash in the amount of $15,000,000 to create a Settlement Fund for the benefit of Class Members, who will receive a *pro rata* payment (per the Plan of Allocation described below), after the deduction of settlement-related costs, including the expenses of the settlement administrator and the costs of notice to the Classes, any service awards, any fee award,[7] and any other administrative fees and expenses which may be approved by the Court. Settlement Agreement § II.A.1. Impax funded the settlement through payment into the Escrow Account on July 6, 2022. *Id.* If the Settlement is approved, no portion of the Settlement Fund will be returned to Defendants. *Id.* at § II.A.2.

---

[6] With respect to Arizona, Massachusetts, and Mississippi unjust enrichment claims, Class Members must have purchased, paid for, and/or provided reimbursement for some or all the purchase price of brand or generic Opana ER from June 4, 2011 through September 2018.

[7] EPP Counsel intend to seek a percentage fee from the $15,000,000 Settlement amount.

3. **Plan of Allocation**

After the Date the Settlement becomes Final, the Net Settlement Fund shall be disbursed in accordance with a plan of distribution to be approved by the Court. Settlement Agreement § II.C.8. The plan of allocation is not a necessary term of the Settlement Agreement, and it is not a condition of the Settlement Agreement that any particular plan of distribution be approved by the Court. *Id.* Nonetheless, the proposed Plan of Allocation, attached hereto as **Exhibit 2**, would allocate the Net Settlement Fund on a *pro rata* basis based on Class Members' purchases of brand and generic Opana ER during the relevant time period.

4. **Notice and Settlement Administration Costs**

All Notice and Administrative Costs will be paid from the Settlement Fund. Settlement Agreement § II.C. Co-Lead Counsel may withdraw from the Settlement Fund up to $500,000 to pay for expenses associated with providing notice of the Settlement to the Classes. § II.C.2. Class Members will be notified through a program led by A.B. Data, a highly experienced, well-regarded, third-party administrator. A.B. Data's notice program uses the same methods previously approved by the Court after certification of the Classes. The proposed Notice Plan is described in the Declaration of Linda V. Young of A.B. Data, Ltd., attached hereto as **Exhibit 3** ("Young Declaration"). The proposed forms of notice ("Proposed Notices"), which seek to communicate Class Members' rights and options under the Settlement in plain, easily understood language, are attached as exhibits to the Young Declaration along with draft Claim Forms.[8]

---

[8] The forms of notice are also included as exhibits to the Settlement Agreement along with proposed Preliminary and Final Approval Orders.

**5. Release**

In exchange for the relief afforded by the Settlement Agreement, Impax and other Released Parties[9] will receive a release of all Released Claims.[10] The release is narrowly tailored to the claims related to this Action and thus covers the claims actually at issue (or that could have been asserted based on the alleged facts) in this MDL through the date of preliminary approval.

**6. Attorneys' Fees and Costs for Class Counsel, and Service Awards for Class Representatives**

The Settlement Agreement permits Co-Lead Counsel to apply to the Court seeking a reasonable portion of the Settlement Fund as payment of any reasonable attorneys' fees and costs ("Class Counsel Fees and Expenses"). *Id.* § D.7. Co-Lead Counsel intends to make an application to the Court for a reasonable Attorneys' Fee Award in an amount not to exceed 33 1/3% of the Settlement Fund, plus reasonable expenses incurred. There is no "clear sailing" provision, and Impax may object to any fee and expense request if it so desires. Nor is there any "kicker" provision, and any reduction in Co-Lead Counsel's requested fee returns to the Classes, not Defendants.

Co-Lead Counsel will also seek service awards for Class Representatives to be paid from the Settlement Fund, in an amount up to $10,000 each, with Wisconsin Masons' Health Care Fund receiving an additional $5,000 ($15,000 in total) for its time preparing for and testifying at trial.

---

[9] Impax, "its predecessors; successors; assigns; and any and all past, present, and future parents, owners, subsidiaries, divisions, departments, and affiliates, and all of their past, present, and future heirs, executors, devisees, administrators, officers, executives, directors, stockholders, partners, members, agents, attorneys, advisors, auditors, accountants, contractors, servants, employees, representatives, insurers, and assignees." Settlement Agreement § I(19).

[10] "Any and all existing or potential causes of action, claims, suits, actions, contentions, allegations, assertions of wrongdoing, and demands, whether class, individual, or otherwise in nature and whether known or unknown, and any damages, liabilities, costs, losses, expenses, penalties, or fees of any kind and under any theory, whenever incurred and whether known or unknown, that directly or indirectly arise out of, relate to, or refer in any way to the conduct alleged in the Action." Settlement Agreement § I(18).

*Id.* § II.D.7.[11] Each Class Representative (1) reviewed and approved the complaint and other substantive pleadings; (2) responded to written discovery and collected, reviewed, and produced documents relating to their claims; (3) prepared for and sat for lengthy depositions by defense counsel; (4) in the case of Wisconsin Masons' Health Care Fund, appeared at trial and testified in EPPs' case-in-chief; and (5) considered and approved the Settlement. The Class Representatives assumed this responsibility to benefit all Class Members. *See Archbold v. Wells Fargo Bank, N.A.*, 2015 WL 4276295, at *6 (S.D. W. Va. July 14, 2015) ("Had the Plaintiff not stepped forward to prosecute these claims, the rest of the class would have received nothing."). By stepping forward and diligently performing their duties as Class Representatives, they performed a valuable public service that will benefit tens of thousands of thousands of persons or entities that indirectly purchased brand or generic Opana ER.

Should the Court award less than any amount requested as a Service Award, the difference in the amount sought and the amount ultimately awarded shall remain in the Settlement Fund for the benefit of the Classes. The Settlement Agreement is neither dependent nor conditioned upon the Court approving the aforementioned payments, nor upon the Court awarding the particular amounts sought. *Id.* § II.D.7.d.

## ARGUMENT

### A. The Settlement Easily Meets the Seventh Circuit's Standards for Approval

As the Seventh Circuit recognizes, federal courts strongly favor and encourage settlements—particularly in class actions and other complex matters where the inherent costs,

---

[11] The proposed service awards for the class representatives here are consistent with service awards granted in other recent reverse payment cases. *See, e.g., In re Lidoderm Antitrust Litig.*, No. 3:14-md-02521, ECF No. 1055 (slip op.), at 7 (N.D. Cal. Sept. 20, 2018) (granting service awards of $10,000 per class representative and collecting cases awarding similar amounts).

delays, and risks of protracted litigation might otherwise overwhelm any potential benefit the class could hope to obtain:

> It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement. In the class action context in particular, there is an overriding public interest in favor of settlement. Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.

*Armstrong v. Bd. of Sch. Dirs. Of the City of Milwaukee*, 616 F.2d 305, 312-13 (7th Cir. 1980) (citations and quotations omitted), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873, 875 (7th Cir. 1998); *see also Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); *Newberg on Class Actions* § 11.41 (4th ed. 2002) (collecting cases).

The proposed Settlement, negotiated at arm's length by competent, experienced counsel, during trial, provides Class Members substantial monetary relief while at the same time mitigating the risk of an adverse verdict and lengthy appeal process that would preclude any recovery whatsoever for the Classes.

**B. The Settlement should be preliminarily approved**

Rule 23(e) provides that a court may approve a proposed class settlement "on a finding that it is fair, reasonable, and adequate." *See* Fed. R. Civ. P. 23(e)(2); *see also Synfuel Techs, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 652 (7th Cir. 2006); *Young v. Rolling in the Dough, Inc.*, 2020 WL 969616, at *3 (N.D. Ill. Feb. 27, 2020). At the preliminary approval stage, the district court should assess whether the proposed settlement falls "within the range of possible approval," in order to "ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing." *Id*.

While "[f]ederal courts naturally favor the settlement of class action litigation," *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 345 (N.D. Ill. 2010) (*quoting Isby*, 75 F.3d at 1196), district courts must nonetheless consider the following four factors to determine whether a proposed settlement is fair, reasonable, and adequate: (a) the strength of the plaintiff's case compared to the amount of the settlement offer; (b) the length, complexity, and expense of further litigation; (c) the opinion of competent counsel; and (d) the stage of the proceedings and amount of discovery completed. *See Synfuel*, 463 F.3d at 653 (citing *Isby*, 75 F.3d at 1199). "Although this standard and the factors used to measure it are ultimately questions for the fairness hearing that comes after a court finds that a proposed settlement is within approval range, a more summary version of the same inquiry takes place at the preliminary phase," *Kessler v. Am. Resorts International's Holiday Network, Ltd.*, 2007 WL 4105204, at *5 (N.D. Ill. Nov. 14, 2007) (citing *Armstrong*, 616 F.2d at 314), under which the facts are viewed "in the light most favorable to the settlement," *Isby*, 75 F.3d at 1199.

Each of these factors weighs in favor of finding the proposed settlement fair, reasonable, and adequate, warranting its preliminary approval.

**1. The Settlement provides substantial relief to the Classes, particularly given the risks posed by continued litigation**

"The most important factor relevant to the fairness of a class action settlement is . . . the strength of the plaintiff's case on the merits balanced against the amount offered in the settlement." *Synfuel*, 463 F.3d at 653 (internal quotes and citations omitted). "Because the essence of settlement is compromise, courts should not reject a settlement solely because it does not provide a complete victory to the plaintiffs." *In re AT&T Mobility*, 270 F.R.D. at 347 (citations omitted).

Given the significant litigation risks, as evidenced by the jury verdict in favor of Endo, the $15 million common fund provides a significant recovery to Class Members. *See In re Southwest*

*Airlines Voucher Litig.*, 2013 WL 4510197, at *7 (N.D. Ill. Aug. 26, 2013) ("In considering the strength of plaintiffs' case, legal uncertainties at the time of settlement favor approval."). In fact, the $15 million common fund reflects as much as 33% of net overcharge damages, which ranged from $44.61 million to $80.06 million. Final Pretrial Order, ECF No. 895, at 18.

### 2. Continued litigation would be risky, costly, and lengthy

Preliminary approval is also favored because the "[s]ettlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011). As explained above, had EPPs not secured this Settlement, the jury may well have rendered a verdict finding Impax not liable. Post-trial motions and the appellate process would then deprive the Classes of any recovery for years, and possibly forever.

Rather than risking an adverse verdict at trial, and years of uncertain appeals, EPPs and their counsel took advantage of a unique opportunity to negotiate a Settlement that provides immediate, certain, and meaningful relief to all Class Members. *See id.* at 586; *see Lane v. Facebook, Inc.*, 696 F.3d 811, 820 (9th Cir. 2012) ("the immediate benefits represented by the Settlement outweighed the possibility—perhaps remote—of obtaining a better result at trial"). Accordingly, this factor weighs in favor of finding the Settlement fair, reasonable and adequate. *See Borcea v. Carnival Corp.*, 238 F.R.D. 664, 674 (S.D. Fla. 2006) (noting that "[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush").

### 3. Co-Lead Counsel are competent, well-informed, and experienced, and they strongly endorse the Settlement

The third factor examines the opinion of competent counsel as to whether a proposed settlement is fair, reasonable, and adequate. *See Isby*, 75 F.3d at 1200. In assessing the qualifications of counsel under this factor, a court may rely upon affidavits submitted by class

counsel as well as its own observations of class counsel during the litigation. *Id*. This Court appointed the attorneys at Freed Kanner London & Millen LLC and DiCello Levitt Gutzler LLC as Co-Lead Counsel, in recognition of their significant experience in class action and complex litigation and good judgment. Co-Lead Counsel endorse this settlement and strongly recommend its approval. Accordingly, the third factor weighs in favor of finding the Settlement fair, reasonable, and adequate. *See, e.g.*, *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000) (placing "significant weight on the . . . strong endorsement of [this] settlement" by a "well-respected" attorney).

### 4. The Settlement was reached after significant analysis and arm's-length negotiation

The last factor concerns the stage of the proceedings and amount of discovery completed at the time the settlement is reached. *See Synfuel*, 463 F.3d at 653. This factor "indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, 2011 WL 3290302 (N.D. Ill. July 26, 2011) (quoting *Armstrong*, 616 F.2d at 325) (internal quotations omitted).

The proposed Settlement was reached after more than eight years of litigation and five days into trial. It is informed by counsel's thorough investigation and Plaintiffs' experts' analysis of the issues at the heart of this case. Armed with this information, EPPs and their counsel had "a clear view of the strengths and weaknesses" of the case and were in a strong position to negotiate a fair, reasonable, and adequate settlement. *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985), *aff'd* 798 F.2d 35 (2d Cir. 1986).

Because the Settlement "is the product of arm's length negotiations, sufficient discovery has been taken to allow the parties and the court to act intelligently, and counsel involved are competent and experienced," the Court may presume the settlement to be fair, adequate, and reasonable. *Newberg on Class Actions* § 11.41 (4th ed. 2002).

14

Accordingly, the final factor weighs in favor of finding the Settlement fair, reasonable and adequate.

### C. The Proposed Form and Manner of Notice Are Appropriate

"Rule 23(e)(1)(B) requires the court to 'direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise' regardless of whether the class was certified under Rule 23(b)(1), (b)(2), or (b)(3)." *Manual for Complex Lit., Fourth*, at § 21.312. The best practicable notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). The notice must contain specific information in plain, easily understood language, including the nature of the action and the rights of class members. Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii); *see also In re AT&T Mobility*, 270 F.R.D. at 352.

As explained in the Young Declaration, A.B. Data, which the Court previously appointed as Notice Administrator, designed a proposed Notice Program that will use (a) digital media (*e.g.*, banner ads), (b) social media (*e.g.*, ads purchased on Facebook, Instagram, and YouTube), (c) Google AdWords/Search, (d) print media (*i.e.*, People Magazine); and (e) earned media (*e.g.*, *PR Newswire*). Young Decl., ¶¶ 11-16; 19. A.B. Data will provide Postcard Notice via USPS First-Class Mail to all 41,000 TPP entities in A.B. Data's Database. Young Decl., ¶ 17. Direct email notice to TPPs and their addresses where email addresses are available will also be sent. *Id*. In addition to direct notice to TPPs, A.B. Data plans to target TPPs through coordinated internet banner ads and social media ads that will appear on various websites and social media platforms. *Id*. at ¶ 18. *See* Fed. R. Civ. P. 23(e)(1) (calling for notice to be provided in a "reasonable manner to all class members who would be bound by the proposal"); *In re Northfield Labs., Inc. Securities Litig.*, 2012 WL 366852, at *7 (N.D. Ill. Jan. 31, 2012). The Notice Program includes a dedicated

settlement website and toll-free telephone line where Class Members can learn more about their rights and options pursuant to the terms of the Settlement. Young Decl., ¶¶ 20-21.[12]

The notice will direct Class Members to the Settlement Website (www.opanaerantitrustlitigation.com), which will contain the Class Notice and an electronic version of the Claim Form that can be submitted online, the toll-free Settlement telephone number, and copies of the full Settlement Agreement and other important documents (including the operative Complaint, this Motion, all Orders of this Court concerning the Settlement, and EPPs' forthcoming motions for attorneys' fees and service award and final approval of the Settlement). Young Decl., ¶¶ 22-24.

### D. An Additional Opt-Out Period Is Unnecessary

While the Court has discretion to give members of a previously-certified class a second chance to opt out, *see* Rule 23(e)(4), there is no requirement that it do so, as numerous courts have recognized. *See, e.g.*, *In re Brand Name Prescription Drugs Antitrust Litig.*, 1996 WL 167347 at *3 (N.D. Ill. Apr. 4, 1996) ("We have found no authority of any kind suggesting that due process requires…a second chance to opt out") (quoting *Officers For Justice v. Civil Service Com'n*, 688 F.2d 615, 634-35 (9th Cir. 1982), *cert. denied*, 459 U.S. 1217 (1983)); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 270-71 (2d Cir. 2006) (courts are under "no obligation" to afford class members a second opportunity for exclusion).

Because all Class Members were informed about this case less than a year ago pursuant to Court-approved mailed individual notice, and were given the opportunity to opt out of the certified Class, and because all Class Members will be provided the opportunity to object to the terms of the settlement and/or Co-Lead Counsel's request for attorneys' fees, expenses and service awards

---

[12] The same proposed Notice Plan has been approved by courts and implemented in many other "reverse payment" cases. Young Decl., ¶ 5.

to the Class representatives, EPPs respectfully submit that no second opt-out period is necessary here. *See, e.g.*, *In re Namenda Direct Purchaser Antitrust Litig.*, No. 1:15-cv-07488, ECF No. 920, ¶¶ 7-8 (S.D.N.Y. Jan. 6, 2020) (no second opt out period necessary where class members previously had chance to opt out after class certified).[13]

### E. A.B. Data, Ltd. and Huntington Bank Should Be Appointed Respectively as Claims Administrator and Escrow Agent

The Court previously appointed A.B. Data as the Notice Administrator. ECF No. 752. EPPs request that A.B. Data now be appointed as the Claims Administrator. A.B. Data, Ltd., which has served as Claims Administrator in other reverse payment cases,[14] will oversee the administration of the Settlement, including disseminating notice to the Classes, calculating each Class Member's *pro rata* share of the Net Settlement Fund based on the proposed plan of allocation, and distributing Settlement proceeds.

Huntington Bank, which has been designated as the Escrow Agent for the Settlement Funds in the Settlement, is a highly respected bank providing consumers, corporations, and others with a broad range of financial services. Huntington Bank has served as escrow agent in other reverse payment litigation and should also be appointed as Escrow Agent here. *See, e.g.*, *In re EpiPen*

---

[13] The Settlement Agreement includes a provision allowing Impax to terminate the Settlement Agreement if a second opt-out period is provided, and if Class Members representing above a certain percentage of the total direct net unit purchases of brand and generic Opana ER purchases made during the Class Period opt out. *See* Settlement Agreement ¶ II.D.2. The agreed percentage is specified in a confidential supplemental agreement to the Settlement Agreement. The supplemental agreement is not being filed but can be provided to the Court for *in camera* inspection. *See Cent. States Grp. v. AIG Glob. Inv. Corp. (In re Healthsouth Corp. Sec. Litig.)*, 334 F. App'x 248, 250 n.4 (11th Cir. 2009) ("The threshold number of opt outs required to trigger the blow provision is typically not disclosed and is kept confidential to encourage settlement and discourage third parties from soliciting class members to opt out.").

[14] *See, e.g.*, *In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices & Antitrust Litig.*, No. 2:17-md-02785, ECF No. 2594 (D. Kan. Mar. 11, 2022) (appointing A.B. Data as claims administrator); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, No. 1:18-md-02819, ECF No. 716 (E.D.N.Y. Jan 18, 2022) (same); *In re Loestrin Fe Antitrust Litig.*, No. 1:13-md-2472, ECF No. 1427 (D. R.I. Mar. 23, 2020) (same); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 1:14-md-02503, ECF No. 1145 (D. Mass. Apr. 5, 2018) (same).

*(Epinephrine Injection, USP) Marketing, Sales Practices & Antitrust Litig.*, No. 2:17-md-02785, ECF No. 2590-1 (D. Kan.) (preliminary approval motion seeking appointment of Huntington Bank as escrow agent); *id.* at ECF No. 2594 (order granting preliminary approval); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 1:14-md-02503, ECF No. 1145 (D. Mass. Apr. 5, 2018) (appointing Huntington Bank as escrow agent).

### F. The Plan of Allocation Is Fair, Reasonable, and Adequate

The standard for approving a plan of allocation for a settlement fund in a class action, like the one governing approval of the settlement as a whole, is that the plan must be fair, reasonable and adequate. Fed. R. Civ. P. 23(e)(2); *see also Summers v. UAL Corp. ESOP Committee*, 2005 WL 3159450, at *2 (N.D. Ill. Nov. 22, 2005); *Schulte v. Fifth Third Bank*, 2010 WL 8816289, at *3-4 (N.D. Ill. Sept. 10. 2010) (examining allocation of funds as part of the preliminary approval process); *Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, 2001 WL 1568856, at *3 (N.D. Ill. Dec. 10, 2001) ("The same standards of fairness, reasonableness and adequacy that apply to the settlement apply to the Plan of Allocation.").

As set forth in the proposed Plan of Allocation[15] and in the Declaration of Dr. Meredith Rosenthal ("Rosenthal Decl.") attached hereto as **Exhibit 4**, the Net Settlement Fund will be distributed into two pools: 44.26% for a Consumer Pool and 55.74% for a Third-Party Payor Pool. Plan of Allocation, ¶¶ 2-3; Ex. C (Rosenthal Decl.), ¶¶ 2(c)-2(d), 3. Claimants will be paid their *pro rata* share of their respective pools. *See* Plan of Allocation, ¶¶ 15-19 (explaining distribution procedure).

Each Allocation Pool shall be distributed to Eligible Claimants in that Allocation Pool on a *pro rata* basis calculated by each Eligible Claimant's Qualifying Claim amount. To

---

[15] All capitalized terms in this section are defined in the Plan of Allocation.

determine each Eligible Claimant's *pro rata* share of an Allocation Pool, the Settlement Administrator shall multiply the total value of that Allocation Pool by a fraction, for which (a) the numerator is the Qualifying Claim amount for that Eligible Claimant for that Allocation Pool, and (b) the denominator is the sum total of all Qualifying Claim amounts by all Eligible Claimants for that Allocation Pool. *See* Plan of Allocation, ¶ 16.[16] To the extent an Eligible Claimants in a given Allocation Pool receives a maximum distribution (which in all events will be no greater than the total amount an Eligible Claimant spent on Opana ER and/or generic Opana ER), then any remaining funds will be allocated to Eligible Claimants in the other Allocation Pool. *Id.* ¶¶ 17-18.[17] Any remaining funds in either Allocation Pool will continue to be distributed until the distribution is no longer economically feasible, at which point Co-Lead Counsel will apply to the Court for a *cy pres* distribution to a charity or other nonprofit organization to be selected at a later date. *Id.* ¶ 19.

### G. The Court Should Schedule a Fairness Hearing to Finally Approve the Settlement

The last step in the settlement approval process is the final approval hearing, at which the Court may hear all evidence necessary to evaluate the proposed Settlement. At that hearing, proponents of the Settlement may explain and describe their terms and conditions and offer argument in support of the Settlement's approval, and members of the Settlement Class or their

---

[16] In light of the Court's question to Direct Purchaser Class Counsel at the preliminary approval hearing for their settlement with Impax, EPP Co-Lead Counsel asked Dr. Rosenthal to assess whether there were any variations in the per-mg price of the varying strengths of brand or generic Opana ER that would affect allocation of Settlement funds to the EPP Classes. As stated in her Declaration, Dr. Rosenthal "conducted a preliminary analysis of the IQVIA data, and, while there is some minor variation in the price per-mg across dosage strengths, it is unlikely that this variation would result in significant differences in the distribution of overcharges across class members (particularly among TPP class members with multiple members)." Rosenthal Decl. n.7.

[17] As explained in the Plan of Allocation, no payment will be made to an Eligible Claimant where the claim would result in a distribution of less than $5.00. Plan of Allocation ¶ 18.

counsel may be heard regarding the proposed Settlement if they choose. EPPs propose the following schedule of events necessary for a hearing on final approval of the Settlement:

| DATE | EVENT |
|---|---|
| Within 14 days after preliminary approval | Notice and Claims Administrator to provide direct mail and email notice, and commence the publication notice plan. |
| Within 45 days after preliminary approval | Co-Lead Counsel shall file a motion for attorneys' fees, unreimbursed litigation costs and expenses, and service awards for the Class Representatives, pursuant to the terms of the Settlement Agreement. |
| Within 60 days after Notice was mailed | Any objections by Class Members to the Impax Settlement Agreement or to Co-Lead Counsel's request for attorneys' fees, unreimbursed litigation costs and expenses, and service awards to the Class Representatives must (a) be submitted in writing, (b) be filed with the Clerk of Court, (c) be postmarked no later than sixty (60) days after Notice was mailed to the Class pursuant to Section VII(1), and (d) otherwise comply with the requirements set forth in the Notice. |
| Within 21 days after the objection deadline | No later than 21 days after the expiration of deadline for Class Members to object to the settlement and/or attorneys' fees, expenses and service awards, Co-Lead Counsel will file all briefs and materials in support of final approval of the settlement; and |
| 30 days after last day to object to the Settlement[18] | Final Settlement Fairness Hearing |

## CONCLUSION

For the foregoing reasons, End-Payor Plaintiffs respectfully request that the Court grant this motion in its entirety and enter an order (i) granting preliminary approval of the Settlement Agreement; (ii) approving the form and manner of the Notice Plan; (iii) appointing A.B. Data as

---

[18] Given the need for the Fairness Hearing to take place no earlier than 90 days after notice is mailed out to appropriate state officials under the Class Action Fairness Act of 2005, 28 U.S.C. § 1715(b), the earliest date a Fairness Hearing can likely take place is early to mid-December 2022.

Settlement Claims Administrator and Huntington Bank as Escrow Agent; (iv) establishing deadlines for filing of objections to the proposed settlement; and (v) scheduling the final Fairness Hearing.

Dated: August 12, 2022

Respectfully submitted,

/s/ Gregory S. Asciolla
Gregory S. Asciolla
Karin E. Garvey
Matthew J. Perez
DICELLO LEVITT GUTLZER LLP
One Grand Central Place
60 East 42nd Street, Suite 2400
New York, NY 10165
(646) 933-1000
gasciolla@dicellolevitt.com
kgarvey@dicellolevitt.com
mperez@dicellolevitt.com

/s/ Robert J. Wozniak
Michael J. Freed
Robert J. Wozniak
Brian M. Hogan
FREED KANNER LONDON
 & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
(224) 632-4500
mfreed@fklmlaw.com
rwozniak@fklmlaw.com
bhogan@fklmlaw.com

***Co-Lead Counsel for the End Payor Classes***