**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE OPANA ER ANTITRUST LITIGATION | MDL No. 2580 |
| | Lead Case No. 14-cv-10150 |
| THIS DOCUMENT RELATES TO: | Hon. Harry D. Leinenweber |
| All End-Payor Actions | |

**END-PAYOR PLAINTIFFS' MOTION FOR PAYMENT OF**
**ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES,**
**AND CLASS REPRESENTATIVE SERVICE AWARDS**

# **TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................ 1

II.     HISTORY OF THE LITIGATION ........................................................................... 3

A.      Complaints and Motions to Dismiss ......................................................................... 3

       B.      Discovery .......................................................................................................... 4

       C.      Class Certification............................................................................................. 5

       D.      Summary Judgment and *Daubert* Motions ........................................................ 5

       E.      Trial Preparation and Trial................................................................................ 6

       F.      Work Related to the Settlement ........................................................................ 9

       G.      Total Time and Expense .................................................................................. 10

III.    THE REQUESTED ATTORNEYS' FEES ARE REASONABLE UNDER
        CONTROLLING LAW ............................................................................................ 10

A.      The Impax Settlement Creates a Common Fund from Which Percentage-of-the-
        Fund Is the Appropriate Method for Awarding Attorneys' Fees..................................... 10

B.      Class Counsel's Fee Request Is Fair and Reasonable under Seventh Circuit
        Authority ......................................................................................................... 11

1.      Class Counsel Overcame Serious Litigation Risks........................................................ 13

2.      Class Counsel Achieved an Excellent Result for the Classes............................................ 15

3.      The Duration and Complexity of this Litigation Supports the Requested Fee ................. 17

4.      To Date No Class Member Has Objected to the Fee Request .......................................... 18

C.      A Cross-Check of Class Counsel's Lodestar Confirms the Reasonableness of the
        Fee Request....................................................................................................... 18

IV.     CLASS COUNSEL'S REQUEST FOR REIMBURSEMENT OF LITIGATION
        EXPENSES IS REASONABLE............................................................................... 20

V.      THE CLASS REPRESENTATIVES SHOULD RECEIVE SERVICE AWARDS ........ 20

VI.     CONCLUSION......................................................................................................... 22

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Americana Art China v. Foxfire Printing & Packaging, Inc.*,
    743 F.3d 243 (7th Cir. 2014) ............................................................................. 11, 12

*Arenson v. Bd. of Trade of City of Chi.*,
    372 F. Supp. 1349 (N.D. Ill. 1974) .......................................................................... 17

*Beesley v. Int'l Paper Co.*,
    2014 WL 375432 (S.D. Ill. Jan. 31, 2014) ............................................................... 11

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) ................................................................................................. 11

*Chambers v. Together Credit Union*,
    2021 WL 1948452 (S.D. Ill. May 14, 2021) ............................................................ 11

*City of Greenville v. Syngenta Crop Protection,Inc.*,
    904 F. Supp. 2d 902 (S.D. Ill. 2012) ....................................................................... 15

*Columbus Drywall & Insulation, Inc. v. Masco Corp.*,
    258 F.R.D. 545 (N.D. Ga. 2007) ............................................................................. 17

*Cook v. Niedert*,
    142 F.3d 1004 (7th Cir. 1998). .......................................................................... 19, 21

*Denius v. Dunlap*,
    330 F.3d 919 (7th Cir. 2003) ................................................................................... 19

*Florin v. Nationsbank of Georgia, N.A.*,
    34 F.3d 560 (7th Cir. 1994) ..................................................................................... 13

*Gaskill v. Gordon*,
    160 F.3d 361 (7th Cir. 1998) ................................................................................... 11

*Harman v. Lyphomed, Inc.*,
    787 F. Supp. 772 (N.D. Ill. 1992) ........................................................................... 14

*In re Aftermarket Filters Antitrust Litig.*,
    No. 1:08-cv-04883, Dkt. Nos. 1025, 1044 (N.D. Ill. Nov. 28, 2012) ...................... 13

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    2000 WL 204112 (N.D. Ill. Feb. 10, 2000) ............................................................ 16

*In re Broiler Chicken Antitrust Litig.*,
2021 WL 5578878 (N.D. Ill. Nov. 30, 2021). ................................................... 13, 21

*In re Cap. One Tel. Consumer Prot. Act Litig.*,
80 F. Supp. 3d 781 (N.D. Ill. 2015) ................................................................. 12

*In re Dairy Farmers of Am., Inc.*,
80 F. Supp. 3d 838 (N.D. Ill. 2015) ............................................ 11, 12, 13, 18

*In re Flonase Antitrust Litig.*,
291 F.R.D. 93 (E.D. Pa. 2013) ................................................................ 14, 17

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002) ............................................................................ 15

*In re Lithotripsy Antitrust Litig.*,
2000 WL 765086 (N.D. Ill. June 12, 2000) ............................................ 12, 13

*In re Opana ER Antitrust Litig.*,
2021 WL 2291067 (N.D. Ill. June 4, 2021) ..................................................... 6

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
No. 09-cv-07666, Dkt. Nos. 697, 701, 703 (N.D. Ill. Apr. 4, 2014),......................... 13

*In re Ready-Mixed Concrete Antitrust Litig.*,
2010 WL 3282591 (S.D. Ind. Aug. 17, 2010) ............................................ 12, 20

*In re Ready-Mixed Concrete Antitrust Litig.*,
No. 1:05-CV-00979, Dkt. No. 732 (S.D. Ind. March 31, 2009)............................... 17

*In re Shopping Carts Antitrust Litig.*,
1983 WL 1950 (S.D.N.Y. Nov. 18, 1983).......................................................... 17

*In re Southeastern Milk Antitrust Litig.*,
2013 WL 2155387 (E.D. Tenn. May 17, 2013)......................................... 14, 15, 16

*In re Synthroid Marketing Litig.*, \
264 F.3d 712 (7th Cir. 2001) ............................................... 12, 13, 17, 20

*In re Trans Union*,
629 F.3d 741 (7th Cir. 2011) ...................................................................... 13

*In re Urethane Antitrust Litig.*,
MDL No. 1616, Dkt. Nos. 3276, 3251 (D. Kan. July 29/June 1, 2016) ................... 16

*Jeffboat, LLC v. Dir., Office of Workers' Comp. Programs*,
    553 F.3d 487 (7th Cir. 2009) ........................................................ 19

*Kirchoff v. Flynn*,
    786 F.2d 320 (7th Cir. 1986) ........................................................ 12

*Leung v. XPO Logistics, Inc.*,
    326 F.R.D. 185 (N.D. Ill. 2018) .................................................... 19

*Matter of Cont'l Illinois Sec. Litig.*,
    962 F.2d 566 (7th Cir. 1992) ........................................................ 14

*Mills v. Electric Auto-Lite Co.*,
    396 U.S. 375 (1970) ...................................................................... 20

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985) ...................................................................... 15

*Pillsbury Co. v. Conboy*,
    459 U.S. 248 (1983) ...................................................................... 15

*Silverman v. Motorola Solutions, Inc.*,
    739 F.3d 956 (7th Cir. 2013) ........................................................ 11

*Standard Iron Works v. ArcelorMittal*,
    2014 WL 7781572 (N.D. Ill. Oct. 22, 2014) ................................ 13

*Sutton v. Bernard*,
    504 F.3d 688 (7th Cir. 2007) ........................................................ 12

*Williams v. Rohm & Haas Pension Plan*,
    2010 WL 4723725 (S.D. Ind. Nov. 12, 2010) .............................. 21

*Williams v. Rohm & Haas Pension Plan*,
    658 F.3d 629 (7th Cir. 2011) ........................................... 11, 12, 19

*Wright v. Nationstar Mortgage*,
    2016 WL 4505169 (N.D. Ill. 2016) .............................................. 18

*Yates v. Mobile Cnnty. Pers. Bd.*,
    719 F.2d 1530 (11th Cir.1983) .................................................... 14

**Rules**

Fed. R. Civ. P. 23 ................................................................... *passim*

## I.  INTRODUCTION

After more than eight years of litigation, completion of expansive fact and expert discovery, a Rule 23(f) appeal to the Seventh Circuit, and on the fifth day of a hard-fought trial that ultimately lasted three weeks, Class Counsel,[1] on behalf of two certified Classes[2] of End-Payor Plaintiffs ("EPPs"),[3] reached a settlement with Impax Laboratories, Inc. ("Impax") for $15 million. In vigorously litigating this case from inception through trial, Class Counsel incurred significant risk, committing substantial time and money—with no guarantee of any recovery. In fact, Class Counsel incurred a total of $4,005,833.95 in out-of-pocket costs and $25,071,514.50 of attorney and staff time (more than 50,000 hours). Joint Decl. ¶ 67.

---

[1] "Class Counsel" includes the two firms appointed as Co-Lead Counsel, DiCello Levitt LLC and Freed Kanner London & Millen LLC (hereinafter, "Co-Lead Counsel"), as well as the other firms representing the Classes that assisted with the prosecution of this litigation. *See* Declaration of Co-Lead Counsel Karin E. Garvey and Robert J. Wozniak in Support of End-Payor Plaintiffs' Motion for Payment of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Service Awards ("Joint Decl."), filed herewith.

[2] The Court certified the following Classes under Rule 23(b)(3) of the Federal Rules of Civil Procedure:

**Antitrust/Consumer Protection Class**: All persons or entities who indirectly purchased, paid for, and/or provided reimbursement for some or all of the purchase price for brand or generic Opana ER 5 mg, 10 mg, 20 mg, 30 mg, and/or 40 mg sold by Defendants, other than for resale, in the states and commonwealths of Arizona, California, Florida, Hawaii, Iowa, Maine, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Vermont, West Virginia, Wisconsin, and the District of Columbia from April 2011 through September 2018; and
**Unjust Enrichment Subclasses**: All persons or entities who from April 2011 through September 2018 indirectly purchased, paid for, and/or provided reimbursement for some or all of the purchase price for brand or generic Opana ER 5 mg, 10 mg, 20 mg, 30 mg, and/or 40 mg sold by Defendants, other than for resale, in the following states and commonwealths:

Subclass 1: Iowa, Michigan, Oregon, West Virginia
Subclass 2: Maine, New Mexico, Wisconsin
Subclass 3: Hawaii, Massachusetts, Mississippi, Nebraska, Vermont
Subclass 4: Florida, Minnesota, Missouri, Nevada, Pennsylvania, South Dakota, Utah
Subclass 5: Arizona, North Dakota.

[3] Plumbers and Pipefitters Local 178 Health & Welfare Trust Fund; Louisiana Health Service & Indemnity Company, d/b/a Blue Cross and Blue Shield of Louisiana; Fraternal Order of Police, Miami Lodge 20, Insurance Trust Fund; Wisconsin Masons' Health Care Fund; Pennsylvania Employees Benefit Trust Fund; and International Union of Operating Engineers, Local 138 Welfare Fund.

The $15 million recovery comes in a case layered with risk from start to finish, beginning with Impax and its co-Defendant Endo Health Solutions Inc., Endo Pharmaceuticals Inc., Penwest Pharmaceuticals Co. (together, "Endo") filing two motions to dismiss EPPs' operative complaints. Once those motions were decided, largely in EPPs' favor, Class Counsel conducted extensive discovery, including reviewing millions of pages of documents, participating in dozens of depositions, and engaging with multiple expert witnesses. Class Counsel did all of that, and more, leading up to class certification, summary judgment, and *Daubert* briefing—all major hurdles EPPs had to overcome. The Court's granting of EPPs' initial class certification motion did not alleviate the risk, as Defendants promptly appealed the Court's ruling to the Seventh Circuit Court of Appeals. Then, throughout most of 2021 and into 2022 (during a global pandemic), Class Counsel devoted an enormous amount of time and expense preparing for and going to trial. At no point was this case without substantial risk, as evidenced by Endo's trial victory. In short, the $15 million recovery is an excellent result achieved in an extremely challenging case.

EPPs obtained the $15 million in settlement only after intense and difficult negotiations with a large, sophisticated Defendant represented by a nationally recognized and highly experienced law firm. Since negotiating and executing a Memorandum of Understanding during trial, Co-Lead Counsel prepared the settlement agreement (together with counsel for Impax), preliminary approval motions, and supporting documents, including Court-approved notices to the certified EPP Classes. Co-Lead Counsel continue to expend time supervising the settlement administration process. Indeed, Co-Lead Counsel anticipates spending many additional hours preparing for the December 15, 2022 Fairness Hearing and overseeing the processing of claims and distribution of settlement funds to Class members.

As discussed further below, the record fully supports Class Counsel's request for a fee award of $5,000,000.00, or one-third of the settlement fund (including a *pro rata* share of the accrued interest). Courts in this Circuit regularly award one-third of common funds as attorneys' fees in antitrust class actions, even without the case proceeding to trial, and all relevant factors favor such an award here. This fee is substantially less than the time Class Counsel spent litigating the case on behalf of the EPP Classes, as it a represents approximately a 0.2 multiple of total hourly fees (or "lodestar"), based on historical hourly rates and work performed from the appointment of interim Co-Lead Counsel through the Court's preliminary approval of the settlement with Impax.[4] The record also shows that the litigation expenses for which Class Counsel seek reimbursement were reasonably necessary to advance the interests of the Classes and to obtain the favorable result. Finally, the record shows that the Class Representatives were instrumental to the success of this litigation and are deserving of the requested service awards.

## II.    HISTORY OF THE LITIGATION

### A.    Complaints and Motions to Dismiss

This action began eight years ago with the filing of a detailed complaint alleging that Defendants unreasonably restrained competition in the market for Opana ER and its AB-rated generic equivalents sold in the United States. Class Counsel expended substantial time, studying industry documents, conferring with industry consultants and economists, and performing extensive legal research to evaluate potential end-payor, or indirect, claims.

After appointment of Co-Lead Counsel, EPPs filed a Consolidated Amended Class Action Complaint on May 4, 2015 (ECF No. 102), which Defendants then moved to dismiss. ECF No.

---

[4] On August 24, 2022, the Court granted EPPs' Motion for Preliminary Approval of Proposed Settlement, Form and Manner of Notice to the Classes, and Proposed Schedule for a Final Fairness Hearing. *See* ECF No. 1069.

121. Co-Lead Counsel, with assistance from other Class Counsel, successfully briefed the opposition to the motion to dismiss, which the Court largely denied on February 10, 2016, dismissing certain state antitrust, consumer and unjust enrichment claims but granting EPPs leave to replead. ECF No. 151. On March 2, 2016, EPPs filed a Second Amended Class Action Complaint. ECF No. 164. On August 11, 2016, the Court largely rejected Defendants' arguments seeking dismissal of unjust enrichment claims under the laws of numerous states. ECF No. 210.

### B. Discovery

Following Defendants' motions to dismiss, frequently together with counsel for the Direct Purchaser Class Plaintiffs and the Retailer Plaintiffs, Co-Lead Counsel, again with assistance from Class Counsel, engaged in all aspects of discovery. Co-Lead Counsel drafted and served discovery requests on Defendants—more than 100 Requests for Production and 15 Interrogatories—and the parties participated in extensive meet-and-confers to negotiate the parameters of those requests. Joint Decl. ¶ 22. Co-Lead and Class Counsel also worked with the Class Representatives to prepare responses to Defendants' discovery requests. *Id*. at ¶¶ 79, 81, 83, 85, 87, 89. In addition, Co-Lead Counsel prepared and served discovery requests on various third parties, securing approximately 20,000 documents. *Id*. at ¶¶ 22-23. Co-Lead Counsel also created a database for reviewing and analyzing more than 4.5 million pages of documents produced by Defendants. *Id*. at ¶¶ 24, 73.

Armed with this valuable information obtained in discovery, Class Counsel then took, participated in, or defended dozens of Plaintiff, Defendant, and third-party fact witness depositions across the United States. *Id*. at ¶¶ 27-29. The parties also engaged in motion practice concerning numerous discovery disputes. *Id*. at ¶ 22.

### C.     Class Certification

In connection with class certification, Co-Lead Counsel retained (jointly with counsel for the Direct Purchaser Class Plaintiffs and Retailer Plaintiffs) 11 experts who issued 22 reports and sat for 22 depositions. *Id*. at ¶ 35. Because of the unique issues involving class-wide impact and damages for the EPPs, Class Counsel also retained separately, two additional experts, Meredith Rosenthal and Laura Craft, who prepared three reports and sat for three depositions. *Id*. at ¶¶ 30, 32. Class Counsel also spent a considerable amount time and effort preparing for and deposing Defendants' opposing experts, including James Hughes, an economist, who solely addressed issues concerning the EPP classes. *Id*. at ¶ 32. On June 4, 2021, following multiple rounds of lengthy briefing, the Court certified the End-Payor Classes under Rule 23(b)(3) of the Federal Rules of Civil Procedure. ECF No. 726.

On June 21, 2021, Defendants filed a petition for permission to appeal pursuant to Fed. R. Civ. P. 23(f). *See In Re: Opana ER Antitrust Litigation,* No. 21-8017, (7th Cir.), CA7 Dkt. 2. On July 1, 2021, EPPs filed a response in opposition. CA7 Dkt. 14. On July 13, 2021, the Seventh Circuit issued its ruling remanding the case to this Court for further consideration of the proposed amended EPP class definitions. CA7 Dkt. 17. On August 11, 2021, the Court amended its June 4, 2021 order to adopt proposed exclusions to the EPP class definitions. ECF No. 746.

### D.     Summary Judgment and *Daubert* Motions

Defendants moved for summary judgment on causation and damages, arguing that Plaintiffs suffered no antitrust injury because Defendants' settlement agreement in the underlying patent litigation allegedly promoted competition and hastened generic entry by granting Impax a so-called "broad license" that purportedly permitted Impax to continue selling generic Opana ER after Endo acquired certain later-issued patents. ECF Nos. 539, 540. Endo also moved for partial summary judgment on several complex patent issues related to the prior patent litigation, seeking

to prevent Plaintiffs from (a) recovering damages after the issuance of the later-issued patents; and (b) presenting certain arguments and defenses related to Impax's purported patent infringement. ECF Nos. 532, 533. Along with its summary judgment motions and replies, Defendants collectively submitted 160 pages of alleged undisputed facts and 138 exhibits. ECF Nos. 562, 581. Defendants also filed 11 *Daubert* motions with an additional 109 exhibits.[5] Class Counsel opposed with two summary judgment briefs, submitting their own statements of undisputed facts and responses to Defendants' statements of facts and exhibits. ECF Nos. 615, 617-21, 639, 644. In addition, Plaintiffs filed 10 *Daubert* motions of their own, supported by 98 exhibits, and opposed each of Defendants' 11 *Daubert* motions, supported by 60 exhibits.[6]

On June 4, 2021, in a 29-page opinion, the Court denied Defendants' summary judgment motions and denied, at least in part, all but one *Daubert* motion filed by Defendants. *See In re Opana ER Antitrust Litig.*, 2021 WL 2291067 (N.D. Ill. June 4, 2021).

### E.     Trial Preparation and Trial

Throughout the end of 2021 and the first half of 2022 (during a global pandemic), Co-Lead Counsel devoted an enormous amount of time and expense preparing for trial. Joint Decl. ¶ 48. After the Court issued its summary judgment and *Daubert* rulings, Co-Lead Counsel submitted a supplemental report prepared by EPP damages expert Dr. Rosenthal, who was subsequently

---

[5] ECF Nos. 510 & 512 (Tupman), 513 & 515 (DeLeon), 516 (Molina), 529 (Leitzinger), 537 & 542 (Bruno), 541 & 544 (Belvis), 545 & 560 (Rosenthal) 546 & 549 (Byrn), 550 & 554 (Zettler and Lessem), 556 & 559 (McGuire), 757 & 758 (Leitzinger, renewed).

[6] ECF Nos. 519 (Patel), 520 (Singer), 521 (Figg), 522 (Lowman), 523 (excluding opinions concerning lawsuits and patents that post-date the reverse payment agreement), 524 (Fassihi), 525 (Gilligan), 526 (Addanki), 527 (Green), 528 (Berneman), 534 (Declaration and Exhibits in support of *Daubert* motions), 565 (Patel reply), 566 (Singer reply), 568 (Figg reply), 569 (Lowman reply), 571 (Post-date reply), 572 (Fassihi reply), 573 (Gilligan reply), 575 (Addanki reply), 576 (Green reply), 577 (Berneman reply), 598 (Rosenthal opposition), 600 (Tupman opposition), 602 (DeLeon opposition), 603 (Molina opposition), 604 (Bruno opposition), 605 (Belvis opposition), 609 (Leitzinger opposition), 613 (McGuire opposition), 614 (Zettler & Lessem opposition), 616 (Byrn opposition), 762 (Leitzinger renewed opposition).

deposed for a third time. *Id*. at ¶ 47. In addition, Defendants moved to exclude Dr. Rosenthal's opinion for a second time, which Co-Lead Counsel opposed, and the Court ultimately denied. *Id*.

Leading up to trial, Defendants filed 23 motions *in limine*. ECF Nos. 801-05, 814-15, 817-20, 822, 824-25, 827, 829, 831. Co-Lead Counsel opposed most of those motions and, together with counsel for the Direct Purchaser Class Plaintiffs and the Retailer Plaintiffs, filed seven motions *in limine* of their own. ECF Nos. 806-12, 839, 842-43, 845-46, 848, 865.

On May 24, 2022, the parties filed a Joint Final Pretrial Order, which included, *inter alia*, witness lists, exhibit lists, deposition designations (including counter and rebuttal designations), and proposed jury instructions and verdict forms. *See* ECF No. 895. Together with counsel for the Direct Purchaser Class Plaintiffs and the Retailer Plaintiffs, Co-Lead Counsel continued to prepare for trial as follows:

- Named 27 fact witnesses and nine expert witnesses and prepared to examine or present them live or via video depositions at trial. Joint Decl. ¶ 48(d). Endo and Impax named 44 witnesses, which Plaintiffs prepared to cross-examine or present either live or via counter-designated video depositions at trial. *Id*.

- Submitted a 186-page spreadsheet of deposition designations, to which Defendants objected and counter-designated deposition testimony. *Id*. at ¶48(e). Plaintiffs replied by responding to Defendants' objections, as well as by objecting and providing reply-designations in response to Defendants' counter-designations. *Id*. Endo submitted a 104-page spreadsheet of deposition designations and Impax submitted a 105-page spreadsheet. *Id*. For each, Plaintiffs responded with objections and counter-designations. *Id*.

- Prepared a final exhibit list with 1,664 exhibits, while Endo offered 618 and Impax offered 190, which Plaintiffs responded to with objections where appropriate. *Id*. at ¶ 48(h).

- Prepared general jury instructions, Phase I jury instructions, and Phase II jury instructions, as well as a statement for the Court in support of their jury instructions, totaling more than 250 pages. *Id*. at ¶ 48(f). Co-Lead Counsel also assisted in preparing objections to Endo's and Impax's separate, opposing jury instructions and responses to Endo's and Impax's objections to Plaintiffs' proposed jury instructions. *Id*.

- Prepared proposed verdict forms for Phase I and Phase II, along with a supportive statement and objections to Endo's and Impax's separate proposed verdict forms. *Id.* at ¶ 48(g).

Co-Lead Counsel travelled to and met in Chicago prior to the final pre-trial conference on June 2, 2022, to submit to court-mandated COVID testing and further coordinate with other plaintiff groups on trial strategy. *Id*. at ¶ 49. Co-Lead Counsel telephonically attended the pretrial conference addressing the Court's rulings on motions *in limine* and instructions related to jury selection and trial logistics, among other things. *Id*. In preparation for jury selection, Co-Lead Counsel reviewed over 200 pages of juror information and questionnaire responses. *Id*. at ¶ 50. The trial began with *voir dire* on June 9, 2022. *Id*. at ¶ 51. A jury was selected that morning and all parties, including Class Counsel, offered opening arguments that afternoon. Class Counsel attended each day of trial during the day, examining witnesses, countering any objections raised by Defendants, and proffering objections of their own. *Id*. at ¶ 52. Each evening, for witnesses whose deposition testimony was presented at trial by video, Class Counsel, in coordination with

the other plaintiff groups, exchanged exhibit lists, deposition designations, related objections, counter-designations, and reply-designations with Defendants. *Id*.

Ultimately, EPPs and Impax reached an agreement-in-principle five days into trial, on June 15, 2022, that resulted in the Settlement Agreement. The trial continued through the remainder of June against Endo, and the jury ultimately returned a verdict in Endo's favor on July 1, 2022. *Id*.

### F.     Work Related to the Settlement

In addition to the litigation work described above, Class Counsel performed the following tasks on behalf of the EPP Classes in connection with the Impax settlement:

- Engaged with Impax multiple times during the course of the eight-year litigation to discuss settlement (*Id*. at ¶ 53);

- During the middle of trial, negotiated with counsel for Impax, and worked with them to prepare and execute a Memorandum of Understanding (*id*. ¶¶ 53, 55);

- Over several weeks following trial, worked with counsel for Impax to prepare and execute the Settlement Agreement (*id*. at ¶ 55);

- Selected a claims administrator and worked with the claims administrator to establish a settlement website for the benefit of the Classes (*id*. at ¶ 56);

- Selected an escrow agent and prepared and executed the necessary paperwork to facilitate settlement payments (*id*.);

- Prepared EPPs' motions for preliminary approval and final approval, and supporting papers regarding the Impax settlement, including the related notice papers and proposed orders, and presented those motions to the Court (*id*. ¶¶ 57-58);

### G. Total Time and Expense

In total, Class Counsel devoted more than 50,000 hours and $25,071,514.50 in time to prosecute the claims on behalf of the EPP Classes, all of which was advanced on a fully contingent basis with no guarantee of recovery. *Id.* at ¶ 67. The requested one-third fee award of $5 million is thus substantially less than total lodestar accrued in prosecuting this action on behalf of the Classes and, as noted, represents a small portion of Class Counsel's total hourly fees.

### III. THE REQUESTED ATTORNEYS' FEES ARE REASONABLE UNDER CONTROLLING LAW

In its order preliminarily approving the settlement with Impax, the Court approved the dissemination of notice to Class members (the "Notice"). As required by Fed. R. Civ. P. 23(h), the Notice informs Class members that Co-Lead Counsel expected to request attorneys' fees not to exceed 33-1/3% of the Settlement Fund, reimbursement of litigation expenses, and service awards for each Class Representative. *See* Notice (Question 14). The Notice also explains how Class members can object to Class Counsel's fee, expense, and service award requests. *Id.* (Question 10). The deadline for objections is November 7, 2022; to date, no objections are pending.[7] Consistent with the Notice provided to Class members (by mail, email, and publication), Class Counsel seeks attorneys' fees in the amount of one-third ($5,000,000.00) of the Settlement Fund.

### A. The Impax Settlement Creates a Common Fund from Which Percentage-of-the-Fund Is the Appropriate Method for Awarding Attorneys' Fees

Under Fed. R. Civ. P. 23(h), "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." As the Supreme Court recognized, "[A] lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."

---

[7] After the applicable deadline passes and prior to the Fairness Hearing, Co-Lead Counsel will file a report with the Court regarding any objections that may be filed.

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). The common fund doctrine is based on the inherent powers of the federal court to "prevent . . . inequity by assessing attorney's fees against the entire Fund, thus spreading fees proportionately among those benefited by the suit." *Id*.

Most courts in the Seventh Circuit use the percentage-of-the-fund methodology in the common fund cases. *See, e.g.*, *Gaskill v. Gordon*, 160 F.3d 361, 363 (7th Cir. 1998) (collecting cases) ("When a class suit produces a fund for the class, it is commonplace to award the lawyers for the class a percentage of the fund, in recognition of the fact that most suits for damages in this country are handled on the plaintiffs' side on a contingent-fee basis."); *Chambers v. Together Credit Union*, 2021 WL 1948452, at *1 (S.D. Ill. May 14, 2021) ("[T]he percentage method is employed by the vast majority of courts in the Seventh Circuit"); *In re Dairy Farmers of Am., Inc.*, 80 F. Supp. 3d 838, 845 (N.D. Ill. 2015) (the percentage method has "emerged as the favored method for calculating fees in common–fund cases in this district"); *Beesley v. Int'l Paper Co.*, 2014 WL 375432, at *2 (S.D. Ill. Jan. 31, 2014) ("When determining a reasonable fee, the Court of Appeals for the Seventh Circuit uses the percentage basis rather than a lodestar or other basis.") (citation omitted).

**B.    Class Counsel's Fee Request Is Fair and Reasonable under Seventh Circuit Authority**

In the Seventh Circuit, the approach to setting attorneys' fees is clear: District courts should "always seek to replicate the market value of an attorney's services . . . ." *Americana Art China v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 246 (7th Cir. 2014). Put another way, "the district court must try to assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys." *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) (*Rohm & Haas II*). *See also Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 957 (7th Cir. 2013) (fees "should approximate the market rate that prevails between willing buyers and willing

11

sellers of legal services"); *Sutton v. Bernard*, 504 F.3d 688, 693 (7th Cir. 2007) (courts must determine "what the parties would have agreed to had negotiations occurred at the outset"); *In re Synthroid Marketing Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid*") ("[W]hen deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services [.]"). The percentage-of-the-fund method utilizes an *ex ante* approach, in which courts award a fee approximating a hypothetical *ex ante* bargain between the class and its attorneys. *See Americana Art China Co.,* 743 F.3d at 246-47; *Rohm & Haas II*, 658 F.3d at 635. Thus, the "Seventh Circuit has directed district courts, when deciding whether requested fees are excessive, to estimate the contingent fee that the class would have negotiated with Class Counsel at the outset of the litigation, had 'negotiations with clients having a real stake been feasible.'" *In re Cap. One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 794 (N.D. Ill. 2015) (*quoting In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir. 2011)).

A contingent fee based on a percentage of the recovery is the most common form of compensation for counsel representing classes in class action litigation, and it is no different in antitrust class action litigation where "the 'market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time,' is a contingent fee in the amount of one-third (1/3) of the common fund recovered." *In re Ready-Mixed Concrete Antitrust Litig.*, 2010 WL 3282591, at *3 (S.D. Ind. Aug. 17, 2010) (citing *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007)); *Dairy Farmers of Am.*, 80 F. Supp. 3d at 862; *In re Lithotripsy Antitrust Litig.*, 2000 WL 765086, at *2 (N.D. Ill. June 12, 2000) (noting that "[m]any courts in this district have utilized" the percentage method to set fees in class actions); *Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986) ("When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee is the 'market rate.'").

Judge Durkin recently awarded attorneys' fees of one-third of the common fund in an antitrust case, holding that "[t]here is simply little to no precedent recommending anything other than an award of 33 percent. With the only real evidence of the "market rate" being one-third, that is what the Court will award." *In re Broiler Chicken Antitrust Litig.*, 2021 WL 5578878, at *4 (N.D. Ill. Nov. 30, 2021). Here, a fee award of one-third of the common fund reflects a real-world arm's length transaction between the Classes and Class Counsel and is a generally accepted percentage in the Seventh Circuit, especially in antitrust cases. *See, e.g.*, *Standard Iron Works v. ArcelorMittal*, 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014) (awarding fees equal to one-third of the common fund); *In re Potash Antitrust Litig.*, No. 1:08-cv-06 910 (N.D. Ill. June 12, 2013), Dkt. Nos. 589, 592 (awarding fees equal to one-third of the common fund plus expenses); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, No. 09-cv-07666 (N.D. Ill. Apr. 4, 2014), Dkt. Nos. 697, 701, 703 (awarding fees equal to one-third of the common fund); *Dairy Farmers of Am.*, 80 F. Supp. 3d 838 (awarding fees equal to one-third of the common fund); *In re Aftermarket Filters Antitrust Litig.*, No. 1:08-cv-04883 (N.D. Ill. Nov. 28, 2012), Dkt. Nos. 1025, 1044 (awarding fees equal to one-third of the common fund); *In re Lithotripsy*, 2000 WL 765086, at *2 ("33.3% of the fund plus expenses is well within the generally accepted range of the attorneys' fee awards"). A consideration of the factors involved in this complex antitrust case supports Class Counsel's requested fee.

### 1.     Class Counsel Overcame Serious Litigation Risks

The Seventh Circuit has recognized that, because of the risks incurred, fee awards must be evaluated "in light of the risk of nonpayment," *Synthroid*, 264 F.3d at 718, and that "a higher risk of loss does argue for a higher fee." *In re Trans Union*, 629 F.3d at 746. *See also Florin v. Nationsbank of Georgia, N.A,*, 34 F.3d 560, 565 (7th Cir. 1994) ("a court must assess the riskiness of the litigation by measuring the probability of success of this type of case at the outset of the

litigation") (emphasis in original). The risk here was significant. *See, e.g.*, *Matter of Cont'l Illinois Sec. Litig.*, 962 F.2d 566, 569 (7th Cir. 1992), *as amended on denial of reh'g*, 985 F.2d 867 (7th Cir. 1992) ("[T]he failure to make any provision for risk of loss may result in systematic undercompensation of plaintiffs' counsel in a class action case, where . . . the only fee that counsel can obtain is, in the nature of the case, a contingent one."); *Harman v. Lyphomed, Inc.*, 787 F. Supp. 772, 782 (N.D. Ill. 1992) ("[L]awyers in successful contingent fee cases should receive a fee twice what they would have received from clients whose payment is not contingent on success.").[8]

From an *ex ante* perspective, Class Counsel bore the risks of (i) multiple motions to dismiss; (ii) credible defense arguments and *Daubert* challenges at class certification; (iii) after initial success at the class certification stage, a Fed. R. Civ. P. 23(f) review; (iv) litigating during the emerging pandemic; and (v) all other risks of litigation on the merits, including summary judgment, *Daubert* motions, other evidentiary challenges, trial risks on liability and damages, post-trial motions, appeals, and much more. *See* Joint Decl. ¶¶ 91-99 (detailing case-specific risks).

Given these potential pitfalls, the *ex ante* risk of the case justifies a substantial fee award to compensate Class Counsel for pursuing the claims in the first instance, litigating effectively for eight years without compensation, financing millions of dollars of case costs with no guarantee of reimbursement, and ultimately achieving outstanding results.[9] *See, e.g.*, *City of Greenville v.*

---

[8] *See also Yates v. Mobile Cnty. Pers. Bd.*, 719 F.2d 1530, 1533 (11th Cir.1983) ("Lawyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of result.") (citation omitted); *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 104 (E.D. Pa. 2013) ("[A]s a contingent fee case, counsel faced a risk of nonpayment in the event of an unsuccessful trial. Throughout this lengthy litigation, class counsel did not receive any payment. This factor supports approval of the requested fee [of 33 1/3 percent].").

[9] It is also important to reward Class Counsel in this situation to incentivize private enforcement of the antitrust laws. *See In re Southeastern Milk Antitrust Litig.*, 2013 WL 2155387, at *5 (E.D. Tenn. May 17, 2013) ("failing to fully compensate class counsel for the excellent work done and the various substantial risks taken would undermine society's interest in the private litigation of antitrust cases. Society's interests

14

*Syngenta Crop Protection,Inc.*, 904 F. Supp. 2d 902, 909 (S.D. Ill. 2012) ("Given the extreme difficulty presented by this matter and the attendant risk in investing years of attorney time carrying millions of dollars in litigation expenses with no guarantee of recovery, a substantial risk multiplier is warranted" and a "fee award of one-third of the fund is thus appropriate[.]"); *Southeastern Milk Antitrust Litig.*, 2013 WL 2155387, at *5 ("counsel undertook this case on a contingency-fee basis and accepted a substantial risk of nonpayment for legal work and reimbursement of out-of-pocket expenses advanced. The Court finds that the fee awarded should fully reflect the risk taken by these lawyers and is a very substantial factor in this case that weighs in favor of the requested [one-third] fee").

### 2. Class Counsel Achieved an Excellent Result for the Classes

The effective and efficient prosecution of this case by Class Counsel over eight years, through fact and expert discovery, class certification (including a Fed. R. Civ. P. 23(f) appeal to the Seventh Circuit), summary judgment, trial preparation, and trial led to the $15 million settlement with Impax. Not only does that settlement assure that Class members will receive a cash payment to compensate them for their injuries, but it also eliminated the risk of the adverse ruling at trial.

This case was a massive undertaking and the volume of work supporting the requested fee is substantial. Very few antitrust cases proceed to trial and even fewer reach a jury verdict. This is

---

are clearly furthered by the private prosecution of civil cases which further important public policy goals, such as vigorous competition by marketplace competitors."); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 635 (1985) ("[w]ithout doubt, the private cause of action plays a central role in enforcing this [antitrust] regime."); *Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983) ("This court has emphasized the importance of the private action as a means of furthering the policy goals of certain federal regulatory statutes, including the federal antitrust laws."); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664 (7th Cir. 2002) (same).

one of only two reverse payment antitrust cases to go to verdict since the Supreme Courts *Actavis* decision in 2013. Class Counsel spent more than 50,000 hours of attorney and support staff time collectively. Moreover, the very nature of the case—a nationwide antitrust class action against two large Defendants represented by dozens of lawyers from the country's preeminent defense firms— presented significant challenges that underscore the scope of the undertaking. For example, although Plaintiffs presented evidence that the underlying patent dispute was settled with anticompetitive terms that put millions of dollars in Impax's pockets in exchange for delayed market competition against Endo's Opana ER product, Defendants forcefully argued that the patent deal was procompetitive because it is the only reason a generic version of Opana ER has been consistently on the market through today.

On each and every issue raised by Defendants and their capable lawyers—from the motion to dismiss stage, to major discovery disputes, to the highly contested class certification, *Daubert*, and summary judgment issues—Class Counsel argued their case professionally and effectively. Class Counsel also attempted to minimize the number of disputes requiring Court involvement by meeting and conferring exhaustively (and often productively) with defense counsel.[10] Class Counsel respectfully submit that their representation has been vigorous, efficient, and effective, and that the facts, arguments, and credibility they developed throughout the litigation were key to achieving the Impax settlement for the Class. As such, the quality of Class Counsel's representation supports the requested fee.

---

[10] Class Counsel made every effort to work the case efficiently and, in Co-Lead Counsel's experience, the total reported lodestar is reasonable for a multi-defendant case of this nature. *See, e.g.*, *Southeastern Milk Antitrust Litig.*, 2013 WL 2155387, at *5, 7 (lodestar over $53 million after five years of litigation); *In re Brand Name Prescription Drugs Antitrust Litig.*, 2000 WL 204112, at *3 (N.D. Ill. Feb. 10, 2000) (lodestar of $84 million after approximately six years of litigation); *In re Urethane Antitrust Litig.*, MDL No. 1616, Dkt. Nos. 3276, 3251 (D. Kan. July 29/June 1, 2016) (lodestar of over $100 million based on 193,000 hours of time over more than ten years of litigation).

### 3. The Duration and Complexity of this Litigation Supports the Requested Fee

Many courts recognize that antitrust cases are among the most challenging, difficult, and expensive cases to litigate. *See, e.g.*, *Arenson v. Bd. of Trade of City of Chi.*, 372 F. Supp. 1349, 1352 (N.D. Ill. 1974) ("An antitrust class action is arguably the most complex action to prosecute," because "[t]he legal and factual issues involved are always numerous and uncertain in outcome."); *In re Flonase Antitrust Litig.*, 291 F.R.D. at 98-99 ("Antitrust class actions are particularly complex to litigate and therefore quite expensive."); *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 258 F.R.D. 545, 559 (N.D. Ga. 2007) ("[C]ourts have found that antitrust actions generally present complex, novel issues, and that plaintiffs can rarely guarantee recovery at trial."); *In re Shopping Carts Antitrust Litig.*, 1983 WL 1950, at *7 (S.D.N.Y. Nov. 18, 1983) ("[A]ntitrust price fixing actions are generally complex, expensive and lengthy."). *See also In re Ready-Mixed Concrete Antitrust Litig.*, No. 1:05-CV-00979 (S.D. Ind. March 31, 2009), Dkt. No. 732 at 6-8 (discussing myriad risks facing antitrust class counsel).

Here, Defendants spared no effort in challenging EPPs' allegations from the initial complaints through a trial verdict. As described above, the unusually high risk, length, and complexities of this case, coupled with the caliber of performance and quality of work performed by Class Counsel, including during trial, warrant the requested fee. Despite the very real risk of nonpayment, Class Counsel committed eight years, over 50,000 attorney and professional hours, and more than $4 million in unreimbursed expenses to ensure the vigorous prosecution of this case. *See Synthroid*, 264 F.3d at 721 ("The market rate for legal fees depends in part on … the amount of work necessary to resolve the litigation.").

This litigation was especially complex. Class Counsel had to grapple with numerous factual obstacles, including: a settlement agreement that contained a "broad license" for later-issued

patents; Endo's success litigating patent infringement lawsuits against other generic manufacturers for those later-issued patents; a complicated payment provision called the "Endo Credit" contained in the settlement agreement; the DCA signed in conjunction with the settlement agreement and disputes over its related payments; Endo's efforts to convert the market from original Opana ER to reformulated Opana ER and disputes regarding the latter product's safety and abuse deterrence, related petitions filed with and decisions issued by the FDA, and Endo's ultimate decision to remove reformulated Opana ER from the market at the FDA's request. It is hard to overstate the challenges Class Counsel faced in making the complexities of this case comprehensible to a lay jury. The time and labor involved in prosecuting this case, and the novelty and difficulty of the questions presented, support Class Counsel's fee request.

### 4. To Date No Class Member Has Objected to the Fee Request

A lack of objections by class members as to fees requested by counsel weighs in favor of the reasonableness of the fees. As noted above, the Court-approved notice of the Impax settlement informed Class members that Co-Lead Counsel would request attorneys' fees not to exceed one-third of the Settlement Fund (as well as reimbursement of litigation expenses, and service awards for the Class Representatives). Although the deadline for objections to the Impax settlement and Class Counsel's fee request has not yet passed, it is notable that not a single Class member has yet objected to the Impax settlement.

### C. A Cross-Check of Class Counsel's Lodestar Confirms the Reasonableness of the Fee Request

While the percentage-of-the-fund method is favored in the Seventh Circuit for calculating fees in common fund cases, *Dairy Farmers*, 80 F. Supp. 3d at 844, courts may use a lodestar[11]

---

[11] The lodestar is derived by multiplying the hourly rate of the attorney or professional by the number of hours reasonably expended. *Wright v. Nationstar Mortgage*, 2016 WL 4505169, at *14 (N.D. Ill. 2016). A reasonable hourly rate is one that is consistent with the common rate in the "community for

cross-check to understand class counsel's time and effort and determine the reasonableness of a fee. *Id*. But this cross-check is not required. *Rohm & Haas II*, 658 F.3d at 636 ("[C]onsideration of a lodestar check is not an issue of required methodology"); *accord Leung v. XPO Logistics, Inc.*, 326 F.R.D. 185, 204 (N.D. Ill. 2018) ("The Court is not required to check its percentage-of-fee determination against the lodestar."). And the Seventh Circuit has "never ordered [a] district judge to ensure that the lodestar result mimics that of the percentage approach." *Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998).

Regardless, a lodestar cross-check in this case easily supports the requested fee of $5 million, which represents a small fraction (approximately 0.2) of overall Class Counsel lodestar. The risks, complexities and challenges Class Counsel faced are discussed in detail above. During the more than eight years of litigation, Class Counsel invested over 50,000 hours of attorney and other professional time from appointment of interim Co-Lead Counsel for the EPPs through preliminary approval of the Impax settlement being granted on August 24, 2022. (*See* Joint Decl. ¶ 67 & Ex. A.) The average hourly rate by Class Counsel and their associated professional staff is approximately $488 (with a cap of $350 per hour for document review (*see* Joint Decl. ¶ 63)), a rate comparable to those of other law firms with similar experience, expertise, and reputation, for similar services in the nation's leading legal markets. Class Counsel's base lodestar is more than $25 million. Awarding one-third of the common fund ($5 million) as a fee is fair and reasonable in light of the total lodestar accrued by Class Counsel in prosecuting this extremely complex case over the course of many years.

---

similar services by lawyers of reasonably comparable skill, experience and reputation." *See Jeffboat, LLC v. Dir., Office of Workers' Comp. Programs*, 553 F.3d 487, 489 (7th Cir. 2009); *see also Denius v. Dunlap*, 330 F.3d 919, 930 (7th Cir. 2003) (holding that the attorney's billing rate for comparable work is generally appropriate).

## IV.    CLASS COUNSEL'S REQUEST FOR REIMBURSEMENT OF LITIGATION EXPENSES IS REASONABLE

Under the common fund doctrine, class counsel customarily is entitled to reimbursement of reasonable expenses incurred in the litigation. *See* Fed. R. Civ. P. 23(h); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 392 (1970) (recognizing the right to reimbursement of expenses where a common fund has been produced or preserved for the benefit of a class); Alba Conte, *Attorney Fee Awards* § 2.08, at 50-51 (3d ed. 2004). Reimbursable expenses are those "that are consistent with market rates and practices." *Ready-Mixed Concrete*, 2010 WL 3282591, at *3; *see also Synthroid*, 264 F.3d at 722 ("Reducing litigation expenses because they are higher than the private market would permit is fine; reducing them because the district judge thinks costs too high in general is not.").

In notifying Class members of the Impax settlement, Class Counsel advised that they would seek repayment of such litigation expenses. Class Counsel's expenses total $4,005,833.95 and consist of the following three categories of expenses: (1) expenses incurred individually by each firm, (2) expenses paid by the common Litigation Fund, and (3) invoiced but as-yet unpaid amounts relating to expert and consultant costs, database and trial expenses, and class notice as directed by the Court. *See* Joint Decl. Ex. B. Class Counsel have paid expenses to date totaling $2,704,270.40. Outstanding invoices not yet paid total $1,374,823.30. Expenses in each of these categories are described in detail in the Joint Declaration and its exhibits, and they were reasonably necessary to advance the interests of the Classes and to obtain the favorable result achieved.

## V.    THE CLASS REPRESENTATIVES SHOULD RECEIVE SERVICE AWARDS

EPPs also request approval for service awards to be paid from the Impax settlement totaling $65,000, with each Class Representative to receive $10,000, and Wisconsin Masons' Health Care Fund receiving an additional $5,000 ($15,000 in total) for its time preparing for and testifying at

20

trial. Courts consider various factors when determining an appropriate service award, including "the actions the [representative] has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the [representative] expended in pursuing the litigation." *Cook*, 142 F.3d at 1016 (citing *Spicer v. Chicago Bd. Options Exch., Inc.*, 844 F. Supp. 1226, 1267 (N.D. Ill. 1993)).

As in this case, class representatives frequently contribute to the successful resolution of a class action by assisting with the preparation of the pleadings, participating in discovery, and continually providing information to class counsel. *Williams v. Rohm & Haas Pension Plan* ("*Rohm & Haas I*"), 2010 WL 4723725, at *2 (S.D. Ind. Nov. 12, 2010), *aff'd*, 658 F.3d 629 (7th Cir. 2011) ("Because a named plaintiff plays a significant role in a class action, an incentive award is appropriate as a means of inducing that individual to participate in the expanded litigation on behalf of himself and others."). Their contributions undoubtedly benefit the class as a whole, and courts in the Seventh Circuit often see fit to compensate class representatives for their service to the class. *See Cook*, 142 F.3d at 1016 (affirming $25,000.00 service award); *In re Broiler Chicken Antitrust Litig.*, 2021 WL 5578878, at *5 (interim $15,000 service award).

Throughout this litigation, the Class Representatives advised Class Counsel and approved pleadings, reviewed and responded to written discovery, searched for, gathered, preserved, and produced documents, prepared for and stood for depositions, kept up to date on the progress of the case, and, in the case of Wisconsin Masons' Health Care Fund, appeared at trial to testify. Joint Decl. ¶¶ 77-90. The Class Representatives were never promised that they would receive any compensation for leading the case. *Id*. at ¶ 78. Rather, they devoted their time and efforts solely to recover some portion of their own overcharges and to enable other Class members to recover theirs.

*Id*. Their help was instrumental to the success of this litigation, and EPPs respectfully submit that the requested service awards are well deserved.

## VI.    CONCLUSION

For all the reasons discussed above, the End-Payor Plaintiffs respectfully request that the Court: (1) award Class Counsel one-third ($5,000,000.00) of the Settlement Fund as attorneys' fees as well as a *pro rata* share of the accrued interest; (2) order reimbursement of litigation expenses incurred by Class Counsel in the amount of $4,005,833.95; and (3) award a total of $65,000 in service awards for the six Class Representatives.


Dated:  October 11, 2022                                  Respectfully submitted,

*/s/ Karin E. Garvey*                                        */s/ Robert J. Wozniak*
Gregory S. Asciolla                                        Michael J. Freed
Karin E. Garvey                                             Robert J. Wozniak
Matthew J. Perez                                           FREED KANNER LONDON
DICELLO LEVITT LLC                                     & MILLEN LLC
485 Lexington Ave., 10th Floor                      2201 Waukegan Road, Suite 130
New York, NY  10017                                     Bannockburn, IL  60015
(646) 933-1000                                              (224) 632-4500
gasciolla@dicellolevitt.com                           mfreed@fklmlaw.com
kgarvey@dicellolevitt.com                            rwozniak@fklmlaw.com
mperez@dicellolevitt.com


*Co-lead Counsel for the End Payor Classes*